# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| SARAH MOLINA, ) | |
| ) | |
| CHRISTINA VOGEL, ) | |
| ) | |
| and ) | |
| ) | |
| PETER GROCE, ) | |
| ) | **JURY TRIAL DEMANDED** |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No.:   4:17-cv-2498 |
| ) | |
| CITY OF ST. LOUIS, MISSOURI, ) | |
| ) | |
| COUNTY OF ST. CLAIR, ILLINOIS, ) | |
| ) | |
| and ) | |
| ) | |
| OFFICERS JOHN DOES I–VI, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiffs Sarah Molina, Christina Vogel, and Peter Groce allege as follows:

## INTRODUCTION

1. Plaintiffs bring this civil-rights action against the City of St. Louis, Missouri; St. Clair County, Illinois; and several of their police officers for retaliating against Plaintiffs for their First Amendment-protected activity and by unreasonably seizing Plaintiffs and applying excessive force by shooting tear gas and pepper spray at them though they were unarmed, non-threatening, non-violent, non-resisting, and not suspected of committing any crime. Plaintiffs seek judgment against the individual officers for violating their clearly established First Amendment and Fourth Amendment rights and

1

against St. Clair County and St. Louis City for their maintenance of a constitutionally infirm custom or policy and their failure to train and supervise their officers.

## PARTIES

2. Plaintiff Sarah Molina is a citizen of Missouri who resides in St. Louis County.

3. Plaintiff Christina Vogel is a citizen of Missouri who resides in St. Louis County.

4. Plaintiff Peter Groce is a citizen of Missouri who resides in the City of St. Louis.

5. Defendant St. Louis City is a municipal corporation of the State of Missouri.

6. Defendant St. Clair County is a municipal corporation of the State of Illinois.

7. Defendants Officers John Does I-VI are police officers employed by either the St. Louis Metropolitan Police Department or St. Clair County Sheriff's Department who were, at all times relevant to this complaint, acting under color of law. They are sued in their individual capacity.

## JURISDICTION AND VENUE

8. Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and the First and Fourth Amendments to the United States Constitution, incorporated as against States and their municipal divisions through the Fourteenth Amendment.

9. The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of a right secured by the Constitution of the United States.

10. Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

11. Divisional venue is proper in the Eastern Division because the a substantial part of the events leading to the claims for relief arose in the City of St. Louis and at least one of the defendants resides in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

## FACTS

12. A Metropolitan St. Louis police officer shot and killed Mansur Ball-Bey on August 19, 2015, during the execution of search warrant at a property on Walton Avenue.

13. Shortly thereafter, people gathered at the intersection of Walton Avenue and Page Boulevard in the city of St. Louis to mourn and protest the shooting of Mr. Ball-Bey.

14. The protest continued peacefully throughout the afternoon without police interference while residents came and went.

15. Ms. Molina and Ms. Vogel arrived in the area at approximately 1:15 p.m. and saw police tape, neighborhood residents, and police officers. Some of the residents were crying.

16. Sometime thereafter, the police removed the tape and left the area.

17. Ms. Molina went to a friend's house in the neighborhood at approximately 3 p.m. Ms. Vogel also left the area at approximately 3 p.m.

18. Ms. Molina walked back to Walton and Page at approximately 4 p.m. and saw children who had just gotten off their school bus walking home along Euclid to their residences in the neighborhood.

19. At approximately 4:08 p.m., Ms. Molina saw a tactical vehicle had returned, near the Page and Walton intersection, as well as police officers staged near the intersection of Page and Cora Avenue.

20. As she walked around the neighborhood, Ms. Molina saw a SWAT vehicle, several canine units, and more police officers. She saw that police had marked off the entrance of Marcus Avenue at Page and that there was no traffic traveling east on Page.

21. The gathering and protest were continuing peacefully at this time. Ms. Vogel was with the protesters, observing.

22. At approximately 4:37 p.m., Ms. Molina saw all the marked police vehicles and uniformed police officers leave the area. Ms. Vogel met up with Ms. Molina around this time.

23. At approximately 5:34 p.m., Ms. Molina and Ms. Vogel were walking east on Page when a friend picked them up and drove them to a spot near the intersection of North Taylor Avenue and Lewis Place.[1]

24. From there, they saw that police—including a SWAT vehicle, two visible canine units, and many other police cars and officers—were staged at Ranken Technical College.

25. Ms. Molina and Ms. Vogel then walked back to the intersection of Walton and Page, where protestors and mourners had organized a march.

26. The march was peaceful.

27. Ms. Molina walked to where her vehicle was parked, on Euclid Avenue near Page, and moved it to a different spot before joining the march to observe.

28. Then, Ms. Molina, Ms. Vogel, and others marched from Walton and Page through the Central West End and then returned to the intersection by way of North Kingshighway Boulevard.

29. The march was peaceful and nonviolent throughout its course.

---

[1] Lewis Place is a cul-de-sac that does not hit Taylor, but there is a sidewalk leading from Lewis to Taylor.

30. At approximately 6:45 p.m., after the marchers returned to the intersection of Walton and Page, Ms. Molina and Ms. Vogel saw a large group of uniformed police officers advance toward the west on Page and stop to form a line just east of the intersection of Marcus Avenue and Page.

31. There were at least 50 officers in and around the line.

32. The line extended across the street and onto both sidewalks adjacent to the street.

33. At approximately 6:56 p.m., Ms. Molina was standing on the sidewalk on the south side of Page near the police line, closer to the police than most others in the area.

34. Ms. Vogel, who was also on the sidewalk, was even closer to the police line.

35. At that time, Ms. Molina saw an SLMPD police officer in a white shirt holding a can of pepper spray.

36. She then heard an unintelligible statement from the line of officers, understanding only the words "first" and "disperse."

37. Thereafter, Ms. Molina heard a second unintelligible statement, and she could not understand any of the words even though she was near the police line, and much nearer than most others there.

38. Ms. Molina heard no warnings concerning the use of chemical weapons.

39. Ms. Vogel, who was one of the very closest pedestrians to the police line, heard a muffled dispersal order. At the time, she could not understand most of the words.

40. Later, when Ms. Vogel reviewed her video recording, she could make out more details, including a warning about the use of chemical weapons, but only after she listened to the recording several times. Some of the announcement remained unintelligible even after playing it back and listening closely.

41. Less than two minutes later, the police advanced toward the protestors, moving west on Page, so the protestors, Ms. Molina, and Ms. Vogel also moved west.

42. At that point, Ms. Molina and Ms. Vogel had bunched closer together and were standing one-half block between Marcus and Walton Avenues on the sidewalk on the south side of Page Boulevard.

43. The police made no further statements.

44. Instead, some officers began passing out riot shields and batons to police on the line, and then officers wearing tactical gear started beating batons against their shields. SWAT officers with assault rifles advanced behind the front line.

45. Ms. Vogel saw a female protester who had been shepherding other protesters away from the police get arrested.

46. Ms. Molina saw the police launch tear gas canisters and smoke grenades directly at the protestors.

47. Later, Ms. Molina and Ms. Vogel saw some people develop large red welts from the canisters.

48. Protestors began running west down Page Boulevard to avoid getting gassed, and the police continued to advance west and launch more tear gas canisters.

49. Ms. Molina and Ms. Vogel quickly left the area, ducking their heads to avoid being hit with projectiles, and both ran south on Bayard Avenue from the Page sidewalk they had been on.

50. A SWAT truck (Bearcat) eventually turned south onto Bayard Avenue, which is a residential street, and continued shooting tear gas canisters.

51. The SWAT truck was under the joint direction of the St. Louis Metropolitan Police Department and the St. Clair County Sheriff's Department.

52. Officers Does I-IV were in the SWAT truck that turned down Bayard Avenue.

53. From Bayard Avenue, to which Ms. Molina and Ms. Vogel had dispersed, they ran into an alley to avoid being hit with canisters.

54. From the alley, Ms. Molina saw the SWAT truck with Officer Does I-IV advance south, continuing to shoot tear gas canisters, and gas the entire residential block of Bayard south of Page.

55. Ms. Molina and Ms. Vogel then crossed over to Euclid Avenue, a residential street on which Ms. Molina owned property, and stood on a sidewalk and the yard adjacent to the street and in front of Ms. Molina's house, speaking with a neighbor and several friends.

56. The police had reason to know that Ms. Molina, Ms. Vogel, and/or her neighbor and friends had observed or participated in the earlier protest.

57. Approximately 30 minutes after the police began shooting tear gas canisters at protestors at Walton and Page, the same SWAT vehicle traveled down Euclid Avenue—some three blocks away from the protest gathering—and shot more tear gas canisters and/or smoke grenades directly at Ms. Vogel, Ms. Molina, and her neighbor and friends, standing on the sidewalk in the neighborhood.

58. The group ran into the backyard to avoid being hit with a canister.

59. Ms. Molina's nostrils stung from the tear gas and the smoke.

60. Ms. Vogel too smelled and tasted tear gas, and it burned her nostrils.

7

61. Ms. Molina and Ms. Vogel saw the same SWAT truck travel south on Euclid Avenue all the way to the intersection with Fountain Avenue, cross over Fountain Avenue, and continue south into Fountain Park.

62. There is no road intersecting Fountain Park, so the SWAT vehicle traveled through the park on the sidewalk and the grass.

63. At that time, Mr. Groce was on his way to his home in the neighborhood and was walking his bicycle down a sidewalk within Fountain Park.

64. Earlier that evening, Mr. Groce had returned to his neighborhood after work.

65. When he arrived in the area, Mr. Groce saw the group of people gathered at the intersection of Walton and Page Avenues.

66. He participated in the protest and public grieving of Mansur Ball-Bey, a resident of the same neighborhood.

67. At some point, a police officer on the sidewalk at the intersection of Walton and Page Avenues kicked Mr. Groce's bicycle and told him to go home.

68. Mr. Groce complied with that directive.

69. He was on his way to his home, which faces Fountain Park, when he encountered the SWAT vehicle in the park that Ms. Molina had seen travel down Euclid Avenue.

70. Mr. Groce did not believe the SWAT vehicle should be traveling over the grass and not on a street, so he told the officers in the vehicle to get out of the park.

71. In response, the officers in the SWAT vehicle shot a tear gas canister and pepper spray directly at him. The canister hit him in the hip and caused a painful bruise.

72. The pepper spray left a swath of a sticky orange substance on Mr. Groce's arm and shoulder.

73. Shortly thereafter, when Mr. Groce wiped his face with his arm, the substance burned his eyes and his face.

74. Ms. Molina, Ms. Vogel, and Mr. Groce suffered physical and emotional damages because of Defendants' actions.

75. Ms. Molina did not observe or participate in any lawful protest for more than a year afterward because she feared retaliation and excessive force.

76. Ms. Vogel refrained from observing lawful protests she otherwise would have gone to because of this incident.

77. Despite being the daughter of a former SLMPD officer, Ms. Vogel became frightened of large groups of police because of the retaliation and excessive force she experienced.

78. Because of this incident, Ms. Vogel experienced physical and mental distress, including panic attacks and sensory flashbacks.

## COUNT I: FIRST AMENDMENT
*First Amendment retaliation – 42 U.S.C. § 1983*

79. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

80. Ms. Molina and Ms. Vogel engaged in constitutionally protected expressive activity when they marched with a group to observe the protest after the police shooting of Mansur Ball-Bey on August 19, 2015.

81. Mr. Groce engaged in constitutionally protected expressive activity when he protested the police shooting of Mansur Ball-Bey on August 19, 2015 and participated in public mourning for Mr. Ball-Bey.

9

82. Ms. Molina and Ms. Vogel engaged in constitutionally protected expressive activity when they assembled with friends and a neighbor on the public sidewalk near her Euclid Avenue property to converse.

83. Mr. Groce engaged in constitutionally protected expressive activity when he told the police officers in the SWAT truck to get out of Fountain Park.

84. The City of St. Louis and St. Clair County, which employed the officers who gassed Ms. Molina, Ms. Vogel, and Mr. Groce and/or were directing the actions of the police forces engaged in gassing, as well as the individual officers who gassed Ms. Molina and Ms. Vogel on Euclid Avenue and Mr. Groce in Fountain Park, were retaliating against them for engaging in constitutionally protected expressive activity.

85. The officers decided to shoot chemicals at Ms. Molina and Ms. Vogel on Euclid Avenue and at Mr. Groce inside Fountain Park because of retaliatory animus.

86. Shooting chemicals at a person is an act that would chill a person of ordinary firmness from continuing to engage in a constitutionally protected activity and it did, in fact, chill Ms. Molina and Ms. Vogel from continuing to peaceably assemble and converse on a public sidewalk and chill Mr. Groce from both continuing to address his grievances to the police and to travel peacefully through a public park, rather than attempting to flee from the SWAT vehicle.

87. Shooting chemicals at a person is an act that would chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity of observing a protest and/or protesting or marching to signify disapproval of police shootings and the constitutionally protected activity of speaking to police officers in a public park.

88. By the time Ms. Molina and Ms. Vogel were conversing on the sidewalk on Euclid Avenue, the crowd had long dispersed from Page and Walton.

89. Ms. Molina, Ms. Vogel, and their associates were singled out to be gassed because they were outdoors, in a group, conversing and assembling on a public sidewalk after the Page and Walton protest group had been dispersed.

90. By the time Mr. Groce was walking his bicycle through Fountain Park, the crowd had long dispersed from Page and Walton.

91. Mr. Groce was singled out to be gassed because he expressed displeasure with the police officers in the SWAT vehicle traveling over the grass in Fountain Park.

92. The City of St. Louis and the County of St. Clair failed to supervise the individual defendant officers, failed to train the officers on the lawful use of chemicals, and executed a custom or policy that resulted in the unconstitutional, retaliatory use of chemicals against Ms. Molina, Ms. Vogel, and Mr. Groce.

93. The right to be free of governmental retaliation for exercise of free speech was clearly established at the time of the violations giving rise to this suit.

WHEREFORE, Plaintiffs respectfully request this Court:

A. Enter judgment in favor of Plaintiffs and against Defendants;

B. Issue a permanent injunction prohibiting Defendants from using chemicals to retaliate against persons who exercise their constitutional rights to free speech and free assembly;

C. Award Plaintiffs nominal and compensatory damages against Defendants for their violation of Plaintiffs' constitutional rights under color of state law;

D. Award Plaintiffs punitive damages against Defendants John Does I-IV for their violation of Plaintiffs' clearly established rights under color of state law;

E. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

F. Allow such other and further relief as the Court deems just and proper.

## COUNT II: FOURTH AMENDMENT
*Excessive Force*

94. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

95. Plaintiffs were seized by Defendants when Defendants intentionally, and by use of chemicals, terminated their freedom of movement.

96. The use of chemicals on the residential street of Euclid Avenue and inside Fountain Park after the protestors had dispersed from Walton and Page was objectively unreasonable.

97. Ms. Molina had not committed any crime and was not suspected of committing any crime.

98. Ms. Vogel had not committed any crime and was not suspected of committing any crime.

99. Mr. Groce had not committed any crime and was not suspected of committing any crime.

100. Ms. Molina, Ms. Vogel, and Mr. Groce posed no threat to the safety of any police officer or any other person.

101. Ms. Molina, Ms. Vogel, and Mr. Groce were not being arrested and were not resisting arrest.

102. Ms. Molina and Ms. Vogel had complied with whatever order there had been to disperse from the Page and Walton intersection—if such order was adequate—even though they were not in the street and were not blocking any traffic or passersby nor violating any law.

103. Mr. Groce had complied with an individual officer's suggestion to go home and did not refuse any police order whatsoever.

104. The City of St. Louis and the County of St. Clair failed to supervise the actions of the individual defendant officers for using excessive force against Ms. Molina, Ms. Vogel, and Mr. Groce when it was not objectively reasonable for the officers to do so, judged from the perspective of a reasonable officer on the scene.

WHEREFORE, Plaintiffs respectfully requests this Court:

   A. Enter judgment in favor of Plaintiffs and against Defendants;

   B. Issue a permanent injunction prohibiting Defendants from using chemicals to unreasonably seize persons not accused of any crime nor violating any police order;

   C. Award Plaintiffs nominal and compensatory damages against Defendants for their violation of Plaintiffs' constitutional rights under color of state law;

   D. Award Plaintiffs punitive damages against Defendants John Does I-IV for their violation of Plaintiffs' clearly established rights under color of state law;

   E. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

   F. Allow such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827
Jessie Steffan, #64861
American Civil Liberties Union of Missouri
      Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
(314) 652-3114
(314) 652-3112 (facsimile)
arothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
American Civil Liberties Union of Missouri
      Foundation
(816) 470-9938
gwilcox@aclu-mo.org
*Attorneys for Plaintiffs*