## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| SARAH MOLINA, | ) | |
| | ) | |
| CHRISTINA VOGEL, and | ) | |
| | ) | |
| PETER GROCE, | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | Case No.:   4:17-cv-2498 AGF |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, | ) | |
| | ) | |
| DANIEL BOOK, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| JOSEPH BUSSO, | ) | |
| *in his individual capacity* | ) | |
| | ) | |
| JASON CHAMBERS, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| LANCE COATS, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| STEPHEN DODGE, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| JOSEPH MADER, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| MICHAEL MAYO, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| MARK SEPER, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM WETHINGTON, | ) | |
| *in his individual capacity,* | ) | |
| | ) | |
| Defendants. | ) | |

1

## FIRST AMENDED COMPLAINT

Plaintiffs Sarah Molina, Christina Vogel, and Peter Groce allege as follows:

## INTRODUCTION

1.     Plaintiffs bring this civil-rights action against the City of St. Louis, Missouri, and some of its police officers for retaliating against Plaintiffs for their First Amendment-protected activity and by unreasonably seizing Plaintiffs and applying excessive force by shooting tear gas and pepper spray at them though they were unarmed, non-threatening, non-violent, non-resisting, and not suspected of committing any crime. Plaintiffs seek judgment against individual officers for violating their clearly established First Amendment and Fourth Amendment rights and for failing to intervene to prevent the violation of those rights; and against St. Louis City for its maintenance of two constitutionally infirm customs or policies.

## PARTIES

2.     Plaintiff Sarah Molina is a citizen of Missouri who resides in St. Louis County.

3.     Plaintiff Christina Vogel is a citizen of Missouri who resides in St. Louis County.

4.     Plaintiff Peter Groce is a citizen of Missouri who resides in the City of St. Louis.

5.     Defendant St. Louis City is a municipal corporation of the State of Missouri.

6.     Defendant Daniel Book is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

7.     Defendant Joseph Busso is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

2

8.      Defendant Jason Chambers is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

9.      Defendant Lance Coats is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

10.      Defendant Stephen Dodge is a lieutenant employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

11.      Defendant Joseph Mader is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

12.      Defendant Michael Mayo is a sergeant employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

13.      Defendant Mark Seper is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

14.      Defendant William Wethington is a police officer employed by the St. Louis Metropolitan Police Department who was, at all times relevant to this complaint, acting under color of law. He is sued in his individual capacity.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983 and the First and Fourth

        Amendments to the United States Constitution, incorporated as against States and their

        municipal divisions through the Fourteenth Amendment.

16.     The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because

        Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to

        redress the deprivation of rights secured by the Constitution of the United States.

17.     Venue is proper in the United States District Court for the Eastern District of Missouri

        pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise

        to the claims occurred in the City of St. Louis.

18.     Divisional venue is proper in the Eastern Division because the a substantial part of the

        events leading to the claims for relief arose in the City of St. Louis and at least one of

        the defendants resides in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

## FACTS

19.     A Metropolitan St. Louis police officer shot and killed Mansur Ball-Bey on August 19,

        2015, during the execution of search warrant at a property on Walton Avenue.

20.     Shortly thereafter, people gathered at the intersection of Walton Avenue and Page

        Boulevard in the city of St. Louis to mourn and protest the shooting of Mr. Ball-Bey.

21.     The protest continued peacefully throughout the afternoon without police interference

        while residents came and went.

22.     Ms. Molina and Ms. Vogel arrived in the area at approximately 1:15 p.m. and saw

        police tape, neighborhood residents, and police officers. Some of the residents were

        crying.

23.      Sometime thereafter, the police removed the tape and left the area.

24.      Ms. Molina went to a friend's house in the neighborhood at approximately 3 p.m. Ms. Vogel also left the area at approximately 3 p.m.

25.      Ms. Molina walked back to Walton and Page at approximately 4 p.m. and saw children who had just gotten off their school bus walking home along Euclid to their residences in the neighborhood.

26.      At approximately 4:08 p.m., Ms. Molina saw a tactical vehicle had returned, near the Page and Walton intersection, as well as police officers staged near the intersection of Page and Cora Avenue.

27.      As she walked around the neighborhood, Ms. Molina saw another tactical vehicle, several canine units, and more police officers. She saw that police had marked off the entrance of Marcus Avenue at Page and that there was no traffic traveling east on Page.

28.      The gathering and protest were continuing peacefully at this time. Ms. Vogel was with the protesters, observing.

29.      At approximately 4:37 p.m., Ms. Molina saw all the marked police vehicles and uniformed police officers leave the area. Ms. Vogel met up with Ms. Molina around this time.

30.      At approximately 5:34 p.m., Ms. Molina and Ms. Vogel were walking east on Page when a friend picked them up and drove them to a spot near the intersection of North Taylor Avenue and Lewis Place.[1]

_____

[1]      Lewis Place is a cul-de-sac that does not hit Taylor, but there is a sidewalk leading from Lewis to Taylor.

31.     From there, they saw that police—including a SWAT vehicle, two visible canine units, and many other police cars and officers—were staged at Ranken Technical College.

32.     Ms. Molina and Ms. Vogel then walked back to the intersection of Walton and Page, where protestors and mourners had organized a march.

33.     The march was peaceful.

34.     Ms. Molina walked to where her vehicle was parked, on Euclid Avenue near Page, and moved it to a different spot before joining the march to observe.

35.     Then, Ms. Molina, Ms. Vogel, and others marched from Walton and Page through the Central West End and then returned to the intersection by way of North Kingshighway Boulevard.

36.     The march was peaceful and nonviolent throughout its course.

37.     At approximately 6:45 p.m., after the marchers returned to the intersection of Walton and Page, Ms. Molina and Ms. Vogel saw a large group of uniformed police officers advance toward the west on Page and stop to form a line just east of the intersection of Marcus Avenue and Page.

38.     There were at least 50 officers in and around the line.

39.     The line extended across the street and onto both sidewalks adjacent to the street.

40.     At approximately 6:56 p.m., Ms. Molina was standing on the sidewalk on the south side of Page near the police line, closer to the police than most others in the area.

41.     Ms. Vogel, who was also on the sidewalk, was even closer to the police line.

42.     At that time, Ms. Molina saw an SLMPD police officer in a white shirt holding a can of pepper spray.

43.    She then heard an unintelligible statement from the line of officers, understanding only the words "first" and "disperse."

44.    Thereafter, Ms. Molina heard a second unintelligible statement, and she could not understand any of the words even though she was near the police line, and much nearer than most others there.

45.    Ms. Molina heard no warnings concerning the use of chemical weapons.

46.    Ms. Vogel, who was one of the very closest pedestrians to the police line, heard a muffled dispersal order. At the time, she could not understand most of the words.

47.    Later, when Ms. Vogel reviewed her video recording, she could make out more details, including a warning about the use of chemical weapons, but only after she listened to the recording several times. Some of the announcement remained unintelligible even after playing it back and listening closely.

48.    Less than two minutes later, the police advanced toward the protestors, moving west on Page, so the protestors, Ms. Molina, and Ms. Vogel also moved west.

49.    At that point, Ms. Molina and Ms. Vogel had bunched closer together and were standing one-half block between Marcus and Walton Avenues on the sidewalk on the south side of Page Boulevard.

50.    The police made no further statements.

51.    Instead, some officers began passing out riot shields and batons to police on the line, and then officers wearing tactical gear started beating batons against their shields. SWAT officers with assault rifles advanced behind the front line.

52.    Ms. Vogel saw a female protester who had been shepherding other protesters away from the police get arrested.

53.     Ms. Molina saw the police launch tear gas canisters and smoke grenades directly at the protestors.

54.     Later, Ms. Molina and Ms. Vogel saw some people develop large red welts from the canisters.

55.     Protestors began running west down Page Boulevard to avoid getting gassed, and the police continued to advance west and launch more tear gas canisters.

56.     Ms. Molina and Ms. Vogel quickly left the area, ducking their heads to avoid being hit with projectiles, and both ran south on Bayard Avenue from the Page sidewalk they had been on.

57.     From Bayard Avenue, to which Ms. Molina and Ms. Vogel had dispersed, they ran into an alley to avoid being hit with canisters.

58.     Ms. Molina and Ms. Vogel then crossed over to Euclid Avenue, a residential street on which Ms. Molina owned property, and stood on a sidewalk and the yard adjacent to the street and in front of Ms. Molina's house, speaking with a neighbor and several friends.

59.     The police had reason to know that Ms. Molina, Ms. Vogel, and/or her neighbor and friends had observed or participated in the earlier protest.

60.     Approximately 30 minutes after the police had begun shooting tear gas canisters at protestors at Walton and Page, a BEAR traveled down Euclid Avenue and shot more tear gas canisters and/or smoke grenades directly at Ms. Vogel, Ms. Molina, and her neighbor and friends, standing on the sidewalk in the neighborhood.

61.     The BEAR was under the direction of the St. Louis Metropolitan Police Department.

62.     Defendants Book, Busso, Chambers, Coats, Mader, Mayo, Seper, and Wethington were in the BEAR.

63.     Defendant Dodge gave orders to the officers operating, stationed on, and deploying chemical munitions from the BEAR.

64.     Ms. Vogel, Ms. Molina, and their associates were more than three blocks from the protest site when the officers aboard the BEAR shot tear gas canisters at them.

65.     The group ran into the backyard to avoid being hit with a canister.

66.     Ms. Molina's nostrils stung from the tear gas and the smoke.

67.     Ms. Vogel too smelled and tasted tear gas, and it burned her nostrils.

68.     Ms. Molina and Ms. Vogel saw the BEAR travel south on Euclid Avenue all the way to the intersection with Fountain Avenue, cross over Fountain Avenue, and continue south into Fountain Park.

69.     There is no road intersecting Fountain Park, so the BEAR traveled through the park on the sidewalk and the grass.

70.     At that time, Mr. Groce was on his way to his home in the neighborhood and was walking his bicycle down a sidewalk within Fountain Park.

71.     Earlier that evening, Mr. Groce had returned to his neighborhood after work.

72.     When he arrived in the neighborhood earlier that evening, Mr. Groce had seen the group of people gathered at the intersection of Walton and Page Avenues.

73.     He participated in the protest and public grieving of Mansur Ball-Bey, a resident of the same neighborhood.

74.     At some point, a police officer on the sidewalk at the intersection of Walton and Page Avenues kicked Mr. Groce's bicycle and told him to go home.

75.     Mr. Groce left the scene.

76.     He was on his way to his home, which faces Fountain Park, when he encountered the
        BEAR in the park that Ms. Molina had seen travel down Euclid Avenue.

77.     Mr. Groce did not believe the BEAR should be traveling over the grass and not on a
        street, so he told the officers in the vehicle to get out of the park.

78.     In response, officers in the BEAR shot a tear gas canister and pepper spray directly at
        him. The canister hit him in the hip and caused a painful bruise.

79.     The pepper spray left a swath of a sticky orange substance on Mr. Groce's arm and
        shoulder.

80.     Shortly thereafter, when Mr. Groce wiped his face with his arm, the substance burned
        his eyes and his face.

81.     Ms. Molina, Ms. Vogel, and Mr. Groce suffered physical and emotional damages
        because of Defendants' actions.

82.     Ms. Molina did not observe or participate in any lawful protest for more than a year
        afterward because she feared retaliation and excessive force.

83.     Ms. Vogel refrained from observing lawful protests she otherwise would have gone to
        because of this incident.

84.     Despite being the daughter of a former SLMPD officer, Ms. Vogel became frightened
        of large groups of police because of the retaliation and excessive force she
        experienced.

85.     Because of this incident, Ms. Vogel experienced physical and mental distress,
        including panic attacks and sensory flashbacks.

## COUNT I: FIRST AMENDMENT
*First Amendment retaliation – 42 U.S.C. § 1983*

*Against All Individual Defendants*

86.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this

complaint as fully set forth herein.

87.    Ms. Molina and Ms. Vogel engaged in constitutionally protected expressive activity

when they marched with a group to observe the protest after the police shooting of

Mansur Ball-Bey on August 19, 2015.

88.    Mr. Groce engaged in constitutionally protected expressive activity when he protested

the police shooting of Mansur Ball-Bey on August 19, 2015 and participated in public

mourning for Mr. Ball-Bey.

89.    Ms. Molina and Ms. Vogel engaged in constitutionally protected expressive activity

when they assembled with friends and a neighbor on the public sidewalk near her

Euclid Avenue property to converse.

90.    Mr. Groce engaged in constitutionally protected expressive activity when he told the

police officers in the BEAR to get out of Fountain Park.

91.    The City of St. Louis, as well as the individual officers who gassed Ms. Molina and

Ms. Vogel on Euclid Avenue and Mr. Groce in Fountain Park, were retaliating against

them for engaging in constitutionally protected expressive activity.

92.    The officers decided to shoot chemicals at Ms. Molina and Ms. Vogel on Euclid

Avenue and at Mr. Groce inside Fountain Park because of retaliatory animus.

93.    Shooting chemicals at a person is an act that would chill a person of ordinary firmness

from continuing to engage in a constitutionally protected activity and it did, in fact,

chill Ms. Molina and Ms. Vogel from continuing to peaceably assemble and converse

on a public sidewalk and chill Mr. Groce from both continuing to address his

grievances to the police and to travel peacefully through a public park, rather than attempting to flee from the BEAR.

94. Shooting chemicals at a person is an act that would chill a person of ordinary firmness from continuing to engage in the constitutionally protected activity of observing a protest and/or protesting or marching to signify disapproval of police shootings and the constitutionally protected activity of speaking to police officers in a public park.

95. By the time Ms. Molina and Ms. Vogel were conversing on the sidewalk on Euclid Avenue, the crowd had long dispersed from Page and Walton.

96. Defendants singled out Ms. Molina, Ms. Vogel, and their associates to be gassed because they were outdoors, in a group, conversing and assembling on a public sidewalk after the Page and Walton protest group had been dispersed.

97. By the time Mr. Groce was walking his bicycle through Fountain Park, the crowd had long dispersed from Page and Walton.

98. Defendants singled out Mr. Groce to be gassed because he expressed displeasure with the police officers in the BEAR traveling over the grass in Fountain Park.

99. The right to be free of governmental retaliation for exercise of free speech was clearly established at the time of the violations giving rise to this suit.

100. The individual Defendants violated Ms. Molina, Ms. Vogel, and Mr. Groce's clearly established First Amendment rights.

## COUNT II: FOURTH AMENDMENT
*Excessive Force and Unlawful Seizure – Section § 1983*
*Against All Individual Defendants*

101. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as fully set forth herein.

102.     Plaintiffs were seized by Defendants Book, Busso, Chambers, Coats, Dodge, Mader, Mayo, Seper, and Wethington when they intentionally, and by use of chemicals, terminated their freedom of movement.

103.     The use of chemicals on the residential street of Euclid Avenue and inside Fountain Park after the protestors had dispersed from Walton and Page was objectively unreasonable.

104.     Ms. Molina, Ms. Vogel, and Mr. Groce had not committed any crime and were not suspected of committing any crime.

105.     Ms. Molina, Ms. Vogel, and Mr. Groce posed no threat to the safety of any police officer or any other person.

106.     Ms. Molina, Ms. Vogel, and Mr. Groce were not being arrested and were not resisting arrest.

107.     Ms. Molina and Ms. Vogel had complied with whatever order there had been to disperse from the Page and Walton intersection—even assuming such order was adequate—even though they were not in the street and were not blocking any traffic or passersby nor violating any law.

108.     Mr. Groce had complied with an individual officer's suggestion to go home and did not refuse any police order whatsoever.

109.     The individual Defendants gave no warning or other directive on Euclid or in Fountain Park before deploying chemical munitions against Ms. Molina, Ms. Vogel, and Mr. Groce.

110.     The individual Defendants violated Ms. Molina, Ms. Vogel, and Mr. Groce's clearly established Fourth Amendment rights.

## COUNT III: FAILURE TO INTERVENE

*Section § 1983*

*Against Defendants Book, Busso, Chambers, Coats, Mader, Mayo, Seper, and Wethington*

111.   Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this complaint as fully set forth herein.

112.   All of the individual officers stationed on the BEAR were present before and during the violation of Ms. Molina, Ms. Vogel, and Mr. Groce's First and Fourth Amendment rights.

113.   The officers on the BEAR knew that by the time they shot gas canisters at Ms. Molina and Ms. Vogel (the first Plaintiffs they encountered), they had traveled almost one-third of a mile from the protest site, onto a residential side street, and that the purpose of the deployment of chemical munitions on Page was to move people onto side streets.

114.   The officers on the BEAR knew that by the time they shot gas canisters and pepper spray at Mr. Groce, they had traveled almost one-half of a mile from the protest site, down a residential side street and into a park, and that the purpose of the deployment of chemical munitions on Page was to move people onto side streets.

115.   The officers who failed to intervene were inside the same vehicle as the officers who shot chemicals at Ms. Molina, Ms. Vogel, and Mr. Groce, and they had a realistic opportunity to prevent the deployment of those chemical munitions.

116.   The officers knew that Ms. Molina, Ms. Vogel, and Mr. Groce were at least three blocks from the scene of the protest at the time they were gassed and/or sprayed.

117.   The officers knew that Ms. Molina, Ms. Vogel, and Mr. Groce were either standing still or walking calmly at the time they were gassed.

14

118.    The officers knew that Ms. Molina, Ms. Vogel, and Mr. Groce were non-threatening, non-violent, non-resisting, not being arrested, and not suspected of committing any crime.

119.    The officers knew that gassing Ms. Molina, Ms. Vogel, and Mr. Groce would be a violation of their constitutional rights.

120.    Despite having an opportunity to prevent the excessive and retaliatory use of force against Plaintiffs and a duty to do so, the officers failed to intervene.

<u>**COUNT IV: MUNICIPAL LIABILITY**</u>
*Section § 1983*
*Against the City of St. Louis*

121.    At the time Ms. Molina, Ms. Vogel, and Mr. Groce were gassed and/or sprayed, the City of St. Louis, through SLMPD, had a custom or policy of deploying chemical munitions against protesters, observers of protests, and other pedestrians when the City perceived them to be expressing an anti-law enforcement view and in order to retaliate against them for that perceived view and chill public expression of that perceived view. For example:

    a.    On March 15, 2012, in or around Compton Hills Reservoir Park near the intersection of Grand Avenue and I-44, SLMPD officers deployed tear gas against people who were perceived by the City to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

    b.    In October 2014, just north of the intersection of Vandeventer and Manchester/Chouteau Avenues, SLMPD officers deployed tear gas and pepper spray against people who were perceived by the City to be expressing an anti-law

enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

       c.      On or about October 9, 2014, just east of the intersection of Arsenal Street and Grand Avenue, SLMPD officers deployed tear gas against people who were perceived by the City to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

       d.      In the early-morning hours of November 25, 2014, on Arsenal Street just to the west of Grand Avenue, SLMPD officers deployed tear gas against people who were perceived by the City to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

       e.      On the afternoon of November 25, 2014, on Highway I-70/I-44 just north of the Martin Luther King bridge, SLMPD officers deployed pepper spray against people who were perceived by the City to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

       f.      On or about December 1, 2014, at Kiener Plaza Park on Chestnut Avenue, SLMPD officers threatened to deploy pepper spray against people who were perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

g.     On or about December 31, 2014, near SLMPD headquarters at Olive and Nineteenth Streets, SLMPD officers deployed pepper spray against people who were perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

h.     On or about May 19, 2015, on Fillmore Street in the Holly Hills neighborhood, SLMPD officers deployed pepper spray against people who were perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from publicly expressing that perceived view.

122.   This custom or policy continued after SLMPD officers deployed chemical munitions against Ms. Molina, Ms. Vogel, and Mr. Groce on August 19, 2015. For example:

a.     On September 15, 2017, in multiple locations and at multiple times, including near the intersection of Tucker and Clark Avenues, near the intersection of Kingshighway and Lindell Boulevards, and near the intersection of Euclid and McPherson Avenues, SLMPD officers deployed various chemical munitions against people who were perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from public expression of that perceived view.

b.     On September 17, 2017, near the intersection of Tucker and Washington Avenues, SLMPD officers deployed pepper spray against people who were perceived to be expressing an anti-law enforcement view in order to retaliate

against them for that perceived view and chill them from public expression of that perceived view.

  c.  On September 29, 2017, near the intersection of Broadway and Clark Avenues, SLMPD officers deployed pepper spray against people who were perceived to be expressing an anti-law enforcement view in order to retaliate against them for that perceived view and chill them from public expression of that perceived view.

123. At the time Ms. Molina, Ms. Vogel, and Mr. Groce were gassed and/or sprayed, the City of St. Louis, through SLMPD, had a custom or policy of deploying chemical munitions without adequate warning against protesters, observers of protests, and other pedestrians where the use of chemical munitions was unreasonable, excessive, and not necessary to achieve any lawful law enforcement purpose, including:

  a.  On March 15, 2012, in or around Compton Hills Reservoir Park near the intersection of Grand Avenue and I-44, SLMPD officers excessively and unreasonably deployed pepper spray without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

  b.  On May 24, 2012, near Kiener Plaza Park on Chestnut Avenue, SLMPD officers excessively and unreasonably deployed pepper spray without adequate warning against a person who was unarmed, non-threatening, non-violent, and not engaged in any crime.

  c.  In October 2014, just north of the intersection of Vandeventer and Manchester/Chouteau Avenues, SLMPD officers excessively and unreasonably

deployed tear gas without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

d.      On that same day, at 904 South Vandeventer, SLMPD officers excessively and unreasonably deployed pepper spray without adequate warning against people who were seated, unarmed, non-threatening, non-violent, and not actively resisting.

e.      Also in October 2014, just to the east of the intersection of Arsenal Street and Grand Avenue, SLMPD officers excessively and unreasonably deployed tear gas without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

f.      In the early-morning hours of November 25, 2014, on Arsenal Street just to the west of Grand Avenue, SLMPD officers excessively and unreasonably deployed tear gas without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

g.      On the afternoon of November 25, 2014, on Highway I-70/I-44 just north of the Martin Luther King bridge, SLMPD officers excessively and unreasonably deployed pepper spray without adequate warning against people who were unarmed, non-threatening, non-violent, and not actively resisting.

h.      On or about December 31, 2014, near SLMPD headquarters at the intersection of Olive and Nineteenth Streets, SLMPD officers excessively and unreasonably deployed pepper spray against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

i.      On or about May 19, 2015, on Fillmore Street in the Holly Hills neighborhood, SLMPD officers deployed pepper spray against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

124.    This custom or policy continued after SLMPD officers deployed chemical munitions against Ms. Molina, Ms. Vogel, and Mr. Groce on August 19, 2015. For example:

a.      On September 15, 2017, in multiple locations and at multiple times, including near the intersection of Tucker and Clark Avenues, near the intersection of Kingshighway and Lindell Boulevards, and near the intersection of Euclid and McPherson Avenues, SLMPD officers unreasonably and excessively deployed various chemical munitions without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

b.      On September 17, 2017, near the intersection of Tucker and Washington Avenues, SLMPD officers unreasonably and excessively deployed pepper spray without adequate warning against people who were unarmed, non-threatening, non-violent, and not engaged in any crime.

c.      On September 29, 2017, near the intersection of Broadway and Clark Avenues, SLMPD officers unreasonably and excessively deployed pepper spray without adequate warning against a person who was unarmed, non-threatening, non-violent, and not engaged in any crime.

125.    As of August 19, 2015, policymaking officials for the City and SLMPD knew about this continuing, widespread, and consistent pattern of SLMPD officers deploying pepper spray and tear gas excessively, unreasonably, and in order to retaliate against and chill persons they perceived to be expressing an anti-law enforcement view, and

they were not only deliberately indifferent to that unconstitutional conduct but also tacitly—and occasionally explicitly—authorized that conduct.

126.     The City's customs or policies caused the unreasonable, excessive, and retaliatory use of chemicals against Ms. Molina, Ms. Vogel, and Mr. Groce in violation of their First and Fourth Amendment rights.

**WHEREFORE**, Plaintiffs respectfully requests this Court:

A.     Enter judgment in favor of Plaintiffs and against Defendants;

B.     Issue a permanent injunction prohibiting Defendants from using chemicals to retaliate against persons perceived to be expressing an anti-law enforcement view and from using chemicals to unreasonably seize persons not accused of any crime nor violating any police order;

C.     Award Plaintiffs nominal and compensatory damages against Defendants for their violation of Plaintiffs' constitutional rights under color of state law;

D.     Award Plaintiffs punitive damages against the individual Defendants for their violation of Plaintiffs' clearly established rights under color of state law;

E.     Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

F.     Allow such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101

21

(314) 652-3114
(314) 652-3112 (facsimile)
arothert@aclu-mo.org
jsteffan@aclu-mo.org

Gillian R. Wilcox, #61278MO
406 West 34th Street, Suite 420
Kansas City, Missouri 64111
ACLU of Missouri Foundation
 (816) 470-9938
gwilcox@aclu-mo.org
*Attorneys for Plaintiffs*

**<u>Certificate of Service</u>**

I certify that a copy of the forgoing was filed electronically on May 4, 2018, and made available to counsel of record by operation of the CM/ECF system.

<u>/s/ Anthony E. Rothert</u>