## STEPHEN DODGE  1/15/2019

### Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF MISSOURI
 2            EASTERN DIVISION
 3
 4
 5
 6
 7
 8    SARAH MOLINA, ET AL. vs. CITY OF ST. LOUIS,
 9              MISSOURI, ET AL.
10         Cause No. 4:17-cv-2498 AGF
11
12
13
14
15
16
17       DEPOSITION OF STEPHEN DODGE
18    TAKEN ON BEHALF OF THE PLAINTIFFS
19           JANUARY 15, 2019
20
21
22
23
24
25
```

### Page 3

```
 1      IN THE UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MISSOURI
 2              EASTERN DIVISION
 3    SARAH MOLINA, ET AL.,  )
                             )
 4      Plaintiffs,          )
                             )
 5      vs.                  ) Cause No. 4:17-cv-2498 AGF
                             )
 6    CITY OF ST. LOUIS,     )
      MISSOURI, ET AL.,      )
 7                           )
        Defendants.          )
 8
 9         DEPOSITION OF STEPHEN DODGE, produced,
10    sworn and examined on January 15, 2019, between the
11    hours of 2:00 in the afternoon and 5:03 in the
12    afternoon of that day, at the offices of City
13    Counselor's Office, 1200 Market Street, Room 314, St.
14    Louis, Missouri 63103, before Susannah L. Massie, a
15    Certified Court Reporter, a Notary Public within and
16    for the State of Missouri, in a certain cause now
17    pending in the United States District Court, Eastern
18    District of Missouri, Eastern Division, wherein SARAH
19    MOLINA, ET AL., are Plaintiffs and CITY OF ST. LOUIS,
20    MISSOURI, ET AL., are Defendants; taken on behalf of
21    the Plaintiffs.
22
23
24
25
```

### Page 2

```
 1               INDEX
                          PAGE NO.
 2    INDEX PAGE                2
 3    DEPOSITION INFORMATION         3
 4    APPEARANCE PAGE               4
 5    EXAMINATION BY MS. STEFFAN        5
 6    NOTARIAL CERTIFICATE         123
 7
 8
 9
10
11               EXHIBITS
      PLAINTIFF'S
12    EXHIBIT NO.   DESCRIPTION       PAGE NO.
13    Dodge 1    SLMPD Work History      14
      Dodge 2    Unit File            29
14    Dodge 3    Course Entries       32
      Dodge 4    Google Earth Map     45
15    Dodge 5    After Action Report  77
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1              A P P E A R A N C E S
 2    For the Plaintiffs:
         ACLU OF MISSOURI FOUNDATION
 3       By:  Jessie Steffan
         906 Olive Street
 4       Suite 1130
         St. Louis, Missouri  63101
 5       (314) 652-3114
         Jsteffan@aclu-mo.org
 6
 7    For the Defendants:
         CITY COUNSELOR'S OFFICE
 8       By:  Andrew D. Wheaton
         1200 Market Street
 9       Room 314
         St. Louis, Missouri  63103
10       (314) 622-4594
         WheatonA@stlouis-mo.gov
11
12    Witness:  STEPHEN DODGE
13    Also Present: Claire Rucker, law clerk
14
15    Court Reporter:
16    Susannah L. Massie, CCR MO #902
      Alaris Litigation Services
17    711 North Eleventh Street
      St. Louis, MO  63101
18    (314) 644-2191
      1-800-280-3376
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

STEPHEN DODGE  1/15/2019

## Page 5

1       IT IS HEREBY STIPULATED AND AGREED, by and
2   between counsel for the Plaintiffs and counsel for the
3   Defendants that this deposition may be taken in
4   shorthand by Susannah L. Massie, a Certified Court
5   Reporter and Notary Public, and afterwards transcribed
6   into typewriting; and the signature of the witness is
7   expressly waived.
8       *  *  *  *  *
9       STEPHEN DODGE,
10  of lawful age, produced, sworn and examined on behalf
11  of the Plaintiffs, deposes and says:
12      EXAMINATION
13  BY MS. STEFFAN:
14      Q.  Good afternoon, Chief Dodge.  Could you
15  please state and spell your name for the record?
16      A.  Stephen Dodge.  S-T-E-P-H-E-N, D-O-D-G-E.
17      Q.  My name is Jessie Steffan.  I am one of the
18  Plaintiff's attorneys in this case, which is called
19  Molina versus City of St. Louis.
20      Have you ever been deposed before?
21      A.  Yes, I have.
22      Q.  When was the last time you were deposed?
23      A.  I want to say it was probably a year ago.
24      Q.  So you're probably familiar with the ground
25  rules, but just as a brief refresher, please try to

## Page 6

1   answer verbally when you're responding to a question
2   rather than nodding or shaking your head.  And I'm
3   going to try not to speak over you while you're giving
4   an answer.  If you would, please try to not speak over
5   me when I'm asking a question.
6       And if you do not understand a question,
7   please let me know and ask me to clarify.  Otherwise I
8   will presume that you understood the question if you
9   go ahead and answer.  Do you understand that?
10      A.  Yes.
11      Q.  Have you taken any medication or drugs or
12  alcohol today that would affect your ability to
13  testify truthfully or to remember things?
14      A.  No.
15      Q.  And do you have any health conditions that
16  affect your ability to testify truthfully or to
17  remember things?
18      A.  No.
19      Q.  Did you do anything to prepare for today's
20  deposition other than possibly communicate with your
21  lawyer?
22      A.  No.
23      Q.  Mr. Dodge, where do you live?
24      A.  Eureka, Missouri.
25      Q.  How old are you?

## Page 7

1       A.  I am 49 years old.
2       Q.  Did you graduate from high school?
3       A.  Yes.
4       Q.  When did you graduate?
5       A.  '87.
6       Q.  Did you go to high school in the St. Louis
7   area?
8       A.  Yes.
9       Q.  Where did you go to high school?
10      A.  DeSmet Jesuit High School.
11      Q.  Did you attend a police academy?
12      A.  Yes, I did.
13      Q.  What police academy did you attend?
14      A.  St. Louis Police Academy.
15      Q.  Did you graduate?
16      A.  Yes.
17      Q.  When did you graduate?
18      A.  Graduated in May of '94.
19      Q.  Did you attend college?
20      A.  Yes.
21      Q.  Where did you attend?
22      A.  Kansas University.
23      Q.  Did you graduate?
24      A.  Yes.
25      Q.  When did you graduate?

## Page 8

1       A.  I graduated in May of '91.
2       Q.  What did you study there?
3       A.  Business administration.
4       Q.  And you ultimately got a bachelor's degree?
5       A.  Yes.
6       Q.  Have you attended any graduate school?
7       A.  Yes.
8       Q.  Where did you attend?
9       A.  St. Louis University School of Law.
10      Q.  When did you attend?
11      A.  Um, it would have been '98 through 2002.
12      Q.  Did you ultimately obtain a degree?
13      A.  Yes.
14      Q.  What degree did you obtain?
15      A.  Juris doctorate.
16      Q.  Have you attended any other graduate
17  school?
18      A.  No.
19      Q.  No other college?
20      A.  No.  That was enough.
21      Q.  And is the St. Louis Police Academy the
22  only police academy you've attended?
23      A.  Yes.
24      Q.  Did I cover most of your educational
25  background?

ALARIS LITIGATION SERVICES
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

Page 9

1    A.  Yes.
2        Q.  Have you served in a branch of the
3    military?
4        A.  No, I have not.
5        Q.  Have you ever served as a correctional
6    officer?
7        A.  No.
8        Q.  Do you have a driver's license?
9        A.  Yes.
10       Q.  Do you have any specialized driving
11   training?
12       A.  Um, yes, I do.
13       Q.  What kind?
14       A.  I took a five-day EVOC course from the
15   Missouri Highway Patrol.
16       Q.  EVOC is spelled how?
17       A.  It's EVOC.  It's an acronym.  I think it's
18   for Emergency Vehicle Operations, something else.
19       Q.  Just generally what does that entail?
20       A.  It just entails like pursuit driving and
21   that kind of thing.
22       Q.  Did you do that in your capacity as a
23   police officer?
24       A.  Yes.
25       Q.  Other than EVOC, do you have any other

Page 10

1    specialized driving training?
2        A.  No.
3        Q.  Are there any restrictions on your ability
4    to drive?
5        A.  No.
6        Q.  Have you ever been convicted of a crime?
7        A.  No.
8        Q.  Have you ever been prosecuted for a crime?
9        A.  No.
10       Q.  Have you ever been arrested?
11       A.  No.
12       Q.  Have you ever been a party to a civil
13   lawsuit?
14       A.  Yes.
15       Q.  What lawsuits?
16       A.  Um, well, this one.  And then a long time
17   ago in '90 -- I want to say '96, '97 there was a
18   vehicle pursuit that I was involved in and there was
19   an injury when the suspect vehicle crashed, and a
20   subsequent lawsuit there.  And there was another
21   lawsuit when I was a patrolman in 2002 where a subject
22   alleged excessive force.  That went to federal court
23   and they found in my favor.  And those are the only
24   ones that come to mind.
25       Q.  The second lawsuit you mentioned, would

Page 11

1    that be Julia Simmons?
2        A.  Yes.
3        Q.  The first one, would it have been a Mr.
4    Golliday perhaps?
5        A.  Yes.
6        Q.  No other lawsuits other than those?
7        A.  Those are the ones I can remember.  I mean,
8    I know there's been a couple others that I've
9    testified in, but I don't think I was necessarily
10   named.
11           Oh, no, I'm sorry.  There was one more.  I
12   take that back.  There was one involving Ferguson.
13       Q.  When you say Ferguson what do you mean?
14       A.  I mean from the initial Ferguson response
15   in August of 2014, during that two-week period.  There
16   were a couple of reporters that had filed a lawsuit
17   that I believe was settled.
18       Q.  You were a Defendant in that lawsuit?
19       A.  I believe so, yes.  I was either a
20   Defendant or a witness.  I thought I was a Defendant.
21           MR. WHEATON: I'm sorry to interrupt.  I
22   hadn't remembered this until now, but if it's the same
23   one I'm thinking of, I believe it was dismissed.  And
24   I don't have any issue with giving you the case name,
25   if I can find it.

Page 12

1    BY MS. STEFFAN:
2        Q.  Just generally do you remember the subject
3    of that lawsuit?
4        A.  Yes.  The reporter had alleged that someone
5    from an armored vehicle had shot them with some kind
6    of projectile.
7        Q.  And do you recall whether you were alleged
8    to have been in the armored vehicle or not?
9        A.  No, I was not alleged to have been in the
10   armored vehicle because I was not in any armored
11   vehicle at that time.
12       Q.  If you recall, what was the allegation with
13   your connection with that lawsuit?
14       A.  I was the commander of the unit at that
15   time.
16       Q.  What was the unit that you were commanding?
17       A.  Mobile Reserve/SWAT.
18       Q.  With the St. Louis Metropolitan Police
19   Department?
20       A.  Yes.
21       Q.  But an action that was alleged to have
22   occurred in St. Louis County?
23       A.  Correct.
24       Q.  Did you testify as part of that lawsuit?
25       A.  In a deposition.

3 (Pages 9 to 12)

STEPHEN DODGE  1/15/2019

## Page 13

1  Q.   You did not testify in court that you
2  recall?
3      A.   No.
4      Q.   Do you recall the disposition of that
5  lawsuit?
6      A.   To the best of my knowledge there was some
7  kind of settlement and then it required officers to do
8  some kind of training or something.  And there might
9  have been a monetary sum paid out, but I'm -- I think
10  I just read that from a newspaper or something like
11  that.  No one actually informed me.
12      Q.   Do you recall the names of the Plaintiffs
13  in the lawsuit?
14      A.   No.  I'd recognize them if I heard them,
15  but I don't remember them off the top of my head.
16      Q.   I'm going to ask you a few questions about
17  your employment history with the St. Louis
18  Metropolitan Police Department.  I understand you now
19  no longer work for that police department; is that
20  right?
21      A.   That's correct.
22      Q.   What is your current position?
23      A.   Chief of Police for the City of Sunset
24  Hills, Missouri.
25      Q.   When did you take that position?

## Page 14

1      A.   February of 2017.
2      Q.   Until February of 2017 you worked at SLMPD?
3  Nothing in-between that and Sunset Hills; correct?
4      A.   Correct.
5      Q.   While I ask you questions about your
6  employment history I'm going to hand you a document
7  you can look at.
8          MS. STEFFAN: I'm marking this document as
9  Dodge Exhibit 1.
10         MR. WHEATON: Thank you.
11         (Plaintiff Exhibit No. Dodge 1, SLMPD Work
12  History, was then marked for identification.)
13  BY MS. STEFFAN:
14      Q.   Have you seen this document before?
15      A.   Yes.
16      Q.   What is it?
17      A.   It's just a list of my assignments.
18      Q.   Does it look accurate to you?
19      A.   Yes.
20      Q.   And it's true that you began work with the
21  police department in 1994?
22      A.   Correct.
23      Q.   And you were there continuously until 2017;
24  is that right?
25      A.   That's correct.

## Page 15

1      Q.   Did you have any other law enforcement
2  related positions during your employment with
3  Metropolitan Police Department?
4      A.   No.
5      Q.   According to this document you were
6  promoted to the rank of lieutenant in 2010; is that
7  right?
8      A.   Yes.
9      Q.   And first you were assigned to specific
10  districts for a very short while and then transferred
11  to Special Ops; is that right?
12      A.   Um, yeah, about two years.  Two years in
13  District Four.
14      Q.   Okay.  Were you with the Second District as
15  a lieutenant?
16      A.   No.  I was at the Second District as a
17  sergeant.  So I got promoted out of the Second
18  District.  Yeah, I see it's in there twice.  I'm not
19  sure.
20      Q.   Okay.  So when you were promoted to
21  lieutenant you moved to the Fourth District for a
22  couple of years?
23      A.   Yes.
24      Q.   And then you moved to Special Ops?
25      A.   That is correct.

## Page 16

1      Q.   Is there a differences between what is
2  listed here as Special Operations Team-CP and SWAT?
3      A.   Yes, there is.
4      Q.   What's the difference?
5      A.   Special operations was more of a narcotics,
6  gang type unit that was stationed out of Central
7  Patrol Division and each area station had their own
8  Special Operations Team.
9      Q.   So where this document says CP, that stands
10  for Central Patrol?
11      A.   Yes.
12      Q.   And how does SWAT differ from that
13  narcotics and gang related focus of Special Ops?
14      A.   Well, SWAT is -- it's a completely
15  different unit in that it also has the tactical
16  component too.  I mean, we do some street and that
17  kind of thing, but it's also the tactical portion of
18  it, whether it's executing search warrants, responding
19  to barricade subjects, hostage situations, civil
20  disturbances, that kind of thing.
21      Q.   For a layman, what is the tactical
22  component or what do you mean when you say tactical?
23      A.   Tactical component means just the
24  specialized, officers with specialized training using
25  specialized equipment to deal with heightened threats

4 (Pages 13 to 16)

STEPHEN DODGE  1/15/2019

## Page 17

1   that involve armed subjects who might be in a
2   barricaded building wanted for a serious crime, who
3   may have taken someone hostage.  So the SWAT Team gets
4   called in to assist on those kind of things that
5   require an extra level of equipment and training.
6       Q.   Without going into great detail, what kind
7   of extra specialized equipment is available to SWAT
8   that would not be available to patrol officers?
9       A.   You know, special ballistic protection,
10  helmets, higher protection vests, carbine rifles, an
11  armored vehicle, different munitions.
12      Q.   You also mentioned that members of SWAT
13  have specialized training; is that correct?
14      A.   That is correct.
15      Q.   What types of specialized training do SWAT
16  members undergo?
17      A.   Well, they initially will undergo two weeks
18  of SWAT training, SWAT 1 and SWAT 2 training, that all
19  officers are required to go through before you get on
20  to SWAT.
21      Q.   Is moving from Special Ops to SWAT a
22  promotion?
23      A.   No.
24      Q.   It's a lateral move?
25      A.   Yes.

## Page 18

1       Q.   For you was it a voluntary move?  You
2   wanted to move from Special Ops to SWAT?
3       A.   I was asked to do it and I said yes.
4       Q.   It looks like on this document your title
5   changed in 2013 from lieutenant to police lieutenant.
6   Those might be the same thing.  I just wanted to make
7   sure.
8       A.   Yeah, it is.  That's the same thing.
9       Q.   In February of 2016 you transferred away
10  from SWAT and into the Fourth District; is that right?
11      A.   That's correct.
12      Q.   Where is the Fourth District, just roughly?
13      A.   Downtown area.
14      Q.   That too was a lateral move; is that right?
15      A.   Yes.
16      Q.   Was it something you wanted to do?
17      A.   Um, no.
18      Q.   It was involuntary?
19      A.   It's just I go where I'm told.
20      Q.   Where this document says service
21  retirement, that means that you are leaving SLMPD; is
22  that right?
23      A.   That was my last day, yes, on the SLMPD.
24      Q.   That's when you moved to Sunset Hills?
25      A.   Correct.

## Page 19

1       Q.   Have you ever been a member of a unit
2   called the Civil Disobedience Team?
3       A.   Yes.
4       Q.   Do you recall when you were a member of
5   that team?
6       A.   That was during my time in Mobile
7   Reserve/SWAT.  Members of the Mobile Reserve/SWAT Team
8   are also part of the Civil Disobedience Team.
9       Q.   It is a secondary kind of assignment?
10      A.   Just one more hat that they wore, so to
11  speak.
12      Q.   Members of CDT could come from any other
13  unit; is that true?
14      A.   Yes.  Yes.  Yeah, they were from all around
15  the department.
16      Q.   But every member of SWAT is also a CDT
17  member?
18      A.   Correct.  Yes.
19      Q.   What type of training does an officer get
20  to become a part of CDT?
21      A.   Well, I've been through probably hundreds
22  of hours of training for CDT in my career, but the
23  main gist of it surrounds chemical munitions and line
24  formations and movements within the line formations.
25      Q.   Anything else that is a major component of

## Page 20

1   CDT training?
2       A.   No.  That's about it.  I mean, there's some
3   legal -- I guess there's some legal components to it
4   as well.  But, yeah, most of all it's just line
5   formations, moving crowds and the use of chemical
6   munitions.
7       Q.   When you say line formations, that's
8   officers forming a line?
9       A.   Correct.  A skirmish line.
10      Q.   Were you a CDT commander?
11      A.   Yeah, I guess technically I guess I was.  I
12  was in charge of the CDT Team since I was commander of
13  the SWAT Team, so, yes.
14      Q.   During the time you were a member of CDT
15  how big was it, how many officers?
16      A.   It varied.  I think CDT first got its real
17  big push when the AG form was coming.  And I want to
18  say that would have been in 2001.  They had had
19  problems, I believe, in Seattle and so they wanted to
20  increase the amount of officers to be prepared when
21  the AG form came here to St. Louis.  So I want to say
22  at that point it was probably up over around 100,
23  maybe more, including SWAT officers.  And that's when
24  they redid the team and got more training and
25  equipment and that kind of thing.

**ALARIS LITIGATION SERVICES**
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

## Page 21

1    Q.   You said the membership was variable in
2    number.  Did it remain around 100?
3         A.   I can't remember.  I don't have the
4    paperwork.
5         Q.   I think you said that CDT got a push when
6    the AG form was coming.  Did it exist before that?
7         A.   Not really.  I think before that it was
8    strictly Mobile Reserve.
9         Q.   Got it.  Do you know where the name came
10   from for CDT?
11        A.   Civil Disobedience Team?  No idea.
12        Q.   You've mentioned that two major components
13   of the CDT training were line formations and the use
14   of chemical munitions; is that right?
15        A.   That's correct.
16        Q.   What did you learn about the use of
17   chemical munitions?
18        A.   I mean, that's a pretty broad, I mean,
19   broad, broad, question.  I mean, it's like, I guess to
20   sum it up, the various types there are; you know, what
21   their capabilities are; when it's appropriate to use
22   them, when it's not appropriate to use them.
23        Q.   When you took CDT training, was that as a
24   patrol officer or as a higher ranking position?
25        A.   It was as a patrol officer.  And then at

## Page 22

1    one point the Mobile Reserve/SWAT was in charge of
2    actually providing the training.  We were the
3    instructors to the officers.  And we'd meet, I think
4    it was quarterly that we'd do training.
5         Q.   You personally were a trainer?
6         A.   I did for a short while when I was a
7    sergeant, yeah.  When I was a sergeant, I did.
8         Q.   So that would have been between 2005 and
9    2009?
10        A.   No.  It would have been when I was a
11   sergeant on the Mobile Reserve Unit, which would have
12   been, I want to say, from 2007 to 2009, so a couple
13   years.
14        Q.   I'm going to ask you some questions about
15   your disciplinary history at the Metropolitan Police
16   Department.  Were you ever demoted?
17        A.   No.
18        Q.   Were you ever assigned to administrative
19   duties as a penalty for something you'd done?
20        A.   No.
21        Q.   Were you ever suspended?
22        A.   I believe one time.
23        Q.   When was that?
24        A.   Um, if you look on here, it would have been
25   11/19 of 1999.

## Page 23

1         Q.   And it appears that was for one day?
2         A.   Correct.
3         Q.   Do you recall what you were suspended for?
4         A.   Yes.
5         Q.   What were you suspended for?
6         A.   For a car accident.  I was responding to a
7    child struck.  A vehicle had run a stop sign in front
8    of me which caused me to swerve and run up into a yard
9    that had some metal poles sticking out of it, so it
10   was a violation of driving policy, since I did not
11   come to a stop before I ran through the stop sign.
12        Q.   That's the only suspension that you recall?
13        A.   Yes.  That's the only suspension I've had.
14        Q.   Were you ever docked pay or benefits as a
15   penalty?
16        A.   No, other than that.  I mean, I think they
17   dock you a day's pay for that.
18        Q.   Did you ever receive a reprimand?
19        A.   No.  Um, hold on.  Check that.  Because I
20   think maybe on a car accident I might have received a
21   reprimand.
22        Q.   A different car accident?
23        A.   Yes.
24        Q.   You might have received a written
25   reprimand?

## Page 24

1         A.   I can't remember if it was written or oral.
2    I can't remember whether -- I think it was a
3    written reprimand -- uh.  Whatever you get for your
4    first car accident, chargeable car accident.
5         Q.   Were you ever told that you needed to
6    undergo counseling on a policy or retraining on a
7    policy of the department?
8         A.   No.
9         Q.   Do you know if anyone filed a civilian
10   complaint against you while you were with the St.
11   Louis Metropolitan Police Department?
12        A.   Have any civilians filed a complaint on me?
13   Yes.
14        Q.   Do you know how many times?
15        A.   I don't.
16        Q.   Thinking back to the most recent civilian
17   complaint you recall, when was that?
18        A.   The last one I can remember would have
19   been -- I can't remember if it was me or if I was with
20   a group and I was a witness.  Probably in 2000 and --
21   I would have been a sergeant.  2005 maybe.
22        Q.   Do you recall why?
23        A.   It was some subjects we found with some
24   narcotics in O'Fallon.  And I can't remember the gist
25   of the complaint, but they didn't like the way it was

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

## Page 25

1  handled by us.
2      Q.  I'm sorry.  O'Fallon, Missouri?
3      A.  I'm sorry.  O'Fallon Place Apartments.
4      Q.  You don't recall any civilian complaints
5  that occurred that were filed between 2005 and the end
6  of your tenure at SLMPD?
7      A.  No.
8      Q.  Thinking back to the 2005 civilian
9  complaint, what was the outcome in that investigation?
10     A.  To the best of my knowledge it was not
11 sustained.
12     Q.  Were you ever reviewed for using force a
13 certain number of times in a certain period of time?
14     A.  No.
15     Q.  My understanding is the department, at
16 least at some point, had a policy of reviewing an
17 officer's uses of force if they were close enough
18 together in a certain period of time?
19     A.  Yes.
20     Q.  Is that correct?
21     A.  Yes.
22     Q.  When you left SLMPD was that still the
23 policy to your understanding?
24     A.  Yes.
25     Q.  And was that the policy throughout your

## Page 26

1  tenure there?
2      A.  I mean, as a sergeant and a lieutenant I
3  remember it, yes.
4      Q.  Do you know if anyone ever filed an
5  employee misconduct report on you?
6      A.  A fellow employee?
7      Q.  Either a fellow employee or a civilian?
8      A.  I mean -- okay.  Is there something
9  different from this than what the other complaint was
10 or is this the same question?
11     Q.  My understanding is a person who wants to
12 complain about an officer can do that either through
13 an employee misconduct report or some other way.  So I
14 don't know.  That's my question.
15     A.  I consider them to be the same.
16     Q.  Okay.
17     A.  So, I mean, it would be referred to my
18 earlier question.  Yes.
19     Q.  That was an employee misconduct report, to
20 your understanding?
21     A.  Yeah.  That's the same -- I understand that
22 to be the same thing as you had asked me earlier.  Any
23 kind of complaint.  We call them complaints.  Has
24 anyone ever filed a complaint on you kind of thing.
25     Q.  Got it.  So you may have already answered

## Page 27

1  that, but just to clarify, do you know whether any
2  other officer filed an employee misconduct report on
3  you while you were at SLMPD?
4      A.  No.
5      Q.  Have you ever filed an employee misconduct
6  report on another officer?
7      A.  As a supervisor, yes.
8      Q.  How many times?
9      A.  Um, I think maybe once or twice.
10     Q.  And just approximately when was that?
11     A.  It's been a while.  I think the one was as
12 a lieutenant when I was in the Fourth District, so I
13 would say that would have been around 2011 or so.
14     Q.  Did you ever file an employee misconduct
15 report when you were a lieutenant with SWAT/Mobile
16 Reserve?
17     A.  I can't remember.
18     Q.  And very generally thinking back to the
19 employee misconduct report you described in
20 approximately 2011, what was the subject of that
21 report?
22     A.  One officer had come to me stating that
23 another officer while searching -- she was a female
24 officer and she had asked this male officer to help
25 her conduct a search, that he was attempting to assist

## Page 28

1  the prisoner in concealing narcotics that he had found
2  on him.
3      Q.  Have you ever filed an EMR related to
4  excessive force?
5      A.  I can't remember.  I may have.  Nothing
6  strikes me though.
7      I take that back.  I don't know if I wrote
8  it or I just reported it.
9      Q.  You recall one circumstance where you might
10 have done that?
11     A.  Yes.  I was a sergeant in the Sixth
12 District where a prisoner complained that one of our
13 officers had flicked a lit cigarette at him, so I
14 contacted Internal Affairs immediately and reported
15 the incident.
16     Q.  Other than that incident, do you recall any
17 other times when you contacted Internal Affairs about
18 a possible unreasonable use of force?
19     A.  No.
20     Q.  Are you familiar with an organization
21 called the St. Louis Police Officers Association?
22     A.  Yes.
23     Q.  Were you a member when you were working at
24 SLMPD?
25     A.  Yes, I was.

7 (Pages 25 to 28)

STEPHEN DODGE  1/15/2019

Page 29

1      Q.   Did you have any leadership roles?
2      A.   No.
3      Q.   Are you familiar with an organization
4  called the Ethical Society of Police?
5      A.   Yes.
6      Q.   Were you a member of it while you were at
7  SLMPD?
8      A.   No.
9      Q.   Do you know whether you can be a member of
10  both?
11      A.   Um, I believe so, yes.
12          (Plaintiff Exhibit No. Dodge 2, Unit File,
13  was then marked for identification.)
14      Q.   I'm going to hand you another document.
15  I've marked this as Dodge Exhibit 2.  Have you ever
16  seen this document before?
17      A.   No.
18      Q.   Do you see on the first page where it says
19  Unit File?
20      A.   Yes.
21      Q.   Do you know what a unit file is?
22      A.   I guess it's my personnel file.
23      Q.   That is my understanding.
24      A.   Okay.
25      Q.   Or at least perhaps a portion of it.

Page 30

1      A.   Okay.
2      Q.   Have you ever seen another officer's unit
3  file?
4      A.   I guess at some point in time I probably
5  have.
6      Q.   So if you want to take a second and page
7  through it, I understand that you are saying you've
8  never seen this unit file before; correct?
9      A.   I've never looked at my unit file or my
10  personnel file before, no, I haven't.
11      Q.   Okay.  As you are paging through it, do you
12  see documents do you recognize and just did not know
13  were part of your unit file or have you not seen
14  documents like these before?
15      A.   I mean, I've certainly entered department
16  memos.  Now whether I've seen these specific ones,
17  it's possible.  It's just been a long time.
18          MR. WHEATON: I just want to point out for
19  the record you've asked him to thumb through it.  It's
20  approximately 180 pages, so.
21          MS. STEFFAN: It is a long document.
22  BY MS. STEFFAN:
23      Q.   Have you seen other things from SLMPD that
24  you would consider to be part of your personnel
25  record?

Page 31

1      A.   Um, just stuff in like -- like that form
2  right there, Exhibit 1.
3      Q.   Other than the Exhibit 1 -- (attorney did
4  not finish question.)
5      A.   PeopleSoft, stuff from PeopleSoft.
6      Q.   What is PeopleSoft?
7      A.   I think that's where this was procured
8  from.  PeopleSoft was kind of our human resources
9  document where you document your hours and it lists
10  your assignments and that kind of thing.
11      Q.   Gotcha.  Does PeopleSoft have the -- let me
12  back up.  PeopleSoft is a piece of software that's on
13  the computer?
14      A.   Correct.
15      Q.   And that is where you would document the
16  times you come to work and leave work?
17      A.   Correct.
18      Q.   Does PeopleSoft also have other records
19  about your work in it or just your hours?
20      A.   It has work assignments and that kind of
21  thing.
22      Q.   In more detail than what we see here in
23  Exhibit 1 or is it a printout like we see?
24      A.   Well, there's a printout.  There's a long
25  printout that has all your training and stuff listed

Page 32

1  on it.
2          (Plaintiff Exhibit No. Dodge 3, Course
3  Entries, was then marked for identification.)
4      Q.   That is a good segue.  Let me hand you a
5  third document.
6          What you've just mentioned might be
7  viewable in PeopleSoft that has a list of your
8  training.
9      A.   Exactly.
10      Q.   Is this what you were referring to?
11      A.   Yes.  Yes.  This is what I was referring
12  to.
13      Q.   And just for the record, you are referring
14  to what I've marked as Dodge Exhibit 3.
15          Just to clarify, this is a list of your
16  training; is that right?
17      A.   Yes.
18      Q.   This one is a lot shorter than what I just
19  handed you.  Does it look accurate to you?
20      A.   It does.  Although, I can tell you that not
21  initially all the training I've had would be on here
22  because I have taken some training before that has not
23  been listed on here, for whatever clerical reason.
24      Q.   You have anticipated my question.  Why are
25  things listed on here sometimes but not always?

8 (Pages 29 to 32)

Page 33

1    A.  Just because of human error.
2        Q.  Do you think there is a lot missing from
3    this document or just a few things?
4        MR. WHEATON: Objection.  Calls for
5    speculation.
6        A.  It's hard to tell.  I couldn't say.
7    BY MS. STEFFAN:
8        Q.  You don't recall how much training you went
9    to that's not on this list?
10       A.  I've been through a lot, a lot of training,
11   and I don't actually remember every piece of training
12   compared to what's on here.  I would say probably the
13   majority, but, yeah, there could be good chunks that
14   are not on here as well.
15       Q.  Okay.  I'd like to direct your attention to
16   a couple of specific courses that you took fairly
17   recently in the last few years.
18       If you look at the third line in September
19   27th, 2016.
20       MR. WHEATON: I'm sorry.  What page?
21       MS. STEFFAN: On the first page.
22   BY MS. STEFFAN:
23       Q.  Do you see a course called ICS 100b?
24       A.  Yes.
25       Q.  Do you know what that refers to?

Page 34

1        A.  I believe it's incident command training.
2        Q.  What is covered in incident command
3    training generally?
4        A.  Um, basically responses to critical
5    incidents.
6        Q.  What is a critical incident?
7        A.  It could be anything from a natural
8    disaster to a hostage situation to a fire to a hazmat.
9    That's a big one.  To a civil unrest, to a bunch of
10   different things.
11       Q.  Tell me again what you said ICS stands for.
12   Incident command?
13       A.  Yeah.  I don't know what that -- I think
14   it's -- I think this is what it is.  Incident Command
15   System maybe.
16       Q.  All right.  Is it for people who are going
17   to be an incident commander?
18       A.  I think it can be for anybody.  I think
19   everybody goes through it at some point in time.  It's
20   not just for commanders.
21       Q.  Okay.  Are the trainings that are listed in
22   this document typically more or less than one day or
23   is it not clear?
24       A.  Most training is one day, but there are
25   some trainings that are more than one day.

Page 35

1        Q.  Okay.  I'd like you to look at the training
2    that you took on April 18th of 2015.  This is still on
3    the first page about ten lines down.  Do you see where
4    it lists a training called 2015 Leader Symposium?
5        A.  Yes.
6        Q.  Do you recall what that training covered?
7        A.  Yes.  That was something Chief Dotson had
8    put on out at Ameren.  And that was, I want to say, a
9    day or a half a day.
10       Q.  Generally what was it about?
11       A.  Just leadership stuff, how to be a good
12   leader, that type of thing.
13       Q.  Looking at the training that you took on
14   December 23, 2014, do you see where it says 2014
15   Non-Biased Policing?
16       A.  Yes.
17       Q.  Do you recall that training?
18       A.  Yes.  That's our -- I believe at the time
19   it was an annual racial profiling training class.
20       Q.  Do you recall how long it was?
21       A.  I want to say four -- either four or eight
22   hours.  I can't remember which.
23       Q.  Looking a few lines down to the training
24   from October 2nd, 2014, do you see a training called
25   Lessons of Ferguson?

Page 36

1        A.  Yes.
2        Q.  Do you recall that training?
3        A.  I don't.
4        Q.  Officers are required to undergo a certain
5    amount of training per year at SLMPD; is that right?
6        A.  Yes, proposed.  And I believe it's over a
7    three-year cycle.  It may have changed, but I thought
8    it was over a three-year cycle.  Actually, it did
9    change.  I think it is now a yearly cycle you're
10   required.  And that just changed two or three years
11   ago.
12       Q.  Is it the same for Sunset Hills?
13       A.  Yeah, it's the same.
14       Q.  Because that's set by the post commission?
15       A.  Correct.  At the time it was, I think, over
16   a two or three-year cycle and then they recently
17   changed it two years ago, two or three years ago.
18       Q.  Do you know what the requirements were when
19   it was a three-year cycle?
20       A.  They had different disciplines and you were
21   required to have so many total hours.  You know, like
22   interpersonal skills, firearms training.  I can't
23   remember what the third one was.  But under each
24   discipline you were required to have so many hours per
25   discipline.

9 (Pages 33 to 36)

STEPHEN DODGE  1/15/2019

## Page 37

1    Q.  Do you know if there are the same or
2  different training requirements for patrol officers
3  versus higher ranking officers?
4    A.  I believe they are the same for all police
5  officers.
6    Q.  Did you comply with the training you were
7  required to get?
8    A.  Yes.
9    And can I go back on the Lessons of
10  Ferguson?
11    Q.  Sure.
12    A.  I believe we had a meeting with all the
13  various police departments involved in Ferguson.  And
14  I want to say it was headed by -- like Highway Patrol
15  was there, Chief Belmar was there and I remember it
16  was almost like a debriefing of sorts.  And I think
17  that might be what that was.
18    So it came out -- it's listed as training.
19  I thought it was more of like a debriefing kind of
20  thing.  I think that might be what that was, just to
21  go back and clarify that.
22    Q.  Fair to say it was multi-jurisdictional?
23    A.  Yes.
24    Q.  Do you recall how long it was?
25    A.  Two to four hours.

## Page 38

1    Q.  Who ran that debriefing?
2    A.  I want to say it was kind of a joint thing.
3  There might have been some -- um, I think the chiefs,
4  but there might have been -- yeah, pretty much ran it,
5  if I recall.
6    Q.  You didn't run the training?
7    A.  No.
8    Q.  Or debriefing?
9    A.  No.
10    Q.  You participated in it?
11    A.  Yes.
12    Q.  Okay.  Do you know if other SWAT officers
13  participated or would it have depended on whether they
14  responded to the Ferguson situation?
15    A.  My sergeants might have been there, but I
16  can't say for sure.  So I don't know what other SWAT
17  personnel were there.
18    Q.  You were a member of CDT while you were on
19  SWAT/Mobile Reserve; right?
20    A.  Correct.
21    Q.  What is your understanding of what civil
22  disobedience means?
23    A.  Civil disobedience is basically where a
24  crowd forms in a certain location and acts in an
25  unlawful manner because of a certain cause.

## Page 39

1    Q.  Have you received any training about
2  responding to protests?
3    A.  Yes.
4    Q.  What do you include in that list of
5  training that you have received?
6    A.  I think that would be covered within civil
7  disobedience, when it goes from a peaceful protest to
8  a civil disobedience encounter.
9    Q.  When you were a member of SLMPD did you
10  have occasion to review the department's use of force
11  policy?
12    A.  Yes.
13    Q.  It's my understanding all officers are
14  required to do that once a month; is that right?
15    A.  That is correct.
16    Q.  And did you actually do that?
17    A.  Yes.
18    Q.  What did that review entail?
19    A.  Um, it entailed a test basically, a three
20  or four question test concerning the use of force
21  policy.
22    Q.  Are the questions like hypotheticals like
23  what would you do in this circumstance or are they
24  something different than that?
25    A.  I think they were more along the lines of

## Page 40

1  what the policy was, the actual policy itself.
2    Q.  My understanding is the test came through
3  something called the Policy Acknowledgement System; is
4  that right?
5    A.  PAS, yes.
6    Q.  Are the questions the same every month?
7    A.  I think they vary, but not a lot.
8    Q.  To the best of your recollection, were
9  there any changes to the use of force policy while you
10  were on SWAT/Mobile Reserve?
11    A.  Um, at one point I think there was a -- I
12  can't say for sure, but I thought there might have
13  been some stuff added after Ferguson relative to the
14  use of chemical munitions, but I can't remember if
15  they put that on the general policy or not.  I know
16  they added a policy concerning that after a decision
17  by the federal court.  That was the change that I can
18  think of.
19    Q.  Do you recall what the changes were?
20    A.  Just something to the effect of stuff,
21  frankly, we were already doing.  That is, giving
22  directions on where you wanted people to disperse and
23  that kind of thing; making several announcements to
24  disperse and giving them directions, clearcut
25  directions, where to go and that chemical munitions

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

## Page 41

1   could be used if they weren't followed.
2        Q.   Was that following an order in a case
3   called Templeton versus City of St. Louis, do you
4   recall?
5        A.   I believe so, yes.
6        Q.   Did you testify as part of that lawsuit?
7        A.   Yes, I did.
8        Q.   Was everything you said during your
9   testimony truthful?
10       A.   Yes.
11       Q.   I'm going to direct your attention now to
12   the day most fully described in this case, which is
13   August 19th of 2015.
14            Are you aware that a police officer shot
15   and killed a civilian named Mansur Ball-Bey on
16   August 19th, 2015?
17       A.   Yes.
18       Q.   Are you aware that there was a protest
19   after that?
20       A.   Yes.
21       Q.   You were a lieutenant with SWAT at that
22   time; is that right?
23       A.   Yes.
24       Q.   Did you -- well, let me ask.  If I use the
25   term the Fountain Park neighborhood are you familiar

## Page 42

1   with that term?
2        A.   Yes, I am.
3        Q.   On August 19th, 2015, did you get deployed
4   to the Fountain Park neighborhood?
5        A.   Yes.
6        Q.   Do you recall what time of day you arrived?
7        A.   Now this is specific to the protest, not to
8   the search warrant during when Ball-Bey was shot;
9   correct?  You're talking about when we responded for
10   the protest?
11       Q.   Yeah.  I should clarify.
12       A.   Because this would be the second time we
13   responded.  Because we were actually -- I was part of
14   the team that made entry.  And then we left and then
15   we were directed to come back.  So just to clarify,
16   you're talking about the second time; correct?
17       Q.   Yes.
18       A.   Okay.
19       Q.   I'm going to be asking you questions about
20   the response to the protest, not the execution of the
21   search warrant.
22       A.   Gotcha.
23       Q.   So just for clarity's sake, you responded
24   to the Fountain Park protest for the purpose of
25   executing a search warrant early in the day --

## Page 43

1        A.   Correct.
2        Q.   -- on August 19, 2015?
3        A.   Correct.
4        Q.   And then you responded a second time after
5   the protest began; is that correct?
6        A.   That's correct.
7        Q.   As part of SWAT on both occasions; right?
8        A.   Yes.
9        Q.   So focusing on the second time you
10   responded to the Fountain Park neighborhood, do you
11   recall what time you arrived there?
12       A.   It was sometime late afternoon.
13       Q.   Who told you to go there?
14       A.   Colonel Leyshock.
15       Q.   Did Colonel Leyshock tell you why you were
16   going there?
17       A.   Just that there was a protest and people
18   were blocking the intersection of Page and Walton.
19       Q.   Do you recall whether you arrived by
20   yourself or with members of SWAT?
21       A.   Members of the SWAT Team.
22       Q.   Do you recall who you arrived with?
23       A.   No.  I mean, the SWAT Team.
24       Q.   You recall they were SWAT, but not the
25   specific people?

## Page 44

1        A.   I can remember a few of them, yes.
2        Q.   Who do you recall?
3        A.   Officer Coats, Officer Busso, Officer
4   Wethington, Manasco, Seper, Mader, Frigerio, Zwilling,
5   Long, Joyner, Moore, Ron Allen.  Those are the names
6   that come to mind right now.  There could be more.
7        Q.   Were other units also responding to
8   Fountain Park at that time?
9        A.   There were a bunch of units there.
10       Q.   Do you recall what other units were there?
11       A.   Um, I believe Anticrime was there, Special
12   Operations and then a bunch of district personnel.
13       Q.   Do you recall what the first thing is that
14   you did when you got to the Fountain Park neighborhood
15   that afternoon?
16       A.   I don't.  I know at some point I talked to
17   Colonel Leyshock and we pulled the BEAR up at one
18   point in time and then we were directed.
19       Q.   Just to be clear, when you say the BEAR,
20   you're talking about the tactical vehicle?
21       A.   Correct.
22       Q.   When you say you pulled it up, what does
23   that mean?  Pulled it up from where?
24       A.   Just drove up to where I guess they had a
25   line formed.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

Page 45

1          Q.  Would that be at Page and Walton?
2          A.  That would have been probably at Marcus and
3    Page, somewhere in that area.
4              (Plaintiff Exhibit No. Dodge 4, Google
5    Earth Map, was then marked for identification.)
6          Q.  I'm going to hand you another document
7    which we'll mark as Dodge Exhibit 4.  Just for
8    clarity's sake, the document that I've handed to you
9    is a map printed out from Google Maps.
10             When we discuss the Fountain Park
11   neighborhood, is this roughly the area that you
12   recognize that to be?
13         A.  Yes, it is.
14         Q.  And as I'm asking you questions you should
15   feel free to refer to the map if it helps you talk
16   about specific locations.
17             We had just talked about the BEAR being
18   pulled up to the Fountain Park neighborhood; is that
19   correct?
20         A.  Correct.
21         Q.  And I think you said that that was near
22   Page and Marcus; is that right?
23         A.  Yes.  That's where, I believe, everyone was
24   staged when we first arrived.
25         Q.  When you say everyone, you mean police

Page 46

1    officers, not the civilians; right?
2          A.  Correct.
3          Q.  When you use the term "staged", what does
4    that mean?
5          A.  Assembled.  That just means that's where
6    everyone is meeting.
7          Q.  Who made the decision to pull the BEAR up
8    to near Page and Marcus?
9          A.  Um, everything was pretty much being
10   directed by Chief Dotson at the time.  So I can't
11   remember specifically who told me to pull it up there,
12   but generally speaking, I mean, obviously whenever we
13   respond to potentially violent protests we will
14   utilize the BEAR.
15         Q.  Chief Dotson was there personally; right?
16         A.  Yes.
17         Q.  And Colonel Leyshock as well?
18         A.  Correct.
19         Q.  You were commanding SWAT on that day?
20         A.  Yes.
21         Q.  Let me ask you this.  How did the BEAR get
22   to that staging location near Page and Marcus?
23         A.  It was driven there from headquarters.
24         Q.  By a SWAT Team member?
25         A.  Yes.

Page 47

1          Q.  Do you recall how long -- let me ask this.
2              You were staged near Page and Marcus as
3    well, you personally; is that right?
4          A.  Yes.  Initially, yes.
5          Q.  Do you recall how long you were there?
6          A.  During -- can you get more specific?
7          Q.  Sure.  When you first arrived in the
8    Fountain Park neighborhood, the first place you went
9    was near Page and Marcus where the other police
10   officers were staged; is that right?
11         A.  Yes.
12         Q.  Do you recall how long you were in that
13   location at that period?
14         A.  Specifically at Marcus and Page or in that
15   general area?
16         Q.  Um, either one.
17         A.  I would say we were in that area for a
18   while.  Three or four -- I mean, yeah, that general
19   area, we were there probably six or seven hours,
20   eight.  Probably even longer than that.  Eight or nine
21   hours.
22         Q.  And when you say in that general area, do
23   you mean the neighborhood as a whole?
24         A.  Yeah.  The neighborhood and in that area.
25   Because at one point we went down to Walton and Page.

Page 48

1    Or we went down to Walton and Page, we came back, we
2    went back down.  We left.  We went over to the school
3    there at Taylor and Page.  And then we went back into
4    Bayard when the house got set on fire.  So that
5    general area right there, I can't remember exact time
6    period, but it was a while.
7          Q.  That day were you traveling on foot or were
8    you in a vehicle?
9          A.  I was in my vehicle.
10         Q.  Is that a cruiser of some kind?
11         A.  It's a -- it was a Tahoe.  Unmarked, white
12   Tahoe.
13         Q.  And you said, as you were describing your
14   actions that day, "we" were moving around.  Are you
15   referring to members of SWAT when you say "we"?
16         A.  I'm referring to -- yeah.  Sometimes it was
17   everybody, sometimes it was just the SWAT Team.  For
18   instance, when they set the building on fire, it was
19   just the SWAT Team that went down there.
20         Q.  You've described how long you were in that
21   general area as something like eight or nine hours; is
22   that right?
23         A.  Yes.
24         Q.  Do you recall how long you were at that
25   specific location of near Page and Marcus?

12 (Pages 45 to 48)

STEPHEN DODGE  1/15/2019

| Page 49 | Page 51 |
|---|---|

**Page 49**

1   A.  Well, again, we were there.  We went up to
2   Page and Walton and then we came back.
3        So you're talking about the total time at
4   Marcus and Page between the times we left and came
5   back, the total amount, or just the first time we were
6   there?
7        Q.   Just the first time you were there before
8   you left that location?
9        A.  I don't.  I'd be guessing.
10       Q.   You testified earlier that the BEAR was
11  pulled up to the Fountain Park neighborhood from
12  headquarters; is that right?
13       A.  Yes.
14       Q.   How long after you arrived in the Fountain
15  Park neighborhood was the BEAR pulled up there?
16       A.  I think we got there at the same -- pretty
17  much the same time.  I think we went down there as a
18  unit.
19       Q.   Got it.  Was the BEAR sort of traveling
20  around, like you were traveling around in your Tahoe?
21       A.  Did it -- traveling around, do you mean did
22  it drive from headquarters down to Page and Marcus?
23       Q.   Yes.  So you've already said that the BEAR
24  was driven from headquarters to Page and Marcus?
25       A.  Correct.

**Page 50**

1        Q.   And it went there and staged with the other
2   officers; right?
3        A.  Correct.  Yes.
4        Q.   After that point did it remain stationary
5   near Page and Marcus for a long time or did it start
6   traveling around like you did in your Tahoe?
7        A.  It was stationary there until we were given
8   orders to move up.  And then it came back and then it
9   moved up again.  And then we left the area.  And then
10  we responded for the fire.
11       Q.   When you say "moved up", do you mean toward
12  the west?
13       A.  Correct.
14       Q.   So just so the record is clear, from near
15  Page and Marcus to near Page and Walton; is that
16  correct?
17       A.  Correct.
18       Q.   Okay.  And you said we were given an order
19  to do that.  Who gave that order?
20       MR. WHEATON: Objection to form.  It's vague
21  as to timeframe.
22       A.  Chief Dotson, I believe.  I can't remember
23  who specifically gave me the order, but I know Chief
24  Dotson was in charge of the scene.
25  BY MS. STEFFAN:

**Page 51**

1        Q.   Okay.  And so that I understand, the BEAR
2   moved up twice, is what you're saying?  It moved up
3   once and then it moved back and then it moved up
4   again --
5        A.  Yes.
6        Q.   -- and then it moved back again?
7        A.  Yes.
8        Q.   Okay.  Were you ever stationed on or in the
9   BEAR?
10       A.  Our BEAR, no.
11       Q.   You clarified not our BEAR.  You were on
12  the St. Clair tactical vehicle?
13       A.  Yes, I was.
14       Q.   If you recall, when did that vehicle arrive
15  at the scene?
16       A.  Um, that vehicle arrived a little bit
17  later, maybe an hour or so after we got down there, at
18  my request.
19       Q.   And did it go to that location near Page
20  and Marcus also?
21       A.  Yes.
22       Q.   And there were officers from other
23  jurisdictions with that vehicle; correct?
24       A.  Yes.  There were two officers from the
25  Illinois jurisdictions that were in the St. Clair

**Page 52**

1   BEAR, BEAR Cat.
2        Q.   A BEAR Cat is somewhat smaller than a BEAR?
3        A.  Yes.
4        Q.   You said that vehicle arrived at your
5   request; is that right?
6        A.  Yes.
7        Q.   Why did you request for that vehicle to
8   come?
9        A.  Um, because it's been my experience from
10  the other protests that there's been a lot of gunfire
11  associated with it.  And so I wanted as much
12  protection for my SWAT officers as possible.  And the
13  second BEAR allowed us to protect my officers and also
14  to patrol the area at that time to ensure that
15  everyone had dispersed from the area.
16       Q.   How did you envision that the second BEAR
17  would help protect your officers?
18       A.  It is a bullet resistant vehicle, so if
19  anyone were to shoot at it, anyone inside should be
20  protected.
21       Q.   Were there St. Louis officers on that BEAR
22  Cat?
23       A.  Yes.
24       Q.   Do you recall who?
25       A.  Myself, the two St. Clair.  I think Nick

13 (Pages 49 to 52)

STEPHEN DODGE  1/15/2019

## Page 53

1    Manasco was in there, Brandon Moore and a couple
2    others I can't remember.
3         Q.   When did you first become stationed on the
4    St. Clair BEAR Cat?
5         A.   Um, well, Chief Dodson had already given us
6    the order to disperse the crowd.  And so the BEAR, the
7    city BEAR, had driven through the crowd deploying
8    chemical munitions.  And at that time is when the,
9    shortly thereafter -- while that was going on or
10   shortly thereafter is when the St. Clair BEAR arrived.
11        Q.   When it arrived did you immediately get in
12   it?
13        A.   I don't know if it was right away or talked
14   to the team first or -- I can't remember the exact.  I
15   don't think I got in it right away, but fairly soon
16   after it arrived.
17        Q.   I think you testified that you believed the
18   BEAR Cat would help to protect your officers and also
19   patrol the area; is that correct?
20        A.   Yes.
21        Q.   When you got on the St. Clair BEAR Cat were
22   you intending to patrol the area at that time?
23        A.   Yes.
24        Q.   Where did you go?
25        A.   I directed, I believe, Sergeant Mayo, who

## Page 54

1    was in the city BEAR, to patrol the area south of Page
2    to ensure that the rioters had dispersed the area.
3    And we would patrol the north part to ensure that all
4    the rioters had left the area.  So he took south of
5    Page and we were going to take north of Page.
6         Q.   You weren't driving the St. Clair BEAR Cat;
7    correct?
8         A.   No.
9         Q.   That was a St. Clair officer who was doing
10   that?
11        A.   I think he's Belleville, but I know they're
12   from St. Clair County, but not necessarily St. Clair
13   County Sheriff's Department.
14        Q.   You took -- in the St. Clair BEAR Cat you
15   took the north side of Page and Sergeant Mayo in the
16   city BEAR took the south side of Page; is that
17   correct?
18        A.   That's correct.
19        Q.   And Sergeant Mayo was the highest ranking
20   officer in the city BEAR at that time; is that
21   correct?
22        A.   Yes.
23        Q.   What did you -- well, I think you just
24   said, you testified that you directed Sergeant Mayo to
25   ensure that the rioters had dispersed the area; is

## Page 55

1    that correct?
2         A.   Yes.
3         Q.   When an officer is making a determination
4    about whether a group has dispersed the area, what is
5    he or she looking for?
6         A.   Well, they're looking for large groups of
7    people who are leaving or who are restaging in another
8    location.
9         Q.   I think we both used the term chemical
10   munitions a few times during this deposition; correct?
11        A.   Yes.
12        Q.   That's a term you are familiar with?
13        A.   Yes.
14        Q.   What does it mean to you?
15        A.   It is a -- it's a munition that can either
16   be launched from a launcher or it can be hand-held.
17   And it emits a smoke-type material that is a chemical
18   irritant that people, you know, makes people
19   uncomfortable, makes their eyes tear up and makes them
20   want to get away from it, to leave the area.
21        Q.   Were chemical munitions deployed by St.
22   Louis Metropolitan police officers on August 19, 2015,
23   in the Fountain Park neighborhood?
24        A.   Yes.
25        Q.   Do you know where?  And you should feel

## Page 56

1    free to refer to the map if it helps you.
2         A.   Yes.  I would say in the areas of Bayard
3    and Page, which was the initial distribution, up to
4    Euclid and Page.  And I think that was the general
5    area where chemical munitions were deployed.
6         Q.   When you were on the St. Clair BEAR Cat
7    patrolling the area north of Page did that BEAR Cat
8    deploy any chemical munitions?
9         A.   Yes, we did.
10        Q.   Where at?
11        A.   The area of Bayard, around Bayard, between
12   Bayard and Euclid on the north side of the street.
13        Q.   Was the vehicle still on Page Boulevard at
14   that time?
15        A.   Yes, it was.
16        Q.   Did the St. Clair BEAR Cat deploy any
17   chemical munitions while it was driving down any
18   street other than Page?
19        A.   I believe when we made a right turn on
20   Euclid we may have deployed chemical munitions at that
21   point, too.
22        Q.   And how about the city BEAR that was
23   patrolling the area south of Page?  Do you know if
24   that vehicle deployed chemical munitions anywhere
25   other than while it was driving on Page Boulevard?

14 (Pages 53 to 56)

STEPHEN DODGE  1/15/2019

## Page 57

1    A.  Maybe.  I think at some point, yeah.  Maybe
2  when it made a left turn onto Euclid, right there on
3  the corner, or when it -- I should say when it circled
4  around and came back the first time I believe it
5  deployed, but that was still on Page though.  So, no,
6  I'm only aware of the ones on Page.
7    Q.  While you were on the St. Clair BEAR Cat
8  patrolling the area north of Page Boulevard were you
9  in communication with the BEAR that was south of Page?
10    A.  I don't know if I communicated.  I could
11  have.
12    Yeah, I would have communications with them
13  if I needed to talk to them concerning something.  I
14  don't know if I actually communicated with them during
15  that time though.
16    Q.  If you had wished to communicate, how would
17  you have done that?
18    A.  On the radio.
19    Q.  And that's something you wore on your
20  uniform?
21    A.  Yes.
22    Q.  And your officers that were on the BEAR
23  patrolling the area south of Page Boulevard also had
24  radios on their uniforms?
25    A.  Yes, they do.

## Page 58

1    Q.  Did you personally deploy any chemical
2  munitions on August 19, 2015?
3    A.  No.
4    Q.  You did see chemical munitions deployed
5  from the St. Clair BEAR Cat; correct?
6    A.  Yes.
7    Q.  Who deployed those?
8    A.  I believe Nick Manasco.
9    Q.  Anyone else?
10    A.  No.
11    Q.  And did you see the city BEAR deploy any
12  chemical munitions?
13    A.  Yes.
14    Q.  Do you know who deployed those?
15    A.  The initial -- the first time we were told
16  by Chief Dotson to disperse the crowd when the BEAR
17  drove westbound on -- well, actually, check that.
18    Before we even did that, we deployed a
19  pepper ball because we went up the use of force
20  continuum.  So we deployed the inert smoke, which was
21  done, I believe, by Manasco or it could have been done
22  by somebody else.  But I know we deployed the inert
23  smoke and then we deployed the pepper ball.  And then
24  they kept throwing bricks.
25    At that point Chief Dotson told me to

## Page 59

1  disperse the crowd.  And at that point I told them to
2  disperse the crowd.  And at that point it would have
3  been, I think, Officer Coats, who was on top of the
4  BEAR, who initially deployed from the launcher.
5    Q.  The launcher sort of looks like a gun?
6    A.  Yes.
7    Q.  But is capable of just deploying a chemical
8  agent; is that right?
9    A.  That's correct.
10    Q.  Did the St. Clair BEAR Cat have launchers
11  on board?
12    A.  Yes, I believe so.
13    Q.  And that's what Officer Manasco used?
14    A.  Yes.
15    Q.  Do you know if the city BEAR had multiple
16  launchers on board or did Officer Coats have the only
17  one?
18    A.  I am unaware.
19    Q.  How many launchers does SWAT have or did it
20  have at the time?
21    A.  I want to say -- ah, do you want me to give
22  you an estimate?
23    Q.  Just an estimate, yeah.
24    A.  I would say two multi-launchers and three
25  or four single launchers.

## Page 60

1    Q.  You'll have to explain.  What's the
2  difference between a multi and a single launcher?
3    A.  A single, you can only launch one at a time
4  whereas the multi has almost like a cylinder that
5  holds multiple cartridges and it rotates as you shoot.
6    Q.  I think earlier you had testified that
7  chemical munitions could be launched with a launcher
8  or thrown by hand; is that correct?
9    A.  Yes.
10    Q.  How do you make a decision about which is
11  appropriate?
12    A.  Well, I mean, it's a tactical decision
13  based on obviously your distance to the crowd.  If you
14  need to keep your distance from the crowd then you're
15  more likely to use the launcher.  If you are able to
16  get closer to the crowd, then the hand-helds are
17  better in terms of they disperse more of the tear gas.
18    Q.  I believe what you testified earlier is
19  that you told Sergeant Mayo to use the BEAR to patrol
20  the area south of Page Boulevard and to ensure that
21  rioters were dispersed; is that right?
22    A.  That's correct.
23    Q.  How did you convey that instruction to him?
24    A.  I told him -- I believe I told him that,
25  after they had dispersed the crowd initially and then

15 (Pages 57 to 60)

STEPHEN DODGE  1/15/2019

Page 61

1  came back and met between Marcus and Walton, had a
2  conversation with him telling him that.
3      Q.  And when you say that that conversation
4  occurred after they had dispersed the crowd initially,
5  when you say "they" you mean the BEAR when it had --
6  it had already traveled a circuit at that point?
7      A.  It had already gone up to Euclid, deployed
8  gas at Bayard and at Euclid and then came back to
9  where we were, to where we were standing.
10     Q.  Okay.  Who had told either Sergeant Mayo or
11 the other officers on the BEAR to make that first loop
12 when it deployed gas the first time?
13     A.  I did.
14     Q.  Okay.
15     A.  Yeah.
16     Q.  So it was two times?
17     A.  Yes.  Yes.  That was when Chief Dotson gave
18 me the order to disperse the crowd.  Then I told him
19 go ahead or told, I believe it was him, and the people
20 in the BEAR, go ahead and deploy gas to disperse the
21 crowd.
22     Q.  So the first time you told that to Sergeant
23 Mayo you're sort of relaying an order from Chief
24 Dotson; is that right?
25     A.  Essentially, yeah.  I mean, he asked me.

Page 62

1  Chief Dotson asked me what would I do to disperse the
2  crowd and I explained to him we're going to drive
3  through the crowd and deploy the hand-helds in the
4  areas where the rioters are, the people throwing
5  bricks at us, to clear them out.
6      Q.  Okay.  And then he said yes, go ahead and
7  do that, is that what you're saying?
8      A.  Yes.
9      Q.  Okay.  And then the second time when you
10 had a conversation with Sergeant Mayo, was that also
11 after you had talked with Chief Dotson or was that on
12 your own initiative?
13     A.  About patrolling the area?
14     Q.  Yeah.
15     A.  That was on my own initiative.
16     Q.  Okay.
17     A.  But that was still part of the original
18 order to make sure the crowd had dispersed.
19     Q.  Got it.
20     A.  Because what I had observed were subjects
21 were coming back after that initial deployment of tear
22 gas.  You could see people who were still off to the
23 side and weren't leaving.  And so it was my concern
24 that they weren't leaving, they were just going to
25 stage in behind the buildings, and then when the tear

Page 63

1  gas dissipated come back out and resume throwing rocks
2  and bricks and looting and that kind of thing.
3      Q.  When you could see the people that you were
4  concerned would come back, where were you?  Were you
5  on Page Boulevard at that time?
6      A.  I was on Page Boulevard, yes.  Just -- Page
7  near Walton, probably just a little bit down from
8  Walton.
9      Q.  Do you know how many chemical munitions the
10 St. Clair BEAR Cat deployed?
11     A.  I do not.  It wasn't very many.  Two or
12 three is a guess.
13     Q.  And how about the city BEAR, do you know
14 how many chemical munitions it deployed?
15     A.  No.
16     MR. WHEATON: It's been about an hour and a
17 half.  I could use a quick break, if it's a good time.
18     MS. STEFFAN: Sure.  That's fine.
19     (A short break was then taken.)
20 BY MS. STEFFAN:
21     Q.  Chief, do you know the Plaintiffs in this
22 case?
23     A.  I do not.
24     Q.  I'm just going to run through their names
25 just to be clear.  You don't know Sarah Molina?

Page 64

1      A.  No.
2      Q.  Christina Vogel?
3      A.  No.
4      Q.  Peter Groce?
5      A.  No.
6      Q.  Could you pick any of them out of a crowd?
7      A.  No.
8      Q.  Are you familiar with the term legal
9  observer?
10     A.  Yes.
11     Q.  What does it mean to you?
12     A.  They are, I believe, part of the ACLU who
13 wear the bright green hats, neon hats, who observe
14 protests and civil disobedience events.
15     Q.  Have you ever seen people wearing those
16 bright green hats out at protests?
17     A.  Yes.
18     Q.  Did you see people wearing bright green
19 hats that you believed to be legal observers at the
20 event on August 19th, 2015?
21     A.  I believe so.
22     Q.  When you were on the St. Clair BEAR Cat
23 either on Page Boulevard or patrolling the area north
24 of Page Boulevard, were there other officers telling
25 you where people were, by radio?

16 (Pages 61 to 64)

## Page 65

1  A.  No.
2  Q.  You were just observing where people were;
3  correct?
4  A.  Correct.  If they did, I don't remember it.
5  But generally speaking, no.  We were on patrol
6  ourselves.
7  Q.  Where were you stationed on the BEAR Cat?
8  A.  On the passenger side.
9  Q.  Like sitting in a seat up next to the
10  driver?
11  A.  I don't think I was in the front seat.  I
12  can't remember.  I just remember being on the
13  passenger side.  I think it was on the right side.  I
14  don't know if I was in the front seat or not, but I
15  know I was on the passenger side.
16  Q.  I assume you've ridden in the city BEAR
17  before as well; is that correct?
18  A.  Yes.
19  Q.  Thinking back to the times when you've been
20  stationed on the city BEAR, have you been both on top
21  and in the inside part?
22  A.  Yes.  I've been in the inside part and,
23  yes, I've gone to the top of the BEAR.
24  Q.  If you're on the inside part and you want
25  to see out of the BEAR, how do you do that?

## Page 66

1  A.  There's windows.  I believe there's windows
2  on the side and there's also portals on the side.
3  Q.  Do you know if the city BEAR at the time it
4  was patrolling the area south of Page Boulevard ever
5  went into Fountain Park proper, which if you look at
6  the map in front of you is the oval toward the bottom
7  of the page?
8  A.  I have no direct knowledge of that.
9  Q.  Do you have indirect knowledge of it?
10  A.  Yes.  The accusation that was made here.  I
11  believe it did head down that way because I was told
12  it did.
13  Q.  Who were you told it did by?
14  A.  In the lawsuit.
15  Q.  Putting aside the allegations in the
16  lawsuit -- (attorney did not finish question.)
17  A.  And I believe when we made a right, the
18  BEAR made a left onto Euclid.
19  Q.  Okay.
20  A.  We made a right on Euclid to go north.  The
21  BEAR, I believe, made a left to go south on Euclid.
22  Where it went from there I don't know, other than
23  what's been reported.
24  Q.  I understand.
25  A.  And in the After Action Report I believe it

## Page 67

1  indicated that it went south on Euclid.
2  Q.  In the course of our discussion today when
3  you've been talking about chemical munitions I think
4  you've mentioned smoke-like substances and tear gas;
5  is that right?
6  A.  Yeah.  Same thing.
7  Q.  Are there other kinds of chemical munitions
8  besides smoke and tear gas?
9  A.  Like a pepper ball, pepper spray.
10  Q.  When we've been using the term chemical
11  munition, does that include hand-held pepper spray or
12  mace to your understanding?
13  A.  Um, it can; although, generally I think
14  more in terms of chemical munitions in terms of SWAT
15  is more of the canisters that we throw or, you know,
16  shot from a launcher, but, yeah, I guess technically
17  it could include general hand-held mace.
18  Q.  Were you wearing a body cam on August 19,
19  2015?
20  A.  No.
21  Q.  To your knowledge was anyone on SWAT?
22  A.  No.
23  Q.  Do you know if the BEAR has video
24  capability?
25  A.  It does not.

## Page 68

1  Q.  How about the St. Clair BEAR Cat?
2  A.  Not that I know of.
3  Q.  Do you know if the city BEAR has GPS
4  capability?
5  A.  I am not aware of that.
6  Q.  The St. Clair BEAR Cat, do you know if it
7  has GPS capability?
8  A.  No idea.
9  Q.  Earlier in your testimony you mentioned a
10  federal court order that required police to tell
11  people how to disperse from an area; is that correct?
12  A.  Yes.
13  Q.  Do you remember when that court order was
14  issued?  Let me clarify.
15  Do you remember if it was before or after
16  the events that we've been talking about today on
17  August 19th, 2015?
18  A.  It was before.
19  Q.  Thinking back to your experience on
20  August 19, 2015, and everything you know about how the
21  police responded that day, do you believe that the
22  requirements of that court order were complied with?
23  A.  Absolutely.  Many times over.  Commands and
24  directions to leave were given 20, 30 plus times.
25  Q.  How were those directions given?  Were they

17 (Pages 65 to 68)

STEPHEN DODGE  1/15/2019

---

Page 69

1   verbally or over a P.A. system?
2       A.  Over a P.A. system.
3       Q.  Is that a P.A. system on the BEAR?
4       A.  I think they were done by both.  I think
5   when we first got there they were giving commands over
6   a P.A. system on a police vehicle and then we were
7   giving them over the BEAR.
8       Q.  Did you give any of those directions?
9       A.  I think I did when I got in the St. Clair
10  BEAR.  I believe I got on there and gave several
11  directions as well to leave the area.
12      Q.  So three different P.A. systems; is that
13  right?
14      A.  Yes.  Yes.
15      Q.  Do you recall what you said?
16      A.  Yes.  I said this is -- I can't remember my
17  exact words, but it was something to the effect of
18  "This is an unlawful assembly.  Immediately disperse
19  the area.  Go west on Page; north on Walton; north on
20  Bayard; south on Walton.  If you do not comply,
21  chemical munitions may be used."  Something to that
22  effect.
23      Q.  You gave that order or that instruction
24  over the P.A. on the St. Clair BEAR Cat; is that
25  correct?

---

Page 70

1       A.  I think so.  Either there -- I can't
2   remember for sure.  I thought it was, but I know at
3   one point we were there with a van too, but I don't
4   know if it had a P.A.  It was either from the van or
5   the St. Clair BEAR.
6       Q.  And you heard other officers give similar
7   instructions?
8       A.  Yes.  A lot.
9       Q.  I think a long time ago in your testimony
10  you mentioned that you left the Fountain Park
11  neighborhood altogether and came back when the car was
12  on fire or the house was on fire?
13      A.  Yeah.  We were there to provide protection
14  for the fire department because they were fighting a
15  vacant house fire.
16      Q.  Okay.  Do you recall what time that was at?
17      A.  It was dark out.  No, I don't remember the
18  exact time.  It was dark out.  I mean, I could guess
19  say maybe 9, 10, 11:00, somewhere through there.
20      Q.  Fair to say that it was late evening?
21      A.  Maybe earlier.  Actually, I'd take that --
22  you know, I would say 8 or 9:00.
23      Q.  Okay.  Before you returned to assist the
24  fire department you had left the Fountain Park
25  neighborhood altogether; is that correct?

---

Page 71

1       A.  Somewhat.  I mean, we went to the school
2   there near Taylor and Page.
3       Q.  Is that Ranken?
4       A.  Yeah, Ranken.  Ranken.  We were in their
5   parking lot.
6       Q.  How long were you in the Ranken parking lot
7   before you came back?
8       A.  An hour or so, a couple hours maybe.
9   Probably an hour.
10      Q.  How did you know to leave the first time
11  and go to the Ranken parking lot?
12      A.  Well, I remember talking to Colonel O'Toole
13  and I said -- I told -- I don't know if this had any
14  bearing on his decision, but I remember talking to
15  Colonel O'Toole and saying, hey, based on what we've
16  dealt with in the past when it gets dark it could get
17  very violent out here and we could get shot.  So if
18  we're not going to take any more actions to disperse
19  the crowd, I think for the officers' safety purposes
20  we need to get out of here.
21      And I don't know if that had any bearing on
22  his decision, but soon after that he said, all right,
23  let's go.  Then we left and went over to Ranken.
24      But that was my concern when it got dark
25  because it's been my experience that's when the guns

---

Page 72

1   start getting shot during these protests.  And that
2   was my concern with the officers.
3       Q.  When you were speaking to Colonel O'Toole
4   you said we should leave if we're not going to take
5   any further actions to disperse the crowd; is that
6   correct?
7       A.  Correct.  If we're not going to clear the
8   crowd, then we need to get out of here.
9       Q.  Okay.  How did you know to have stopped
10  taking actions to disperse the crowd at that point?
11      MR. WHEATON:  Objection.  Form.
12  BY MS. STEFFAN:
13      Q.  Do you understand what I'm asking?
14      A.  Um, at that point we were directed by Sam
15  Dotson, Chief Dotson, to stop dispersing the crowd.
16      Q.  How did Chief Dotson convey that direction
17  to you?
18      A.  Through Colonel Leyshock and Colonel
19  O'Toole, I believe.
20      And then at one point he had directed me to
21  call the BEAR back.
22      Q.  And how did -- if I understand what you've
23  just said, Chief Dotson told Colonel Leyshock to tell
24  you something; is that right?
25      A.  I believe so.  I don't remember, to be

---

18 (Pages 69 to 72)

STEPHEN DODGE  1/15/2019

Page 73

1  honest with you.
2      Q.  Yeah.
3      A.  I just remember at one point Chief Dotson
4  had ordered me to call the BEAR out, the city BEAR
5  back, which was on patrol.  He ordered me back and
6  then he told me to have the city BEAR come back.
7      Q.  Okay.
8      A.  At that point we stopped dispersing any
9  more of the crowd.
10     Q.  At that time you were on the St. Clair BEAR
11  Cat north of Page and the city BEAR was on the south
12  side of Page; is that right?
13     A.  Yes.
14     Q.  How did you tell the city BEAR that it
15  should come back?
16     A.  By radio.
17     Q.  Okay.  Is that how Colonel Leyshock
18  conveyed that order to you also, was by radio?
19     A.  Yes.  Colonel Leyshock got a hold of me on
20  the radio and told me to respond back to Marcus and
21  Page.
22     Q.  Do you recall what channel you were using?
23     A.  I do not.
24     Q.  Do you recall what channels are available
25  to you?  My understanding is there's lots, but there

Page 74

1  are only a few that --
2      A.  There's a ton.
3      Q.  -- the department uses regularly?
4      A.  Yeah.  There's several channels that are
5  available to Mobile/SWAT, and actually the whole
6  department.  They've got a ton of them on there.
7      Q.  Do you recall if -- I understand you don't
8  recall what channels you were using or what channel
9  you were using, but do you recall whether Colonel
10  Leyshock's instruction to you and your instruction to
11  the city BEAR were on the same channel or if you had
12  to change channels in order to communicate with the
13  BEAR?
14     A.  I don't recall that.
15     Q.  Okay.  And you did comply with that
16  instruction; is that right?
17     A.  Yes.
18     Q.  You went back to the Page and Marcus area?
19     A.  Yes.
20     Q.  And that's where you had the conversation
21  with Mr. O'Toole?
22     A.  Um, at that point it was more with -- when
23  I initially got back it was more with Colonel Leyshock
24  and then Chief Dotson.
25     Q.  Got it.  What did Colonel Leyshock say to

Page 75

1  you when you got back there?
2      A.  Apparently he had informed me that the
3  chief was upset because he didn't know that the St.
4  Clair BEAR had been requested.
5      Q.  Anything else?
6      A.  That was the gist of his conversation with
7  me.
8      Q.  Did you talk to the chief directly?
9      A.  Soon after that.
10     Q.  What did the chief say?
11     A.  He wanted me to call back the city BEAR
12  back to the scene.
13     Q.  When you got back to Page and Marcus with
14  the St. Clair BEAR Cat, was the city BEAR already
15  there or it came back sometime later?
16     A.  It came back a little bit later.
17     Q.  It came back because you told it to come
18  back?
19     A.  Yes.
20     Q.  Who did you tell on the BEAR that you
21  wanted it to come back?
22     A.  I don't recall.  I think I just said -- I
23  don't recall my exact words or who they were to.  It
24  might have been Sergeant Mayo, I'm guessing.
25     Q.  Did you use a call sign on the radio?

Page 76

1      A.  I don't know.
2      Q.  Did you have a call sign?
3      A.  Yes.
4      Q.  What was it?
5      A.  7100.
6      Q.  And did each individual officer stationed
7  on the BEAR have their own call sign or does the
8  vehicle have a call sign?
9      A.  Well, it just depends.  Because when we
10  were on tactical operations, a lot of times we'll just
11  go by names.  Each officer is issued a call sign, but
12  they're also issued a call sign with their partner.
13     Q.  It seems confusing.
14     A.  It can be.
15     Q.  I have also heard on radio transmissions
16  Cruiser 2, Cruiser 3.  Are you familiar with terms
17  like that?
18     A.  Yes.
19     Q.  If Cruiser 2 is used, do you know who that
20  refers to?
21     A.  It's a colonel.  I'm not sure which one.
22  Cruiser 1 is the chief.  Beyond that I can't remember
23  which cruiser is assigned to which colonel, but, yes.
24     Q.  Fair to say if you refer to yourself as a
25  cruiser you are a pretty high ranking officer; is that

19 (Pages 73 to 76)

STEPHEN DODGE  1/15/2019

Page 77

1    fair?
2        A.   Yes.
3        Q.   How far do the cruiser numbers go?
4        A.   How ever many colonels there are.  I don't
5    know how many they have right now.  Four or five, who
6    knows.
7        Q.   Is it only the chief and colonels who use
8    that term?
9        A.   Yes, other than the term for a cruiser is
10   also the paddy wagon too, which is kind of confusing
11   there too, but, yes, generally speaking.
12       Q.   Any chance you would recall what Sergeant
13   Mayo's call sign was at the time?
14       A.   It would be either 7101, '02 or '03.  I'm
15   not sure.  One of those three though.
16       Q.   So 7100 as a category referred to SWAT?
17       A.   Yeah, that's the Mobile Reserve/SWAT unit.
18   And then all the numbers go from there.
19       Q.   Just to be clear, is there some difference
20   between Mobile Reserve and SWAT?
21       A.   It's the same unit.  Kind of two different
22   functions, but it's the same unit.
23            (Plaintiff Exhibit No. Dodge 5, After
24   Action Report, was then marked for identification.)
25       Q.   Let me hand you a document.  Earlier you

Page 78

1    used the term After Action Report.  Is this what you
2    were referring to, what I've handed you as Dodge
3    Exhibit 5?
4        A.   Yes, it is.
5        Q.   Have you seen the After Action Report
6    before?
7        A.   Yes.
8        Q.   Did you write it?
9        A.   I did not.
10       Q.   Do you know who wrote it?
11       A.   Nick Manasco.
12       Q.   Did you contribute information to it?
13       A.   Um, not much.
14       Q.   Do you recall contributing anything
15   specifically?
16       A.   Nothing specifically, no.
17       Q.   Do you remember when the first time you saw
18   it was?
19       A.   Um, it would have been within, I would say,
20   two or three weeks after the incident.
21       Q.   Was it fully completed when you saw it the
22   first time?
23       A.   It was fully completed by the officer, yes.
24       Q.   Did you have to review it also?
25       A.   I did review it.  And I noticed there were

Page 79

1    some inconsistencies in it and meant to make
2    corrections, got caught up in some other stuff, it
3    kind of got out of mind.  I transferred from the unit
4    and then left the department.  And I never went back
5    and had them make the corrections, which is on me.
6        Q.   So this is the first draft that you saw, is
7    what we have?
8        A.   It's the only draft I saw and I did not
9    make my corrections on this.
10       Q.   But there are some inconsistencies in this
11   document?
12       A.   Yes.  Yes.
13       Q.   Could you point them out?
14       A.   Well, I mean, you know, I think the biggest
15   thing it does here is we had two different times where
16   we went down and deployed gas and I think this kind of
17   blends two of them into one, in reading it.
18            The other thing I noticed, it didn't have
19   me in the -- I don't think it had me in the BEAR Cat,
20   which I was.
21            Those are the ones that stick out the most.
22   But I think somehow, the best I can tell, it blended
23   two of them into one.
24       Q.   Other than blending those two circuits into
25   one and also not stating that you were on the St.

Page 80

1    Clair BEAR Cat, were there other inconsistencies that
2    you noted?
3        A.   Those were the two major ones or the
4    biggest ones.
5        Q.   Do you know what the process is for
6    drafting an After Action Report?
7        A.   Well, yeah.  I instructed Nick Manasco,
8    who's done our other previous After Action Reports, to
9    gather as much information and interview as many
10   people as you can and write the After Action Report to
11   the best of your ability.  It's a very difficult
12   process because we're not documenting the incident as
13   it's happening, so a lot of times you've got to build
14   from memory.  And these are pretty chaotic situations,
15   so obviously mistakes can be made and not everything
16   be included in it.
17       Q.   Did you -- well, you know that Officer
18   Manasco did in fact write the report; correct?
19       A.   He wrote this, yes.
20       Q.   Do you know how he gathered information
21   from the report?
22       A.   Um, I believe just from interviewing other
23   members.
24       Q.   Of SWAT?
25       A.   Yes.

20 (Pages 77 to 80)

STEPHEN DODGE  1/15/2019

Page 81

1    Q.  Did he interview you?
2    A.  Um, I'm sure we talked about it at some
3  point in time, yeah, because I think we talked about
4  when I was given the order, unless he observed it, to
5  go ahead and deploy the first time from Chief Dotson.
6    Q.  And was that an interview?
7    A.  It wasn't a formal interview.  I was just
8  telling him, hey, you know, this is what -- this is
9  the point.  Because he was there too, so he might have
10  even observed that, to be honest with you, so.  I
11  don't really remember.
12    Q.  Do you know whether he had discussions with
13  other officers in order to collect information?
14    A.  I believe he would have, yes, but I don't
15  know.  I wasn't there for any interviews that he
16  conducted.
17    Q.  Do you know if Officer Manasco took notes
18  from your conversation with him?
19    A.  No.  I'm unaware.  I don't know either way.
20    Q.  You mentioned that it's difficult to write
21  an After Action Report because officers are not
22  documenting things as they happen and sometimes scenes
23  are chaotic; is that right?
24    A.  Yeah.  Long and chaotic, absolutely.
25    Q.  Are you familiar with something called a

Page 82

1  Documentation Team?
2    A.  Yes.
3    Q.  There was no Documentation Team for this
4  event; is that correct?
5    A.  I don't know if they had one for the
6  initial response.  That would have been separate from
7  us, what we were doing, but I did not have a
8  Documentation Team assigned to the SWAT Team for our
9  gas deployments.
10    Q.  Do you know if there was someone aboard the
11  city BEAR who was responsible for keeping track of
12  where the BEAR was or what chemical munitions --
13    A.  No.
14    Q.  -- were deployed or anything like that?
15    A.  No.
16    Q.  No, there was no one responsible or, no,
17  you don't know?
18    A.  No, there was no single person responsible
19  counting every chemical munition and where it was.
20  There was no documentation person like that.  Pretty
21  much each officer is responsible for, to the best of
22  their ability, remembering what they did and where
23  they did it.
24    Q.  When did you direct Officer Manasco to
25  draft this report?

Page 83

1    A.  I mean, soon after the incident.
2    Q.  The same day or some other day?
3    A.  I mean, it was probably within the week
4  afterwards.
5    Q.  Does he have any training on report
6  writing, to your knowledge?
7    A.  Through the department.
8    Q.  What kind of training through the
9  department?
10    A.  From the police academy.  And he's probably
11  written a thousand police reports.  And before this he
12  did the After Action in Ferguson and on South Grand,
13  so he's done two previous ones.
14    Q.  For Spot (phonetic)?
15    A.  Yes.
16    Q.  With those previous After Action Reports,
17  did you also review those?
18    A.  Yes.
19    Q.  And were you able to fix things that you
20  thought were a problem?
21    A.  Yes, those I was able to make corrections.
22    Q.  Is there some kind of sign-off process?
23    A.  For After Action Reports, no.  It's
24  basically an internal document that we use just to
25  document what we did, where we did it, that kind of

Page 84

1  thing.
2    Q.  Was there an After Action Review following
3  this incident?
4    A.  Um, I don't remember.
5    Q.  This might be the same thing.  I'm not
6  sure.  Was there a Critical Incident Review?
7    A.  I know we got together with some of the
8  commanders and discussed this, yes.  Yes, there was.
9  Yes, there was.  Either the next day or a couple of
10  days later we did get with -- I think it was the next
11  day.  Several of the commanders got together and did
12  kind of a Critical Incident Review of what happened
13  the day before.
14    Q.  Where was that?
15    A.  Headquarters.
16    Q.  And you said some of the commanders.  Is
17  that commanders of different units?
18    A.  I mean all of the commanders and probably
19  some supervisors.  I don't remember if the police
20  officers were there or not, but I think it was mostly
21  supervisors.
22    Q.  How long did it last?
23    A.  A couple hours.
24    Q.  Who ran that?
25    A.  Chief Dotson and Colonel Leyshock.

21 (Pages 81 to 84)

STEPHEN DODGE  1/15/2019

## Page 85

1    Q.  Were you required to attend?
2    A.  Yes.
3    Q.  Who else was there?
4    A.  Those are the two I remember the most.  I
5  think Captain Deeba was there and Major -- I can't
6  remember if Major Cagle was there maybe.  And a bunch
7  of the other commanders were there at the scene, I
8  believe.
9    Q.  Is it fair to say it was a dozen people or
10  less?
11    A.  Um, it could have been more.  I just
12  remember that part of it.
13    Q.  What was the goal of that review?
14    A.  Just to go over what we did the day before
15  and learn from it and prepare, actually, because we
16  were getting prepared, um, for more protests to be
17  coming.
18        So it wasn't just a review of the night
19  before, but it was also to meet and discuss what
20  actions we were going to take over the next several
21  days to prepare for it, for the protests that were
22  going to take place there again over the course of the
23  next few days.
24    Q.  Did you review any audio or video at that
25  After Action Review?

## Page 86

1    A.  No.  Actually, I shouldn't say that.  I
2  can't recall.  I can't recall.
3    Q.  Was it primarily sort of verbal discussion
4  based?
5    A.  Yes, I believe so.
6    Q.  You said Chief Dotson and Colonel Leyshock
7  are who ran the After Action Review; is that right?
8    A.  Yes.
9    Q.  They talked the most?
10    A.  Yes.
11    Q.  I understand it was a couple hours long,
12  but generally what did they say?
13    A.  Just went over the actions we took and what
14  we did and what we could have done better and how we
15  were going to prepare for the next few days of
16  potential protests.
17    Q.  What was your takeaway about how to prepare
18  for the next days of protests you anticipated?
19    A.  Just in terms of what man hours we're going
20  to work, where are we going to stage, a lot of
21  logistical type stuff.  You know, what are -- 
22  obviously we already kind of knew what our role was
23  going to be, but where we were going to be and how we
24  were going to prepare for it and that kind of thing,
25  what other equipment we need.

## Page 87

1    Q.  You said you also went over what you had
2  done and discussed whether or not there were things
3  you could have done better; is that right?
4    A.  Yes.
5    Q.  What was your take away as far as things
6  that you could have done better?
7    A.  Well, where we were staged wasn't very good
8  because the wind was blowing in our face, so when we
9  deployed the tear gas, a lot of the policemen were
10  taking in the tear gas.  And they didn't have their
11  CDT equipment or their gas masks.  So that was one
12  takeaway of something we could have done better.
13    Q.  Anything else?
14    A.  Nothing that I can recall.
15    Q.  How did you know that you were supposed to
16  attend the After Action Review?
17    A.  I was instructed by somebody.
18    Q.  You don't recall who?
19    A.  I can guess.
20    Q.  Okay.  Someone above you?
21    A.  Yes.  Or by email or somehow, but someone
22  told me to be at the After Action Review.
23    Q.  Okay.  Your officers who were under your
24  command may or may not have been there; is that right?
25    A.  I don't think they were.  I think it was

## Page 88

1  just myself and possibly the supervisors.
2    Q.  Supervisors being sergeants?
3    A.  Yes.  But I can't be sure about that.
4    Q.  Did you relay anything from that After
5  Action Review to the officers under your command?
6    A.  Nothing that stands out other than we need
7  to make sure -- yeah, I do remember one thing.  We
8  need to be careful of the wind direction.
9        That was a tough one there because they had
10  already picked that spot when we got there.  So we
11  didn't really pick the spot for the staging area and
12  where to set up the skirmish line.  So it wouldn't be
13  really feasible or practical to then move the skirmish
14  line all the way around to the other side of where the
15  crowd had formed, so we kind of had to deal with what
16  we had.
17    Q.  Um-hum.  So based on your understanding as
18  a longtime police officer, do you believe that the
19  people who were protesting the shooting of Mansur
20  Ball-Bey had a First Amendment right to do that?
21    A.  Absolutely.
22    Q.  Do you believe that right was respected?
23    A.  Absolutely.
24    Q.  I am going to ask you some questions about
25  other protests.

22 (Pages 85 to 88)

STEPHEN DODGE  1/15/2019

---

Page 89

1          Did you work during a protest in March of
2    2012 near the Compton Hills Reservoir?
3       A.  I was not there.
4       Q.  Did you work a protest near the Quik Trip
5    on South Vandeventer in October of 2014 after the
6    Michael Brown shooting?
7       A.  Yes.
8       Q.  Did you see any chemical munitions
9    deployed?
10       A.  Yes.  There was mace deployed at that
11    location.
12       Q.  Was mace deployed against protestors who
13    were sitting on the Quik Trip parking lot?
14       A.  I believe the mace I saw deployed were
15    people that were coming towards the officers when we
16    were on a skirmish line.  That's not to say they
17    weren't sitting.  There may have been some over-spray.
18    I don't know of any -- I don't know if they were
19    directly sprayed with mace while they were just laying
20    there.  They may have gotten over-spray from someone
21    else, but the ones -- the deployments I remember were
22    people who were coming towards the line in an
23    aggressive manner.
24       Q.  Where was the skirmish line, if you
25    remember?

---

Page 90

1       A.  It was on the -- of the Quik Trip lot?
2       Q.  Um-hum.
3       A.  It would have been on the -- it started on
4    the south side of the Quik Trip lot moving north.
5       Q.  On Vandeventer?
6       A.  I would say we were towards Chouteau moving
7    north towards SLU.  And the concern there was that
8    they were there to burn down the Quik Trip, I
9    remember.
10       Q.  How many people were there?
11       A.  Protestors?
12       Q.  Protestors, yeah.
13       A.  Oh, 150.
14       Q.  Do you recall if this was afternoon,
15    evening?
16       A.  It was evening.
17       Q.  Dark outside?
18       A.  Yes.
19       Q.  The mace that you saw deployed, was that
20    hand-held mace?
21       A.  Hand-held.
22       Q.  Or canisters?
23       A.  Hand-held.
24       Q.  How many times did you see mace deployed?
25       A.  I think I only saw -- personally, I think I

---

Page 91

1    only saw it one time.
2       Q.  Just one officer?
3       A.  I think so, yeah.
4       Q.  Do you recall what officer?
5       A.  No.
6       Q.  Were you there as a member of SWAT or CDT?
7       A.  SWAT.  SWAT, CDT, again, kind of joined
8    together a little bit.
9       Q.  Yeah.  How many police officers were there
10    approximately?
11       A.  50, 60.  This is all guesstimates, by the
12    way.
13       Q.  All the officers who were there were
14    members of SWAT and CDT?
15       A.  Yes.  There might have been some
16    detectives.  They might have pulled some people from
17    -- I can't remember if it was an organized group of
18    CDT officers or not.  I seem to think it was, but I'm
19    not for sure.
20       Q.  You said the mace was deployed against
21    people who were coming towards the skirmish line?
22       A.  I just remember one subject coming towards
23    the skirmish line in an aggressive manner and mace was
24    deployed at him.
25       Q.  Do you know who that subject was?

---

Page 92

1       A.  No.
2       Q.  Not someone known to you?
3       A.  No.
4       Q.  Was it effective?
5       A.  He got away from the skirmish line, yes.
6       Q.  Was he arrested, do you know?
7       A.  I don't think so, no.
8       Q.  Were there other arrests?
9       A.  Yes.  There were arrests made.
10       Q.  What were those arrests for?
11       A.  I didn't -- I wasn't in charge of charging,
12    so I'm not quite sure what the actual charge was.  I
13    can guess for a charge, but that would just be
14    strictly my guess.
15       Q.  Were people arrested on the Quik Trip
16    property?
17       A.  Yes, blocking the front door of the Quik
18    Trip property were the ones who were arrested.
19       Q.  How long did you stay at that scene?
20       A.  An hour or so.
21       Q.  Were you there after the arrests had been
22    effected?
23       A.  Yes, because we had eventually gotten
24    everyone dispersed off the Quik Trip lot.
25       Q.  Did you see any other chemical munitions

23 (Pages 89 to 92)

STEPHEN DODGE  1/15/2019

## Page 93

1  deployed after the subjects had been arrested on the
2  Quik Trip parking lot?
3     A.  No.
4        Q.  Did you hear any dispersal orders at that
5  location?
6     A.  Hundreds.  That might be an exaggeration,
7  but a lot.
8        Q.  A lot?
9     A.  Yes.
10        Q.  Did those dispersal orders that you heard
11  include a route that protestors should take?
12     A.  I don't remember.  I believe so, but --
13  I'll just say I can't remember.
14        Q.  Did you hear an order that an assembly had
15  been declared unlawful?
16     A.  At the Quik Trip lot?
17     Q.  Um-hum.
18     A.  Yeah, I can't remember.  I know there's
19  tons of video of it, but I can't remember what it was
20  exactly that was said.  Before we move a crowd -- I
21  can tell you this.  Before we move a crowd they are
22  given instructions that it's, you know, generally it's
23  an unlawful assembly and they are to move and which
24  direction.  So I believe it would have been done
25  several, several times, but I know they were told to

## Page 94

1  move.
2        Q.  Do you know based on the times you've heard
3  a declaration that there has been an unlawful assembly
4  whether that announcement provides the reason that the
5  assembly is unlawful?  Does that question make sense?
6     A.  No.  I think what they -- I think it's just
7  this is an unlawful assembly; leave the area
8  immediately; go north, south, east, west, is the gist
9  of it.  It doesn't say this is an unlawful assembly
10  because you did this, and this, and this.  I don't think
11  that's necessarily what we do.
12        Q.  How does the person know if the unlawful
13  assembly declaration applies to them?
14        MR. WHEATON:  Objection.  Calls for
15  speculation.
16  BY MS. STEFFAN:
17     Q.  You can answer.
18     A.  Okay.  How do I know how they should know?
19     Q.  Yes.
20     A.  Okay.  I mean, just common sense would tell
21  you that when you're blocking, like in that instance
22  when you've got 50, 60 people blocking a door to get
23  into a private business and the officers are yelling
24  over a loud speaker several, several times to leave,
25  it's an unlawful assembly, I would think per common

## Page 95

1  sense you'd know it would apply to you since you are
2  the one engaged in the activity of blocking the front
3  door of the Quik Trip.
4        It's impractical to call out each
5  individual person by their description.  So it seems
6  to me it would be common sense.
7        Q.  So taking that event as an example, if a
8  person were present near the Quik Trip parking lot but
9  standing on the sidewalk, would that person -- should
10  that person know by means of common sense that the
11  unlawful assembly declaration applies to them?
12        MR. WHEATON:  Objection.  Form and
13  foundation.  Calls for speculation.
14     A.  It just depends on what activity they're
15  engaged in.  If they're on the sidewalk throwing
16  objects at law enforcement, then that would be part of
17  an unlawful assembly.
18  BY MS. STEFFAN:
19     Q.  You didn't personally use any chemical
20  munitions at that protest; is that right?
21     A.  No.
22        Q.  Did you work during, let's say, any protest
23  during the fall of 2014 near the intersection of
24  Arsenal and Grand in the South Grand neighborhood?
25     A.  Arsenal and Grand, yes.  Are you talking

## Page 96

1  about in November?
2        Q.  To my understanding there were -- (attorney
3  did not finish question.)
4     A.  The night of the Grand Jury decision?
5     Q.  Yes, that would have been one.
6     A.  Yes, we were there.  Yes, I was there that
7  night and in charge of the SWAT Team during that.
8        Q.  Did you see any chemical munitions
9  deployed?
10     A.  Yes.
11        Q.  How many times?
12     A.  Several.
13        Q.  What type of munitions did you see
14  deployed?
15     A.  I think it was all kinds from the launcher
16  and hand-held.
17        Q.  When you say hand-held you mean the can,
18  not the throwing?
19     A.  I mean the throwing, yeah.
20     Q.  Okay.
21     A.  I don't think I even saw any from the can.
22  I think it was all either the kind you throw or from
23  the launcher.
24        Q.  Did you use any chemical munitions at that
25  protest?

24 (Pages 93 to 96)

STEPHEN DODGE  1/15/2019

Page 97

1    A.  No.  I can tell you in all the protests and
2  everything I supervised I didn't deploy one canister
3  of anything or use any chemical munitions myself at
4  any time.
5    Q.  You did though at that protest see other
6  officers do so; right?
7    A.  Yes.
8    Q.  Were they members of SWAT?
9    A.  Yes.
10    Q.  And you said you saw several deployments?
11    A.  Oh, yes.
12    Q.  Does that mean a handful or lots and lots?
13    A.  I mean, I can't count -- I can't give you a
14  number, but probably over 10 to 15, less than 30
15  different kinds of munitions, given the severity of
16  what was going on down there.  It was a lot.
17    Q.  Did you hear a declaration of an unlawful
18  assembly?
19    A.  Yes.
20    Q.  Lots of times?
21    A.  Yes.  With directions given on where to go.
22    Q.  Did you hear warnings that chemical
23  munitions could be deployed?
24    A.  Yes.
25    Q.  Do you recall where people were told to go?

Page 98

1    A.  The one time I was there they were told to
2  go north -- I'm sorry.  Correction.  West on Arsenal
3  or they could have gone, I believe, south on Grand,
4  but west on Arsenal was one of the main options they
5  were given.
6    Q.  Do you recall what officers you saw deploy
7  chemical munitions?
8    A.  Not specifically.  I mean, it was a bunch
9  of them.
10    Q.  Were you present when tear gas was deployed
11  into MoKaBe's Coffee Shop?
12    A.  I would argue with you that chemical
13  munitions were deployed into MoKaBe's Coffee Shop.  I
14  would say that's not necessarily true.  So I couldn't
15  answer that question.
16    Q.  Do you recognize what I'm talking about?
17    A.  Yes.
18    Q.  Where do you think chemical munitions were
19  deployed?
20    A.  I think they were deployed on Arsenal right
21  there at the corner.
22    Q.  Do you think it's fair to say that chemical
23  munitions in the air made their way inside MoKaBe's
24  Coffee Shop?
25    A.  If they had the door open, yes, or window

Page 99

1  open, it's possible, depending upon what the wind was
2  doing.
3    Q.  What was the purpose of that deployment of
4  chemical munitions?
5    A.  Well, I was contacted by Colonel Cherio
6  (phonetic) for that deployment.  And we had officers
7  that were being encircled by large crowds.  We had
8  stores that were being broken into and looted and we
9  had numerous gun shots being fired in the area.  And
10  so there was concern.  And we had also received some
11  intel that they were going to try to burn down several
12  buildings in that location.
13    So at that point the area had gotten out of
14  control.  And so at that point it was our intent to
15  clear out the crowd to prevent looting and burning
16  and, even worse, someone from getting shot and killed,
17  whether police officer or citizen.
18    Q.  And were you -- were the chemical munitions
19  effective in reaching that goal?
20    A.  Yes.
21    Q.  If a person went inside MoKaBe's Coffee
22  Shop would they have been complying with your
23  instructions?
24    A.  Um, I believe so, yes.  Now the only
25  problem with that could be is if they all -- if

Page 100

1  there's 100 of them in there and they came back out to
2  the intersection again and started looting and burning
3  and everything else, that would be problematic.  I'm
4  not saying that was the case, but that is an instance
5  where that could be a problem.
6    Q.  My understanding is there was another
7  protest before that one in October of 2014 also near
8  that intersection and including the parking lot behind
9  the Qdoba across the street there.  Were you present
10  at that protest?
11    A.  We didn't go down there.  We were staged up
12  on North Grand, but we never made it down there for
13  that.
14    Q.  Where you were staged on North Grand did
15  you see any deployments of chemical munitions?
16    A.  No.  We didn't deploy any chemical
17  munitions that evening.
18    Q.  Were you working at a protest on or near
19  the MLK Bridge on Highway 70 that same month?
20    A.  I think I know -- I had been earlier, but I
21  don't think it was that month.  The one I was on was
22  for, I think, the union protest, but I think that was
23  well before that.
24    Q.  Thinking back to the protest you were
25  present at, did you see the deployment of chemical

25 (Pages 97 to 100)

STEPHEN DODGE  1/15/2019

---

### Page 101

1  munitions?
2      A.  No.  There were no chemical munitions
3  deployed then.
4      Q.  Did you work at a protest on December 1st
5  of 2014, so about a week after the Arsenal and Grand
6  protest, this one at Kiener Plaza?
7      A.  No, I was not there for that.
8      Q.  How about one later that month, I believe
9  on New Year's Eve of 2014, near police headquarters on
10  Tucker?
11      A.  No.  We were not there.  I was not there
12  for that one.
13          Are you talking about the one where they
14  rushed the headquarters, where they ran into the
15  headquarters?
16      Q.  I think it was, yeah, near police
17  headquarters?
18      A.  No, I was not there for that one.
19      Q.  Were you present for a protest in May of
20  2015 near Jennifer Joyce's house on Fillmore Street in
21  Holly Hills?
22      A.  No.
23      Q.  You testified earlier that you did not have
24  a Documentation Team for the event on August 19th,
25  2015; right?

### Page 103

1      A.  Oh, yes.  I mean mace.
2      Q.  Other than mace?
3      A.  No.  In training, I should say.  I take
4  that back.  In training.
5      Q.  Fair to say you've never deployed tear gas
6  in the course of your police work other than in
7  training; is that correct?
8      A.  Correct.  I'm trying to think if I ever did
9  it on any barricaded subject or hostage situation.  I
10  don't think I ever did, but certainly never in any
11  civil disobedience or rioting situation.
12      Q.  You have directed other officers to do so?
13      A.  Yes.
14      Q.  In civil disobedience or rioting
15  situations?
16      A.  Yes.
17      Q.  Other than the occasions that we've already
18  talked about, so the Arsenal and Grand and the
19  August 19th, 2015, occasion, have you directed
20  officers to deploy chemical munitions at a protest or
21  civil disobedience event?
22      A.  Yes.
23      Q.  When have you done that?
24      A.  Ferguson, during the initial Ferguson,
25  which would have been August of 2014.

### Page 102

1      A.  Correct.
2      Q.  There was a Documentation Team for the
3  Arsenal and Grand protests in November of 2014; is
4  that right?
5      A.  From the SWAT Team?
6      Q.  At all?
7      A.  There could have been with the Civil
8  Disobedience Team.  I'm unaware.  But there was no
9  specific documenter with the SWAT Team.
10      Q.  Okay.  Were you Civil Disobedience Team
11  commander during the Arsenal and Grand protests?
12      A.  Not really.  I think at that point they had
13  kind of -- after Ferguson they had kind of more or
14  less started up one which was more oversaw by Randy
15  Jemerson and, I believe, Brian Rossomanno.  So they
16  were more or less -- we'd assist them.  We'd assist
17  them on training, but he more or less, those two more
18  or less ran the Civil Disobedience Team from then on
19  after Ferguson.
20      Q.  You testified earlier that you have never
21  deployed a chemical munition personally at a protest;
22  is that right?
23      A.  Correct.
24      Q.  Have you done so in the course of your
25  police work unrelated to protests?

### Page 104

1      Q.  Other than those three?
2      A.  I think that's it.  Yeah, those three.
3  Those are the ones that come to mind.
4      Q.  I understand that you left the employ of
5  the St. Louis Metropolitan Police Department in
6  February of 2017; is that right?
7      A.  Yes.
8      Q.  And in your capacity as chief of the Sunset
9  Hills Police Department you haven't policed any
10  protests in the City of St. Louis; is that right,
11  since that date?
12      A.  As the chief of Sunset Hills, no.
13      Q.  How about officers under your command, have
14  they done so?
15      A.  In the City of St. Louis, no.
16      Q.  Much earlier you testified about the
17  content of CDT training and the fact that it talked
18  about when it was appropriate and not appropriate to
19  use chemical munitions on duty; is that right?
20      A.  Sure, yes.
21      Q.  So based on that training and your
22  experience as a police officer with the St. Louis
23  Metropolitan Police Department, when is it appropriate
24  to use chemical munitions?
25          MR. WHEATON: Objection to form.  Calls for

26 (Pages 101 to 104)

STEPHEN DODGE  1/15/2019

Page 105

1   speculation.  Subject to that, if you understand you
2   can answer.
3          A.   That's pretty broad.  I mean, that's -- um,
4   but generally speaking, in a situation where I would
5   say the ability to make individual arrests, you know,
6   the crowd is so big and uncontrollable to where the
7   situation is such that an individual arrest becomes
8   impractical or very dangerous, for both the officer
9   and the -- and the suspect, for lack of a better term.
10         Because a lot of times if you go in there
11  to make a physical arrest it turns into a physical
12  confrontation.  And then it's not just chemical
13  munitions.  It could be a nightstick, it can be having
14  to take someone to the ground.  And that's when the
15  protestor, rioter, suspect, could be hurt and also the
16  officer could be hurt.
17         So when that's a possibility, I would say
18  that's when you would prefer to use chemical munitions
19  because it really is designed to prevent injury, to
20  prevent those hand to hand physical confrontations.
21  BY MS. STEFFAN:
22         Q.   Is there anything different about the
23  circumstances in which it is appropriate to use
24  hand-held mace or is that generally the same as what
25  you've just described?

Page 106

1          MR. WHEATON: I'm sorry.  Can you read that
2   back?
3          (Question read back by reporter.)
4          MR. WHEATON: Same objections as before.
5          A.   It depends upon, I mean, which kind of
6   hand-held mace because there's the foggers, which
7   those are almost like a larger fire extinguisher type
8   thing that disperses a wide pattern.  Those would be
9   more of a crowd situation there too where it's
10  dangerous to go in there, as opposed to the
11  hand-helds, which each officer carries, which just
12  shoots more of a direct stream.  That could be used in
13  more of a hand to hand situation as opposed -- or to
14  avoid a hand to hand situation against a specific
15  individual rather than a large crowd who might be
16  throwing rocks and bottles and stuff at you.
17  BY MS. STEFFAN:
18         Q.   So if I understand correctly, you are
19  saying a fogger would be appropriate to use in
20  circumstances similar to the other chemical munitions
21  you've described earlier whereas a hand-held mace can
22  might be slightly different?
23         A.   Yes.  You know, the only disadvantage
24  though with a fogger though is you have to get really
25  close.  And that's where you could subject yourself to

Page 107

1   getting injured, is by being closer to the crowd.
2   That's where they can grab you, hit you, you know,
3   have a shorter distance to hit you with an item rather
4   than with the other chemical munitions it gives you --
5   it allows you to get a little bit of distance.
6          Q.   Have you heard the term streamer before as
7   it relates to mace?
8          A.   No.
9          Q.   I understand that you don't work at the St.
10  Louis Police Department anymore, but based on your
11  knowledge of the policies and guidelines in
12  place while you were there, do you know if officers
13  were required to make a report every time they use a
14  chemical munition?
15         A.   I believe so, yes.
16         Q.   The officers whom you directed to use
17  chemical munitions, do you know if they wrote reports?
18         A.   They reported their information to Officer
19  Manasco who contained it in the After Action Report.
20         Q.   That complies with that guideline?
21         A.   I believe so.  And I believe, I'm not sure,
22  but I thought some of the information was contained in
23  the total report done by whoever completed the whole
24  report for the whole incident.
25         Q.   Did you review that whole report for the

Page 108

1   whole incident?
2          A.   I never did.  It was never distributed to
3   me for review.
4          Q.   If I understand correctly, an incident
5   report like that does have a formal sign-off process?
6          A.   Yes.
7          Q.   But you as a SWAT Team member would not be
8   a part of that formal sign-off process?
9          A.   No.  It would be whoever is in the
10  officer's chain of command, I'm assuming, whoever they
11  designated to do that.
12         Q.   Are you familiar with a city ordinance, St.
13  Louis City ordinance about traffic obstruction?
14         A.   Impeding the flow of traffic?
15         Q.   Yes.
16         A.   I believe that's the ordinance for it.
17         Q.   You are familiar with that ordinance?
18         A.   I mean, I don't think I've ever -- I don't
19  know if I've ever written a ticket for it or not, but
20  basically it just -- it is what it says on its face,
21  impeding the flow of traffic by stopping traffic.
22         Q.   And you just said you don't know if you've
23  ever written a ticket for that?
24         A.   Yeah, I don't know.
25         Q.   Do you know if you have enforced it in

ALARIS LITIGATION SERVICES
www.alaris.us              Phone: 1.800.280.3376              Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

## Page 109

1    other ways?
2        A.   Um, I believe when we first -- the first
3    time -- actually, during this incident a couple of
4    subjects were initially, I think, taken into custody
5    for that, impeding the flow of traffic.  The first
6    time we walked down with the skirmish line, I believe
7    a couple of subjects were taken into custody for
8    impeding the flow.
9        Q.   When you say "this incident", you're
10   talking about the August 2015 incident?
11       A.   Correct.  Correct.
12       Q.   So based on your familiarity with that
13   ordinance, what is your understanding of when a person
14   is actually impeding the flow of traffic?
15       A.   When they're standing in a traffic lane,
16   which would prevent vehicles from passing through that
17   traffic lane.
18       Q.   Do you know if that ordinance applies on
19   sidewalks?
20       A.   I would not think it applies on sidewalks,
21   no, just in the traffic lane, the lane of travel.
22       Q.   How about if a person is standing adjacent
23   to a curb but in the street, would that ordinance
24   apply?
25       A.   It could, depending upon where they were.

## Page 110

1    I mean, you know, if it's -- I don't know what the
2    actual feet is, but I mean if there's a sidewalk
3    and you're in the street I would think, yeah, you
4    technically could be impeding the flow of traffic.
5        Q.   How about if a person is standing in a
6    street that has been closed or blocked by police?
7    Could the person be violating the impeding flow of
8    traffic ordinance under that circumstance?
9        A.   Yes.  If they caused the police to have to
10   block the traffic for their safety, absolutely.
11       Q.   How about if another civilian caused the
12   police to block off the street?
13       A.   And then you got in the street too?  Yeah.
14   I think you would be impeding the flow of traffic.
15       Q.   Thinking about the St. Louis laws that were
16   in place while you were a member of the St. Louis
17   Metropolitan Police Department, do you believe that
18   impeding the flow of traffic is justification for a
19   dispersal order?
20       MR. WHEATON: Objection.  Form.  Foundation.
21   Calls for speculation.  Subject to that, go ahead.
22       A.   I think it's justification for an arrest
23   after a warning.  So a dispersal order could be
24   considered a warning, but it's absolutely
25   justification for an arrest or a ticket, which is

## Page 111

1    technically an arrest.  It's very dangerous.
2    BY MS. STEFFAN:
3        Q.   If a person is ordered to disperse, and
4    relying on your experience as a police officer, how
5    far does the person need to go before they have
6    complied with that dispersal order?
7        A.   Out of the street to allow the free flow of
8    traffic.
9        Q.   So if a person is ordered to disperse
10   because they are standing in a street and they move to
11   the sidewalk, have they dispersed at that point?
12       MR. WHEATON: Objection.  Form and
13   foundation.  Calls for speculation absent specific
14   circumstances.  Subject to that, go ahead.
15       A.   Now are you talking about dispersal in
16   terms of it's an unlawful assembly?
17   BY MS. STEFFAN:
18       Q.   I'm just trying to understand if a civilian
19   is given an order to disperse and they are trying to
20   comply with that order, how far do they need to go in
21   order to do so?
22       MR. WHEATON: Same objection.
23       A.   Well, a dispersal order generally is given
24   because it's unlawful assembly.  At that point they
25   need to leave the area altogether.  Now in terms of

## Page 112

1    how far that is, that is as far as it takes to where
2    there's no longer a group assembled that was engaged
3    in the unlawful activity.  So it's not enough for the
4    group to move two blocks away if you still have the
5    same group blocking the traffic, throwing objects at
6    officers or looting.
7    BY MS. STEFFAN:
8        Q.   If people remain assembled but they go
9    inside a building, is that complying with a dispersal
10   order?
11       MR. WHEATON: Objection.  Form and
12   foundation.  Calls for speculation.
13       A.   It depends upon if they're invited in the
14   building or if it was a building they just looted.
15   BY MS. STEFFAN:
16       Q.   At the St. Louis Metropolitan Police
17   Department did you receive training on unlawful
18   assembly?
19       A.   Specific training as to that specific
20   topic, no, other than what we've talked about in civil
21   disobedience, which is focused around unlawful
22   assemblies.  But in terms of the specific laws, we
23   never received any specific training as to the law
24   itself.
25       Q.   Did the civil disobedience training include

28 (Pages 109 to 112)

STEPHEN DODGE  1/15/2019

## Page 113

1    what makes an unlawful assembly or is it just how to
2    respond once there is one?
3            MR. WHEATON: Objection.  Form.
4        A.  It does talk -- I mean, I guess it's mostly
5    about how to respond to the unlawful assembly, which
6    is generally determined by a commander.
7    BY MS. STEFFAN:
8        Q.   The response is generally -- (attorney did
9    not finish question.)
10       A.   Well, when you declare it an unlawful
11   assembly, you know, it that situation where there's a
12   large group, it's going to be determined by a
13   commander.  And obviously he's got to follow the
14   applicable law which is for the state and for the
15   local.
16       Q.   I may have already asked you this, but have
17   you ever decided an assembly was unlawful?
18       A.   Myself, no.
19       Q.   Do you know if any officers under your
20   command have done so?
21       A.   No, they haven't.  It usually comes from
22   higher above.
23       Q.   Does it have to come from higher above?
24       A.   Depending upon the situation.  I mean, you
25   know, with the protests, you know, those were pretty

## Page 114

1    serious situations because you do obviously have that
2    First Amendment element to it.  So you want to make
3    sure that you are allowing people to express their
4    First Amendment right, but at the same time doing it
5    lawfully.  So any time -- I would say any time that
6    there's that large of a gathering, it's going to come
7    up from pretty high when you determine it's unlawful
8    assembly.
9        Q.   Based on your long career with the St.
10   Louis Metropolitan Police Department, if a person
11   wants to express themselves by participating in a
12   protest, but do so lawfully, how do they do that?
13           MR. WHEATON: Objection.  Form.  Calls for
14   speculation.  Subject to that, if you understand you
15   can answer.
16       A.   Um, I mean, they just don't break the law.
17   Don't throw things, don't get in the street, that kind
18   of thing.
19   BY MS. STEFFAN:
20       Q.   Do you have any understanding of whether
21   there's a minimum number of people to be an assembly?
22       A.   Yes.
23       Q.   What is your understanding?
24       A.   I think it's nine, but I could be wrong.
25   It's like six to nine or something like that.  It's

## Page 115

1    written out in the city code that you can look up, but
2    it's been a long time.  It's been over three and a
3    half years since I've had to worry about it.  And
4    hopefully I never have to again.
5        Q.   Do you know if there are guidelines about
6    how close the people need to be to one another to be
7    an assembly?
8        A.   No.
9        Q.   Did you send any emails related to the
10   August 19, 2015, protest?
11       A.   I can't remember.  Like I said, it's been a
12   long time.
13       Q.   Have you ever sent emails related to
14   protests?
15       A.   I'm sure I have at some point in time, but
16   not many.
17       Q.   For example, when Officer Manasco wanted to
18   share this After Action Report with you, how would he
19   have done that?  Did he do it by email?
20       A.   I think initially he just presented me a
21   copy of it.  He may have emailed me a copy later, but
22   I remember initially I think he just presented me with
23   a copy.
24       Q.   You did have a department issued email
25   address when you were with St. Louis Metropolitan

## Page 116

1    Police Department?
2        A.   Yes.  Yes.
3        Q.   And did you use it in the course of your
4    work?
5        A.   Yes.
6        Q.   Have you ever sent emails about chemical
7    agents?
8        A.   Um, I think at one point when we were
9    ordering some during Ferguson.
10       Q.   Other than that time do you recall ever
11   sending emails about chemical munitions?
12       A.   I do not.
13       Q.   Did you patrol the women's march in January
14   of 2017 downtown?
15       A.   Yes.
16       Q.   As a member of SWAT?
17       A.   No.  I was in the Fourth District at the
18   time.  I don't know if I was assigned to it or I was
19   just there because I was the District Four watch
20   commander, but I was down there.
21       Q.   How long were you there?
22       A.   A few hours.  If I remember, it was really,
23   really hot.  Or maybe not, no.  I was there about
24   three or four hours because I remember it was right
25   before I left to go to Sunset Hills.

29 (Pages 113 to 116)

STEPHEN DODGE  1/15/2019

Page 117

1       Q.  Yeah, I think this would have been about a
2   month before you left SLMPD?
3       A.  Yes.  Maybe even shortly before that
4   because they knew I was leaving.
5       Q.  You were there as a Fourth District
6   lieutenant?
7       A.  Yeah.  I don't think I was assigned to the
8   detail.
9       Q.  What was your duty or your role while you
10  were there?
11      A.  I was just commander, watch commander of
12  the Fourth District as a general role.  I don't think
13  I had any -- I can't remember if I was assigned that
14  detail or not, to be honest with you.
15      Q.  Did you see protestors?
16      A.  Yes.
17      Q.  Do you recall how many approximately?
18      A.  I'm trying to remember if that was an
19  organized march.  So I don't know if it was really --
20  was that an organized?  I can't remember if it was an
21  organized march with a permit or not, to be honest
22  with you.  So it wouldn't even necessarily be
23  considered protestors.  They would have been
24  considered part of the march.  Because I thought we
25  had the streets blocked off for everyone.  It was a

Page 118

1   women's march.  So I don't think.  But there were a
2   few hundred, I think.  Several hundred.
3       Q.  You're saying you believe the police had
4   the streets blocked off?
5       A.  Yes, because I think they had permits and
6   stuff, I thought.
7           But I think there was another group
8   actually at the same time, if this is the same thing
9   I'm thinking of, where they actually had a protest
10  group there as well.  Maybe I'm confusing something.
11      Q.  I'm understanding from what you're saying
12  that you are distinguishing a protest and a march; is
13  that right?
14      A.  Yes.
15      Q.  How are those terms different to you?
16      A.  Well, I guess when I think of a protest, I
17  guess I do -- I mean, this is more of just an
18  organized march kind of thing rather than a
19  spontaneous protest kind of thing.
20      Q.  Did you deploy any chemical munitions at
21  the women's march?
22      A.  No.
23      Q.  Did you effectuate any arrests?
24      A.  No.
25      Q.  Did you see any officers deploy chemical

Page 119

1   munitions?
2       A.  No.
3       Q.  Did you see any officers effect any
4   arrests?
5       A.  No.  Not to say they didn't.  I just didn't
6   see any.
7       Q.  Thinking back to your experience on
8   August 19, 2015, and looking at the After Action
9   Report, is there anything that you would do
10  differently today if these same events occurred other
11  than potentially change the staging location based on
12  the wind direction?
13      A.  Yeah.  I would have corrected the After
14  Action Report.  That's on me.
15      Q.  Other than that?
16      A.  Maybe change the staging location more
17  towards -- but that would have been tough to do.
18          Beyond that, I think, you know, I can look
19  at that incident and say no one was seriously injured
20  in any of the actual -- in any of those three protests
21  I handled.  No citizens or police officers were
22  seriously injured or even killed, which is not
23  uncommon at riots, if you look at L.A. and places like
24  that.  So I take a lot of pride in that, that no
25  protestors or rioters or policemen or civilians or

Page 120

1   anybody expressing their First Amendment rights were
2   injured, seriously injured or killed.  I take a lot of
3   pride in that.
4       Q.  So you would not -- other than the staging
5   location and correcting the After Action Report, would
6   you do anything differently if it happened today?
7       A.  Um, you know, the only thing I think we
8   might have done, we could have done maybe, is effected
9   more arrests at the beginning.  But at the same time,
10  given the political climate and everything, I
11  understand they wanted to be as, you know, give them
12  as much room -- give the protestors as much room as
13  possible to effect -- you know, to carry out their
14  First Amendment rights.
15          So I know that they didn't want to make
16  arrests because they were hoping after they were done
17  protesting they would leave peacefully.  You know,
18  that is what they were hoping.  But I think had we
19  effected more arrests then that could have prevented
20  us from later having to deploy chemical munitions and
21  it could have prevented burning buildings and the
22  looting and the car catching on fire, you know, so.
23      Q.  Other than that possibility, are there
24  other things that you would have done differently if
25  these events happened today?

30 (Pages 117 to 120)

## Page 121

1        A.  No.
2            MS. STEFFAN: I think I'm finished.  If you
3    have questions, please feel free to go ahead.
4            MR. WHEATON: I don't.
5            MS. STEFFAN: Can I have a minute then to
6    look through my notes?
7            MR. WHEATON: Sure.
8            MS. STEFFAN: We can go off the record.
9            (A short break was then taken.)
10           MS. STEFFAN: No further questions.
11           MR. WHEATON: Okay.  I'm going to explain
12   signature.
13           MS. STEFFAN: Sure.
14           MR. WHEATON: You probably know this, but
15   you have the right to read through the transcript and
16   sign off on it to check it for typographical errors or
17   any other words that may have been taken down
18   incorrectly.  You can't change the substance of your
19   testimony.  Or you can trust that the court reporter
20   took it down accurately.  In that case, you can waive
21   signature.  And that's your choice.  Typically I
22   recommend that people waive signature.  But either
23   tell the court reporter you'll waive or sign.  It's up
24   to you.
25           THE WITNESS: I will waive my signature.

## Page 122

1
2            DEPOSITION CONCLUDES AT 5:03
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 123

1
2            NOTARIAL CERTIFICATE OF REPORTER
3
4            I, Susannah L. Massie, MO CCR, and Notary
5    Public within and for the State of Missouri, do hereby
6    certify that the witness whose testimony appears in
7    the foregoing deposition was duly sworn by me pursuant
8    to Section 492.010 RSMo; that the testimony of said
9    witness was taken by me to the best of my ability and
10   thereafter reduced to typewriting under my direction;
11   that I am neither counsel for, related to, nor
12   employed by any of the parties to the action in which
13   this deposition was taken, and further that I am not a
14   relative or employee of any attorney or counsel
15   employed by the parties thereto, nor financially or
16   otherwise interested in the outcome of the action.
17
18
19           _____
20           Notary Public within and for
21           The State of Missouri
22           MO CCR #902
23
24
25

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

STEPHEN DODGE  1/15/2019

**A**

ability 6:12,16
10:3 80:11
82:22 105:5
123:9
able 60:15
83:19,21
aboard 82:10
absent 111:13
absolutely
68:23 81:24
88:21,23
110:10,24
academy 7:11,13
7:14 8:21,22
83:10
accident 23:6
23:20,22
24:4,4
accurate 14:18
32:19
accurately
121:20
accusation
66:10
Acknowledge...
40:3
ACLU 4:2 64:12
acronym 9:17
action 2:15
12:21 66:25
77:24 78:1,5
80:6,8,10
81:21 83:12,16
83:23 84:2
85:25 86:7
87:16,22 88:5
107:19 115:18
119:8,14 120:5
123:12,16
actions 48:14
71:18 72:5,10
85:20 86:13
activity 95:2,14
112:3
acts 38:24

actual 40:1
92:12 110:2
119:20
added 40:13,16
address 115:25
adjacent
109:22
administration
8:3
administrative
22:18
Affairs 28:14,17
affect 6:12,16
afternoon 3:11
3:12 5:14
43:12 44:15
90:14
AG 20:17,21
21:6
age 5:10
agent 59:8
agents 116:7
AGF 1:10 3:5
aggressive
89:23 91:23
ago 5:23 10:17
36:11,17,17
70:9
AGREED 5:1
ah 59:21
ahead 6:9 61:19
61:20 62:6
81:5 110:21
111:14 121:3
air 98:23
AL 1:8,9 3:3,6
3:19,20
Alaris 4:16
alcohol 6:12
allegation 12:12
allegations
66:15
alleged 10:22
12:4,7,9,21
Allen 44:5
allow 111:7
allowed 52:13

allowing 114:3
allows 107:5
altogether 70:11
70:25 111:25
Amendment
88:20 114:2,4
120:1,14
Ameren 35:8
amount 20:20
36:5 49:5
Andrew 4:8
announcement
94:4
announceme...
40:23
annual 35:19
answer 6:1,4,9
94:17 98:15
105:2 114:15
answered
26:25
anticipated
32:24 86:18
Anticrime 44:11
anybody 34:18
120:1
anymore 107:10
Apartments
25:3
Apparently
75:2
APPEARANCE
2:4
appears 23:1
123:6
applicable
113:14
applies 94:13
95:11 109:18
109:20
apply 95:1
109:24
appropriate
21:21,22 60:11
104:18,18,23
105:23 106:19
approximately

27:10,20
30:20 91:10
117:17
April 35:2
area 7:7 16:7
18:13 45:3,11
47:15,17,19,22
47:24 48:5,21
50:9 52:14,15
53:19,22 54:1
54:2,4,25
55:4,20 56:5
56:7,11,23
57:8,23
60:20 62:13
64:23 66:4
68:11 69:11,19
74:18 88:11
94:7 99:9,13
111:25
areas 56:2 62:4
argue 98:12
armed 17:1
armored 12:5,8
12:10,10 17:11
arrest 105:7,11
110:22,25 111:1
arrested 10:10
92:6,15,18
93:1
arrests 92:8,9
92:10,21 105:5
118:23 119:4
120:9,16,19
arrive 51:14
arrived 42:6
43:11,19,22
45:24 47:7
49:14 51:16
52:4 53:10,11
53:16
Arsenal 95:24
95:25 98:2,4
98:20 101:5
102:3,11 103:18
aside 66:15
asked 18:3

26:22 27:24
30:19 61:25
62:1 113:16
asking 6:5
42:19 45:14
72:13
assembled
46:5 112:2,8
assemblies
112:22
assembly 69:18
93:14,23 94:3
94:5,7,9,13,25
95:11,17 97:18
111:16,24
112:18 113:1,5
113:11,17 114:8
114:21 115:7
assigned 15:9
22:18 76:23
82:8 116:18
117:7,13
assignment
19:9
assignments
14:17 31:10,20
assist 17:4
27:25 70:23
102:16,16
associated
52:11
Association
28:21
assume 65:16
assuming
108:10
attempting
27:25
attend 7:11,13,19
7:21 8:8,10
85:1 87:16
attended 8:6,16
8:22
attention 33:15
41:11
attorney 31:3
66:16 96:2

113:8 123:14
attorneys 5:18
audio 85:24
August 11:15
41:13,16 42:3
43:2 55:22
58:2 64:20
67:18 68:17
68:20 101:24
103:19,25
109:10 115:10
119:8
available 17:7,8
73:24 74:5
avoid 106:14
aware 41:14,18
57:6 68:5

**B**
bachelor's 8:4
back 11:12 24:16
25:8 27:18
28:7 31:12
37:9,21 42:15
48:1,2,3 49:2
49:5 50:8
51:3,6 57:4
61:1,8 62:21
63:1,4 65:19
68:19 70:11
71:7 72:21
73:5,5,6,15,20
74:18,23 75:1
75:11,12,13,15
75:16,17,18,21
79:4 100:1,24
103:4 106:2,3
119:7
background
8:25
ball 58:19,23
67:9
Ball-Bey 41:15
42:8 88:20
ballistic 17:9
barricade 16:19
barricaded 17:2

103:9
based 60:13
71:15 86:4
88:17 94:2
104:21 107:10
109:12 114:9
119:11
basically 34:4
38:23 39:19
83:24 108:20
Bayard 48:4
56:2,11,11,12
61:8 69:20
BEAR 44:17,19
45:17 46:7,14
46:21 49:10,15
49:19,23 51:1
51:9,10,11 52:1
52:1,2,2,13,16
52:21 53:4,6,7
53:10,18,21
54:1,6,14,16
54:20 56:6,7
56:16,22 57:7
57:9,22 58:5
58:11,16 59:4
59:10,15 60:19
61:5,11,20
63:10,13
64:22 65:7,16
65:20,23,25
66:3,18,21
67:23 68:1,3,6
69:3,7,10,24
70:5 72:21
73:4,4,6,10,11
73:14 74:11,13
75:4,11,14,14
75:20 76:7
79:19 80:1
82:11,12
bearing 71:14,21
began 14:20
43:5
beginning
120:9
behalf 1:18 3:20

5:10
believe 11:17,19
11:23 20:19
22:22 29:11
34:1 35:18
36:6 37:4,12
41:5 44:11
45:23 50:22
53:25 56:19
57:4 58:8,21
59:12 60:18
60:24 61:19
64:12,21 66:1
66:11,17,21,25
68:21 69:10
72:19,25
80:22 81:14
85:8 86:5
88:18,22
89:14 93:12
93:24 98:3
99:24 101:8
102:15 107:15
107:21,21
108:16 109:2,6
110:17 118:3
believed 53:17
64:19
Belleville 54:11
Belmar 37:15
benefits 23:14
best 13:6 25:10
40:8 79:22
80:11 82:21
123:9
better 60:17
86:14 87:3,6
87:12 105:9
Beyond 76:22
119:18
big 20:15,17
34:9 105:6
biggest 79:14
80:4
bit 51:16 63:7
75:16 91:8
107:5

blended 79:22
blending 79:24
blends 79:17
block 110:10,12
blocked 110:6
117:25 118:4
blocking 43:18
92:17 94:21
94:22 95:2
112:5
blocks 112:4
blowing 87:8
board 59:11,16
body 67:18
bottles 106:16
bottom 66:6
Boulevard
56:13,25 57:8
57:23 60:20
63:5,6 64:23
64:24 66:4
branch 9:2
Brandon 53:1
break 63:17,19
114:16 121:9
Brian 102:15
bricks 58:24
62:5 63:2
Bridge 100:19
brief 5:25
bright 64:13,16
64:18
broad 21:18,19
21:19 105:3
broken 99:8
Brown 89:6
building 17:2
48:18 112:9,14
112:14
buildings 62:25
99:12 120:21
bullet 52:18
bunch 34:9
44:9,12 85:6
98:8
burn 90:8 99:11
burning 99:15

100:2 120:21
business 8:3
94:23
Busso 44:3

**C**
C 4:1
Cagle 85:6
call 26:23 72:21
73:4 75:11,25
76:2,7,8,11,12
77:13 95:4
called 5:18 17:4
19:2 28:21
29:4 33:23
35:4,24 40:3
41:3 81:25
Calls 33:4 94:14
95:13 104:25
110:21 111:13
112:12 114:13
cam 67:18
canister 97:2
canisters 67:15
90:22
capabilities
21:21
capability 67:24
68:4,7
capable 59:7
capacity 9:22
104:8
Captain 85:5
car 23:6,20,22
24:4,4 70:11
120:22
carbine 17:10
career 19:22
114:9
careful 88:8
carries 106:11
carry 120:13
cartridges 60:5
case 5:18 11:24
41:2,12 63:22
100:4 121:20
Cat 52:1,2,22

53:4,18,21
54:6,14 56:6,7
56:16 57:7
58:5 59:10
63:10 64:22
65:7 68:1,6
69:24 73:11
75:14 79:19
80:1
catching 120:22
category 77:16
caught 79:2
cause 1:10 3:5
3:16 38:25
caused 23:8
110:9,11
CCR 4:16 123:4
123:22
CDT 19:12,16,20
19:22 20:1,10
20:12,14,16
21:5,10,13,23
38:18 87:11
91:6,7,14,18
104:17
Central 16:6,10
certain 3:16
25:13,13,18
36:4 38:24,25
certainly 30:15
103:10
CERTIFICATE
2:6 123:2
Certified 3:15
5:4
certify 123:6
chain 108:10
chance 77:12
change 36:9
40:17 74:12
119:11,16 121:18
changed 18:5
36:7,10,17
changes 40:9
40:19
channel 73:22
74:8,11

channels 73:24
74:4,8,12
chaotic 80:14
81:23,24
charge 20:12
22:1 50:24
92:11,12,13
96:7
chargeable
24:4
charging 92:11
check 23:19
58:17 121:16
chemical 19:23
20:5 21:14,17
40:14,25 53:8
55:9,17,21
56:5,8,17,20
56:24 58:1,4
58:12 59:7
60:7 63:9,14
67:3,7,10,14
69:21 82:12,19
89:8 92:25
95:19 96:8,24
97:3,22 98:7
98:12,18,22
99:4,18 100:15
100:16,25
101:2 102:21
103:20 104:19
104:24 105:12
105:18 106:20
107:4,14,17
116:6,11 118:20
118:25 120:20
Cherio 99:5
chief 5:14 13:23
35:7 37:15
46:10,15
50:22,23
53:5 58:16,25
61:17,23 62:1
62:11 63:21
72:15,16,23
73:3 74:24
75:3,8,10

76:22 77:7
81:5 84:25
86:6 104:8,12
chiefs 38:3
child 23:7
choice 121:21
Chouteau 90:6
Christina 64:2
chunks 33:13
cigarette 28:13
circled 57:3
circuit 61:6
circuits 79:24
circumstance
28:9 39:23
110:8
circumstances
105:23 106:20
111:14
citizen 99:17
citizens 119:21
city 1:8 3:6,12,19
4:7 5:19 13:23
41:3 53:7 54:1
54:16,20
56:22 58:11
59:15 63:13
65:16,20 66:3
68:3 73:4,6,11
73:14 74:11
75:11,14 82:11
104:10,15
108:12,13 115:1
civil 10:12 16:19
19:2,8 21:11
34:9 38:21,23
39:6,8 64:14
102:7,10,18
103:11,14,21
112:20,25
civilian 24:9,16
25:4,8 26:7
41:15 110:11
111:18
civilians 24:12
46:1 119:25
Clair 51:12,25

52:25 53:4,10
53:21 54:6,9
54:12,12,14
56:6,16 57:7
58:5 59:10
63:10 64:22
68:1,6 69:9
69:24 70:5
73:10 75:4,14
80:1
Claire 4:13
clarified 51:11
clarify 6:7 27:1
32:15 37:21
42:11,15 68:14
clarity's 42:23
45:8
class 35:19
clear 34:23
44:19 50:14
62:5 63:25
72:7 77:19
99:15
clearcut 40:24
clerical 32:23
clerk 4:13
climate 120:10
close 25:17
106:25 115:6
closed 110:6
closer 60:16
107:1
Coats 44:3 59:3
59:16
code 115:1
Coffee 98:11,13
98:24 99:21
collect 81:13
college 7:19
8:19
colonel 43:14,15
44:17 46:17
71:12,15 72:3
72:18,18,23
73:17,19 74:9
74:23,25
76:21,23

84:25 86:6
99:5
colonels 77:4,7
come 10:24
19:12 23:11
27:22 31:16
42:15 44:6
52:8 63:1,4
73:6,5 75:17
75:21 104:3
113:23 114:6
comes 113:21
coming 20:17
21:6 62:21
85:17 89:15
89:22 91:21
91:22
command 34:1
34:2,12,14
87:24 88:5
104:13 108:10
113:20
commander
12:14 20:10,12
34:17 102:11
113:6,13 116:20
117:11,11
commanders
34:20 84:8,11
84:16,17,18
85:7
commanding
12:16 46:19
commands
68:23 69:5
commission
36:14
common 94:20
94:25 95:6,10
communicate
6:20 57:16
74:12
communicated
57:10,14
communication
57:9
communicatio...

| | | | | |
|---|---|---|---|---|
| 57:12 | confrontation | 36:15 38:20 | court 1:1 3:1,15 | 71:16,24 90:17 |
| compared | 105:12 | 39:15 42:9,16 | 3:17 4:15 5:4 | date 104:11 |
| 33:12 | confrontations | 43:1,3,5,6 | 10:22 13:1 | day 3:12 18:23 |
| complain 26:12 | 105:20 | 44:21 45:19 | 40:17 68:10,13 | 23:1 34:22,24 |
| complained | confusing 76:13 | 45:20 46:2,18 | 68:22 121:19 | 34:25 35:9,9 |
| 28:12 | 77:10 118:10 | 49:25 50:3,13 | 121:23 | 41:12 42:6,25 |
| complaint 24:10 | connection | 50:16,17 51:23 | cover 8:24 | 46:19 48:7,14 |
| 24:12,17,25 | 12:13 | 53:19 54:7,17 | covered 34:2 | 68:21 83:2,2 |
| 25:9 26:9,23 | consider 26:15 | 54:18,21 55:1 | 35:6 39:6 | 84:9,11,13 |
| 26:24 | 30:24 | 55:10 58:5 | CP 16:9 | 85:14 |
| complaints | considered | 59:9 60:8,22 | crashed 10:19 | day's 23:17 |
| 25:4 26:23 | 110:24 117:23 | 65:3,4,17 | crime 10:6,8 | days 84:10 |
| completed | 117:24 | 68:11 69:25 | 17:2 | 85:21,23 |
| 78:21,23 | contacted 28:14 | 70:25 72:6,7 | critical 34:4,6 | 86:15,18 |
| 107:23 | 28:17 99:5 | 80:18 82:4 | 84:6,12 | deal 16:25 |
| completely | contained | 102:1,23 103:7 | crowd 38:24 | 88:15 |
| 16:14 | 107:19,22 | 103:8 109:11,11 | 53:6,7 58:16 | dealt 71:16 |
| complied 68:22 | content 104:17 | corrected 119:13 | 59:1,2 60:13 | debriefing |
| 111:6 | continuously | correcting | 60:14,16,25 | 37:16,19 38:1 |
| complies | 14:23 | 120:5 | 61:4,18,21 | 38:8 |
| 107:20 | continuum | Correction 98:2 | 62:2,3,18 | December |
| comply 37:6 | 58:20 | correctional 9:5 | 64:6 71:19 | 35:14 101:4 |
| 69:20 74:15 | contribute | corrections | 72:5,8,10,15 | decided 113:17 |
| 111:20 | 78:12 | 79:2,5,9 83:21 | 73:9 88:15 | decision 40:16 |
| complying | contributing | correctly 106:18 | 93:20,21 | 46:7 60:10,12 |
| 99:22 112:9 | 78:14 | 108:4 | 99:15 105:6 | 71:14,22 96:4 |
| component | control 99:14 | counsel 5:2,2 | 106:9,15 107:1 | declaration |
| 16:16,22,23 | conversation | 123:11,14 | crowds 20:5 | 94:3,13 95:11 |
| 19:25 | 61:2,3 62:10 | counseling | 99:7 | 97:17 |
| components | 74:20 75:6 | 24:6 | cruiser 48:10 | declare 113:10 |
| 20:3 21:12 | 81:18 | Counselor's | 76:16,16,19,22 | declared 93:15 |
| Compton 89:2 | convey 60:23 | 3:13 4:7 | 76:23,25 77:3 | Deeba 85:5 |
| computer 31:13 | 72:16 | count 97:13 | 77:9 | Defendant 11:18 |
| concealing 28:1 | conveyed 73:18 | counting 82:19 | curb 109:23 | 11:20,20 |
| concern 62:23 | convicted 10:6 | County 12:22 | current 13:22 | Defendants 3:7 |
| 71:24 72:2 | copy 115:21,21 | 54:12,13 | custody 109:4,7 | 3:20 4:7 5:3 |
| 90:7 99:10 | 115:23 | couple 11:8,16 | cycle 36:7,8,9 | degree 8:4,12 |
| concerned 63:4 | corner 57:3 | 15:22 22:12 | 36:16,19 | 8:14 |
| concerning | 98:21 | 33:16 53:1 | cylinder 60:4 | demoted 22:16 |
| 39:20 40:16 | correct 12:23 | 71:8 84:9,23 | | department |
| 57:13 | 13:21 14:3,4 | 86:11 109:3,7 | **D** | 12:19 13:18,19 |
| CONCLUDES | 14:22,25 | course 2:14 9:14 | D 4:8 | 14:21 15:3 |
| 122:2 | 15:25 17:13,14 | 32:2 33:23 | D-O-D-G-E 5:16 | 19:15 22:16 |
| conditions 6:15 | 18:11,25 19:18 | 67:2 85:22 | dangerous | 24:7,11 25:15 |
| conduct 27:25 | 20:9 21:15 | 102:24 103:6 | 105:8 106:10 | 30:15 54:13 |
| conducted | 23:2 25:20 | 116:3 | 111:1 | 70:14,24 74:3 |
| 81:16 | 30:8 31:14,17 | courses 33:16 | dark 70:17,18 | 74:6 79:4 |

STEPHEN DODGE  1/15/2019

104:23 107:10
110:17 112:17
114:10 115:24
116:1
**department's**
39:10
**departments**
37:13
**depended**
38:13
**depending** 99:1
109:25 113:24
**depends** 76:9
95:14 106:5
112:13
**deploy** 56:8,16
58:1,11 61:20
62:3 81:5 97:2
98:6 100:16
103:20 118:20
118:25 120:20
**deployed** 42:3
55:21 56:5,20
56:24 57:5
58:4,7,14,18
58:20,22,23
59:4 61:7,12
63:10,14 79:16
82:14 87:9
89:9,10,12,14
90:19,24
91:20,24 93:1
96:9,14 97:23
98:10,13,19,20
101:3 102:21
103:5
**deploying** 53:7
59:7
**deployment**
62:21 99:3,6
100:25
**deployments**
82:9 89:21
97:10 100:15
**deposed** 5:20
5:22
**deposes** 5:11

**deposition** 1:17
2:3 3:9 5:3
6:20 12:25
55:10 122:2
123:7,13
**described** 27:19
41:12 48:20
105:25 106:21
**describing**
48:13
**description** 2:12
95:5
**designated**
108:11
**designed**
105:19
**DeSmet** 7:10
**detail** 17:6 31:22
117:8,14
**detectives** 91:16
**determination**
55:3
**determine** 114:7
**determined**
113:6,12
**differ** 16:12
**difference** 16:4
60:2 77:19
**differences** 16:1
**different** 16:15
17:11 23:22
26:9 34:10
36:20 37:2
39:24 69:12
77:21 79:15
84:17 97:15
105:22
106:22 118:15
**differently**
119:10 120:6
120:24
**difficult** 80:11
81:20
**direct** 33:15
41:11 66:8
82:24 106:12
**directed** 42:15

44:18 46:10
53:25 54:24
72:14,20
103:12,19
107:16
**direction** 72:16
88:8 93:24
119:12 123:10
**directions**
40:22,24,25
68:24,25
69:8,11 97:21
**directly** 75:8
89:19
**disadvantage**
106:23
**disaster** 34:8
**disciplinary**
22:15
**discipline** 36:24
36:25
**disciplines**
36:20
**discuss** 45:10
85:19
**discussed** 84:8
87:2
**discussion** 67:2
86:3
**discussions**
81:12
**dismissed** 11:23
**disobedience**
19:2,8 21:11
38:22,23 39:7
39:8 64:14
102:8,10,18
103:11,14,21
112:21,25
**dispersal** 93:4
93:10 110:19
110:23 111:6,15
111:23 112:9
**disperse** 40:22
40:24 53:6
58:16 59:1,2
60:17 61:18,20

62:1 68:11
69:18 71:18
72:5,10 111:3,9
111:19
**dispersed**
52:15 54:2,25
55:4 60:21,25
61:4 62:18
92:24 111:11
**disperses** 106:8
**dispersing**
72:15 73:8
**disposition** 13:4
**dissipated** 63:1
**distance** 60:13
60:14 107:3,5
**distinguishing**
118:12
**distributed**
108:2
**distribution**
56:3
**district** 1:1,1 3:1,1
3:17,18 15:13
15:14,16,18,21
18:10,12 27:12
28:12 44:12
116:17,19 117:5
117:12
**districts** 15:10
**disturbances**
16:20
**Division** 1:2 3:2
3:18 16:7
**dock** 23:17
**docked** 23:14
**doctorate** 8:15
**document** 14:6
14:8,14 15:5
16:9 18:4,20
29:14,16 30:21
31:9,9,15 32:5
33:3 34:22
45:6,8 77:25
79:11 83:24
83:25
**documentation**

82:1,3,8,20
101:24 102:2
**documenter**
102:9
**documenting**
80:12 81:22
**documents**
30:12,14
**Dodge** 1:17 2:13
2:13,14,14,15
3:9 4:12 5:9
5:14,16 6:23
14:9,11 29:12
29:15 32:2,14
45:4,7 77:23
78:2
**Dodson** 53:5
**doing** 40:21
54:9 82:7
99:2 114:4
**door** 92:17
94:22 95:3
98:25
**Dotson** 35:7
46:10,15
50:22,24
58:16,25 61:17
61:24 62:1,11
72:15,15,16,23
73:3 74:24
81:5 84:25
86:6
**downtown** 18:13
116:14
**dozen** 85:9
**draft** 79:6,8
82:25
**drafting** 80:6
**drive** 10:4
49:22 62:2
**driven** 46:23
49:24 53:7
**driver** 65:10
**driver's** 9:8
**driving** 9:10,20
10:1 23:10
54:6 56:17,25

STEPHEN DODGE  1/15/2019

drove 44:24
  58:17
drugs 6:11
duly 123:7
duties 22:19
duty 104:19
  117:9

___

**E**

E 4:1,1
earlier 26:18,22
  49:10 60:6,18
  68:9 70:21
  77:25 100:20
  101:23 102:20
  104:16 106:21
early 42:25
Earth 2:14 45:5
east 94:8
Eastern 1:1,2 3:1
  3:2,17,18
educational
  8:24
effect 40:20
  69:17,22 119:3
  120:13
effected 92:22
  120:8,19
effective 92:4
  99:19
effectuate
  118:23
eight 35:21
  47:20,20
  48:21
either 11:19 26:7
  26:12 35:21
  47:16 55:15
  61:10 64:23
  70:1,4 77:14
  81:19 84:9
  96:22 121:22
element 114:2
Eleventh 4:17
email 87:21
  115:19,24
emailed 115:21

emails 115:9,13
  116:6,11
Emergency
  9:18
emits 55:17
employ 104:4
employed
  123:12,15
employee 26:5
  26:6,7,13,19
  27:2,5,14,19
  123:14
employment
  13:17 14:6 15:2
EMR 28:3
encircled 99:7
encounter 39:8
enforced
  108:25
enforcement
  15:1 95:16
engaged 95:2
  95:15 112:2
ensure 52:14
  54:2,3,25
  60:20
entail 9:19
  39:18
entailed 39:19
entails 9:20
entered 30:15
Entries 2:14
  32:3
entry 42:14
envision 52:16
equipment
  16:25 17:5,7
  20:25 86:25
  87:11
error 33:1
errors 121:16
Essentially
  61:25
estimate 59:22
  59:23
ET 1:8,9 3:3,6,19
  3:20

Ethical 29:4
Euclid 56:4,12
  56:20 57:2
  61:7,8 66:18
  66:20,21 67:1
Eureka 6:24
Eve 101:9
evening 70:20
  90:15,16
  100:17
event 64:20
  82:4 95:7
  101:24 103:21
events 64:14
  68:16 119:10
  120:25
eventually
  92:23
everybody
  34:19 48:17
EVOC 9:14,16,17
  9:25
exact 48:5
  53:14 69:17
  70:18 75:23
exactly 32:9
  93:20
exaggeration
  93:6
EXAMINATION
  2:5 5:12
examined 3:10
  5:10
example 95:7
  115:17
excessive
  10:22 28:4
executing 16:18
  42:25
execution
  42:20
Exhibit 2:12 14:9
  14:11 29:12,15
  31:2,3,23 32:2
  32:14 45:4,7
  77:23 78:3
EXHIBITS 2:11

exist 21:6
experience
  52:9 68:19
  71:25 104:22
  111:4 119:7
explain 60:1
  121:11
explained 62:2
express 114:3,11
expressing
  120:1
expressly 5:7
extinguisher
  106:7
extra 17:5,7
eyes 55:19

___

**F**

face 87:8
  108:20
fact 80:18
  104:17
fair 37:22 70:20
  76:24 77:1
  85:9 98:22
  103:5
fairly 33:16
  53:15
fall 95:23
familiar 5:24
  28:20 29:3
  41:25 55:12
  64:8 76:16
  81:25 108:12
  108:17
familiarity
  109:12
far 77:3 87:5
  111:5,20 112:1,1
favor 10:23
feasible 88:13
February 14:1,2
  18:9 104:6
federal 10:22
  40:17 68:10
feel 45:15
  55:25 121:3

feet 110:2
fellow 26:6,7
female 27:23
Ferguson 11:12
  11:13,14 35:25
  37:10,13 38:14
  40:13 83:12
  102:13,19
  103:24,24
  116:9
fighting 70:14
file 2:13 27:14
  29:12,19,21,22
  30:3,8,9,10,13
filed 11:16 24:9
  24:12 25:5
  26:4,24 27:2
  27:5 28:3
Fillmore 101:20
financially
  123:15
find 11:25
fine 63:18
finish 31:4 66:16
  96:3 113:9
finished 121:2
fire 34:8 48:4,18
  50:10 70:12,12
  70:14,15,24
  106:7 120:22
firearms 36:22
fired 99:9
first 11:3 15:9
  20:16 24:4
  29:18 33:21
  35:3 44:13
  45:24 47:7,8
  49:5,7 53:3,14
  57:4 58:15
  61:11,12,22
  69:5 71:10
  78:17,22 79:6
  81:5 88:20
  109:2,2,5
  114:2,4 120:1
  120:14
five 77:5

STEPHEN DODGE  1/15/2019

five-day 9:14
fix 83:19
flicked 28:13
flow 108:14,21
  109:5,8,14
  110:4,7,14,18
  111:7
focus 16:13
focused 112:21
focusing 43:9
fogger 106:19
  106:24
foggers 106:6
follow 113:13
followed 41:1
following 41:2
  84:2
foot 48:7
force 10:22
  25:12,17 28:4
  28:18 39:10
  39:20 40:9
  58:19
foregoing 123:7
form 20:17,21
  21:6 31:1
  50:20 72:11
  95:12 104:25
  110:20 111:12
  112:11 113:3
  114:13
formal 81:7
  108:5,8
formations
  19:24,24 20:5
  20:7 21:13
formed 44:25
  88:15
forming 20:8
forms 38:24
found 10:23
  24:23 28:1
foundation 4:2
  95:13 110:20
  111:13 112:12
Fountain 41:25
  42:4,24 43:10

44:8,14 45:10
45:18 47:8
49:11,14 55:23
66:5 70:10,24
four 15:13 35:21
  35:21 37:25
  39:20 47:18
  59:25 77:5
  116:19,24
Fourth 15:21
  18:10,12 27:12
  116:17 117:5,12
frankly 40:21
free 45:15 56:1
  111:7 121:3
Frigerio 44:4
front 23:7 65:11
  65:14 66:6
  92:17 95:2
fully 41:12 78:21
  78:23
functions 77:22
further 72:5
  121:10 123:13

---

### G

gang 16:6,13
gas 60:17 61:8
  61:12,20
  62:22 63:1
  67:4,8 79:16
  82:9 87:9,10
  87:11 98:10
  103:5
gather 80:9
gathered 80:20
gathering 114:6
general 40:15
  47:15,18,22
  48:5,21 56:4
  67:17 117:12
generally 9:19
  12:2 27:18
  34:3 35:10
  46:12 65:5
  67:13 77:11
  86:12 93:22

105:4,24
111:23 113:6,8
getting 72:1
  85:16 99:16
  107:1
gist 19:23 24:24
  75:6 94:8
give 59:21 69:8
  70:6 97:13
  120:11,12
given 50:7,18
  53:5 68:24
  68:25 81:4
  93:22 97:15
  97:21 98:5
  111:19,23
  120:10
gives 107:4
giving 6:3 11:24
  40:21,24 69:5
  69:7
go 6:9 7:6,9
  17:19 18:19
  37:9,21 40:25
  43:13 51:19
  53:24 61:19
  61:20 62:6
  66:20,21
  69:19 71:11,23
  76:11 77:3,18
  81:5 85:14
  94:8 97:21,25
  98:2 100:11
  105:10 106:10
  110:21 111:5,14
  111:20 112:8
  116:25 121:3,8
goal 85:13
  99:19
goes 34:19 39:7
going 6:3 13:16
  14:6 17:6
  22:14 29:14
  34:16 41:11
  42:19 43:16
  45:6 53:9
  54:5 62:2,24

63:24 71:18
72:4,7 85:20
85:22 86:15
86:19,20,23
86:23,24
88:24 97:16
99:11 113:12
114:6 121:11
Golliday 11:4
good 5:14 32:4
  33:13 35:11
  63:17 87:7
Google 2:14
  45:4,9
Gotcha 31:11
  42:22
gotten 89:20
  92:23 99:13
GPS 68:3,7
grab 107:2
graduate 7:2,4
  7:15,17,23,25
  8:6,16
graduated 7:18
  8:1
Grand 83:12
  95:24,24,25
  96:4 98:3
  100:12,14
  101:5 102:3,11
  103:18
great 17:6
green 64:13,16
  64:18
Groce 64:4
ground 5:24
  105:14
group 24:20
  55:4 91:17
  112:2,4,5
  113:12 118:7,10
groups 55:6
guess 20:3,11,11
  21:19 29:22
  30:4 44:24
  63:12 67:16
  70:18 87:19

92:13,14 113:4
118:16,17
guessing 49:9
  75:24
guesstimates
  91:11
guideline
  107:20
guidelines
  107:11 115:5
gun 59:5 99:9
gunfire 52:10
guns 71:25

---

### H

half 35:9 63:17
  115:3
hand 14:6 29:14
  32:4 45:6
  60:8 77:25
  105:20,20
  106:13,13,14,14
hand-held
  55:16 67:11,17
  90:20,21,23
  96:16,17
  105:24 106:6
  106:21
hand-helds
  60:16 62:3
  106:11
handed 32:19
  45:8 78:2
handful 97:12
handled 25:1
  119:21
happen 81:22
happened
  84:12 120:6
  120:25
happening
  80:13
hard 33:6
hat 19:10
hats 64:13,13,16
  64:19
hazmat 34:8

head 6:2 13:15
  66:11
headed 37:14
headquarters
  46:23 49:12
  49:22,24
  84:15 101:9,14
  101:15,17
health 6:15
hear 93:4,14
  97:17,22
heard 13:14
  70:6 76:15
  93:10 94:2
  107:6
heightened
  16:25
helmets 17:10
help 27:24
  52:17 53:18
helps 45:15
  56:1
hey 71:15 81:8
high 7:2,6,9,10
  76:25 114:7
higher 17:10
  21:24 37:3
  113:22,23
highest 54:19
Highway 9:15
  37:14 100:19
Hills 13:24 14:3
  18:24 36:12
  89:2 101:21
  104:9,12
  116:25
history 2:13
  13:17 14:6,12
  22:15
hit 107:2,3
hold 23:19
  73:19
holds 60:5
Holly 101:21
honest 73:1
  81:10 117:14,21
hopefully 115:4

hoping 120:16
  120:18
hostage 16:19
  17:3 34:8
  103:9
hot 116:23
hour 51:17 63:16
  71:8,9 92:20
hours 3:11 19:22
  31:9,19 35:22
  36:21,24
  37:25 47:19,21
  48:21 71:8
  84:23 86:11,19
  116:22,24
house 48:4
  70:12,15
  101:20
human 31:8 33:1
hundred 118:2,2
hundreds 19:21
  93:6
hurt 105:15,16
hypotheticals
  39:22

___ I ___

ICS 33:23 34:11
idea 21:11 68:8
identification
  14:12 29:13
  32:3 45:5
  77:24
Illinois 51:25
immediately
  28:14 53:11
  69:18 94:8
impeding
  108:14,21
  109:5,8,14
  110:4,7,14,18
impractical
  95:4 105:8
in-between 14:3
incident 28:15
  28:16 34:1,2,6
  34:12,14,17

78:20 80:12
  83:1 84:3,6,12
  107:24 108:1,4
  109:3,9,10
  119:19
incidents 34:5
include 39:4
  67:11,17 93:11
  112:25
included 80:16
including 20:23
  100:8
inconsistencies
  79:1,10 80:1
incorrectly
  121:18
increase 20:20
INDEX 2:1,2
indicated 67:1
indirect 66:9
individual 76:6
  95:5 105:5,7
  106:15
inert 58:20,22
information 2:3
  78:12 80:9,20
  81:13 107:18
  107:22
informed 13:11
  75:2
initial 11:14 56:3
  58:15 62:21
  82:6 103:24
initially 17:17
  32:21 47:4
  59:4 60:25
  61:4 74:23
  109:4 115:20
  115:22
initiative 62:12
  62:15
injured 107:1
  119:19,22
  120:2,2
injury 10:19
  105:19
inside 52:19

65:21,22,24
  98:23 99:21
  112:9
instance 48:18
  94:21 100:4
instructed 80:7
  87:17
instruction
  60:23 69:23
  74:10,10,16
instructions
  70:7 93:22
  99:23
instructors 22:3
intel 99:11
intending 53:22
intent 99:14
interested
  123:16
internal 28:14,17
  83:24
interpersonal
  36:22
interrupt 11:21
intersection
  43:18 95:23
  100:2,8
interview 80:9
  81:1,6,7
interviewing
  80:22
interviews 81:15
investigation
  25:9
invited 112:13
involuntary
  18:18
involve 17:1
involved 10:18
  37:13
involving 11:12
irritant 55:18
issue 11:24
issued 68:14
  76:11,12 115:24
item 107:3

___ J ___

January 1:19
  3:10 116:13
Jemerson
  102:15
Jennifer 101:20
Jessie 4:3 5:17
Jesuit 7:10
joined 91:7
joint 38:2
Joyce's 101:20
Joyner 44:5
Jsteffan@aclu...
  4:5
Julia 11:1
Juris 8:15
jurisdictions
  51:23,25
Jury 96:4
justification
  110:18,22,25

___ K ___

Kansas 7:22
keep 60:14
keeping 82:11
kept 58:24
Kiener 101:6
killed 41:15
  99:16 119:22
  120:2
kind 9:13,21
  12:5 13:7,8
  16:17,20 17:4
  17:6 19:9
  20:25 26:23
  26:24 31:8,10
  31:20 37:19
  38:2 40:23
  48:10 63:2
  77:10,21 79:3
  79:16 83:8,22
  83:25 84:12
  86:22,24
  88:15 91:7
  96:22 102:13
  102:13 106:5

STEPHEN DODGE  1/15/2019

114:17 118:18
118:19
**kinds** 67:7
    96:15 97:15
**knew** 86:22
    117:4
**know** 6:7 11:8
    17:9 21:9,20
    24:9,14 26:4
    26:14 27:1
    28:7 29:9,21
    30:12 33:25
    34:13 36:18,21
    37:1 38:12,16
    40:15 44:16
    50:23 53:13
    54:11 55:18,25
    56:23 57:10
    57:14 58:14
    58:22 59:15
    63:9,13,21,25
    65:14,15 66:3
    66:22 67:15
    67:23 68:2,3
    68:6,20 70:2
    70:4,22 71:10
    71:13,21 72:9
    75:3 76:1,19
    77:5 78:10
    79:14 80:5,17
    80:20 81:8,12
    81:15,17,19
    82:5,10,17
    84:7 86:21
    87:15 89:18,18
    91:25 92:6
    93:18,22,25
    94:2,12,18,18
    95:1,10
    100:20 105:5
    106:23 107:2
    107:12,17
    108:19,22,24
    108:25 109:18
    110:1,1 113:11,19
    113:25,25
    115:5 116:18

117:19 119:18
120:7,11,13,15
120:17,22
121:14
**knowledge** 13:6
    25:10 66:8,9
    67:21 83:6
    107:11
**known** 92:2
**knows** 77:6

---

**L**

**L** 3:14 4:16 5:4
    123:4
**L.A** 119:23
**lack** 105:9
**lane** 109:15,17
    109:21,21
**large** 55:6 99:7
    106:15 113:12
    114:6
**larger** 106:7
**late** 43:12
    70:20
**lateral** 17:24
    18:14
**launch** 60:3
**launched** 55:16
    60:7
**launcher** 55:16
    59:4,5 60:2,7
    60:15 67:16
    96:15,23
**launchers** 59:10
    59:16,19,25
**law** 4:13 8:9 15:1
    95:16 112:23
    113:14 114:16
**lawful** 5:10
**lawfully** 114:5,12
**laws** 110:15
    112:22
**lawsuit** 10:13,20
    10:21,25 11:16
    11:18 12:3,13
    12:24 13:5,13
    41:6 66:14,16

**lawsuits** 10:15
    11:6
**lawyer** 6:21
**laying** 89:19
**layman** 16:21
**leader** 35:4,12
**leadership** 29:1
    35:11
**learn** 21:16
    85:15
**leave** 31:16
    55:20 68:24
    69:11 71:10
    72:4 94:7,24
    111:25 120:17
**leaving** 18:21
    55:7 62:23,24
    117:4
**left** 25:22 42:14
    48:2 49:4,8
    50:9 54:4
    57:2 66:18,21
    70:10,24
    71:23 79:4
    104:4 116:25
    117:2
**legal** 20:3,3
    64:8,19
**Lessons** 35:25
    37:9
**let's** 71:23
    95:22
**level** 17:5
**Leyshock** 43:14
    43:15 44:17
    46:17 72:18,23
    73:17,19 74:23
    74:25 84:25
    86:6
**Leyshock's**
    74:10
**license** 9:8
**lieutenant** 15:6
    15:15,21 18:5,5
    26:2 27:12,15
    41:21 117:6
**line** 19:23,24

20:4,7,8,9
21:13 33:18
44:25 88:12
88:14 89:16
89:22,24
91:21,23 92:5
109:6
**lines** 35:3,23
    39:25
**list** 14:17 32:7,15
    33:9 39:4
**listed** 16:2 31:25
    32:23,25
    34:21 37:18
**lists** 31:9 35:4
**lit** 28:13
**Litigation** 4:16
**little** 51:16 63:7
    75:16 91:8
    107:5
**live** 6:23
**local** 113:15
**location** 38:24
    46:22 47:13
    48:25 49:8
    51:19 55:8
    89:11 93:5
    99:12 119:11,16
    120:5
**locations** 45:16
**logistical** 86:21
**long** 10:16 30:17
    30:21 31:24
    35:20 37:24
    44:5 47:1,5,12
    48:20,24
    49:14 50:5
    70:9 71:6
    81:24 84:22
    86:11 92:19
    114:9 115:2,12
    116:21
**longer** 13:19
    47:20 112:2
**longtime** 88:18
**look** 14:7,18
    22:24 32:19

33:18 35:1
66:5 115:1
119:18,23 121:6
**looked** 30:9
**looking** 35:13
    35:23 55:5,6
    119:8
**looks** 18:4 59:5
**loop** 61:11
**looted** 99:8
    112:14
**looting** 63:2
    99:15 100:2
    112:6 120:22
**lot** 32:18 33:2
    33:10,10 40:7
    52:10 70:8
    71:5,6,11 76:10
    80:13 86:20
    87:9 89:13
    90:1,4 92:24
    93:2,7,8,16
    95:8 97:16
    100:8 105:10
    119:24 120:2
**lots** 73:25 97:12
    97:12,20
**loud** 94:24
**Louis** 1:8 3:6,14
    3:19 4:4,9,17
    5:19 7:6,14 8:9
    8:21 12:18,22
    13:17 20:21
    24:11 28:21
    41:3 52:21
    55:22 104:5
    104:10,15,22
    107:10 108:13
    110:15,16
    112:16 114:10
    115:25

---

**M**

**mace** 67:12,17
    89:10,12,14,19
    90:19,20,24
    91:20,23 103:1

STEPHEN DODGE  1/15/2019

103:2 105:24
106:6,21 107:7
**Mader** 44:4
**main** 19:23 98:4
**major** 19:25
21:12 80:3
85:5,6
**majority** 33:13
**making** 40:23
55:3
**male** 27:24
**man** 86:19
**Manasco** 44:4
53:1 58:8,21
59:13 78:11
80:7,18 81:17
82:24 107:19
115:17
**manner** 38:25
89:23 91:23
**Mansur** 41:15
88:19
**map** 2:14 45:5,9
45:15 56:1
66:6
**Maps** 45:9
**march** 89:1
116:13 117:19
117:21,24 118:1
118:12,18,21
**Marcus** 45:2,22
46:8,22 47:2
47:9,14 48:25
49:4,22,24
50:5,15 51:20
61:1 73:20
74:18 75:13
**mark** 45:7
**marked** 14:12
29:13,15 32:3
32:14 45:5
77:24
**Market** 3:13 4:8
**marking** 14:8
**masks** 87:11
**Massie** 3:14
4:16 5:4 123:4

**material** 55:17
**Mayo** 53:25
54:15,19,24
60:19 61:10,23
62:10 75:24
**Mayo's** 77:13
**mean** 11:7,13,14
16:16,22 20:2
21:18,18,19
23:16 26:2,8
26:17 30:15
43:23 44:23
45:25 46:4,12
47:18,23
49:21 50:11
55:14 60:12
61:5,25 64:11
70:18 71:1
79:14 83:1,3
84:18 94:20
96:17,19 97:12
97:13 98:8
103:1 105:3
106:5 108:18
110:1,2 113:4
113:24 114:16
118:17
**means** 16:23
18:21 38:22
46:5 95:10
**meant** 79:1
**medication** 6:11
**meet** 22:3
85:19
**meeting** 37:12
46:6
**member** 19:1,4
19:16,17 20:14
28:23 29:6,9
38:18 39:9
46:24 91:6
108:7 110:16
116:16
**members** 17:12
17:16 19:7,12
43:20,21
48:15 80:23

91:14 97:8
**membership**
21:1
**memory** 80:14
**memos** 30:16
**mentioned**
10:25 17:12
21:12 32:6
67:4 68:9
70:10 81:20
**met** 61:1
**metal** 23:9
**Metropolitan**
12:18 13:18
15:3 22:15
24:11 55:22
104:5,23
110:17 112:16
114:10 115:25
**Michael** 89:6
**military** 9:3
**mind** 10:24 44:6
79:3 104:3
**minimum** 114:21
**minute** 121:5
**misconduct**
26:5,13,19
27:2,5,14,19
**missing** 33:2
**Missouri** 1:1,9
3:1,6,14,16,18
3:20 4:2,4,9
6:24 9:15
13:24 25:2
123:5,21
**mistakes** 80:15
**MLK** 100:19
**MO** 4:16,17
123:4,22
**Mobile** 12:17
19:6,7 21:8
22:1,11 77:17
77:20
**Mobile/SWAT**
74:5
**MoKaBe's** 98:11
98:13,23

99:21
**Molina** 1:8 3:3
3:19 5:19
63:25
**monetary** 13:9
**month** 39:14
40:6 100:19,21
101:8 117:2
**Moore** 44:5
53:1
**move** 17:24 18:1
18:2,14 50:8
88:13 93:20
93:21,23 94:1
111:10 112:4
**moved** 15:21,24
18:24 50:9,11
51:2,2,3,3,6
**movements**
19:24
**moving** 17:21
20:5 48:14
90:4,6
**multi** 60:2,4
**multi-jurisdicti...**
37:22
**multi-launchers**
59:24
**multiple** 59:15
60:5
**munition** 55:15
67:11 82:19
102:21 107:14
**munitions** 17:11
19:23 20:6
21:14,17 40:14
40:25 53:8
55:10,21 56:5
56:8,17,20,24
58:2,4,12 60:7
63:9,14 67:3,7
67:14 69:21
82:12 89:8
92:25 95:20
96:8,13,24
97:3,15,23
98:7,13,18,23

99:4,18 100:15
100:17 101:1,2
103:20 104:19
104:24 105:13
105:18 106:20
107:4,17 116:11
118:20 119:1
120:20

---

## N

**N** 4:1
**name** 5:15,17
11:24 21:9
**named** 11:10
41:15
**names** 13:12
44:5 63:24
76:11
**narcotics** 16:5
16:13 24:24
28:1
**natural** 34:7
**near** 45:21 46:8
46:22 47:2,9
48:25 50:5,14
50:15 51:19
63:7 71:2 89:2
89:4 95:8,23
100:7,18 101:9
101:16,20
**necessarily** 11:9
54:12 94:11
98:14 117:22
**need** 60:14
71:20 72:8
86:25 88:6,8
111:5,20,25
115:6
**needed** 24:5
57:13
**neighborhood**
41:25 42:4
43:10 44:14
45:11,18 47:8
47:23,24 49:11
49:15 55:23
70:11,25

STEPHEN DODGE  1/15/2019

95:24
neither 123:11
neon 64:13
never 30:8,9
  79:4 100:12
  102:20 103:5
  103:10 108:2,2
  112:23 115:4
New 101:9
newspaper
  13:10
Nick 52:25
  58:8 78:11
  80:7
night 85:18
  96:4,7
nightstick
  105:13
nine 47:20
  48:21 114:24
  114:25
nodding 6:2
Non-Biased
  35:15
north 4:17 54:3
  54:5,15 56:7
  56:12 57:8
  64:23 66:20
  69:19,19 73:11
  90:4,7 94:8
  98:2 100:12,14
NOTARIAL 2:6
  123:2
Notary 3:15 5:5
  123:4,20
noted 80:2
notes 81:17
  121:6
noticed 78:25
  79:18
November 96:1
  102:3
number 21:2
  25:13 97:14
  114:21
numbers 77:3
  77:18

numerous 99:9

O

O'Fallon 24:24
  25:2,3
O'Toole 71:12,15
  72:3,19 74:21
objection 33:4
  50:20 72:11
  94:14 95:12
  104:25 110:20
  111:12,22 112:11
  113:3 114:13
objections
  106:4
objects 95:16
  112:5
observe 64:13
observed
  62:20 81:4,10
observer 64:9
observers 64:19
observing 65:2
obstruction
  108:13
obtain 8:12,14
obviously 46:12
  60:13 80:15
  86:22 113:13
  114:1
occasion 39:10
  103:19
occasions 43:7
  103:17
occurred 12:22
  25:5 61:4
  119:10
October 35:24
  89:5 100:7
Office 3:13 4:7
officer 9:6,23
  19:19 21:24,25
  26:12 27:2,6
  27:22,23,24
  27:24 41:14
  44:3,3,3 54:9
  54:20 55:3

59:3,13,16
  76:6,11,25
  78:23 80:17
  81:17 82:21,24
  88:18 91:2,4
  99:17 104:22
  105:8,16
  106:11 107:18
  111:4 115:17
officer's 25:17
  30:2 108:10
officers 13:7
  16:24 17:8,19
  20:8,15,20,23
  22:3 28:13,21
  36:4 37:2,3,5
  38:12 39:13
  46:1 47:10
  50:2 51:22,24
  52:12,13,17,21
  53:18 55:22
  57:22 61:11
  64:24 70:6
  72:2 81:13,21
  84:20 87:23
  88:5 89:15
  91:9,13,18
  94:23 97:6
  98:6 99:6
  103:12,20
  104:13 107:12
  107:16 112:6
  113:19 118:25
  119:3,21
officers' 71:19
offices 3:12
Oh 11:11 90:13
  97:11 103:1
okay 15:14,20
  26:8,16 29:24
  30:1,11 33:15
  34:21 35:1
  38:12 42:18
  50:18 51:1,8
  61:10,14 62:6
  62:9,16 66:19
  70:16,23 72:9

73:7,17 74:15
  87:20,23
  94:18,20
  96:20 102:10
  121:11
old 6:25 7:1
Olive 4:3
once 27:9 39:14
  51:3 113:2
ones 10:24 11:7
  30:16 57:6
  79:21 80:3,4
  83:13 89:21
  92:18 104:3
open 98:25
  99:1
operations 9:18
  16:2,5,8 44:12
  76:10
opposed 106:10
  106:13
Ops 15:11,24
  16:13 17:21
  18:2
options 98:4
oral 24:1
order 41:2
  50:18,19,23
  53:6 61:18,23
  62:18 68:10,13
  68:22 69:23
  73:18 74:12
  81:4,13 93:14
  110:19,23 111:6
  111:19,20,21,23
  112:10
ordered 73:4,5
  111:3,9
ordering 116:9
orders 50:8
  93:4,10
ordinance
  108:12,13,16,17
  109:13,18,23
  110:8
organization
  28:20 29:3

organized 91:17
  117:19,20,21
  118:18
original 62:17
outcome 25:9
  123:16
outside 90:17
oval 66:6
over-spray
  89:17,20
oversaw 102:14

P

P 4:1,1
P.A 69:1,2,3,6
  69:12,24 70:4
paddy 77:10
page 2:1,2,4,12
  29:18 30:6
  33:20,21 35:3
  43:18 45:1,3
  45:22 46:8
  46:22 47:2,9
  47:14,25 48:1
  48:3,25 49:2
  49:4,22,24
  50:5,15,15
  51:19 54:1,5,5
  54:15,16 56:3
  56:4,7,13,18
  56:23,25 57:5
  57:6,8,9,23
  60:20 63:5,6
  63:6 64:23,24
  66:4,7 69:19
  71:2 73:11,12
  73:21 74:18
  75:13
pages 30:20
paging 30:11
paid 13:9
paperwork 21:4
Park 41:25 42:4
  42:24 43:10
  44:8,14 45:10
  45:18 47:8
  49:11,15 55:23

66:5 70:10,24
parking 71:5,6
  71:11 89:13
  93:2 95:8
  100:8
part 12:24 19:8
  19:20 30:13
  30:24 41:6
  42:13 43:7
  54:3 62:17
  64:12 65:21
  65:22,24
  85:12 95:16
  108:8 117:24
participated
  38:10,13
participating
  114:11
parties 123:12
  123:15
partner 76:12
party 10:12
PAS 40:5
passenger 65:8
  65:13,15
passing 109:16
patrol 9:15 16:7
  16:10 17:8
  21:24,25 37:2
  37:14 52:14
  53:19,22 54:1
  54:3 60:19
  65:5 73:5
  116:13
patrolling 56:7
  56:23 57:8,23
  62:13 64:23
  66:4
patrolman 10:21
pattern 106:8
pay 23:14,17
peaceful 39:7
peacefully
  120:17
penalty 22:19
  23:15
pending 3:17

people 34:16
  40:22 43:17
  43:25 55:7,18
  55:18 61:19
  62:4,22 63:3
  64:15,18,25
  65:2 68:11
  80:10 85:9
  88:19 89:15
  89:22 90:10
  91:16,21 92:15
  94:22 97:25
  112:8 114:3,21
  115:6 121:22
PeopleSoft 31:5
  31:5,6,8,11,12
  31:18 32:7
pepper 58:19
  58:23 67:9,9
  67:11
period 11:15
  25:13,18 47:13
  48:6
permit 117:21
permits 118:5
person 26:11
  82:18,20
  94:12 95:5,8
  95:9,10 99:21
  109:13,22
  110:5,7 111:3,5
  111:9 114:10
personally 22:5
  46:15 47:3
  58:1 90:25
  95:19 102:21
personnel
  29:22 30:10
  30:24 38:17
  44:12
Peter 64:4
phonetic 83:14
  99:6
physical 105:11
  105:11,20
pick 64:6 88:11
picked 88:10

piece 31:12
  33:11
place 25:3 47:8
  85:22 107:12
  110:16
places 119:23
Plaintiff 14:11
  29:12 32:2
  45:4 77:23
Plaintiff's 2:11
  5:18
Plaintiffs 1:18
  3:4,19,21 4:2
  5:2,11 13:12
  63:21
Plaza 101:6
please 5:15,25
  6:4,7 121:3
plus 68:24
point 20:22
  22:1 25:16
  30:4,18 34:19
  40:11 44:16,18
  47:25 50:4
  56:21 57:1
  58:25 59:1,2
  61:6 70:3
  72:10,14,20
  73:3,8 74:22
  79:13 81:3,9
  99:13,14
  102:12 111:11
  111:24 115:15
  116:8
poles 23:9
police 7:11,13,14
  8:21,22 9:23
  12:18 13:18,19
  13:23 14:21
  15:3 18:5
  22:15 24:11
  28:21 29:4
  37:4,13 41:14
  45:25 47:9
  55:22 68:10
  68:21 69:6
  83:10,11 84:19

88:18 91:9
  99:17 101:9,16
  102:25 103:6
  104:5,9,22,23
  107:10 110:6,9
  110:12,17 111:4
  112:16 114:10
  116:1 118:3
  119:21
policed 104:9
policemen 87:9
  119:25
policies 107:11
Policing 35:15
policy 23:10
  24:6,7 25:16
  25:23,25
  39:11,21 40:1,1
  40:3,9,15,16
political 120:10
portals 66:2
portion 16:17
  29:25
position 13:22
  13:25 21:24
positions 15:2
possibility
  105:17 120:23
possible 28:18
  30:17 52:12
  99:1 120:13
possibly 6:20
  88:1
post 36:14
potential 86:16
potentially
  46:13 119:11
practical 88:13
prefer 105:18
prepare 6:19
  85:15,21 86:15
  86:17,24
prepared 20:20
  85:16
present 4:13
  95:8 98:10
  100:9,25

101:19
presented
  115:20,22
presume 6:8
pretty 21:18
  38:4 46:9
  49:16 76:25
  80:14 82:20
  105:3 113:25
  114:7
prevent 99:15
  105:19,20
  109:16
prevented
  120:19,21
previous 80:8
  83:13,16
pride 119:24
  120:3
primarily 86:3
printed 45:9
printout 31:23
  31:24,25
prisoner 28:1,12
private 94:23
probably 5:23
  5:24 19:21
  20:22 24:20
  30:4 33:12
  45:2 47:19,20
  63:7 71:9 83:3
  83:10 84:18
  97:14 121:14
problem 83:20
  99:25 100:5
problematic
  100:3
problems 20:19
process 80:5,12
  83:22 108:5,8
procured 31:7
produced 3:9
  5:10
profiling 35:19
projectile 12:6
promoted 15:6
  15:17,20

STEPHEN DODGE  1/15/2019

promotion
17:22
proper 66:5
property 92:16
92:18
proposed 36:6
prosecuted
10:8
protect 52:13,17
53:18
protected
52:20
protection 17:9
17:10 52:12
70:13
protest 39:7
41:18 42:7,10
42:20,24
43:5,17 89:1,4
95:20,22
96:25 97:5
100:7,10,18,22
100:24 101:4,6
101:19 102:21
103:20 114:12
115:10 118:9,12
118:16,19
protesting
88:19 120:17
protestor
105:15
protestors
89:12 90:11,12
93:11 117:15,23
119:25 120:12
protests 39:2
46:13 52:10
64:14,16 72:1
85:16,21 86:16
86:18 88:25
97:1 102:3,11
102:25 104:10
113:25 115:14
119:20
provide 70:13
provides 94:4
providing 22:2

**Public** 3:15 5:5
123:5,20
pull 46:7,11
pulled 44:17,22
44:23 45:18
49:11,15 91:16
purpose 42:24
99:3
purposes 71:19
pursuant 123:7
pursuit 9:20
10:18
push 20:17 21:5
put 35:8 40:15
Putting 66:15

_____

**Q**

Qdoba 100:9
quarterly 22:4
question 6:1,5,6
6:8 21:19
26:10,14,18
31:4 32:24
39:20 66:16
94:5 96:3
98:15 106:3
113:9
questions 13:16
14:5 22:14
39:22 40:6
42:19 45:14
88:24 121:3,10
quick 63:17
**Quik** 89:4,13
90:1,4,8 92:15
92:17,24 93:2
93:16 95:3,8
quite 92:12

_____

**R**

R 4:1
racial 35:19
radio 57:18
64:25 73:16
73:18,20
75:25 76:15
radios 57:24

ran 23:11 38:1,4
84:24 86:7
101:14 102:18
**Randy** 102:14
rank 15:6
**Ranken** 71:3,4,4
71:6,11,23
ranking 21:24
37:3 54:19
76:25
reaching 99:19
read 13:10 106:1
106:3 121:15
reading 79:17
real 20:16
really 21:7 81:11
88:11,13
102:12 105:19
106:24 116:22
116:23 117:19
reason 32:23
94:4
recall 12:7,12
13:2,4,12 19:4
23:3,12 24:17
24:22 25:4
28:9,16 33:8
35:6,17,20
36:2 37:24
38:5 40:19
41:4 42:6
43:11,19,22,24
44:2,10,13 47:1
47:5,12 48:24
51:14 52:24
69:15 70:16
73:22,24 74:7
74:8,9,14
75:22,23
77:12 78:14
86:2,2 87:14
87:18 90:14
91:4 97:25
98:6 116:10
117:17
receive 23:18
112:17

received 23:20
23:24 39:1,5
99:10 112:23
recognize 13:14
30:12 45:12
98:16
recollection
40:8
recommend
121:22
record 5:15
30:19,25
32:13 50:14
121:8
records 31:18
redid 20:24
reduced 123:10
refer 45:15 56:1
76:24
referred 26:17
77:16
referring 32:10
32:11,13 48:15
48:16 78:2
refers 33:25
76:20
refresher 5:25
regularly 74:3
related 15:2
16:13 28:3
115:9,13 123:11
relates 107:7
relative 40:13
123:14
relay 88:4
relaying 61:23
relying 111:4
remain 21:2
50:4 112:8
remember 6:13
6:17 11:7 12:2
13:15 21:3 24:1
24:2,18,19,24
26:3 27:17
28:5 33:11
35:22 36:23
37:15 40:14

44:1 46:11
48:5 50:22
53:2,14 65:4
65:12,12 68:13
68:15 69:16
70:2,17 71:12
71:14 72:25
73:3 76:22
78:17 81:11
84:4,19 85:4,6
85:12 88:7
89:21,25 90:9
91:17,22 93:12
93:13,18,19
115:11,22
116:22,24
117:13,18,20
remembered
11:22
remembering
82:22
report 2:15 26:5
26:13,19 27:2
27:6,15,19,21
66:25 77:24
78:1,5 80:6,10
80:18,21 81:21
82:25 83:5
107:13,19,23
107:24,25
108:5 115:18
119:9,14 120:5
reported 28:8
28:14 66:23
107:18
reporter 3:15
4:15 5:5 12:4
106:3 121:19
121:23 123:2
reporters 11:16
reports 80:8
83:11,16,23
107:17
reprimand
23:18,21,25
24:3
request 51:18

52:5,7
requested 75:4
require 17:5
required 13:7
  17:19 36:4,10
  36:21,24 37:7
  39:14 68:10
  85:1 107:13
requirements
  36:18 37:2
  68:22
Reserve 21:8
  22:11 27:16
  38:19 40:10
  77:20
Reserve/SWAT
  12:17 19:7,7
  22:1 77:17
Reservoir 89:2
resistant 52:18
resources 31:8
respected
  88:22
respond 46:13
  73:20 113:2,5
responded
  38:14 42:9,13
  42:23 43:4,10
  50:10 68:21
responding 6:1
  16:18 23:6
  39:2 44:7
response 11:14
  42:20 82:6
  113:8
responses 34:4
responsible
  82:11,16,18,21
restaging 55:7
restrictions 10:3
resume 63:1
retirement 18:21
retraining 24:6
returned 70:23
review 39:10,18
  78:24,25
  83:17 84:2,6

84:12 85:13,18
  85:24,25 86:7
  87:16,22 88:5
  107:25 108:3
reviewed 25:12
reviewing 25:16
ridden 65:16
rifles 17:10
right 13:20
  14:24 15:7,11
  18:10,14,22
  21:14 31:2
  32:16 34:16
  36:5 38:19
  39:14 40:4
  41:22 43:7
  44:6 45:22
  46:1,15 47:3
  47:10 48:5,22
  49:12 50:2
  52:5 53:13,15
  56:19 57:2
  59:8 60:21
  61:24 65:13
  66:17,20 67:5
  69:13 71:22
  72:24 73:12
  74:16 77:5
  81:23 86:7
  87:3,24 88:20
  88:22 95:20
  97:6 98:20
  101:25 102:4
  102:22 104:6
  104:10,19 114:4
  116:24 118:13
  121:15
rights 120:1,14
rioter 105:15
rioters 54:2,4
  54:25 60:21
  62:4 119:25
rioting 103:11,14
riots 119:23
rocks 63:1
  106:16
role 86:22 117:9

117:12
roles 29:1
Ron 44:5
room 3:13 4:9
  120:12,12
Rossomanno
  102:15
rotates 60:5
roughly 18:12
  45:11
route 93:11
RSMo 123:8
Rucker 4:13
rules 5:25
run 23:7,8 38:6
  63:24
rushed 101:14

_____

            S

S 4:1
S-T-E-P-H-E-N
  5:16
safety 71:19
  110:10
sake 42:23
  45:8
Sam 72:14
Sarah 1:8 3:3,18
  63:25
saw 78:17,21
  79:6,8 89:14
  90:19,25 91:1
  96:21 97:10
  98:6
saying 30:7
  51:2 62:7
  71:15 100:4
  106:19 118:3,11
says 5:11 16:9
  18:20 29:18
  35:14 108:20
scene 50:24
  51:15 75:12
  85:7 92:19
scenes 81:22
school 7:2,6,9
  7:10 8:6,9,17

48:2 71:1
search 16:18
  27:25 42:8,21
  42:25
searching
  27:23
seat 65:9,11,14
Seattle 20:19
second 10:25
  15:14,16,17
  30:6 42:12,16
  43:4,9 52:13
  52:16 62:9
secondary 19:9
Section 123:8
see 15:18 29:18
  30:12 31:22
  31:23 33:23
  35:3,14,24
  58:4,11 62:22
  63:3 64:18
  65:25 89:8
  90:24 92:25
  96:8,13 97:5
  100:15,25
  117:15 118:25
  119:3,6
seen 14:14
  29:16 30:2,8
  30:13,16,23
  64:15 78:5
segue 32:4
send 115:9
sending 116:11
sense 94:5,20
  95:1,6,10
sent 115:13 116:6
separate 82:6
Seper 44:4
September
  33:18
sergeant 15:17
  22:7,7,11 24:21
  26:2 28:11
  53:25 54:15
  54:19,24
  60:19 61:10,22

62:10 75:24
  77:12
sergeants 38:15
  88:2
serious 17:2
  114:1
seriously 119:19
  119:22 120:2
served 9:2,5
service 18:20
Services 4:16
set 36:14 48:4
  48:18 88:12
settled 11:17
settlement 13:7
seven 47:19
severity 97:15
shaking 6:2
share 115:18
Sheriff's 54:13
shoot 52:19
  60:5
shooting 88:19
  89:6
shoots 106:12
Shop 98:11,13
  98:24 99:22
short 15:10 22:6
  63:19 121:9
shorter 32:18
  107:3
shorthand 5:4
shortly 53:9,10
  117:3
shot 12:5 41:14
  42:8 67:16
  71:17 72:1
  99:16
shots 99:9
side 54:15,16
  56:12 62:23
  65:8,13,13,15
  66:2,2 73:12
  88:14 90:4
sidewalk 95:9
  95:15 110:2
  111:11

| | | | | |
|---|---|---|---|---|
| sidewalks 109:19,20 | smoke-like 67:4 | 112:23 | 88:11 119:11,16 | stores 99:8 |
| sign 23:7,11 | smoke-type 55:17 | specifically 46:11 47:14 | 120:4 | stream 106:12 |
| 75:25 76:2,7 | Society 29:4 | 50:23 78:15 | standing 61:9 | streamer 107:6 |
| 76:8,11,12 | software 31:12 | 78:16 98:8 | 95:9 109:15 | street 3:13 4:3,8 |
| 77:13 121:16 | somebody | speculation | 109:22 110:5 | 4:17 16:16 |
| 121:23 | 58:22 87:17 | 33:5 94:15 | 111:10 | 56:12,18 100:9 |
| sign-off 83:22 | somewhat 52:2 | 95:13 105:1 | stands 16:9 | 101:20 109:23 |
| 108:5,8 | 71:1 | 110:21 111:13 | 34:11 88:6 | 110:3,6,12,13 |
| signature 5:6 | soon 53:15 | 112:12 114:14 | start 50:5 72:1 | 111:7,10 114:17 |
| 121:12,21,22 | 71:22 75:9 | spell 5:15 | started 90:3 | streets 117:25 |
| 121:25 | 83:1 | spelled 9:16 | 100:2 102:14 | 118:4 |
| similar 70:6 | sorry 11:11,21 | spontaneous | state 3:16 5:15 | strictly 21:8 |
| 106:20 | 25:2,3 33:20 | 118:19 | 113:14 123:5,21 | 92:14 |
| Simmons 11:1 | 98:2 106:1 | spot 83:14 | States 1:1 3:1,17 | strikes 28:6 |
| single 59:25 | sort 49:19 59:5 | 88:10,11 | stating 27:22 | struck 23:7 |
| 60:2,3 82:18 | 61:23 86:3 | spray 67:9,11 | 79:25 | study 8:2 |
| sitting 65:9 | sorts 37:16 | sprayed 89:19 | station 16:7 | stuff 31:1,5,25 |
| 89:13,17 | south 54:1,4,16 | St 1:8 3:6,13,19 | stationary 50:4 | 35:11 40:13,20 |
| situation 34:8 | 56:23 57:9,23 | 4:4,9,17 5:19 | 50:7 | 79:2 86:21 |
| 38:14 103:9,11 | 60:20 66:4,21 | 7:6,14 8:9,21 | stationed 16:6 | 106:16 118:6 |
| 105:4,7 106:9 | 67:1 69:20 | 12:18,22 13:17 | 51:8 53:3 65:7 | subject 10:21 |
| 106:13,14 | 73:11 83:12 | 20:21 24:10 | 65:20 76:6 | 12:2 27:20 |
| 113:11,24 | 89:5 90:4 | 28:21 41:3 | stay 92:19 | 91:22,25 |
| situations 16:19 | 94:8 95:24 | 51:12,25 52:21 | Steffan 2:5 4:3 | 103:9 105:1 |
| 80:14 103:15 | 98:3 | 52:25 53:4,10 | 5:13,17 12:1 | 106:25 110:21 |
| 114:1 | speak 6:3,4 | 53:21 54:6,9 | 14:8,13 30:21 | 111:14 114:14 |
| six 47:19 114:25 | 19:11 | 54:12,12,14 | 30:22 33:7,21 | subjects 16:19 |
| Sixth 28:11 | speaker 94:24 | 55:21 56:6,16 | 33:22 50:25 | 17:1 24:23 |
| skills 36:22 | speaking 46:12 | 57:7 58:5 | 63:18,20 | 62:20 93:1 |
| skirmish 20:9 | 65:5 72:3 | 59:10 63:10 | 72:12 94:16 | 109:4,7 |
| 88:12,13 89:16 | 77:11 105:4 | 64:22 68:1,6 | 95:18 105:21 | subsequent |
| 89:24 91:21 | special 15:11,24 | 69:9,24 70:5 | 106:17 111:2,17 | 10:20 |
| 91:23 92:5 | 16:2,5,8,13 | 73:10 75:3,14 | 112:7,15 113:7 | substance |
| 109:6 | 17:9,21 18:2 | 79:25 104:5 | 114:19 121:2,5 | 121:18 |
| slightly 106:22 | 44:11 | 104:10,15,22 | 121:8,10,13 | substances |
| SLMPD 2:13 | specialized | 107:9 108:12 | Stephen 1:17 | 67:4 |
| 14:2,11 18:21 | 9:10 10:1 16:24 | 110:15,16 | 3:9 4:12 5:9 | Suite 4:4 |
| 18:23 25:6,22 | 16:24,25 17:7 | 112:16 114:9 | 5:16 | sum 13:9 21:20 |
| 27:3 28:24 | 17:13,15 | 115:25 | stick 79:21 | Sunset 13:23 |
| 29:7 30:23 | specific 15:9 | stage 62:25 | sticking 23:9 | 14:3 18:24 |
| 36:5 39:9 | 30:16 33:16 | 86:20 | STIPULATED | 36:12 104:8,12 |
| 117:2 | 42:7 43:25 | staged 45:24 | 5:1 | 116:25 |
| SLU 90:7 | 45:16 47:6 | 46:3 47:2,10 | stop 23:7,11,11 | supervised |
| smaller 52:2 | 48:25 102:9 | 50:1 87:7 | 72:15 | 97:2 |
| smoke 58:20 | 106:14 111:13 | 100:11,14 | stopped 72:9 | supervisor 27:7 |
| 58:23 67:8 | 112:19,19,22 | staging 46:22 | 73:8 | supervisors |
| | | | stopping 108:21 | 84:19,21 88:1 |

| | | | | |
|---|---|---|---|---|
| 88:2 | 123:7 | 20:12,13,24 | testify 6:13,16 | 85:5 87:25 |
| supposed 87:15 | Symposium | 21:11 42:14 | 12:24 13:1 41:6 | 87:25 90:25 |
| sure 15:19 18:7 | 35:4 | 43:21,23 | testimony 41:9 | 90:25 91:3,18 |
| 37:11 38:16 | system 34:15 | 46:24 48:17 | 68:9 70:9 | 92:7 94:6,6 |
| 40:12 47:7 | 40:3 69:1,2,3 | 48:19 53:14 | 121:19 123:6,8 | 94:10,25 |
| 62:18 63:18 | 69:6 | 82:1,3,8,8 | Thank 14:10 | 96:15,21,22 |
| 70:2 76:21 | systems 69:12 | 96:7 101:24 | thereto 123:15 | 98:18,20,22 |
| 77:15 81:2 | | 102:2,5,8,9,10 | thing 9:21 16:17 | 100:20,21,22 |
| 84:6 88:3,7 | **T** | 102:18 108:7 | 16:20 18:6,8 | 100:22 101:16 |
| 91:19 92:12 | tactical 16:15,17 | Team-CP 16:2 | 20:25 26:22 | 102:12 103:8 |
| 104:20 107:21 | 16:21,22,23 | tear 55:19 60:17 | 26:24 31:10,21 | 103:10 104:2 |
| 114:3 115:15 | 44:20 51:12 | 62:21,25 67:4 | 35:12 37:20 | 108:18 109:4 |
| 121:7,13 | 60:12 76:10 | 67:8 87:9,10 | 38:2 40:23 | 109:20 110:3 |
| surrounds | Tahoe 48:11,12 | 98:10 103:5 | 44:13 63:2 | 110:14,22 |
| 19:23 | 49:20 50:6 | technically | 67:6 79:15,18 | 114:24 115:20 |
| Susannah 3:14 | take 11:12 13:25 | 20:11 67:16 | 84:1,5 86:24 | 115:22 116:8 |
| 4:16 5:4 123:4 | 28:7 30:6 | 110:4 111:1 | 88:7 106:8 | 117:1,7,12 118:1 |
| suspect 10:19 | 54:5 70:21 | tell 32:20 33:6 | 114:18 118:8,18 | 118:2,5,7,16 |
| 105:9,15 | 71:18 72:4 | 34:11 43:15 | 118:19 120:7 | 119:18 120:7,18 |
| suspended | 85:20,22 | 68:10 72:23 | things 6:13,17 | 121:2 |
| 22:21 23:3,5 | 87:5 93:11 | 73:14 75:20 | 17:4 30:23 | thinking 11:23 |
| suspension | 103:3 105:14 | 79:22 93:21 | 32:25 33:3 | 24:16 25:8 |
| 23:12,13 | 119:24 120:2 | 94:20 97:1 | 34:10 81:22 | 27:18 65:19 |
| sustained 25:11 | takeaway 86:17 | 121:23 | 83:19 87:2,5 | 68:19 100:24 |
| SWAT 16:2,12 | 87:12 | telling 61:2 | 114:17 120:24 | 110:15 118:9 |
| 16:14 17:3,7,12 | taken 1:18 3:20 | 64:24 81:8 | think 9:17 11:9 | 119:7 |
| 17:15,18,18,18 | 5:3 6:11 17:3 | Templeton 41:3 | 13:9 20:16 | third 32:5 33:18 |
| 17:20,21 18:2 | 32:22 63:19 | ten 35:3 | 21:5,7 22:3 | 36:23 |
| 18:10 19:16 | 109:4,7 121:9 | tenure 25:6 | 23:16,20 24:2 | thought 11:20 |
| 20:13,23 | 121:17 123:9,13 | 26:1 | 27:9,11 31:7 | 36:7 37:19 |
| 38:12,16 41:21 | takes 112:1 | term 41:25 42:1 | 33:2 34:13,14 | 40:12 70:2 |
| 43:7,20,21,23 | talk 45:15 57:13 | 46:3 55:9,12 | 34:18,18 36:9 | 83:20 107:22 |
| 43:24 46:19 | 75:8 113:4 | 64:8 67:10 | 36:15 37:16 | 117:24 118:6 |
| 46:24 48:15 | talked 44:16 | 77:8,9 78:1 | 37:20 38:3 | thousand 83:11 |
| 48:17,19 52:12 | 45:17 53:13 | 105:9 107:6 | 39:6,25 40:7 | threats 16:25 |
| 59:19 67:14,21 | 62:11 81:2,3 | terms 60:17 | 40:11,18 45:21 | three 36:10,17 |
| 77:16,20 | 86:9 103:18 | 67:14,14 76:16 | 49:16,17 | 39:19 47:18 |
| 80:24 82:8 | 104:17 112:20 | 86:19 111:16 | 52:25 53:15 | 59:24 63:12 |
| 91:6,7,7,14 | talking 42:9,16 | 111:25 112:22 | 53:17 54:11,23 | 69:12 77:15 |
| 96:7 97:8 | 44:20 49:3 | 118:15 | 55:9 56:4 | 78:20 104:1,2 |
| 102:5,9 108:7 | 67:3 68:16 | test 39:19,20 | 57:1 59:3 | 115:2 116:24 |
| 116:16 | 71:12,14 95:25 | 40:2 | 60:6 65:11,13 | 119:20 |
| SWAT/Mobile | 98:16 101:13 | testified 11:9 | 67:3,13 69:4,4 | three-year 36:7 |
| 27:15 38:19 | 109:10 111:15 | 49:10 53:17 | 69:9 70:1,9 | 36:8,16,19 |
| 40:10 | Taylor 48:3 71:2 | 54:24 60:6,18 | 71:19 75:22 | throw 67:15 |
| swerve 23:8 | team 16:8 17:3 | 101:23 102:20 | 79:14,16,19,22 | 96:22 114:17 |
| sworn 3:10 5:10 | 19:2,5,7,8 | 104:16 | 81:3 84:10,20 | throwing 58:24 |

STEPHEN DODGE  1/15/2019

62:4 63:1
95:15 96:18,19
106:16 112:5
**thrown** 60:8
**thumb** 30:19
**ticket** 108:19,23
110:25
**time** 5:22 10:16
12:11,15 19:6
20:14 22:22
25:13,18 30:4
30:17 34:19
35:18 36:15
41:22 42:6,12
42:16 43:4,9
43:11 44:8,18
46:10 48:5
49:3,5,7,17
50:5 52:14
53:8,22
54:20 56:14
57:4,15 58:15
59:20 60:3
61:12,22 62:9
63:5,17 66:3
70:9,16,18
71:10 73:10
77:13 78:17,22
81:3,5 91:1
97:4 98:1
107:13 109:3,6
114:4,5,5 115:2
115:12,15
116:10,18 118:8
120:9
**timeframe**
50:21
**times** 24:14
25:13 27:8
28:17 31:16
49:4 55:10
61:16 65:19
68:23,24
76:10 79:15
80:13 90:24
93:25 94:2
94:24 96:11

**97**:20 105:10
**title** 18:4
**today** 6:12 67:2
68:16 119:10
120:6,25
**today's** 6:19
**told** 18:19 24:5
43:13 46:11
58:15,25 59:1
60:19,24,24
61:10,18,19,22
66:11,13 71:13
72:23 73:6,20
75:17 87:22
93:25 97:25
98:1
**ton** 74:2,6
**tons** 93:19
**top** 13:15 59:3
65:20,23
**topic** 112:20
**total** 36:21 49:3
49:5 107:23
**tough** 88:9
119:17
**track** 82:11
**traffic** 108:13,14
108:21,21
109:5,14,15,17
109:21 110:4,8
110:10,14,18
111:8 112:5
**trainer** 22:5
**training** 9:11 10:1
13:8 16:24
17:5,13,15,18
17:18 19:19,22
20:1,24 21:13
21:23 22:2,4
31:25 32:8,16
32:21,22 33:8
33:10,11 34:1,3
34:24 35:1,4,6
35:13,17,19,23
35:24 36:2,5
36:22 37:2,6
37:18 38:6

**39**:1,5 83:5,8
102:17 103:3,4
103:7 104:17
104:21 112:17
112:19,23,25
**trainings** 34:21
34:25
**transcribed** 5:5
**transcript** 121:15
**transferred**
15:10 18:9
79:3
**transmissions**
76:15
**travel** 109:21
**traveled** 61:6
**traveling** 48:7
49:19,20,21
50:6
**Trip** 89:4,13
90:1,4,8 92:15
92:18,24 93:2
93:16 95:3,8
**true** 14:20 19:13
98:14
**trust** 121:19
**truthful** 41:9
**truthfully** 6:13
6:16
**try** 5:25 6:3,4
99:11
**trying** 103:8
111:18,19 117:18
**Tucker** 101:10
**turn** 56:19 57:2
**turns** 105:11
**twice** 15:18 27:9
51:2
**two** 15:12,12
17:17 21:12
36:10,16,17,17
37:25 51:24
52:25 59:24
61:16 63:11
77:21 78:20
79:15,17,23,24
80:3 83:13

**85**:4 102:17
112:4
**two-week** 11:15
**type** 16:6 19:19
35:12 86:21
96:13 106:7
**types** 17:15
21:20
**typewriting** 5:6
123:10
**typically** 34:22
121:21
**typographical**
121:16

_____
**U**

**uh** 24:3
**ultimately** 8:4
8:12
**um** 8:11 9:12
10:16 15:12
18:17 22:24
23:19 27:9
29:11 31:1 34:4
38:3 39:19
40:11 44:11
46:9 47:16
51:16 52:9
53:5 67:13
72:14 74:22
78:13,19
80:22 81:2
84:4 85:11,16
99:24 105:3
109:2 114:16
116:8 120:7
**Um-hum** 88:17
90:2 93:17
**unaware** 59:18
81:19 102:8
**uncomfortable**
55:19
**uncommon**
119:23
**uncontrollable**
105:6
**undergo** 17:16

**17**:17 24:6
36:4
**understand** 6:6
6:9 13:18
26:21 30:7
51:1 66:24
72:13,22 74:7
86:11 104:4
105:1 106:18
107:9 108:4
111:18 114:14
120:11
**understanding**
25:15,23 26:11
26:20 29:23
38:21 39:13
40:2 67:12
73:25 88:17
96:2 100:6
109:13 114:20
114:23 118:11
**understood** 6:8
**uniform** 57:20
**uniforms** 57:24
**union** 100:22
**unit** 2:13 12:14
12:16 16:6,15
19:1,13 22:11
29:12,19,21
30:2,8,9,13
49:18 77:17,21
77:22 79:3
**United** 1:1 3:1,17
**units** 44:7,9,10
84:17
**University** 7:22
8:9
**unlawful** 38:25
69:18 93:15
93:23 94:3,5
94:7,9,12,25
95:11,17 97:17
111:16,24 112:3
112:17,21 113:1
113:5,10,17
114:7
**Unmarked** 48:11

STEPHEN DODGE  1/15/2019

| | | | | |
|---|---|---|---|---|
| unreasonable | 37:3 41:3 | 81:7,15 85:18 | 106:1,4 110:20 | 107:17 |
| 28:18 | vests 17:10 | 87:7 92:11 | 111:12,22 112:11 | |
| unrelated | video 67:23 | watch 116:19 | 113:3 114:13 | **X** |
| 102:25 | 85:24 93:19 | 117:11 | 121:4,7,11,14 | |
| unrest 34:9 | viewable 32:7 | way 24:25 | WheatonA@s... | **Y** |
| upset 75:3 | violating 110:7 | 26:13 66:11 | 4:10 | yard 23:8 |
| use 20:5 21:13 | violation 23:10 | 81:19 88:14 | white 48:11 | yeah 15:12,18 |
| 21:16,21,22 | violent 46:13 | 91:12 98:23 | wide 106:8 | 18:8 19:14 |
| 28:18 39:10 | 71:17 | ways 109:1 | wind 87:8 88:8 | 20:4,11 22:7 |
| 39:20 40:9,14 | Vogel 64:2 | we'll 45:7 76:10 | 99:1 119:12 | 26:21 33:13 |
| 41:24 46:3 | voluntary 18:1 | we're 62:2 71:18 | window 98:25 | 34:13 36:13 |
| 58:19 60:15,19 | vs 1:8 3:5 | 72:4,7 80:12 | windows 66:1,1 | 38:4 42:11 |
| 63:17 75:25 | | 86:19 | wished 57:16 | 47:18,24 |
| 77:7 83:24 | **W** | we've 67:10 | witness 4:12 | 48:16 57:1,12 |
| 95:19 96:24 | wagon 77:10 | 68:16 71:15 | 5:6 11:20 | 59:23 61:15 |
| 97:3 104:19 | waive 121:20,22 | 103:17 112:20 | 24:20 121:25 | 61:25 62:14 |
| 104:24 105:18 | 121:23,25 | wear 64:13 | 123:6,9 | 67:6,16 70:13 |
| 105:23 106:19 | waived 5:7 | wearing 64:15 | women's 116:13 | 71:4 73:2 74:4 |
| 107:13,16 116:3 | walked 109:6 | 64:18 67:18 | 118:1,21 | 77:17 80:7 |
| uses 25:17 74:3 | Walton 43:18 | week 83:3 101:5 | words 69:17 | 81:3,24 88:7 |
| usually 113:21 | 45:1 47:25 | weeks 17:17 | 75:23 121:17 | 90:12 91:3,9 |
| utilize 46:14 | 48:1 49:2 | 78:20 | wore 19:10 | 93:18 96:19 |
| | 50:15 61:1 | went 10:22 33:8 | 57:19 | 101:16 104:2 |
| **V** | 63:7,8 69:19 | 47:8,25 48:1,2 | work 2:13 13:19 | 108:24 110:3 |
| vacant 70:15 | 69:20 | 48:2,3,19 49:1 | 14:11,20 31:16 | 110:13 117:1,7 |
| vague 50:20 | want 5:23 10:17 | 49:17 50:1 | 31:16,19,20 | 119:13 |
| van 70:3,4 | 20:17,21 22:12 | 58:19 66:5,22 | 86:20 89:1,4 | year 5:23 36:5 |
| Vandeventer | 30:6,18 35:8 | 67:1 71:1,23 | 95:22 101:4 | Year's 101:9 |
| 89:5 90:5 | 35:21 37:14 | 74:18 79:4,16 | 102:25 103:6 | yearly 36:9 |
| variable 21:1 | 38:2 55:20 | 86:13 87:1 | 107:9 116:4 | years 7:1 15:12 |
| varied 20:16 | 59:21,21 | 99:21 | worked 14:2 | 15:12,22 22:13 |
| various 21:20 | 65:24 114:2 | weren't 41:1 | working 28:23 | 33:17 36:10,17 |
| 37:13 | 120:15 | 54:6 62:23 | 100:18 | 36:17 115:3 |
| vary 40:7 | wanted 17:2 | 62:24 89:17 | worry 115:3 | yelling 94:23 |
| vehicle 9:18 | 18:2,6,16 | west 50:12 | worse 99:16 | |
| 10:18,19 12:5,8 | 20:19 40:22 | 69:19 94:8 | wouldn't 88:12 | **Z** |
| 12:10,11 17:11 | 52:11 75:11,21 | 98:2,4 | 117:22 | Zwilling 44:4 |
| 23:7 44:20 | 115:17 120:11 | westbound | write 78:8 80:10 | |
| 48:8,9 51:12 | wants 26:11 | 58:17 | 80:18 81:20 | **0** |
| 51:14,16,23 | 114:11 | Wethington | writing 83:6 | 02 77:14 |
| 52:4,7,18 | warning 110:23 | 44:4 | written 23:24 | 03 77:14 |
| 56:13,24 69:6 | 110:24 | Wheaton 4:8 | 24:1,3 83:11 | |
| 76:8 | warnings 97:22 | 11:21 14:10 | 108:19,23 | **1** |
| vehicles 109:16 | warrant 42:8,21 | 30:18 33:4,20 | 115:1 | 1 2:13 14:9,11 |
| verbal 86:3 | 42:25 | 50:20 63:16 | wrong 114:24 | 17:18 31:2,3,23 |
| verbally 6:1 69:1 | warrants 16:18 | 72:11 94:14 | wrote 28:7 | 76:22 |
| versus 5:19 | wasn't 63:11 | 95:12 104:25 | 78:10 80:19 | 1-800-280-33... |
| | | | | 4:18 |

STEPHEN DODGE  1/15/2019

**10** 70:19 97:14
**100** 20:22 21:2
  100:1
**100b** 33:23
**11/19** 22:25
**11:00** 70:19
**1130** 4:4
**1200** 3:13 4:8
**123** 2:6
**14** 2:13
**15** 1:19 3:10
  97:14
**150** 90:13
**180** 30:20
**18th** 35:2
**19** 43:2 55:22
  58:2 67:18
  68:20 115:10
  119:8
**1994** 14:21
**1999** 22:25
**19th** 41:13,16
  42:3 64:20
  68:17 101:24
  103:19
**1st** 101:4

_____
**2**
**2** 2:2,13 17:18
  29:12,15 76:16
  76:19
**2:00** 3:11
**20** 68:24
**2000** 24:20
**2001** 20:18
**2002** 8:11 10:21
**2005** 22:8
  24:21 25:5,8
**2007** 22:12
**2009** 22:9,12
**2010** 15:6
**2011** 27:13,20
**2012** 89:2
**2013** 18:5
**2014** 11:15 35:14
  35:14,24 89:5
  95:23 100:7

101:5,9 102:3
103:25
**2015** 35:2,4
  41:13,16 42:3
  43:2 55:22
  58:2 64:20
  67:19 68:17
  68:20 101:20
  101:25 103:19
  109:10 115:10
  119:8
**2016** 18:9 33:19
**2017** 14:1,2,23
  104:6 116:14
**2019** 1:19 3:10
**23** 35:14
**27th** 33:19
**29** 2:13
**2nd** 35:24

_____
**3**
**3** 2:3,14 32:2,14
  76:16
**30** 68:24 97:14
**314** 3:13 4:5,9
  4:10,18
**32** 2:14

_____
**4**
**4** 2:4,14 45:4,7
**4:17-cv-2498**
  1:10 3:5
**45** 2:14
**49** 7:1
**492.010** 123:8

_____
**5**
**5** 2:5,15 77:23
  78:3
**5:03** 3:11 122:2
**50** 91:11 94:22

_____
**6**
**60** 91:11 94:22
**622-4594** 4:10
**63101** 4:4,17
**63103** 3:14 4:9

**644-2191** 4:18
**652-3114** 4:5

_____
**7**
**70** 100:19
**7100** 76:5 77:16
**7101** 77:14
**711** 4:17
**77** 2:15

_____
**8**
**8** 70:22
**87** 7:5

_____
**9**
**9** 70:19
**9:00** 70:22
**90** 10:17
**902** 4:16 123:22
**906** 4:3
**91** 8:1
**94** 7:18
**96** 10:17
**97** 10:17
**98** 8:11