## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **SARAH MOLINA,** *et al*. | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 4:17-cv-2498-AGF** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF ST. LOUIS** *et al*., | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

COME NOW Defendants City of St. Louis ("City"), Daniel Book, Joseph Busso, Jason Chambers, Lance Coats, Stephen Dodge, Joseph Mader, Michael Mayo, Mark Seper, and William Wethington, by and through their attorney Julian Bush, City Counselor for the City of St. Louis, and pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure and Local Rule 7-4.01(E), hereby set forth the following undisputed material facts for purposes of their Motion for Summary Judgment only:

1.  On August 19, 2015, between 3:00 p.m. and 4:00, Molina gathered with a crowd near the intersection of Walton and Page where she heard multiple dispersal orders given which included warnings regarding the use of chemical munitions. (Ex. A, Molina Dep., p. 44).

2.  Molina ignored those dispersal orders because she believed they were unlawful. (Ex. A, Molina Dep., pp. 45-46).

3.  Later in the afternoon on August 19, 2015, police officers were struck with thrown objects and injured. (Ex. B, Wethington Dep., p. 41).

4.      Video file 15-041999 008 ("Video 8") was recorded by Detective Jodie Eaton and begins at approximately 6:54 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶¶ 3-6)

5.      Video 8 is 22 minutes and 42 seconds long and it accurately reflects the events as they occurred from approximately 6:54 p.m. to 7:17 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶ 6)

6.      At 6:54 p.m., a crowd had again assembled in the street on Page between Marcus and Page and Walton and Page. (Ex. D, Video 8 at 00:11)

7.      At 6:54 p.m., Vogel was standing at the northwest corner of Page and Marcus wearing a beige dress and a green hat. (Ex. D, Video 8 at 00:16)

8.      At 6:55 p.m., a clear and audible dispersal order was given over a loudspeaker as follows:

> This is an unlawful assembly. You are impeding the flow of traffic. This is your order to disperse. You can disperse by walking west on Page, and North and South on Walton. Anyone who remains is subject to arrest and or other actions up to and including the deployment of chemical munitions. You will be given sufficient time to disperse. This is your first order to disperse.

(Ex. D, Video 8 at 1:16)

9.      Molina and Vogel heard this dispersal order and understood that it was a dispersal order. (Ex. A, Molina Dep, p. 51; Ex. E, Vogel Dep., pp. 47-48).

10.      Neither Molina nor Vogel dispersed. (Ex. D, Video 8 at 5:43, 8:59; 9:52; 12:00)

11.      At 6:56 p.m., a second clear and audible dispersal order was given over a loudspeaker as follows:

> This is an unlawful assembly. This is your order to disperse. You are

impeding the flow of traffic. You are being ordered to disperse by walking either west on Page and then South or North on Walton or continuing west on Page on the sidewalk out of the street. Anyone who remains is subject to arrest and or other actions up to and including the deployment of chemical munitions. A dispersal order means you must leave the area and not just move to the sidewalk. This is your second order to disperse.

(Ex. D, Video 8 at 2:16)

12.     At 7:00 p.m., Molina is standing on the sidewalk on the south side of Page wearing blue jeans, a blue shirt, and a green hat. (Ex. D, Video 8 at 5:43)

13.     Seconds later, an unidentified officer may be heard saying "they're starting to mask up." (Ex. D, Video 8 at 6:06)

14.     Seconds after that, also at 7:00 p.m., multiple objects were thrown at police officers. (Ex. D, Video 8 at 6:10; 6:23)

15.     Officer on the police line were not wearing helmets and were not wearing protective gear. (Ex. D, Video 8 at 6:10; 6:23; Ex. E, Vogel Dep., p. 28)

16.     At 7:02 p.m. a glass object was thrown at police officers and shattered near the police line. (Ex. D, Video 8 at 7:36)

17.     Because of the danger posed by the increasingly riotous crowd, officers began to pass out shields – but not every officer had a shield. (Ex. D, Video 8 at 7:36 – 9:30)

18.     From 7:03 p.m. to at least 7:06 p.m., Vogel was standing on the sidewalk North of Page with a cell phone in her hand. (Ex. D, Video 8 at 8:59; 9:52; 12:00)

19.     Vogel knew that, at this point in time, multiple objects had been thrown at officers and multiple dispersal orders had been given. (Ex. E, Vogel Dep., pp. 39-40)

20.     At 7:06 p.m., a third dispersal order was given. (Ex. D, Video 8 at 12:04)

21.     At 7:07 p.m. Vogel was assembled with a crowd and standing on the

3

Case: 4:17-cv-02498-AGF   Doc. #: 171   Filed: 07/06/20   Page: 4 of 15 PageID #: 2212

sidewalk north of Page while multiple individuals in the crowd threw objects at police officers. (Ex. D, Video 8 at 13:00-13:30; Ex. E, Vogel Dep., p. 45)

22.     Vogel and Molina both agree they were assembled with and standing very near a group of individuals, some of whom were throwing objects at police officers. (Ex. E, Vogel Dep., p. 45; Ex. A, Molina Dep., p. 55 ("I was assembled with them"))

23.     At 7:08 p.m., and in response to the multiple objects thrown at officers, police deployed inert smoke. (Ex. D, Video 8 at 13:00-13:30; Ex. F, Dodge Dep., p. 58)

24.     At 7:12 p.m., then Chief of Police Samuel Dotson ordered that another warning be given before chemical munitions are deployed. (Ex. D, Video 8 at 17:30).

25.     Individuals continued to throw objects at police officers. (Ex. D, Video 8 at 17:32).

26.     At 7:12 p.m., another clear and audible dispersal order was given over a loudspeaker as follows:

> This is an unlawful assembly. Please clear the area or we will deploy chemical munitions. You can go north on Walton, south on Walton, or west on Page. Clear the area or we will deploy chemical munitions. This is your lawful warning.

(Ex. D, Video 8 at 17:30)

27.     The crowd, which has at this point had moved east to the intersection of Bayard and Page and which included Molina and Vogel, did not disperse. (Ex. D, Video 8 at 18:00; Ex. E, Vogel Dep., p. 136; Ex. A, Molina Dep., p. 85)

28.     At 7:13 p.m., an unidentified police officer said "they're picking up more bricks down there." (Ex. D, Video 8 at 19:40)

29.     At 7:14 p.m., more bricks, rocks, and other objects were thrown at police officers. (Ex. D, Video 8 at 20:00-20:40)

4

30.     At 7:15 p.m., the B.E.A.R. traveled west on Page and deployed tear gas at the intersections of Bayard and Page and Euclid and Page to disperse the riotous crowd., which continued to throw rocks at the B.E.A.R while it was at the intersection of Euclid and Page (Ex. D, Video 8 at 29:40-22:30; Ex. F, Dodge Dep., p. 56; Ex. G, Mayo Dep., p. 52)

31.     At 7:16 p.m., the B.E.A.R returned from the intersection of Euclid and Page to the police line near the intersection of Walton and Page. (Ex. D Video 8 at 29:40-22:30)

32.     Video file 15-041999 010 ("Video 10") was recorded by Detective Jodie Eaton and begins at approximately 7:26 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶¶ 3, 7)

33.     Video 10 is 4 minutes and 18 second in length and depicts events as they occurred from approximately 7:26 p.m. to 7:30 p.m. on August 19, 2015. (Ex. C, Eaton Aff. (Ex. C, Eaton Aff. ¶¶  3, 8)

34.     Ms. Heather DeMian ("DeMian") was subpoenaed for all video in her possession recorded on August 19, 2015. (Ex. H, DeMian Subpoena)

35.     In response, DeMian  provided a video she recorded on August 19, 2015, attached hereto as "Exhibit I" (hereafter "Demian Video"), which fairly and accurately depicts events as they occurred on August 19, 2015. (Ex. I, DeMian Video; Ex J, Groce Dep., pp. 175-177)

36.     The DeMian Video and Video 10 depict, in part, the same incidents occurring at the same time. (Ex. J, Groce Dep., p. 199).

37.     The DeMian Video depicts events as they occurred from approximately

7:21 p.m. to 8:47 p.m. on August 19, 2015. (Ex. I, DeMian Video; Ex. J, Groce Dep., p. 199).

38.    At 7:24 p.m., eight minutes after tear gas was initially deployed, people were sill gathered near the intersection of Page and Walton while many of the 150-200 others had moved onto the streets and alleyways north and south of Page. (Ex. D, Video 8 at 20:00 – 21:00; DeMian Video at 3:03-4:36)

39.    Also at 7:24 p.m., another dispersal order was given from a police loudspeaker. (Ex. I, DeMian Video at 4:36; Ex. F, Dodge Dep., pp. 69-70)

40.    The 7:24 p.m. dispersal order, which may be heard on the DeMian Video, stated in part over a loudspeaker: "Clear the area immediately. This is an unlawful assembly. You need to leave the area now… we are getting ready to come back." (Ex. I, DeMian Video at 3:07-4:36)

41.    Groce heard this dispersal order. (Ex. J, Groce Dep., p. 177).

42.    In fact, Groce is plainly visible on the DeMian Video riding his bicycle through the intersection of Walton and Page while that dispersal order was being given and very near to where that dispersal order was given. (Ex. I, DeMian Video at 3:07-3:26; Ex. J, Groce Dep., p. 176)

43.    At that time, having been given orders to disperse the crowd, Dodge ordered Sgt Mayo (in the B.E.A.R) to patrol the area south of Page to ensure that rioters had dispersed while Dodge (in the St. Claire County BearCat Tactical Vehicle ("BearCat")) would patrol the area north of Page. (Ex. F, Dodge Dep. pp, 54-55)

44.    At 7:26 p.m, both the B.E.A.R and BearCat traveled west on Page to ensure that all rioters had dispersed. (Ex. K, Video 10 at 00:13; Ex. I, DeMian Video

4:50-5:30)

45.     At 7:27 p.m., one canister was deployed at the intersection of Bayard and Page and the corresponding loud noise of this deployment is clearly heard on both Video 10 and the DeMian Video. (Ex. K, Video 10 at 1:12; Ex. I, DeMian Video at 5:58; Ex. F, Groce Dep. pp. 179, 180 ("I heard a loud noise" while the B.E.A.R was at the intersection of Bayard and Page)).

46.     The B.E.A.R. and BearCat then proceeded to the intersection of Page and Euclid, with Groce following closely behind on his bicycle. (Ex. K, Video 10 at 1:12-2:10; Ex. I, DeMian Video at 5:58-7:00; Ex. J, Groce Dep. pp. 180-181).

47.     At 7:28 p.m., twelve minutes after tear gas was initially deployed and three minutes after the last dispersal order, the B.E.A.R. turned south onto Euclid and the BearCat turned North onto Euclid. (Ex. I, DeMian Video at 7:03; Ex. K, Video 10 at 2:15).

48.     At 7:28 p.m., just after the BearCat turned North on Euclid, an officer on the top of the BearCat shot a canister north on Euclid, and the loud noise of that deployment is clearly heard on both Video 10 and the DeMian Video. (Ex. I, DeMian Video at 7:06; Ex. K, Video 10 at 2:18; Ex. F, Dodge Dep. p. 56; Ex. J, Groce Dep. p. 183 ("I heard a sound" at 7:06 on the DeMian Video))

49.     Molina's property at 1221 N. Euclid is only 550 feet south of the intersection of Euclid and Page. (Ex. L, Google Maps Distance Measurement; Ex. M, Photo taken from the intersection of Euclid and Page with Molina'a property shown as the only white house in the photo)

50.     As the B.E.A.R turned south on Euclid and proceeded south past Ms.

Molina's property, no further deployments of any munitions are heard on the DeMian Video. (Ex. I, DeMian Video at 7:06-7:53).

51.     No one on the B.E.A.R. deployed any munitions as the B.E.A.R. traveled south on Euclid past Molina's property. (Ex. I, DeMian Video at 7:06-7:53; Ex. J, Groce dep., p. 114: "Q: Did you see the B.E.A.R deploy any chemical munitions of any kind as it traveled south on Euclid towards Fountain Park? A: … no, I don't—I don't recall seeing that happen."; Ex. Y, Kampas Dep., pp. 84-85; Ex. N, Dodge Aff. ¶ 14).

52.     Not only did Groce not see the B.E.A.R deploy any chemical munitions as it traveled south on Euclid, but he did not see any clouds of smoke and did not experience any additional irritation in his eyes as he followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., pp. 112-113)

53.     When the B.E.A.R. turned south on Euclid, Molina and Vogel were standing with a group of at least six individuals, several of whom had been assembled at Page and Walton minutes earlier. (Ex. E, Vogel Dep., p. 83 (Q: Now I think you said that there were approximately eight, but no more than ten people standing on the sidewalk in front of Ms. Molina's house, right? A: Right.))

54.     Vogel turned her back to the B.E.A.R. as it traveled south on Euclid and could not see where the alleged canisters were deployed to. (Ex. E, Vogel Dep., p. 91)

55.     Vogel does not know where the alleged canisters came from. (Ex. E, Vogel Dep., p. 89)

56.     Vogel does not know how far away from her the B.E.A.R. was when the alleged canisters were deployed. (Ex. E, Vogel Dep. p. 89)

57.     Vogel was not tear gassed while in front of Ms. Molina's property. ((Ex. I,

DeMian Video at 7:06-7:53); Ex. E, Vogel Dep. p. 94 (Q: And did you walk through the tear gas [you allege] had just been deployed to follow in the path of the B.E.A.R.? A: No.))

58.     Chemical munitions deployments make "loud pops." (Ex. E, Vogel Dep. p. 92)

59.     Vogel recorded and narrated a video in the minutes after she alleges she was tear gassed, but did not mention that she had been tear gassed in the video. (Ex. E, Vogel Dep. p. 106)

60.     At the time Vogel alleges she was exposed to tear gas south on Euclid, she had already been exposed to tear gas minutes earlier (which exposure she does not allege was unconstitutional). (Ex. E, Vogel Dep. p. 113-115).

61.     At the time of Vogel's alleged exposure to tear gas south on Euclid, her eyes were still watering and her nostrils were still stinging from her exposure to tear gas minutes earlier and it would be difficult, if not impossible, for Vogel to determine which side effects were the result of the first (unchallenged) exposure versus the second. (Ex. E, Vogel Dep. p. 113-114).

62.     As soon as Molina saw a tactical vehicle driving south on Euclid, she turned and ran. (Ex. A, Molina Dep. p. 99)

63.     Molina does not know which tactical vehicle drove south on Euclid. (Ex. A, Molina Dep. p. 98)

64.     With regard to who or what came south on Euclid, Molina believes it "could have been aliens from Mars." (Ex. A, Molina Dep. p. 100)

65.     Molina did not see the tactical vehicle or any person on it deploy any

chemical munitions. (Ex. A, Molina Dep. p. 106, 109, p.112 ("I think when it was shot I had already ducked behind the house…Q: I mean, do you know where it came from? Did you see it come from the vehicle? A:… Well, no…)

66.     There were already remnants of tear gas in the air before the tactical vehicle drove south on Euclid, and Molina does not remember any additional irritation after the alleged deployment of tear gas south on Euclid. (Ex. A, Molina Dep. pp. 110-111)

67.     Groce does not remember anything any officer said to him near the intersection of Page and Marcus and does not remember anything he said to any officer. (Ex. J, Groce Dep., p. 104)

68.     Groce does not remember what the officer that allegedly kicked his bicycle was wearing. (Ex. J, Groce Dep., p. 105).

69.     Groce followed the B.E.A.R. south on Euclid while riding his bicycle. (Ex. J, Groce Dep., p. 110); Ex. I, Demian Video at 6:10-7:00.

70.     Groce did not experience any additional eye irritation as he followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., pp. 112-113).

71     Groce did not see any clouds of smoke anywhere around him as he followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., p. 113).

72.     Groce did not see the B.E.A.R. deploy any chemical munitions of any kind as it traveled south on Euclid. (Ex. J, Groce Dep., p. 114).

73.     The B.E.A.R. did not deploy any munitions of any kind as it traveled south on Euclid. (Ex. J, Groce Dep., p. 114; Ex. I, DeMian Video at 7:06-7:53).

74.     Groce approached and came within feet of the B.E.A.R. while it was stationary in Fountain Park. (Ex. J, Groce Dep., p. 118)

75.     Groce was irritated as he approached the B.E.A.R. and "wanted to tell them to leave." (Ex. J, Groce Dep., p. 118)

76.     Groce communicated his irritation to the officers on the B.E.A.R. (Ex. J, Groce Dep., p. 119)

77.     Groce does not remember what he said, does not remember if he raised his voice, and does not remember if he used profanity. (Ex. J, Groce Dep., p. 119)

78.     Groce remembers "something hit [him] on the hip" and he does not know where it came from. (Ex. J, Groce Dep., pp. 122, 135)

79.     Groce has no idea what hit him.  (Ex. J, Groce Dep., pp. 122, 135)

80.     Groce did not see any person do anything or deploy any canisters at or near the time the object hit him in his hip. (Ex. J, Groce Dep., pp. 123)

81.     The SLMPD was already giving directions on means of egress and warnings regarding use of chemical munitions before the City entered a settlement agreement requiring that be done. (Ex. F, Dodge Dep., p. 40).

82.      Visibility from inside the B.E.A.R. is extremely limited as the portholes in the B.E.A.R. are roughly six inched in diameter and the gas canisters are roughly 4 – 4.5 inches in diameter. (Ex. O, Mader Dep., p. 77; Ex. B, Wethington Dep.,  p. 54; Ex. P, Seper Dep., p. 41 (Q: Like you wouldn't necessarily know where the B.E.A.R. was traveling because you couldn't see very well outside; is that fair? A: Yes.).

83.     Give the size of the portholes, it is impossible to deploy a chemical munition through a porthole while looking out of it. (Ex. P, Seper Dep., p. 44)

84.     Officers traveling inside of the B.E.A.R. could not see what any other was doing because their backs were to each other. (Ex. P, Seper Dep., p. 44)

85.     Canisters deployed from inside of the B.E.A.R. would have been deployed by hand through the portholes and would not have traveled more than a few feet from the B.E.A.R. (Ex. Q, Chambers Dep., p. 52).

86.     Book, Busso, Chambers, Dodge, Coats, Mader, Mayo, Seper, and Wethington do not know Molina, Vogel, or Groce and would not recognize them. (Ex. R, Book Dep., p. 48; Ex. S, Busso Dep., pp. 74-75; Ex. T, Coats Dep., p. 60; Ex. F, Dodge Dep., p. 63; Ex. O, Mader Dep., p. 87-88; Ex. G, Mayo Dep., pp. 35-36; Ex. P, Seper Dep., p. 45; Ex. B, Wethington Dep. pp. 52-53)

87.     Vogel has no reason to believe that any of the individual defendants knew who she was on August 19, 2015 other than that she assumes the police helicopter could see her and was relaying that information to the officers on the B.E.A.R. (Ex. E, Vogel Dep., pp. 115-116)

88.     Molina as no reason to believe that any of the individual defendant officers recognized her other than that she assumes the police helicopter saw her green hat and relayed her location to the individual defendants and that that she was "a white person who was in a black neighborhood." (Ex. A, Molina Dep. pp. 134-135).

89.     Groce has no reason to believe that any of the individual defendants recognized him. (Ex. J, Groce Dep. pp. 226-227).

90.     All SLMPD officers are issued copies of and instructed in the SLMPD Use of Force Policy during their Police Academy training. (Ex. U, Larson Aff. ¶ 5)

91.     Section I of Special Order 1-01 provides that "Officers will use the least

amount of force reasonably necessary to accomplish their lawful objectives while safeguarding their own lives and the lives of others." (Ex. U, Larson Aff. ¶ 6)

92.     Every month, all SLMPD officers are required to review the SLMPD Use of Force Policy and answer questions regarding that policy via the electronic Policy Acknowledgement System. (Ex. U, Larson Aff. ¶ 7)

93.     Section XIII of Special Order 1-01 is titled "Deployment of Chemical Agents for Crowd Dispersal" and was in effect on August 19, 2015. (Ex. U, Larson Aff. ¶ 8)

94.     Section XIII of Special Order 1-01 provides that "Chemical agents will not be used for the purpose of frightening or punishing individuals for exercising their constitutional rights." (Ex. U, Larson Aff. ¶ 9)

95.     Section XIII of Special Order 1-01 further provides that, except in situations that turn violent when persons at the scene present an imminent threat of bodily harm to persons, or of damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threats, any use of chemical agents for crowd dispersal requires the briefing and express consent of the Chief of Police or the Assistant Chief of Police or another Deputy Chief where neither the Chief of Police or Assistant Chief of Police are readily available. (Ex. U, Larson Aff. ¶ 10)

96.     Even then, except in situations that turn violent as described in paragraph 10 above and Section XIII(C)(3) of Special Order 1-01, chemical agents will not be used to disperse groups engaged in non-criminal activity without satisfying each of the elements set forth in Section XIII(C)(2) of Special Order 1-01, which are as follows:

a)      The Incident Commander ensures that clear and unambiguous warnings are issued stating that chemical agents will be utilized, in conjunction with a statement about why the area is being cleared, (e.g., "You are impeding the flow of vehicular traffic");

b)      Individuals are provided sufficient opportunity to heed the above-mentioned warnings and exit the area;

c)      The impact of chemical agents on individuals who are complying with lawful law enforcement commands is minimized; and

d)      Ensuring and announcing a means of safe egress from the area that is available to individuals.

(Ex. U, Larson Aff. ¶ 11)

97.     Video file 15-041999 (2) 007 ("Wood Video 7") was recorded by Detective James Wood and begins at approximately 6:54 p.m. on August 19, 2015. (Ex. V, Wood Aff. ¶¶ 3-5)

98.     Wood Video 7 is 18 minutes and 8 seconds long and it accurately reflects the events as they occurred from approximately 6:54 p.m. to 7:12 p.m. on August 19, 2015. (Ex. V, Wood Aff. ¶ 6)

99.     Wood Video 7 is attached as "Exhibit W." (Ex. W, Wood Video 7)

100.    Also in response to the City's Subpoena, DeMian provided a second video she recorded on August 19, 2015, attached hereto as "Exhibit X" (hereafter "Demian Video 2"), which fairly and accurately depicts events as they occurred on August 19, 2015. (Ex. X, DeMian Video 2; Ex. N, Dodge Aff. ¶ 5)

WHEREFORE, Defendants respectfully request that this honorable Court grant summary judgment in favor of Defendants and against Plaintiffs.

Respectfully submitted,

/s/ Andrew D. Wheaton
Andrew D. Wheaton   #65269 MO
Associate City Counselor
Attorney for Defendants
City Hall, Room 314,
St. Louis, MO  63103
314.622.3361
FAX: 314.622.4956
wheatona@stlouis-mo.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2020 the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system. I further certify that an electronic version of the foregoing, in Word format, was emailed to Plaintiff's counsel that same day.

/s/ Andrew D. Wheaton

15