IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

SARAH MOLINA, et al,          )
                              )
          Plaintiffs,         )
                              )
vs.                           ) No. 4:17-CV-2498-AGF
                              )
CITY OF ST. LOUIS, et al,     )
                              )
          Defendants.         )


Deposition of CHRISTINA VOGEL
taken on behalf of the Defendants
January 18, 2019


INDEX

Questions By:                         Page:

MR. WHEATON                           5, 153
MR. ROTHERT                             149




Reporter:  Sara Alice Masuga, CSR, CCR
IL CSR No. 084-002993  MO CCR No. 1012




MASUGA REPORTING SERVICE
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215

EXHIBIT E

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF MISSOURI
 2
 3      SARAH MOLINA, et al,        )
                                    )
 4              Plaintiffs,         )
                                    )
 5      vs.                         )  No. 4:17-CV-2498-AGF
                                    )
 6      CITY OF ST. LOUIS, et al,   )
                                    )
 7              Defendants.         )
 8
 9   APPEARANCES:
10
     On Behalf of the Plaintiffs:
11
12           ACLU
             By Anthony E. Rothert, Esq.
13           906 Olive Street
             Suite 1130
14           St. Louis, MO  63101
15
16   On Behalf of the Defendants:
17
             City Counselor's Office
18           By Andrew D. Wheaton, Esq.
             1200 Market Street
19           City Hall Room 314
             St. Louis, MO  63103
20
21   Also Present:
22           Mr. Naif Albattal
             Mr. Shomari Smith
23           Ms. Nicole Strombom
24
25
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1         IT IS STIPULATED AND AGREED by and between

2    counsel for Plaintiffs and counsel for Defendants that

3    the deposition of CHRISTINA VOGEL may be taken pursuant

4    to the Federal Rules of Civil Procedure, by and on behalf

5    of the Defendants on January 18, 2019, at the offices of

6    the ACLU, 906 Olive Street, St. Louis, Missouri, before

7    me, Sara Alice Masuga, Certified Court Reporter and

8    Certified Shorthand Reporter; that the issuance of notice

9    is waived and that this deposition may be taken with the

10   same force and effect as if all Federal Rules had been

11   complied with.

12        IT IS FURTHER STIPULATED AND AGREED that the

13   signature of the deponent is reserved.

14

15

16

17

18

19

20

21

22

23

24

25

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                     EXHIBIT INDEX
          Exhibit:                            Page:
 2
 3   Defendants' Vogel Exhibit A.........................57
     (Google Maps Image of Area)
 4
 5   Defendants' Vogel Exhibit B.........................87
     (Color Laser Copy of Photograph)
 6
 7   Defendants' Vogel Exhibit C.........................96
     (Color Laser Copy of Photograph)
 8
 9   Defendants' Vogel Exhibit D.........................97
     (Color Laser Copy of Photograph)
10
11   Defendants' Vogel Exhibit E........................107
     (Defendant City of St. Louis' First Set of
12    Interrogatories Directed to Plaintiff
      Christina Vogel)
13
14   Defendants' Vogel Exhibit F........................140
     (Plaintiff's First Supplemental Rule 26(A)(1)
15    Disclosures)
16
17   (Exhibits attached.)
18
19
20
21
22
23
24
25
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          CHRISTINA VOGEL produced, sworn, and examined as

 2     a witness on behalf of the Defendants testified as

 3     follows commencing at 1:33 p.m.:

 4

 5                  E X A M I N A T I O N

 6     BY MR. WHEATON:

 7

 8          Q.   Good afternoon, ma'am.

 9          A.   Good afternoon.

10          Q.   We met a moment ago, but, again, my name is

11     Andrew Wheaton.  I'm an Associate City Counselor with the

12     City of St. Louis City Counselor's Office and I represent

13     the Defendants in this case.

14               First question is, have you ever been deposed

15     before?

16          A.   No.

17          Q.   Okay.  Just a few ground rules, and your

18     counsel may have already gone through this with you, but

19     if you do not understand a question that I'm asking you,

20     please just let me know.  I'd be happy to rephrase it.

21     If you answer the question, I will assume and the Jury

22     will assume that you understood what I was asking you,

23     okay?

24          A.   Yes.

25          Q.   Secondly, and I imagine you'll do a good job
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   of this, just for our court reporter's benefit, please
 2   try and wait until I get my question out before you give
 3   an answer, okay?
 4           A.   Okay.
 5           Q.   Just helps make a clearer record.  Finally, if
 6   you want to take a break at any time, just let me know.
 7   That's no problem.  I'll just ask that if there is a
 8   question pending that you answer the question before you
 9   take a break, all right?
10           A.   Okay.
11           Q.   I just want to start by asking you some
12   general background information.  Where are you from
13   originally?
14           A.   Could you expand on that?
15           Q.   Just are you from St. Louis?
16           A.   I'm from South Bend.
17           Q.   South Bend, Indiana?
18           A.   Indiana, yes.
19           Q.   Notre Dame.  That's all I know about it, I
20   guess.
21           A.   Okay.
22           Q.   When did you move to St. Louis?
23           A.   When I was five.
24           Q.   And do you currently live in the City of
25   St. Louis or are you elsewhere?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    I am elsewhere.
 2          Q.    Okay, where about?
 3          A.    The county.
 4          Q.    Okay.  Just generally, where in the county are
 5     you from?  I don't need your --
 6          A.    North County.
 7          Q.    Actually, I think you've already provided your
 8     home address.  I won't ask you to put it on the record
 9     now.
10          A.    Okay.
11          Q.    But am I correct that you are from or live
12     currently in Florissant?
13          A.    Yes.
14          Q.    And how long have you lived in Florissant?
15          A.    I'm counting.
16          Q.    Take your time.
17          A.    I want to say about six and a half years.
18          Q.    Okay.  And what brought you to the St. Louis
19     area?
20          A.    I went to law school.
21          Q.    Where at?
22          A.    St. Louis University.
23          Q.    And what year did you graduate?
24          A.    2015.
25          Q.    Did you graduate in three years?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1           A.    Yes.
2           Q.    Did you focus on anything in particular when
3    you were at SLU?
4           A.    Civil and criminal.
5           Q.    And are you currently employed?
6           A.    Yes.
7           Q.    Where at?
8           A.    With JurisTemps.
9           Q.    And what do you do for them?
10          A.    I am a contract attorney.
11          Q.    What kind of work, generally, does that
12   entail?
13          A.    Document review.
14          Q.    Okay.  And how long have you been doing that?
15          A.    Several months.
16          Q.    All right.  And I don't need to go through
17   your whole employment history, but pri- -- after you
18   graduated law school and before doing document review,
19   did you work anywhere during that time?
20          A.    Yes.
21          Q.    All right.  Where at?
22          A.    Brown & Crouppen.
23          Q.    All right.  And you said you graduated -- I'm
24   sorry -- in what year from SLU?
25          A.    2015.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.    2015.  So, how long did you work at Brown &

2     Crouppen?

3          A.    About two years.

4          Q.    Now, I want to ask you a little bit about your

5     history, if any, of participating in protests in the

6     St. Louis area.

7          A.    Okay.

8          Q.    When was the first time that you participated

9     in a protest in the St. Louis area?

10         A.    I believe it would be sometime around 2014.

11         Q.    All right.  Would that have been in Ferguson

12    after the officer-involved shooting with Michael Brown?

13         A.    Yes.

14         Q.    And tell me about that.  Why did you go?

15         A.    I went because I believed there was a lack of

16    justice and I am from that area.  I grew up in the

17    Ferguson/Dellwood area.  It was close to home.  And I

18    went in order to -- Sorry.

19         Q.    You're fine.  You went to protest, you went

20    to --

21         A.    Yeah.

22         Q.    -- express your --

23         A.    Yeah.

24         Q.    -- views?

25         A.    I went to express my views --

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.    Okay.

2          A.    -- and protest.

3          Q.    And how long did you spend protesting in -- in

4    that area?

5          A.    I don't understand the --

6          Q.    I mean, just --

7          A.    -- question.

8          Q.    -- hours?  Days?  Did you go back repeatedly

9    or was it you went, you stayed for a while and left?

10          A.    Yes, I protested repeatedly.

11          Q.    Okay.  Can you give me an estimate as to how

12    many times you returned to protest in the Ferguson area?

13          A.    No.

14          Q.    Is it -- Was it a lot?

15          A.    Yes.

16          Q.    Okay.  During the time that you spent in the

17    Ferguson area in 2014 -- And if I recall correctly, it

18    was the fall of 2014; is that right?  Do you --

19          A.    What is it -- Yeah.  Yes.

20          Q.    When -- Well, I guess at the height of

21    protests --

22          A.    Okay.

23          Q.    -- in the area.

24          A.    Yeah.

25          Q.    During that time frame, did you ever see the

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    police deploy teargas?

2            A.    Yes.

3            Q.    Were you ever exposed to teargas during that

4    time?

5            A.    Yes.

6            Q.    How many times?

7            A.    I don't recall the number of times.

8            Q.    Was it a lot?

9            A.    Multiple times.

10           Q.    Okay.  And when I say "exposed," were you

11   actually -- can you explain just your experience with

12   that?  Was it where you walked through after teargas had

13   already been deployed or was it a situation where you

14   were very near where teargas canisters were deployed?

15           A.    I was near where the canisters were deployed.

16           Q.    And did that happen where you were near where

17   canisters were deployed multiple times in 2014?

18           A.    I'm sorry, I don't think I understand what

19   you're asking.

20           Q.    I'm just -- I'm trying to --

21           A.    No --

22           Q.    -- understand -- You already said you were

23   exposed to teargas multiple times and I'm trying to

24   understand if each time you were close to the canisters

25   that had been deployed.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1        A.   Yes.
2        Q.   Thank you.  In 2014, did you ever see
3   individuals throwing objects at the police?
4        A.   I don't recall seeing any individuals throwing
5   objects at the police.
6        Q.   Now, this will probably be a distinction as we
7   go on today, but as I understand it, saying that you
8   don't remember something is different than saying
9   affirmatively that, no, I did not see that.  Do you
10  understand the distinction that I'm drawing there?
11       A.   Yes.
12       Q.   Okay.  Now, is what you're saying that you
13  just don't recall seeing anybody throw objects at the
14  police, but it could have happened, you just don't
15  remember it; is that what you're saying?
16       A.   Could you -- I'm sorry, could you -- could you
17  rephrase what you're --
18       Q.   Okay.
19       A.   -- asking?
20       Q.   I'm just trying to understand if you ever saw
21  anybody in 2014 throw any objects towards police
22  officers.
23       A.   I do not recall seeing any actual individual
24  throwing anything towards police, no.
25       Q.   Did you ever see any objects flying towards
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   police officers, but you just didn't see where they came

2   from?

3           A.   Yes.

4           Q.   How many times did you see that?

5           A.   I could not put a number on that.

6           Q.   Okay.  Was it many times?

7           A.   Yes.

8           Q.   Okay.  Now, can you give me any better

9   estimate of how many times you went back to protest in

10  the Ferguson area other than a lot?

11          A.   No, I did not count how many times I went.

12  There were multiple times that I went.

13          Q.   Okay.  Over the course of how much time?

14          A.   I want to say about a year.

15          Q.   Oh, so, you went back to protest many times

16  over the course of a year to the Ferguson --

17          A.   Yes.

18          Q.   -- area?

19          A.   Yes.

20          Q.   All right.  Did you ever see, during those

21  protests, any property damage that occurred as a result

22  of the protests?

23          A.   No.

24          Q.   After -- So, moving on in terms of your past

25  of attending protests in the St. Louis area, did you

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   attend any protests between Ferguson in 2014 and the

2   incident at issue in this case in August of 2015?

3           A.   I'm sorry, could you repeat that?

4           Q.   Sure.  I'm just trying to get --

5           A.   Uh-huh.

6           Q.   -- a history of your participation in protests

7   in the St. Louis area, okay?

8           A.   (Nodding.)

9           Q.   And I'm asking whether you attended any

10  protests in the St. Louis area between Ferguson and the

11  incident at issue in this case on August 19 of 2015.

12          A.   In the St. Louis area?

13          Q.   Yeah.

14          A.   Yes.

15          Q.   Where?

16          A.   I don't recall.  I don't recall the exact

17  area.

18          Q.   I understand there were some protests and some

19  unrest in the area of Grand and Arsenal in the City of

20  St. Louis.  Do you have any recollection of being there?

21          A.   No, I was not at those.

22          Q.   I want to ask you about August 19, 2015, okay?

23          A.   Okay.

24          Q.   I understand you were still living in the

25  Florissant area at the time, right?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1        A.    Yes.

2        Q.    Do you remember what time you woke up that

3   day?

4        A.    No.

5        Q.    Do you remember what you were wearing that

6   day?

7        A.    No.

8        Q.    Do you remember what time you first arrived in

9   the area of Walton and Page on August 19, 2015?

10       A.    No.

11       Q.    Can you give me a general idea?

12       A.    I would -- I do not have a general idea of the

13  time.  It would have to be sometime before 1:00.

14       Q.    Why do you say that?

15       A.    I'm estimating.

16       Q.    I understand that there was a protest earlier

17  that day near the Courthouse regarding the anniversary of

18  the officer-involved shooting of Kajieme Powell.  Did you

19  know that?

20       A.    No.

21       Q.    Okay.  So, I assume then that you did not

22  attend that --

23       A.    No.

24       Q.    -- protest; is that correct?

25       A.    Yes.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1           Q.   How did you first learn, if you did, of the
2    officer-involved shooting of Mansur Ball-Bey?
3           A.   I don't recall.
4           Q.   Do you recall why you went to the area of Page
5    and Walton?
6           A.   I heard about it.
7           Q.   Do you know, can you give me any idea of how
8    you heard about it?
9           A.   No, I do not remember where -- where exactly I
10   first heard about it.
11          Q.   Okay.  I assume that -- Well, correct me if
12   I'm wrong, but I assume that in the many times that you
13   went to protest in Ferguson that you may have met others
14   that went there to protest, too; is that right?
15          A.   Yes.
16          Q.   Is it possible that one of those individuals
17   called you or texted you to tell you what had happened on
18   August 19, 2015?
19          A.   That is possible.
20          Q.   Okay.  Do you still have the same phone that
21   you had at that time?
22          A.   No.
23          Q.   Do you still have any of your text messages
24   from that day?
25          A.   No.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              Q.    Now, I understand that you produced a number
 2   of videos and some photographs for this case --
 3              A.    Yes.
 4              Q.    -- is that right?
 5              A.    Yes, that is.
 6              Q.    And, sorry, this is natural to kind of
 7   anticipate what somebody's asking, but just please make
 8   an effort to wait until I get the question out.
 9              A.    I'm sorry about that.
10              Q.    You're fine.  It happens to everybody.  I'm
11   sure I would do the same thing.
12                    How did you retain those photographs and
13   videos if you no longer have the same phone?
14              A.    I downloaded them to my computer.
15              Q.    When?
16              A.    I want to say the next day.
17              Q.    August 20 --
18              A.    Yes.
19              Q.    -- 2015?
20              A.    Yes, it was either the next day or that same
21   night.  I'm not sure which one.
22              Q.    Do you remember doing that, specifically?
23              A.    Yes.
24              Q.    Why did you do that?
25              A.    Because I do legal observing.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Is that something that you had done in the
 2   past where you took videos and photos and then went home
 3   and downloaded them to your computer?
 4          A.   Yes.
 5          Q.   Do you still have those photographs and videos
 6   from prior protests?
 7          A.   Yes.
 8          Q.   Now -- Sorry, my computer turned off.  Give me
 9   one moment, please.
10               So, I received eight video files and they're
11   all labeled Vogel Christina 8192015. and then there's a
12   number after them, and they're numbered 1, 6, 7, 8, 9,
13   10, 11, and 13.  I'm wondering if there was a 2, 3, 4, 5,
14   and a 12 'cause I don't have them.
15          A.   I gave over everything that I have.
16          Q.   Do you know if there existed Videos 2, 3, 4,
17   5, and 12?
18          A.   I don't believe so.  I -- I don't know.
19          Q.   Do you have any explanation for why these
20   videos are numbered in a sequence that's not continuous?
21          A.   No.
22          Q.   Did you download every video that you recorded
23   on August 19, 2015, to your computer?
24          A.   Yes, to my knowledge, I did.
25          Q.   All right.  Did you produce every video that
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   you downloaded from August 19, 2015?
 2           A.   Yes, I did.
 3           Q.   Do you know whether the original video files
 4   that you downloaded have any associated metadata that
 5   goes along with them?
 6           A.   I don't know anything about metadata.
 7           Q.   Sure.  I'll just tell you that in my
 8   experience, you can right click on a file and hit
 9   "properties" and often there's information regarding when
10   it was taken or created and other associated what I'll
11   call metadata.  Does that sound right to you?
12           A.   Yes.
13           Q.   Have you seen that before?
14           A.   I have seen that before.
15           Q.   All right.  Did you ever check to see if the
16   files that you downloaded have any associated metadata
17   like that?
18           A.   No, I never checked.
19           Q.   Okay.  Did you take them on a smartphone?
20           A.   Yes.
21           Q.   Now, I know on my phone anyway, when I take a
22   picture, I'm able to go and look at the exact geographic
23   location where that photograph was taken.  Do you know if
24   your phone had that capability at the time?
25           A.   I don't know what capabilities it had.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1          Q.   Okay.  And you still have the original files
2     that you downloaded to your computer, right?
3          A.   Yes.
4          Q.   All right.  And I will just tell you, perhaps
5     you are already aware of this, but we've sent requests
6     asking for that associated metadata.  They're not -- The
7     responses aren't due yet, but --
8          A.   Okay.
9          Q.   -- I assume they're forthcoming.
10              I'm going to walk you through these videos
11    that you produced and ask you some questions about them,
12    okay?
13         A.   Okay.
14         Q.   I'm going to start with Number 1.
15              (Video playing.)
16         Q.   Sorry, let me --
17              MR. WHEATON:  And, Sara, you do not have to
18         take this down.
19              (Video playing.)
20                   (Questions by Mr. Wheaton)
21         Q.   All right.  Do you remember taking this video?
22         A.   Yes.
23         Q.   Do you remember approximately what time in the
24    day you took this video?
25         A.   I believe it was sometime around 4:00, but I
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   am not sure.

2          Q.   Fair enough.  And I'm not asking you to, you

3   know -- It's not a memory test.  If you don't remember,

4   you don't remember.

5          A.   Right.

6          Q.   I understand that, okay?

7          A.   Okay.

8          Q.   Now, I believe I heard you say that this was

9   in the location of Taylor and Lewis; is that right?

10         A.   Yes.

11         Q.   Near Ranken Technical College?

12         A.   Yes.

13         Q.   And what brought you over there?

14         A.   I walked down towards that area and saw the

15  staging area.

16         Q.   Was this the first place that you went that

17  day?

18         A.   No.

19         Q.   Where did you go first?

20         A.   First gathered over near the area of Page and

21  Walton.

22         Q.   And if you think this was around four o'clock,

23  can you estimate when you would have first arrived at the

24  area of Page and Walton?

25         A.   I came earlier.  I want to say somewhere

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   around 1:00.  It was sometime shortly after

 2   Mansur Ball-Bey was killed.

 3          Q.    Okay.  So, that's about a three-hour period

 4   between when you first arrived and when you took this

 5   video?

 6          A.    Yes.

 7          Q.    Can you fill in the gaps for me in terms of

 8   what you were doing during that time frame?

 9          A.    I can try.

10          Q.    Okay.

11          A.    I stayed over near the area of Page and Walton

12   for a while and I did at some point go home.

13          Q.    Home to Florissant?

14          A.    Home to Florissant.  And I came back later.

15          Q.    Did you drive?

16          A.    Yes.

17          Q.    Did you drive yourself?

18          A.    Yes.

19          Q.    Was anyone with you?

20          A.    No.

21          Q.    Okay.  So, at some point you went home?

22          A.    Yes.

23          Q.    Why did you go home?

24          A.    I don't remember.

25          Q.    To eat lunch maybe?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    Maybe.

 2          Q.    You don't remember?

 3          A.    I don't remember.

 4          Q.    All right.  How long did you spend at home?

 5          A.    Maybe about an hour.

 6          Q.    Was it your practice during that time frame to

 7    monitor social media to keep updated on what, if

 8    anything, was happening at protest scenes like this?

 9          A.    I checked my social media, yes.

10          Q.    Do you remember if you saw anything on that

11    day on social media regarding this incident?

12          A.    That is possible.

13          Q.    Okay.  Do you remember specifically seeing

14    anything?

15          A.    I -- I don't remember specifically --

16          Q.    That's all right.

17          A.    -- what I saw.

18          Q.    Now, if you went home -- Remind me how long do

19    you believe you spent at home that day?

20          A.    About an hour.

21          Q.    So, can you estimate, based on that, what time

22    you came back to the area of Page and Walton?

23          A.    Some -- Somewhere around 4:00.

24          Q.    So, somewhere around when you first took this

25    video?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Yes.

 2          Q.   Were you -- Well, first let me ask you, do you

 3    know Sarah Molina?

 4          A.   Yes.

 5          Q.   How do you know her?

 6          A.   I met her through protests.

 7          Q.   In the Ferguson area?

 8          A.   Yes.

 9          Q.   Did she likewise attend multiple protests in

10    the Ferguson area?

11          A.   I can't speak for how many times somebody else

12    went, so...

13          Q.   Sure.  Did you see her multiple times there?

14          A.   I did.

15          Q.   Okay.  So, you saw her there --

16          A.   Yes.

17          Q.   -- many times?

18          A.   Yes.

19          Q.   And that's how you first met her?

20          A.   Yes.

21          Q.   Were you in communication with her on

22    August 19, 2015?

23          A.   Do you mean through --

24          Q.   Through text.

25          A.   -- text?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.    On the phone.  Any communication.

2          A.    I could have been.  I don't remember.

3          Q.    Did you meet up with Ms. Molina at some point

4    on that day?

5          A.    I saw her there, yes.

6          Q.    What time?

7          A.    I cannot pinpoint that time.

8          Q.    Can you give me an approximation?  Was it

9    after this video?

10         A.    It was before this video.

11         Q.    Do you know where you first saw Miss Molina

12   that day?

13         A.    Most likely somewhere in the area of Page and

14   Walton.

15         Q.    When you were in the area of Page and Walton

16   earlier in the day, were there any police officers there?

17         A.    Yes.

18         Q.    Were there any individuals in the street at

19   Page and Walton?

20         A.    I believe so.

21         Q.    Would you say that at that time there was a

22   crowd of individuals in the intersection of Page and

23   Walton or near the intersection of Page and Walton?

24         A.    Yes.

25         Q.    Were there any police officers at that time

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1   talking to the crowd?
2         A.   I don't know if anyone was talking to the
3   crowd.
4         Q.   I understand that -- I'll just represent to
5   you that, based on the Incident Report at least, that
6   some officers went and talked to the crowd that was
7   gathered near the intersection of Page and Walton earlier
8   that afternoon.
9         A.   Okay.
10        Q.   Do you have any recollection of that?
11        A.   No.
12        Q.   So, you said there were police officers there.
13  What were they doing?
14        A.   Around what time?
15        Q.   So, when you first arrived near the area of
16  Page and Walton.
17        A.   Standing around.  Standing around, talking to
18  each other.  Watching the crowd.
19        Q.   And I'll ask you about later on in the day,
20  but at that time when you were first near the
21  intersection of Page and Walton, did you hear any
22  dispersal orders from any police officers?
23        A.   No.
24        Q.   All right, I'm going to show you Video Number
25  7 --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    Okay.
 2          Q.    -- okay?  So, this is the third video in
 3    order.  I'm sorry.  Excuse me.  This is the third video
 4    in order that -- I've been a little under the weather
 5    this week.  I apologize.
 6          A.    No problem.
 7          Q.    I thought I was feeling better, but apparently
 8    not.  This is the third video in order of what you
 9    produced in this case, okay?
10          A.    Okay.
11          Q.    And it's labeled Vogel Christina 8192015.7.
12                (Video playing.)
13          Q.    I'm just going to stop it right there at the
14    eight second mark.  Is that you narrating this?
15          A.    Yes.
16          Q.    And did I hear correctly that you said, It is
17    August 19, 2015, and it is approximately 7:01 p.m."?
18          A.    Yes.
19          Q.    Do you believe that to be an accurate
20    timestamp for this video?
21          A.    I'm sorry, did you say do I believe that's an
22    accurate or inaccurate.
23          Q.    Sorry.
24          A.    I couldn't hear.
25          Q.    Bad --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    I'm sorry.

 2          Q.    -- question.  Do you think that's accurate --

 3          A.    Yes.

 4          Q.    -- that it's approximately 7:01 p.m.?

 5          A.    Yes.

 6          Q.    All right, I'm going to continue playing here,

 7     but first, it looks like you're standing on the sidewalk

 8     near the intersection of Marcus and Page; is that right?

 9          A.    Yes.

10          Q.    All right.  And you're standing next to a line

11     of police officers, right?

12          A.    Yes.

13          Q.    And you would agree that at this time, they're

14     not wearing any protective gear --

15          A.    Yes.

16          Q.    -- is that correct?

17          A.    Yes.

18          Q.    All right.

19                (Video playing.)

20          Q.    I'm going to stop it at approximately -- well,

21     at the 50 second mark.  Now that you've had a chance to

22     kind of get your bearings on this, do you know if at this

23     point in time any dispersal orders had been given by

24     police officers?

25          A.    No, I don't think so.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1        Q.   All right.  All right.  I'm going to continue

2   playing here.

3             (Video playing.)

4        Q.   I'm going to ask you to pay careful attention

5   till the end of this video, okay?

6        A.   (Nodding.)

7             (Video continues playing.)

8        Q.   So, I see the -- I hear something and then I

9   see the camera, you know, move away.  Do you know what

10  happened at the end of that video?

11       A.   Sounds like something was thrown.

12       Q.   Do you remember something being thrown at that

13  time at the police line?

14       A.   No.

15       Q.   Now, at any point that day, do you remember

16  objects being thrown towards police officers?

17       A.   Yes.

18       Q.   How many times?

19       A.   I did not count.

20       Q.   Okay.  Was it a lot?

21       A.   I wouldn't say a lot, no.

22       Q.   I'm going to back up to the video prior to

23  this, which is Video Number 6, okay?

24       A.   Okay.

25       Q.   So, this is the second video in order of what
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

 1   was produced.

 2          A.    Okay.

 3                (Video playing.)

 4          Q.    Now, before I continue with this, do you know

 5   if these videos were produced in chronological order?  In

 6   other words, Video 1 would have come first, this one

 7   next, Video 7 third, and so on?

 8          A.    That should be chronological order, yes.

 9          Q.    Okay, we're going to continue from here.

10                (Video playing.)

11          Q.    Now I stopped the video at 51 seconds.

12          A.    Okay.

13          Q.    Did you hear a dispersal order given over the

14   loudspeaker in this video?

15          A.    Barely.

16          Q.    Did you hear at the end there where he said,

17   "This is your first order to disperse"?

18          A.    I could barely make it out.

19          Q.    All right.  As --

20                MR. ROTHERT:  Well, this is -- are you asking

21       if she heard it on the video?

22                MR. WHEATON:  On the video.

23                MR. ROTHERT:  Okay.

24                     (Questions by Mr. Wheaton)

25          Q.    At the time, did you hear an officer speaking

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    over the loudspeaker?

2          A.    At the time, yes, I could hear speaking.

3          Q.    And what did you hear?

4          A.    Muffled noise.

5          Q.    Okay.  Now, I hear an individual it sounds

6    like is standing next to you screaming quite loudly at

7    the same time.  Did that affect at all your ability to

8    hear the officer over the loudspeaker?

9          A.    The officer was on a loudspeaker, so it should

10   not have.

11         Q.    Fair enough.  Did you understand it at the

12   time to be a dispersal order?

13         A.    No, I couldn't hear what was going on at the

14   time.

15         Q.    Did you have any understanding of why this

16   officer was speaking over the loudspeaker at the time?

17         A.    No.

18         Q.    All right.  Did you hear an officer speaking

19   over the loudspeaker at any other point in time over the

20   course of the next 30 minutes?

21         A.    I don't believe so.

22         Q.    All right.  I'm going to continue playing this

23   video from 51 seconds.

24               (Video playing.)

25         Q.    I'm going to stop it at 1:22 there.  Did you

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   hear the officer say, "This is an unlawful assembly.
 2   This is your order to disperse," on the video?
 3        A.   Yes.
 4        Q.   Did you hear that on that day as you were
 5   standing there?
 6        A.   On that day, no, it was very hard to hear.
 7        Q.   And why was that?
 8        A.   It was muffled.
 9        Q.   Had you previously, at any point during your
10   attendance at protests in your life, heard dispersal
11   orders given?
12        A.   Yes.
13        Q.   And how many times?
14        A.   I don't know the number of times.
15        Q.   Many times?
16        A.   Yes.
17        Q.   I'm sorry?
18        A.   Yes.
19        Q.   Okay.  Was it your practice to ignore those
20   dispersal orders and to remain?
21        A.   No, that was not my practice.
22        Q.   And what was your practice?
23        A.   If I could hear it, I would disperse.
24        Q.   So, if you hear a dispersal order, it's your
25   testimony that you would disperse?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1        A.   Yes.

2        Q.   Had you done that in the past?

3        A.   Yes.

4        Q.   How many times?

5        A.   I could not count the number of times.

6        Q.   Okay.  Now, the first time during the first

7   dispersal order, I heard somebody yelling, "Fuck" --

8   "Fuck you," right next to you and other things.  During

9   this dispersal order, I didn't hear anybody else yelling.

10  Is that the same as what you heard and then failed to

11  hear the second time around?  Is that -- That's a

12  terrible question.  Did that make sense?

13       A.   Could you re- --

14       Q.   Sure.

15       A.   -- phrase the question?

16       Q.   During the second dispersal order, was anybody

17  other than the police officer, you know, yelling or

18  speaking loudly that you could hear on the video?

19       A.   No.

20       Q.   All right.  So, again, do you know why it

21  would have been difficult for you to hear this dispersal

22  order?

23       A.   It was muffled.

24       Q.   So, you're saying that the speaker that it

25  came out of was muffled?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Yes.
 2          Q.   All right.  And you're standing pretty close
 3   to the B.E.A.R. -- I'll call the City's tactical vehicle
 4   the B.E.A.R., is that okay?
 5          A.   Yes.
 6          Q.   You're standing pretty close to the B.E.A.R.
 7   at the time that this dispersal order was given, right?
 8          A.   Yes.
 9          Q.   Do you know where the officer that was giving
10   the dispersal order was standing?
11          A.   Behind the police line.
12          Q.   Okay.  And, again, pretty close to you, right?
13          A.   Yes.
14          Q.   And can you estimate in terms of feet how many
15   feet away that officer was at the time this dispersal
16   order was given?
17          A.   No, I couldn't give a good estimate.
18          Q.   All right.  So, that's the second dispersal
19   order that we've heard, and do you have any idea
20   approximately what time in the day this video was taken?
21          A.   No.
22          Q.   Now, Video 7, which was the one we just
23   watched, was at 7:01 p.m., right?
24          A.   Yes.
25          Q.   Is it accurate to say that this was likely
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   taken in the five minutes before that video was taken?
 2          A.   Yes.
 3          Q.   Did you take any other videos between this
 4   video and Video 7 that we just watched?
 5          A.   No.
 6          Q.   Did you take any photos between this video and
 7   Video 7 that we just watched?
 8          A.   I took photos.  I am not sure the -- of the
 9   order or time frame.
10          Q.   Did you produce every photograph that you took
11   on August 19, 2015?
12          A.   Most likely no.
13          Q.   Why do you say that?
14          A.   Some of the vid- -- Some of the photos that I
15   took at the time may have been -- were not saved.  I had
16   an iPhone with limited data, so...
17          Q.   When you say they were not saved, you mean you
18   deleted them?
19          A.   I did not delete them.  They would not save.
20          Q.   Can you explain that?
21          A.   When you take a picture with limited storage,
22   it says limited storage.  You have to go back in and
23   delete some of the photos you have.  And I believe at
24   that time, I had some issues with my storage, so I cannot
25   say that I kept every single picture that I took or video
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    that I took.  I was having data issues.

2         Q.   So, what you just explained in terms of having

3    things not save as you took them applies equally to

4    videos that you attempted to take that day?

5         A.   Yes.

6         Q.   And can you explain in the context of video

7    what happened when you would try to take it?  You'd get

8    like a message at the end?

9         A.   Uh-huh.  Yes.

10        Q.   And it says what?

11        A.   I couldn't tell you word for word, but it says

12   you don't have enough.

13        Q.   Basically insufficient storage --

14        A.   Yes.

15        Q.   -- space?

16        A.   Yes.

17        Q.   Are you able at that time to go back in your

18   phone and open up the video that you just took?

19        A.   No.

20        Q.   So, how then were you able to take the eight

21   videos that you produced in this case?

22        A.   I had room for that.  Should I explain a

23   little more what I mean?

24        Q.   If you could, yeah.

25        A.   Okay.  So, you -- you asked me if I had

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    produced every single video that I took and picture that

2    I took that day.  I did not.  I took some -- Some stuff

3    would not save.  I had to go back in and delete photos,

4    personal photos that had nothing to do with this, in

5    order to save some room.  But I would frequently have

6    issues with my storage space to where I would not be able

7    to save everything, if that makes sense.

8         Q.   Yes.

9         A.   Yes.

10        Q.   Now, do I still understand you correctly that

11   there were photos and videos that you attempted to take

12   at the scene that you were unable to take because you had

13   insufficient storage space?

14        A.   Most likely, yes.

15        Q.   Now, you say "most likely."  Do you know

16   that's true --

17        A.   Yes.

18        Q.   -- or -- Okay.  All right.  How many?

19        A.   I did not count.

20        Q.   Okay.  Now, this was the second dispersal

21   order on this video.

22        A.   Uh-huh.

23        Q.   Do you know if there were any additional

24   dispersal orders given prior to the initial deployment of

25   inert gas this evening?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              A.    Could you -- I'm sorry, I didn't understand
 2      what you're asking.
 3              Q.    Sure.  So, at least Video 8 (sic) I'll call
 4      it, you timestamped it at 7:01 p.m. --
 5              A.    Yes.
 6              Q.    -- how long after that video was taken was gas
 7      first deployed by the police?
 8              A.    I don't know the amount of minutes.
 9              Q.    Can you -- Was it less than 30 minutes?
10              A.    It could have been, yes.
11              Q.    Do you have any idea what time gas was first
12      deployed by police on August 19, 2015?
13              A.    No.
14              Q.    Okay.  Now, you allege that approximately 30
15      minutes after gas was first deployed that you were
16      subjected to teargas by police?
17              A.    Yes.
18              Q.    Do you have any idea what time that happened?
19              A.    It would be sometime after 7:00 and before
20      8:00 if I were to estimate, but I couldn't give the -- a
21      good approximate time, either.
22              Q.    All right.  Moments ago, I made a reference to
23      Video 8.  That was my mistake.  I should have said Video
24      7.  Now I'm going to show you Video 8, okay?
25              A.    Okay.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                  (Video playing.)
 2          Q.   I paused it at 17 seconds.  Do you see these
 3     objects on the ground here (pointing)?
 4          A.   Yes.
 5          Q.   What are those?
 6          A.   They look like water bottles.
 7          Q.   Do you know how they got there?
 8          A.   No.
 9          Q.   Individuals were throwing water bottles at the
10     police then, right?
11          A.   Okay.
12          Q.   Is that right?
13          A.   Could be.
14          Q.   Okay, I'm just asking if you saw that when you
15     were there.
16          A.   Yes.
17          Q.   So, you would agree that at the point in time
18     this video was taken, number one, the dispersal orders
19     had been given, right?
20          A.   Yes.
21          Q.   And, number two, objects had been thrown at
22     the police line, right?
23          A.   Yes.
24          Q.   Multiple objects, right?
25          A.   Yes.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1      Q.   And would you agree then that -- Well, let me
2   ask you, at this point in time, were there still people
3   in the street, a group of people right next to you?
4      A.   Yes.
5      Q.   Would you agree then that at this point in
6   time, this is an unlawful assembly and needs to disperse?
7      A.   No.
8      Q.   Why not?
9      A.   Could we -- Could we go back to your
10  questioning, please?  I'm sorry.
11     Q.   You want the question read back; is that what
12  you're saying?
13     A.   Yes, I'm trying to find -- follow your line of
14  questioning.  I'm sorry.
15     Q.   Sure.  I can set it up again.  No problem.
16     A.   Okay.
17     Q.   So, I had asked you whether you agreed that at
18  this point in time dispersal orders had been given and
19  you said yes, right?
20     A.   Yes.
21     Q.   And whether you agreed that at this point in
22  time multiple objects had been thrown at police and you
23  said yes?
24     A.   Yes.
25     Q.   Do you agree that at this point in time that

1   this assembly is an unlawful assembly that needs to

2   disperse?

3          A.   I would not agree to that because I don't have

4   any basis for saying whether or not that's a unlawful

5   assembly.

6          Q.   Do you have any understanding of what an

7   unlawful assembly is?

8          A.   Could you explain the --

9          Q.   No, I'm --

10         A.   -- defini- -- Well, it --

11         Q.   Yeah, I'm just --

12         A.   That --

13         Q.   -- asking you what your understanding is, if

14   any.

15         A.   And I guess that's why I don't want to agree

16   because I'd like to know what the definition.  When you

17   say "unlawful assembly," could you explain the definition

18   of "unlawful assembly"?

19         Q.   Sure, and we'll get to that, but --

20         A.   Okay.

21         Q.   -- first I want to understand what your

22   understanding of that is without any explanation given

23   from me first, okay?

24              MR. ROTHERT:  Could you tell us the timestamp

25       on this assembly that's on the screen?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                 MR. WHEATON:  Could I what now?
 2                 MR. ROTHERT:  What's the timestamp on -- on --
 3                 MR. WHEATON:  This is the 17th second of
 4        Vogel Christina 1915.8.
 5                 MR. ROTHERT:  Okay.  So, you're asking if this
 6        is an unlawful assembly?
 7                 MR. WHEATON:  At this point in time, yes.
 8                 MR. ROTHERT:  Police officers standing there?
 9                 MR. WHEATON:  I'm sorry?
10                 MR. ROTHERT:  Is what you -- You're asking
11        her --
12                 MR. WHEATON:  No.  Well --
13                 MR. ROTHERT:  -- if police officers standing
14        there is an unlawful assembly?
15                 MR. WHEATON:  No, I had asked her --
16                 MR. ROTHERT:  Yeah.
17                 MR. WHEATON:  -- if there were also a crowd of
18        people standing in the street --
19                 MR. ROTHERT:  Okay.
20                 MR. WHEATON:  -- next to her and she said yes.
21        That's what I'm asking about.  All right.
22                 MR. ROTHERT:  You said "this," so I -- "this
23        is an unlawful assembly," so I don't understand what
24        you're asking about.
25                 MR. WHEATON:  Okay.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              MR. ROTHERT:  Do you understand what he's
 2       asking about?
 3              THE WITNESS:  Yes.
 4              MR. ROTHERT:  Okay, if you're able to answer
 5       the question.
 6                   (Questions by Mr. Wheaton)
 7       Q.   Are you able to answer the question?
 8       A.   I'm sorry.  I am not trying to be difficult at
 9  all.  I just want to make sure we --
10       Q.   You're a lawyer.  It's in our nature.  It's
11  fine.  Go ahead.
12       A.   Okay.  So, you want to know my definition of
13  an unlawful assembly?
14       Q.   I want to know your understanding of what an
15  unlawful assembly is.
16       A.   That is a good question.  I would say my
17  understanding of an unlawful assembly would be -- I don't
18  know.  I don't know if I could give you a good definition
19  of that without -- for myself.
20       Q.   Without what?
21       A.   I don't know if I can give you a good
22  definition --
23       Q.   And if you don't have an --
24       A.   -- for myself.
25       Q.   -- understanding of what it is, that's fine.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          A.    I want to have an understanding of what you're

2     asking when you say do you agree that this is an unlawful

3     assembly.

4          Q.    And that's not the --

5          A.    Could you tell me what -- what are you saying

6     is an unlawful assembly here?  Because we can -- What --

7     What are you wanting me to agree to specifically?

8          Q.    I'm not asking you to agree to anything.

9          A.    Okay.

10         Q.    I was just asking what your understanding is,

11    that's all, okay?  And it sounds like you're not able to

12    give one at least at this point.

13         A.    No.

14         Q.    Okay.  Now, at this point in time -- And let

15    me ask you, do you know approximately what time this

16    video was taken?

17         A.    I cannot remember.

18         Q.    Sometime shortly after seven o'clock --

19         A.    Yes.

20         Q.    -- does that sound right?

21         A.    Sometime after seven, yes.

22         Q.    All right.  Now, when you first saw

23    individuals throwing objects at the police line, why

24    didn't you leave?

25         A.    I don't know if I have an answer to that.  I

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1    didn't leave because I didn't leave.
2         Q.   Okay.  Would you agree that an individual that
3    throws an object at a police officer is assaulting that
4    police officer?
5         A.   Yes.
6         Q.   And you would agree that that's a crime,
7    right?
8         A.   Yes.
9         Q.   And you would agree that you were standing
10   very near a group of individuals that was in the street,
11   some of whom were throwing objects at police officers,
12   right?
13        A.   Yes.
14        Q.   Okay.  Do you know whether after this, after
15   individuals first threw objects at officers, whether the
16   officers got out any shields?
17        A.   I believe so.
18        Q.   All right.  And fair to assume that they did
19   so because objects were being thrown at them, right?
20        A.   I could not -- I wouldn't assume anything in
21   this case.
22        Q.   All right.  I'm going to go ahead and
23   fast-forward this video to just before the one minute
24   mark, okay?
25        A.   Uh-huh.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1       Q.    I'm going to start playing it from 50 seconds.

2             (Video playing.)

3       Q.    I'm going to stop it at 1:03.

4       A.    Uh-huh.

5       Q.    Did you see and hear a glass bottle thrown at

6    police officers and break --

7       A.    Yes.

8       Q.    -- very near to them?

9       A.    Yes.

10      Q.    Did you see that as you were standing there

11   taking this video on this day at this time?

12      A.    Yes.

13      Q.    And did you leave at this time?

14      A.    No.

15      Q.    All right.  I'm going to show you the next

16   video, which is labeled Vogel Christina 8192015.9, okay?

17      A.    Okay.

18      Q.    Now, before I open it up, I'm just going to --

19   I can show you that the date modified times on hear say

20   April 19 of 2018.  Do you know why that is?

21      A.    No.

22      Q.    Okay.  Do you know whether the original files

23   have a different date modified time on them?  I'm just

24   wondering whether they may have accurate timestamps.

25      A.    No.  I believe that's when I -- No.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.    Maybe when you produced them?
 2          A.    I believe that's when I pro- -- Yeah, I think
 3    that's when I transferred them over or produced them.
 4    I'm not sure.
 5          Q.    Okay.  I'm going to play you .9 now, okay?
 6          A.    Okay.
 7                (Video playing.)
 8                (At this point, Mr. Smith left the conference
 9                room.)
10          Q.    And I'm going to fast-forward to the 3:30
11    mark.
12          A.    Uh-huh.
13                (Video playing.)
14          Q.    I'm going to stop it at 3:43.  Did you hear
15    yourself just say, "I believe this is another order to
16    disperse"?
17          A.    Yes.
18          Q.    Is it accurate to say then that you understood
19    at this time when this video was taken that multiple
20    dispersal orders had already been given?
21          A.    I wouldn't say multiple.  I said another
22    order.
23          Q.    At least one?
24          A.    Yeah, yeah.
25          Q.    Is that correct?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1            A.   Yes.
 2            Q.   So, at the point in time that you took this
 3    video, you understood that at least one order to disperse
 4    had been given, right?
 5            A.   Yes.
 6            Q.   And you just heard another order to disperse,
 7    right?
 8            A.   Yes.
 9            Q.   Do you know what time this video was taken?
10            A.   I don't remember.
11            Q.   All right.  And assuming, as we have, that
12    these videos are taken in chronological order, at this
13    point in time, multiple objects, including a glass
14    bottle, have been thrown at police officers, right?
15            A.   Yes.  Yes.
16            Q.   After you heard here what you believed to be a
17    second dispersal order, did you disperse?
18            A.   No.
19            Q.   Why not?
20            A.   I don't know.
21            Q.   Would you agree as you sit here today that you
22    should have?
23            A.   No.
24            Q.   Why not?
25            A.   I don't know.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Well, I'm just trying to understand --
 2          A.   Uh-huh.
 3          Q.   -- your thinking, okay?
 4          A.   Okay.
 5               MR. ROTHERT:  We're at the one hour mark, so I
 6      need to take a restroom break --
 7               MR. WHEATON:  That's fine.
 8               MR. ROTHERT:  -- if that's okay.
 9               MR. WHEATON:  Sure.
10               MR. ROTHERT:  There's no question pending to
11      us.
12               (At this point, there was a break taken from
13               2:29 p.m. to 2:35 p.m.)
14                  (Questions by Mr. Wheaton)
15          Q.   Okay, I'm going to continue playing Video
16      Number 9 until the end.  There's not that much more,
17      okay?
18          A.   (Nodding.)
19          Q.   And I want you to, again, pay careful
20      attention to the end of this video --
21          A.   Okay.
22          Q.   -- all right?
23               (Video playing.)
24          Q.   I stopped it at 4:10.
25          A.   Uh-huh.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   First of all, in the last 30 seconds, did you
 2    hear objects hitting police shields?
 3          A.   Yes.
 4          Q.   Did you hear that as you were standing there
 5    that day?
 6          A.   Yes.
 7          Q.   Now, at 4:10, did you see right here
 8    (pointing) where a brick hits the top of this police
 9    officer's shield?
10          A.   I saw an object.  I can't tell what that
11    object is.
12          Q.   Fair enough.  And I'm going to back it up just
13    a few seconds --
14          A.   Okay.
15          Q.   -- just to give you a chance to watch it
16    again, okay?
17               (Video playing.)
18          Q.   Were you able to see any better that time?
19          A.   Yes, I -- I see an object.  I still --
20          Q.   Okay.
21          A.   -- can't tell.  I -- I wouldn't say that it's
22    a brick.
23          Q.   You --
24          A.   I'd say it's an object.
25          Q.   You would agree with me at least that a fairly
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1    large object hit that officer's shield at 4:10 on this

2    video?

3            A.   I would say that an object hit the officer's

4    shield, yes.

5            Q.   And you would agree that it was thrown at the

6    police line, right?

7            A.   Yes.

8            Q.   Do you remember seeing that happen as you were

9    standing there taking this video?

10           A.   Yes.

11           Q.   Do you remember what you were thinking at that

12   point in time?

13           A.   No.

14           Q.   Okay.  Now, do you know what time this Video

15   .9 was taken that evening?

16           A.   No.

17           Q.   Okay.  Would you agree that shortly after this

18   video was taken, smoke was deployed by police for the

19   first time that day?

20           A.   I wasn't there the whole time, so I don't know

21   if it was the first time, but, yes, shortly after, there

22   was gas.

23           Q.   All right.  Now, the first time that the

24   police deployed anything that day or at least the first

25   time you saw it shortly after this video was taken, would
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   you agree that it was inert gas and that it was not

 2   teargas?

 3          A.   I don't know what kind of gas it was.

 4          Q.   And you didn't know at the time what kind of

 5   gas it was; is that accurate?

 6          A.   I knew that there was some type of gas coming

 7   out because of the reaction in my lungs and my eyes

 8   stinging.

 9          Q.   Now, I know you testified that you had

10   previously been exposed to teargas multiple times, right?

11          A.   Yes.

12          Q.   Had you previously been exposed to inert smoke

13   multiple times, as well?

14          A.   Yes.

15          Q.   Are you able to tell the difference between

16   the two?

17          A.   I'm honestly not sure if you could tell the

18   difference.

19          Q.   So, teargas, obviously, irritates your eyes,

20   right?

21          A.   Yes.

22          Q.   And anything else?

23          A.   Your lungs.

24          Q.   Does inert smoke have the same effect in your

25   experience?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          A.    Yes.

2          Q.    All right, I'm going to move to Video .10.

3                (Video playing.)

4          Q.    I'm going to stop it at the ten second.

5          A.    Okay.

6          Q.    Was that you narrating?

7          A.    Yes.

8          Q.    Did you just say, "Police did not actually

9     deploy teargas.  I believe it was a smoke bomb"?

10         A.    Yes.

11         Q.    And do you specifically recall that being the

12    case?

13         A.    I don't know.  I don't even know why I said

14    that, no.

15         Q.    Do you remember the police first deploying

16    what you called a smoke bomb on this day?

17         A.    Yes.

18         Q.    Do you know what time that happened?

19         A.    No.

20         Q.    Okay.  I'll just represent to you that the

21    Incident Report records the first deployment of inert

22    smoke being around 7:12 that evening.

23         A.    Okay.

24         Q.    Do you have any reason to doubt the accuracy

25    of that?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    A.    No.
2    Q.    Now, we're stopped at the tenth second on
3  Video .10 that you took, right?
4    A.    Uh-huh.
5    Q.    And I see, just in the frame, one, two, three,
6  four, five, six, seven, eight, nine people (pointing)
7  standing within the frame of this video; is that right?
8    A.    Yes.
9    Q.    Was there still a fairly large group around
10  you at this point in time just after inert smoke was
11  first deployed?
12    A.    Could you specify what number you're looking
13  for when you say "fairly large"?
14    Q.    Well, can you estimate it for me?
15    A.    I --
16    Q.    More than 20 people?
17    A.    I do not recall at that point, no.
18    Q.    Do you know whether between the time that
19  inert smoke was first deployed and teargas was first
20  deployed whether individuals in the crowd continued to
21  throw objects at police?
22    A.    I don't recall.
23    Q.    Would you agree that, given that at least two
24  dispersal orders had been given and that multiple objects
25  had already been thrown at police officers, that the

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    deployment of inert smoke at this time was justified?

2          A.    No.

3          Q.    Why not?

4          A.    I'm not going to agree to the use of smoke or

5    any other munitions being used.

6          Q.    Even where there are individuals in a crowd

7    throwing objects at police officers?

8          A.    I'm not going to agree to that usage, no.

9          Q.    So, if I understand you correctly, are you

10   saying that you would never agree under any circumstances

11   that either smoke or teargas should be deployed against a

12   crowd; is that what you're saying?

13         A.    I'm not trying to be difficult, but, no, I

14   would not say never to any circumstance.

15         Q.    Do you know what time teargas was first

16   deployed this evening?

17         A.    I do not know.

18         Q.    Okay.  From the time that this -- that we left

19   off on this video --

20         A.    Uh-huh.

21         Q.    -- the tenth second on .10 --

22         A.    Yes.

23         Q.    -- which is after inert smoke was first

24   deployed, walk me through what happened next.

25         A.    Are you saying at this particular point where

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   the video is stopped --

2           Q.   Tell me --

3           A.   -- after?

4           Q.   -- what happened over the course of the next

5   ten minutes.  Generally first and then we'll go back and

6   I'll ask you specific questions about it.

7           A.   Okay.  Generally -- I'm sorry, I'm trying to

8   recall.  Give me a second.  Generally what I remember is

9   was a -- police continued to advance.  We were pushed

10  back.

11          Q.   To where?

12          A.   I'm trying to remember.

13          Q.   Was it the next intersection past Page and

14  Walton, which would be --

15          A.   Yes.

16          Q.   -- Bayard --

17          A.   Is that Bayard?

18          Q.   -- and Page?

19          A.   Yes.  Yes.

20          Q.   Okay, go on.

21          A.   Sometime at that point, I ran back to Bayard.

22          Q.   Along with others, right?

23          A.   Along with others, yes.  And --

24          Q.   How many others?

25          A.   I could not say.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1         Q.   Sorry.  Go on.
 2         A.   I ran back with others because they began to
 3   deploy gas and that is when I began to disperse.
 4         Q.   And where did you move to at that time?
 5         A.   It was back to that other intersection,
 6   Bayard.
 7         Q.   Well, as I understand you, you were already at
 8   Bayard and Page.
 9         A.   Okay.
10         Q.   Where did you move to from there when, in your
11   words, you began to disperse?
12         A.   Moved to Bayard, and at that point, canisters
13   were still being (demonstrating) placed, dispersed into
14   the -- onto the street, so I continued down an alley, and
15   that's when I ended up on Euclid.
16         Q.   Would it be helpful to look at a map of the
17   area?
18         A.   Yes.
19              MR. WHEATON:  I'm sorry, can we mark this?
20              (At this point, an off-the-record discussion
21              was had.)
22              (At this point, Defendants' Exhibit Vogel A
23              was marked for identification.)
24                 (Questions by Mr. Wheaton)
25         Q.   I'm going to go ahead and hand that to you.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Uh-huh.
 2          Q.   Do you recognize this to be a Google Maps
 3     image of the area surrounding Walton and Page, generally?
 4          A.   Yes.
 5          Q.   Do you see on here the intersection of Page
 6     and Bayard?  There's a "D" right in the middle of it.
 7          A.   (Pointing.)  Okay, yes.
 8          Q.   And is that where you and others had been
 9     pushed back to at the time when you say you dispersed?
10          A.   Yes.
11          Q.   And does this map aid you in showing where you
12     went from there?
13          A.   Yes.  (Pointing.)  So, we ended up over here.
14     You see this little alleyway that goes to Euclid?
15          Q.   Yes.
16          A.   Came down through that alley to Euclid.
17          Q.   So, you're indicating that you went south on
18     Bayard and into an alleyway that connects Bayard to
19     Euclid?
20          A.   Yes.
21          Q.   Were any teargas canisters deployed near the
22     intersection of Bayard and Page?
23          A.   Yes.
24          Q.   Okay.  Were you exposed to teargas at that
25     time?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Yes.
 2          Q.   How near were you to the canisters when they
 3   were deployed?
 4          A.   I was close enough where it to affect my eyes,
 5   my breathing, my skin.
 6          Q.   How long does that effect typically last for
 7   you?
 8          A.   About a few hours.  I -- I couldn't say
 9   exactly.
10          Q.   Okay.  In your experience, within a few hours,
11   the effects completely dissipate?
12          A.   Not completely, no.  It lingers for a little
13   longer than that.
14          Q.   How long does it typically take for the
15   effects to completely dissipate for you?
16          A.   Maybe completely dissipate, about a day or so.
17          Q.   Approximately 24 hours?
18          A.   Yes.
19          Q.   How long after what you characterize as a
20   smoke bomb was deployed -- Scratch that question.
21          A.   Okay.
22          Q.   Do you know what time what you characterize as
23   a smoke bomb was deployed?
24          A.   No.
25          Q.   Can you give me any idea?
```

```
 1              A.    Sometime after -- Sometime after 7:00.
 2              Q.    And certainly sometime before 7:30; is that
 3    right?
 4              A.    I believe so.
 5              Q.    And why do you believe that?
 6              A.    I'm estimating.
 7              Q.    Fair enough.  How long was it between the
 8    deployment of what you called the smoke bomb and the
 9    first deployment of teargas?
10              A.    Within a matter of minutes.
11              Q.    Between that time, that matter of minutes,
12    were any objects thrown at police officers?
13              A.    I don't recall.
14              Q.    Certainly if there's video showing that, you
15    don't have any reason to dispute that, right?
16              A.    No.
17              Q.    Now, why were you or how were you pushed back
18    to the intersection of Bayard and Page?
19              A.    The police pushed us back.
20              Q.    Was it the smoke?
21              A.    It was whatever they were giving to us at the
22    time, yes.
23              Q.    So, what you called the smoke bomb?
24              A.    Yes.
25              Q.    That's what caused you and others to be pushed
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   back to the intersection of Bayard and Page; is that
 2   right?
 3           A.   Are you basing it off this video?  Or -- Or
 4   just --
 5           Q.   I can show you another one if you like, but
 6   right now I'm asking based --
 7           A.   Okay.
 8           Q.   -- on your memory.
 9           A.   Okay.
10           Q.   Okay?
11           A.   I wanted to make sure.  Yes, I believe so.
12           Q.   All right.  And you bring up this video we
13   were just watching.  Do you know if you were standing
14   near the intersection of Bayard and Page when that video
15   was taken?
16           A.   No.
17           Q.   Where were you?
18           A.   I was still on Page.
19           Q.   Yeah, but you were --
20           A.   I'm not exactly sure where.
21           Q.   Do you believe you were closer to Marcus and
22   Page than you were after you got pushed back to Bayard
23   and Page?
24           A.   No, at that point, they had pushed us back a
25   little further (pointing), so we were, I believe, a
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   little closer to Bayard.
 2        Q.   Okay.  Now, after you were exposed to teargas
 3   at the intersection of Bayard and Page and went through
 4   this alley connecting Bayard to Euclid, what happened
 5   next?
 6        A.   Then went to the property of the person that I
 7   was with, Sarah Molina.
 8        Q.   Immediately or did you wait a few minutes to
 9   watch what was going on?
10        A.   No, we -- I wasn't watching anything after
11   that.  We went through the alley and got on Euclid,
12   walked to the property, met up with a few other people
13   and we were talking.
14        Q.   Where is Sarah Molina's property on Euclid?
15        A.   I don't know the address, I'm sorry.
16        Q.   Can you point on the map and determine where
17   it's at?
18        A.   On this map, no, I'm sorry, I can't tell.
19        Q.   Do you know approximately how many houses
20   there are between Page Boulevard and Sarah Molina's
21   property?
22        A.   No.
23        Q.   Is it more than two?
24        A.   I don't know.
25        Q.   Did you see any teargas canisters or other
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    chemical munitions deployed near the intersection of Page
 2    and Euclid?
 3         A.    When?
 4         Q.    So, my understanding is that -- Well, I won't
 5    tell you my understanding.  I'm just going to ask you.
 6    Within let's say five minutes of the time you were
 7    exposed to teargas at Bayard and Page, did you see any
 8    canisters deployed near the intersection of Page and
 9    Euclid?
10         A.    Within five minutes, I would say no.
11         Q.    When you went through the alleyway connecting
12    Bayard and Euclid, did others go with you?
13         A.    I remember going with Sarah Molina.  I don't
14    recall if anybody else came with us.
15         Q.    And I know I asked you this already, but in
16    the context of everything that we've established up to
17    this point --
18         A.    Okay.
19         Q.    -- does that aid you in remembering when you
20    first encountered Sarah Molina on that day?
21         A.    Yes.
22         Q.    Can you say when?
23         A.    It was after we were pushed back from Page and
24    Marcus and sometime around Page and Bayer -- Bayard.
25         Q.    So, you ran into her at the intersection of
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   Page and Bayard or near it?
 2          A.   Near at -- Near or at, yes.
 3          Q.   And you already said you don't remember what
 4   you were wearing that day, but do you remember what
 5   Miss Molina was wearing that day?
 6          A.   No.
 7          Q.   Were either of you -- You can't remember
 8   anything at all about what either of you were wearing; is
 9   that right?
10          A.   No.
11          Q.   And you testified that you do not have any
12   recollection of seeing teargas deployed near the
13   intersection of Euclid and Page within five minutes of
14   being exposed to teargas at Bayard and Page; is that
15   correct?
16          A.   Correct.
17          Q.   And you do not have any recollection of
18   teargas being deployed near the intersection Page and
19   Euclid at any time that day; is that right?
20          A.   No.
21          Q.   Okay.  When do you recall teargas being
22   deployed near the intersection of Page and Euclid?
23          A.   I could not place the exact time.  It was a
24   little longer than five minutes, I believe, but it was
25   while I was on Euclid with Sarah Molina in front of her
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   property.
 2         Q.    Could you see -- Well, I assume you saw
 3   teargas canisters being deployed, so I assume you could
 4   see the intersection of Page and Euclid from
 5   Sarah Molina's property; is that right?
 6         A.    I -- I guess I'm trying -- What are you asking
 7   with the -- the teargas and the intersection?  Are you
 8   asking about when the B.E.A.R. came down the street?
 9         Q.    I'm tal- -- No, I'm just trying to get a
10   general timeline.
11         A.    Okay.
12         Q.    I'm trying to go in chronological order --
13         A.    Okay.
14         Q.    -- okay?
15         A.    I'm trying to remember.  I honestly don't --
16   can't recall if I could see the intersection itself, but
17   you -- the smoke that teargas makes, you can see that,
18   but that doesn't mean I can see the intersection, so I
19   could not say if I can see the intersection or not.  I
20   don't recall that.
21         Q.    So, you could see the smoke, but not
22   necessarily the intersection of Page and Euclid; is that
23   right?
24         A.    I suppose so.  I'm still not sure what time.
25   I guess it depends on the time frame we're talking.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Uh-huh.  Now, maybe this will help.
 2          A.   Okay.
 3          Q.   I'm going to show you the next video you
 4    produced, which is I'll call .11 --
 5          A.   Okay.
 6          Q.   -- okay?
 7               (Video playing.)
 8          Q.   And I'm going to stop this at the 32 second
 9    mark, okay?
10          A.   Okay.
11          Q.   What street are you standing on when you took
12    this video?
13          A.   That is Euclid.  And I can show you what
14    happened.  Okay, so, that's not Page and Euclid.  That is
15    actually the clearing.  So, we have Bayard here
16    (pointing) and this is the alleyway and it turns into a
17    clearing right here (pointing) and then you have Euclid
18    Avenue (pointing).  So, (pointing) that is what I am
19    actually looking at is the little clearing from Euclid
20    (pointing) on down into this (pointing), this area.
21          Q.   Are you able to put an "X" on the spot where
22    you were standing when you took this video?  Here, I'll
23    give you this.  Actually, you know, why don't you use the
24    blue pen.
25               MR. ROTHERT:  Would you like me to get a
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1        marker?
 2                MR. WHEATON:  Yeah, that might work better.
 3        Thank you.
 4                (At this point, there was a brief interruption
 5                in the proceedings.)
 6                MR WHEATON:  Thank you, sir.
 7                    (Questions by Mr. Wheaton)
 8        Q.   Go ahead and put an "X" on the spot where you
 9        were standing when you took Video .11.
10                MR. ROTHERT:  And you're asking her to mark
11        Exhibit --
12                MR. WHEATON:  Vogel A.
13                MR. ROTHERT:  -- Vogel A?
14                MR. WHEATON:  Yes, sir.
15                MR. ROTHERT:  Okay, thank you.  We'll have
16        trouble figuring that out later if we don't say it
17        now.
18                MR. WHEATON:  I always have a much higher
19        opinion of my memory in the moment than I do later
20        on.
21        A.   I'm sorry, could you --
22                    (Questions by Mr. Wheaton)
23        Q.   Do you want me to play it again?
24        A.   Would you mind playing that again?
25        Q.   Sure.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1      A.    Yeah.

2            (Video playing.)

3      Q.    All right, does that help determine where you

4  were standing when you took this video?

5      A.    I think so.

6      Q.    I think you just indicated that you were

7  either on Bayard or in between Bayard and Euclid

8  somewhere around this alley; is that right?

9      A.    Yes, it's definitely in this alley and I'm --

10  looking at this, I'm not sure I was actually on Euclid at

11  this point, but it was --

12      Q.    Is it possible -- I'm sorry.  Go ahead.

13      A.    Oh, you can go ahead.

14      Q.    It looked to me like you were just standing

15  next to a chain link fence and in front of a vacant lot

16  or at least a large side lot and the only place I see one

17  is right there on Bayard just south of that alleyway.  Is

18  that where you were standing or are you able to tell?

19      A.    Where are you saying?

20      Q.    Oh.

21      A.    Would you mind showing me?

22      Q.    I was just speaking about this (pointing) area

23  right here.

24      A.    Yes.  It -- I can -- If I mark what I mark, it

25  would not be an exact area --

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1        Q.   Okay.

 2        A.   -- but my estimation.

 3        Q.   Sure, I understand.

 4        A.   Okay.  It would definitely be somewhere in

 5   this...  (Witness marking.)

 6        Q.   Okay, thank you.  So, you've marked, for the

 7   record, a spot either on or just off of this alleyway

 8   between Bayard and Euclid?

 9        A.   Yes.

10        Q.   All right.  And I'll leave this with you.  And

11   as you were pointing your camera through that gap in the

12   trees on this video, do you know what street you were

13   looking at through the trees?

14        A.   Bayard.

15        Q.   Oh, so, you were looking back to the east

16   towards Bayard?

17        A.   Yes.

18        Q.   And you were narrating the video, and can you

19   describe what you had just seen at the time that you were

20   taking that video?

21        A.   Yes.  When we moved back to Bayard and Page

22   and we ended up on Bayard, we ended up in the alley

23   because of the teargas that was being thrown at -- or at

24   the gas that was being thrown at protestors, so I ended

25   up in this alley (pointing) and I'm pointing the camera
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   toward Bayard where it had just happened.
 2          Q.    That makes sense.  And where you just were,
 3   right?
 4          A.    Yes.
 5          Q.    And let me ask you, did you ever livestream
 6   any of the protests that you attended?
 7          A.    No.
 8          Q.    All right.  Never?
 9          A.    No.
10          Q.    So, there's no way that at any point in time
11   on this day that you were livestreaming any video that
12   you were taking?
13          A.    No.
14          Q.    Did you upload any of the video that you took
15   on this day to the internet?
16          A.    No.
17          Q.    Did you share it with anybody?
18          A.    No.
19          Q.    Via message?  Via e-mail?
20          A.    Nope.
21          Q.    You just downloaded it to your computer,
22   that's it?
23          A.    Yeah.
24          Q.    Okay.  What happened next after you took that
25   video when you were standing in between Bayard and Euclid
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   in that alleyway?

2          A.    Went through the alleyway or the clearing and

3   ended up on Euclid.

4          Q.    Where on Euclid?

5          A.    This map is a little fuzzy, but wherever that

6   clearing is, it should be somewhere around this area

7   (pointing).

8          Q.    Okay.  So, you came out, obviously, right

9   where that alley intersects with Euclid Avenue, right?

10         A.    Yes.

11         Q.    Did you spend any time there?

12         A.    That is when we went to Sarah Molina's

13   property.

14         Q.    And where in relation to that alley

15   intersecting with Euclid Avenue is Sarah Molina's

16   property?

17         A.    Excuse me.  I don't remember.

18         Q.    Is it --

19         A.    It's --

20         Q.    -- north of there?  Is it south of there?  Can

21   you even say that or do you have no recollection at all?

22         A.    It is over in this area (pointing) closer

23   towards Fountain Park.

24         Q.    So, are you able to draw -- Well, can you draw

25   a circle around the area where you believe Sarah Molina's

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1   property is on this map?  It looked to me like you were

2   just indicating to an area just south of where that alley

3   intersects with Euclid Avenue.

4        A.   It would be a big circle because I -- I can't

5   remember the exact location.

6            MR. ROTHERT:  Well, use the marker instead

7        of --

8        A.   Okay.

9            MR. ROTHERT:  -- the pen --

10       A.   Yeah, that would be good.

11           MR. ROTHERT:  -- so that it...

12       A.   Is it okay to draw a big --

13       Q.   Go ahead.

14       A.   -- circle?

15       Q.   I've got more copies.

16           MR. ROTHERT:  Yeah.

17       A.   Okay.  (Witness marking.)

18       Q.   Yeah, do you mind filling that in a little bit

19   more --

20       A.   Yeah.

21       Q.   -- for me?  It looks like it faded out a

22   little bit.  And you're right; that is a pretty big

23   circle.

24       A.   Yeah.

25           MR. ROTHERT:  It is a dry-erase marker, so --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              MR. WHEATON:   Gotcha.
 2              MR. ROTHERT:   -- this is not its intended
 3       purpose.
 4              MR. WHEATON:   Sure.
 5              (Questions by Mr. Wheaton)
 6       Q.   All right.  Did you immediately go to
 7   Sarah Molina's property?
 8       A.   Yes.
 9       Q.   And what time was that?
10       A.   This was a few minutes after that video.
11       Q.   When you say "a few," what's "a few" to you,
12   three?  Five?  Ten?
13       A.   About in between three to five minutes.  We
14   came out of the alley, we walked, and then we started
15   immediately walking to the property.
16       Q.   Was anybody else with you at the time?
17       A.   I don't remember if anybody else was with us
18   while we were walking to her property.
19       Q.   Well, you said "with us."  I assume
20   Miss Molina was with you, right?
21       A.   Yes.
22       Q.   And you don't remember if anybody else other
23   than Miss Molina was with you?
24       A.   No.
25              (At this point, Mr. Smith returned to the
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                      conference room.)
 2          Q.    Was there anybody else in the area as you were
 3   walking south on Euclid towards Miss Molina's property?
 4          A.    I don't recall.
 5          Q.    Now, you would agree that there were between
 6   approximately 100 and 200 people gathered near the
 7   intersection of Page and Walton in the videos that we
 8   were just watching, right?
 9          A.    Yes.
10          Q.    I'm trying to understand where all those
11   people went.
12          A.    Okay.
13          Q.    So, as you were walking south on Euclid, did
14   you see where the majority of that crowd had gone to?
15          A.    I did not see where the majority of that crowd
16   had gone to and I don't remember there being a lot of
17   people on Euclid.
18          Q.    At that time?
19          A.    At that time, yes.
20          Q.    Do you remember there being any people on
21   Euclid other than you and Miss Molina at that time as you
22   were walking to Miss Molina's property?
23          A.    As we were walking, no, I don't remember.
24          Q.    Now, do you remember anything that Miss Molina
25   said to you as you were walking to her property?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   No.

 2          Q.   Nothing at all?

 3          A.   Aside from, "I have property on the street.

 4   Let's go there" --

 5          Q.   That's all you --

 6          A.   -- that's --

 7          Q.   -- can recall.

 8          A.   -- about it.  That's all I can recall.

 9          Q.   So, she invited you to come to her property?

10          A.   Yes.

11          Q.   And I think you said that you knew her at the

12   time, right?

13          A.   Yes.

14          Q.   And did you know her pretty well?

15          A.   Yes.

16          Q.   Had you hung out socially in the past aside

17   from seeing her at protests?

18          A.   Yes.

19          Q.   Did you routinely exchange text messages with

20   her?

21          A.   Not really, no.

22          Q.   Did you ever text her?

23          A.   Yes.

24          Q.   Did you text her on that day?

25          A.   I don't remember.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1           Q.   Did you ever text her about protests?

2           A.   Probably.

3           Q.   Is that probably what you mostly texted about

4    because that's how you knew each other?

5           A.   Not mostly, but most likely.

6           Q.   Do you still have any of those text messages?

7           A.   No, I don't think so.

8           Q.   Did I ask you this already, do you still have

9    the same phone?

10          A.   You asked that, but, no, I don't.

11          Q.   Remember what I said about me having a higher

12   opinion of my memory?  That's a good example.  You don't?

13          A.   No.

14          Q.   When did you get rid of it?

15          A.   I -- I don't remember.  Maybe -- Maybe a year

16   later.

17          Q.   Okay.  Did others gather with you near

18   Miss Molina's property?

19          A.   Yes.

20          Q.   How many?

21          A.   I cannot remember the exact amount.  It was a

22   small amount.  In between -- In between four to eight;

23   somewhere around.  There was definitely no more than ten.

24   It was very small.

25          Q.   Did you know anybody else that was there other

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   than Miss Molina?
 2        A.   I met her neighbor, who was outside of his
 3   property, and names of everybody, I don't remember.
 4        Q.   Was it a situation where you were introduced
 5   to multiple people?
 6        A.   Yes.
 7        Q.   All right.  And you don't remember their names
 8   other than --
 9        A.   No, I don't.
10        Q.   Okay.  Do you remember Miss Molina's
11   neighbor's name that you met?
12        A.   I only know his first name was Sonny.
13        Q.   Do you know where he lived?  When you say
14   "neighbor," is it like next-door neighbor?
15        A.   I believe he was next door.
16        Q.   Do you know if Miss Molina has a security
17   camera on that property?
18        A.   No.
19        Q.   No, she does not?
20        A.   No, I don't know.
21        Q.   Okay.  Do you know whether anybody was
22   recording with their phone or any other recording device
23   during the time when you were all standing in front of
24   Miss Molina's property?
25        A.   No.  I don't know if anybody.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.   You don't know if they were or not?

2          A.   No.

3          Q.   I'm going to back up just a little bit in

4    time.  As you were standing on that "X" that you drew on

5    Vogel A and you were looking back towards Bayard, I

6    understand that you saw teargas deployed through that gap

7    in the trees on Bayard Avenue; is that right?

8          A.   I would say that I saw the teargas while I was

9    on Bayard and ran up the alley.  Did not have time to

10   record anything at that time because I was trying to get

11   away from the gas --

12         Q.   All right.

13         A.   -- but that's when I took it out and recorded

14   that it had happened.

15         Q.   Understood.  And just so I understand fully

16   the reason why you did not record it, it's because you

17   were --

18         A.   Trying to get away.

19         Q.   -- trying to get away?

20         A.   Yes.

21         Q.   Had you been recording in the minutes prior to

22   trying to get away?

23         A.   I don't think so, no.

24         Q.   Now, there's a lot of video of this incident

25   taken by you and by documentation officers from the

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   Police Department --
 2          A.   Okay.
 3          Q.   -- and I see you often holding up your phone
 4   on these videos.  Was it your practice to record often as
 5   you were attending protests?
 6          A.   Yes.
 7          Q.   Did you do that on this day?
 8          A.   Yes.
 9          Q.   And can you give me a percentage in terms of
10   the percentage of time that you would be recording versus
11   not on this day as you were at this protest?
12          A.   No.
13          Q.   Fair enough.  Can you give me any estimate at
14   all in terms of a percentage?
15          A.   No, I don't have any estimate of percentage.
16          Q.   Okay.  I'm going to show you what the next
17   video you produced --
18          A.   Okay.
19          Q.   -- which I'll call .13, okay?
20               (Video playing.)
21          Q.   Sorry.  I meant to stop it right at the end
22   there.
23          A.   Uh-huh.
24          Q.   I could see some red hair at the very end of
25   that video.  Do you know who that is?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Yeah, that's Sarah.

 2          Q.   Okay, Sarah Molina?

 3          A.   Sarah Molina.

 4          Q.   Who's this other individual (pointing) walking

 5     in front of you?

 6          A.   Could you?

 7          Q.   This individual with the black ball cap on.

 8               MR. ROTHERT:  Could we fold it a little bit

 9        forward?

10          Q.   Sure.  Is that better.

11          A.   Okay, yes, that is Sarah Coffey.

12          Q.   Do you know Sarah Coffey?

13          A.   Yes.

14          Q.   How do you know her?

15          A.   She is part of the National Lawyers Guild with

16     me and Sarah Molina.

17          Q.   Did you go to law school with her?

18          A.   I did not.

19          Q.   Did you go to law school with Sarah Molina?

20          A.   I did not.

21          Q.   Have you known Miss Coffey for a long time?

22          A.   No.

23          Q.   All right.  When did you meet her?

24          A.   Sometime during the protests.

25          Q.   Which protests?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              A.   I don't recall when.
 2              Q.   All right.  Now, what time did you take this
 3    Video .13?
 4              A.   I don't know what time that was.  I think that
 5    was somewhere, if I were to estimate, somewhere around
 6    7:45 or so, yes.
 7              Q.   Now, at the time that you're taking this
 8    video --
 9              A.   Uh-huh.
10              Q.   -- had the B.E.A.R. -- Well, first of all,
11    what street are you on?
12              A.   This is Euclid.
13              Q.   And you're looking south towards Fountain
14    Park, right?
15              A.   Yes.
16              Q.   And at the time that you were taking this
17    video, had the B.E.A.R. already driven past you?
18              A.   Yes.
19              Q.   Okay.  What happened there, anything?
20              A.   Yes.  We basically ran behind the house
21    because the B.E.A.R. had come down and was -- there was
22    gas coming from the vehicle, so I ran at that time and
23    this took place shortly after the B.E.A.R. passed us.
24              Q.   Very shortly after?
25              A.   Yes.  I mean, I don't know the definition of
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   "very shortly," but, yes, shortly after.
 2           Q.   So, let's walk through that in a little --
 3           A.   Okay.
 4           Q.   -- more detail.  When did you first see the
 5   B.E.A.R. coming south down Euclid Avenue?
 6           A.   I don't know the time.
 7           Q.   Where are you standing at the time?
 8           A.   We were standing on the sidewalk in front of
 9   the property.
10           Q.   Miss Molina's property?
11           A.   In front of Miss Molina's property, yes.
12           Q.   And what did you see?
13           A.   I saw the B.E.A.R. turning onto Euclid and
14   there were a few -- there were a few people outside of --
15   outside of their houses on the sidewalk and gas was
16   projected towards them and the B.E.A.R. continued coming
17   down towards us, so I ran back behind the house because
18   they were coming straight at us and gas was coming out
19   towards us.
20           Q.   A couple things I want to ask about in that.
21           A.   Okay.
22           Q.   When you said they were standing in front of
23   "their houses," whose houses are you talking about?
24           A.   There were some people standing outside of
25   houses and --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.    Including Miss Molina's house --

2          A.    Yes.

3          Q.    -- obviously?

4          A.    Yes.

5          Q.    And which other houses?

6          A.    Houses down the street.

7          Q.    How many?

8          A.    I can't remember the exact amount.  There were

9     a few, a few people, I believe.

10         Q.    Now, I think you said that there were

11    approximately eight, but no more than ten people standing

12    on the sidewalk in front of Miss Molina's house, right?

13         A.    Right.

14         Q.    Were -- Can you tell me how many people in

15    total there were standing in that area in front of all of

16    the houses that you just referenced?

17         A.    If I were giving a number, I would say not

18    very many.  Excluding -- Excluding our group, I would say

19    maybe between five to ten.  There were not many out

20    there.

21         Q.    So, how many other groups were there aside

22    from your group?

23         A.    I don't recall how many groups there were.

24         Q.    Was there more than one other group?

25         A.    I don't know.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   And, again, if you need to take a break at any
 2   time, I'm totally fine with that.  Just let me know --
 3          A.   Could --
 4          Q.   -- okay?
 5          A.   Could I --
 6          Q.   Sure.
 7          A.   -- take?
 8          Q.   Yeah, let's take a break.
 9          A.   Thank you.
10               (At this point, there was a break taken from
11               3:27 p.m. to 3:35 p.m.)
12               MR. WHEATON:   Sara, do you have the last
13          question available there?
14               (At this point, the reporter read back from
15               the record at Page 83, Lines 21 through 25.)
16                (Questions by Mr. Wheaton)
17          Q.   In terms of the number of people that were in
18   the area when you saw the B.E.A.R. driving south on
19   Euclid, would it be accurate to say that it was
20   approximately 20 people?
21          A.   That number seems a little high.
22          Q.   What would you say?
23          A.   Maybe ten to 15.
24          Q.   As you saw the B.E.A.R. driving south on
25   Euclid, did you hear anybody speaking over a loudspeaker?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              A.    No.
 2              Q.    In the five minutes prior to seeing the
 3     B.E.A.R. drive south on Euclid, had you heard anybody
 4     speaking over a loudspeaker?
 5              A.    No.   There was nothing going on on Euclid.
 6              Q.    In the five minutes prior to the B.E.A.R.
 7     driving south on Euclid, did you hear any deployments of
 8     chemical munitions anywhere?
 9              A.    No.
10              Q.    So, you said you saw the B.E.A.R. driving
11     south on Euclid and that there was gas coming from it?
12     Can you explain what you meant by that?
13              A.    They were throwing or shooting or doing
14     something to make the canisters go towards people.
15              Q.    And that's what I'm --
16              A.    Yes.
17              Q.    -- trying to understand is how was the -- how
18     were the canisters deployed.   Were they thrown?
19              A.    I don't know.   They were coming from the
20     vehicle and going towards people.
21              Q.    Did you start moving towards the back of the
22     house as soon as you saw the B.E.A.R. driving south on
23     Euclid or did you not start moving until you saw gas
24     being deployed?
25              A.    Not until the gas was deployed.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

 1        Q.   How many seconds did it take for the B.E.A.R.

 2   to drive from the intersection of Page and Euclid to your

 3   location in front of Miss Molina's house?

 4        A.   I -- I don't know how many seconds.  It -- It

 5   was quick.  I did not have enough time to do anything but

 6   run.

 7        Q.   Okay.  And you anticipated my next question,

 8   which was, did it occur to you attempt to record the

 9   B.E.A.R. as it was driving south on Euclid?

10        A.   Yes.  I did not have time.

11        Q.   So, it was fairly quick then?

12        A.   Yes.

13        Q.   Explain to me exactly what you saw, if you can

14   remember, in terms of how canisters were deployed from

15   the B.E.A.R.

16        A.   I -- I don't know if I could give or say

17   exactly if they were being thrown or if they were being

18   shot.  I just saw canisters flying from the vehicle in --

19   onto the streets towards people or directly at people,

20   so...

21        Q.   And you say you saw canisters flying onto the

22   streets.  Is that accurate I assume that cannisters were

23   deployed onto the street itself?

24        A.   No, just it -- it was just being thrown out

25   at -- at the street, at people.  It -- It was just coming

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   out.

 2          Q.    How many canisters were deployed?

 3          A.    I did not count.

 4          Q.    Can you estimate?

 5          A.    No.

 6          Q.    Was it more than one?

 7          A.    Yes.

 8          Q.    More than two?

 9          A.    Yes.

10          Q.    More than four?

11          A.    I -- I believe so.

12          Q.    Okay.  Did you take any photographs of any of

13   those canisters?

14          A.    Yes.

15          Q.    Did you produce those in this case?

16          A.    Yes.

17          Q.    I'm going to show you what we'll mark as Vogel

18   B.

19                (At this point, Defendants' Exhibit Vogel B

20                was marked for identification.)

21          Q.    I'll hand you that.

22                MR. WHEATON:  There you go.

23                MR. ROTHERT:  Thanks.

24                    (Questions by Mr. Wheaton)

25          Q.    Do you recognize this photograph?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1        A.    Yes.

2        Q.    What is it?

3        A.    It's one of the canisters that we picked up

4   off the street after the B.E.A.R. passed us.

5        Q.    Do you know who took this photograph?

6        A.    I believe that was me.  It looks like a

7   photograph I took.

8        Q.    Okay.  Do you know who's holding this

9   canister?

10       A.    I don't remember.

11       Q.    Do you know where this yellow glove came from?

12       A.    No.

13       Q.    Do you know whose legs those are in the

14   background of this photograph?

15       A.    No.

16       Q.    But you took this photograph?

17       A.    Yes.

18       Q.    How many photographs did you take -- well,

19   let's start with that day -- that actually saved to your

20   phone?

21       A.    I don't know.  I never counted how many photos

22   I took.  Just whatever you have, however many you have.

23       Q.    Okay.  And is this one of the canisters that

24   was deployed from the B.E.A.R. as it drove south on

25   Euclid?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Yes.
 2          Q.   Did you take pictures of every canister that
 3   was deployed from the B.E.A.R. as it drove south on
 4   Euclid?
 5          A.   No.
 6          Q.   All right.  And this says 518 Riot CS Chemical
 7   Irritating Agent; is that right?
 8          A.   Yes.
 9          Q.   Do you know whether this canister was deployed
10   from one of the portholes in the B.E.A.R. or was it
11   deployed from the top of the B.E.A.R.?
12          A.   I don't know where it came from.
13          Q.   You cannot say one way or the other?
14          A.   No, I do not know where from the vehicle it
15   came from.
16          Q.   All right.  When did you first start moving
17   towards the back of Miss Molina's house?
18          A.   When -- When I started seeing teargas or the
19   canisters coming out of the B.E.A.R.
20          Q.   How far away from you was the B.E.A.R. when
21   you first saw canisters start coming out of it?
22          A.   I don't remember.
23          Q.   Are you able to estimate at all in terms of
24   how many car lengths away from you it was when you first
25   saw canisters being deployed from the B.E.A.R.?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1              A.    No.
2              Q.    Is it accurate to say -- Well, strike that.
3                    You started moving towards the back of
4    Miss Molina's house when you saw the first canister come
5    out of the B.E.A.R., right?
6              A.    Yes.
7              Q.    But you don't know --
8              A.    I'm sorry.
9              Q.    I'm sorry.  You're fine.
10             A.    Can we take a break?  I'm sorry.
11             Q.    You're okay.
12                   (At this point, there was a break taken from
13                   3:43 p.m. to 3:49 p.m.)
14             Q.    So, can you estimate at all how far away the
15   B.E.A.R. was from you at the time when it first deployed
16   chemical munitions on you?
17             A.    No.
18             Q.    Did you start -- I think you said that you
19   started running towards the rear of Miss Molina's house
20   immediately when you saw the first canister come from the
21   B.E.A.R.; is that right?
22             A.    Yes.
23             Q.    Okay.  So, did you turn around to start moving
24   towards the backyard?
25             A.    I turned towards the house and started
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   running.

2         Q.   So, you turned towards the house, and at that

3   point, your back would be to the B.E.A.R., right?

4         A.   I guess so, yes.

5         Q.   And given that your back is to the B.E.A.R.,

6   from that point forward, you could not see where the

7   other canisters were being deployed to; is that right?

8         A.   Yes.

9         Q.   That first canister that was deployed that you

10  did see, where did it go?

11        A.   Towards one of the houses.  I don't know

12  exactly where.

13        Q.   One of the houses, not necessarily

14  Miss Molina's house, right?

15        A.   Yes.

16        Q.   What happened next?

17        A.   What do you mean by "next"?  Do you mean after

18  I ran --

19        Q.   I want --

20        A.   -- towards the house?

21        Q.   Yeah, I want --

22        A.   Okay.

23        Q.   -- to take it step by step.  You start running

24  towards the house.  Where did you run to?

25        A.   I ran back, tried to run behind the house and

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    could -- I could hear the canisters being deployed, the

2    sound that they make, could hear the pop and the whiz and

3    could smell the -- the gas and it affected my lungs, my

4    eyes.

5            Q.   Were you standing in the backyard at the time?

6            A.   I had not -- I had not yet made it to the back

7    of the house when the -- when I started smelling the

8    teargas and hearing it --

9            Q.   How many pops --

10           A.   -- being deployed.

11           Q.   -- did you hear?

12           A.   I don't remember.

13           Q.   Are those loud pops?

14           A.   Yes.

15           Q.   Is it something where you could hear it a few

16   blocks away when they go off?

17           A.   I don't -- I don't know.

18           Q.   Have you ever been a few blocks away from

19   where teargas canisters are going off?

20           A.   I don't think I've been a few blocks away, no.

21           Q.   For example, when you were standing in that

22   alley between Bayard and Euclid --

23           A.   Yes.

24           Q.   -- could you hear any canisters going off on

25   Page from there?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1          A.   I don't -- I don't think so.  There was a lot
2     of noise going on.
3          Q.   At that time?
4          A.   At that time, yes.
5          Q.   From other individuals that were around you?
6          A.   From a lot of things.  There was the
7     helicopters, there was different -- so many different
8     sounds.
9          Q.   Were people yelling?
10         A.   Yes.
11         Q.   How many people?
12         A.   I don't know.
13         Q.   All right, back to when you're in the backyard
14    of Miss Molina's house, what happened where we left off?
15         A.   I had not quite made it to the back of the
16    house we were running towards and that's when the -- the
17    teargas was coming.  Excuse me.  I was more towards the
18    side of the house.  I was running for the back of the
19    house, but I was more towards the side of the house when
20    the smell of the teargas, the sound that it makes when it
21    comes out started hitting and we had a fog, a cloud of
22    smoke coming up at that point and everything happened
23    very quickly, so the B.E.A.R. had passed by that time.
24    Excuse me.
25         Q.   Did you ever make it to the backyard?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1            A.   I did not, no.
 2            Q.   Did you turn around?  I mean, where did you go
 3       next?
 4            A.   Well, once it had passed, yes, turned back
 5       around to see what was going on.  The --
 6            Q.   I'm trying to understand, isn't there teargas
 7       in the air at that point in time?  Did you wait for it to
 8       dissipate or did you immediately turn around and go walk,
 9       following the B.E.A.R.'s path?
10            A.   I was trying to see what was going on because
11       things were being thrown at us and it was affecting
12       trying to get the bearings, so, yes, as the teargas was
13       going up, in order to get an understanding of what was
14       happening because I had not made it to the backyard, yes,
15       I turned around to see where the B.E.A.R. was and the
16       B.E.A.R. was passing.  It had passed the house.
17            Q.   And did you walk through the teargas that had
18       just been deployed to follow in the path of the B.E.A.R.?
19            A.   No.
20            Q.   How did you avoid it?  I'm -- I'm just -- I'm
21       trying to understand.
22            A.   How did I avoid what?
23            Q.   The teargas that had just been deployed.
24            A.   I did not avoid the teargas.
25            Q.   So, you walked -- you turned around and walked
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1   essentially through the teargas that had just been

2   deployed to follow in the B.E.A.R.'s path; is that right?

3          A.   No, I never said that.

4          Q.   Okay.  All right.

5          A.   I turned around to see what was going on.  The

6   B.E.A.R. had passed at that point.  And I did not

7   immediately follow after that.  It was not an immediate

8   follow.  It was getting bearings, seeing what was going

9   on, and once the initial cloud was gone, yes, I walked

10  back out onto the sidewalk and began recording the

11  B.E.A.R. at that point and made it to Fountain Park.

12         Q.   Do you know whether the B.E.A.R. deployed any

13  other teargas canisters between Miss Molina's property

14  and Fountain Park?

15         A.   Between the property and Fountain Park, I am

16  not sure what happened in between that stretch.  I did

17  take photos of what -- what we found between the house

18  and the park.

19         Q.   Did you take those immediately?

20         A.   I believe so.

21         Q.   And I apologize if I asked you this already,

22  but how many minutes was it between when teargas was

23  deployed at the intersection of Page and Bayard and the

24  time that the B.E.A.R. drove past where you were and

25  deployed teargas?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1              A.    I'm sorry, could you repeat the question?
2              Q.    Sure.  How many minutes was it between the
3      time that teargas was deployed near the intersection of
4      Page and Bayard and the time that teargas was deployed
5      south on Euclid?
6              A.    Quite some time had passed.  I would -- I
7      would estimate somewhere around 30 minutes.
8              Q.    I'm going to show you what we're going to mark
9      as Vogel C.
10                   (At this point, an off-the-record discussion
11                    was had.)
12                   (At this point, Defendants' Exhibit Vogel C
13                   was marked for identification.)
14             Q.    Do you recognize that photograph?
15             A.    Yes.
16             Q.    Did you take that?
17             A.    I believe so, yes.
18             Q.    When?
19             A.    Af- -- Sometimes after the B.E.A.R. had passed
20     us.
21             Q.    And that's what I'm trying to understand is if
22     it was an immediate identification of these canisters and
23     then you take out your phone and take the picture right
24     there.
25             A.    Yes.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              Q.    Where in relation to Miss Molina's property
 2     was this photo taken?
 3              A.    I did not mark that.  I am not sure.
 4              Q.    Have you been back to Miss Molina's property
 5     since?
 6              A.    No.
 7              Q.    Did you take any other photographs just after
 8     the B.E.A.R. drove past other than Vogel B and C?
 9              A.    I took whatever you have.
10              MR. WHEATON:  I've got one more here, which
11         we'll mark as Vogel D, if we could, Sara.
12              Here you go, Tony.
13              (At this point, Defendants' Exhibit Vogel D
14              was marked for identification.)
15                 (Questions by Mr. Wheaton)
16              Q.    Do you recognize that photograph?
17              A.    Yes.
18              Q.    Did you take that photograph?
19              A.    I believe so, yes.
20              Q.    Was it at approximately the same time you took
21     the other two?
22              A.    Yes.  Yes.
23              Q.    Is this photograph, Vogel D, of the same
24     object that's depicted in Vogel C?
25              A.    Hmm.  I -- I don't know.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.   All right.   See, it looks like there's a piece
2    of tape or something around it that's a little frayed at
3    the edge there and this one appears to have the same
4    fray.   Does that help you out in determining whether
5    they're the same or not?
6          A.   I -- I can't tell.   I don't --
7          Q.   Fair enough.
8          A.   -- remember.
9          Q.   Fair enough.   Did you pick this object
10   (pointing) up and take a photo of it?
11         A.   I believe somebody else picked that up and I
12   took a picture of it.
13         Q.   Do you know if it was hot?
14         A.   I don't know.
15         Q.   Is this (pointing) sidewalk depicted in Vogel
16   D the same as the sidewalk depicted in Vogel C?
17         A.   It doesn't look like it.
18         Q.   Do you have an independent recollection of
19   taking (pointing) Vogel D, this photograph?
20         A.   I have a vague recollection of taking the
21   photos.
22         Q.   Okay.   Do you have any specific recollection
23   of taking this (pointing) photograph, Vogel D?
24         A.   Yes.
25         Q.   Do you know what side of the street you were

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    standing on when you took it?
 2           A.    I don't remember.
 3           Q.    Do you know how far away from Fountain Park
 4    you were when you took this photo?
 5           A.    No.
 6           Q.    Back to this video that we had been looking
 7    at, Vogel .13 --
 8           A.    Uh-huh.
 9           Q.    -- so if I understand your testimony, at the
10    time that you took the video marked .13 where you're
11    walking south on Page, you had already been exposed to
12    teargas, right?
13           A.    Yes.
14           Q.    How long after being exposed to teargas was it
15    before you started recording Vogel .13?
16           A.    I am not sure.  Maybe within a few minutes.
17           Q.    Certainly less than five minutes?
18           A.    Yes.
19           Q.    Was it less than two minutes?
20           A.    I don't think so.
21           Q.    Do you know if anybody else that you were
22    standing near at the time was recording as the B.E.A.R.
23    passed south on Euclid?
24           A.    I don't think so.
25           Q.    Did you talk to Miss Molina about whether she
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   had taken any photographs or any recordings that day?

 2          A.   No.  Excuse me.  No.

 3          Q.   No?

 4          A.   (Shaking head.)

 5          Q.   Do you know Peter Groce?

 6          A.   Yes.

 7          Q.   How do you know him?

 8          A.   I met him on that day.

 9          Q.   Am I pronouncing that correctly; do you know?

10   Is it Groce?  Is it Groce?

11          A.   I don't.

12          Q.   Okay, I'll go with Groce then, I guess.  You

13   met him that day?

14          A.   Yes.

15          Q.   When?

16          A.   Shortly after that video was taken, when the

17   B.E.A.R. left, we walked towards Fountain Park and met

18   Peter at that point.

19          Q.   So, you walked towards Fountain Park.  Where

20   did you meet Peter at?

21          A.   In Fountain Park.

22          Q.   In the actual park?

23          A.   Yes.

24          Q.   Now, do you know whether the B.E.A.R. had

25   deployed any smoke or chemical munitions in Fountain
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   Park?
 2         A.   Yes, it looked like they had and that's what I
 3   was taking video of, yes.
 4         Q.   Do you know if it was smoke or if it was
 5   teargas?
 6         A.   No.
 7         Q.   And if I understood your testimony, you walked
 8   towards that smoke, right, or teargas, whichever it was?
 9         A.   After the B.E.A.R. had left and the smoke had
10   dissipated, yes.
11         Q.   And that's when you encountered Mr. Groce,
12   right?
13         A.   Yes.
14         Q.   And he was in Fountain Park?
15         A.   Yes.
16         Q.   Did he say anything to you or to anyone that
17   you were with?
18         A.   I believe he was telling us what happened and
19   said that the police had shot a canister at him.
20         Q.   Was he able to identify the canister that he
21   said the police had shot at him?
22         A.   I believe so, yes.
23         Q.   How?
24         A.   I believe he -- I believe he pointed at a
25   canister that was on the ground.  I don't completely
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   recall.
 2        Q.   I want to make sure I understand that.  You
 3   believe he pointed at a canister that was on the ground,
 4   but you're not sure?
 5        A.   I don't remember.  I don't recall.
 6        Q.   Did you take a picture of any canisters in
 7   Fountain Park?
 8        A.   I think so.  I -- Whatever photos you -- We
 9   produced all the photos that I took.
10        Q.   All right.  Now, I believe that I've shown you
11   every photo of canisters that was produced by the
12   Plaintiffs in this case.
13        A.   Yes.
14        Q.   Have we seen one that was taken in Fountain
15   Park up to this point?
16        A.   I don't know which one it was.  I'm not sure.
17        Q.   And, again, you're not sure if you even took
18   one in Fountain Park; is that right?
19        A.   I'm not sure.
20        Q.   Now, what did Peter Groce say to you when you
21   encountered him in the park exactly, if you remember?
22        A.   All I -- All I really remember is him saying
23   that the police shot him, shot -- All I remember him
24   saying is that the police shot a canister at him.  That's
25   it.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1           Q.    Did he say anything about a canister hitting
 2      him?
 3           A.    Yes, I believe so, because he had a bruise.
 4           Q.    How do you know he had a bruise?
 5           A.    He showed it.
 6           Q.    How?
 7           A.    He lifted up his shirt.
 8           Q.    His shirt.  Where was the bruise?
 9           A.    Somewhere on his abdomen.
10           Q.    Somewhere on his abdomen?
11           A.    Yes.
12           Q.    What did it look like?
13           A.    A bruise.
14           Q.    Was it big?  Small?
15           A.    I don't remember.
16           Q.    Can't give me any idea of the size of it?  I
17      mean, was it bigger than an inch in diameter?
18           A.    It was bigger than that.  It was -- It was
19      bigger than an inch.  It was, if I were to estimate,
20      about -- it was maybe medium size.
21           Q.    Do you remember anything else that Mr. Groce
22      said in Fountain Park?
23           A.    I don't recall.
24           Q.    Did you say anything while you were in
25      Fountain Park?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Most likely.
 2          Q.   Do you remember what you said?
 3          A.   I don't.
 4          Q.   Did Molina say anything while you were in
 5     Fountain Park?
 6          A.   Probably did.  I --
 7          Q.   Do you remember what she said?
 8          A.   I do not remember.
 9          Q.   Was anybody else with you?
10          A.   I don't remember.
11          Q.   Miss, what was her name who was walking in
12     front of you in this video?
13          A.   Sarah Coffey.
14          Q.   Was she with you when you entered Fountain
15     Park?
16          A.   I believe so, yes.
17          Q.   Did Miss Coffey say anything at any point in
18     time that you can recall either while you were walking to
19     Fountain Park or while you were in Fountain Park?
20          A.   Not that I can recall, no.
21          Q.   Did you see anybody else in the area as you
22     were walking south on Euclid towards Fountain Park?
23          A.   No.
24          Q.   Nobody?
25          A.   I don't believe I saw anybody else.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Did you see anybody in Fountain Park as you
 2    entered Fountain Park other than Mr. Groce?
 3          A.   No.
 4          Q.   Where was the B.E.A.R. at that point in time?
 5          A.   I don't know where it went.  It was no longer
 6    at Fountain Park.
 7          Q.   Did you hear any canisters or any deployment
 8    coming from Fountain Park?
 9          A.   (No response.)
10          Q.   Did you understand my question?  Did you hear
11    it?  I think I misspoke there.
12               Did you hear any sound of teargas or smoke
13    deploying from Fountain Park itself?  I just did it
14    again.
15          A.   When are you talking?  Are you saying when --
16          Q.   As you were walking towards Fountain Park.
17          A.   You know, I -- I don't remember.
18          Q.   Now, on the video just prior to .13 --
19          A.   Yes.
20          Q.   -- you were narrating what you had just seen
21    with regard to deployments near the intersection of
22    Bayard and Page, right?
23          A.   No.  Could you repeat that question?
24          Q.   Sure.  Do you remember the video I'm talking
25    about where you're looking through the trees and --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1          A.   Yes.
2          Q.   -- you're standing on that "X" --
3          A.   Yes.
4          Q.   -- in between Bayard and Euclid?
5          A.   Yes.
6          Q.   And as you were taking that video, you were
7     narrating, right?
8          A.   Yes.
9          Q.   And do you remember what you were saying?
10         A.   Yes, they had just shot teargas on Bayard.
11         Q.   And you took that video to document that fact,
12    right?
13         A.   Yes.
14         Q.   And this Video .13 you took in the minutes
15    after you testified that teargas was deployed near you
16    south on Euclid; is that right?
17         A.   Yes.
18         Q.   But you did not mention in that video that
19    teargas had just been deployed; is that right?
20         A.   No.
21         Q.   What happened after you ran into Mr. Groce?
22         A.   I believe I went back with Sarah Molina to a
23    nearby house.
24         Q.   Do you know whose house?
25         A.   Yes, I believe it was Steven Hoffman's house.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.    Who is Steven Cofman (sic)?
 2          A.    He is another member of the National Lawyers
 3     Guild.
 4                (At this point, an off-the-record discussion
 5                was had.)
 6          Q.    Had you met Mr. Cofman (sic) before that day?
 7          A.    Yes.
 8          Q.    On how many occasions?
 9          A.    Many times.
10          Q.    Did you know him well?
11          A.    I know him, yes.
12          Q.    Was he one of the people that was standing out
13     on the sidewalks before the B.E.A.R. drove south on
14     Euclid?
15          A.    No.
16          Q.    Was anybody standing in the street itself as
17     the B.E.A.R. drove south on Euclid?
18          A.    I don't believe so.
19          Q.    But you don't know for sure?
20          A.    No.
21                MR. WHEATON:  Sara, can me mark this as Vogel
22        E?  I'll give you a copy, Tony.
23                (At this point, Defendants' Exhibit Vogel E
24                 was marked for identification.)
25                    (Questions by Mr. Wheaton)
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1      Q.   Do you recognize Vogel E as a copy of sworn

2  Interrogatory Answers that you gave in response to the

3  City of St. Louis Interrogatories directed to you?

4      A.   Yes.

5      Q.   I'm going to draw your attention to Page 4 and

6  Interrogatory Number 7 that asks about witness, okay?

7      A.   Okay.

8      Q.   And it says, State the names and addresses of

9  every person known by Plaintiffs (sic), Plaintiff's

10  representatives or Plaintiff's attorneys (sic) to have

11  witnessed any occurrence mentioned in the Complaint, or

12  who were present at the scene within ninety minutes of

13  any occurrence mentioned in the Complaint.  Designate

14  which [...] such people actually claim to have witnessed

15  each occurrence."  And you note Sarah Coffey as Number 1,

16  right?

17      A.   Yes.

18      Q.   And why did you put her on there?

19      A.   I'm sorry?

20      Q.   Why did you list her as a witness?  What did

21  she see?

22      A.   She saw the police.

23      Q.   Was she standing near you --

24      A.   Yes.

25      Q.   -- as the B.E.A.R. drove south on Euclid?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1          A.    Yes.
2          Q.    And you say you're not sure if she witnessed
3   the police shoot chemical munitions at you; is that
4   right?
5          A.    Yes.
6          Q.    Does the same go for Sarah Molina?
7          A.    It says, "Witnessed police" --
8          Q.    Okay.
9          A.    -- "shoot chemical munitions at me," yes.
10         Q.    And then Sonny Unknown is the neighbor?
11         A.    Yes.
12         Q.    Was he standing near you when this happened?
13         A.    Yes.
14         Q.    Who's Derecka Purnell?
15         A.    She was a law student at the time.  I am not
16  sure where she was.
17         Q.    Do you know if she was with the same group
18  that was standing in front of Sarah Molina's property?
19         A.    I don't.  I don't recall.
20         Q.    I'm just trying to understand --
21         A.    Uh-huh.
22         Q.    -- why she's listed here.
23         A.    Because she -- I remember seeing her at some
24  point at the night, but I don't remember if she was there
25  with us or not.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1              Q.   Okay, that's what I'm --
2              A.   Uh-huh.
3              Q.   -- that's all I'm trying to understand.
4              A.   Yes.
5              Q.   What about Steven Hoffman, was he standing
6     with you-all in front of Miss Molina's residence?
7              A.   I don't believe so, no.
8              Q.   So, is he another one where you just remember
9     seeing him at some point that day?
10             MR. ROTHERT:  I think --
11             Q.   And I think you referenced him before.
12             MR. ROTHERT:  When you -- When you were turned
13        away, I think we all got on the same page.  She was
14        saying Hoffman, not Cofman --
15             Q.   Hoffman.
16             MR. ROTHERT:  -- just a minute ago.
17             A.   Yes, that was --
18             Q.   Gotcha.
19             A.   -- the person --
20             MR. ROTHERT:  That's -- That's --
21             A.   -- whose house --
22             MR. ROTHERT:  -- who she --
23             A.   -- we went --
24             MR. ROTHERT:  -- was --
25             A.   -- to.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              MR. ROTHERT:  -- testifying about.
 2         Q.   Ah.
 3         A.   Yes, that was the person who -- whose house we
 4    went to.
 5         Q.   After you met up with Mr. Groce?
 6         A.   Yes.
 7         Q.   And where is his house located at?
 8         A.   On the other side of Fountain Park.
 9         Q.   The south side?
10         A.   Yes.
11         Q.   Well, here.  I'm showing you again --
12              MR. ROTHERT:  Let's use the actual --
13         Q.   Yeah, let's use the actual one.
14         A.   Yeah.
15              MR. ROTHERT:  -- actual.  Maybe we should say
16      let's use Vogel Exhibit A.
17              MR. WHEATON:  There you go.
18         A.   It was on the other side of -- It was on the
19    other side of Fountain Park and I believe it was near the
20    intersection of Fountain Avenue and Euclid.
21                (Questions by Mr. Wheaton)
22         Q.   Do you know where Mr. Groce lives?
23         A.   It's my understanding that he lives in that
24    area, also.
25         Q.   How much -- And did you walk straight to
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    Mr. Hoffman's house after you encountered Mr. Groce in
 2    Fountain Park?
 3          A.   I believe so.
 4          Q.   Why did you go there?
 5          A.   Because the police were going around in
 6    B.E.A.R. -- in a B.E.A.R., shooting teargas at people and
 7    I was trying to get into a safe area.
 8          Q.   Did you go inside?
 9          A.   Yes.
10          Q.   How long did you spend at Mr. Hoffman's house?
11          A.   I want to say a few hours.
12          Q.   What did you do?
13          A.   We talked.  We basically checked social media
14    to see what was going on outside.
15          Q.   Did you find anything?
16          A.   Yes.
17          Q.   What did you find?
18          A.   Well, found accounts of people saying what was
19    happening in the area.
20          Q.   What types of social media were you checking?
21          A.   Twitter, Facebook.
22          Q.   You -- Sorry.  Anything else?
23          A.   That's it.
24          Q.   Did you watch any videos while you were at
25    Mr. Hoffman's house?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          A.   I don't think I did.  I don't remember.

2          Q.   After you were exposed to teargas near

3    Miss Molina's property on Euclid, how long did it take

4    before the effects of that completely dissipated?

5          A.   I want to say until the next day, most likely.

6          Q.   Now, when you were exposed to teargas south on

7    Euclid, you had already been exposed to teargas minutes

8    earlier, right?

9          A.   Yes.

10         Q.   Had the effects of that exposure dissipated

11   yet by the time that you were exposed the second time?

12         A.   Not quite.

13         Q.   And can you kind of elaborate on that for me?

14   I mean, were your eyes still watering, were your nostrils

15   still stinging from the first exposure?

16         A.   Yes, nostrils still sing -- stinging, lungs

17   still stinging.  Of course it clings to your clothes, so

18   you continue smelling it, which makes it an ongoing

19   irritant.

20         Q.   Okay.  So, fair to say then that the effects

21   of both of those exposures, you were feeling those --

22         A.   Yes.

23         Q.   -- still after the second exposure?

24         A.   Yes.

25         Q.   And it would be difficult, if not impossible,

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   for you to tell, you know, what side effects were the
 2   result of the first exposure versus the second?
 3           A.   Probably.
 4           Q.   Now, you don't mention, as far as I recall,
 5   the first exposure to teargas in your Complaint; is that
 6   right?
 7           A.   No, I -- I believe it's -- I believe it's in
 8   there.
 9           Q.   But in any case, you allege that your
10   constitutional rights were violated by the second
11   exposure to teargas, right?
12           A.   Yes.
13           Q.   But not the first?
14           A.   I don't think so.
15           Q.   So --
16           A.   It -- Do you have a --
17           Q.   And I'm just trying to under- --
18           A.   -- copy --
19           Q.   -- stand what --
20           A.   -- of the Complaint --
21           Q.   -- you're --
22           A.   -- so I can see it again?
23           Q.   I do have a copy --
24           A.   Okay.
25           Q.   -- yeah.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    I'm just trying to --
 2          Q.    It's lengthy.
 3          A.    I know.  I just looked at it, but I -- I can't
 4    answer for sure, you know.
 5          Q.    Yeah.  Let's see.
 6                MR. ROTHERT:  The Plaintiffs will be willing
 7          to stipulate that this lawsuit is about the second
 8          exposure.
 9                MR. WHEATON:  Okay.  Not the first?
10                MR. ROTHERT:  Not what's being described as
11          the first.
12                MR. WHEATON:  Okay, fair enough.
13                      (Questions by Mr. Wheaton)
14          Q.    Is it --
15          A.    Okay.
16          Q.    -- we're all in agreement with that?
17          A.    Yes.
18          Q.    Okay.  Do you have any reason to believe that
19    any of the officers that were in the B.E.A.R. that day
20    knew who you were?
21          A.    Yes.
22          Q.    What's that based on?
23          A.    There -- There was a helicopter that had been
24    circling over where we were talking for -- for a while.
25    We also were not far away from the initial -- We were not
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   too far away from Page and Walton where they first
 2   started dispersing everybody.
 3            Q.   Anything else?
 4            A.   I believe it's just the simple fact that we
 5   were outside and a protest had just been dispersed using
 6   chemical munitions.  We were nearby, we were outside, and
 7   there was a B.E.A.R. actively looking for people outside,
 8   there was also the helicopter, so that is the reason that
 9   I would believe that.
10            Q.   What does the helicopter, how does that tie
11   into it?
12            A.   Helicopters are --
13            Q.   Are you assuming --
14            A.   Yeah, there would be an assumption that the
15   helicopter could see us and was --
16            Q.   And was relaying --
17            A.   -- communicating, yes.
18            Q.   And was relaying information?
19            A.   Yes.
20            Q.   Are you assuming that the helicopter relayed
21   that there was a group of people south on Page at the
22   time that you were standing in a group of people south on
23   Page; is that what you're assuming?
24            A.   Do you mean on Euclid?
25            Q.   Sorry.  Yes, I do.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Okay.  Yes.
 2          Q.   All right.  And, again, you would agree that
 3     there were many people near the intersection of Walton
 4     and Page that day, right?
 5          A.   Yes.
 6          Q.   Okay.  Do you know who Daniel Book is?
 7          A.   I believe he's one of the officers.
 8          Q.   Okay.  What about Joe Busso, do you know who
 9     he is?
10          A.   He's one of the named officers.
11          Q.   All right.  Lance Coats, Stephen Dodge,
12     Joseph Mader, Michael Mayo, Mark Seper, and
13     William Wethington --
14          A.   Yes.
15          Q.   -- all --
16          A.   All police officers.
17          Q.   Had you ever met any of them before -- Have
18     you ever met any of them?
19          A.   Honestly, I don't know if they've seen me
20     before.
21          Q.   You don't know if you've ever met them or seen
22     them before, right?
23          A.   Yes.
24          Q.   Yes, that's correct?
25          A.   Yes, correct.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Do you have any familiarity with what the
 2    inside of the B.E.A.R. is like?
 3          A.   No.
 4          Q.   Okay.  Now, you've also included a failure to
 5    intervene claim against all of these individual
 6    Defendants, right?
 7          A.   I believe so.
 8          Q.   Do you know what the basis of that claim is?
 9          A.   What does it say?
10          Q.   I'm just asking you if you know as you sit
11    here today what the basis --
12          A.   Uh-huh.
13          Q.   -- of that failure to intervene claim is.
14          A.   Oh, failure to say maybe we shouldn't do this.
15          Q.   And when you say "this," what do you mean?
16          A.   Maybe we shouldn't drive a B.E.A.R. up and
17    down residential areas where there is no protest and
18    shoot teargas canisters at people.
19          Q.   Okay.  Now, you've asserted that against every
20    individual Defendant officer, right?
21          A.   Yes.
22          Q.   Regardless of where they were in the B.E.A.R.,
23    on top, inside, doesn't matter, they all should have said
24    maybe we shouldn't drive south on Euclid and deploy
25    teargas?
```

 1          A.    Yes.

 2          Q.    Now, in terms of your damages in this case,

 3    your injuries --

 4          A.    Uh-huh.

 5          Q.    -- I think you said that your exposure to

 6    teargas completely resolved after approximately 24 hours;

 7    is that right?

 8          A.    The irritant -- -tation?

 9          Q.    Yeah.  Had it mostly resolved within a few

10    hours of your exposure to teargas?

11          A.    No, I was still coughing up teargas the next

12    day.

13          Q.    Okay.  And can you explain that to me?  What

14    is that -- You know, what is that like?  Does it continue

15    to irritate you?

16          A.    Yes, it's like a -- I want to say a stinging

17    irritant at the back of the throat and you can feel the

18    gas still just kind of sitting in the back of the throat.

19    It causes a reaction to try to expel the rest of the gas

20    out, so I was coughing that up for a while, yes.

21          Q.    Now, after this day, were you ever again

22    exposed to teargas?

23          A.    After this day, no.

24          Q.    Did you ever attend any other protests after

25    this protest on August 19, 2015?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   I don't believe I did, no.
 2          Q.   You don't believe you did or no, you did not?
 3          A.   I did not -- I did not attend any protests for
 4   I want to say up to a year after.
 5          Q.   Now, you had been exposed to teargas many
 6   times before this, right?
 7          A.   I believe about two or three other times.
 8          Q.   Now, you -- the fact that you didn't attend
 9   protests for some time after August 19, 2015 --
10          A.   Uh-huh.
11          Q.   -- why was that?
12          A.   It was because of the behavior of the police
13   officers on that night.  It was beyond just dispersing.
14   We had already dispersed and it felt as though we were
15   being hunted down.  There was, basically, no protection
16   put in place to keep people safe from that type of
17   behavior.  And by "that type of behavior," I mean from
18   driving a tactical vehicle up and down residential areas
19   and shooting teargas out of the vehicle at people who are
20   simply on a residential street.  After seeing that, it
21   did not feel safe to go to any protest after that as
22   though there were no limits to what officers were allowed
23   to do.
24          Q.   The individuals that were standing in the
25   group with you in front of Miss Molina's property, had
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1  all of them been at the intersection of Page and Walton

2  when teargas was first deployed?

3       A.   I don't know because I don't remember who was

4  there.

5       Q.   Can you recall whether any of the individuals

6  that were standing in front of Miss Molina's residence

7  with you had been at the intersection of Page and Walton?

8       A.   I -- I couldn't -- I couldn't tell you.

9       Q.   Now, you-all stood talking to each other for

10  several minutes at least, right?

11       A.   Yes.

12       Q.   What did you talk about?

13       A.   I don't remember.

14       Q.   Did it have anything to do with what had

15  happened minutes before near the intersection of Page and

16  Walton?

17       A.   That's possible.

18       Q.   Yeah.  You just don't remember at all what

19  anybody said?

20       A.   No, it was a few years ago, so...

21       Q.   All right.  And what I'm getting at is --

22       A.   Uh-huh.

23       Q.   -- do you have any reason to believe that any

24  of those other individuals that you were standing with

25  had been near the intersection of Page and Walton when

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   teargas was first deployed?
 2        A.   No, I -- I don't know.
 3        Q.   Did you seek any medical attention as a result
 4   of your exposure to teargas on August 19, 2015?
 5        A.   No.
 6        Q.   I'm sorry?
 7        A.   No.
 8        Q.   What amount are you seeking in damages in this
 9   case?
10        A.   I have not set an amount.  I -- I don't know.
11        Q.   Have you determined what, you know, any amount
12   in damages that you may seek would be based on?  Is it --
13   And when I say that, I mean, is it based on your exposure
14   to the teargas and --
15        A.   (Nodding.)
16        Q.   -- is that it or is there anything else?
17        A.   The exposure to the teargas, the -- the
18   unconstitutional -- unconstitutional behavior with the
19   First -- the retaliation the First Amendment.
20        Q.   Anything else?
21        A.   I don't know.
22        Q.   Just to be clear --
23        A.   Uh-huh.
24        Q.   -- you don't know which of the individual
25   Defendant officers, if any, deployed the teargas
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1    canisters that were deployed south on Euclid as the

2    B.E.A.R. drove past Miss Molina's residence; is that

3    right?

4         A.   No, I don't.

5         Q.   But you assume that it was one or more of the

6    named individual Defendants?

7         A.   Yes.

8         Q.   And what's that based on?

9         A.   Based on what's in the Complaint.

10        Q.   Anything else?

11        A.   No.

12             MR. WHEATON:  Can we take a two minute break?

13             (At this point, there was a break taken from

14             4:42 to 4:46 p.m.)

15               (Questions by Mr. Wheaton)

16        Q.   When you ran into Peter Groce in Fountain Park

17   and you went back to Mr. Hoffman's house, did Peter Groce

18   go with you?

19        A.   No, I don't think he did.

20        Q.   Where did he go?

21        A.   I don't know.

22        Q.   When was the last time you saw him?

23        A.   That night.

24        Q.   Was he on a bike at the time?

25        A.   He had a bike with him.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   What kind of bike?

 2          A.   I don't know.

 3          Q.   What color was it?

 4          A.   I don't know.

 5          Q.   What was Peter Groce wearing?

 6          A.   I don't know.

 7          Q.   Okay.  Does Sarah Molina have red hair?

 8          A.   Yes.

 9          Q.   Was that her hair at the end of that video

10     that we watched earlier?

11          A.   Yes.

12          Q.   What was she wearing that day?

13          A.   I don't know.

14          Q.   Okay.  Did Sarah Molina go with you to

15     Mr. Hoffman's house?

16          A.   Yes.

17          Q.   Did you-all talk that evening about what had

18     transpired earlier?

19          A.   Yes.

20          Q.   What did you say?

21          A.   We were just basically talking about what had

22     happened on Euclid, what had happened on Page and Walton.

23          Q.   What specifically did you talk about?

24          A.   The teargassing.

25          Q.   Do you remember anything that you said to
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    Miss Molina?
 2           A.    No, nothing sticks out.
 3           Q.    All right.  I understand nothing sticks out,
 4    but, I mean, do you remember anything --
 5           A.    No.
 6           Q.    -- that you said --
 7           A.    No --
 8           Q.    -- to her?
 9           A.    -- nothing.
10           Q.    All right.
11           A.    I don't remember anything.
12           Q.    Do you remember anything she said to you?
13           A.    No.
14           Q.    Did you post anything on social media about
15    this day, August 19, 2015?
16           A.    I did not.  I shared another person's post and
17    I believe that is it.
18           Q.    Whose post?
19           A.    Derecka Purnell.
20           Q.    And what was the post?
21           A.    It was in regards to -- It was in regards to
22    the events that had happened that night.
23           Q.    Which events?
24           A.    The shooting of Mansur Ball-Bey, the
25    teargassing.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   Did you produce a screenshot of that post in
 2     this case?
 3          A.   Yes.
 4          Q.   Did you post anything else on social media
 5     about August 19, 2015?
 6          A.   Not that I recall.
 7          Q.   Do you post com- -- you know, routinely on
 8     social media?
 9          A.   Yes.
10          Q.   Which ones?
11          A.   Facebook.  I had a Twitter at the time and I
12     deactivated it a few years ago and don't have it anymore.
13          Q.   What was your Twitter handle?
14               MR. ROTHERT:  Don't.  We'll answer that, we'll
15          give you that off the record.
16               MR. WHEATON:  Okay.  We can go off the record
17          real quick.
18               (At this point, an off-the-record discussion
19                was had.)
20                  (Questions by Mr. Wheaton)
21          Q.   Did you post anything on Twitter about the
22     events on August 19, 2015?
23          A.   No.
24          Q.   Did you ever post anything on either Facebook
25     or Twitter about protests in the St. Louis area in
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   general?
 2        A.   Yes, probably.
 3        Q.   Do you remember what?
 4        A.   No.
 5        Q.   Are you friends with Sarah Molina on Facebook?
 6        A.   Yes.
 7        Q.   Have you ever posted anything on her wall or
 8   messaged her relating in any way to protests?
 9        A.   I don't think I have.
10        Q.   Is it possible that you have, you just don't
11   remember?
12        A.   I -- I don't know.  I don't think I have on --
13   I'm pretty sure I haven't.
14        Q.   How long did you spend with Sarah Molina that
15   evening after the B.E.A.R. passed you on Euclid?
16        A.   A few hours.
17        Q.   At any point, did you go back outside?
18        A.   At some point, I went outside to go to my car
19   and go home, yes.
20        Q.   Where was your car at?
21        A.   It was -- I believe it was on Walton.  It was
22   on Walton past Page.
23        Q.   Can you indicate --
24        A.   Yeah.
25        Q.   -- on this map approximately where it was
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    parked?
 2          A.    It was (pointing) over here in this area
 3    somewhere.
 4          Q.    So, you think north on Walton off Page?
 5          A.    Yes.
 6          Q.    Are you aware that you've brought a claim for
 7    municipal liability in this case against the City of
 8    St. Louis?
 9          A.    Yes.
10          Q.    Do you have an understanding of what the basis
11    of that claim is?
12          A.    Yes.
13          Q.    What is that?
14          A.    Could you -- I'm sorry, could you repeat the
15    question?
16          Q.    Sure.  Do you have an understanding of what
17    the basis of your municipal liability claim against the
18    City of St. Louis is?
19          A.    Yes.
20          Q.    And what is that?
21          A.    The City is where it took place.  These are
22    the City's officers.
23          Q.    So, it's your contention that because these
24    are the City's officers, the City is liable for their
25    conduct; is that right?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1              MR. ROTHERT:  No.  I object that you're asking
 2        for a legal conclusion and, so...
 3        Q.   Is that right, Miss Vogel?
 4              THE WITNESS:  Do I answer after an objection
 5        or?
 6              MR. ROTHERT:  Yeah, you can -- Yes, you are
 7        allowed to answer the question that's been asked.
 8        A.   Okay.  Yes.
 9        Q.   Is there anything other than that that your
10   claim for municipal liability against the City of
11   St. Louis is based upon?
12              MR. ROTHERT:  I object that you're asking for
13        her for a legal conclusion.  She happens to be a
14        lawyer, but.  But you can answer.
15        A.   Yeah, I don't really -- I don't really -- I --
16   Back -- Piggybacking off of what that was saying, the
17   objection, I don't feel comfortable giving a legal
18   conclusion because in this case I am a Plaintiff, so...
19        Q.   Okay.  And I'm just trying to understand
20   what --
21        A.   That's fine.
22        Q.   -- facts your claim against the City is based
23   upon --
24        A.   Okay.
25        Q.   -- okay?  That's all.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   Okay.
 2          Q.   So, aside from the fact that these officers
 3     were employees of the City of St. Louis --
 4          A.   Uh-huh.
 5          Q.   -- is there any other fact upon which your
 6     claim against the City of St. Louis is based?
 7               MR. ROTHERT:  I'm going to object that you're
 8          asking her for things beyond her personal knowledge.
 9               MR. WHEATON:  That's a foundation objection I
10          take it?
11               MR. ROTHERT:  That is a foundation objection,
12          yes.
13               MR. WHEATON:  Okay.
14          A.   Yeah, I couldn't answer that.
15               (Questions by Mr. Wheaton)
16          Q.   You don't know?
17          A.   I am a Plaintiff and not an attorney in this
18     case, so I am not going to give an answer for that.
19          Q.   Now, I understand that you believe that the
20     deployment of teargas near you south on Euclid was
21     unjustified; is that --
22          A.   Yes.
23          Q.   -- right?
24          A.   Yes.
25          Q.   Have you ever witnessed any other teargas
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   deployments by City of St. Louis officers that you

 2   likewise believed or believe was unjustified?

 3         A.   City of St. Louis police officers, no.

 4         Q.   When you encountered Mr. Groce in the park,

 5   other than the bruise that you saw on his abdomen, did

 6   you observe anything else about him that was abnormal at

 7   that time?

 8         A.   No, I don't think so.

 9         Q.   And did you see any kind of, you know,

10   substance on him or anything about his person that you

11   thought was abnormal?

12         A.   No.

13         Q.   Okay.  I understand that you have a family

14   member that was a St. Louis police officer; is that

15   right?

16         A.   Yes.

17         Q.   Was that your father?

18         A.   Yes.

19         Q.   How long did he serve?

20         A.   It was for a few years.  Somewhere between

21   five and ten.

22         Q.   Do you remember when, approximately?

23         A.   It was before I was born.

24         Q.   Do you know whether he received any training

25   as a police officer in order to be one?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    Yes.
 2          Q.    Okay.  Do you know whether as a general
 3    proposition the City of St. Louis trains its police
 4    officers and they go to a police academy?
 5          A.    I would assume so.
 6          Q.    Do you know one way or the other whether they
 7    get supplemental training after they graduate from the
 8    academy?
 9          A.    I don't know what they get after that.
10          Q.    Do you know one way or the other whether
11    St. Louis police officers receive training in the use of
12    chemical munitions or in responding to protests?
13          A.    No, I have no knowledge of what type of
14    training they get.
15          Q.    And that's as a general proposition you have
16    no knowledge of what type of training police officers
17    get; is that right?
18          A.    Yes.
19          Q.    I'm going to show you a video that's been
20    previously produced in this case both by the Plaintiffs
21    and by the Defendants.
22                MR. ROTHERT:  Can we go off the record --
23                MR. WHEATON:  Sure.
24                MR. ROTHERT:  -- for one moment?
25                (At this point, an off-the-record discussion
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
1              was had.)
2                   (Questions by Mr. Wheaton)
3         Q.   All right, I'm going to show you a video file
4    and it's the same one that we've looked at in another
5    deposition.  I'll call it Video 008.
6                   MR. WHEATON:  Just for you, Mr. Rothert, it's
7         Video 8 of 12 taken by Detective Eaton.
8                   MR. ROTHERT:  Okay.
9                   MR. WHEATON:  The same one.
10                  (Questions by Mr. Wheaton)
11        Q.   I'm going to go to 8:50 on this video, okay?
12   And I'm going to play from 8:50 and, again, this is Video
13   008.  And if you want me to move the screen up or down
14   for you to see better, let me know --
15        A.   Okay.
16        Q.   -- okay?
17        A.   Okay.
18                  (Video playing.)
19        Q.   I'm going to stop it right here at 8:56.  Can
20   you identify yourself in this video?
21        A.   Yes.
22        Q.   Is that you (pointing)?
23        A.   Yes.
24        Q.   You are wearing that looks like a beige dress
25   and a lime green hat?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1            A.   Yes.

 2            Q.   All right.  And you are standing on the north

 3    side of Page Boulevard on the sidewalk; is that right?

 4            A.   Yes.

 5            Q.   And I'm going to continue playing from here --

 6    Well, let me ask you first, do you have any concept of

 7    what time this is?

 8            A.   No.

 9            Q.   Okay.  And do you see (pointing) at this point

10    that there's a crowd of people in the street?

11            A.   Yes.

12            Q.   Do you see that a number of individuals

13    (pointing) have shirts or rags wrapped around their

14    faces?

15            A.   Yes.

16            Q.   Is that something that you often saw at

17    protests that you went to?

18            A.   I saw it occasionally.

19            Q.   Okay.  Did you see it on August 19, 2015?

20            A.   Yes.

21            Q.   Do you know why people do that?

22            A.   No.

23            Q.   I'm going to continue playing from here.

24                 (Video playing.)

25            Q.   I'm going to stop it at 9:01.  Geez.  Sorry.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    Who's (pointing) this individual?

2          A.    That is Scott Kampas.

3          Q.    And, again, who is that?

4          A.    He is part of the National Lawyers Guild.

5          Q.    Is this the same individual you referenced

6    earlier that you've known for a while or is this a

7    different guy?

8          A.    I don't believe I've referenced Scott --

9          Q.    Okay.

10         A.    -- yet.

11         Q.    Sorry.  I'm having trouble keeping track of

12    the names.

13         A.    Okay.

14         Q.    So, this is the first time that you referenced

15    Scott?

16         A.    Yes.

17         Q.    Did you spend a lot of time with Scott on

18    August 19, 2015?

19         A.    I don't know if -- I don't really recall the

20    amount of time I spent with anybody, but, yes, we were

21    next to each other.

22         Q.    All right.  Were you next to each other for a

23    while?

24         A.    What do you mean by "a while"?

25         Q.    Had you spent any time with him earlier in the

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   day?
 2          A.   I had seen him earlier in the day, yes.
 3          Q.   All right.  I'm going to continue playing from
 4   here.
 5               (Video playing.)
 6          Q.   Are you able to identify yourself at 9:46
 7   anywhere in this frame?
 8          A.   Yes.
 9          Q.   Where are you?  Is this you (pointing)?
10          A.   Yes.
11          Q.   Now, is this the point in time that you are
12   simultaneously taking video with your phone?
13          A.   I think so.
14          Q.   Okay.  So, can we then conclude that this is
15   sometime just after seven o'clock that evening?
16          A.   Yes.
17          Q.   All right.  Now, fast-forwarding a few
18   minutes, you already testified that you and the rest of
19   the crowd got pushed back to Bayard and Page, right?
20          A.   Yes.
21          Q.   At some point, you had to have crossed over
22   Page to get to that alley?
23          A.   Yes.
24          Q.   Do you know when you did that?
25          A.   No, I don't know.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.   Okay.  Are there any other individuals other
2     than those that we've already talked about today that you
3     believe witnessed the deployment of munitions south on
4     Euclid near Miss Molina's property?
5          A.   No.
6          Q.   Do you have contact information for any of the
7     individuals identified in response to Interrogatory
8     Number 7?  Obviously, I don't need Miss Molina's, but --
9          A.   Uh-huh.
10         Q.   -- for the other witnesses listed there, do
11    you have any contact information for them?
12         A.   I would have contact information for
13    Scott Kampas.
14         Q.   And what would that be?
15         A.   Phone number.
16         Q.   Okay.  Do you have it on you?
17         A.   No.
18              MR. WHEATON:  Okay.  Would you be able to
19         provide it or otherwise produce Mr. Kampas for a
20         deposition?
21              MR. ROTHERT:  I don't know.  You can make a
22         request and we'll -- and we'll entertain it when it
23         comes.
24              (Questions by Mr. Wheaton)
25         Q.   Do you know his address?

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1        A.    No.
 2        Q.    Okay.  Can you give me his phone number?
 3        A.    I guess.
 4              MR. ROTHERT:  Do you --
 5        Q.    Okay.  And I don't mind doing it off the
 6   record.  Doesn't bother me.
 7              MR. ROTHERT:  If you know his phone number.
 8        A.    I don't know his phone number.
 9        Q.    Do you have it here --
10        A.    I don't -- I don't have my phone with me.
11        Q.    You don't have it with you?
12        A.    No.
13        Q.    Okay.  Would you --
14              MR. WHEATON:  Tony, would you be agreeable to
15        just having her send you the phone number and
16        letting me know what it is?
17              MR. ROTHERT:  You know, I don't know.  We'll
18        consider that, yeah, I mean.
19              MR. WHEATON:  Okay.  Well, I mean --
20              MR. ROTHERT:  There's been no discovery
21        request for it, but...
22              MR. WHEATON:  Sure.  Well, I mean, he's a --
23        he's a witness, you know.  I don't know that your --
24        We'll take a look at the Rule 26 disclosures here.
25                   (Questions by Mr. Wheaton)
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

 1          Q.   All right.  While I'm looking for those, do
 2    you have contact information for anybody else that you
 3    listed in response to Interrogatory Number 7?
 4          A.   Aaron Banks and Keith Rose.
 5          Q.   I'm sorry, I'm having a little trouble hearing
 6    you.
 7          A.   Aaron Banks and Keith Rose.
 8          Q.   Okay.  Do you know their addresses or phone
 9    numbers?
10          A.   I may have their -- I have their phone
11    numbers.
12          Q.   Okay.
13          A.   I don't have addresses.
14          Q.   Do you have them in your phone?
15          A.   Yes.
16          Q.   Okay.  Now, I'm going to try to do this the
17    easiest way possible, but I'm going to show you a copy of
18    the initial disclosures in this case.  It was 98
19    different people who may have, you know, knowledge
20    regarding this case.  I'm going to ask you to look
21    through the list and see if you recognize any of these
22    names.
23          A.   Okay.
24          Q.   Okay?
25               MR. WHEATON:  I'm sorry, Tony, but this is the

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          only copy I brought.  That's my mistake.  It
 2          start- --
 3                  MR. ROTHERT:  You going to mark it as an
 4          exhibit or --
 5                  MR. WHEATON:  Sure.  Yeah, can I mark this?
 6                  MR. ROTHERT:  That'd probably be a good idea.
 7                  MR. WHEATON:  That's an excellent idea, Tony.
 8          What are we on?
 9                  (At this point, an off-the-record discussion
10                   was had.)
11                  (At this point, Defendants' Exhibit Vogel F
12                   was marked for identification.)
13                  THE WITNESS:  And this is relation to this
14          case?
15                  MR. WHEATON:  Correct.
16                  MR. ROTHERT:  Yes.
17                      (Questions by Mr. Wheaton)
18          Q.   Now, if you would just scan through this list,
19     look at the names, and if you recognize any of them, tell
20     me.
21          A.   Are we -- I'm -- I'm sorry.  I'm confused by
22     the instructions.  Am I looking for names that I
23     recognize or am I looking for names of people who may
24     have witnessed this case specifically?
25                  Q.   My goal here is to understand what any of
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   these witnesses may know about this case --
 2          A.    Okay.
 3          Q.    -- okay?
 4          A.    Okay.
 5          Q.    So, start with Number 1 and look through them,
 6   and if you recognize any of these names, please tell me.
 7          A.    No, I don't know if any of these people have
 8   any further information for this specific.
 9          Q.    Did you have a chance to read through all 98
10   of these names?
11          A.    Yes.  I can look again.
12          Q.    Sure.  I just want to be sure we're not
13   missing anybody.
14          A.    No, I...
15          Q.    You don't recognize any of those names?
16          A.    I recognize some of the names, but as far as
17   with the -- whether or not they have information for this
18   specific incident, no --
19          Q.    Okay.
20          A.    -- I...
21          Q.    Which names do you recognize?
22          A.    Which names do I just recognize in general?
23          Q.    Yeah.
24          A.    Mustafa Abdulllah.
25          Q.    Who's that?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.    He works with the ACLU here.
 2          Q.    Do you know whether he was there on August 19,
 3     2015?
 4          A.    No.
 5          Q.    Okay.
 6          A.    So, as I said, I don't know -- I don't
 7     recognize any of these names as having been there.  I
 8     can't say one way or the -- another aside from, I'm
 9     sorry, Heather De Mian, 25, that would probably be the
10     one that sticks out and that's about it.  I recognize
11     names as far as some people I know.  I do not recognize
12     anybody else --
13          Q.    Okay.
14          A.    -- who could have been there.
15          Q.    Do you know Miss De Mian?
16          A.    I've spoken with her a few times.
17          Q.    At protests?
18          A.    Yes.
19          Q.    And she often livestreams the protests, right?
20          A.    Yes.
21          Q.    Do you know whether she livestreamed this
22     protest?
23          A.    I think she did.
24          Q.    All right.  Have you ever watched any of those
25     recordings by Miss De Mian?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          A.   No.
 2          Q.   Did we cover everybody?
 3          A.   Yes.
 4          Q.   Okay.  Speaking of --
 5          A.   I believe so.
 6          Q.   -- being associated with the ACLU, prior to,
 7   you know, retaining the ACLU as counsel in this case, did
 8   you have any association with the organization?
 9          A.   I'm sorry, could you repeat the question?
10          Q.   That's fine.  It's been a long day.  Prior to
11   your being represented by the ACLU in this case --
12          A.   Uh-huh.
13          Q.   -- did you have any association with the
14   organization?
15          A.   Association with them, no.
16          Q.   Okay.  Now, we saw you wearing this green
17   hat --
18          A.   Yes.
19          Q.   -- in this video.  What is that?
20          A.   That is with the National Lawyers Guild and
21   that's legal observers.
22          Q.   I'm not -- embarrassingly, not familiar
23   with -- Well, I've heard of, but I'm not familiar with
24   the National Lawyers Guild.  What is it?
25          A.   It is an association of lawyers that have an
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1  interest in social justice and public interest.
 2         Q.   And are you still associated with that group?
 3         A.   No.
 4         Q.   Okay.  Why not?
 5         A.   Because I'm not associated with them anymore.
 6         Q.   Did you -- Did you used to go to meetings or
 7  something and you just --
 8         A.   Yes.
 9         Q.   -- stopped going?
10         A.   Yes.
11         Q.   All right.  Is there any reason other than you
12  just stopped going to the meetings?
13         A.   Not really.  I just stopped going to the
14  meetings.
15         Q.   Okay.  So, that hat, where did you get it
16  from?
17         A.   From the National Lawyers Guild.
18         Q.   Do they hand them out or?
19         A.   No, they don't hand them out.
20         Q.   How do you get it?
21         A.   You volunteer to be a legal observer.
22         Q.   And then they give you one?
23         A.   They don't give just a -- I'm sorry.  Yeah,
24  they just give you the hat on the days that you observe.
25         Q.   Oh, so, like it's not yours, it's like a --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   for the day, here's a hat?
 2          A.   Yes.
 3          Q.   Did somebody hand it out to you on this day?
 4          A.   I don't remember.  I -- I don't.
 5          Q.   What does it say on it?
 6          A.   I believe it says -- Aside from National
 7   Lawyers Guild, I'm not sure exactly what it says.  I
 8   never took the time to read it.
 9          Q.   Okay.  What's your understanding of what it
10   means to be a legal observer?
11          A.   We observe the behavior of police at protests
12   and document the behavior.
13          Q.   Document by what means?
14          A.   Recording, logs.  Recording and written logs.
15          Q.   Okay.  Did you take any written logs on
16   August 19, 2015?
17          A.   Yes.
18          Q.   Where are those?
19          A.   That would be privileged, right?  Yes.
20          Q.   Would it?  You were taking notes
21   contemporan- --
22          A.   Oh.
23          Q.   -- eously --
24          A.   Taking --
25          Q.   -- with what was --
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1            A.   No, no, I was not writing down anything, any

 2     notes at the time.  I was not writing any notes.

 3            Q.   All right.

 4            A.   I was just recording.

 5            Q.   Is it your understanding that you have

 6     withheld from production logs that were --

 7            A.   No, I --

 8            Q.   -- taken on this day?

 9            A.   No.

10            Q.   Were they produced?

11            A.   I don't know what was produced.

12            Q.   Okay.

13                 MR. WHEATON:  I mean, we could shortcut this,

14            Tony, if you know.  I don't remember seeing them.

15                 MR. ROTHERT:  I don't even know what you're

16            talking about, so...

17                 MR. WHEATON:  Okay.

18                    (Questions by Mr. Wheaton)

19            Q.   All right.  Well, let's just -- let's back up.

20     Did you write down any logs related to August 19, 2015?

21            A.   Yes.

22            Q.   Do you still have them?

23            A.   Yes.

24            Q.   Did you -- Okay.  What are they?

25            A.   Logs describing the documenting what I had
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1    recorded.
 2           Q.    What you had?
 3           A.    What I recorded and photos that I took.
 4           Q.    Okay.  Documenting how?
 5           A.    I'm -- I'm sorry, I don't understand what
 6    you're asking.
 7           Q.    Well, I just -- I've never seen them, so I'm
 8    trying to understand --
 9           A.    Okay.
10           Q.    -- what they are, okay?  Can you tell me
11    what -- what they are?
12           A.    It's just a description of the videos.
13           Q.    Like a description of what's happening on --
14           A.    Yeah.
15           Q.    -- the videos?
16           A.    Yeah.
17           Q.    And when did you make these logs?
18           A.    Either the night of or the day after.
19           Q.    Does the log include times and locations with
20    regards to the events recorded in it?
21           A.    I believe so.
22           Q.    And when did you create these logs?
23           A.    Either the night of or the day after.
24           Q.    You don't remember either way, but it was one
25    or the other?
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1        A.   Uh-huh.

 2        Q.   How many --

 3        A.   I'm sorry.  Yes.

 4        Q.   How many pages are they?

 5        A.   I would guess maybe one.

 6        Q.   All right.  Do you remember what they say?

 7             MR. ROTHERT:  I'll object that that's asking

 8        for the content of work product.

 9             MR. WHEATON:  Okay.  So, you're instructing

10        her not to answer?

11             MR. ROTHERT:  I am instructing her not to

12        answer.  Those are listed on your Privilege Log that

13        you received.

14             MR. WHEATON:  Okay.  And I don't doubt you.  I

15        just don't recall that, you know.

16             MR. ROTHERT:  I'm happy for you to ask about

17        their existence and how many pages they are, all

18        that, but cont- -- content I'm going to object.

19             MR. WHEATON:  Okay.

20             (Questions by Mr. Wheaton)

21        Q.   Did you write anything else down aside from

22   anything for your attorneys related to this incident on

23   August 19, 2015?

24        A.   No, aside from work product materials, I did

25   not write anything else down.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1          Q.   And we may have covered this already, but in
 2    terms of text messages, e-mails, social media posts about
 3    the incidents on August 19, 2015 --
 4          A.   Yes.
 5          Q.   -- are there any at all that...
 6          A.   None that I recall, no.
 7          Q.   And have you, you know, looked?
 8          A.   Yes, I've looked.  I didn't see any, so...
 9          Q.   Okay.  Now, just to be clear, did you have any
10    other interactions with St. Louis City Police officers on
11    August 19, 2015, other than what we have discussed here
12    today?
13          A.   No.
14               MR. WHEATON:  Okay.  That's all the questions
15      I have.
16               MR. ROTHERT:  Okay.
17
18                    E X A M I N A T I O N
19    BY MR. ROTHERT:
20
21          Q.   Miss Vogel, I'm going to ask you a couple just
22    clarification questions --
23          A.   Okay.
24          Q.   -- all right?  A few hours ago, I think, you
25    testified that you didn't have any reason to question the
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   accuracy of the police report; do you remember that
 2   testimony?
 3           A.   Yeah.  Yes.
 4           Q.   All right.  Have you reviewed any of the
 5   depositions of the police officers in this case?
 6           A.   No.
 7           Q.   Have you read the deposition of the person who
 8   repaired that -- prepared that report?
 9           A.   No.
10           Q.   Do you know anything about how that report was
11   prepared?
12           A.   No.
13           Q.   And do you also recall testifying that you
14   have no familiarity with the inside of a B.E.A.R.?
15           A.   Yes.
16           Q.   Could you see, were you able to see in the
17   B.E.A.R. at any time --
18           A.   No.
19           Q.   -- when you encountered it?
20           A.   No.
21           Q.   Okay.  And would you know how to identify
22   people inside a B.E.A.R. without seeing into it?
23           A.   No.
24           Q.   And do you know how to see in a B.E.A.R.?
25           A.   No.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1       Q.   This -- This what was called the second
2   exposure to teargas, has it caused you any -- any mental
3   distress or trauma?
4       A.   Yes.
5       Q.   Okay.  Does it cau- -- Does it cause you to
6   have panic attacks?
7       A.   Yes.
8       Q.   And is that what you had today during this
9   deposition?
10      A.   Yes.
11      Q.   You saw or you were aware that some bottles
12  were thrown at police officers; correct?
13      A.   Yes.
14      Q.   Why didn't the police just leave?
15      A.   I don't know.
16      Q.   When -- When you heard dispersal orders given
17  in front of you, you were on the sidewalk; correct?
18      A.   Yes.
19      Q.   And you weren't doing anything illegal?
20      A.   Yes.
21      Q.   Did you believe that dispersal order applied
22  to you?
23      A.   No, because I was not doing anything illegal.
24      Q.   And finally, we heard a euphemism,
25  "officer-involved shooting," used a couple times here.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1  What -- In -- On Aug- -- In August in 2015, what was the

2  officer's involvement in a shooting that gave rise to

3  this protest?

4       A.   He shot and killed a young man named

5  Mansur Ball-Bey.

6       Q.   Okay.  And there was some mention of some

7  protests in Ferguson, and was there an officer involved

8  in a shooting there, too?

9       A.   Yes.

10      Q.   And what was the involvement of the officer in

11 that shooting?

12      A.   The officer shot and killed Michael Brown.

13      Q.   Okay.  And did the -- did your knowledge

14 that -- that the St. Louis Metropolitan Police Department

15 gratuitously uses chemical munitions on its protestors

16 play a role in your decision to stay away from protests

17 for a time?

18           MR. WHEATON:  Objection, form and foundation.

19      Q.   You can go ahead and answer.

20      A.   Yes.

21           MR. ROTHERT:  I don't have anything else to

22      you ask.  Thank you so much.

23           MR. WHEATON:  I have a couple follow-ups on

24      that.

25

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                      FURTHER EXAMINATION
 2   BY MR. WHEATON:
 3
 4        Q.   Did you review anything to prepare for your
 5   deposition today?
 6        A.   I spoke with my attorneys.
 7        Q.   Did you review any video, photo, social media
 8   posts, documents to review for -- to prepare for your
 9   deposition today?
10        A.   I looked at my -- my -- Oh, sorry.  I've
11   looked at my videos, yes.
12        Q.   Okay.  Did you look at all of the videos that
13   we looked at today?
14        A.   No.
15        Q.   Did you look at any other videos other than
16   those we looked at today?
17        A.   No.
18        Q.   Did you review any documents to prepare for
19   your deposition today?
20        A.   Not outside of my own, no.
21        Q.   When you say not outside of your own, what do
22   you mean by that?
23        A.   Not outside of anything -- any work --
24   attorney work product that I've already done, yeah.
25        Q.   So, if you reviewed something, then I presume
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1    it's listed on your Privilege Log --

2         A.   Yes.

3         Q.   -- and it's been withheld as work product or

4    attorney-client privilege?

5         A.   Yes.

6         Q.   So, you just testified that you have panic

7    attacks on occasion.  Can you tell me more about that?

8    What do those entail and how often have you had them?

9         A.   It is an immense feeling of panic,

10   hyperventilating, difficulty breathing, tight chest,

11   entire body shaking.

12        Q.   How many times has that happened since

13   August 19, 2015?

14        A.   Quite a few.

15        Q.   Can you give me an idea in terms of frequency?

16        A.   I'm trying to get a good number.  I would

17   say -- I would say I had them a few times a week for a

18   while and now I've gotten them down to maybe once a

19   month, once every month -- other month.

20        Q.   And, again, you have not sought any medical or

21   mental health treatment as a result of this incident; is

22   that right?

23        A.   Yes, I have.

24        Q.   Oh, you have?

25        A.   Yes.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1            Q.    Sorry, I thought I had asked you that earlier.
 2            A.    I don't think you did.
 3            Q.    Okay.  Where have you gone?
 4            A.    It is Devereaux Counseling.
 5            Q.    And where is that located at?
 6            A.    St. Charles, Missouri.
 7            Q.    And how many times have you gone there?
 8            A.    I go there -- I was going there once a week
 9       and now it is once every other week.
10            Q.    Okay.  When did you first start going there?
11            A.    I do not remember when I first started going
12       there.
13            Q.    Was it soon after August 19, 2015, or was it
14       sometime later?
15            A.    Could -- I'm sorry, could you give -- just to
16       be clear, could you give a time frame for your idea of
17       "soon after" and "sometime later" just so I can --
18            Q.    Sure.
19            A.    -- be accurate?
20            Q.    Well, just to shortcut this --
21            A.    Yes.
22            Q.    -- I'm looking at your Interrogatory
23       Answers and I see --
24            A.    Uh-huh.
25            Q.    -- that Devereaux Counseling is on here and it
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   says approximately 2016 to 2018.

 2          A.   Yes.

 3          Q.   Is that accurate?

 4          A.   Yes.

 5               MR. ROTHERT:  It's Page -- Page 6 if you would

 6      like to...

 7               THE WITNESS:  Thank you.

 8          A.   Yes.

 9          Q.   Do you have copies of any of your medical or

10   mental health records from Devereaux Counseling?

11          A.   No, I don't.

12          Q.   Have you sought any other medical or mental

13   health treatment as a result of the incidents at issue in

14   this case?

15          A.   No.

16          Q.   Had you ever had any panic attacks or any kind

17   of similar episode prior to August 19, 2015?

18          A.   I had difficulty breathing and the doctors

19   never really figured out what that was.

20          Q.   Do you believe it was a result of having panic

21   attacks prior to August 19, 2015?

22          A.   No, I don't believe that.

23          Q.   You believe it was a result of anxiety or some

24   other --

25          A.   No, I don't believe that.
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1      Q.   Okay.  I'm just wondering why you -- why you
2  brought it up, you said that you had --
3      A.   Oh --
4      Q.   -- had shortness of breath.
5      A.   -- because it's in my -- it would be in my
6  medical records if --
7      Q.   Oh, okay.
8      A.   -- because I sought treatment for difficulty
9  breathing.
10     Q.   Oh.  Were you ever diagnosed with any medical
11  condition as a result of that or complaint?
12     A.   No, there were never any actual tests run or
13  anything.
14     Q.   No asthma or anything like that?
15     A.   They never ran any tests.  It's just
16  difficulty breathing.
17     Q.   Okay.  I know this is a broad, catchall
18  question, but is there anything that I did not ask you
19  about today that you, you know, believe is important
20  regarding this day that you haven't mentioned yet?
21     A.   Yeah, that's -- that's a little bit vague.
22  I'm not sure if I can --
23     Q.   Sure.
24     A.   -- answer that correctly, but to my knowledge,
25  no.

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1          Q.   Okay, fair enough.  If nothing comes to mind,

2     that's -- that's all.  It's kind of an unfair question.

3          A.   Yes.

4               MR. ROTHERT:  Reporters always ask it.

5               MR. WHEATON:  Yeah.  All right.  Well, I

6     really appreciate your time.  Thank you very much.

7               THE WITNESS:  Thank you.

8               MR. WHEATON:  All right.

9               MR. ROTHERT:  We'll review.

10              (Deposition adjourned at 5:36 p.m.)

11                   (SIGNATURE RESERVED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1   STATE OF                    )
                                 )SS
 2   COUNTY OF                   )

 3

 4        I, CHRISTINA VOGEL, do hereby state that the

 5   foregoing statements are true and correct to the best of

 6   my knowledge and belief.

 7

 8

 9

10

11        _____

12                   CHRISTINA VOGEL

13

14

15        Subscribed and sworn to before me this _____ day

16   of _____, 2019.

17

18

19

20        _____

21                   NOTARY PUBLIC

22

23   My Commission Expires:

24

25
```

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

```
 1                   DEPOSITION CORRECTION SHEET
                     DEPOSITION OF CHRISTINA VOGEL
 2
 3     In Re:  SARAH MOLINA, et al vs. CITY OF ST. LOUIS, et al
       4:17-CV-2498-AGF
 4
 5     Page:   Line:          Should Read:
       Reason:
 6
       Page:   Line:          Should Read:
 7     Reason:
 8     Page:   Line:          Should Read:
       Reason:
 9
       Page:   Line:          Should Read:
10     Reason:
11     Page:   Line:          Should Read:
       Reason:
12
       Page:   Line:          Should Read:
13     Reason:
14     Page:   Line:          Should Read:
       Reason:
15
       Page:   Line:          Should Read:
16     Reason:
17     Page:   Line:          Should Read:
       Reason:
18
       Page:   Line:          Should Read:
19     Reason:
20
21     _____
                     SIGNATURE OF DEPONENT
22
23
24
25
```

MASUGA REPORTING SERVICE
314/680-2424

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

1                C E R T I F I C A T E

2

3          I, Sara Alice Masuga, a Certified Shorthand

4    Reporter and Certified Court Reporter within and for the

5    States of Illinois and Missouri, DO HEREBY CERTIFY that

6    pursuant to agreement between counsel that on January 18,

7    2019, at the offices of the ACLU, 906 Olive Street,

8    St. Louis, Missouri, there appeared before me the

9    aforementioned witness and, having been duly sworn to

10   tell the whole truth, was examined and the examination

11   was taken down in shorthand by me and afterwards

12   transcribed upon the computer and said transcription is

13   herewith returned.

14          IN WITNESS WHEREOF, I have hereunto subscribed my

15   name this 5th day of February, 2019.

16

17

18

19

20

21          _____
            Sara Alice Masuga, CSR, CCR
            IL CSR No. 084-002993
22          MO CCR No. 1012

23

24

25

SARAH MOLINA, et al v. CITY OF ST. LOUIS, et al
Deposition of CHRISTINA VOGEL taken on 01/18/2019

MASUGA COURT REPORTING
2033 Hiawatha Avenue
St. Louis, MO  63143-1215
(314)781-1447

February 5, 2019

ACLU
Attn:  Anthony E. Rothert, Esq.
906 Olive Street
Suite 1130
St. Louis, MO  63101

In Re: SARAH MOLINA, et al vs. CITY OF ST. LOUIS, et al
4:17-CV-2498-AGF

Dear Mr. Rothert:

Enclosed herewith, please find your copy of the
deposition transcript of CHRISTINA VOGEL taken in the
above-styled matter along with the original signature
page of same.

Please have the deponent read your copy of the
transcript, note any corrections to be made, sign the
original signature page, have the deponent's signature
notarized where indicated, and return the signed
signature page and correction sheets to Mr. Wheaton for
proper filing of the original transcript with the Court.

Thank you for your attention to this matter.

Sincerely,

MASUGA COURT REPORTING


Sara Alice Masuga, CSR, CCR

cc:  Mr. Wheaton