UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH MOLINA, *et al*. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:17-cv-2498-AGF |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ST. LOUIS *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiffs' Response to Defendants' Statement of Uncontroverted Material Facts and Plaintiffs' Statement of Additional Uncontroverted Material Facts[1]**

**I.      Responses to Defendants' SUMF**

1.      On August 19, 2015, between 3:00 p.m. and 4:00, Molina gathered with a crowd near the intersection of Walton and Page where she heard multiple dispersal orders given which included warnings regarding the use of chemical munitions. (Ex. A, Molina Dep., p. 44).

**Response: Controverted in part. Molina did go to that intersection on the afternoon of that day, and she heard multiple dispersal orders given that—to the best of her recollection—included a warning about the use of chemical munitions.**

**However, a couple of facts are not quite right. First, the police left before 3:00 p.m. (Molina Dep., 30:16-19), and Molina herself left at 3:00 p.m. (Molina Dep., 30:22-24), so the orders and warnings she heard came before that time. Second, it is unclear what "with a crowd" means in this context. Molina testified forcefully that she remained on the sidewalk through her times at that intersection, whereas some people from the neighborhood who were protesting and mourning the death of Mansur Ball-Bey were in the street. (*See, e.g.*,**

[1] When referencing exhibits included with Defendants' statement of uncontroverted material facts, Plaintiffs refer to the exhibit letter used by Defendants. Plaintiffs' additional exhibits are denoted with an exhibit number.

**Molina Dep. 32:22-24; 42:23-24; 43:6-9;** *see also id.* **57:23–58:2 (Molina testifying that a**

**police video taken after 6:30 p.m. shows her on the sidewalk).)**

2.      Molina ignored those dispersal orders because she believed they were unlawful. (Ex. A, Molina Dep., pp. 45-46).

**Response: Controverted in part. In general, Plaintiffs do not dispute that Molina**

**believed some of the dispersal orders were unlawful. But it is not clear what "ignored"**

**means here. If it means that she did not leave the area, that is controverted. Although she**

**did not leave because of the orders, she did leave. She left that intersection at about 3:00**

**p.m. because she had to use the bathroom. (***E.g.***, Molina Dep. 33:5-10.)**

**It is also controverted that she believed every order given that day was unlawful.**

**Molina testified that she believed dispersal orders given in the absence of an unlawful**

**assembly were unlawful. When asked if she believed "every dispersal order [she] heard**

**that day to be an unlawful order, she said, "No, not every one." (Molina Dep. 46:2-4.)**

3.      Later in the afternoon on August 19, 2015, police officers were struck with thrown objects and injured. (Ex. B, Wethington Dep., p. 41).[2]

**Response: Objection under Rule 56(c)(1)(B) and (c)(2) and controverted in part.**

**Although Plaintiffs do not dispute that a few objects were thrown at officers, videos**

---

[2]      **Plaintiffs do not dispute that some objects were thrown at police on Page between Marcus and Walton around, roughly, 7 p.m. and at the intersection of Page and Walton around 7:13 p.m. But there were not very many and the only evidence Plaintiffs can find of thrown objects comes** *after* **the dispersal orders and** *after* **the police line advances. (***See, e.g.***, Ex. 6, Vogel Video of Approaching Police.) Video from shortly before the police begin advancing (taken by Detectives Wood and Eaton from behind or in the police line) is inconclusive. (***See generally*** **Ex. D and Ex. W.) A very few thrown objects (which appear to be water bottles) are seen, but again only** *after* **the dispersal orders and** *after* **the police line begins advancing. Noises consistent with thrown objects can be heard [again,** *after* **the police line advances] (***see*** **Ex. W), but those noises are similarly consistent with the "pop" of a launched chemical munition, and the video does unequivocally depict munitions—they are visible landing on Page in front of the advancing police. (***See, e.g.***, Ex. W at 13:13.) The "pop" sound is also consistent with a baton striking a plastic riot shield, which is clearly visible in a video taken by Vogel as the police advance west on Page. (***See*** **Ex. 6 at 0:28-0:36.) In addition, in Ex. D ("Video 8"), the crowd is visible for a long while before police begin advancing down Page, and no thrown objects are seen. (***See*** **Ex. D at 12:00-13:00.)**

taken by Detectives Eaton and Wood from the time period Wethington was describing in the cited testimony—around when the BEAR was deployed to Page (visible at 14:11 in Ex. D and at Ex. 6, Vogel Video of Advancing Police at 1:09)—do not depict any officer being struck or injured. (*See generally* Exs. D & W.)[3]

As to the <u>objection</u>, the cited materials do not establish the absence of a genuine dispute, and Wethington's testimony as to these alleged facts is inadmissible because he has no personal knowledge as to those facts and their truth or falsity. <u>Narum v. Eli Lilly & Co.</u>, 914 F. Supp. 317, 321 (D. Minn. 1996). (*See also* Wethington Dep. 44:20-25 (testifying that "when I say 'see it,' I mean, you're looking out of a—through a gas mask out little portholes and stuff like that. You're buttoned up, as they say, you know" and therefore he could not say where he saw smoke from chemical munitions).)

4.      Video file 15-041999 008 ("Video 8") was recorded by Detective Jodie Eaton and begins at approximately 6:54 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶¶ 3-6)

Response: <u>Uncontroverted</u>.

5.      Video 8 is 22 minutes and 42 seconds long and it accurately reflects the events as they occurred from approximately 6:54 p.m. to 7:17 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶ 6)

Response: <u>Uncontroverted</u>, except what Detective Eaton actually said—and what would be more accurate—is that the video "depicts events as they occurred," not *the* events. Because she is recording from a single vantage point, she of course did not capture the entirety of the scene.

6.      At 6:54 p.m., a crowd had again assembled in the street on Page between Marcus

---

3          Exhibits 2 and 6 are video records, which will be delivered to the Court on a drive.

and Page and Walton and Page. (Ex. D, Video 8 at 00:11)

**Response: Uncontroverted.**

7.      At 6:54 p.m., Vogel was standing at the northwest corner of Page and Marcus

wearing a beige dress and a green hat. (Ex. D, Video 8 at 00:16)

**Response: Uncontroverted, except that she is on the northwest *sidewalk*. (*Id.*)**

8.      At 6:55 p.m., a clear and audible dispersal order was given over a loudspeaker as

follows:

> This is an unlawful assembly. You are impeding the flow of traffic. This is
> your order to disperse. You can disperse by walking west on Page, and North and
> South on Walton. Anyone who remains is subject to arrest and or other actions up to
> and including the deployment of chemical munitions. You will be given sufficient
> time to disperse. This is your first order to disperse.

(Ex. D, Video 8 at 1:16)

**Response: Uncontroverted that, with over-ear headphones on, counsel can
understand the words of this dispersal order as captured by the video taken by Detective
Eaton from her location on or behind the police line, using a department-issued recording
device. Controverted that it was "clear and audible" given that Molina could not
understand most of the words at the time and she was a quarter-block from the police line.
(Molina Dep. 51:18–52:8; Ex. D, Video 8, at 5:43.)**

9.      Molina and Vogel heard this dispersal order and understood that it was a dispersal

order. (Ex. A, Molina Dep, p. 51; Ex. E, Vogel Dep., pp. 47-48).

**Response: Uncontroverted that Molina and Vogel both recognized it as a dispersal
order but controverted that Molina heard the words. (Molina Dep. 51:18–52:8.) The
difference in what Molina could hear versus what Vogel could hear makes sense: although
both Molina and Vogel were on the sidewalk, Vogel was several rows of people closer to the
police line. (Compare Ex. D, Video 8, at 0:16 [depicting Vogel on the northwest corner of**

the sidewalk at Marcus and Page] and at 5:43 [depicting Molina on the south sidewalk of Page, about a quarter-block from the police line].)

10.     Neither Molina nor Vogel dispersed. (Ex. D, Video 8 at 5:43, 8:59; 9:52; 12:00)

**Response: <u>Uncontroverted</u>, but this fact rests on an assumption that is not in evidence: that the dispersal order was directed at them. The basis of the order was: "You are impeding the flow of traffic." Molina and Vogel were on the sidewalk. Furthermore, the egress instructions were to "walk west on Page." The cited materials (Ex. D at 8:59 and 9:52) show that Vogel walked west on the north sidewalk of Page.**

**For clarity's sake, Plaintiffs agree as to these depictions:**

- **Ex. D, Video 8 at 5:43 (roughly 6:59 p.m.) depicts Molina on the south sidewalk of Page.**

- **Ex. D, Video 8 at 8:59 and 9:52 (roughly 7:03 p.m. and 7:04 p.m.) depict Vogel on the north sidewalk of Page.**

- **Ex. D, Video 8 at 12:00 (roughly 7:06 p.m.) depicts Vogel on the north sidewalk of Page. She took video of the police line advancing on her position at this time as well. (*See* Ex. 6)**

11.     At 6:56 p.m., a second clear and audible dispersal order was given over a loudspeaker as follows:

> This is an unlawful assembly. This is your order to disperse. You are
> impeding the flow of traffic. You are being ordered to disperse by walking either west on Page and then South or North on Walton or continuing west on Page on the sidewalk out of the street. Anyone who remains is subject to arrest and or other actions up to and including the deployment of chemical munitions. A dispersal order means you must leave the area and not just move to the sidewalk. This is your second order to disperse.

(Ex. D, Video 8 at 2:16)

**Response: <u>Uncontroverted</u>** that, with over-ear headphones on, counsel can understand the words of this dispersal order as captured by the video taken by Detective Eaton from her location on or behind the police line, using a department-issued recording device. **Controverted** that it was "clear and audible" given that Molina could not understand most of the words at the time and she was a quarter-block from the police line. **(Molina Dep. 51:18–52:8; Ex. D, Video 8, at 5:43.)**

12.     At 7:00 p.m., Molina is standing on the sidewalk on the south side of Page wearing blue jeans, a blue shirt, and a green hat. (Ex. D, Video 8 at 5:43)

**Response: Uncontroverted.**

13.     Seconds later, an unidentified officer may be heard saying "they're starting to mask up." (Ex. D, Video 8 at 6:06)

**Response**: **Objection** pursuant to Fed. R. Civ. P. 56(c)(2). A party cannot properly assert a fact that an unidentified person—who cannot be seen and therefore whose identity and even clothing is unknown—"may" be saying something that is hearsay. The material cited therefore cannot be presented in a form that would be admissible in evidence.

14.      Seconds after that, also at 7:00 p.m., multiple objects were thrown at police officers. (Ex. D, Video 8 at 6:10; 6:23)

**Response**: **Controverted in part.** The word "multiple" is ambiguous, and what the cited material shows is at most two water bottles. The video shows a water bottle in the air at time stamp 6:10. But counsel watched the video many times and cannot see anything in the air at time stamp 6:23. However, several police do say "Bottle!" and point up into the air at that time stamp.

15.     Officer on the police line were not wearing helmets and were not wearing protective gear. (Ex. D, Video 8 at 6:10; 6:23; Ex. E, Vogel Dep., p. 28)

**Response**: **Controverted in part**. **There are many officers present, and it is not clear from the videos who is part of the line and who is not. It is also not clear what time period this fact refers to. It is uncontroverted that some officers are not wearing helmets. However, many officers are wearing protective gear, in that they are wearing gloves, bullet-proof vests, and weapons. By timestamp 8:18 (roughly 7:03 p.m.), the next time a line is visible in Ex. D, the officers also have riot shields and batons.**

16.     At 7:02 p.m. a glass object was thrown at police officers and shattered near the police line. (Ex. D, Video 8 at 7:36)

**Response: Uncontroverted**.

17.     Because of the danger posed by the increasingly riotous crowd, officers began to pass out shields – but not every officer had a shield. (Ex. D, Video 8 at 7:36 – 9:30)

**Response: Objection pursuant to Fed. R. Civ. P. 56(c)(2). Although Plaintiffs do not dispute that shields were passed out, the cited material does not show that any officer was involuntarily without a shield. In fact, when remarks are heard like, "I need more shields" and "He needs a stick," there are responses like "I gotcha" and "I got one up here." (*See id.* at 8:18.)**

**The cited material also does not show that the shields were passed out "because of the danger posed by the increasingly riotous crowd." There was a small handful of thrown bottles. Other than that, the videos—even the videos from the police detectives—do not show any additional force directed to the police. Many people in the crowd are yelling, but people had been yelling for a long time. To the extent the police's motivation in passing out shields is material to this action (which it is not), an equally reasonable inference (which must be taken in Plaintiffs' favor) is that the police began passing out shields because they intended to advance on the crowd (which they do at timestamp 9:25 in Ex. D) and/or**

**because they intended to deploy chemical munitions (which they do at least by timestamp 13:36, possibly before).**

18.     From 7:03 p.m. to at least 7:06 p.m., Vogel was standing on the sidewalk North of Page with a cell phone in her hand. (Ex. D, Video 8 at 8:59; 9:52; 12:00)

**Response: <u>Uncontroverted</u>.**

19.     Vogel knew that, at this point in time, multiple objects had been thrown at officers and multiple dispersal orders had been given. (Ex. E, Vogel Dep., pp. 39-40)

**Response: <u>Uncontroverted</u>.**

20.     At 7:06 p.m., a third dispersal order was given. (Ex. D, Video 8 at 12:04)

**Response: <u>Objection</u> pursuant to Fed. R. Civ. P. 56(c)(2). Counsel cannot hear a dispersal order in the cited material.**

21.     At 7:07 p.m. Vogel was assembled with a crowd and standing on the sidewalk north of Page while multiple individuals in the crowd threw objects at police officers. (Ex. D, Video 8 at 13:00-13:30; Ex. E, Vogel Dep., p. 45)

**Response: <u>Controverted in part</u>. The cited material shows Vogel walking backward on the sidewalk north of Page until timestamp 13:27, after which she is no longer in view. Two (or possibly three) objects are thrown toward police, though not from the area Vogel is in. There are similar noises that come from other things: one officer hits a shield with a baton several times (also visible in Ex. 6 at 0:28-0:36), and then chemical munitions are launched with a "pop" sound. (The video shows police cheering and clapping upon deployment at approximately timestamp 13:32.) In addition, although Plaintiffs do not controvert that Vogel was very near the crowd, "assembled with a crowd" is ambiguous. The cited material depicts Vogel keeping her distance from the bulk of the crowd, staying on the sidewalk, backing away from the advancing police, and distinguishing herself as a**

legal observer by wearing a lime green hat.

22.     Vogel and Molina both agree they were assembled with and standing very near a group of individuals, some of whom were throwing objects at police officers. (Ex. E, Vogel Dep., p. 45; Ex. A, Molina Dep., p. 55 ("I was assembled with them"))

**Response: <u>Objection pursuant to Fed. R. Civ. P. 56(c)(2) and controverted in part</u>. It is <u>uncontroverted</u> that both Molina and Vogel were standing near other people, and that at least one person threw objects at police. "Assembled with," as it was used at Molina's deposition and here, was used in the context of a soliloquy about the unlawful-assembly statute and is therefore a legal conclusion that cannot be presented in a form that would be admissible in evidence. In any event, only Molina agreed she was assembled with a group.[4] Vogel was not asked that question and therefore did not answer it.**

23.     At 7:08 p.m., and in response to the multiple objects thrown at officers, police deployed inert smoke. (Ex. D, Video 8 at 13:00-13:30; Ex. F, Dodge Dep., p. 58)

**Response: <u>Controverted in part</u>. It is uncontroverted that police deployed inert smoke. Whether that was in response to thrown objects or in furtherance of the mission to advance on protestors to clear the street is not supported by the cited material. The dispersal orders given before this deployment of chemical munitions warn about the use of chemical munitions because protestors are "impeding the flow of traffic." *See* responses to SUMF paragraphs 8 and 11. Further, what then-lieutenant Dodge testified in the cited**

---

[4] The exchange went as follows:
Q. Were you one of . . . the people assembled together at that location?
A. I was on the other side of the street by myself.
Q. Were you one of the people assembled together with the group at that time?
A: . . . I was assembled with them. . . .
Q: Now, do you believe that you were assembled for a common purpose?
A: Of throwing rocks at the police, no way. Or bricks or whatever.
Q: Were you there to protest?
A: I was there as a legal observer.
Molina Dep. 55:3-20.

material also supports the inference that the deployment of chemical munitions was to

support the mission of advancement:

> Q. And did you see the city BEAR deploy any chemical munitions?
> A. Yes.
> Q. Do you know who deployed those?
> A. The initial -- the first time we were told by Chief Dotson to disperse the crowd
> when the BEAR drove westbound on -- well, actually, check that. Before we even
> did that, we deployed a pepper ball because we went up the use of force continuum.
> So we deployed the inert smoke, which was done, I believe, by Manasco or it could
> have been done by somebody else. But I know we deployed the inert smoke and then
> we deployed the pepper ball. And then they kept throwing bricks.

**(Dodge Dep. 58:11-24.)**

24.     At 7:12 p.m., then Chief of Police Samuel Dotson ordered that another warning be

given before chemical munitions are deployed. (Ex. D, Video 8 at 17:30).

**Response: <u>Controverted</u>. By this point, chemical munitions have been deployed**

**multiple times, and the police have advanced west on Page almost to the Walton**

**intersection, so it cannot be a warning to be given *before* chemical munitions are deployed.**

**Further, what Dotson actually says is: "Give another warning and let's go." (*Id.* at 17:30.)**

**It is not clear from the cited material what "let's go" means since a half-dozen or more**

**chemical munitions have already been deployed at this point.**

25.     Individuals continued to throw objects at police officers. (Ex. D, Video 8 at 17:32).

**Response: <u>Controverted</u>. The cited material shows *one* person throwing *one* munition**

**that had been launched by police away from himself and back toward the police, though it**

**falls short. (*See id.*)**

26.      At 7:12 p.m., another clear and audible dispersal order was given over a

loudspeaker as follows:

This is an unlawful assembly. Please clear the area or we will deploy chemical munitions.
You can go north on Walton, south on Walton, or west on Page. Clear the area or we will deploy
chemical munitions. This is your lawful warning.

(Ex. D, Video 8 at 17:30)

**Response: <u>Uncontroverted</u> except as to "clear and audible" for the reasons provided in response to paragraph 8. (And the warning is actually at 17:45.)**

27.     The crowd, which has at this point had moved east to the intersection of Bayard and Page and which included Molina and Vogel, did not disperse. (Ex. D, Video 8 at 18:00; Ex. E, Vogel Dep., p. 136; Ex. A, Molina Dep., p. 85)

**Response: <u>Controverted</u> for multiple reasons.**

**First, the civilians were advancing *west*, not east. At the cited video timestamp, the video (taken from behind the advancing officers) depicts the police on Page Boulevard facing west, and the individuals who remain are in front of the police. (Ex. D, Video 8, at 18:00.)**

**Second, the intersection depicted is the Page intersection with Walton. Bayard (which is yet another block to the west) is not visible. (*Id.*)**

**Third, each of the dispersal orders directed civilians to go west on Page (*see, e.g.*, Ex. D, Video 8, at 1:16), which is precisely what they were doing, so the allegation that they "did not disperse" is false.**

**Fourth, the cited excerpt of Vogel's deposition does not support this statement of fact in any way. Although she testified that "you and the rest of the crowd got pushed back to Bayard and Page" at some point after 7:00 p.m. (*id.* 136:17-20), she does not testify that she was still among others at that point, or that she was "not dispersing," or that police were west of Page and Walton.**

**Fifth, the cited excerpt of Molina's deposition does not support this statement of fact in any way. In fact, Molina testified that she *did* disperse:**

**Q. Okay. You say you dispersed.**

11

> **A. I left.**
> **Q. What's that based on?**
> **A. I left.**
> **Q. . . . When you say you dispersed, you're talking about when you moved west on Page?**
> **A. I moved west on Page, south on Bayard, through an alleyway, down over Euclid. I went through three blocks away . . . .**

**(Molina Dep. 84:24–85:8.)**

**Sixth, Molina also testified that she was not sure that the crowd had been pushed back to the intersection of Bayard and Page (*see id.* at 85:3–86:1), so she was no longer "included" among the "crowd," as this statement of fact suggests.**

28.    At 7:13 p.m., an unidentified police officer said "they're picking up more bricks down there." (Ex. D, Video 8 at 19:40)

**Response: <u>Uncontroverted</u>.**

29.    At 7:14 p.m., more bricks, rocks, and other objects were thrown at police officers. (Ex. D, Video 8 at 20:00-20:40)

**Response: <u>Controverted in part</u>. <u>Uncontroverted</u> that individuals on the southwest corner sidewalk of Page and Walton throw several objects (which appear to be bricks or rocks) at officers, interspersed with Officer Zwilling on the south end of the police line launching munitions at those individuals. <u>Controverted</u> that these are "more" bricks. No previously cited material shows a thrown brick before this point.**

30.    At 7:15 p.m., the B.E.A.R. traveled west on Page and deployed tear gas at the intersections of Bayard and Page and Euclid and Page to disperse the riotous crowd., which continued to throw rocks at the B.E.A.R while it was at the intersection of Euclid and Page (Ex. D, Video 8 at 29:40-22:30; Ex. F, Dodge Dep., p. 56; Ex. G, Mayo Dep., p. 52)

**Response: <u>Controverted in part</u> because the cited material does not support this**

12

statement of fact.[5] Although it is <u>uncontroverted</u> that at approximately 7:15 p.m., the BEAR traveled west on Page from behind the police line just east of Walton, neither Bayard nor Euclid is visible from the video. They are not visible partly because they are too far away and Euclid is around a curve, but also because chemical munition smoke obscures even the BEAR's lights. (*See e.g.*, Ex. D, Video 8, at 21:32.) At, for example, 22:09 on Ex. D, Video 8, multiple officers are coughing because of the blanket of chemical munition smoke.

At the cited section, Defendant (and then-Lieutenant) Dodge testifies merely that "the general area where chemical munitions were deployed" was "in the areas of Bayard and Page . . . up to Euclid and Page." (*See* Dodge Dep. 56:2-5.) He is not testifying about the BEAR in particular. When he does testify about the BEAR, he contradicts himself:

> Q. And how about the city BEAR that was patrolling the area south of Page? Do you know if that vehicle deployed chemical munitions anywhere other than while it was driving on Page Boulevard?
>
> A. Maybe. I think at some point, yeah. Maybe when it made a left turn onto Euclid, right there on the corner, or when it -- I should say when it circled around and came back the first time I believe it deployed, but that was still on Page though. So, no, I'm only aware of the ones on Page.

(Dodge Dep. 56:22-57:6.) His conclusions are contradicted by the after-action report. [*See* Ex. 3, though that report was written after the fact by someone not stationed on the BEAR (as Dodge was not).]

31.     At 7:16 p.m., the B.E.A.R returned from the intersection of Euclid and Page to the police line near the intersection of Walton and Page. (Ex. D Video 8 at 29:40- 22:30)

**Response: <u>Uncontroverted</u>** that the BEAR traveled east on Page at approximately that time. However, the cited material does not depict where it is traveling from and it does not depict the vehicle reaching the police line. What then-lieutenant Dodge testifies is that it

---

[5] The video citation should likely be 20:40-22:30.

**"circled around and came back." (Dodge Dep. 57:1-6.) The after-action report and Defendant/Sergeant Mayo's testimony controvert that the BEAR returned "from the intersection of Euclid and Page" and instead support the fact that the BEAR traveled south down Euclid before traveling back east on Page. (Ex. 3; Mayo Dep. 53:4-13 (testifying about the first trip west on Page as described in the After-Action Report and acknowledging that he "did advise Officer Chambers [who was driving the BEAR] to continue south on Euclid"); *see also* Dodge Dep. 79:15-17 ("we had two different times where we went down and deployed gas").)**

32.     Video file 15-041999 010 ("Video 10") was recorded by Detective Jodie Eaton and begins at approximately 7:26 p.m. on August 19, 2015. (Ex. C, Eaton Aff. ¶¶ 3, 7)

**Response: <u>Uncontroverted</u>.**

33.     Video 10 is 4 minutes and 18 second in length and depicts events as they occurred from approximately 7:26 p.m. to 7:30 p.m. on August 19, 2015. (Ex. C, Eaton Aff. (Ex. C, Eaton Aff. ¶¶ 3, 8)

**Response: <u>Uncontroverted</u>. (The video is taken on Page Boulevard.)**

34.     Ms. Heather DeMian ("DeMian") was subpoenaed for all video in her possession recorded on August 19, 2015. (Ex. H, DeMian Subpoena)

**Response: <u>Uncontroverted</u> except that the subpoena was limited to video, audio, and photographs taken on August 19, 2015 "within a one mile radius of the intersection of Walton and Page" and video of "any protest, civil unrest, or demonstration" on that date in the City.**

35.      In response, DeMian provided a video she recorded on August 19, 2015, attached hereto as "Exhibit I" (hereafter "Demian Video"), which fairly and accurately depicts events as they occurred on August 19, 2015. (Ex. I, DeMian Video; Ex J, Groce Dep., pp. 175-

177)

**Response: <u>Uncontroverted</u>, except that Groce's testimony does not speak to the accuracy of De Mian's video.**

36.    The DeMian Video and Video 10 depict, in part, the same incidents occurring at the same time. (Ex. J, Groce Dep., p. 199).

**Response: <u>Uncontroverted</u> that Video 10 depicts a small portion of the time period that the De Mian Video depicts, but they are taken from different positions and the De Mian Video is much darker and blurrier. The cited material refers to one specific incident, the two armored vehicles (and a white police van) traveling west on Page (at least the second trip west on Page for the City BEAR). That incident is depicted on both videos.**

37.    The DeMian Video depicts events as they occurred from approximately

7:21 p.m. to 8:47 p.m. on August 19, 2015. (Ex. I, DeMian Video; Ex. J, Groce Dep., p. 199).

**Response: <u>Uncontroverted</u>, though of course the video is taken from a single vantage point. In addition, because it was a livestream, it is blurry and dark.**

38.    At 7:24 p.m., eight minutes after tear gas was initially deployed, people were sill gathered near the intersection of Page and Walton while many of the 150-200 others had moved onto the streets and alleyways north and south of Page. (Ex. D, Video 8 at 20:00 – 21:00; DeMian Video at 3:03-4:36)

**Response: <u>Controverted</u>. The cited material does not support this statement of fact.**

**_See_ paragraph 5: Ex. D, Video 8, ends at approximately 7:17 p.m. and cannot support the alleged statement of fact. It might be meant to support the embedded fact about when "tear gas was initially deployed," but there is no cited evidence about when _tear gas_ as opposed to other chemical munitions were deployed. Defendant and then-Lieutenant Dodge testified that a pepper ball was the first munition deployed, and that**

15

occurred before the time period the cited material depicts. **(Dodge Dep. 58:11-24;** *see also id.* **67:2-6 (testifying that when he had referred to "smoke-like substances and tear gas," he had meant the "same thing").)**

**The cited material from the De Mian video also does not support the alleged statement of fact. From 3:30 to 4:36, there is** *no one* **lingering in the street at that intersection. Only a handful of people—5 individuals at most—are even visible, and they are not really "gathered"; most are walking alone, while two people stand near each other on the sidewalk. Furthermore, it bears repeating that the dispersal orders given had** *instructed* **civilians to go west on Page and/or north or south on Walton. (***See, e.g.,* **paragraphs 8 and 11.)**

39.     Also at 7:24 p.m., another dispersal order was given from a police loudspeaker. (Ex. I, DeMian Video at 4:36; Ex. F, Dodge Dep., pp. 69-70)

**Response:** **Controverted. The cited material does not support the alleged statement of fact. Although counsel can hear, with over-ear headphones on, a muffled announcement that sounds like it is coming from a loudspeaker, none of the words are audible on the De Mian Video.**

40.     The 7:24 p.m. dispersal order, which may be heard on the DeMian Video, stated in part over a loudspeaker: "Clear the area immediately. This is an unlawful assembly. You need to leave the area now… we are getting ready to come back." (Ex. I, DeMian Video at 3:07-4:36)

**Response:** **Controverted. The cited material does not support the alleged statement of fact. Although counsel can hear, with over-ear headphones on, a muffled announcement that sounds like it is coming from a loudspeaker, none of the words are audible on the De Mian Video.**

41.     Groce heard this dispersal order. (Ex. J, Groce Dep., p. 177).

**Response: <u>Controverted</u>. The cited material does not support the alleged statement of fact. Groce testified only that he thinks he heard a voice on a loudspeaker while he was on Page Avenue riding his bicycle. This is what the cited material actually says:**

> **Q. I stopped [the De Mian video] at 4:29. Could you hear a voice over a loudspeaker in the, say, 20 seconds that we --before this that we just listened to?**
> **A. I heard, yeah, something that could be a voice on a loudspeaker.**
> **Q. All right. Did you hear a voice on a loudspeaker while you were on Page Avenue riding your bicycle at this time?**
> **A. I think so, yeah.**
> **Q. Do you remember what the voice said?**
> **A. So much of the voice on the loudspeaker was unintelligible.**
> **Q. All right. And do you remember hearing anything that the voice said?**
> **A. I don't recall.**
> **Q. All right. I'm going to keep playing from 4:29 [in the De Mian video].**
> **Q. I just stopped it at 4:34. Could you make out the voice saying, "Clear the area immediately," there?**
> **A. No.**
> **Q. All right. I'll keep going from there.**
> **Q. I stopped it at 4:43. Could you make out anything that the voice just said?**
> **A. Which voice?**
> **Q. Over the loudspeaker.**
> **A. No.**
> **Q. Could you hear him say, "This is an unlawful assembly. Clear the area now"?**
> **A. I would not have noticed that unless the other voice had not sort of parodied what apparently was said on the loudspeaker.**

**(Groce Dep. 177:12–178:19.)**

42.     In fact, Groce is plainly visible on the DeMian Video riding his bicycle through the intersection of Walton and Page while that dispersal order was being given and very near to where that dispersal order was given. (Ex. I, DeMian Video at 3:07-3:26; Ex. J, Groce Dep., p. 176)

**Response: <u>Uncontroverted</u> that Groce is visible in the De Mian video, but <u>objection</u> that "very near" is ambiguous; Groce is about a half-block to the west, at the intersection of Page and Walton, while police vehicles—from one of which the loudspeaker sounds emanated—are near Page and Marcus. Furthermore, it bears repeating that the dispersal**

17

orders given had *instructed* civilians to go west on Page, which is the direction Groce is going.

43.     At that time, having been given orders to disperse the crowd, Dodge ordered Sgt Mayo (in the B.E.A.R) to patrol the area south of Page to ensure that rioters had dispersed while Dodge (in the St. Claire County BearCat Tactical Vehicle ("BearCat")) would patrol the area north of Page. (Ex. F, Dodge Dep. pp, 54-55)

**Response: <u>Uncontroverted</u> that Dodge so testifies.**

44.     At 7:26 p.m, both the B.E.A.R and BearCat traveled west on Page to ensure that all rioters had dispersed. (Ex. K, Video 10 at 00:13; Ex. I, DeMian Video 4:50-5:30)

**Response: <u>Uncontroverted</u> that the City BEAR and St. Clair County BearCat traveled west on Page at approximately that time, but <u>controverted</u> that the motivation was to "ensure that all rioters had dispersed" because the people had traveled the directions that the dispersal orders had instructed them to go and the police line—to the extent the safety of officers had motivated the deployment of the armored vehicles—remained far to the east. (*See, e.g.*, Video 10 at 2:10 and after, depicting the police line backing up east down Page toward Marcus; De Mian Video 3:30 and after, showing very few civilians, even on the sidewalk. When De Mian pans across Page at timestamp 5:15, it is completely empty of pedestrians. *See also id.* at 5:20, De Mian stating, "There's no assembly. It's just press." and at 6:56, De Mian stating, "So, people dispersed and they appear to be chasing them.")**

45.     At 7:27 p.m., one canister was deployed at the intersection of Bayard and Page and the corresponding loud noise of this deployment is clearly heard on both Video 10 and the DeMian Video. (Ex. K, Video 10 at 1:12; Ex. I, DeMian Video at 5:58; Ex. F, Groce Dep. pp. 179, 180 ("I heard a loud noise" while the B.E.A.R was at the intersection of Bayard and Page)).

**Response: <u>Uncontroverted</u>, although the location of the deployment is not visible on**

18

either video, and the sound is not clear on Video 10.

Furthermore, to the extent Defendants are attempting to establish that all munition launches are audible, that implication is <u>controverted</u> by Video 10 at 2:18, in which a lit munition is clearly visible being launched from the St. Clair armored vehicle but no sound can be heard.

46.    The B.E.A.R. and BearCat then proceeded to the intersection of Page and Euclid, with Groce following closely behind on his bicycle. (Ex. K, Video 10 at 1:12- 2:10; Ex. I, DeMian Video at 5:58-7:00; Ex. J, Groce Dep. pp. 180-181).

Response: <u>Controverted in part</u>. Uncontroverted that Groce was riding west on the south sidewalk of Page and that he was behind the vehicles. But <u>controverted</u> in that he disputed that he was "closely" following behind on his bicycle. (Groce Dep: 181:13–182:1.)

47.    At 7:28 p.m., twelve minutes after tear gas was initially deployed and three minutes after the last dispersal order, the B.E.A.R. turned south onto Euclid and the BearCat turned North onto Euclid. (Ex. I, DeMian Video at 7:03; Ex. K, Video 10 at 2:15).

Response: <u>Controverted in part</u>. <u>Uncontroverted</u> that, at approximately 7:28 p.m., the armored vehicles turned each direction on Euclid from Page.

<u>Controverted</u> in that none of the cited material supports an allegation as to when "tear gas was initially deployed."[6]

Further, even crediting the alleged statement of fact about a dispersal order given at 7:24 p.m., though that order is inaudible on the cited video, that was four minutes before

---

[6] *See, e.g.,* Dodge Dep. 67:2-17 ("Q. In the course of our discussion today when you've been talking about chemical munitions I think you've mentioned smoke-like substances and tear gas; is that right? A. Yeah. Same thing. Q. Are there other kinds of chemical munitions besides smoke and tear gas? A. Like a pepper ball, pepper spray. Q. When we've been using the term chemical munition, does that include hand-held pepper spray or mace to your understanding? A. Um, it can; although, generally I think more in terms of chemical munitions in terms of SWAT is more of the canisters that we throw or, you know, shot from a launcher, but, yeah, I guess technically it could include general hand-held mace.").

the vehicles made their turns.

Finally, at timestamp 2:15 on Video 10, it is clear that there is no one to "disperse." Vehicular traffic is flowing; the street lights are working; there are few civilians (and none impeding the flow of traffic on the street), and the armored vehicles travel at speed. At 2:22 on Video 10, Chief Dotson says, "What the fuck are they doing chasing them there?" Then Colonel Leyshock says, "Will you do me a favor and get the St. Clair back here? Chief wants to talk to them." It is a reasonable inference that the BearCat's route and launch of munition are what prompts the Chief's statement. (*See also* Dodge Dep. 72:9–73:21.) Unlike the St. Clair BearCat, which can be seen turning north onto Euclid from Video 10, the City BEAR cannot be seen turning south. (*Id.*)

48.     At 7:28 p.m., just after the BearCat turned North on Euclid, an officer on the top of the BearCat shot a canister north on Euclid, and the loud noise of that deployment is clearly heard on both Video 10 and the DeMian Video. (Ex. I, DeMian Video at 7:06; Ex. K, Video 10 at 2:18; Ex. F, Dodge Dep. p. 56; Ex. J, Groce Dep. p. 183 ("I heard a sound" at 7:06 on the DeMian Video))

Response: Controverted. *See* paragraph 45.

As to the De Mian Video, there is an audible pop at 7:13, but De Mian is far away from the BearCat and there is nothing that connects the sound to the launching of a munition at all, much less from a particular vehicle.

Although a munition launch *is* visible at 2:18 on Ex. K, Video 10, nothing is audible at that time stamp.

The cited material from the Dodge deposition merely acknowledges that the St. Clair armored vehicle launched munitions around Page and Bayard and Page and Euclid, not that such munitions were audible.

20

49.     Molina's property at 1221 N. Euclid is only 550 feet south of the intersection of Euclid and Page. (Ex. L, Google Maps Distance Measurement; Ex. M, Photo taken from the intersection of Euclid and Page with Molina's property shown as the only white house in the photo)

**Response: Controverted in part. Uncontroverted that the property is approximately 550 feet south of the Euclid and Page intersection (though the Google Maps measurement does not include the space taken up by the intersection or most of the property). However, controverted in that Exhibit M does not depict Molina's property as seen from Page and Euclid in a fair and accurate way. The provenance of Exhibit M is not disclosed and therefore it may not be admissible because it has not been authenticated. However, it appears to be a Google view that has been "zoomed" or foreshortened. As such, it leaves out the first four lots on the street, as well as the paved alley. (*See* Ex. 1, Molina Declaration with Non-Zoomed Photograph from Euclid and Page facing 1221 N. Euclid.) In the non-zoomed photograph, one can see the large tree in the tree lawn on the west side of the street that is not visible in Exhibit M.**

50.     As the B.E.A.R turned south on Euclid and proceeded south past Ms. Molina's property, no further deployments of any munitions are heard on the DeMian Video. (Ex. I, DeMian Video at 7:06-7:53).

**Response: Controverted, in that the cited material does not support this alleged statement of fact. The De Mian video is poor quality and very far from the BEAR. Until time stamp 7:50, De Mian is on Page while the BEAR is on Euclid, so it is not visible at all. In addition, a helicopter is flying overhead, so the sound is muffled. Even once De Mian turns south onto Euclid, at the approximate time stamp 7:50, all a viewer can see (very briefly as De Mian changes position) is the flashing lights of the BEAR. De Mian asks what the officers in the BEAR are doing, and pedestrian and legal observer Scott Kampas says,**

"I think they are chasing some people. They are going towards Fountain Park" at 7:58.

Fountain Park is at the south end of the 1200 block of Euclid. After that point, the BEAR is

not visible at all. Although this portion of the video supports the fact that the BEAR did

travel south on Euclid a second time, it gives no information one way or another about its

deployment of munitions anywhere on Euclid.

51.     No one on the B.E.A.R. deployed any munitions as the B.E.A.R. traveled south on

Euclid past Molina's property. (Ex. I, DeMian Video at 7:06-7:53; Ex. J, Groce dep., p. 114: "Q:

Did you see the B.E.A.R deploy any chemical munitions of any kind as it traveled south on Euclid

towards Fountain Park? A: … no, I don't—I don't recall seeing that happen."; Ex. Y, Kampas

Dep., pp. 84-85; Ex. N, Dodge Aff. ¶ 14).

Response: Controverted. Officers on the BEAR did deploy munitions at Vogel and

Molina while they were standing on Molina's property. (Molina Dep. 105:22-24; 108:25–

109:12, 112:4-5; Vogel Dep. 81:4–92:20, 93:13-23)

In addition, the cited excerpt of the De Mian Video does not support this alleged

statement of fact for the reasons stated in paragraph 50. The Groce deposition excerpt is

elided in a misleading way and does not support the alleged statement of fact. What the

cited excerpt says in context is:

> Q. Did you see any clouds of smoke anywhere around you as you were
> traveling south on Euclid towards Fountain Park?
> A. I don't remember.
> Q. You don't remember one way or the other?
> A. I don't remember.
> Q. All right. Do you believe that if you had seen clouds of smoke right in front
> of you or to the left or the right that that's something that would have been
> memorable to you as you're traveling towards your home south on Euclid?
> A. I -- I disagree with the question. I just don't -- I was focused on the B.E.A.R.
> and riding my bicycle toward my house.
> Q. Did you see the B.E.A.R. deploy any chemical munitions of any kind as it
> traveled south on Euclid towards Fountain Park?
> A. I don't remember, no. I don't -- I don't recall seeing that happen.

**(Groce Dep. 113:15–114:8.) Finally, the Kampas deposition except does not support the alleged statement of fact. What Kampas says is that he does not recall seeing tear gas be deployed south of Page on Euclid, but he did not go "far south" of Page and the vehicle "remained in the distance." (Kampas Dep. 85:21-25.) This is supported by the fact that, by at least 7:58 on the De Mian Video, Kampas is heading north on Euclid.**

52.     Not only did Groce not see the B.E.A.R deploy any chemical munitions as it traveled south on Euclid, but he did not see any clouds of smoke and did not experience any additional irritation in his eyes as he followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., pp. 112-113)

**Response: <u>Controverted in part</u>. Uncontroverted that Groce did not experience additional irritation in his eyes as he was traveling south on Euclid, but controverted in that he did not *remember* seeing clouds of smoke. (Groce Dep. 113:15-20; *see also* response to paragraph 51.)**

53.     When the B.E.A.R. turned south on Euclid, Molina and Vogel were standing with a group of at least six individuals, several of whom had been assembled at Page and Walton minutes earlier. (Ex. E, Vogel Dep., p. 83 (Q: Now I think you said that there were approximately eight, but no more than ten people standing on the sidewalk in front of Ms. Molina's house, right? A: Right.))

**Response: <u>Controverted in part</u>, in that nothing in the cited material supports the alleged statement of fact that "several of whom had been assembled at Page and Walton minutes earlier."**

54.     Vogel turned her back to the B.E.A.R. as it traveled south on Euclid and could not see where the alleged canisters were deployed to. (Ex. E, Vogel Dep., p. 91)

**Response: <u>Controverted in part</u>.** She saw the first canister. Vogel testified that once she saw the first chemical munition come from the BEAR as it was traveling south on Euclid and go "[t]owards one of the houses," which she described as "flying from the vehicle . . . onto the streets towards people or directly at people," she turned to run to the backyard of Molina's house. (Vogel Dep. 91:9-12, 86:13-20. *See also generally* Vogel Dep. 81:4–92:20, describing the scene, the other pedestrians present, her actions, the canisters she photographed after the effect, and the officers' deployment of the canisters in detail.)

55.    Vogel does not know where the alleged canisters came from. (Ex. E, Vogel Dep., p. 89)

**Response: <u>Controverted</u>.** In the cited material, Vogel is testifying about a specific canister that was launched from the BEAR, a 518 Riot CS Chemical Irritating Agent canister that she photographed after the fact. (*Id.* 89:6-8.) She testified that the canister came "from the vehicle" (*id.* 89:14-15). It was in response to the question of whether that canister came from a porthole or the top of the BEAR that she said she did not know where it came from. (*Id.* 89:9-12.)

56.    Vogel does not know how far away from her the B.E.A.R. was when the alleged canisters were deployed. (Ex. E, Vogel Dep. p. 89)

**Response: <u>Uncontroverted</u>.**

57.    Vogel was not tear gassed while in front of Ms. Molina's property. ((Ex. I, DeMian Video at 7:06-7:53); Ex. E, Vogel Dep. p. 94 (Q: And did you walk through the tear gas [you allege] had just been deployed to follow in the path of the B.E.A.R.? A: No.))

**Response: <u>Controverted in part</u>** because the De Mian Video does not support this alleged statement of fact or show anything one way or another about the deployment of

24

**chemical munitions on Euclid south of Page. Uncontroverted that Vogel was not tear gassed while in front of Ms. Molina's property, but that is because she left the public sidewalk in front of Ms. Molina's property due to the munitions being fired at them and turned and ran toward the backyard to get away from them. (See Vogel Dep. 91:25–92:8 ("I ran back, tried to run behind the house and could – I could hear the canisters being deployed, the sound that they make, could hear the pop and the whiz and could smell the – the gas and it affected by lungs, my eyes. . . . I had not yet made it to the back of the house when the – when I started smelling the teargas and hearing it --").)**

58.    Chemical munitions deployments make "loud pops." (Ex. E, Vogel Dep. 92)

**Response: Uncontroverted that Vogel testified that the pops she heard were loud.**

59.    Vogel recorded and narrated a video in the minutes after she alleges she was tear gassed, but did not mention that she had been tear gassed in the video. (Ex. E, Vogel Dep. p. 106)

**Response: Uncontroverted that she did not mention herself specifically. The video is 35 seconds long. The somewhat breathless and tearful narration consists of the following:**

> **"They're still shooting. They are shooting in Fountain Park right now. You can see the gas. Everybody has dispersed. And what they are doing is they're coming after people that are, that have dispersed, and they are targeting them. As you can see, the tear gas or smoke gas or whatever it is that they just shot coming up out of Fountain Park."**

**(See Ex. 2, Vogel Video of Munitions in Fountain Park.)**

60.    At the time Vogel alleges she was exposed to tear gas south on Euclid, she had already been exposed to tear gas minutes earlier (which exposure she does not allege was unconstitutional). (Ex. E, Vogel Dep. p. 113-115).

**Response: Uncontroverted.**

61.    At the time of Vogel's alleged exposure to tear gas south on Euclid, her eyes were still watering and her nostrils were still stinging from her exposure to tear gas minutes earlier and

it would be difficult, if not impossible, for Vogel to determine which side effects were the result of the first (unchallenged) exposure versus the second. (Ex. E, Vogel Dep. p. 113-114).

**Response: <u>Uncontroverted</u>.**

62.     As soon as Molina saw a tactical vehicle driving south on Euclid, she turned and ran. (Ex. A, Molina Dep. p. 99)

**Response: <u>Uncontroverted</u>, though she saw the vehicle for the first time somewhere between Maple and Page, and it was shooting. (Molina Dep. 101:16-20, 98:9-11 ("We were [pointing] standing in front of 1221 and the same vehicle or – or another vehicle, a vehicle that of the same similar type that we had seen on Bayard shooting at us came down the street, started shooting.").)**

63.     Molina does not know which tactical vehicle drove south on Euclid. (Ex. A, Molina Dep. p. 98)

**Response: <u>Controverted in part</u> in that she knows now because she read the after-action report. (*See* Ex. 3, After-Action Report at 00039, describing how St. Louis' tactical vehicle traveled south on Page.) But <u>uncontroverted</u> that she did not know at the time.**

64.     With regard to who or what came south on Euclid, Molina believes it "could have been aliens from Mars." (Ex. A, Molina Dep. p. 100)

**Response: <u>Controverted</u> in that the cited material does not support the veracity of this alleged statement of fact, which is not submitted in good faith. Molina responded in this sarcastic manner after counsel had asked her four times whether she knew which tactical vehicle traveled south on Euclid and she had repeatedly testified that she did not know at the time.**

   1. **[W]hat color was the vehicle that drove south on Euclid?**
      **I don't know.**
   2. **[D]o you know whether it was the same vehicle that you had observed near Ranken Technical College earlier that day?**

. . . . I know there were two vehicles there. I don't know which one this was.

3.  **You don't know which vehicle it was that drove south on Euclid and deployed teargas, right?**
    Correct.

4.  **[A]gain, you don't know which vehicle it was, right?**
    It could have been aliens from Mars . . . .

(Molina Dep. 99:1–100:4.)

65.     Molina did not see the tactical vehicle or any person on it deploy any
chemical munitions. (Ex. A, Molina Dep. p. 106, 109, p.112 ("I think when it was shot I had
already ducked behind the house…Q: I mean, do you know where it came from? Did you see it
come from the vehicle? A:… Well, no…)

**Response: <u>Uncontroverted</u>, though she made a reasonable inference based on what
she did see: canisters come from Euclid (where the vehicle was) toward the west (where she
was) and create smoke, as well as white or yellow residue and the canisters themselves,
found afterward. (*E.g.*, Molina Dep. 107:13-25, 108:17–109:12.)**

66.     There were already remnants of tear gas in the air before the tactical vehicle drove
south on Euclid, and Molina does not remember any additional irritation after the alleged
deployment of tear gas south on Euclid. (Ex. A, Molina Dep. pp. 110- 111)

**Response: <u>Controverted</u> in that the cited material does not support this alleged
statement of fact. What Molina testifies is that there were areas where there was CS in the
air, but "I don't know if there was in that spot" (the alley where she took refuge) and "I
don't remember if [CS gas] was at that moment [of the deployment] or just in general in
the air." Her nostrils stung in a way not caused by inert smoke.**

67.     Groce does not remember anything any officer said to him near the intersection of
Page and Marcus and does not remember anything he said to any officer. (Ex. J, Groce Dep., p.
104)

27

**Response: <u>Uncontroverted</u>.**

68.     Groce does not remember what the officer that allegedly kicked his bicycle was wearing. (Ex. J, Groce Dep., p. 105).

**Response: <u>Uncontroverted</u>.**

69.     Groce followed the B.E.A.R. south on Euclid while riding his bicycle. (Ex. J, Groce Dep., p. 110); Ex. I, Demian Video at 6:10-7:00.

**Response: <u>Uncontroverted</u>, except that the De Mian Video does not depict Euclid at this time stamp (or Groce on Euclid at all).**

70.     Groce did not experience any additional eye irritation as he  followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., pp. 112-113).

**Response: *See* response to paragraph 52.**

71.     Groce did not see any clouds of smoke anywhere around him as he followed the B.E.A.R. south on Euclid. (Ex. J, Groce Dep., p. 113).

**Response: *See* response to paragraph 52.**

72.     Groce did not see the B.E.A.R. deploy any chemical munitions of any kind as it traveled south on Euclid. (Ex. J, Groce Dep., p. 114).

**Response: *See* response to paragraph 51.**

73.     The B.E.A.R. did not deploy any munitions of any kind as it traveled south on Euclid. (Ex. J, Groce Dep., p. 114; Ex. I, DeMian Video at 7:06-7:53).

**Response: *See* response to paragraph 51.**

74.     Groce approached and came within feet of the B.E.A.R. while it was stationary in Fountain Park. (Ex. J, Groce Dep., p. 118)

**Response: <u>Uncontroverted</u> that Groce approached the BEAR, but <u>controverted</u> in that "within feet" is ambiguous and describes a wide range of relative locations. Groce**

28

testified that he and the vehicle were both in the park and north of the fountain, which encapsulates a distance of approximately 50–100 feet. (Groce Dep. 122:1-9.)

75.     Groce was irritated as he approached the B.E.A.R. and "wanted to tell them to leave." (Ex. J, Groce Dep., p. 118)

**Response: <u>Uncontroverted</u>.**

76.     Groce communicated his irritation to the officers on the B.E.A.R. (Ex. J, Groce Dep., p. 119)

**Response: <u>Uncontroverted</u>, except that he testified he *attempted* to communicate that irritation to the officers on the BEAR.**

77.     Groce does not remember what he said, does not remember if he raised his voice, and does not remember if he used profanity. (Ex. J, Groce Dep., p. 119)

**Response: <u>Controverted in part</u> in that, although Groce does not remember his exact words, he does remember generally that: "I said leave the park. . . . I said something that was a reflection of my belief that vehicles, any vehicles, should not be in that park." (Groce Dep. 119:1-5.)**

78.     Groce remembers "something hit [him] on the hip" and he does not know where it came from. (Ex. J, Groce Dep., pp. 122, 135)

**Response: <u>Uncontroverted</u> that something hit Groce on the hip. <u>Controverted</u> in part in that the cited testimony does not support the second part of the alleged statement of fact:**

**Q. . . . Tell me exactly what happened after you said to the officers something to the effect of leave the park?
A. The next thing I remember was something hit me on the hip and something hit me on the arm. . . . .**

**(Groce Dep. 122:16-20.)**

Q: . . . you don't know where it came from, right?
A.  I believe it came from the BEAR.
Q. Okay. And what's that based on?
A. I was oriented to the BEAR and I didn't see anyone else around me. I felt an impact on my hip, I looked down, I found the object, then the BEAR drove away.

(Groce Dep. 135:3-9; *see also id.* 122:5-6 ("It seemed to emanate from the vehicle."), *id.* 125:5-12 ("Q. . . . do you have any idea where that object came from that hit you in the hip? A. I believe it came from the BEAR. Q. Why? A. I didn't see anyone else around. It – It came from that direction. I was – I was oriented looking at the BEAR. It came directly at me.").)

79.     Groce has no idea what hit him. (Ex. J, Groce Dep., pp. 122, 135)

Response: <u>Controverted</u>. (Groce Dep. 122 :25–123:1 ("I believe what hit me on the hip was a teargas canister.").)

80.     Groce did not see any person do anything or deploy any canisters at or near the time the object hit him in his hip. (Ex. J, Groce Dep., pp. 123)

Response: <u>Controverted</u> in that Groce was asked this question, and his response was narrower. The actual exchange in the cited material is:

Q. Did you see anybody on the B.E.A.R. or in the B.E.A.R. do anything at or near the time that this object hit you in the hip?
A. I don't remember seeing people. It seemed to emanate from the vehicle.
Q. Did you see any officers on top of the B.E.A.R.?
A. I don't remember officers on top of the B.E.A.R.
Q. Okay. And, again, I'm going to ask you just the same question. Did you see any officers on top of the B.E.A.R. between the time you approached it and the time that you felt something hit your hip?
A. I don't remember seeing officers on top of the B.E.A.R.

(Groce Dep. 123:2-16.)

81.     The SLMPD was already giving directions on means of egress and warnings regarding use of chemical munitions before the City entered a settlement agreement requiring that be done. (Ex. F, Dodge Dep., p. 40).

Response: <u>Controverted</u>. *See, e.g.*, *Ahmad v. City of St. Louis*, 2017 WL 5478410, at *15–16 (E.D. Mo. Nov. 15, 2017) (crediting witness testimony from September 2017, long

30

**after the settlement agreement from *Templeton*, "regarding vague, inaudible dispersal orders, the lack of opportunity to comply with dispersal orders, and the refusal to offer or permit egress once the order was given regarding a protest" and holding that "Plaintiffs have also presented sufficient evidence [at preliminary-injunction stage] demonstrating that they are likely to prevail on their claim that [the City of St. Louis] has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights"). Further, it bears repeating that, although a means of egress was given during dispersal orders on August 19, 2015, the people egressing the direction provided were nonetheless chased and gassed. *See* response to paragraph 47.**

82.    Visibility from inside the B.E.A.R. is extremely limited as the portholes in the B.E.A.R. are roughly six inched in diameter and the gas canisters are roughly 4–4.5 inches in diameter. (Ex. O, Mader Dep., p. 77; Ex. B, Wethington Dep., p. 54; Ex. P, Seper Dep., p. 41 (Q: Like you wouldn't necessarily know where the B.E.A.R. was traveling because you couldn't see very well outside; is that fair? A: Yes.).

**Response: <u>Controverted in part</u>. Gas canisters of various sizes and shapes were deployed that day, and some of them are much narrower in diameter. *See, e.g.*, Ex. 4, Photos of Canisters Found on Aug. 19, 2015.**

83.    Give the size of the portholes, it is impossible to deploy a chemical munition through a porthole while looking out of it. (Ex. P, Seper Dep., p. 44)

**Response: <u>Controverted</u>. SWAT Officer Nicholas Manasco testified:**

> **Q. Can you see out the porthole at the same time you're deploying a munition out the porthole?**
> **A. Are we talking hand-held or projectiles?**
> **Q. Either one.**
> **A. Yes.**
> **Q. . . . You can see out the porthole while you are deploying a munition with**

a launcher; is that correct?
A. Can I elaborate? . . . . I do it two different ways. If I can get behind the
launcher, I can see out the porthole. Sometimes I'll have the launcher in the
porthole and I can see if I'm just in a downward angle just trying to get it out
there because the crowd is pushed back. I'll look through the actual window
right above the porthole. . . . .
Q. You said you can see out two different ways. Just to summarize, that is
either directly behind the launcher through the porthole or through the
window as you're deploying munitions through the porthole?
A. Correct.
Q. I think you said you also pushed out munitions with your hand
through the porthole; is that correct?
A. That's correct.
Q. Can you see through the porthole while you're doing that?
A. . . . So once I stick my hand out the window I look through the glass
to see where it's going, make sure it's not going to land on somebody,
and then I drop it.

**(Manasco Dep. 41:15–43:9.)**

84.     Officers traveling inside of the B.E.A.R. could not see what any other was doing

because their backs were to each other. (Ex. P, Seper Dep., p. 44)

**Response: <u>Controverted</u>. The interior of the BEAR is an open space and does not**

**require officers to have their backs to one another. The BEAR driver, SWAT Officer**

**Chambers, testified that:**

Q. I think you had said earlier that when the BEAR is deployed you usually
had basically as many officers as could fit inside; is that right?
A. Yes.
Q. And I think you said that one of the reasons you would put a bunch of
officers inside is so that you can pass stuff back and forth?
A. Yeah, so they could all pass, you know, whatever around because there's
only so many portholes back there, you know.
Q. Yeah.
A. The rest of the guys would just be helping them get the stuff.
Q. What kind of stuff are you talking about?
A. Whatever chemical or less lethal munitions they chose to bring along with
them. I'm not sure what everybody had in particular.

**(Chambers Dep. 39:20–40:11; *see also* Mader Dep. 75:24–26:7 (testifying that, on August**

**19, 2015, chemical munition canisters "were still in the buckets and were, I believe they**

were in the floorboard of the BEAR"); Seper Dep. 41:22–42:1 (testifying that he "probably could have been switching back and forth" between standing up and sitting down).

85.     Canisters deployed from inside of the B.E.A.R. would have been deployed by hand through the portholes and would not have traveled more than a few feet from the B.E.A.R. (Ex. Q, Chambers Dep., p. 52).

**Response: <u>Controverted</u>. (Chambers Dep. 52:22–53:5 ("Q. [H]ave you seen officers launch canisters from the BEAR using a launcher? A. Yes. I don't remember the cool, specific tactical specific name, but it was – it's a large – you know, it'd shoot, I think, five it held"); *see also* Ex. 5, Manasco Dep. 41:5-14 (testifying that "I've used a launcher to shoot a projectile out" of the porthole on the BEAR). *See also* response to paragraph 83. *See also* Wethington Dep. 70:6-10 (testifying that on August 19, 2015, "there was access to [a launcher] in the BEAR" and he "used one").**

86.     Book, Busso, Chambers, Dodge, Coats, Mader, Mayo, Seper, and Wethington do not know Molina, Vogel, or Groce and would not recognize them. (Ex. R, Book Dep., p. 48; Ex. S, Busso Dep., pp. 74-75; Ex. T, Coats Dep., p. 60; Ex. F, Dodge Dep., p. 63; Ex. O, Mader Dep., p. 87-88; Ex. G, Mayo Dep., pp. 35-36; Ex. P, Seper Dep., p. 45; Ex. B, Wethington Dep. pp. 52-53)

**Response: <u>Uncontroverted</u> that they do not know Molina, Vogel, or Groce and would not recognize them by face. However, <u>controverted</u> that none of the officers would recognize a legal observer by his or her bright green hat. Officer Busso and Sergeant Mayo testified that they were familiar with the lime green hats of legal observers, though they did not know what the hats meant. (Busso Dep. 133:3-9; Mayo Dep. 36:3-5.) Lieutenant Dodge, who had command of the St. Louis BEAR though he himself was stationed on the St. Clair BearCat, testified:**

33

Q. Are you familiar with the term legal observer?
A. Yes.
Q. What does it mean to you?
A. They are, I believe, part of the ACLU who wear the bright green hats, neon hats, who observe protests and civil disobedience events.
Q. Have you ever seen people wearing those bright green hats out at protests?
A. Yes.
Q. Did you see people wearing bright green hats that you believed to be legal observers at the event on August 19th, 2015?
A. I believe so.

**(Dodge Dep. 64:8-21.)**

87.     Vogel has no reason to believe that any of the individual defendants knew who she was on August 19, 2015 other than that she assumes the police helicopter could see her and was relaying that information to the officers on the B.E.A.R. (Ex. E, Vogel Dep., pp. 115-116)

**Response: <u>Uncontroverted</u>. No radio from or to the officers in the BEAR was produced, even though the officers were wearing radios. (*See* Coats Dep. 42:3-11; Book Dep. 52:7–53:4; Mader Dep. 118:18-23; Seper Dep. 42:3-8; Wethington Dep. 65:5-15 (testifying that he had a radio "during this incident" and "we were trying to" talk by radio but gas masks made this challenging).)**

88.     Molina as no reason to believe that any of the individual defendant officers recognized her other than that she assumes the police helicopter saw her green hat and relayed her location to the individual defendants and that that she was "a white person who was in a black neighborhood." (Ex. A, Molina Dep. pp. 134-135).

**Response: <u>Uncontroverted</u>. Officer Busso and Sergeant Mayo testified that they were familiar with the lime green hats of legal observers, though they did not know what the hats meant. (Busso Dep. 133:3-9; Mayo Dep. 36:3-5.)**

89.     Groce has no reason to believe that any of the individual defendants recognized him. (Ex. J, Groce Dep. pp. 226-227).

**Response: <u>Uncontroverted</u>.**

90.     All SLMPD officers are issued copies of and instructed in the SLMPD Use of Force Policy during their Police Academy training. (Ex. U, Larson Aff. ¶ 5)

**Response: <u>Uncontroverted</u>.**

91.     Section I of Special Order 1-01 provides that "Officers will use the least amount of force reasonably necessary to accomplish their lawful objectives while safeguarding their own lives and the lives of others." (Ex. U, Larson Aff. ¶ 6)

**Response: <u>Uncontroverted</u>.**

92.     Every month, all SLMPD officers are required to review the SLMPD Use of Force Policy and answer questions regarding that policy via the electronic Policy Acknowledgement System. (Ex. U, Larson Aff. ¶ 7)

**Response: <u>Controverted</u>. The Policy Acknowledgement System does not require officers to review the use-of-force policy. (*See, e.g.*, Book Dep. 41:3-8.) The questions are extremely superficial. (*Id.* 41:25–42:1 ("Q. How long does [answering the questions] take you? A. About three seconds."); Seper Dep. 34:13-15 ("Not long at all.").) There are never questions about chemical munitions. (*Id.* 16-18. *See also* Ex. 5, Manasco Dep. 58:5-10 ("Have you ever had any training about when it is appropriate or under what circumstances it is appropriate to use a chemical munition in a protest or at a protest? A. I don't recall any specific training on when to use them.").)**

93.     Section XIII of Special Order 1-01 is titled "Deployment of Chemical Agents for Crowd Dispersal" and was in effect on August 19, 2015. (Ex. U, Larson Aff. ¶ 8)

**Response: <u>Uncontroverted</u>.**

94.     Section XIII of Special Order 1-01 provides that "Chemical agents will not be used for the purpose of frightening or punishing individuals for exercising their constitutional rights."

35

(Ex. U, Larson Aff. ¶ 9)

**Response: <u>Uncontroverted</u>.**

95.    Section XIII of Special Order 1-01 further provides that, except in situations that turn violent when persons at the scene present an imminent threat of bodily harm to persons, or of damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threats, any use of chemical agents for crowd dispersal requires the briefing and express consent of the Chief of Police or the Assistant Chief of Police or another Deputy Chief where neither the Chief of Police or Assistant Chief of Police are readily available. (Ex. U, Larson Aff. ¶ 10)

**Response: <u>Uncontroverted</u> that Larson so averred. <u>Controverted</u> that this is an accurate summary of Section XIII of Special Order 1-01, which only restricts the use of chemical agents "for crowd dispersal." (Ex. U at 50.) Furthermore, there is nothing in the Special Order that describes what a "situation" is: how long it lasts or what geographic area it encompasses. In addition, the language "situations turn violent" indicates that there is no ending limitation on the use of chemical munitions after "violence" occurs. (*See also* Ex. 5, Manasco Dep. 58:5-10 ("Have you ever had any training about when it is appropriate or under what circumstances it is appropriate to use a chemical munition in a protest or at a protest? A. I don't recall any specific training on when to use them.").)**

96.    Even then, except in situations that turn violent as described in paragraph 10 above and Section XIII(C)(3) of Special Order 1-01, chemical agents will not be used to disperse groups engaged in non-criminal activity without satisfying each of the elements set forth in Section XIII(C)(2) of Special Order 1-01, which are as follows:

      a.    The Incident Commander ensures that clear and unambiguous warnings are issued stating that chemical agents will be utilized, in conjunction with a statement about

why the area is being cleared, (e.g., "You are impeding the flow of vehicular traffic");

b.  Individuals are provided sufficient opportunity to heed the above-mentioned warnings and exit the area;

c.  The impact of chemical agents on individuals who are complying with lawful law enforcement commands is minimized; and

d.  Ensuring and announcing a means of safe egress from the area that is available to individuals.

(Ex. U, Larson Aff. ¶ 11)

Response: **Uncontroverted. The qualifier "engaged in non-criminal activity" is important because Defendants view all uses of the public streets and sidewalks for protest as criminal activity and anyone protesting a street can be arrested in the discretion of the incident commander. (*See* Ex. 7, Testimony of Lt. Timothy Sachs, 73:9-23, Ex. 8, Testimony of Sgt. Brian Rossomanno, 212:6–213:20; *Langford v. City of St. Louis, Missouri*, 443 F. Supp. 3d 962 (E.D. Mo. 2020).) Indeed, the example given of an appropriate statement about why an "area" is being cleared supports the fact that this is Defendants' belief. (*See also* Mayo Dep. 53:22–56:3.)**

97.    Video file 15-041999 (2) 007 ("Wood Video 7") was recorded by Detective James Wood and begins at approximately 6:54 p.m. on August 19, 2015. (Ex. V, Wood Aff. ¶¶ 3-5)

**Response: Controverted in part. The metadata associated with Wood Video 7 shows a start time stamp of 6:58 p.m.**

98.    Wood Video 7 is 18 minutes and 8 seconds long and it accurately reflects the events as they occurred from approximately 6:54 p.m. to 7:12 p.m. on August 19, 2015. (Ex. V, Wood Aff. ¶ 6)

**Response: <u>Uncontroverted</u>, except what Detective Wood actually said—and what would be more accurate—is that the video "depicts events as they occurred," not *the* events. Because he is recording from a single vantage point, he of course did not capture the entirety of the scene.**

99.    Wood Video 7 is attached as "Exhibit W." (Ex. W, Wood Video 7)

**Response: <u>Uncontroverted</u>.**

100.    Also in response to the City's Subpoena, DeMian provided a second video she recorded on August 19, 2015, attached hereto as "Exhibit X" (hereafter "Demian Video 2"), which fairly and accurately depicts events as they occurred on August 19, 2015. (Ex. X, DeMian Video 2; Ex. N, Dodge Aff. ¶ 5)

**Response: <u>Uncontroverted</u>, except that the video, which is 23:55 long, is of course taken from a single vantage point. It is dark and blurry.**


## II.    Plaintiffs' Additional SUMF

1.    Exhibit 3 is a true and accurate copy of an After-Action Report, written by SWAT officer Nicholas Manasco, that purports to memorialize certain events that took place on August 19, 2015 when individuals protested the shooting of Mansur Ball-Bey by a St. Louis police officer (the "After-Action Report"). (Ex. 3.)

2.    On August 19, 2015, Sergeant Mayo and Officers Mader, Seper, Book, and Wethington, were inside the St. Louis BEAR.[7] Ex. 3 at 00038. *See also* Seper Dep. at 39:21-24.

3.    Officers Busso and Coats were on top of the BEAR. (Coats Dep. 99:7-9.)

4.    Officer Chambers was driving the BEAR. (*E.g.*, Ex. 3 at 00039.)

5.    All of the officers inside and on top of the BEAR had access to chemical munitions

---

[7] "BEAR" is an acronym for Ballistically Engineered Armored Response vehicle.

and a launcher. (Wethington Dep. 70:6-10; Coats Dep. 82:15-22, 84:24-85:1; Chambers Dep. 39:20–40:11; Mader Dep. 75:24–26:7.)

6.     The After-Action Report states that Lieutenant Doge ordered police officers, on several occasions, to deploy chemical munitions. (Ex. 3 at 00037–38.)

7.     The After-Action Report states that, as the BEAR travelled south of Page on Euclid, "Officer Mader deployed four (4) Triple Phaser CS smoke canisters and three (3) CS riot smoke canisters," causing protestors "to run east into the gangways of several residences out of sight."

8.     The BEAR then continued south of Euclid to Fountain. (Ex. 3 at 00039; Ex. 2, Vogel Video of Munitions in Fountain Park; *see also* response to Defs.' SUMF paragraph 59.)

9.     Officer Mader admits that "[b]y the time you put on face masks and helmets, we pretty well look similar to each other, and I can't tell you from one guy to the next." (Ex. O, Mader Depo. at 107:6-9.)

10.    Officer Mader admits that he deployed chemical munitions from inside the BEAR. *Id*. at 79:14-80:2 ("Q. You deployed canisters from the BEAR that day? A. I believe so, yes."); 106:25-107:11 ("I know I deployed some… I don't know who else did.").

11.    Officer Mader admits that, based on his experience as a police officer, if Plaintiffs' allegations are true, then "there's a possibility" that "a crime" was committed against them. *Id*. at 140:16-141:15.

12.    Molina dispersed by moving west on Page, south on Bayard, through an alleyway, down to Euclid. *Id*. at 84:22-85:8.

13.    When Molina and Vogel arrived at 1221 Euclid, Molina talked to her neighbor, Sonny, who, along with a friend, was working on his car. *Id*. at 94:9-23. Otherwise, there was no one else with them at first. *Id*. at 94:9-25.

14.     Several other people then gathered in front of the house with Molina and Vogel. *Id*. at 95:1-5.

15.     Molina did not hear any dispersal orders on Euclid. *Id*. at 167:9-16 ("No, there was nothing said at all" and "Not even an unintelligible order, nothing").

16.     As the BEAR was travelling south on Euclid, Molina, along with a group of five to six other people (including Vogel), stood in front of her house, on the yard or sidewalk.  *Id*. at 136:23-137:1.

17.     Neither Molina nor any of the other people standing in front on her house was not doing anything threatening, violent, or unlawful. *Id*. at 165:13-166:7.

18.     At that time, Molina was wearing a lime green hat, which is indicates that she was a legal observer. *Id*. at 134:12-19.

19.     As Molina and Vogel ran between the houses, chemical munitions were deployed at them "through the space between the two houses." *Id*. at 105:22-24; 108:25-109:12.

20.     The chemical munitions came from the BEAR. *Id*. at 112:4-5.

21.     Molina then saw the BEAR continue driving south on Euclid into Fountain Park. *Id*. at 118-1-3.

22.     As a result of the deployment of chemical munitions directed at her, Molina "was injured in the sense that for almost a year, I didn't do anything at all. I laid in bed depressed, didn't get out of bed…. I was completely depressed. I had no desire to do anything and I didn't participate in things that I like to participate in." *Id*. at 167:22-168:8.

23.     In the five minutes before the BEAR began driving south of Page on Euclid, Vogel did not hear anybody speaking on a loudspeaker. *Id*. at 85:2-5.

24.     When the BEAR began driving south of Page on Euclid, there were very few people on Euclid. *Id*. at 83:14-20 ("If I were giving a number, I would say not very many.

Excluding – Excluding our group, I would say maybe between five and ten. There were not many out there."); *Id*. at 84:17-23 ("Maybe ten to 15" people in total).

25.     When she was on the sidewalk in front of Molina's house on Euclid, Vogel saw canisters flying from the BEAR onto the streets towards people or directly at people. *Id*. at 82:7-19, 86:13-20.

26.     As she was running along the side of the house, Vogel noticed "the smell of the teargas, the sound that it makes when it comes out started hitting and we had a fog, a cloud of smoke coming up at that point." *Id*. at 93:13-23.

27.     Vogel was exposed to tear gas on two separate occasions that evening: first near the intersection of Bayard and Page, and second when she was next to Molina's house on Euclid. *Id*. at 58:21-59:1 and 93:18-23.

28.     Despite the fact that it is difficult for Vogel to tell which side effect was caused by which exposure, she felt the "effects" of "both of these exposures." *Id*. at 113:20-114:2.

29.     The exposure to tear gas has caused Vogel to experience mental distress and panic attacks. *Id*. at 151:1-7; 154:6-14.

30.     As a result, Vogel sought counseling. *Id*. at 154:20-156:4.

31.     The impact of the chemical munition canister on Groce's hip caused pain and serious bruising. Ex. 29.

32.     St. Louis Metropolitan Police Department officers have deployed chemical munitions at protestors to retaliate against them for expressing a perceivedly anti-law enforcement viewpoint on multiple occasions since 2012. (*See* Ex. 1; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 15;[8] Ex. 16; Ex. 17 at *15; Ex. 18; Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23; *see also* Dodge Dep. 89:4-23.)

---

[8] *See also* Molina Dep. 152:17-19 (identifying declarant in attachment).

33.     St. Louis Metropolitan Police Department officers have deployed chemical munitions at protestors who are nonviolent and not engaged in any crime on multiple occasions since 2012. (*See* Ex. 1; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 16; Ex. 17 at *15; Ex. 18; Ex. 19; Ex. 20; Ex. 21; Ex. 22; Ex. 23.)

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
Omri E. Praiss, #41850MO
Kayla DeLoach, #72424MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, MO 63101
Phone: 314-652-3114

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938

**Attorneys for Plaintiffs**