54

1   MR. ROTHERT: No objection.

2   THE COURT: Exhibit C is received into evidence.

3   And D also, I assume, you want in evidence?

4   MR. RELYS: I did. Thank you, Judge.

5   THE COURT: Yeah. So D is also received into

6   evidence.

7   Q  (By Mr. Relys) And, again, this is a two-page order. So

8   I don't want you to read the whole thing to us, but could you

9   tell us, generally speaking, what -- what the special order --

10  Section XIII of Special Order 1-01 says about the use of

11  chemical munitions as to it being used to disperse crowds?

12  A  Yeah. We can use chemical munitions to disperse crowds.

13  They are only to be used by tactical units, which would be my

14  SWAT unit. It's the use of chemical agents, and, you know,

15  it's not to be used, you know, for the purpose of frightening

16  or punishing any individuals. It's just to be used, you know,

17  to disperse them.

18  Q  And does this special order cover the use of handheld

19  pepper spray?

20  A  Yes.

21  Q  Handheld pepper spray?

22  A  I believe on the next page it says something about

23  sergeants being issued foggers. Or, no, I'm sorry. No, this

24  one doesn't. It was -- it was in the -- the one you've

25  already admitted.

55

1  Q    Okay.
2  A    Yeah.  I'm sorry.
3  Q    So I'm going to ask you the question again.  I think --
4  does the -- this deals with dispersal of crowds; right?
5  A    Yes, it does.
6  Q    And does this -- "chemical agent equipment" is defined in
7  paragraph (A)?
8  A    Yes, sir, it is.
9  Q    Is handheld mace included in that definition?
10 A    No.  Oh, no, that is not.  No.
11 Q    Okay.
12 A    The foggers and the spray are not.  No.  This is just the
13 chemical munitions that my team uses.
14 Q    Okay. And so paragraph (C) deals with restrictions on
15 deployment here; right?
16 A    That's correct.
17 Q    Those restrictions do not necessarily apply to the
18 handheld mace?
19 A    No, not at all.  This is -- this is for the munitions
20 that the tactical team uses.
21 Q    Okay. And is this a -- is this the order that you follow
22 when you give the dispersal orders that we've been talking
23 about?
24 A    Yes, sir.  Yes, sir.
25 Q    To the best of your knowledge, has this order been

71

1  between Locust and Washington.

2  Q   And where you were, you couldn't understand what the

3  dispersal order said; right?

4  A   You're correct, yes.

5  Q   You could hear it, but you couldn't understand?

6  A   You're correct.

7  Q   And that was actually at 10:50 p.m.?

8  A   The final dispersal was at 2301.

9  Q   And who gave the final order?

10 A   Sergeant Rossomanno.

11 Q   Who was the incident commander?

12 A   The incident commander would have been Colonel Leyshock,

13 Gerald Leyshock.

14 Q   Okay.  So is it possible he gave that final order --

15 Mr. Leyshock?

16 A   No.

17 Q   So if Mr. Rossomanno states that he gave a dispersal

18 order, the last one he gave was at 10:50, would you believe

19 him if he said that under oath?

20 A   I would believe he gave one then if he told me.

21 Q   Okay.

22 A   But I have radio documentation that there was one given

23 at 2301.  So I don't know what his recollection was.

24         THE COURT:  Well, let me ask you this.

25         THE WITNESS:  Yes, ma'am.

Pls.' Ex. 7

72

1    THE COURT: Did you have that radio documentation
2    when you signed the affidavit you filed in this case last
3    week?
4    THE WITNESS: No, ma'am. I got that afterwards.
5    THE COURT: Okay. So when you said in there that it
6    was at 10:50, you were mistaken?
7    THE WITNESS: That was the last I knew when I signed
8    the document, yes, ma'am.
9    THE COURT: And so since then, what did you find out?
10   THE WITNESS: That there was orders given after that
11   and the final order was given at 2301.
12   THE COURT: All right. Please proceed.
13   Q   (By Mr. Rothert) And what was the basis for dispersal at
14   that time, at 11:01 p.m.?
15   A   That the people were not leaving the area and they were
16   still blocking the streets.
17   Q   Okay. So, first of all, your testimony is that they were
18   blocking the streets; is that right?
19   A   Correct.
20   Q   And by blocking the streets, what do you mean?
21   A   Standing in the street, laying in the streets, not
22   allowing traffic through.
23   Q   Okay. So traffic was not being allowed through because
24   of people in the streets?
25   A   Because of people in the streets, the police department

Case: 4:17-cv-02498-AGF Doc. #: 183-7 Filed: 08/13/20 Page: 5 of 7 PageID #: 3207
Timothy Sachs Cross-examination                      Volume 2

73

1  put vehicles to prevent them from being run over, but they
2  were the cause of that. So the streets were blocked by them
3  and not allowing vehicular traffic through.
4  Q   Now, streets are regularly blocked by protest activity in
5  the city of St. Louis; correct? That's a regular thing that
6  happens?
7  A   On occasion. I mean I wouldn't say regularly. I don't
8  know. I don't go to every one of the protests. I don't know.
9  Q   Okay. But you've been to protests that block the street?
10 A   Yes. Correct.
11 Q   And where people are marching in a street, for instance?
12 A   Yes.
13 Q   And when does that become illegal?
14 A   Actually, it's illegal right away.
15 Q   Okay. Who decides that it's illegal?
16 A   I believe it's a state statute or the city ordinance
17 violations that indicate that they're in violation of that.
18 Q   All right. So who decides when -- when someone's going
19 to be arrested for being in the street if there's a protest
20 that's in the street?
21 A   It would be the incident commander.
22 Q   Okay. Is it just at their discretion?
23 A   As far as I know, yes.
24 Q   So you agree there was no destruction of property
25 happening when Mr. Rossomanno gave his last announcement? No

74

1   matter what time it was, you agree that there was no
2   destruction of property occurring at that time?
3   A   I can't say that, no, sir.
4   Q   Well, you're aware of none?
5   A   That's correct.
6   Q   And your understanding -- well, let's move on from there.
7   How much time passed from when the final announcement was made
8   until people were locked in by the four lines of police lines?
9   A   Nineteen minutes approximately.
10  Q   So you know that people came into that area after -- came
11  into the area that was blocked off after the last announcement
12  had been made; right?
13  A   I do not know that, no.
14  Q   Well, were you looking to see if that happened?
15  A   I was not in a position to do that.  No.
16  Q   Was there any step taken to make sure that no one entered
17  the zone after the announcement was made?
18  A   Officers were not allowed to let anyone pass from behind
19  them.
20  Q   Okay.  But they weren't blocking the streets?  Before
21  they blocked the streets, before they went in place, how long
22  was it before they were in place?
23  A   Okay.  I had different lines in place at different -- you
24  have to help me here.
25  Q   Okay.  So it was possible for people to enter into the

75

1  area after the last dispersal order and be locked in; isn't
2  that true?
3  A    I would -- I would say yes because there was still egress
4  allowed.  So I guess they were allowed ingress.  We weren't
5  controlling egress or ingress at the time.
6          THE COURT:  So when did you actually start
7  controlling it from different directions?  You said earlier
8  that to the east you had the bicycle people there.
9          THE WITNESS:  Right.  Yes, ma'am.
10         THE COURT:  So when were they not letting anybody go
11 east?  What time?
12         THE WITNESS:  Oh, that was well before 11:00 where
13 they couldn't go east.
14         THE COURT:  When did they stop letting people go
15 north?
16         THE WITNESS:  That was approximately -- north and
17 south was approximately quarter after.  And the egress to east
18 and west or egress west was still open until about 20 after,
19 and --
20         THE COURT:  And do you have records that show this,
21 where you're getting these precise numbers, or is it your
22 memory?
23         THE WITNESS:  It's my memory based on the radio
24 transmissions, Judge.
25         THE COURT:  Okay.

Pls.' Ex. 7