ERIC LARSON  4/8/2019

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MISSOURI
 3                  EASTERN DIVISION
 4
 5     MALEEHA AHMAD, ET AL.,   )
                                )
 6          Plaintiffs,    )
                                )
 7     vs.            ) Case No. 4:17-CV-2455-CDP
                                )
 8     CITY OF ST. LOUIS,   )
       MISSOURI,            )
 9                          )
            Defendant.    )
10
11
12
13
14
15
16
17        DEPOSITION OF ERIC LARSON
18     TAKEN ON BEHALF OF THE PLAINTIFFS
19             APRIL 8, 2019
20
21
22
23
24
25
```

## Page 2

```
 1               I N D E X
 2              WITNESSES
 3     ALL WITNESSES  PAGE
 4     For Plaintiffs
 5     ERIC LARSON
 6       Examination by Mr. Praiss        7
 7       Examination by Mr. Dierker     247
 8       Re-Examination by Mr. Praiss   251
 9
10               EXHIBITS
11     NO.      DESCRIPTION        PAGE
12     Exhibit 1  11/16/17 email from
             Lawrence O'Toole        17
13
       Exhibit 2  Fourth Amended Rule
14         30(b)(6) Deposition Notice     20
15     Exhibit 3  Civil Disobedience Response
           Operations Plan section,
16         CITY 00430 through CITY 00438    62
17     Exhibit 4  Metropolitan Police
           Department - City of St.
18         Louis, Office of the Chief
           of Police, Special Orders     83
19
       Exhibit 5  City of St. Louis Law
20         Department Police Section
           Protest Law, 8/16/17        86
21
       Exhibit 6  Settlement Agreement in
22         Templeton v. Dotson case      93
23     Exhibit 7  Declaration of Jerome V.
           Baumgartner            101
24
       Exhibit 8  Picture taken from
25         Washington and Tucker     117
```

## Page 3

```
 1               EXHIBITS
 2     NO.      DESCRIPTION       PAGE
 3     Exhibit 9  Picture taken from the
           Washington and Tucker
 4             location          128
 5     Exhibit 10 10/11/17 email from Carl
           Filler with attached Scope
 6         of Work for Critical
           Incident Review document    154
 7
       Exhibit 11 Operational Planning,
 8         Major Event - After Action
           Critique            162
 9
       Exhibit 12 Chapter 574 sections of
10         the Missouri Revised
           Statutes            170
11
       Exhibit 13 Metropolitan Police
12         Department, September 1,
           2017, Instructions for the
13         Issuance of Warning from
           Police Officer Unlawful
14         Assembly, Dispersal Order    203
15     Exhibit 14 Civil Disobedience
           Response Operations Plan
16         relative to the expected
           Stockley verdict dated
17         9/27/17          206
18     Exhibit 15 Training Course Lesson
           Plan, Course Title:  Civil
19         Disobedience Team/7250
           Training dated September
20         2014           219
21     Exhibit 16 Declaration of Charles
           Wall, with attached
22         Exhibit A         223
23
24
25     (Exhibits attached to transcript.)
```

## Page 4

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF MISSOURI
 3                  EASTERN DIVISION
 4
 5     MALEEHA AHMAD, ET AL.,   )
                                )
 6          Plaintiffs,    )
                                )
 7     vs.            ) Case No. 4:17-CV-2455-CDP
                                )
 8     CITY OF ST. LOUIS,    )
       MISSOURI,            )
 9                          )
            Defendant.    )
10
11
12        DEPOSITION OF WITNESS, ERIC LARSON,
13     produced, sworn and examined on the 8th day of
14     April, 2019, between the hours of eight o'clock in
15     the forenoon and six o'clock in the afternoon of
16     that day, at the Office of the St. Louis City
17     Counselor, 1200 Market Street, City Hall, St.
18     Louis, Missouri, before Tara Schwake, a Registered
19     Professional Reporter, Certified Realtime Reporter,
20     Certified Shorthand Reporter (IL), Certified Court
21     Reporter (MO), and Notary Public within and for the
22     State of Missouri.
23
24
25
```

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 5

1    APPEARANCES
2
3    FOR THE PLAINTIFFS:
4        ACLU OF MISSOURI FOUNDATION
5        906 Olive Street, Suite 1130
6        St. Louis, Missouri  63101
7        (314) 652-3114
8        by: Mr. Omri Praiss
9           Ms. Jessie Steffan
10       opraiss@aclu-mo.org
11       jsteffan@aclu-mo.org
12
13   FOR THE DEFENDANT:
14       OFFICE OF THE CITY COUNSELOR
15       1200 Market Street, Room 314
16       St. Louis, Missouri  63103
17       (314) 621-3361
18       by: Mr. Robert Dierker
19          Ms. Abby Duncan
20          Mr. Andrew Wheaton
21       dierkerr@stlouis-mo.gov
22
23
24
25

Page 6

1    COURT REPORTER:
2        TARA SCHWAKE, CRR, RPR, CCR, CSR
3        Alaris Litigation Services
4        711 North 11th Street
5        St. Louis, Missouri  63101
6        (314) 644-2191
7        1-800-280-DEPO
8        transcripts@alarislitigation.us
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        IT IS HEREBY STIPULATED AND AGREED by
2    and between Counsel for Plaintiffs and Counsel for
3    Defendant that this deposition may be taken by Tara
4    Schwake, Notary Public and Certified Realtime
5    Reporter, thereafter transcribed into typewriting,
6    with the signature of the witness being expressly
7    reserved.
8        ERIC LARSON,
9    of lawful age, having been produced, sworn, and
10   examined on the part of Plaintiffs, testified as
11   follows:
12        * * * * *
13       (Deposition commenced at 9:58 a.m.)
14        EXAMINATION
15   QUESTIONS BY MR. PRAISS:
16   Q   Good morning.
17   A   Good morning.
18   Q   My name's Omri Praiss, I'm an
19   attorney with the ACLU and we're here today for a
20   deposition in a case involving -- titled Ahmad
21   versus City of St. Louis.
22       Are you familiar with that case?
23   A   I am.
24   Q   Could you state your name for the
25   record?

Page 8

1    A   For the record, my name is Eric
2    Larson.
3    Q   And if I refer to you as Mr. Larson,
4    is that okay?
5    A   That is fine.
6    Q   Have you ever been deposed before?
7    A   I have.
8    Q   How many times?
9    A   At least once that I'm aware of.
10   Q   How recently was that?
11   A   That has been probably 15 years ago.
12   Q   It's been a while.
13   A   Yes.
14   Q   I'll give you a quick refresher.
15   Basically I'll be asking you a lot of questions
16   today, and we have a court reporter who is
17   transcribing everything.  Please let me finish my
18   questions even when you can probably anticipate
19   what I'm going to ask you so that the record is
20   clear.  I'll do the same and let you finish your
21   answers before I ask a new question.  Is that fair?
22   A   It is.
23   Q   If at any time I ask you a question
24   today that you don't understand, please ask me to
25   rephrase it.  Otherwise, I'm going to assume you

2 (Pages 5 to 8)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 9

| | |
|---|---|
| 1 | understood my question.  Is that acceptable? |
| 2 | A    That's acceptable. |
| 3 | Q    Okay.  Are you under any medication |
| 4 | that impairs your ability to provide truthful and |
| 5 | accurate answers today? |
| 6 | A    I am not. |
| 7 | Q    And you understand you're under oath? |
| 8 | A    I do. |
| 9 | Q    Subject to penalty of perjury? |
| 10 | A    I do. |
| 11 | Q    Wonderful.  Do you understand that |
| 12 | this is a deposition of what's titled a Rule |
| 13 | 30(b)(6) deposition where you are actually |
| 14 | designated as the representative on behalf the City |
| 15 | today? |
| 16 | A    I am aware of that. |
| 17 | Q    And you're going to be testifying |
| 18 | with respect to a series of topics; you understand |
| 19 | that? |
| 20 | A    I do. |
| 21 | Q    If you don't mind, I'll take a few |
| 22 | minutes to get a little bit of background |
| 23 | information about yourself, because that may impact |
| 24 | your testimony on some topics. |
| 25 | MR. DIERKER:  Excuse me, I'm sorry to |

Page 10

| | |
|---|---|
| 1 | interrupt but I would like to put on the record |
| 2 | that originally the plan was that this 30(b)(6) |
| 3 | would cover both the Ahmad and the Molina cases and |
| 4 | owing to some discovery issues in Molina, this is |
| 5 | going forward in the context of Ahmad but my |
| 6 | understanding is that topics 4, 5, 8, 9, 10, and 11 |
| 7 | duplicate topics in the 30(b)(6) notice in the |
| 8 | Molina case, and it's our expectation that we will |
| 9 | not have to duplicate the testimony in Molina that |
| 10 | is being adduced in this case. |
| 11 | MR. PRAISS:  And I appreciate your |
| 12 | comments.  I'm not sure this is the right place and |
| 13 | I don't want to get into a debate with you.  I know |
| 14 | there was correspondence between and you Tony |
| 15 | Rothert about that issue and I think, as you know, |
| 16 | there are still outstanding discovery issues in |
| 17 | Molina but I can assure you to the extent, at all |
| 18 | possible, we have no intent of duplicating this |
| 19 | deposition unnecessarily. |
| 20 | MR. DIERKER:  I'm confident that you |
| 21 | don't but I felt the need to put something on the |
| 22 | record. |
| 23 | MR. PRAISS:  That's fine, but we |
| 24 | don't know what additional discovery we will be |
| 25 | getting and how that will impact so I can't commit |

Page 11

| | |
|---|---|
| 1 | to anything final at this point. |
| 2 | MR. DIERKER:  I understand. |
| 3 | Q    (BY MR. PRAISS)  Very briefly, give |
| 4 | me a summary of your employment background in |
| 5 | chronological order if you could. |
| 6 | A    Since 1994, I have been employed by |
| 7 | the St. Louis Metropolitan Police Department. |
| 8 | Q    And summarize for me a little bit |
| 9 | about what positions you have held. |
| 10 | A    From essentially February 1995, I was |
| 11 | commissioned as a police officer.  I was a patrol |
| 12 | officer in the second district until approximately |
| 13 | September of 2004. |
| 14 | Q    Okay. |
| 15 | A    When I was transferred to the crime |
| 16 | laboratory and began training as a firearm and tool |
| 17 | mark examiner.  Which I performed until |
| 18 | approximately February of 2010, when I was promoted |
| 19 | to the rank of sergeant.  In 2011, I became the |
| 20 | supervisor of the evidence technician unit.  In |
| 21 | January of 2013, I became the acting laboratory |
| 22 | director until June of 2013, when I was promoted to |
| 23 | the rank of lieutenant and given the title |
| 24 | laboratory director. |
| 25 | In September of 2015, I was promoted |

Page 12

| | |
|---|---|
| 1 | to the rank of captain and transferred from the |
| 2 | laboratory to District 5, where I remained until |
| 3 | approximately -- I believe it was August of 2017 |
| 4 | when I was transferred to the command of |
| 5 | investigative services, where I remained until |
| 6 | early 2018, I think January 2018, when I was moved |
| 7 | to be over planning and research until April of |
| 8 | 2018 when I was promoted to the rank of major, and |
| 9 | I have been the commander/deputy commander of |
| 10 | specialized enforcement since that time. |
| 11 | Q    Congratulation, it's been an amazing |
| 12 | career. |
| 13 | A    Thank you. |
| 14 | Q    I can ask you a ton of questions on |
| 15 | it but I'm going to refrain because I want to focus |
| 16 | on the 30(b)(6) but just two I need to understand. |
| 17 | In early January of 2018 you said you |
| 18 | were transferred to planning and research. |
| 19 | A    Correct. |
| 20 | Q    Just explain to me a little bit of |
| 21 | what that entails? |
| 22 | A    Essentially I was moved from |
| 23 | investigative services where I was the captain of |
| 24 | homicide, bomb and arson, sex crimes, the |
| 25 | investigative units of the police department, over |

3 (Pages 9 to 12)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

---

Page 13

1  to planning and research, which is essentially the
2  departments of research -- planning is responsible
3  for writing special orders, researching policy,
4  preparing our crime numbers for the FBI, and that
5  was -- that was my function.
6       Q    And you were in that position for
7  actually a very short time?
8       A    For a very short time.
9       Q    Okay.  And then you were transferred
10  -- you were promoted to major; correct?
11       A    Yes.
12       Q    And if I understood correctly, you
13  were in charge of specialized enforcement?
14       A    I was the commander of specialized
15  enforcement from April of 2018 through December of
16  2018, and then in 2019 I became the deputy
17  commander.  We have had several department
18  reorganizations between April of 2017 through
19  December of 2018.
20       Q    As deputy commander, it's still over
21  specialized enforcement?
22       A    Correct.
23       Q    So my question is, what does the term
24  specialized enforcement, what does that entail?
25       A    Essentially specialized enforcement

---

Page 15

1  some direction from the courts.
2       Q    Since the Stockley protests, is it
3  your testimony the City has done -- made no effort
4  to evaluate the current special orders and policies
5  in effect?
6       A    No, I would not say that.
7       Q    So I misunderstood you.  So again,
8  during the time period that you were there, help me
9  understand what efforts were made by the Department
10  of Planning and Research to, I'll broadly
11  characterize as this, to evaluate modifying
12  policies, writing new policies, or looking at
13  lessons learned from the Stockley protest.  I'm
14  trying to make is as broad as possible.
15       A    If you're trying to make it as broad
16  as possible, we're discussing several areas that
17  are outside the scope of planning and research.
18  Planning and research is an area that generally
19  works at the direction of the Chief of Police or
20  senior command.  So a request has to come from that
21  office to the planning and research unit to perform
22  functions related to policy reviews, changes in
23  policy, changes in direction on that.  And when
24  we're talking about policy, we're talking about all
25  department policy.

---

Page 14

1  are primarily uniformed members of the department
2  who are not in district assignment.  So I'm in
3  charge of, as the deputy commander, I report to a
4  colonel, I have a captain that reports to me, but
5  the units are SWAT, K-9, aviation, traffic,
6  commercial motor vehicle inspection, special
7  operations, which relates primarily to anti-crime
8  and auto theft.  Our drug enforcement and
9  interdiction units, public transportation, and park
10  rangers.  I think that's everybody.
11       Q    Altogether, how many officers report
12  to you?
13       A    I think it's somewhere about 96 to a
14  hundred.
15       Q    During the period when you were in
16  charge of planning and research the first four
17  months of 2018, you mentioned that you were working
18  on writing special orders and researching policy?
19       A    To some extent, yes.
20       Q    During that time, did you do any work
21  that related in any way to what had occurred in the
22  Stockley protests?
23       A    No.  Because the Stockley protest is
24  the subject of litigation and so we won't write
25  policy until the litigation is complete or we have

---

Page 16

1       So I mean, there's something
2  somewhere along the lines of 3,000 pages of
3  department policy.  So to say we have made no
4  changes in policy during that time, I don't believe
5  would be fair.  To say that we didn't talk or
6  discuss about things related to protests or protest
7  activity, I can't say we did or I can't say that we
8  did not.  We may have, but because of the ongoing
9  litigation, no concrete direction had been
10  determined on what things would need to be
11  modified or not be modified.
12       Q    Let me follow up a little bit.  If I
13  understood correctly with respect to planning and
14  research, you indicate that the Chief of Police
15  would have to make a request of the department to
16  investigate something?
17       A    Or a senior command, so a colonel,
18  assistant chief.
19       Q    To your knowledge, since September of
20  2017, has the Chief of Police made any requests to
21  the planning and research group, department, that
22  related to the Stockley protests?
23       A    I believe the assistant chief
24  indicated some information which were -- which was
25  related to I believe Judge Perry issued an order

---

4 (Pages 13 to 16)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

1 related to what we would be allowed to do or not do
2 as far as engaging in the dispersement of
3 individuals during protest activity.  The bulk of
4 that information is already incorporated into a
5 special order.  That Special Order is 1-01, Section
6 XIII.
7         But as far as any hard policy
8 changes, I can tell you there have been none that
9 have been put into effect.
10      Q    And I understand you've told me that
11 now twice, that there hasn't been some changes
12 because of litigation.  My question, and I still
13 don't think you answered it is, to your knowledge,
14 has the Chief of Police or somebody else below him
15 made a specific request of the planning and
16 research department through an email or other
17 communication, saying, I instruct to you
18 investigate and look at policies that in any way
19 relate to what happened in the Stockley protests?
20      A    I would say to the best of my
21 knowledge, no.
22      Q    Thank you.  I appreciate that answer.
23 Mark this.
24         (Plaintiffs' 30(b)(6) Exhibit 1
25 marked for identification by the court reporter.)

1      Q    (BY MR. PRAISS)  Mr. Larson, you have
2 Exhibit 1?
3      A    I do.
4      Q    You said something a few seconds ago
5 in your answer that prompted me to think of this
6 exhibit, so I figured I'd just real quickly ask a
7 couple questions about it.
8         Do you see this as an email that was
9 sent on November 16, 2017, by Lawrence O'Toole?
10      A    I do.
11      Q    And it indicates it has an attachment
12 to it which is the Ahmad Preliminary Injunction, I
13 believe it's referring to the order that was issued
14 by the judge in this case?
15      A    Correct.
16      Q    Okay.  Have you had an opportunity at
17 any time since November of 2017 to review that
18 order?
19      A    Let me think.  I have -- I obviously
20 received this email because it's directed to the
21 SLMPD.  I would have printed and made a copy of
22 this and reviewed it at around the time that it was
23 issued.  I had not reviewed this order prior to our
24 deposition.  We may have discussed it during
25 settlement meetings that I was a part of.

1      Q    Okay.  You had mentioned in your
2 testimony referring to the assistant chief
3 providing some communication relating to the
4 injunction entered by the court, preliminary
5 injunction.
6      A    Yes.
7      Q    Was this the communication you were
8 referring to?
9      A    I believe so.
10      Q    Okay.  And that's what I wanted to
11 confirm.  Other than this communication -- strike
12 that.
13         To whom this was communication sent?
14      A    It was sent to all members of the
15 SLMPD.
16      Q    So all police officers?
17      A    If it went to SLMPD.org, it went to
18 all employees of the Metropolitan Police
19 Department.
20      Q    Other than this email telling all
21 members of the St. Louis Metropolitan Police
22 Department to familiarize themselves with the order
23 issued by the judge, are you aware of any other
24 steps taken by the St. Louis Metropolitan Police
25 Department to train or inform the police officers

1 of the terms of the injunction?
2         MR. DIERKER:  I think I have to
3 object to the form of that question because it
4 could be calling for privileged communications.
5      Q    (BY MR. PRAISS)  Let me make it clear
6 to you.  At no point today do I want you to tell me
7 about communications that attorneys had with you or
8 with police officers; okay?  To the extent there
9 are, I'm not interested, I'm not entitled to those.
10         Separate from that, my question is,
11 to your knowledge, other than this one short little
12 email that we have in front us here that was sent
13 on November 16, 2017, are you aware of any other
14 communications or efforts undertaken by the St.
15 Louis Metropolitan Police Department to train
16 police officers with respect to the substance of
17 the preliminary injunction issued by the court in
18 this case?
19      A    I am not.
20         (Plaintiffs' 30(b)(6) Exhibit 2
21 marked for identification by the court reporter.)
22      Q    (BY MR. PRAISS)  Mr. Larson, I hand
23 you what's been marked Exhibit 2, and this is a
24 copy of the Fourth Amended Rule 30(b)(6) Deposition
25 Notice that was issued by us in this case to the

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 21

1    City.  You're familiar with this exhibit?
2        A   I am.
3        Q    Obviously, this is the fourth one,
4    which means there was an original one and a first,
5    second, and third, potentially, I assume all of
6    those.
7            Do you recall the first time you saw
8    any form of this depo notice, deposition notice?
9        A   I do not recall the first time I saw
10   it. I don't know what version I may have seen, but
11   in preparation for this deposition, I saw and
12   reviewed a 30(b)(6) request.
13       Q   When was the first time, your best
14   estimate of when you saw it?  Was it yesterday or a
15   month ago?  That's what I'm trying to get at.
16       A   No, probably November, December.
17       Q   Gotcha.  Thank you.  Did you review
18   it?
19       A   I did.
20       Q    I think one thing I was going to put
21   on the record also that I believe there is one
22   topic and that's the topic number 3 that has been
23   covered and we do not plan to cover that today,
24   just so you know.
25            If you go to the second page of this

Page 22

1    exhibit, do you see there is a heading Relevant
2    Time Period and Definitions?
3        A   Okay.
4        Q    Can we agree that, you know, when I
5    use the reference "the City of St. Louis," or even
6    just the abbreviation of "the City," that this
7    definition that's here for the City of St. Louis
8    would apply?
9        A   Yes.
10       Q    Okay.  I don't want to keep saying a
11   long, convoluted definition each time.  And when I
12   say "Stockley verdict protest," do you agree with
13   the definition that's here; is that acceptable?
14       A   Yes.
15       Q    And the term "prior protests" that's
16   defined here, can we agree that definition is going
17   to apply today?
18       A   Yes.
19       Q    And then there's a definition for
20   "chemical agents."
21            Do you see that?
22       A   I do.
23       Q    Can we agree that definition will
24   apply except in those situations where I make it
25   clear to you that it shouldn't apply?

Page 23

1        A   Yes.
2        Q    Okay.  There is, at the end of this
3    notice, if you notice, a Request for Production on
4    the last page?
5            Do you see that?
6        A   Yes.
7        Q    Did you rely on any documents in
8    preparing for today's deposition?
9        A   I reviewed documents related to
10   today's deposition.
11           MR. PRAISS:  Okay.  A question for
12   counsel.  Have all of those documents been produced
13   to the plaintiffs in this litigation?
14           MR. DIERKER:  To the best of our
15   knowledge, all of the documents on which the
16   witness relied have been produced.
17           MR. PRAISS:  Thank you.  That's what
18   I need to know.
19       Q    (BY MR. PRAISS)  And you notice now
20   the deposition notice has -- this Fourth Amended
21   one has 25 different topics?
22       A   Yes.
23       Q    And you understand that you have been
24   designated as the representative of the City of St.
25   Louis to testify about each of these topics except

Page 24

1    for topic 3?
2        A   I do.
3        Q    How many hours in total would you
4    estimate you spent preparing for this deposition?
5        A   That's difficult to say.  Somewhere
6    between 8 and 16 over the course of several weeks,
7    several months, since November, and I would also
8    indicate that because there are apparently two
9    cases that are very similar, I reviewed a lot of
10   material not all specific to Ahmad.  Some were
11   specific to another case.
12       Q    The other case we're referring to,
13   Molina?
14       A   Correct.
15       Q    But in total in the past few weeks,
16   since the first time you've seen this deposition or
17   some prior version, your estimate is between 8 and
18   16 hours?
19       A   At least, if not more.
20       Q    Okay.  Let me start with trying to
21   narrow the universe of people you may have met
22   with.  Excluding any attorneys, did you meet
23   individually with anybody to prepare for today's
24   deposition?
25       A   Not outside individuals who are in

6 (Pages 21 to 24)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| Page 25 | Page 27 |
|---|---|

**Page 25**

1  our law department.
2     Q    Let me start with this one.  Did you
3  have meetings where attorneys were present?
4     A    I did.
5     Q    In those meetings, were there any
6  individuals who are not attorneys also present?
7     A    Yes.
8     Q    Who were those individuals?
9     A    I met with Sergeant Charles Wall, who
10  is currently detached to our law department.
11     Q    Yes.  What does it mean when you say
12  "detached"?
13     A    His assignment is temporarily, he is
14  temporarily assigned to the law department from his
15  parent unit, and I'm not sure where that parent
16  unit was.
17     Q    Is my understanding correct that he
18  was assigned to the law department to assist in
19  connection with any ongoing litigation?
20     A    That is my understanding.
21     Q    Other than Charles Wall, can you
22  think of any other individuals you met with in
23  connection with any meetings with attorneys in
24  preparing for today's deposition?
25     A    No.  They provided materials, I

**Page 27**

1  have done nothing else to prepare for the
2  deposition?
3     A    No, not that I'm aware of.
4     Q    Let's start, topic number 1, sir.
5     A    Okay.
6     Q    Topic number 1 states, "The manner by
7  which the City of St. Louis video recorded the
8  Stockley Verdict Protests."
9        Do you see that?
10     A    I do.
11     Q    As of September 2017, did the City
12  have any rules or requirements relating to video or
13  audio recording of police response to public
14  protests?
15     A    Well, I want to make sure I'm
16  answering this as completely as possible.  In
17  general, there are several different ways that we
18  document protest activity.  When we have a large
19  event, something that we know is ongoing to occur,
20  something like the Stockley protest, we put an
21  operations order into effect.
22        As part of that operations order,
23  there are officers who are assigned as
24  Documentation Team members.  Those members will
25  have either still cameras or video cameras at their

**Page 26**

1  reviewed materials, and we had discussions about
2  those materials.
3     Q    So the only non-attorney that you met
4  in preparing for today's deposition is Charles
5  Wall; correct?
6     A    As far as I can recall.
7     Q    And how long do you think met with
8  Charles Wall?
9     A    We had two or three different
10  meetings, probably no more than, total, an hour and
11  a half.
12     Q    Okay.  Of the 8 to 16 hours that you
13  said you estimate you spent preparing, what
14  percentage of that would you say was meeting with
15  attorneys versus you meeting by yourself?
16     A    Probably half and half, perhaps.
17  Maybe a little different -- I spent a lot of time
18  -- obviously, anything counsel forwarded to me for
19  review, I reviewed.  So I spent a lot of time
20  reading documents, I refreshed myself with a lot of
21  the material so I would be adequately prepared to
22  discuss these topics.
23     Q    Is it fair to say that other than the
24  meetings you have had with attorneys, the meeting
25  with Mr. Charles Wall, and your own efforts, you

**Page 28**

1  disposal to record protester and police activity
2  relative to the event being monitored.
3        We also have a Real Time Crime Center
4  that has cameras located throughout the City which
5  may capture incidents on video.
6        We also have an intelligence division
7  that may use video cameras to document certain
8  aspects of their investigation or their monitoring
9  of activities, and I believe in, relative to like
10  the Stockley incident, some members of our Bicycle
11  Response Team may have had cameras.
12     Q    I appreciate that and I want to cover
13  that information in greater detail but I still want
14  to go back to my question.  Is there something in
15  writing that I'm not aware of that, where the City
16  has laid out specific policies, rules, with respect
17  to video or audio recording of a police response to
18  a public protest?
19     A    No, not specifically, other than what
20  we've described in the operations order.
21     Q    Okay.  As a matter of policy, does
22  the City believe it's important to attempt to video
23  record police response to public protest?
24     A    From a matter of policy, we believe
25  it's important to document the activities that we

7 (Pages 25 to 28)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 29

1  take during these incidents.
2      Q    Okay.  As a matter of policy, does
3  the City believe it's important to attempt to video
4  record the use of chemical agents by police in
5  response to public protests?
6      A    Can you give me that again?
7      Q    Sure.  As a matter of policy, does
8  the City believe it is important to video record
9  the use of chemical agents by police in response to
10  public protests?
11      A    To the best of my knowledge, we have
12  no order that requires us to document by a video
13  the actual deployment of chemical agents.
14      Q    Okay.  You gave me a list of
15  different ways that the City can video record
16  public protests.  You mentioned Documentation Team
17  members; right?
18      A    Mm-hmm.
19      Q    Realtime Crime Center, the
20  intelligence division, and the Bicycle Team, who
21  may also have cameras; correct?
22      A    Correct.
23      Q    Are there any others?
24      A    Well, insofar as the department
25  issues cameras to patrol supervisors for the

Page 30

1  documentation of regular type of crime incidents,
2  you know, there's evidence that needs to be
3  recovered, things of that nature, but not -- but
4  that's not specifically related to First Amendment
5  protests.
6      Q    Okay.  Any other ways?
7      A    Not that I'm aware of.
8      Q    Does the helicopter have capability
9  to video record?
10      A    Yes.  The -- well, I take that back.
11  The helicopter has certain technological abilities,
12  I believe recording is one of them but I can't
13  confirm that.
14      Q    Has the City at any time considered
15  including some video recording capabilities on the
16  Bear?
17      A    The Bear may have its own type of --
18  I'm not intimately familiar with the mechanics of
19  the Bear.  I know it has certain ability.  I know
20  it has a PA, some other things.  I don't know that
21  it has video and, to the best of my knowledge, we
22  haven't ever discussed putting a camera on the
23  Bear.
24      Q    Okay.  My understanding from the
25  Molina depositions is the Bear does not have any

Page 31

1  video recording capabilities and I guess my
2  question to you is, from the City's perspective, is
3  there a reason not to include video capability on a
4  Bear that finds itself in positions where it
5  deploys chemical munitions and, as a matter of
6  policy, would be advisable to record those, no
7  different than all the other ways that the City
8  currently uses?
9      A    It might be advantageous for us to do
10  that in the future.  I don't think there's a
11  deliberate reason we don't have it on there other
12  than it probably isn't equipped with that
13  capability and to equip it with that would be a
14  monetary cost, but it's certainly something I think
15  that's worth looking into.
16      Q    Are you aware of anyone suggesting
17  that that be done since the Stockley protest?
18  Let's start with that time period.
19      A    No, not to my knowledge, I don't
20  believe so.
21      Q    Okay.  The first mechanism you
22  mention is the Documentation Team?
23      A    Mm-hmm.
24      Q    Was the Documentation Team deployed
25  in connection with the Stockley protest?

Page 32

1      A    It was.
2      Q    And did it record events from the
3  Stockley protest?
4      A    To the best of my knowledge, it did.
5  And just as a point clarification, there are
6  several Documentation Teams relative to the detail.
7  They are -- each CDT unit is I believe supposed to
8  have a Documentation Team, so we have several out at
9  -- roughly at the same time, doing similar
10  functions.
11      Q    And those members, explain to me
12  again what is their purpose when they go out?
13      A    Their purpose is to primarily
14  document police and citizen interaction during the
15  course of a First Amendment protest.  They also are
16  responsible for photographing the arresting officer
17  and the arrested subject prior to the arrested
18  subject being transported in the interest of
19  documenting, and then they have a role in the
20  report preparation aspect.
21      Q    You say "report preparation."  What
22  report are you referring to?
23      A    In general, there is, when incidents
24  transpire and then arrest is made, a police report
25  is prepared, and the Documentation Team participate

8 (Pages 29 to 32)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 33

1  in that.
2      Q    I think you testified that each CDT
3  unit has its own Documentation Team.  What is a CDT
4  unit, just to make sure I'm clear?
5      A    For clarification, Civil Disobedience
6  Team.
7      Q    That's what I assumed but I wanted to
8  make sure.
9          And when you say "unit," what does
10  that mean in connection with a CDT unit?
11     A    Oh, in the -- if you -- when
12  reviewing the operations order, you'll see there
13  will be CD Team 1 or CD Team Alpha, and then
14  Evidence Collection Team 1.  It just -- or
15  Documentation Team 1.  It's just essentially the
16  officers that are assigned to that team, that unit,
17  within the overall team, that has a specific
18  function.
19     Q    Do you know sitting here today how
20  many different Documentation Teams were assigned to
21  the Stockley protests?
22     A    I believe there were at least four
23  because I believe we had four components to the CDT
24  team.
25     Q    Do you know if the Documentation Team

Page 34

1  was present in connection with what's been referred
2  to in the public discourse as the kettle?
3      A    I believe they would have been
4  present but I have no firsthand knowledge that they
5  were present.
6      Q    Do you know if the Documentation Team
7  -- strike that.
8          Do you know if a Documentation Team
9  was present in connection with the Luther Hall
10  incident?
11     A    I don't know at what point that the
12  Documentation Team would have come in on that
13  because they come in behind the CDT efforts, they
14  are stationed behind them in rank.  So I assume
15  they would have been behind the officers in that
16  CDT team but where their location was in connection
17  with those specific incidents, I don't know.
18     Q    Because, for example, in the Luther
19  Hall incident clearly there was a situation where
20  police officers were interacting with people
21  exercising their First Amendment; fair to say?
22     A    It's fair to say there was an
23  incident, yeah.
24     Q    And there was an interaction between
25  the police officers, to put it mildly, and certain

Page 35

1  individuals; correct?
2      A    Yes.
3      Q    That would have been the purpose of
4  the Documentation Team to record that incident;
5  correct?
6      A    Potentially.
7      Q    When the Stockley protests were
8  completed, how does -- how did the records, the
9  video records taken by the Documentation Team, get
10  compiled somewhere?  Where are they maintained?
11  I'm trying to understand the next process.
12     A    They would -- depending on the media
13  and how they were recorded, there's a couple of
14  different ways that they get to our property
15  custody section.
16         So primarily they could be downloaded
17  and put onto a flash drive or a disk and then
18  entered into property custody to be held for review
19  or trial or duplication, discovery requests.
20         Things that would be recorded by the
21  Real Time Crime Center would be very similar.  They
22  would be recorded, they would be held on a server,
23  copies would be made and then forwarded to the
24  either the prisoner -- prisoner -- property custody
25  for holding.

Page 36

1          In the cases of still photos,
2  anything that would have come off camera cards,
3  those would have probably been submitted to our
4  laboratory division and then held in our digital
5  information management system.
6      Q    Is there a simple way to search, if
7  you wanted to know, get a listing of all the video
8  -- I'm going to start with Documentation Team from
9  the Stockley protests -- that summarizes here's the
10  Documentation Team, here is the dates and times and
11  location of every video they have done, so it's
12  very easy to find?  Like if I don't know what
13  happened at this intersection at 11 o'clock, I just
14  search through it and there it is?
15     A    Not necessarily, I don't believe we
16  have a comprehensive data management system that --
17  because it's not going into a system that way.
18  It's going in piecemeal.  The records would have
19  been recorded and then submitted as evidence.  I
20  don't believe we have any type of that other than
21  what the Real Time Crime Center would have related
22  to their file storage method.
23     Q    I'm going to deal with the Real Time
24  Crime Center in a minute.  I'm still talking about
25  the Documentation Team.  They complete the process,

9 (Pages 33 to 36)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 37

1    they, if I understand correctly, transfer their
2    video recordings to the property custody section?
3        A    Yes, sir.
4        Q    And my question is, who is in charge
5    of the property custody section back in September
6    or November, October of 2017, let's say?  If you
7    know.
8        A    The property custody section is a
9    unit within the police department.  It reports to,
10   I believe, the commander of auxiliary services.
11   There is a sergeant who is in charge of the
12   day-to-day operation of the property custody unit.
13   At one time there was a lieutenant.  I am not sure
14   if, the time frame in question, we have a
15   lieutenant there or not.
16       Q    And that's fine.  I understand people
17   move around quite a bit.  I've gotten that
18   impression.  But regardless, whoever was in charge
19   sometime in let's say end of September, October
20   2017, received a significant amount of video
21   recordings from Documentation Teams that capture
22   the Stockley protests.
23           My question to you is, are you just
24   throwing them in a big basket somewhere --
25       A    No, no, no.

Page 38

1        Q    -- or is there any effort to
2    document, saying this team recorded this time
3    period, that it's --
4        A    What would have occurred is the
5    incident would have been recorded.  The record
6    would be associated with a complaint number.  The
7    material would be conveyed to the property custody
8    unit.  Property custody would put it in its
9    evidence tracking system by the complaint number.
10   So all evidence related to the incident would, in
11   theory, be in the property custody, tracking the
12   evidence that goes to property custody, would be in
13   their tracking software and everything that we have
14   related to that case would be on a list from them
15   but not specifically related to at a point in time
16   this video, a second point in time this video, a
17   third point in time this video.  And it would be
18   entered by the individual who submitted the
19   evidence.  So I submit evidence, it would be
20   submitted by me under my name.
21       Q    Gotcha.  You used the phrase "case
22   and complaint."  What do you mean when you say
23   that?
24       A    The complaint number relates to the,
25   quote, case or incident.  So any time the police

Page 39

1    department has an incident and writes an official
2    report, we generate a complaint number.  The
3    complaint number is a unique identifier related to
4    that specific incident.
5        Q    And entire, all the videos recorded
6    by the Documentation Team in connection with the
7    Stockley protests, would they all be classified
8    under one complaint or case number?
9        A    Not necessarily because multiple
10   incidents might occur over the course of a time --
11   the time period, which would have different
12   victims, different subjects; therefore, different
13   complaint numbers could be generated.
14           So you might, if we're talking a
15   series in time, since the Stockley protests
16   occurred over multiple days, there could be
17   multiple complaint numbers related to that --
18   related to those incidents that occurred during a
19   specific time frame.
20       Q    To your knowledge, if today I was
21   looking for a specific incident, let's say I want
22   videos taken by a Documentation Team in connection
23   with a kettle, is a there a capability by the City
24   of St. Louis to locate that readily and produce it
25   in litigation or to use it for its own purposes?

Page 40

1        A    Yes, I believe so.
2        Q    Okay.  I think you testified that
3    there is four Documentation Teams?
4        A    Potentially.  There may be more.
5        Q    Okay.  There are two, I believe,
6    identified in the OPs plan; is that correct?
7        A    Okay, yes.
8        Q    Okay.  Do you know what the others
9    are?
10       A    The potential, I was speaking of the
11   fact that we have -- I believe there were four CDT
12   teams out and I was under the impression that there
13   would be one evidence team for -- one evidence
14   collection team for each CDT team.
15           That may not be 100 percent accurate,
16   but I would also indicate that there are the
17   ability of other individuals to collect evidence as
18   well.  So obviously, if there's something -- police
19   officers have a duty to collect and preserve
20   evidence.  If there was some evidence that needed
21   to be collected, we would do that.
22       Q    Were, to your knowledge, four
23   different Documentation Teams deployed in
24   connection with the Stockley protests?
25       A    I'd have to review the OPs order.

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 41

1    Q    Okay.  You mentioned several times
2  the Real Time Crime Center is another vehicle
3  through which the City can record protests?
4    A    Correct.
5    Q    Okay.  Where is that located?
6    A    The center itself is located in
7  police headquarters at 1915 Olive.
8    Q    And I apologize for my ignorance.
9  I'm learning quickly here, a steep learning curve.
10  But is that basically capturing what -- throughout
11  the City, there is, I assume, a capability to
12  record what's transpiring in the City at all times?
13    A    There are a network of cameras that
14  are funded by police and private partnerships that
15  are located in various areas of the City that are
16  connected to the Real Time Crime Center and the
17  Real Time Crime Center has the ability to review or
18  record video from those locations, if needed.
19    Q    Who is responsible for maintaining
20  those cameras throughout the City that are
21  providing information to the Real Time Crime
22  Center?
23    A    I believe it is the City's
24  responsibility; although, I think it depends on who
25  owns the camera as far as because I do know that

Page 42

1  we, as in the police department, have relationships
2  with private entities that allow us access to their
3  cameras but I believe they're responsible for the
4  maintenance of those cameras.  It's not assumed by
5  the City.
6    Q    So to the extent the camera is owned
7  by a private entity, they're clearly responsible
8  for maintaining their own cameras but all the
9  cameras that are owned by the City, is it fair to
10  say the City is responsible for maintaining them?
11    A    I believe that would be fair to say.
12    Q    Does the City, to your knowledge,
13  utilize the services of an independent contractor
14  to maintain the cameras to the extent they
15  malfunction?
16    A    When we have a vendor that we work
17  with that is the camera platform, as I understand
18  it, there are potential video platforms, different
19  video platforms available for this type of unit.
20  We use a platform, I believe it's called Genetec,
21  and that is the platform that we utilize to -- when
22  we have issues with our cameras.  So the cameras
23  need to be Genetec compatible, which is a system
24  style, and that we would work with them if there
25  was some issue with the recordings.

Page 43

1    Q    I apologize, maybe I'm getting
2  confused here.  Is Genetec a software or is it
3  actually a company?
4    A    I believe it is a company that
5  manages software related to a camera, a hardware
6  and software, so.
7    Q    So is it your understanding that to
8  the extent there is, let's say, either a software
9  or hardware malfunction with a particular camera
10  that is owned by the City, the City will contact
11  Genetec and say there is a problem with camera X,
12  you need to go out and repair it?
13    A    Not necessarily.  We would do our own
14  repair if it was within our capability.  If it was
15  something that was beyond our capability, we would
16  probably work with Genetec to resolve an issue.
17    Q    Is there a particular department
18  that's responsible for that?
19    A    The City, I believe, has a department
20  that maintains the cameras and they work in
21  conjunction with the Real Time Crime Center.  At
22  one time the Real Time Crime Center did do some
23  camera maintenance.  I'm not sure what time frame
24  they stopped doing that and the City took over
25  relative to the merger of the City and the police

Page 44

1  department.  There's been lots of changes that I
2  may not be aware of.
3    Q    Does this department that you
4  mentioned have a name?
5    A    I'm not sure what the City calls
6  that.
7    Q    Was that department --
8    A    It could be --
9    Q    Was that department in existence
10  around September and October of 2017?
11    A    I don't know, but I believe so.
12    Q    Because I'm really focusing about
13  that time period.  So, hypothetically, if there was
14  a camera that malfunctioned in, say, September of
15  2017, and somebody in the City learned about this
16  camera malfunction, I'm trying to understand the
17  process of how that would be communicated to whom
18  and such that it could be repaired.
19    A    I would assume, as I understand it,
20  that if we know that there is a camera
21  malfunctioning, we bring it to the attention of the
22  City group and they assist in getting it resolved.
23    Q    Would that typically happen by
24  communicating through email?
25    A    I would assume it would be a phone

11 (Pages 41 to 44)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 45

1    call or an email notifying them.
2        Q    Would there typically be a record
3    showing what the repair is -- what repairs are
4    necessary and that the repairs have been completed?
5        A    I assume we would be notified that
6    the repairs are completed.  That would be a
7    communication between the City department and the
8    Real Time Crime Center or the people that are
9    maintaining that.
10       Q    With respect to the Real Time Crime
11   Center, in particular focusing the time period
12   again of during and after the Stockley protests, it
13   immediately has access to all video recording
14   through the cameras that the City operates as well
15   as public -- private entities; correct?
16       A    I believe they have the capability of
17   reviewing those.  They're not looking at every
18   camera that's across the City all the time.
19       Q    How are those records being retained
20   by the Real Crime Center?
21       A    Essentially what happens is data
22   comes in, depending on how, who owns the camera,
23   there is an overwrite period somewhere between 7
24   and 30 days.  Obviously if -- in the case of
25   something like this Stockley protest where we know

Page 46

1    that there is the potential for litigation or
2    issues or things that we are going to want to look
3    at again, that information is downloaded and stored
4    on the server and the files are named, listed, and
5    it's maintained on that server pending
6    determination of do we need this or do we not need
7    it.
8        Q    To your knowledge, have all of those
9    records from the Real Crime Center been retained
10   since the Stockley protests?
11       A    To the best of my knowledge, those
12   that have been identified as pertinent have been
13   kept and retained.
14       Q    When you say those that have been
15   designated as pertinent, what does that mean?  Were
16   any records excluded and destroyed relating to the
17   Stockley protests?
18       A    Not that I'm aware of, but as I said,
19   because the Real Time Crime Center covers the
20   entire city, those that may be outside of the
21   interest area may not have been kept for any
22   reason.
23       Q    But anything that -- any video
24   recording of the Stockley protests that captured
25   any activity relating to the protests, those, to

Page 47

1    the best of your knowledge, have been retained?
2        A    To the best of my knowledge, those
3    have been retained and produced.
4        Q    Is that also true with respect to the
5    recording done by the Documentation Team?
6        A    Yes.
7        Q    And with respect to the method in
8    which the Real Time Crime Center maintains its
9    records, is it fair to say that there's a really
10   easy way to identify, if I'm looking for a
11   particular video recording, to search for it by
12   date and the location of that camera?
13       A    Yes.  They should be able to do that
14   for you.
15       Q    Okay.  Does the City have any
16   specific rules, handwritten rules, or policies with
17   respect to the retention of video recordings
18   involving protests?
19       A    I don't believe we have a specific
20   retention policy related to protests specifically.
21       Q    Does it have -- is there a general
22   document retention policy that would cover those?
23       A    I don't believe so.  I don't believe
24   we have a specific, at least from the police
25   department side, other than what we discuss related

Page 48

1    to our in car camera videos, I don't believe that
2    Real Time Crime Center has their own.  They may
3    have their own policy on that written policy but I
4    don't think I've seen that as far as part of the
5    department's overall special orders.
6        Q    I'm a little perplexed and want to
7    make sure I'm hearing you correctly.  Is it your
8    testimony that the City of St. Louis does not have
9    a document retention policy, in general?
10       A    Oh, I would never say that.
11           MR. DIERKER:  Excuse me, I have to
12   object because I think you're outside the topics of
13   this 30(b)(6).  But you may answer.
14       Q    (BY MR. PRAISS)  I don't believe -- I
15   think topic number 2, if you look at it, sir,
16   please, Mr. Larson?  "The manner by which the City
17   of St. Louis has retained video recordings of the
18   Stockley Verdict Protests."
19           Do you see that?
20       A    I see that.
21       Q    And when I -- when we wrote this, the
22   manner, at least in my mind, within the scope of it
23   is, the starting point is, is there a policy that
24   relates to the retention of video recordings
25   relating to the Stockley protests?

12 (Pages 45 to 48)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 49

1      And if I understood you correctly,
2  your testimony a few minutes ago is that you're not
3  aware of anything specific dealing with the
4  retention of videos by either let's say the
5  Documentation Team --
6      A    Right.
7      Q    -- or the Real Crime Center --
8      A    Right.
9      Q    -- that deals with video protests; is
10  that correct?
11      A    Well, I think we're -- we're saying
12  the same things differently.  What I am saying is,
13  obviously, if we have evidence that relates to a
14  complaint number, that evidence is downloaded,
15  recorded, or held in the manners in which I've
16  discussed going to property custody.  As far as an
17  overall, quote, City policy on the retention of
18  video, I can't speak to that specifically.
19      As far as a police department, i.e.,
20  our policies related to video would be documented
21  in either the in car camera order, because that
22  talks about the -- and even that is downloaded to
23  disk and submitted to property custody, as I've
24  indicated.
25      Q    My question -- let's look at it

Page 50

1  differently.  How long does that type of
2  documentation have to be retained?
3      A    Until it's approved to be disposed
4  of, which I mean, I'm not following the question.
5      Q    Let's say there's an incident,
6  protests, and no litigation is filed.  How long
7  does the City maintain those records from the
8  Documentation Team and the Real Time Crime Center
9  of that protest?
10      A    If there is no complaint number
11  generated, if there are no incidents involving an
12  arrest, that data would probably not be kept more
13  than, I don't know, anywhere between 7 to 30 days
14  because we have no need for it.
15      Q    Let's assume there was one arrest of
16  one individual because that individual, you know,
17  did not comply with a request by an officer.  At
18  that point, is there any policy that requires the
19  City or whereby the City maintains the records
20  relating to that protest in the event that down the
21  road and during the statute of limitation a lawsuit
22  would be filed?
23      A    Individuals arrested, if there was
24  evidence of that arrest that occurred on video, it
25  would be downloaded, put on disk or flash drive,

Page 51

1  and held in evidence until the matter is resolved,
2  adjudicated, or it's purged at some point.
3      Q    If you could look at topic 25?  This
4  says, I'll read it for the record, it's the
5  "Circumstances surrounding the loss or destruction
6  of the video recording produced labeled as City
7  01152."
8      Do you see that?
9      A    I do.
10      Q    What specific steps did you prepare
11  to testify with respect to this topic?
12      A    It is my understanding that related
13  to this topic there is one camera that produced two
14  files, which apparently during the course of
15  collection we noted that there was something wrong
16  with the files and we released them as part of the
17  discovery process and we discussed that there were
18  cameras a block north and a block south of the
19  camera in question that didn't record, and my
20  understanding is that we're working with the
21  vendor, Genetec, to try to recover that data.  And
22  that those files were related to two separate dates
23  and times, so it was apparently a camera
24  malfunction.
25      Q    Do you know where that camera is

Page 52

1  located?
2      A    I believe it was located at 14th and
3  Locust but feel free to correct me if I have that
4  location wrong.
5      Q    To date, has the City been able to
6  recover that video?
7      A    To the best of my knowledge, no, it
8  is an ongoing process and we are working on it.
9      Q    And if I understood correctly, you
10  are working with a vendor, i.e., Genetec?
11      A    That was information I was given.
12      Q    Is this a camera that Genetec was
13  responsible for maintaining back at the time of the
14  Stockley protests?
15      A    I have no knowledge of that.  I don't
16  believe they are responsible for maintaining the
17  camera.  As we discussed previously, we would only
18  come in -- we only would contact them if it was
19  something that we couldn't fix.
20      Q    Okay.  When was the first time the
21  City learned that the camera that recorded the
22  video that was produced as City 01152 had
23  malfunctioned?
24      A    I believe it was when we were
25  compiling the information for discovery, when the

13 (Pages 49 to 52)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 53

1  individual that was reviewing those videos found
2  it, noted it, and released it.
3      Q    So at no time -- at the time when
4  this Stockley incident occurred around September,
5  October of 2017, nobody at that point learned to
6  recognize that this camera was not working?
7      A    To the best of my knowledge, no, but
8  that's not to say a work order wasn't put in, but I
9  don't believe so. Nobody has given me the
10  information that, yes, we were aware that camera
11  was not functioning at the time of the incident.
12      Q    And that's what I'm trying to get at
13  because if I'm hearing you correctly, is it your
14  testimony, as the corporate representative of the
15  City today, that literally this camera has been
16  inoperable and malfunctioning since September of
17  2017 until just recently when somebody, in response
18  to a discovery request, learned that this camera
19  failed many, many months ago?
20      A    Yeah. I don't know. You'd have to
21  talk with someone specifically in the Real Time
22  Crime Center --
23      Q    I'm talking to you today because
24  you're the corporate representative and that was
25  your duty to make sure you were knowledgeable and

Page 54

1  informed about it, with all due respect, Mr.
2  Larson, and I need answers today. I don't want to
3  go running around. That's why I do a 30(b)(6),
4  because I need those answers from you and I would
5  have hoped you would have done a little more
6  research. But I'm going to keep asking questions.
7      A    You're welcome to keep asking
8  questions.
9      Q    To your knowledge, was a work order
10  ever issued after September 2017 with respect to
11  the camera that took the video City 01152?
12      A    No.
13      Q    How would we find if there was one?
14      A    I would have to look into the Real
15  Time Crime Center to see if there's any records or
16  the City agency that we use to maintain the
17  cameras.
18      Q    Prior to today's deposition, what --
19  is there a reason why you did not take steps to
20  determine whether -- when and if a work order was
21  issued with respect to this camera that
22  malfunctioned back in September of 2017?
23      A    I made an assumption that the camera
24  is currently working. The malfunction, I don't
25  know if it was a sporadic malfunction, a long-term

Page 55

1  malfunction, if it was repaired and corrected, I
2  don't know. I was -- in preparation, I learned
3  that there was two files which had been turned over
4  that were corrupted and my investigation was to
5  determine what we knew about those corrupted files.
6      Q    And that's what I'm trying to figure
7  out, what the City knew. So I -- specific question
8  for you is, when was the first time -- strike that.
9           I asked you this and I'm going to ask
10  it again, but am I correct that in preparing for
11  today's deposition, in particular topic 25, other
12  than learning that this particular camera
13  malfunctioned back in September of 2017 and that
14  somebody learned about that in connection with
15  responding to a discovery request in this case, you
16  have no knowledge about the circumstances of for
17  how long this camera malfunctioned, what steps, if
18  any, were undertaken by the City to repair it, or
19  what steps the City engaged Genetec to repair it at
20  any time from September '17 until the present? Is
21  that a fair summary of things you don't have
22  testimony about today?
23      A    Correct.
24      MR. PRAISS:  Then I would say that we
25  have a serious problem and this will require either

Page 56

1  a motion for sanctions with the court for failure
2  to prepare a witness or we'll have to come back
3  here at a different time, but this is unacceptable.
4  I need to understand what happened to this video
5  and I think the topic is pretty damn clear, Judge
6  Dierker.
7           He made no effort, as far as I'm
8  concerned. To tell me what you wrote in the email
9  to Tony is unacceptable. I got that email and I
10  said, gee, I'd like to know what happened. That's
11  his role today.
12      MR. DIERKER:  Well, with all due
13  respect to your disgruntlement, I think that your
14  inquiring into the history of the repair and
15  malfunctioning of the camera in question at other
16  dates is beyond the topic and is completely beyond
17  the scope of discovery and -- but we will be happy
18  to provide, if they can be located, any work orders
19  with regard to that camera and we'll be happy to
20  resume the deposition if necessary.
21           But my position is that the
22  investigation has occurred into the loss or
23  destruction of the video in question and that it is
24  ongoing.
25      MR. PRAISS:  Well, I don't believe

14 (Pages 53 to 56)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 57

1  he's given me any testimony about the circumstances
2  surrounding the loss or destruction other than what
3  you wrote in an email, the fact that somebody
4  discovered it a few months ago.  But why it was
5  destroyed, what was happening with this camera,
6  when the City learned about it, those are relevant.
7      For example -- anyways.  So I -- I
8  we'll agree to disagree.  Why don't we take a short
9  break.
10     MR. DIERKER:  Okay.
11     MR. PRAISS:  Thank you.
12     (Off the record.)
13     Q    (BY MR. PRAISS)  Mr. Larson, back on
14  the record.  Close the loop on a few other
15  questions, again dealing with topics 1 and 2 in
16  particular.
17     You had mentioned, I believe in your
18  testimony, if I heard you correctly, about the fact
19  that the City does have an in car cameras for --
20     A    We have some, yes.  Not all police
21  cars are equipped with in car camera system, but
22  some police cars are.
23     Q    Are you aware if there's any in car
24  camera video recording of the Stockley protests?
25     A    I am not.

## Page 58

1      Q    If I wanted to know if those exist,
2  is that something that -- is it your understanding
3  that the City has, in its recordkeeping,
4  distinguishes between video recording from
5  Documentation Team versus the Real Time Crime
6  Center versus in car camera recording, those are
7  all separately retained in different ways?
8      A    Not necessarily separately retained.
9  They're all retained in -- primarily again with
10  even in car, the information is downloaded,
11  recorded, put on disk, and entered into property
12  custody with the complaint number of the associated
13  incident.
14     Q    But is it fair to say that somewhere
15  in the recording, recordkeeping process, there is
16  some identifier that indicates this was a video
17  recording taken by an in car camera?
18     A    Yes.  We would be -- we would know
19  how, where that came from.  Yes.
20     Q    Perfect.  On a similar note, I think
21  -- and I think, and I apologize if I asked you this
22  or you answered it before but I want to make sure I
23  have a clear understanding myself.
24     How are the Documentation Team videos
25  named or tagged so they can be reviewed?

## Page 59

1      A    They're essentially downloaded and on
2  -- and burned onto a disk with a file name and that
3  -- and then put into an evidence envelope which
4  would say something to the effect of video of X.
5      Q    Let's talk about that X.  Would it
6  say video from Documentation Team X?
7      A    Yes.  It would say something to the
8  effect of video recorded by Documentation Team.
9      Q    Okay.  Would they identify the name
10  of a person on the Documentation Team?
11     A    The seizing and submitting officer
12  would prepare the evidence envelope that would have
13  that information.
14     Q    And obviously you would identify the
15  date and time and the location where that video was
16  taken by the Documentation Team?
17     A    It would indicate that, in the police
18  report on the evidence envelope, it would indicate
19  the date, time, location, where it was collected.
20     Q    Okay.  Are there any rules or
21  policies that the Documentation Team members have
22  to follow while they're collecting video?
23     A    Not specifically, as in they have
24  been trained to, as part of the CDT process, to
25  collect that evidence, that documentation, record

## Page 60

1  it, seize, mark package, and submit it to property
2  custody.
3      Q    Are there any rules that may
4  expressly prohibit them from deleting videos that
5  they take that may show improper police conduct?
6      A    There are no, to the best of my
7  knowledge, no specific rule directed at that but
8  our general rule would be, in the special orders,
9  would be that that would not be acceptable.
10     Q    When you say the "general rule," can
11  you point me to what are you referring to?
12     A    Things like conduct unbecoming.
13  Obviously we -- that would be an illegal criminal
14  act, to destroy evidence, and that would be a
15  violation of law, and, therefore, we don't have an
16  order that says you're not to do unlawful things.
17  So I mean, it's part of the -- part and parcel of
18  being a police officer, you would not download and
19  destroy unfavorable evidence.
20     Q    So to the extent somebody in the
21  Documentation Team recorded an incident where the
22  police acted inappropriately in connection with the
23  Stockley protest and then deleted it, that would be
24  an unlawful act?
25     A    Yes, I believe it would be

ALARIS LITIGATION SERVICES
www.alaris.us        Phone: 1.800.280.3376        Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 61

1 destruction of evidence, hindering prosecution, any
2 list of crimes.
3     Q    Has it come to the City's attention
4 at any time that that -- something like that has
5 actually happened where somebody on the
6 Documentation Team has deleted video?
7     A    I have no knowledge that that
8 occurred.
9     Q    As part of CDT training, what
10 Documentation Team training is included?
11     A    As part of the overall briefing on
12 how we're going to execute specific functions, the
13 individuals who are assigned to those teams are
14 given cameras and told to go out and record the
15 actions of protesters and the officers during the
16 event.
17     Q    Other than that, any other training?
18     A    Not to my knowledge, there's not a
19 specific like PowerPoint or lesson plan that covers
20 that.  It's incorporated into the ongoing trainings
21 of the CDT teams.
22     Q    Am I correct that Luther Hall was in
23 the Documentation Team?
24     A    I'm not sure.  Luther Hall was
25 assigned to the intelligence unit at the particular

## Page 62

1 time.  I am not sure in the detail where he was
2 listed, if he was listed in the detail.  He may
3 have been on a Documentation Team in a previous
4 assignment.
5     Q    Okay.  Do you have the OPs plan in
6 front of you, sir?
7     A    I do.
8     Q    Can we mark that as an exhibit, if
9 you don't mind?
10     MR. DIERKER:  Can we go off the
11 record for a minute?
12     MR. PRAISS:  Sure.
13     (Off the record.)
14     (Plaintiffs' 30(b)(6) Exhibit 3
15 marked for identification by the court reporter.)
16     Q    (BY MR. PRAISS) Mr. Larson, I'm
17 going to hand you two pages and they have been
18 Bates numbered CITY 430 and 431 on the backside as
19 well as 439 and 438, and these are pages taken from
20 the OPs plan?
21     A    Correct.
22     Q    Okay.  And for the record, when I use
23 the term "OPs plan," what does that mean?
24     A    It's the operation order that is an
25 umbrella document that we utilize to direct

## Page 63

1 individuals to their job functions during an event,
2 and we put these together for large scale special
3 events.  So Fair St. Louis would have an OPs an
4 operations order.  Mardi Gras has an operations
5 order.  Things like that.
6     Q    Are the two pages I've handed, you
7 are those from the OPs plan related to the Stockley
8 post?
9     A    They are.
10     Q    And if you look on pages Bates
11 numbered 430 and 439, do you see Luther Hall's name
12 shown?
13     A    I do.
14     Q    And am I correct it identifies him
15 being on the Documentation Team?
16     A    Correct.
17     Q    Okay.  Does this confirm for you that
18 Luther Hall was on the Documentation Team during
19 the Stockley protests?
20     A    Not necessarily.  The way these
21 things are put together, the individuals' names are
22 -- they go into a pool.  He may -- he is listed in
23 the order as being on the operations plan.  At the
24 particular date and time, incident location, for
25 his incident, I can't state that he was with these

## Page 64

1 individuals at the time.
2     Q    Do you have any reason to, sitting
3 here, to not believe that he was on a Documentation
4 Team as noted in the OPs plan?
5     A    Again, this OPs plan had him on that
6 team.  There are changes that occur to the OPs
7 plan, people call in sick, people get moved around.
8 In particular, I would have to say that he was not
9 with the Documentation Team at the time of his
10 incident just because I have been told that that
11 was not the case.
12     Q    Separate and apart from the time of
13 his incident, and I understand a lot of things can
14 happen where changes happen from what the OPs plan
15 says, but sitting here today as the corporate
16 representative, are you aware whether or not any of
17 those actually hypothetical things happened or, to
18 the contrary, Mr. Luther Hall was in fact on a
19 Documentation Team, at least in part, during the
20 Stockley protests?
21     A    He was listed as part of the
22 Documentation Team in that particular operations
23 order.
24     Q    And my question, do you have reason
25 specifically, based on facts, to tell me that he

16 (Pages 61 to 64)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 65

1    didn't participate on the Documentation Team, at
2    least in part, during the Stockley protest?
3         MR. DIERKER:  I need to object as
4    outside the scope of the deposition designation as
5    to Luther Hall's specific assignment, but you may
6    answer.
7         MR. PRAISS:  If he knows.
8         A    I don't -- I don't know.
9         Q    (BY MR. PRAISS)  Okay.  When was the
10   OPs plan -- and I know we only have a few pages of
11   it -- but when was it created?
12        A    It would have been created prior to
13   the verdict announcement.  Probably a week or so
14   prior we would be collecting names.  Because not
15   knowing when the verdict would be released, we have
16   the things, shift changes, all kinds of personnel
17   issues, this is a very big document, we're trying
18   to get multiple members of the police department at
19   one place, at one time.  So it would have been --
20   it operates off a template format, meaning our
21   operation planning unit has a template that they
22   use for specific things, for specific roles, and
23   individuals are plugged into that template.
24             It was an ongoing process to create
25   that document and the document was released prior

Page 66

1    to the events that occurred.
2             So we knew the Grand Jury verdict was
3    going to come in a day or so.  The OPs plan was
4    ready to go by those dates.
5         Q    Was the OPs plan at any time amended
6    after its release?
7         A    Not to my knowledge, but there are
8    email -- if there were personnel changes in general
9    manners, we update -- like replacement personnel
10   lists, there would be a replacement personnel list.
11   I don't know that one was created.  A lot of that
12   stuff comes by phone.  People call in, say Joe is
13   not coming, Eric is coming, and so.
14        Q    But my question is, to your
15   knowledge, nobody input any of those information
16   about individual changes in terms of generating an
17   amended OPs plan?
18        A    No.  No.
19        Q    Thank you.  Do you have the Notice of
20   Deposition in front of you?
21        A    I do.
22        Q    I'd like to jump to topic 12, if I
23   could, and cover topics 12 and 15 with you.
24        A    Okay.
25        Q    You see they all, in one way or

Page 67

1    another, deal with chemical agents?
2         A    Yes.
3         Q    Okay.  Is there anything that you did
4    specifically to prepare for these topics?
5         A    Topic 12 and topic 15?
6         Q    No, topic 12, 13, 14, and 15.
7         A    Yes, I reviewed the special orders,
8    Special Order 1-01 specifically, the section, I
9    believe it's Section VIII-6 that covers mace and
10   Section XIII which covers chemical agents and crowd
11   dispersement.
12        Q    The first section was section?
13        A    I believe it's Section VI.  It's
14   individual use of mace.
15        Q    And the other section you reviewed?
16        A    I believe it was XIII.
17        Q    And other than reviewing those
18   sections from the Special Order, did you do
19   anything else to prepare for testifying as a
20   corporate representative on topics 12 through 15?
21        A    I looked at some training documents,
22   primarily related more towards dispersal order than
23   chemical agents, but that's part of the Special
24   Order Section XIII, 1-01 Section XIII.
25        Q    Okay.  Anything else?  I just want to

Page 68

1    make sure I have a complete understanding of what
2    you did, what you looked at in preparing for these
3    topics 12 through 15?
4         A    I believe that would be the extent of
5    it.
6         Q    Okay.  In a few minutes I'm going to
7    show you a particular document.  Please let me
8    know, when I hand it to you, if that's the training
9    document you were referring to or it's something
10   else and we'll explore that a little bit.
11             In your career since -- I think you
12   started out in 1994 --
13        A    Mm-hmm.
14        Q    -- '95 time period, have you yourself
15   ever deployed pepper spray or mace?
16        A    I have been involved in incidents
17   where pepper spray and mace were deployed,
18   primarily as a patrol officer, which would be in
19   the 1995 through 2004 time frame.  Whether I was
20   actually the officer that deployed or was an assist
21   officer, I can't recall.
22        Q    Okay.  Do you recall approximately
23   how many times you, whether yourself did it or
24   another police officer close to you, used pepper
25   spray that you recall from 1995-2004?

17 (Pages 65 to 68)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

---

Page 69

1     A    I can't recall.  I'd be speculating.
2     Q    Okay.  After 2004, though, you had --
3  have you ever yourself deployed pepper spray mace,
4  or witnessed other police officers doing it?
5     A    I'm sorry, I'm pausing because I'm
6  trying to think through.  Most of my duties were
7  not street enforcement related between 2004 and
8  2015, so I would say during that time frame, no, I
9  can't recall ever deploying or seeing mace
10 deployed.
11       I can't recall seeing mace deployed
12 as a commander during -- during any -- not where I
13 was -- not where I was like front and center
14 present, no.  I don't -- I don't recall.
15    Q    So really the only times where you
16 either yourself used pepper spray mace, or
17 witnessed someone, would have been during the
18 1995/2004 time period?
19    A    Yes.
20    Q    During that time period, were those
21 incidents in connection with an arrest of an
22 individual?
23    A    Yes.
24    Q    Prior to the use of pepper spray or
25 mace in those incidents, is it your recollection

---

Page 70

1  that the officer provided any warnings to the
2  individual?
3     A    No, it would have been relative to
4  affecting an arrest.  The individual would have
5  been told that they were under arrest or it would
6  have been a fight situation so the deployment would
7  have been immediate and there would be no warning
8  given.
9     Q    Were there any situations where it
10 wasn't a fight but simply somebody was not
11 compliant with a request, such as turn around so I
12 can put handcuffs on you, the person doesn't
13 comply, and to effectuate the arrest, the officer
14 needs to use pepper spray mace?
15    A    Under our order, we do not warn that
16 we're going to deploy mace for an arrest situation.
17 The individual is notified that they're under
18 arrest, turn around, put your hands behind your
19 back, and then if when the individual fails to do
20 that, then it's an escalation of force through the
21 use of force continuum.
22       So if I go to put my hands on an
23 individual, and they resist, they begin to flail,
24 then I might use mace to subdue them and bring them
25 under compliance.

---

Page 71

1     Q    Think of a situation where the person
2  is not resisting in any way physically, there is no
3  threat of violence, there is no imminent threat of
4  harm to the police officer who is trying to
5  effectuate the arrest --
6     A    Then there would be --
7     Q    Just a -- let me finish my question.
8     A    Sorry.
9     Q    I'm going to start over.  I want you
10 to imagine the following scenario, which is not
11 implausible at all, I hope you'll agree with me,
12 that there is an officer trying to effectuate an
13 arrest.  The officer has the handheld pepper spray
14 mace device with him.  He asks the person to do
15 something and the person is -- simply refuses to
16 comply with that request but is not exhibiting any
17 force or violence, there is absolutely no threat of
18 imminent harm to the police officer or anybody
19 else, just a non-compliant individual.
20       Under those circumstances, is the
21 police officer allowed, on the escalation of use of
22 force, to spray the person with pepper spray
23 without giving him a warning, saying words to the
24 effect, sir, you're not complying with my request;
25 unless you comply, I'm going to spray you with

---

Page 72

1  pepper spray and it's going to hurt.  Something to
2  that effect?
3     A    No.
4     Q    Is there a reason why, as a policy,
5  the City wouldn't want police officers under the
6  circumstance that I described, where an individual
7  is simply uncooperative, but not violent, that you
8  wouldn't, in the process of trying to effectuate an
9  arrest in a peaceful manner, not give a warning,
10 saying, I'm going to do something that's going to
11 hurt you, please cooperate?
12    A    Because mace is not --
13       MR. DIERKER:  Excuse me, I'd like to
14 object to the form of the question as
15 argumentative, but you may answer.
16    A    Because, technically, mace is not to
17 be used just on non-compliance, passively resisting
18 persons.  So we would not use mace on someone who
19 is passively resisting.  Mace would be used on an
20 actively resisting.  So if I am refusing to be
21 handcuffed, we would put handcuffs on an individual
22 and use -- we wouldn't necessarily spray them
23 unless they are actively resisting.
24    Q    (BY MR. PRAISS)  So if I heard you
25 correctly, if someone is passively resisting, the

---

18 (Pages 69 to 72)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 73

1  City's policies is that mace should not be used in
2  that circumstance; is that an accurate statement?
3      A   I believe so.
4      Q   Okay.  To the extent, in connection
5  with the Stockley protests, individuals were
6  engaging in civil disobedience but peacefully, and
7  at no time actively resisting but simply passively
8  resisting a request, an order from a police
9  officer, it would have been inappropriate for a
10  police officer in those situations to use pepper
11  spray at those individuals to get them to comply
12  with a request; is that a fair statement?
13      A   Unless other factors were in play.
14  So, for example, obviously we would need to give
15  warnings to individuals that were -- because of the
16  dynamic nature of protests, where there is some
17  engaged in unlawful activities, sometimes in order
18  to disperse crowds, mace would be deployed, but
19  only after a set of circumstances.
20      Q   Okay.  I want to break that down a
21  little bit and understand what you're saying.  I
22  want to talk about a situation where you have a
23  group of people protesting and officers tell a
24  particular individual -- gives him a command to do
25  X Y and Z.

Page 74

1          At that point, if the person is
2  passively resisting, refusing to turn around so
3  handcuffs could be put on him or her, is there any
4  basis for an officer then to use handheld mace and
5  spray the person in order to get them to comply,
6  under the police policies?
7      A   I think we're going to quibble over
8  what active/passive resistance looks like.  Under
9  strict passive resistance, I would say no, there
10  would be no reason, but what shifts from active to
11  passive is where we are going to have issues on
12  when spraying is going to occur or not going to
13  occur.
14      Q   Okay.  But again, I want to focus on
15  my situation, that simply is a refusal to comply
16  with an order but not in any way resisting or
17  tugging or doing anything.  Just saying no, holding
18  my hands like this.  Would an officer be allowed,
19  in my -- I'm just crossing my hands and -- would in
20  your mind be -- is that a position where an officer
21  could spray me without any warning?
22      A   By crossing your arms, you are
23  committing active and defensive resistance, so
24  you're actively resisting my attempt to take you
25  into custody, so, therefore, mace could be

Page 75

1  deployed.
2      Q   Okay.  Is there a reason why the City
3  has a policy that in that situation allows a police
4  officer to spray me without warning to get me to
5  cooperate, knowing that by spraying someone, it's
6  going to hurt like hell, excuse my language, and if
7  I gave the warning as a police officer, I may get
8  compliance?  What's the rationale for not giving
9  a warning in that situation?  That's why I'm
10  perplexed.
11          MR. DIERKER: I'll object to the form
12  of the question as argumentative and calls for a
13  legal conclusion.  You may answer.
14      Q   (BY MR. PRAISS) You're not an
15  attorney, are you?  I just want to make sure I
16  didn't miss something.
17      A   Technically, I am an attorney.  I
18  graduated from law school in 2004.
19      Q   Should have covered your education.
20      A   Yes.
21      Q   Where did you go to law school?
22      A   Saint Louis University School of Law.
23      Q   Okay.  So you are an attorney.
24      A   I am an attorney.  I don't actively
25  practice law.

Page 76

1      Q   For today's deposition I am not
2  asking for any legal opinions by you.  I think the
3  judge will handle the law side quite well.
4      A   Yes.  I hope so.
5      Q   Yes.  My question to you is, solely
6  as the representative of the City today about
7  City's policies and practices.  And we have topics
8  dealing with chemical agents, you have mentioned
9  that you viewed the Special Order Section VI
10  dealing with mace, and I'm going back to my
11  specific question.
12          Could you explain to me the rationale
13  between -- strike that.
14          Can you explain to me the City's
15  rationale for allowing officers to use handheld
16  pepper spray against an individual who is not
17  acting violently, but simply refusing an order,
18  without first giving a simple warning, advising the
19  individual that there will be pepper spray deployed
20  against them unless they comply?
21          MR. DIERKER: I'll renew my
22  objection.  You may answer.
23      A   The reason is, generally, in order to
24  take the person into custody, to use the element of
25  surprise as it were, to take the individual into

19 (Pages 73 to 76)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 77

1 custody.  If -- and again, we're talking about
2 active versus passive resistance.  We wouldn't use
3 mace on individuals that are just generally not
4 compliant.  It's when they're not compliant and we
5 cannot take them into custody.
6       You cannot comply with -- you can --
7 I'm trying to phrase this appropriately.  You can
8 be non-compliant and actively resisting, in which
9 we would deploy mace.  In general, if you are
10 passively resisting, I am not going to go, I'm
11 going to sit down, we would use empty hand
12 techniques to take the individual into custody.  We
13 would not deploy mace.
14       As regards to warnings, as a standard
15 policy, we do not give warnings to individuals that
16 we are going to not -- we don't use warnings on a
17 one-on-one individual basis.  If we're going to use
18 them in a crowd dispersal basis, then a warning
19 would be applied.
20     Q    (BY MR. PRAISS)  That's what I'm
21 trying to understand.  Why is it in one situation
22 you do have warnings and the City recognizes the
23 value of them, but in this situation, prior to
24 escalating the situation, the City has a policy
25 that allows the use of pepper spray without

## Page 78

1 warnings?  That's what I'm trying to exactly
2 understand.
3       MR. DIERKER:  Once again I object to
4 the form of the question.
5     Q    (BY MR. PRAISS)  You may answer.
6     A    I cannot give you a reason why we
7 provide warnings other than the tactical
8 application of the mace itself.
9     Q    When you say "the tactical
10 application of mace," what do you mean by that,
11 sir?
12     A    The actual deployment, the -- to tell
13 someone that we are going to take a course of
14 action then gives them an opportunity to thwart
15 that course of action.  So we wouldn't -- if I gave
16 you the opportunity to -- if I said I am going to
17 spray you with mace if you don't comply, well, then
18 you might cover your face with your arm and then --
19     Q    Or I may just as well comply,
20 couldn't I?  Isn't that a possibility too?
21     A    All possibilities are possibilities
22 until they become probabilities.
23     Q    So if the goal is to avoid escalating
24 the situation, will you agree with me that, at a
25 minimum, you will try to de-escalate by warning a

## Page 79

1 person, saying, sir, your hands are crossed, you
2 are resisting my attempt to arrest you, I am asking
3 you one last time, please comply or I will have to
4 spray you with pepper spray?
5     A    But in most instances, we've
6 already --
7       MR. DIERKER:  Excuse me, I object to
8 the form of the question, argumentative, compound,
9 complex, calling for a legal conclusion.
10       MR. PRAISS:  Wow, any other
11 objections, Judge Dierker, from your law school
12 days that you want to come up with?
13       MR. DIERKER:  If I think of any, I'll
14 assert them.
15       MR. PRAISS:  Please assert them.  I
16 think you could add three more.
17     Q    (BY MR. PRAISS)  But subject to all
18 that, sir, could you answer my question?
19     A    Mostly because our goal in any
20 situation is de-escalation and voluntary
21 compliance.  It -- everything works better for the
22 officer on the street if we can gain voluntary
23 compliance from the individual.  Once we have
24 reached a point where we're in a situation where
25 we've already asked you to comply, we've already

## Page 80

1 then told you to comply, so we've got two refusals
2 of compliance, at the third point it's time for us
3 to take action.  And the individual officer has the
4 discretion of determining what that action will be.
5 And what is to -- what minimizes the potential for,
6 quote, injuries from taking such action.
7       So we could go hands on and grab and
8 manipulate an individual, force them to the ground,
9 potentially causing injury.  We could spray them
10 with mace, which, while painful, does not tend to
11 have long-lasting effects or long-term injuries.
12 That's why it's a non-deadly use of force.
13       I think that is part of the
14 explanation in that, once we have reached the stage
15 of taking action, we are no longer in a -- required
16 to be giving warnings as far as what we've done.
17 We've already done that.  We've already given the
18 warnings.  We've already said you're failing to
19 comply.  You're subject to arrest.  We're going to
20 arrest you if you fail to comply.  That's a matter
21 of using force.
22     Q    But nowhere in that process is the
23 police officer required to give a warning that he
24 or she is going to -- about to use pepper spray
25 mace in order to get compliance from an individual;

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 81

1  correct?
2      A    They are not.
3      Q    Okay.  Could you, for the benefit --
4  for my benefit and for the record, describe as best
5  you can the difference between passively resisting
6  and actively resisting?  What triggers that
7  distinction?  And let me also, I'd like to
8  understand what training is provided to officers or
9  are there anything in writing that defines those
10  things?
11      A    It covers it in the orders and during
12  defensive tactics training I believe from the St.
13  Louis Police Academy, where all officers go through
14  that, you know.  Active resisting is generally an
15  active fight or flailing or resistance to being
16  taken into custody.
17      Q    Let's focus on the last part, "the
18  resistance to being taken into custody."  What
19  constitutes resistance?  What's the minimum amount
20  that I have to do to trigger active resistance?
21  Let's get the minimum threshold.
22      A    The minimum threshold, it first would
23  start with refusing to comply because that's an
24  active act.  And then as we go forward, we're going
25  to get into things that are actually resisting my

Page 82

1  arrest.  That could be fleeing.  It could be
2  flailing.  It could be -- those two are the main
3  ones.  Fleeing from being put into handcuffs,
4  running from me, taking a fighting stance.  All of
5  those.
6      Q    Again, I'm focusing on the minimum.
7  You seem to be wanting to look at the higher end of
8  the spectrum, with all due respect.
9      A    Right.
10      Q    Take the situation, and I think I
11  heard you correctly, of an individual simply
12  refuses to comply.
13      A    Mm-hmm.
14      Q    Was it your testimony that simply
15  refusing to comply in itself is actively resisting?
16      A    It can be.  Refusing to comply, if
17  I'm refusing to comply and I'm locking my arms, or
18  I'm refusing to comply by holding this chair, that
19  can be an active resistance.  Passively resisting
20  is I'm just resisting you.  I'm just saying no.
21  And when the officer puts his hand on me to put me
22  in handcuffs, I willingly put my hands behind my
23  back and I am cuffed and I passively walk away.
24      Q    So in the situation today of an
25  individual who refuses to comply with a request and

Page 83

1  locks his or her hands in such a fashion that make
2  it difficult for a police officer to effectuate an
3  arrest, the police officer can, using his or her
4  discretion, spray that individual with pepper spray
5  without giving any warning; is that a fair summary?
6      A    They do not have to give a warning.
7      Q    Gotcha.
8          MR. PRAISS:  Let me mark this as an
9  exhibit.
10          (Plaintiffs' 30(b)(6) Exhibit 4
11  marked for identification by the court reporter.)
12      Q    (BY MR. PRAISS)  I have given you
13  what's been marked as Exhibit 4, and it begins with
14  Bates number CITY 764, and does yours end -- I want
15  to make sure we're looking at the same thing
16  because the numbers seem to be off right now --
17  ends with CITY 53?
18      A    Yes.
19      Q    Okay.  And I don't have an
20  explanation why the Bates numbers are not
21  sequential.  Do you recognize this document?
22      A    I do, and just as a point of
23  clarification in my earlier statement where I said
24  I reviewed pepper mace and I said Section VI, it's
25  actually Roman numeral Section IV, IV instead of

Page 84

1  VI.
2      Q    Okay.  If you go to Bates number CITY
3  775?  Is that the portion of the Special Order
4  Section IV dealing with the use of pepper spray?
5  Pepper mace?
6      A    It is.
7      Q    Okay.  Is there anything in here that
8  you can point me to specific language that
9  identifies the difference between passive versus
10  active resistance?
11      A    There is not.
12      Q    Are you aware of any specific
13  training, written documents that specifically
14  delineate to officers the difference between
15  passive versus active resistance?
16      A    I cannot point to any specific
17  training other than just my own as far as what we
18  discuss as far as active versus passive, that you
19  don't want to use mace on passively compliant
20  people.
21      Q    Again, I'm interested in your
22  testimony as a corporate representative and I think
23  one of the topics deals with the training dealing
24  with chemical agents?
25      A    Yes.

21 (Pages 81 to 84)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 85

```
 1        Q    You understand our definition of
 2  "chemical agents" includes pepper spray -- pepper
 3  mace?
 4        A    I do.
 5        Q    Okay.  So my question, in preparing
 6  for today's deposition, is it your testimony the
 7  City has no training documents that explain
 8  specifically the difference between passive versus
 9  active resistance which would advise police
10  officers under what circumstances they may or may
11  not use pepper spray mace to effectuate an arrest?
12  I have not seen those documents and I'm trying to
13  find out if they're out there.
14        A    No, I cannot.  I cannot.
15        Q    Have you ever seen such document?
16        A    No, I cannot recall.  No, I cannot.
17        Q    Okay.  For the record, I believe
18  there may be a page missing in here, and I think
19  there was an email from Tony to you about it on
20  Friday and maybe at some point, when we get that
21  page, we'll include it in here.  I noticed that --
22        MR. DIERKER:  Well, it's certainly --
23  it's our intention that you have the whole thing.
24        MR. PRAISS:  I think there are one or
25  two pages missing that Tony brought to your
```

Page 86

```
 1  attention.  That's all I want to make sure.
 2        Okay.  Will you mark this as the next
 3  exhibit.
 4        (Plaintiffs' 30(b)(6) Exhibit 5
 5  marked for identification by the court reporter.)
 6        Q    (BY MR. PRAISS)  I'm handing you
 7  what's been marked for identification purposes as
 8  Exhibit 5.  Mr. Larson, this document, Exhibit 5,
 9  is titled City of St. Louis Law Department Police
10  Section Protest Law and it's dated August 16, 2017.
11        Do you see that?
12        A    I do.
13        Q    Have you ever seen this document
14  before today's deposition?
15        A    I have.
16        Q    When do you recall seeing it?
17        A    I saw it when it was presented and I
18  believe that was on 8/16 when it was presented to
19  the senior command during pre-Stockley training.
20        Q    Did you -- is this -- this is not a
21  document you reviewed in preparing for today's
22  deposition?
23        A    I did.  I would have read it in the
24  course of preparation.
25        Q    All right.  Because you recall
```

Page 87

```
 1  earlier I tried to be as thorough as possible to
 2  find out all documents you reviewed.  I don't
 3  recall -- you mentioned a training document.  Is
 4  this the document you were referring to?
 5        A    I did review this training document,
 6  or this document prior to our meeting today.
 7        Q    Okay.  Did you make an effort to
 8  speak with anybody other than your attorneys about
 9  this document, Exhibit 5?
10        A    No.
11        Q    Okay.  Are you aware -- strike that.
12        You mentioned that this was presented
13  to you and others in senior command prior to the
14  Stockley protest?
15        A    Yes.
16        Q    And when you say senior command, what
17  does that mean?
18        A    The senior command would be the
19  chief, the assistant chief, the colonels, the
20  majors, I believe the captains, and perhaps
21  specialized unit lieutenants.
22        Q    Do you recall who provided this
23  presentation?
24        A    It was the law department, I believe
25  it was Christine Hutson.
```

Page 88

```
 1        Q    Do you know if at any time subsequent
 2  to the presentation that was made to the senior
 3  command, a similar presentation of this document
 4  was provided to all police officers?
 5        A    I believe -- I don't believe so.  I
 6  don't know.  It may have gone out in department
 7  mail but I can't recall.
 8        Q    Okay.  This is dated just a few weeks
 9  before the Stockley protest; correct?
10        A    Yes.
11        Q    Do you know if this was prepared
12  specifically in anticipation of the verdict in the
13  Stockley matter?
14        A    I believe it was.
15        Q    Is it fair to say, is it your
16  understanding that this document purports to
17  reflect the policies and practices of the City of
18  St. Louis for the matters that are identified in
19  it?
20        A    Can you repeat that?  I'm confused.
21        Q    Sure.  It's not the clearest
22  question, so thank you for asking me to rephrase.
23        Is it fair to say that Exhibit 5 and
24  the information contained within it about protest
25  law accurately reflects the City's understanding
```

22 (Pages 85 to 88)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 89

1  with respect to the matters set forth in the
2  document?
3      A    Yes.
4      Q    All right.  Go to page 17, please, of
5  the PowerPoint.
6      A    Yes.
7      Q    It's titled Chemical Agents.
8           Do you see that?
9      A    I do.
10     Q    It says, "In most cases, mandatory
11 warnings must be given prior to using chemical
12 agents as a result of Templeton."
13          Do you see that?
14     A    Yes.
15     Q    The phrase "In most cases" indicates
16 to me that it's not universal; correct?
17     A    Yes.
18     Q    And is what we discussed up until now
19 about the use of pepper spray, pepper mace, the
20 only exception whereby mandatory warnings must not
21 be given prior to using chemical agents?
22     A    I'm sorry, I'm confused again.
23     Q    We discussed the use of pepper spray
24 mace; correct?
25     A    Yes.

## Page 90

1      Q    And we were talking about it in the
2  context of handheld device by a police officer;
3  correct?
4      A    Correct.
5      Q    Is that the only situation where a
6  mandatory warning is not required prior to using a
7  chemical agent?
8      A    Well, in general, mandatory warnings
9  are required when they're being used for crowd
10 dispersal.  So when we're using them as a crowd
11 dispersal tool, then they're going to -- then a
12 mandatory warning is necessary.
13     Q    Gotcha.  So this document is only
14 dealing with the context of -- strike that.
15          Let's go to the next page, page 18.
16     A    Yes.
17     Q    Make sure I got the right page here.
18 I'm going to be so upset at myself.  Are we missing
19 pages here?  Do you have page 18 on yours?
20     A    I have page 18.
21     Q    You're the only one here that has
22 page 18.  It's my lack of -- inability to copy
23 things appropriately.  I'm still learning the Xerox
24 machine at the ACLU.
25          MR. DIERKER:  You have my sympathy.

## Page 91

1          MR. PRAISS:  Thank you.  I tried so
2  hard not to bother anybody at the office and this
3  is what I get.  I have odd pages.  Well, I
4  apologize.  We'll make copies of that one but this
5  is to, the extent I deal with odd pages, we'll be
6  in good shape.
7      Q    (BY MR. PRAISS)  On page 18, am I
8  correct it says, "Which chemical agents are covered
9  by this policy?"  And it says, "All of them."
10 Correct?
11     A    That is correct.
12     Q    Okay.  Are there any chemical agents
13 that are not included in the policy dealing with
14 protest law in --
15     A    No.  Sorry.
16     Q    If the chemical composition -- strike
17 that.
18          Am I correct that the chemical
19 composition of pepper spray mace, whether it's in a
20 handheld device or in a fogger, is identical?
21     A    The chemical composition of, I'm
22 sorry, the handheld mace and a fogger are
23 identical?  I believe they are.  I think it's the
24 dispersal method that is different.
25     Q    Are you familiar with the Templeton

## Page 92

1  Settlement Agreement?
2      A    Yes, I mean, I know that it occurred.
3      Q    Do you see there's references in the
4  pages that follow that refer in the heading to the
5  Templeton versus Dotson, et al., Settlement
6  Agreement?
7      A    Yes.
8      Q    Quite a few pages dealing with it?
9      A    Yes.
10     Q    Have you yourself ever looked at the
11 Templeton Settlement Agreement?
12     A    I believe so.  I believe it was
13 disseminated to commanders at the time of the
14 agreement.
15     Q    Okay.  Did you review the Templeton
16 Settlement Agreement in preparation for today's
17 deposition?
18     A    I don't believe I did because
19 Templeton was incorporated in the Special Order
20 1-01, Section XIII.
21     Q    Did I hear you correctly that
22 Templeton Settlement Agreement -- strike that.
23          Am I correct that the terms of the
24 Templeton Settlement Agreement were incorporated
25 into Section XIII of Special Order 1-01?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 93

1     A   Yes.
2     Q   Okay.
3         MR. DIERKER:  Off the record.
4         (Off the record.)
5         (Plaintiffs' 30(b)(6) Exhibit 6
6     marked for identification by the court reporter.)
7     Q   (BY MR. PRAISS)  Sir, I'm going to
8     hand you what's been marked as Exhibit 6, which is
9     a copy of the Templeton Settlement Agreement?
10    A   Mm-hmm.
11    Q   You don't believe you reviewed this
12    in preparing for the deposition?
13    A   I don't believe so because I believe
14    the context of it was all incorporated into Special
15    Order 1-01 Section XIII.
16    Q   Okay.  If you look on the first page,
17    paragraph A at the bottom, and I'll paraphrase
18    generally, do you see that in, first, the
19    defendants and anybody acting on their behalf
20    basically will not enforce any rule, policy, or
21    practice that grants law enforcement officials
22    authority or discretion to do certain things which
23    are set out on page 2?
24        Do you see that?
25    A   Yes.

Page 94

1     Q   So to the extent the City of St.
2     Louis had any rule, policy, or practice as of the
3     date of this Settlement Agreement that granted law
4     enforcement officials the authority or discretion
5     of the things that are set forth on the following
6     page, the understanding of the City was that this
7     Settlement Agreement prohibited those practices;
8     correct?
9     A   Correct.
10    Q   It sets out at two different
11    circumstances where chemical agents could be used
12    on the next page; correct?
13    A   Yes.
14    Q   And the first one, basically, it
15    precluded police officers as part of the Settlement
16    Agreement from using chemical agents for the
17    purpose of dispersing groups of individuals who
18    were engaged in non-criminal activity in the City
19    unless the full requirements were met; correct?
20    A   Correct.
21    Q   And the second factor was it
22    prohibited police officers from using chemical
23    agents on individuals who were engaged in
24    non-criminal activity for the purpose of
25    frightening them or punishing them for exercising

Page 95

1     their constitutional rights?
2     A   That is correct.
3     Q   Okay.  There was four requirements
4     that applied to the first circumstance; correct?
5     A   Yes.
6     Q   The first one is that there has to be
7     a clear and unambiguous warning?
8         Do you see that?
9     A   Correct.
10    Q   Second one, there's an opportunity to
11    heed the warning?
12    A   Correct.
13    Q   The third one is a minimized impact
14    on individuals who are complying with orders; and
15    the last one is ensure safe egress is available to
16    people.
17        Do you see those four requirements?
18    A   I do, for the individuals engaged in
19    non-criminal activity.
20    Q   No, this would be for element one for
21    the purpose of dispersing groups of individuals.
22    A   Who are engaged in non-criminal
23    activity.
24    Q   Gotcha.  With respect to the first
25    requirement of clear and unambiguous warning, is it

Page 96

1     the City's understanding that that warning would,
2     among other things, advise the person that chemical
3     agents would be used?
4     A   Yes, we would give a warning that
5     would say failing to comply with X action can
6     result in the deployment of chemical munitions.  We
7     would then direct individuals where to go and how
8     to comply, and then we'd try to minimize the effect
9     of the chemical agents if they were deployed.
10    Q   And I'm just focusing on the first
11    one.  I just want to make sure that my
12    understanding is accurate that the reference to
13    clear and unambiguous warning specifically
14    contemplates a warning that chemical agents would
15    be used absent compliance.
16    A   Yes.
17    Q   Gotcha.  With respect to minimize
18    impact on individuals who are complying with the
19    order in that situation, is it -- do you agree that
20    it is easier for police officers to comply with
21    this requirement if they use a handheld pepper
22    spray device as compared to a fogger?  Let me ask
23    it differently.
24        Would you agree that foggers tend to
25    spray a larger area and, therefore, more likely to

24 (Pages 93 to 96)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 97

1    impact a greater number of individuals than a
2    handheld device?
3        A    Yes.
4        Q    So if the objective is to minimize
5    the impact on individuals who are complying with an
6    order with respect to this requirement, you would
7    agree with me that using a handheld device would be
8    more appropriate?
9        A    It may be.
10       Q    Do you see that there is a definition
11   of "chemical agents" included as part of Settlement
12   Agreement?
13       A    I'm sorry -- oh, what -- yeah, under
14   1, where it says, yes, that there are a range of
15   chemical, that all would be collectively referred
16   to as chemical agents.
17       Q    Okay.  So again, the answer to my
18   question is, there is a specific definition for the
19   term "chemical agents" as it's used in the
20   Templeton Settlement Agreement; is that a fair
21   statement?
22       A    Yes.
23       Q    And that definition includes tear
24   gas, inert smoke, pepper gas, or other chemical;
25   correct?

Page 98

1        A    Yes.
2        Q    And I think we established it before
3    but again, you agree with me that pepper spray, OC
4    spray and mace all have the same chemical
5    composition; correct?
6        A    Yes.
7        Q    And am I correct that the definition
8    of "chemical agents" and in the Templeton
9    Settlement Agreement does not distinguish based on
10   the manner by which the pepper gas would be
11   deployed against protesters?
12       A    It does not.
13       Q    Am I correct there's no language in
14   the Templeton Settlement Agreement that indicates
15   that pepper gas deployed using an individual
16   handheld device is not included in the definition
17   of "chemical agents"; is that correct?
18       A    That is correct.
19       Q    And am I correct there is no language
20   in the Templeton Settlement Agreement that
21   indicates that only pepper gas deployed using a
22   fogger is included in the definition of "chemical
23   agents"; is that correct?
24       A    I'm sorry, I'm confused.
25       Q    I'll ask -- I'm covering all kinds

Page 99

1    of --
2        A    I'm focusing on what you're saying to
3    make sure that I'm understanding as I don't want to
4    answer incorrectly.
5        Q    I appreciate it.  Am I correct there
6    is no language in the Templeton Settlement
7    Agreement that indicates that only pepper gas
8    deployed using a fogger is included in the
9    definition of "chemical agents"; is that correct?
10       A    I believe that's correct.
11       Q    Bottom line, regardless how pepper
12   spray is deployed, it is covered within the
13   definition of "chemical agents" under the Templeton
14   Settlement Agreement?
15       A    Yes.
16       Q    Gotcha.  I have a long question.
17       A    Okay.
18       Q    And I'm going to read it.  If you
19   need me to repeat it, I'm happy to do so.
20            Under the Templeton Settlement
21   Agreement, do you agree that absent circumstances
22   that present imminent threat of bodily harm, police
23   officers could not use handheld pepper spray for
24   the purpose of dispersing groups of individuals
25   engaged in non-criminal activity without, among

Page 100

1    other things, first providing a clear and
2    unambiguous warning that chemical agents would be
3    utilized and providing those individuals with
4    sufficient opportunity to heed the warning and exit
5    the area?
6        A    Yes.
7        Q    Under the Templeton Settlement
8    Agreement, do you agree that absent circumstances
9    present imminent threat of bodily harm, police
10   officers could not use handheld pepper spray on
11   individuals engaged in non-criminal activity for
12   the purpose of frightening them or punishing them
13   for exercising their constitutional rights?
14       A    That is correct.
15       Q    Okay.  Thank you.
16       Q    Is this a good time for a break?
17       MR. PRAISS:  Absolutely.  You've got
18   the toughest job here today.  Well, she has the
19   toughest job, I take it back.  Tara has the hardest
20   job.  But when either of you need a break,
21   seriously, just let me know.  As long as I ask --
22   don't ask for a break when there's a question
23   pending.  That's all.
24       THE WITNESS:  No, of course not.
25       (Off the record.)

25 (Pages 97 to 100)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| Page 101 | Page 103 |
|---|---|

Page 101

1    (Plaintiffs' 30(b)(6) Exhibit 7
2  marked for identification by the court reporter.)
3      Q    (BY MR. PRAISS)  Mr. Larson, I've
4  hand you had what's within marked as Exhibit Number
5  7.
6         Do you see that?
7      A    I do.
8      Q    And it says Declaration of Jerome
9  Baumgartner that was submitted as Defendant's
10  Exhibit 1 in connection with a preliminary
11  injunction hearing I'll represent to you?
12      A    Yes.
13      Q    So it's part of a court file.  Have
14  you ever seen this exhibit before today?
15      A    I have not seen the Declaration.  I
16  have seen the Special Order behind it.
17      Q    Perfect.  If you go to paragraph 6 of
18  Mr. Baumgartner's Declaration, I'll read it into
19  the record.  "On January 7, 2015, a temporary
20  directive on the use of chemical agents for
21  dispersing groups engaged in peaceful, non-criminal
22  activity was put in immediate effect, pursuant to
23  the matter then before the US District Court and is
24  attached as Exhibit B."
25         Do you see that?

Page 103

1  questions.
2      A    Okay.
3      Q    Am I  correct that to a large extent,
4  that temporary directive tracks the approach taken
5  under the Templeton Settlement Agreement in terms
6  of laying out under what circumstance, if any,
7  police could use chemical agents in the context of
8  dispersing groups of individuals?
9      A    It does.
10      Q    Okay.  Am I correct that the
11  temporary directive includes the same essential
12  requirements before chemical agents could be used
13  to disperse groups of individuals who are engaged
14  in peaceful, non-criminal activity; am I correct?
15      A    You are correct.
16      Q    Okay.  Am I correct that the
17  temporary directive, similar to the Templeton
18  Settlement Agreement, includes a definition for
19  "chemical agents"?
20      A    It does.
21      Q    Am I correct that the definition of
22  "chemical agents" in the Templeton Settlement
23  Agreement and in the temporary directive is
24  identical?
25      A    Yes.

| Page 102 | Page 104 |
|---|---|

Page 102

1      A    I do.
2      Q    Okay.  If you could go to Exhibit B,
3  please, of Mr. Baumgartner's Declaration, and do
4  you see at the top of it, it says Directive
5  2015-01-07?
6         Do you see that?
7      A    Yes.
8      Q    Am I correct that's -- the date there
9  is referring to July 1, 2015?  Is that your
10  understanding?
11      A    That is correct.
12      Q    Okay.  Am I  correct the directive
13  went into effect on that date?
14      A    Correct.  This is considered a
15  temporary directive by the St. Louis Police
16  Department and it was put into effect.
17      Q    Okay.  Take as much time as you need
18  just to refresh your recollection of the terms of
19  the temporary directive and I'll ask you some
20  questions about it.  Let me know when you're ready.
21      A    Okay.  I believe I'm ready.
22      Q    And if you could compare the terms of
23  the temporary directive to the terms of the
24  Templeton Settlement Agreement, let me know when
25  you have those side by side, I'll ask you some

Page 104

1      Q    So is it fair to say all the answers
2  to the questions I asked you before, with respect
3  to the Templeton Settlement Agreement, in terms
4  what's included or not included, applies here?
5      A    Yes.
6      Q    And in particular, am I correct that
7  the temporary directive does not distinguish in any
8  way, based on the manner by which pepper gas would
9  be deployed against protesters?
10      A    It does not speak to the manner of
11  deployment.
12      Q    So am I correct that the temporary
13  directive applies to pepper spray regardless
14  whether it's deployed using a handheld device, a
15  fogger, or some other device?
16      A    It does.
17      Q    Okay.  I got two long questions for
18  you again.  I'll go slow to make sure you have a
19  chance to absorb it.
20         Am I correct that under the temporary
21  directive, police officers could not use handheld
22  pepper spray for the purpose of dispersing groups
23  of individuals engaged in peaceful, non-criminal
24  activity without, among other things, first
25  providing a clear and unambiguous warning that

26 (Pages 101 to 104)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 105

1  chemical agents will be utilized and providing
2  those individuals with sufficient opportunity to
3  heed the warning and exit the area?
4      A   Yes.
5      Q   Okay.  Am I correct that under the
6  temporary directive, police officers could not use
7  handheld pepper spray on individuals engaged in
8  peaceful, non-criminal activity for the purposes of
9  frightening them or punishing them for exercising
10  their constitutional rights?
11      A   Yes.
12      Q   Thank you.  If you go to Mr.
13  Baumgartner's Declaration and look on paragraph 7,
14  it indicates that the "temporary directive was sent
15  to all commissioned officers via the Policy
16  Acknowledgment System for review and
17  acknowledgment."
18          Do you see that?
19      A   I do.
20      Q   Okay.  The Policy Acknowledgment
21  System is abbreviated as the PAS System?
22      A   PAS System.
23      Q   Thank you.  When something like the
24  temporary directive is sent to all commissioners
25  and officers using a PAS System, is a complete copy

Page 106

1  of the temporary directive sent or is it just a
2  short, brief summary?
3      A   No, the entire -- the entire
4  directive, the text of -- this text would be sent.
5      Q   Okay.  Are there times when the PAS
6  System is used as a vehicle for training purposes
7  where, rather than attach the actual document, a
8  just one or two line sentence abbreviation is
9  provided?
10      A   It can be used as a notification
11  method, much like you're describing.  It can also
12  be used as a training where it links to certain
13  videos and things would be supplied.
14      Q   Okay.  With respect to, for example,
15  the use of force policy, for example -- when I say
16  the use of force policy, what do you understand
17  that to mean?
18      A   The use of force policy would be the
19  policy that is outlined in Special Order 1-01.
20      Q   The entirety of Special Order 1-01?
21      A   Yes.
22      Q   Okay.  Is there -- is the PAS System
23  used with respect to ensuring that police officers
24  are up to date on their knowledge of Special Order
25  1-01?

Page 107

1      A   It is.
2      Q   When that's done, how is that
3  information conveyed to police officers using the
4  PAS System?
5      A   Monthly a notice is sent from the PAS
6  System to all commissioned members of the
7  department, I believe it would go even all members
8  of the department, and within that guideline is
9  this is the monthly use of force reminder.  As part
10  of that, there will be a test as far as several
11  questions regarding specific elements of use of
12  force.
13          And the employee reviews the order,
14  can review the order, it's there in its entirety,
15  and then can -- and then takes the test, which they
16  have to pass before the order is considered signed.
17      Q   Is the entirety of Special Order 1-01
18  included as part of that communication to the
19  commission officers?
20      A   A link.  There's a button on the side
21  that says "Review."  When you hit the "Review," it
22  will generate the order.
23      Q   Is it a requirement that they review
24  the Special Order or is it sufficient that they
25  simply answer the questions?

Page 108

1      A   They must answer the questions to
2  sign the order.  They are not required to review
3  the order in order to sign it.
4      Q   Is there a requirement that they have
5  to answer all the questions correctly in order to
6  pass?
7      A   Yes.
8      Q   All officers getting the same
9  questions at the same time?
10      A   There is a multiple rotating number
11  of questions that officers are sent, so it's not
12  the same exact test every month.
13      Q   Okay.  If you look at paragraph 8 of
14  Mr. Baumgartner's Declaration, if you take a minute
15  to read that?  You see that indicates that the
16  temporary directive we have been looking at,
17  Exhibit B to Mr. Baumgartner's Declaration, became
18  Section XIII of Special Order 1-01 which was issued
19  on July 10, 2015.
20          Do you see that?
21      A   I do.
22      Q   And it indicates in that, "Section
23  XIII of Special Order 1-01 outlines the policy for
24  deployment of chemical agents for crowd dispersal,
25  and identifies the restrictions, consistent with

27 (Pages 105 to 108)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 109

1  the Settlement Agreement issued by the US District
2  Court" in the Templeton matter; correct?
3      A    Yes.
4      Q    Okay.  Is it fair to say that Section
5  XIII of Special Order 1-01 was implemented pursuant
6  to the Templeton Settlement Agreement?
7      A    Yes.
8      Q    Is it fair to say that in adopting
9  Section XIII of Special Order 1-01, the City wanted
10  this new provision to be consistent with the terms
11  of the Templeton Settlement Agreement?
12      A    Yes.
13      Q    Other than Section XIII of Special
14  Order 1-01, as of September 2017, did the City have any
15  other policies relating to when police officers
16  could deploy chemical agents for crowd dispersal?
17      A    No.
18      Q    Other than Section XIII of Special
19  Order 1-01, does the City presently have any other
20  policies relating to when police officers can
21  deploy chemical agents for crowd dispersal?
22      A    No.
23      Q    If you go to Exhibit C of Mr.
24  Baumgartner's Declaration, am I correct that has
25  Section XIII of Special Order 1-01?

## Page 110

1      A    Yes.
2      Q    Please take as much time as you need
3  to review Special Order XIII.  Let me know when
4  you're ready.
5      A    I believe I'm ready.
6      Q    Okay.  Is this is one of the
7  documents you specifically testified before you
8  reviewed in preparing for today's deposition?
9      A    It is.
10      Q    Gotcha.  Did you speak with anyone
11  other than the City's attorneys with respect to
12  Special Order XIII?
13      A    I did not.
14      Q    And I misspoke.  Section XIII of
15  Special Order 1-01.
16      A    No, I'm sorry, I did not.
17      Q    And am I correct that nowhere in
18  Section XIII of Special Order 1-01 is there a
19  definition for the term "chemical agents"?
20      A    There is not.
21      Q    Okay.  Help me understand, if the
22  City's stated objective was to issue Special Order
23  -- strike that.
24          Help me understand if, as you
25  testified, the City's objective was to issue

## Page 111

1  Section XIII of Special Order 1-01 consistent with
2  the terms of the Templeton Settlement Agreement,
3  why did the City choose not to include a definition
4  for "chemical agents"?
5      A    We didn't include a definition but
6  they included the listing of chemical agents under
7  Section A.  Chemical agent equipment.  So we didn't
8  define "chemical agents."  We listed them, those
9  that were available to the SWAT unit.
10      Q    Could you please compare the
11  definition of -- specifically look at the
12  definition of "chemical agents" both in the
13  Templeton Settlement Agreement and the temporary
14  directive, and confirm to me whether all the items
15  identified in those definitions are included in
16  Section XIII of Special Order 1-01.
17      A    I believe they are.
18      Q    Do you see a reference to the term
19  "tear gas," for example?
20      A    I do.
21      Q    That's included in the Settlement
22  Agreement and the temporary directive; correct?
23      A    It is.
24      Q    Is that included anywhere on Section
25  XIII, Special Order 1-01?

## Page 112

1      A    It is under CS gas.  CS gas is
2  considered a tear gas, versus OC, which is
3  considered a mace.
4      Q    Is it your testimony that the
5  language used under the term "chemical agent
6  equipment" in Section A of Special -- of Section
7  XIII of Special Order 1-01 essentially has exactly
8  the same meaning as the definition of "chemical
9  agents" in the Templeton Settlement Agreement and
10  the temporary directive?
11      A    Yes.
12      Q    Okay.  I think we have established
13  unequivocally that it's the City's understanding
14  that under the Templeton Settlement Agreement and
15  the temporary directive, that they both include
16  pepper spray in any form, whether deployed using a
17  handheld device or a fogger; correct?
18      A    Yes.
19      Q    Is it the City's understanding that
20  handheld pepper spray is or is not included under
21  Section XIII of Special Order 1-01?
22      A    I believe it would be included.
23      Q    Is there any training provided to
24  police officers specifically about that issue,
25  whether handheld pepper spray is covered under

28 (Pages 109 to 112)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 113

1  Section XIII of Special Order 1-01 or is it
2  exclusively covered under the Section VI that we
3  looked at before about handheld pepper spray?
4  Mace?
5      A    As it relates to dispersement and
6  crowd, it would be listed here in XIII.  As it
7  relates to the individual officers' use for
8  affecting arrests of individuals under general
9  circumstances, the deployment methodology is listed
10  in Section VI.
11     Q    Would you agree with me that it's not
12  difficult to envision circumstances where those two
13  circumstances conflate and get very close to one
14  another?
15     A    Yes.  I would agree with that.
16     Q    For example, in the situation of a
17  kettle, a police officer standing at that moment,
18  trying to interact with a protester, in his or her
19  mind could think, I am under -- my actions are
20  governed by Section VI because I'm trying to
21  effectuate an arrest, or equally could think, no,
22  my actions are governed by Section XIII because
23  we're trying to disperse the heck out of this crowd
24  and they've ignored dispersal orders.
25          That's very plausible; right?

Page 114

1      A    Yes.
2          MR. DIERKER:  I'm a little late in my
3  objection to the form, but...
4          MR. PRAISS:  It's quite all right.
5      Q    (BY MR. PRAISS)  And recognizing that
6  the scenario that I'm laying out there is quite
7  possible -- plausible, I misspoke, my question is,
8  again, are you aware of any specific training
9  provided to police officers who find themself in
10  that situation where they're trying to decide am I
11  going to be under Section VI or Section XIII of
12  Special Order 1-01 in terms of how I use this
13  handheld device?
14     A    I am not aware of any specific
15  training related to that.
16     Q    Okay.  Are you aware of any documents
17  that deal with that issue?
18     A    No, not outside the orders we've
19  discussed.
20     Q    Are you aware of any specific
21  communications using the PAS System where it was
22  communicated to police officers at any time, before
23  or after the Stockley protests, saying there's two
24  different provisions that handheld pepper mace are
25  covered by, Section VI and, yes, it's also covered

Page 115

1  under Section XIII, and here is which one applies
2  under what circumstances.
3          Has that ever been done, to your
4  knowledge?
5      A    No.
6      Q    Okay.
7          MR. DIERKER:  Excuse me.  But we've
8  been referring to Section VI.
9      A    It's actually Section IV.
10         MR. DIERKER:  And it's actually
11  Section IV.
12     Q    (BY MR. PRAISS)  When I said Section
13  VI in the last few minutes a couple times, you
14  understood I was referring to Section IV, which is
15  the provision we looked at and we marked before
16  dealing with handheld mace; correct?
17     A    I understood you to be referring to
18  the section of the order that refers to mace.
19     Q    Thank you very much, and thank you
20  for correcting me.  I said it once and no one
21  corrected me, so I kept saying it.
22         MR. DIERKER:  Well, I needed to
23  double check myself, so.
24     A    And I think that was my fault.  I
25  misquoted the Roman numerals in my initial

Page 116

1  statement.
2      Q    (BY MR. PRAISS)  I'm still trying to
3  understand why, from a practical perspective, when
4  the issue -- when the City issued the Templeton --
5  the temporary directive, it made a conscious
6  decision to track the language in the Templeton
7  Settlement Agreement.  You recall that?
8      A    I was not part of the creation of the
9  temporary directive, but yes, the intent was to
10  mirror the Settlement Agreement.
11     Q    And you've testified as a
12  representative that the same intent applied when
13  the City adopted Section XIII of Special Order
14  1-01.  Correct?
15     A    Yes.
16     Q    Recognizing that, is there a reason
17  why the City did not track and include that same
18  definition for "chemical agents" but rather just
19  blended it in in different sections of 1 and 2
20  under the heading A?  If you are aware of any
21  reason?
22     A    I'm not aware of any reason.
23     Q    Okay.  But it is your testimony, as
24  the corporate representative today, that handheld
25  pepper spray, to the extent it's used in connection

29 (Pages 113 to 116)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 117

1  with crowd dispersal, is included within the terms
2  and requirements of Section XIII of Special Order
3  1-01?
4      A    Yes.
5      Q    Okay.  So to the extent an officer in
6  connection with let's say the kettle understood
7  they were trying to disperse the individuals for
8  failure to heed their warnings of dispersal, that
9  officer's conduct should be judged under Section --
10  the terms of Section XIII of Special Order 1-01?
11      A    Yes.
12      Q    Okay.
13      MR. DIERKER:  Would now be a good
14  time to break for lunch?
15      MR. PRAISS:  This is probably less
16  than five minutes.  A few questions here and --
17  even though this was previously marked, could you
18  add the stickers?
19      (Plaintiffs' 30(b)(6) Exhibit 8
20  marked for identification by the court reporter.)
21      Q    (BY MR. PRAISS)  Mr. Larson, I'm
22  going to hand you what's been marked as Deposition
23  Exhibit 8.  Do you have that?
24      A    Yes, you've given it to me.
25      Q    Do you see at the very top it

## Page 118

1  indicates this is a picture that was taken from
2  Washington and Tucker?
3      A    Okay.
4      Q    Do you see the number 2?  Do you know
5  what that signifies, if anything, next to
6  Washington and Tucker top left?
7      A    I assume it's a camera.
8      Q    And if you look carefully on the
9  bottom in blue, you can read that it looks like it
10  was taken around 11:30 p.m. on September 17, 2017.
11      Do you see that?
12      A    Yes, it appears to be a time stamp.
13      Q    Do you recognize this to be a picture
14  of the police surrounding the individuals in what
15  is known as the kettle?
16      A    It is a picture that represents
17  officers around individuals.  We don't in the
18  police department recognize the term "kettle," so
19  any questions that you have on that, I'm a bit --
20      Q    You do know we have two topics that
21  use the term "kettle"?
22      A    Yes, I saw that in here, but...
23      Q    Is there a different term that you
24  prefer for me to use --
25      A    No.

## Page 119

1      Q    -- that captures that moment when the
2  police came in from four different directions and
3  surrounded a bunch of protesters?
4      A    I will say this picture indicates
5  what appears to be a mass arrest scenario.
6      Q    Do you recognize this to be at the
7  corner of Washington and Tucker where the kettle
8  took place?
9      A    Yes.
10      Q    Gotcha.  And the timing of it
11  corresponds to when the kettle took place, around
12  11:30 p.m.; correct?
13      A    Yes.
14      Q    Can you see, literally right in the
15  middle of the picture, there is a nice foggy area
16  there.
17      Do you see that?
18      A    Mm-hmm, I do.
19      Q    Do you recognize that to be spray
20  from a fogger being used against the individuals in
21  that area?
22      A    It could be.  I can't say what it is.
23      Q    Okay.  Would you agree with me that
24  in the situation -- assuming that when the judge
25  looks at the video and you watch it slowly, it

## Page 120

1  becomes abundantly clear that there is an OC spray
2  being used to effectuate against the people there.
3      A    Mm-hmm.
4      Q    Help me understand, in light of the
5  Section XIII of Section 1-01, that includes the
6  requirement that chemical agents would not be used
7  unless the third requirement being that the impact
8  of chemical agents on individuals who are complying
9  with lawful law enforcement commands is minimized,
10  how is the use of a fogger in this situation
11  consistent with that restriction?
12      MR. DIERKER:  I'll object to the form
13  of the question, it assumes facts not in evidence,
14  calls for an opinion, speculation.  But you may
15  answer.
16      A    At this point, they may be effecting
17  arrests and there may be resistings occurring.  I
18  can't say that, at this point in time, that the
19  four elements of giving the warning, attempting to
20  get those who wished to comply the opportunity to
21  comply, that has or has not occurred, I can't say,
22  but, you know, based on this picture, it is very
23  difficult, when using a fogger, to minimize the
24  risks to those in the immediate area, including
25  other police officers.

30 (Pages 117 to 120)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 121

1    Q    (BY MR. PRAISS)  And with that in
2  mind, why is the use of a fogger used specifically
3  in these context, knowing that it, by definition,
4  is contrary to the restriction about minimizing the
5  harm to other people who are being compliant and
6  lawful?
7    A    I can't answer that.
8    Q    Again, you're the City's
9  representative, so the buck stops with you for
10  better or worse today, Mr. Larson --
11    A    I understand, sir.
12    Q    -- and you are on the hot seat.
13    A    Yes.
14    Q    You know, this is the Special Order
15  that governs the dispersal, the deployment of
16  chemical agents for crowd dispersal.  Under
17  Chemical Agent Equipment it specifically identifies
18  high-capacity, extended-range OC spray being issued
19  to sergeants; correct?
20    A    Yes.
21    Q    That high-capacity, extended-range OC
22  spray, by definition, covers a large area unlike a
23  handheld pepper spray device; correct?
24    A    It does.
25    Q    Okay.  And am I  correct that

Page 122

1  high-capacity, extended-range OC spray was in fact
2  utilized in connection with the Stockley protest;
3  correct?
4    A    It was.
5    Q    My question to you is, as a policy,
6  why does the City have -- allow the use of
7  high-capacity, extended-range OC spray in the
8  context where there is a group of individuals when
9  it's very likely that within them there may be some
10  who are complying and acting lawfully, which would
11  then mean it contravenes the Special Order?
12    MR. DIERKER:  Object to the form of
13  the question.
14    A    I would say that as -- it's a tool,
15  as any other tool, and the application for it
16  depends on the -- on the circumstances.  So the
17  fact that we are not restricting the tools that are
18  available, it may not have been the best tool to be
19  utilized at the time, but in the event of it, is a
20  tool that is available for use and, therefore, we
21  don't restrict the use of it.
22    Q    (BY MR. PRAISS)  You are aware that
23  high-capacity, extended-range OC spray was in fact
24  utilized in connection with the Stockley protest?
25    A    Yes.

Page 123

1    Q    To the extent it was used rather than
2  handheld device, do you agree that that likely
3  violated the restrictions about trying to minimize
4  the impact of chemical agents on individuals who
5  were compliant because instead a handheld device
6  should have been used?
7    A    Can you give that to me again?
8    Q    Sure.  I think we've established that
9  at different points in time, and in particular in
10  connection with the kettle, high-capacity,
11  extended-range OC spray was utilized; correct?
12    A    Correct.
13    Q    And I think we've established that
14  the use of high-capacity, extended-range OC spray
15  covers a larger area than a handheld pepper spray;
16  correct?
17    A    Correct.
18    Q    And as a result, the use of
19  high-capacity, extended-range OC spray likely will
20  impact individuals who may be lawful and compliant;
21  correct?
22    A    It can.
23    Q    And my question to you is, do you
24  agree that the use of high-capacity, extended-range
25  OC spray in the context of, let's say, the kettle,

Page 124

1  where there was a significant number of people,
2  some of whom were acting lawfully and just got
3  caught up in the situation, rather than handheld
4  device, contravened Section XIII of Special Order
5  1-01 because a handheld device, unlike the OC
6  spray, would have minimized the impact?
7    A    No, because the -- also in Special
8  Order is the statement that the above provisions do
9  not apply to situations that turn violent when
10  persons at the scene present immediate threats to
11  bodily injuries, property damage, things of that
12  nature, so that would take out the minimization
13  requirement there.  So I think we agree in
14  principle but perhaps in execution is where we're
15  having the issue.
16    Q    I like the fact that you went to that
17  provision as your so-called safety net here, Mr.
18  Larson, but I'm going to probe a little bit about
19  that.
20    A    Of course you are.
21    Q    In connection with the kettle -- and
22  I know you may not like the term but it's an easy,
23  short-term abbreviation for what happened around
24  11:30 at night on September 17th.  Are you aware of
25  any individuals who were acting violently at the

31 (Pages 121 to 124)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 125

1   scene such that they presented an imminent threat
2   of bodily harm to persons or damage to property
3   when officers tried to arrest them?
4        A    No.
5        Q    Okay.  Because I have not seen any
6   when I looked at the videos and am I correct also
7   that in fact none of the arrests were for acting
8   violently?  Nobody was charged with violent
9   destruction of property in connection with the
10  kettle; correct?
11       A    Not in connection with the kettle.
12       Q    So I'll go back my question where you
13  resorted to what I'm calling your little safety net
14  here.
15       A    Sure.
16       Q    In connection with the kettle, where
17  we've now established there was no evidence --
18  there is no evidence of anybody acting in a violent
19  manner that presented imminent threat or bodily
20  harm to persons or of damage to property, am I
21  correct that the use of the high-capacity,
22  extended-range OC spray, rather than the handheld
23  pepper spray, contravened the terms of Section XIII
24  of Special Order 1-01 because, by definition, it
25  was going to impact a greater number of individuals

Page 126

1   who were compliant with law enforcement?
2        A    No, I don't think so.  I'm confused
3   over the totality of the circumstances that took
4   place during the effecting the arrests as far as
5   utilizing this tool or not utilizing the tool.
6        Q    I'm going to go through it one more
7   time and I'll accept your answer, whatever it is at
8   the end, but I'm a little perplexed here.
9        A    Okay.
10       Q    We have a situation where around
11  11:30 there is a kettle, there is a group of
12  people.
13       A    Okay.
14       Q    You agree with me that it's likely
15  that within that group of people some people
16  weren't even protesters, they just got caught up in
17  the situation; correct?
18       A    I believe that is one of the
19  contentions.
20       Q    Yes.  And we established that there's
21  no evidence that anybody was acting violently and
22  presented imminent threat of harm at that moment in
23  time around 11:30 at night; correct?
24       A    Yes, we have established that.
25       Q    Okay.  Police officers had -- were

Page 127

1   trying to effectuate arrests; correct?
2        A    Yes, they were trying to a mass
3   arrest of all the individuals there.
4        Q    But none of those individuals are
5   acting violently and presenting imminent threat of
6   harm to them?
7        A    I --
8        Q    Are you aware of any evidence, sir,
9   facts, that somebody was acting in a violent manner
10  and presented imminent threat of harm that was
11  documented by the police from the incident that
12  occurred at 11:30 at Tucker and Washington?
13       A    I am not.
14       Q    Thank you.  So again, with that in
15  mind, the police officers that were congregating
16  around the people there, they had a choice; would
17  you agree with me?  Option 1, they can go and
18  effectuate their arrests using a handheld pepper
19  spray device; correct?
20       A    Mm-hmm.
21       Q    Is that a yes?
22       A    Yes.
23       Q    Or they can do it using the
24  high-capacity, extended-range OC spray; correct?
25       A    Correct.

Page 128

1        Q    And by definition, we have
2   established that the high-capacity, extended-range
3   OC spray, by its nature, is going to cover a larger
4   range and spray a bunch of people?
5        A    Yes.
6        Q    If the requirements of the Section
7   XIII, the third one is specifically saying that you
8   cannot, per the terms of the Settlement Agreement,
9   deploy chemical agents without satisfying all four
10  elements and the third one is to minimize the
11  impact on individuals, shouldn't those officers
12  have been required to use handheld device rather
13  than the OC spray?
14       A    I'm sorry, I'm processing.
15       Q    Take your time.
16       A    It would have been better to minimize
17  the effects, I think, that to -- than using the
18  fogger.  So to minimize the effects to those who
19  are not -- who are compliant.  But yes.
20       Q    I'll accept that.
21       A    Okay.
22       Q    Let's do one more picture and then
23  we'll take a break.
24            (Plaintiffs' 30(b)(6) Exhibit 9
25  marked for identification by the court reporter.)

ALARIS LITIGATION SERVICES
www.alaris.us              Phone: 1.800.280.3376              Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 129

1      Q    (BY MR. PRAISS)  Mr. Larson, do you
2  have Exhibit 9 in front of you?
3      A    I do.
4      Q    This is another picture, if you look
5  again at the top, it's indicates from the
6  Washington and Tucker location?
7      A    Yes.
8      Q    And the time stamp on this one is
9  just a few minutes before.  It's at 11:25, again on
10  September 17, 2017.
11      Do you see that?
12      A    Yes.
13      Q    There is a -- if you look at the
14  picture on the right side of it, do you see a
15  police officer with a gas mask on and his right
16  hand extended?
17      A    Yes.
18      Q    And can you tell that that officer is
19  holding in his right hand an extended
20  high-capacity, OC spray device?
21      A    That's what it appears to be.
22      Q    And do you see just right outside of
23  it a mist in that area?
24      A    Yes.
25      Q    Again, in that situation the officer

Page 130

1  is directing that OC spray, it appears, based on
2  the position of his hand, at the person who is
3  standing with his hands up, or I don't know who
4  else.  Can you see who else it's pointing at?
5      A    It's pointing in the general
6  directions of an individual with his hands up and
7  there is an individual that appears to be in front
8  of the officer.  That's moving downward.
9      Q    Oh, the -- when you say "moving
10  downward," are you pointing to the lady with her
11  hands down?
12      A    I'm pointing to this individual here.
13      Q    Okay.  Do you agree with me that the
14  use of the OC spray device in that situation, by
15  definition, would impact a great deal of people
16  because they're all congregating in a very small
17  area?
18      A    Yes.
19      Q    Okay.  Do you agree with me again, it
20  would have been preferable, at a minimum, to use
21  your language, to use a handheld pepper spray
22  device rather than the OC spray if your goal is to
23  be compliant with the terms of Section XIII of
24  Special Order 1-01?
25      A    Yes.

Page 131

1      Q    Thank you.
2      MR. PRAISS:  Why don't we take a
3  break.
4      (Off the record.)
5      Q    (BY MR. PRAISS)  Okay, Mr. Larson,
6  back on the record, we had a nice kind of lunch
7  break.  If at any time later this afternoon you
8  need to take a break again, just let me know.
9      A    I will, thank you.
10      Q    I want to close off a few more
11  questions and then we'll move on to a new topic, I
12  assure you, but I still want to focus on topics 12
13  through 15, make sure I've covered everything.
14      A    Okay.
15      Q    If you look at the exhibit that was
16  the Declaration of Mr. Baumgartner, do you have
17  that?  I think it's number 7?
18      A    I do.
19      Q    And if you go to Exhibit C within
20  that which is Section XIII of Special Order 1-01?
21      A    Yes.
22      Q    There is the reference under Section
23  A 2 that "High-capacity, extended-range OC spray is
24  also issued to Sergeants and available at the Area
25  Stations."

Page 132

1      A    Yes.
2      Q    I just wanted to ask it, other than
3  sergeants, does anybody else have use of -- had use
4  of extended-range OC spray in connection with the
5  Stockley protests?
6      A    It was issued primarily to
7  supervisors.  I can't say that it wasn't issued or
8  delegated to someone else, but for the most part,
9  the high-capacity, extended-range deployment
10  canisters was for the sergeants only.
11      Q    And when it has a reference to the
12  term "Area Stations," what is that referring to?
13      A    That refers to the three area patrol
14  divisions.  We have a north patrol, a central
15  patrol, and a south patrol division.
16      Q    Okay.  If you go to -- on the next
17  page of it, there's Section D, Required Reporting?
18      A    Yes.
19      Q    And it indicates that, "When chemical
20  agents are deployed for crowd dispersal, the
21  Incident Commander will ensure that an I/LEADS,"
22  all capital, "report is created to document their
23  use," and it lays out certain details that have to
24  be included.
25      Do you see that?

ALARIS LITIGATION SERVICES
www.alaris.us            Phone: 1.800.280.3376            Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 133

1    A    Yes.
2       Q    First of all, just for the record,
3  who was the incident commander for the Stockley
4  protest?
5       A    I believe the incident commander was
6  Gerald Leyshock.
7       Q    And do you know -- first of all, what
8  is the purpose of creating an I/LEADS report?
9       A    To document the -- I/LEADS is our
10  records management system and the purpose of
11  creating it is to document incidents, both arrest
12  and the non-arrest situations, where we want to
13  have a record of it, so it's our -- it's how we
14  document police reports primarily.
15       Q    And in this case particularly, it's
16  the I/LEADS -- strike that.
17            So the I/LEADS report can be used for
18  various different reporting scenarios; correct?
19       A    Yes.
20       Q    But in this case it specifies that an
21  I/LEADS report has to be created whenever chemical
22  agents are deployed for crowd dispersal; correct?
23       A    It does.
24       Q    Okay.  And that's the policy of the
25  City of St. Louis?

Page 134

1    A    Yes.
2       Q    Okay.  Are I/LEADS reports, are they
3  created by hand or on a computer?
4       A    They are created in a computer.  It
5  is a records management software tool that
6  basically is a framework device that -- and
7  information is entered manually into it.
8       Q    Is it a searchable database?
9       A    It is.
10       Q    So if I wanted to find all the
11  I/LEADS report relating to the protests that -- on
12  the issue of the Stockley protests or the Molina
13  protests, the protests involving the Molina case,
14  it's not difficult to locate them, I assume?
15       A    No, not if a report was prepared.
16       Q    Okay.  In those situations chemical
17  agent were deployed; correct?
18       A    Then a report would be prepared and
19  we would have it.
20       Q    Okay.  When a report is prepared, is
21  it the standard practice that the one report is
22  used to encompass all incidents where chemical
23  agents are deployed, or is there a requirement that
24  for each incident where agents were deployed
25  against an individual or group of individuals,

Page 135

1  there's a separate report?
2       A    It can be done both ways.  It's
3  generally reports are created based on arrest
4  criteria, because when we arrest an individual, we
5  need their pedigree information, their charge
6  information, all of that, and that revolves around
7  a specific complaint number.
8            If multiple arrests are occurring in
9  a specific vicinity with the -- a substantially
10  same group of officers, it could all be included in
11  one complaint number.  If this was multiple
12  locations, multiple commanders, then it might be
13  included -- the incidents may come under multiple
14  complaint numbers.
15       Q    For example, in the situation of the
16  kettle on September 17, 2017, if at that evening
17  several different officers deployed chemical agents
18  at different groups of individual, would it have
19  been appropriate to have one single I/LEADS report
20  or several?
21       A    It would most likely be most
22  appropriate to have one large because we're dealing
23  with one large incident in the downtown area.
24  However, that's not to say there weren't other
25  reports made based on, you know, if other officers

Page 136

1  in the fourth district may have made an arrest
2  downtown, that would have a separate complaint
3  number.
4       Q    And to your knowledge, was an I/LEADS
5  report prepared either in the single or plural in
6  connection with the Stockley protests?
7       A    I believe there were reports
8  prepared, yes.
9       Q    Okay.  Is it your understanding,
10  trying to be thorough here, that I/LEADS report,
11  either in plural or single, were prepared in
12  connection with the protests at Page and Walton
13  that are referenced in the Molina litigation?
14       A    Yes.
15       Q    And if I understood you correctly
16  before, your testimony was that Section XIII of
17  Special Order 1-01 that we're looking at applies to
18  the same chemical agents that were referenced in
19  the Templeton Settlement Agreement as well as the
20  temporary directive; correct?
21       A    Yes.
22       Q    And such that this Section XIII of
23  Special Order 1-01 applies to the use of handheld
24  pepper spray if it's done in connection with the
25  dispersal of individuals?

34 (Pages 133 to 136)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 137

1  A   Yes.
2  Q   Okay.  And in those situations, to
3  the extent that a police officer used handheld mace
4  in connection with the kettle, would an I/LEADS
5  report have to be generated or reference that
6  incident?
7  A   Yeah, in a mass arrest scenario, if
8  an officer was deploying mace to take individuals
9  into custody, it should be documented, yes.
10  Q   Okay.  So this gets to, in my mind a
11  little bit, that blurry line between Section IV,
12  Special Order 1-01 versus Section XIII.  When an
13  officer deploys handheld pepper spray under the
14  terms of Section IV, Special Order 1-01, is an
15  I/LEADS report required?
16  A   It is.
17  Q   It is?
18  A   Yes, under Section IV, it's a use of
19  force; therefore, it would require an I/LEADS
20  report.
21  Q   Okay.  Thank you for clarifying that
22  for me.  Just want to now close the loop on some of
23  these topics if you have them in front of you.
24  A   Sure.
25  Q   Topic 12, I'll read it for the

Page 138

1  record, it says, "The City of St. Louis's policies
2  and/or practices concerning under what
3  circumstances police officers can use handheld
4  chemical agents, regardless of size of container."
5  Do you see that?
6  A   Yes.
7  Q   Is it fair to say that you have
8  provided me -- strike that.
9  Is it fair to say that the testimony
10  you've provided with respect to Section IV of
11  Special Order 1-01, as well as Section XIII of
12  Special Order 1-01, cover all the circumstance when
13  a handheld chemical agent could be used, regardless
14  of size or container?
15  A   Yes.
16  Q   There is no other provisions that the
17  City has that deal with the use of handheld pepper
18  spray in different circumstances?
19  A   No, I believe those are the two.
20  Q   Okay.  Go to topic 13.  That one
21  focuses on training with respect to exactly what I
22  just read about Section 12.
23  Do you see that?
24  A   I do.
25  Q   What specific steps did you take to

Page 139

1  prepare to testify as a representative with respect
2  to topic 13?
3  A   I reviewed the Special Order, I
4  reviewed one of the training materials that the
5  academy provided relative to CDT deployment and the
6  CDT operations which referenced chemical agents and
7  the necessity to provide warrants.
8  Q   I, off the top of my head, can't
9  visualize that document, so unless -- we can go off
10  the record.
11  (Off the record.)
12  Q   (BY MR. PRAISS)  Mr. Larson, you just
13  described an exhibit and it sounds like, with
14  respect to the training exhibit, we were going to
15  try and locate that and later on this afternoon
16  I'll ask you a few questions on it.
17  Other than that one which you
18  described as a two-page document dealing with
19  training issues, did you review any other documents
20  that relate to topic 13?
21  A   I don't believe so.
22  Q   Okay.  Other than that document,
23  which we'll look at in more detail later, are you
24  aware of any other training materials that were
25  provided to police officers concerning under what

Page 140

1  circumstances they can use handheld chemical agents
2  regardless of size of container?
3  A   No, other than what we discussed
4  previously today, the training document supplied by
5  the law department in August of 2017.  That
6  training document I reviewed.  I mean, it was a
7  classroom document.
8  Q   No, I'm not looking at things you
9  reviewed.  I'm looking at -- when I'm asking about
10  training, it's training to the police officers in
11  general.
12  A   Right.
13  Q   And we -- the document we looked at
14  before, which was Exhibit Number 6, that was, if I
15  recall your testimony you provided, just the senior
16  staff?
17  A   Yes.
18  Q   And it wasn't disseminated, as far as
19  you know, to all police officers?
20  A   As far as I know.
21  Q   Okay.  Now you have just testified
22  there's about a two-page document that you do
23  believe you reviewed and was provided to all
24  officers; correct?
25  A   No.  It's an internal document

35 (Pages 137 to 140)

ERIC LARSON  4/8/2019

Page 141

1    discussing the outline of the training program for
2    the materials that then Sergeant Jemerson, now
3    Lieutenant Jemerson, would have conducted during
4    CDT training.
5        Q.   Okay.  Other than that outline, are
6    you aware of any actual written materials that Mr.
7    Jemerson or somebody else uses in training police
8    officers concerning under what circumstance they
9    can use handheld chemical agents?
10       A.   No.
11       Q.   Do you know if any such training
12   materials exist in writing?
13       A.   To the best of my knowledge, those
14   would all be incorporated in the document that we
15   turned over relative to the other deposition
16   request, so but no, I did not review them.
17       Q.   When you say "the other document,"
18   you're referring to the two-page document?
19       A.   I'm referring to that as incorporated
20   into a large lesson plan of series of materials
21   that speak specifically to this issue, I believe.
22       MR. PRAISS:  Go off the record real
23   quick.
24       (Off the record.)
25       Q.   (BY MR. PRAISS)  Other than the

Page 142

1    two-page document that we'll hopefully get in the
2    next couple hours and the POST document that you
3    just referenced, are you aware of any other
4    training materials that have been provided to
5    police officers concerning under what circumstances
6    they can use handheld chemical agents?
7        A.   No, I am not.
8        Q.   Thank you.
9        Could you look real quick at the next
10   topic?  I think we are on 14.
11       A.   Okay.
12       Q.   And this one is similar to topic 12
13   but focuses about the City's policies and practices
14   concerning under what circumstance police officers
15   can deploy chemical agents at protesters; correct?
16       A.   Mm-hmm.
17       Q.   Is that a yes?
18       A.   Yes.  Sorry.
19       Q.   You have given us quite a bit of
20   testimony with respect to Section XIII of Special
21   Order 1-01.
22       A.   Yes.
23       Q.   Is that the only policy that the City
24   has concerning when police officers can deploy
25   chemical agents at protesters?

Page 143

1        A.   Yes.
2        Q.   That was in place in September 2017
3    and still in place today; correct?
4        A.   It is.
5        Q.   It's never been amended?
6        A.   No.
7        Q.   Okay.  Is there anything about --
8    strike that.
9        Finally topic 15 goes with topic 14
10   but simply asks for the training that's provided to
11   police officers with respect to under what
12   circumstance they can deploy chemical agents at
13   protesters?
14       A.   Right.
15       Q.   Okay.  Other than the two exhibits
16   that you just referenced in response to my
17   questions for topic 13, are you aware -- strike
18   that.  I apologize.
19       The two documents that you just
20   recently testified with respect to my questions
21   relating to topic 13, is it your understanding that
22   those documents are also responsive to topic 15?
23       A.   Yes.
24       Q.   Okay.  Other than those two
25   documents, are you aware of any other documents

Page 144

1    that have ever been provided to police officers
2    concerning under what circumstance they can deploy
3    chemical agents at protesters?
4        A.   I am not.
5        Q.   Okay.  Again, I don't have the
6    benefit of those two documents in front of me but
7    separate from -- we know that those are the only
8    documents that you're aware of, that have been used
9    in training police officers about the use of
10   chemical agents, whether in a protest action or in
11   a different situation.
12       How often is that training provided
13   to police officers?
14       A.   Relating to the documents that I'm
15   referring to, the CDT outline, it is provided
16   during CDT classes at the Police Academy.  So every
17   officer who is a graduate of the Police Academy,
18   moving forward since 2014, and that's date of the
19   training program, has been trained in CDT tactics,
20   deployment, and when chemical munitions can and
21   should be used or should not be used in civil
22   disturbance cases.
23       Q.   Okay.  And that, if I understand you
24   correct, that's taken place for officers since 2014
25   as part of their training in the academy?

36 (Pages 141 to 144)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 145

1    A    Correct.
2    Q    Okay.  What about officers prior to
3  2014 where we don't have the benefit of this
4  outline?
5    A    Right.  Officers prior to that time,
6  I mean, the -- we created the Civil Disobedience
7  Teams and civil disobedience training was conducted
8  during the creation of those individual teams.
9  Since we've been doing ongoing training of getting
10  more people trained within the City of St. Louis
11  Police Department to be CDT qualified, we've been
12  doing that.  So there were trainings that took
13  place to get members onto the CDT team and then
14  there's ongoing trainings at the academy.  For new
15  members.  And there's refresher training as well
16  that is handled by the SWAT Team on units,
17  mobility, lot formations and deployments and how
18  and when they should be deployed.
19    Q    Thank you.  Your answer raises a few
20  follow-up questions.
21    A    I'm sure they do.
22    Q    Yes, but I want to break it in
23  pieces.  First of all, two documents that you've
24  referenced in responding to the topics dealing with
25  training, one of them we know is dated 2014; right?

Page 146

1    A    Correct.
2    Q    The second document, what's the name
3  I should use for it?
4    A    I believe it would be the POST
5  accreditation documents.
6    Q    Okay.  What's the date of that one,
7  if you know?
8    A    I don't know.
9    Q    Is it after 2014 or before?
10    A    I don't know.
11    Q    Prior to 2014, sitting here today as
12  the corporate representative, do you know what
13  documents, if any, were used in training police
14  officers about the use -- the deployment of
15  chemical agents?
16    A    Oh, I don't -- I don't know.
17    Q    Do you know if they had any
18  documents?
19    A    I assume they had documents but I
20  don't know.
21    Q    Okay.
22    A    I would assume any training that
23  related to CDT that would have been handled through
24  the academy, the academy would have some
25  documentation of that type of training.

Page 147

1    Q    Did you take any steps to learn that?
2  And I'm not trying to be mean here --
3    A    No.
4    Q    -- but I'm doing my job.
5    A    Right.
6    Q    I need to know, in preparing to
7  testify about topics 12 and 15, did you do any --
8  what efforts did you take to determine what
9  specific training materials were being used prior
10  to 2014 with respect to the deployment of chemical
11  agents?
12    MR. DIERKER:  If I could interject, I
13  assume you're within the relevant time period
14  starting September 15, 2012.  Is that --
15    MR. PRAISS:  Yes, all my questions,
16  but there was a gap from 2012 and 2014 that I'm
17  trying to determine.
18    MR. DIERKER:  That's fine.  I just
19  want to be clear you weren't going back to the
20  foundation.
21    Q    (BY MR. PRAISS)  So my question is,
22  what steps did you take to determine what materials
23  were used in training police officers about the
24  deployment of chemical agents for the relevant time
25  period beginning in September of 2012 until 2014?

Page 148

1    A    None.
2    Q    And sitting here today you have no
3  knowledge one way or the other whether any training
4  materials did or didn't exist, you're just making
5  an assumption?
6    A    Right.  Correct.
7    Q    And focusing on the time period, the
8  entire time period, do you know who were the
9  individuals who were responsible for training
10  police officers with respect to the deployment of
11  chemical agents?
12    A    There is ongoing training through the
13  Police Academy on the -- how to use a chemical
14  agent, so how an officer uses their handheld mace.
15  That is an ongoing training process.  The records
16  of that would be within the St. Louis Metropolitan
17  Police Department Academy.
18    The SWAT Team would be responsible
19  for their training related to the use of chemical
20  munitions, launchers, things of that nature.  They
21  go through training programs related to that
22  specific.  The SWAT commander, CDT commander,
23  Lieutenant Jemerson is responsible, or has been
24  responsible for training the CDT teams and on
25  providing the information on when to use and when

37 (Pages 145 to 148)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 149

1    not to use.  Related to civil disturbances.  And
2    among others.  I mean, there were other individuals
3    in that role other than Lieutenant Jemerson at the
4    time.  He wasn't the SWAT commander during
5    Stockley.
6         Q    If you know, the topics 15 topic 13,
7    they're focusing not about how to use chemical
8    agents but when it's appropriate to use it and when
9    it's not appropriate.
10         Do you understand that?
11         A    I do, and that would be part of the
12    on -- the training on deployment.  It's how we do
13    it.  How and when you would use chemical agents.
14         Q    And the sum and substance is that, if
15    I want to understand -- strike that.
16         If I want to look at what training
17    materials exist that, to your knowledge, from 2012
18    until the present, with respect to when police
19    officers can employ chemical agents, I just need to
20    look at those two documents, the 2014 document you
21    described as well as the POST accreditation and, to
22    your knowledge, there are no other documents that
23    have anything in writing that says when it's
24    appropriate to use chemical agents?
25         A    At this time, that's correct.

Page 150

1         Q    Okay.  I'll take a look at those in
2    great detail after the deposition.
3         Do you know how long the training
4    takes with respect to the circumstance when
5    chemical agents should be used?
6         A    I do not.  I know that it is part of
7    I believe a 16-hour course on CDT deployment.  As
8    to how many hours or minutes, I don't know.
9         Q    And you mentioned something about a
10    refresher, I think, in one of your answers?
11         A    Yes.
12         Q    Is that refresher done through the
13    PAS System or is that in person?
14         A    It's generally a method in which the
15    SWAT Team creates a training day, the members of
16    the CDT have to respond to the training day, and
17    they work on the mechanical tactics and they cover
18    use of force during that.
19         Q    During that use of force, do you have
20    personal -- can you testify as a corporate
21    representative under oath that there is actually
22    information about when it's appropriate to use
23    chemical agents rather than how to use chemical
24    agents?
25         A    I believe the bulk of the training

Page 151

1    relates to how to use chemical agents and I can't
2    say on when.  I believe it is covered.
3         Q    We're not going to spend very much
4    time on it but I'd like to at least cover with you
5    briefly topics 16 and 17.
6         A    Okay.
7         Q    And again, these deal with, for lack
8    of a better term, "kettle"?
9         A    Mm-hmm.
10         Q    And when I use the term "kettle," you
11    understand that's referring to what transpired on
12    September 17, 2017, around 11:30 at night, downtown
13    St. Louis?
14         A    Yes.
15         Q    And you've indicated that the City
16    itself doesn't use that term at all; correct?
17         A    That is correct.
18         Q    And nevertheless, if it's okay with
19    you, I'll use it just as an abbreviation; is that
20    okay?
21         A    Correct.
22         Q    To your knowledge, at any time, did
23    the City have any policies or practices concerning
24    the use of a kettle, referring to police officers
25    coming in from four different directions to entrap

Page 152

1    a group of people that they want to arrest?
2         A    No.  We do not have a policy
3    outlining use of that tactic.
4         Q    To your knowledge, has the City ever
5    used that tactic prior to September 17, 2017?
6         A    To the best of my knowledge, no.
7         Q    Did simply the incident commander or
8    other individuals on the ground that evening come
9    up with that approach on their own, out of thin
10    air?
11         A    I believe so.
12         Q    Gotcha.  Since September 17, 2017,
13    has the City considered adopting any guidelines,
14    policies or practices with respect to under what
15    circumstance, if any, it is appropriate to use an
16    approach such as a kettle in dealing with
17    protesters?
18         A    We have not.  We're waiting on
19    determination of several things to revise or revamp
20    certain aspects of our Special Orders to determine
21    we're not looking, as this kettle or mass arrest
22    scenario is -- has come -- become a topic of
23    concern for the agency, we're in the process of
24    determining what our next step is, policy wise, to
25    avoid or ensconce and procedure what and how these

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 153

1    methods should or could be utilize.
2         Q    In a nutshell, am I  hearing you
3    correctly that the City basically is not doing
4    anything to modify or change any of its policies or
5    practices that relate to police interaction with
6    protesters until this case is fully resolved?
7         A    No, I wouldn't make it as declaratory
8    as you have made it.  I mean, I think we are
9    reviewing all types of information and we're
10   constantly trying to figure out how we can do
11   things better, how can we gain compliance, what are
12   the best practices in this situation.  I don't
13   think we've determined what the best course of
14   action is yet.
15        Q    But specifically, has the City, to
16   your knowledge, since the court issued its
17   preliminary injunction, done -- made any changes to
18   whatever to any policies or practices that are
19   relevant to what transpired in connection with the
20   Stockley protest?
21        A    No, other than -- no.  No.  I don't
22   think so.
23        Q    And is the reason the City hasn't
24   done that is, is it because the City is waiting for
25   final resolution of the litigation, or is it

Page 154

1    because it determined that there was no need to do
2    it?  That's what I'm trying to understand.
3         A    Right, and I think it's somewhere in
4    between.  We are trying to determine, A, what we
5    need to do and how we need to do it and what is it
6    that we should do.
7         Q    It's been quite a while since the
8    court issued its order and so with respect to the
9    statement that you made about that you're still
10   evaluating, trying to determine, what's taking so
11   long?
12        A    It's a process, like anything else,
13   and processes take time.
14        Q    Let me ask you a question here on
15   that.
16             (Plaintiffs' 30(b)(6) Exhibit 10
17   marked for identification by the court reporter.)
18        Q    (BY MR. PRAISS)  I'm going to hand
19   you what's been marked for identification purposes
20   as Exhibit 10.
21        A    Yes.
22        Q    Are you familiar with Exhibit 10?
23        A    I am.  Well, excuse me, I am not.
24   It's a -- I am familiar in the fact that it is an
25   email but I am not familiar with the content of the

Page 155

1    email.  I don't believe I've seen this email
2    previously.
3         Q    Just for the record, so at least the
4    record is clear, this is an email dated October 11,
5    2017, from Carl Filler, F-i-l-l-e-r, to the mayor
6    of the City of St. Louis and Nicole Hudson.
7             Do you see that?
8         A    I do.
9         Q    And it's referring to "Critical
10   Incident Review Draft Scope of Works"?
11        A    Yes.
12        Q    If you could just take a minute and
13   just look at substance of the email from Carl
14   Filler to the mayor, as well as the material
15   attached?
16        A    Mm-hmm.
17        Q    Let me know when you have had a
18   chance to just glance at it.
19        A    Okay.  Okay.
20        Q    Have you had a chance to look at
21   Exhibit 10?
22        A    I have.
23        Q    For the record, I did mention before
24   but you see Carl Filler is the senior policy
25   advisor in the mayor's office?

Page 156

1         A    Yes.
2         Q    Okay.  Are you at all familiar with
3    the information that's discussed in the attachment
4    to this email?
5         A    No, I am not.  I don't believe I saw
6    this.
7         Q    Back to the line of questions we had
8    just before I showed you this exhibit.  My question
9    to you was if you're aware of any specific changes
10   made by the City of St. Louis with respect to any
11   policies or practices that relate to the Stockley
12   protest since the court issued its preliminary
13   injunction, and you told me that because of the
14   pending litigation and because it's an ongoing
15   evaluation, that has not happened and no changes
16   have been made; is that a fair summary?
17        A    I believe that is a fair summary.
18        Q    Okay.  With respect to the statement
19   by you that it's an ongoing process, I showed you
20   this exhibit because I thought you might be
21   familiar with it showing efforts done by the City.
22        A    Correct.
23        Q    When you say -- when you testify
24   about ongoing efforts, what are you referring to?
25   What ongoing efforts has the City done specifically

39 (Pages 153 to 156)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 157

1   to evaluate whether it should amend, modify any of
2   the policies or practices that were at issue in
3   connection with the Stockley protests?
4        A    And as I indicated, I guess what I
5   should be clear on, is I understand that I am the
6   City's representative.  I don't -- I did not have
7   access to the mayor's email in preparation for
8   that.  Most of my statements I think could be
9   construed more directly with the St. Louis Police
10  Department per se.  So if there are events going on
11  that -- such as this document on the opinions and
12  scope of work for critical incident review, I may
13  not be aware of them or was not aware.
14       But as I said, it's an ongoing
15  process and there are a lot of people who are
16  interested in making sure that we have a resolution
17  and we get this right.
18       Q    Just for the record, you do
19  understand you're testifying here today not just on
20  behalf of the St. Louis Metropolitan Police
21  Department but on behalf of the City of which the
22  St. Louis Metropolitan Police Department is
23  subsumed within it; correct?
24       A    Yes, I've been instructed to that.
25       Q    Okay.  I just want to make sure that

Page 158

1   was clear to you.
2        A    Yes.
3        Q    My question to you, Mr. Larson, is
4   again, you make a generic statement that, and I
5   believe you, that the City has an interest in
6   having an ongoing evaluation with you of the
7   policies and practices and making necessary
8   changes.  I want more specificity.
9        Can you identify for me sitting here
10  today any specific steps that have been undertaken
11  by the City in evaluating whether it's appropriate
12  to amend, modify any policies or practices that are
13  at issue with respect to the Stockley protest since
14  September of 2017?
15       A    No.
16       Q    Okay.  Back to topics 16 and 17.  We
17  covered topic 16.  On topic 17, I'll let you catch
18  up.  Topic 17 deals with the "Training provided to
19  police officers regarding the City's policies and
20  practices concerning the use of a kettle."
21       And is it fair to say that there are
22  no such training were provided at any time because
23  there are no policies or practices concerning the
24  use of a kettle?
25       A    Yes.

Page 159

1        Q    Okay.  Did you review any video of
2   the Stockley protest in preparation for today's
3   deposition?
4        A    I did not watch any video.
5        Q    At any time did you watch any video
6   of the Stockley protests?
7        A    Only if video was being shown during
8   the protest and it would be open source video.  But
9   no, I did not.
10       Q    But not after the protest for some
11  reason --
12       A    No, certain -- no, not --
13       Q    -- meet with people and review it?
14       A    No.  Well, wait a minute.  We had
15  several POST Stockley training sessions with the
16  senior command on how things were done.  They were
17  kind of an after action review.  I cannot recall if
18  there was video as part of that or not.  The
19  sessions were composed at the direction of the
20  chief's office and I believe Lieutenant Jemerson
21  hosted those and distributed that information.
22       Q    Do you recall approximately how many
23  of those sessions there were?
24       A    I believe there were at least two,
25  possibly three.

Page 160

1        Q    And Jemerson handled all of those?
2        A    Yes.
3        Q    Do you recall, this was again -- just
4   a senior staff?
5        A    Senior staff and possibly involved
6   commanders, specialized unit commanders.
7        Q    Okay.  Were there any specific -- was
8   it a PowerPoint or any other materials used in
9   connection with those meetings?
10       A    I don't recall.  I believe there was
11  a PowerPoint.
12       Q    I'm not sure I've ever seen that
13  PowerPoint.
14       MR. DIERKER:  I know I have not.
15       A    Well, and I could be completely
16  wrong.  We've done so many different after action
17  reports related to incidents, I mean, I know we did
18  one related to the workhouse.  I can't recall --
19  I'll be honest with you, I'm very confused this
20  afternoon.
21       Q    (BY MR. PRAISS)  I definitely don't
22  mean to confuse you and again, if you need a break
23  at any time, just let me know, but again, you know,
24  we have in front of us, for example, what's been
25  marked before as Exhibit Number 6 --

40 (Pages 157 to 160)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 161

1     A    Correct.
2          Q    -- which is a presentation
3    specifically before the Stockley protest that was
4    given to, and I'm using the term generically,
5    senior staff, including yourself --
6          A    Correct.
7          Q    -- about what the City's
8    understanding was in terms of the applicable
9    statutory and legal provisions dealing with protest
10   law.
11         A    Right.
12         Q    And what you're just testified is
13   that subsequent to the Stockley protest, there have
14   been several meetings where Mr. Jemerson presented
15   information about, I would call them lessons
16   lenders?
17         A    Right.  And I'll be honest, I believe
18   that I am mixing incidents.  We had a change of
19   command after Stockley and I can't recall what we
20   did specifically.  I know that we had similar
21   review -- we had a review session after the
22   workhouse.  We had training and sessions prior to
23   Stockley where we covered material like this.  So
24   I'd have to say that I was confused and I answered
25   in error.

Page 162

1          Q    And I appreciate your testimony.
2    Sitting here today, can you testify as the
3    corporate representative with certainty that there
4    have been no meetings and presentations at any time
5    addressing or evaluating after action review, After
6    Action Critique, whatever the term is, in terms of
7    what I will generally call lessons learned from the
8    Stockley protest made to senior staff or anybody
9    else?
10         MR. DIERKER:  I assume you're
11   excluding litigation.
12         MR. PRAISS:  Yes.
13         A    Again, I cannot.
14         Q    (BY MR. PRAISS)  You don't know one
15   way or the other?
16         A    No.  I can't recall one way or the
17   other.
18         Q    Okay.  Are you familiar with the term
19   "After Action Critique"?
20         A    I am.
21         Q    Is After Action Critique the same as
22   an after action review?
23         A    It's interchangeable.
24         (Plaintiffs' 30(b)(6) Exhibit 11
25   marked for identification by the court reporter.)

Page 163

1          Q    (BY MR. PRAISS)  Mr. Larson, I hand
2    you what's been marked for identification purposes
3    as Exhibit 11.
4          Do you see that?
5          A    I do.
6          Q    And is that your name on the second
7    page of this?
8          A    S.
9          Q    So you're definitely familiar with
10   this exhibit?
11         A    I am.
12         Q    And this is titled Operational
13   Planning Major Event - After Action Critique;
14   correct?
15         A    Correct.
16         Q    And you prepared this sometime after
17   the Stockley protest; correct?
18         A    Correct.
19         Q    Okay.  And it's -- in your own words,
20   what's an After Action Critique?
21         A    The After Action Critique is a simple
22   review of the incident that occurred.  In this
23   particular format, it asks a series of questions
24   about the role that an individual played and what
25   things that worked well and things that did not

Page 164

1    work well.
2          Q    Okay.  Is there any -- strike that.
3          If you read, and I'll put it in the
4    record, that in the block at the top it says, "In
5    an effort to improve the quality and effectiveness
6    of the performance of the St. Louis Metropolitan
7    Police Department and the handling of Special/Major
8    Events as well as maintaining," all capitalized,
9    "C-A-L-E-A compliance, all detail commanders and
10   supervisors are required to complete an After
11   Action Critique after major events."
12         Did I read that correctly?
13         A    You did.
14         Q    Is this the only form of After Action
15   Critique that's provided to all detail commanders
16   and supervisors?  Or is there a different form for
17   different supervisors based on their role?
18         A    This would be the main form that
19   would be submitted or requested to be returned.
20         Q    When you say "the main form," is
21   there a different form?
22         A    No.  I mean, not that I'm aware of.
23   There's not another form; although, commanders or
24   individuals could write memorandums as far as a
25   after action review.  I could request from a

**ALARIS LITIGATION SERVICES**
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| Page 165 | Page 167 |
|---|---|

**Page 165**

1  subordinate an after action review for a particular
2  incident, they would put that on a memorandum, not
3  specifically this form.
4      Q.   Okay.  To your knowledge, were any
5  such memorandum prepared by any detail commanders
6  or supervisors in connection with the Stockley
7  protest?
8      A.   To the best of my knowledge, no.
9      Q.   To the best of your knowledge, is the
10 After Action Critique that you submitted, which is
11 Exhibit 11, the only After Action Critique that was
12 submitted by detail commanders and supervisors
13 after the Stockley protest?
14     A.   As far as I know, it is.
15     Q.   Okay.  When it says here that "all
16 detail commanders and supervisors are," and I
17 emphasize the word "required to complete an After
18 Action Critique," did the other detail commanders
19 and supervisors fail to meet that requirement in
20 this case?  Kind of an obvious question.
21     A.   Apparently, they did.
22     Q.   Okay.  Have they been reprimanded in
23 any way, to your knowledge, for not complying with
24 the Major Event - After Action Critique
25 requirements by the City?

**Page 166**

1      A.   To my knowledge, no.
2      Q.   Okay.  Is it of a concern, from the
3  City's perspective, that pretty significant
4  incident occurred in the City of St. Louis, there
5  is a document that contemplates that all detail
6  commanders and supervisors should fill out this
7  form in order to, quote, "improve the quality and
8  effectiveness of the performance of the police
9  department," that you're the only one who took the
10 time to fill one out?  Is that a serious concern?
11     A.   It's a concern that more were not
12 submitted.
13     Q.   The form that you filled addresses
14 things such as the quality of the food; correct?
15     A.   Correct.
16     Q.   Talks about whether the roll call
17 location was adequate; correct?
18     A.   Correct.
19     Q.   About whether the roll call
20 information was adequate; correct?
21     A.   Correct.
22     Q.   Whether the number of personnel
23 assigned was adequate; correct?
24     A.   Correct.
25     Q.   By the way, on the food, you

**Page 167**

1  commented was the "Food provided ranged from
2  adequate to exceptional"; that was your feedback?
3      A.   Yes.
4      Q.   Okay.  And then it talks about "What
5  things worked well?"
6          Do you see that?
7      A.   Yes.
8      Q.   And then there's a section of "What
9  can be done to make the detail better next year?"
10 Right?
11     A.   Yes.
12     Q.   And not a single commander or
13 supervisor filled out the information about what
14 can be done to make the detail better next time.
15 After the Stockley incident; correct?
16     A.   Correct, this is the only one that
17 I'm aware of.
18     Q.   So now I'm going back to my question,
19 does this in any way refresh your recollection of
20 whether, after the Stockley protest, there has been
21 any presentations where documents were provided to
22 police officers with what I'm going to generally
23 term as lessons learned and how to do things better
24 to ensure that the quality and effectiveness of the
25 performance of the St. Louis Metropolitan Police

**Page 168**

1  Department is improved in the future?
2      A.   I can't recall any.
3      Q.   Am I correct that this particular
4  document, Exhibit 11, was created at Saint Louis
5  University?
6      A.   I don't believe so.
7      Q.   This was not created by a social work
8  professor?
9      A.   Oh, the actual, where the form was
10 created or how the form was created?
11     Q.   The form, yeah.
12     A.   Oh, I don't -- I don't know the
13 history of the form.
14     Q.   Okay.  Yeah, I was referring to the
15 form of it.
16     A.   The only thing I can tell you, it is
17 Version 1 and it first became department policy in
18 October of 2007, but I have no knowledge of how the
19 mechanics of it took place.
20     Q.   But you understood, at the time you
21 filled it, that this form and the requirements
22 there applied to the events that just had
23 transpired in the Stockley protest?
24     A.   Yes.
25     Q.   Okay.  Let's focus on topics 4

42 (Pages 165 to 168)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 169

1    through 6, if you want to look at those.
2            Have you had a chance to review
3    topics 4, 5, and 6?
4        A    I have.
5        Q    Do you see the common denominator to
6    all of them deals with unlawful assembly?
7        A    Yes.
8        Q    And different areas of inquiry about
9    unlawful assembly; is that a fair statement?
10       A    Yes.
11       Q    If you could go back and spend some
12   time looking at Exhibit 6 (sic) that we dealt with
13   before?
14           MR. PRAISS:  And I apologize, Judge,
15   that's the one we don't have the even pages.
16           MR. DIERKER:  That's fine.
17       Q    (BY MR. PRAISS)  If you go to page 5
18   of this document, presentation?
19       A    Mm-hmm.
20       Q    Do you see it's titled Section
21   574.040?
22       A    Yes.
23       Q    And your understanding, that's a
24   provision under Missouri law; correct?
25       A    Correct.

Page 170

1        Q    Okay.
2            (Plaintiffs' 30(b)(6) Exhibit 12
3    marked for identification by the court reporter.)
4        Q    (BY MR. PRAISS)  Just so you know, in
5    Exhibit 12, I did a simple Google search and I
6    printed out copies of Section 574.040 of the
7    Missouri Revised Statutes as well as 574.050 and I
8    believe there should also be one more, 574.060.  So
9    you have, to the extent you want to refer to the
10   actual language, because sometimes in the exhibit
11   that we're looking at, Exhibit 6, I believe it has
12   elements but might not have the full language, so
13   feel free to refer to both exhibits.
14       A    Thank you.
15       Q    Back to page 5 of the exhibit dealing
16   with Section 574.040, you see it identifies the
17   different elements necessary for a person to
18   violate that statutory provision?
19       A    Yes.
20       Q    And it says, "A person commits the
21   offense of unlawful assembly if," and 1, "he or she
22   must knowingly assemble with six or more other
23   persons"; correct?
24       A    Yes.
25       Q    Second requirement, that individual

Page 171

1    must "agree with such persons to violate any
2    criminal laws."
3            Do you see that?
4        A    Yes.
5        Q    The third one, the person must reach
6    that agreement to violate the criminal laws "with
7    force or violence"; correct?
8        A    Yes.
9        Q    If you now flip to page 6 of the
10   PowerPoint presentation?
11       A    Yes.
12       Q    There is a description of, that lays
13   out the City's understanding of the provision
14   574.040 and when someone potential violates it;
15   correct?
16       A    Correct.
17       Q    And it indicates, and please correct
18   me if I am misstating it, that, "Every person who
19   is present and cognizant of the unlawful acts being
20   committed bit other members of the assembly can be
21   found guilty of being unlawfully assembled"; is
22   that correct?
23       A    That is correct.
24       Q    Is it your understanding that that
25   statement reflects the policy of the City?

Page 172

1        A    Yes, that's the interpretation of the
2    City on this ordinance.
3        Q    Sitting here today as a corporate
4    representative, do you believe that's an accurate
5    statement?
6        A    I believe it is.
7        Q    You're familiar with the word
8    "cognizant"; correct?
9        A    Its common definition, yes.
10       Q    Okay.  "Cognizant" means to be aware
11   of something; correct?
12       A    Yes.
13       Q    Okay.  Do you agree that a person can
14   be cognizant of unlawful acts being performed by
15   other individuals without agreeing with other
16   individuals to engage in the same unlawful acts?
17       A    Potentially.
18       Q    To be cognizant of something is very
19   different than to agree to do something; correct?
20       A    Correct.
21       Q    Okay.  Am I correct that the
22   statement on page 6 of the presentation, that does
23   not include any requirements that in order to be
24   found guilty of the crime of unlawful assembly, a
25   person must agree with other individuals to

43 (Pages 169 to 172)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 173

1  actually violate the criminal laws with force or
2  violence?
3      A    Page 6 does not state that.
4      Q    So to the extent page 6 does not
5  include those requirements of an agreement rather
6  than being cognizant and not only an agreement, but
7  an agreement to violate the criminal laws with
8  force or violence, it is incorrect?
9          MR. DIERKER:  I'll object to the form
10  of the question, calling for a legal conclusion.
11     A    Yeah.
12     Q    (BY MR. PRAISS)  I am not asking for
13  a legal opinion.  I am asking from your
14  understanding as a corporate representative with
15  respect to topics 4, 5, and 6 dealing with unlawful
16  assembly, when it can be declared, on page 6 of the
17  PowerPoint presentation that was provided to senior
18  staff --
19     A    Mm-hmm.
20     Q    -- only one or two weeks before the
21  Stockley -- weeks before the Stockley protest, it
22  suggests, am I correct, that an unlawful assembly
23  can be declared even in circumstances where people
24  are simply cognizant of certain unlawful acts
25  happening but not agreeing to do so?

Page 174

1      A    It doesn't say --
2          MR. DIERKER:  Same objection.  Go
3  ahead.
4      A    I was going to say it doesn't say
5  that an unlawful assembly can be declared because
6  people in the crowd are cognizant of the acts.  I
7  mean, the point of this slide appears to be the
8  fact that those people who are in the crowd who are
9  aware that the crowd is creating unlawful acts can
10  be found guilty of unlawful assembly.
11     Q    (BY MR. PRAISS)  So again, that's
12  what I'm trying to understand.  Is it the City's
13  position that somebody who is simply found, for
14  example, inside the kettle, who is cognizant of the
15  protest around him but hasn't reached any agreement
16  with anybody to do anything unlawful and to break
17  the criminal -- the laws, by force of violence,
18  that that individual, just by standing and being
19  cognizant that those other people around him, can
20  be charged with unlawful assembly?
21     A    It's very fact dependent in the whole
22  incident -- I mean, you've laid out a large
23  scenario of a hypothetical that I'm having a little
24  trouble keeping up with but, essentially, if there
25  are people within that group that are creating

Page 175

1  unlawful acts which have risen to the level to
2  declare an unlawful assembly, the persons within
3  that group, whether they've committed an -- a
4  person in that group could be found guilty of
5  unlawful -- being unlawfully assembled.
6      Q    And I apologize for my hypothetical
7  and I appreciate your answer but I'm going to try
8  and distill it, if I may, Mr. Larson.
9          Is it the City's understanding that a
10  person can be charged with unlawful assembly under
11  circumstance where that person does not reach an
12  agreement with other individuals to violate the
13  criminal laws with force or violence?  That's my
14  question.
15     A    Well, they have to reach an agreement
16  with -- because that's an element of the crime.
17     Q    In the slide that we're looking at on
18  page 6, is there any requirement there that
19  specifies -- strike that.
20          On page 6, sir, the word "agreement"
21  does not appear?
22     A    It does not.
23     Q    And it specifically says that every
24  person who is simply present and cognizant of the
25  fact that unlawful acts are being committed by

Page 176

1  others can be found guilty of unlawful assembly;
2  correct?
3      A    That is the statement.
4      Q    And that's the policy of the City of
5  St. Louis?
6      A    It was the information that was
7  provided.
8      Q    It was provided, not just to anybody
9  but the top people who were then expected to share
10  that information with the people below them;
11  correct?
12     A    Yes.
13     Q    Okay.  If you look at page 8, am I
14  correct that deals with City Ordinance 15.52.010?
15     A    It does.
16     Q    And it lays out the key elements
17  necessary for a person to violate this ordinance?
18     A    Yes.
19     Q    And first, you have to have at least
20  two persons; correct?
21     A    Yes.
22     Q    They have to assemble together;
23  correct?
24     A    Yes.
25     Q    They have to act in concert?

44 (Pages 173 to 176)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 177

1    A    Yes.
2    Q    And they have to do so to do any
3  unlawful act with force or violence; correct?
4    A    Yes.
5    Q    Am I correct that both Section
6  574.040 and Ordinance 15.52.010 include, among
7  other things, the requirement to do an unlawful act
8  with force or violence?
9    A    Yes.
10    Q    Okay.  When it uses the phrase to
11  "act in concert" in Ordinance 15.52.010, what is
12  your understanding that means?
13    MR. DIERKER:  I'll object to the form
14  of the question, asking for a conclusion of law.
15    Q    (BY MR. PRAISS)  I'm not -- let me
16  rephrase the question.
17    What is the City's understanding with
18  respect to the enforcement of Section Ordinance
19  15.52.010, what "act in concert" requires?
20    MR. DIERKER:  Same objection.
21    A    The common definition of to "act in
22  concert" is to act together.
23    Q    (BY MR. PRAISS)  I looked it up, the
24  Merriam-Webster dictionary provides the following
25  definition for the word "concert:  Agreement in

Page 178

1  design or plan; union formed by mutual
2  communication of opinion and views."
3    As the City's representative, do you
4  agree with that definition?
5    A    I would agree.
6    Q    Okay.  The last part of Ordinance
7  15.52.010 has language about, it starts, "and every
8  person present at such meeting or assembly who
9  shall not endeavor to prevent the commission or
10  perpetration of such unlawful act shall be guilty
11  of a misdemeanor."
12    Do you see that?
13    A    I do.
14    Q    When it uses the phrase there "every
15  person at such meeting or assembly," the language
16  "meeting or assembly," is it the City's
17  understanding that that refers to the meeting or
18  assembly that's discussed above in the first
19  section of the provision?
20    MR. DIERKER:  Once again I'll object
21  to the form of the question as calling for legal
22  conclusions.  I don't feel that legal opinions are
23  within the scope of the corporate representative
24  deposition but --
25    Q    (BY MR. PRAISS)  I'll rephrase my

Page 179

1  question because I apologize if I -- and I should
2  be doing it, I am not, again, Mr. Larson, asking
3  for a legal opinion.
4    What I'm trying to understand is the
5  City, when it sends out police officers to enforce
6  Ordinance 15.52.010, I'm trying to learn, no
7  different than any other citizen, of under what
8  circumstance, if any, may I be, based on the City's
9  understanding, subject to a violation of this
10  ordinance?
11    So the City must have an
12  understanding how it enforces it and how it trains
13  police officers about it and that's all I'm looking
14  for.  Not a legal conclusion but an understanding
15  of the City with respect to the enforcement of this
16  provision.  Does that make sense?  And I think I'm
17  entitled to that and I'm happy to take that to the
18  judge any day, Judge.
19    MR. DIERKER:  Well, we'll do that
20  when and if needed but I'll adhere to my objection.
21    Q    (BY MR. PRAISS)  But I want it on the
22  record to be clear what I'm looking for.  I am not
23  looking for, even though I now found out you're an
24  attorney, I don't want your legal opinion.  I want
25  the City's understanding about this.  Fair enough?

Page 180

1    When it says in the last clause that
2  "every person present at such meeting or assembly,"
3  is it referring to the two people who assemble
4  together to act in concert?  Is that what it's
5  referring to?  Is that the City's understanding?
6    A    Yes.
7    Q    Okay.  So to the extent two people
8  get together, as referenced in the first section of
9  Ordinance 15.52.010, and one of them --
10    A    Well, I would have to -- may I
11  interject?  I'm sorry.
12    Q    No problem.
13    A    The -- when -- go ahead with your
14  question.
15    Q    My question is going to be much
16  easier.  I came up with a different approach.
17  Let's say two people assemble together at a street
18  corner.
19    A    Yes.
20    Q    And they decide, in concert, as
21  required here, to commit an unlawful act with force
22  of violence against the property of the City or
23  somebody.  Okay?
24    A    All right.
25    Q    Let's say I am standing next to them

45 (Pages 177 to 180)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 181

1  but I don't even know who the heck they are, but
2  let's say I'm overhearing this thing.  Is it the
3  City's understanding that I can be charged with
4  unlawful assembly because I failed to endeavor to
5  prevent the commission or perpetration of such
6  unlawful act?
7       MR. DIERKER:  Same objection.
8       A   And I would have to say yes, because,
9  as we were discussing the first scenario, you
10  indicated the two people together, yes, they are
11  the people who are violating the ordinance.  The
12  rest of the ordinance indicates any -- therefore,
13  "every person present at such meeting or assembly
14  who shall not endeavor to prevent the commission or
15  perpetration of such unlawful act shall be guilty
16  of a misdemeanor."
17       So by failing to stop them, if you've
18  overheard them, you're involved, failing to notify
19  officers, yes, in theory, you would be subject to.
20       Q   (BY MR. PRAISS)  Now change my little
21  hypothetical now, say I don't overhear anything,
22  they're just standing there, they've reached an
23  agreement.  I don't hear a thing, I don't have a
24  clue what they're thinking to do.  I'm just
25  standing next to them.

## Page 182

1       Can I be charged with unlawful
2  assembly even though I have no knowledge of what
3  they're planning to do?
4       MR. DIERKER:  Same objection.
5       Q   (BY MR. PRAISS)  Again, I'm looking
6  for the City's understanding of how it enforces
7  this provision.
8       A   Yes.
9       Q   So your testimony is, as the
10  corporate representative of the City of St. Louis,
11  that in the connection with let's say the kettle,
12  if, hypothetically, there was two people there who
13  reached some agreement to commit an unlawful act by
14  violence, even though you've already testified
15  there's no evidence to suggest anybody acted with
16  violence, everybody else that was entrapped inside
17  the kettle, the City's position could be charged
18  with unlawful assembly even though they didn't even
19  know who those two people were in my hypothetical
20  and they never talked to them and had no idea what
21  their intent was, but simply because they were in
22  the wrong place at the wrong time, they could be
23  charged with a misdemeanor of violating the law?
24       A   They could be.  We're talking about
25  some very fact-dependent circumstances, we're

## Page 183

1  talking about all kinds of events and prosperity,
2  and these things don't happen in a vacuum.  There
3  is all kinds of warnings that would be given,
4  attempts to get crowd people to disperse, so,
5  therefore, being taken into custody at that point
6  could occur to someone who is not necessarily
7  engaged in the unlawful or riotous behavior,
8  violent behavior.
9       Q   I'm really focusing on the kettle,
10  and I think you've acknowledged to me that in
11  undertaking the approach of the kettle coming in
12  from four corners, it was reasonable to anticipate
13  that some people would get trapped who were not in
14  fact protesters and acting in any way in connection
15  with other protesters; you recall that?
16       A   Yes.
17       Q   Knowing that, my question to you is,
18  it is still the City's position that, when you have
19  trapped a very significant, large group of people,
20  by the mere fact that, and not a complicated
21  hypothetical, only two people in the whole group
22  reached some agreement to do something with
23  violence, is my hypothetical, and everybody else is
24  clueless, they're just kinda like, how the heck did
25  I get here, that the police officers at that point,

## Page 184

1  that evening, could arrest everybody for unlawful
2  assembly because they are at the wrong place at the
3  wrong time; is that the City's position?
4       MR. DIERKER:  Same objection.
5       A   They -- yes.  That's the City's
6  position.
7       Q   (BY MR. PRAISS)  And since those
8  people, under the City's position, are in violation
9  of the law, even though, again, my fact pattern,
10  they have no idea what's happening with the other
11  people, they're just bystanders, because the City
12  considers them to be engaged in unlawful assembly,
13  that means that under policy Section XIII of
14  Special Order 1-01, the police can deploy chemical
15  agents at them without any warnings?
16       A   Potentially.
17       Q   The warnings -- the warning
18  requirement doesn't apply --
19       A   Doesn't apply --
20       Q   -- because they're engaged in
21  unlawful activity, they're no longer peaceful?
22       A   But it would require violence or
23  threat of violence and things of that nature, and
24  again, you're asking very finite questions about
25  very fluid situations.

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 185

1    Q    I'm trying to -- I'm visualizing the
2  circumstance of what I believe transpired during
3  the kettle and you have now explained to me the
4  City's position, which it is what it is, but that a
5  lot of people that night, all of them could have
6  been charged with unlawful assembly, and when I go
7  back to Special Order -- Section XIII, Special
8  Order 1-01, it specifies that, "Per the Settlement
9  Agreement, chemical agents will not be used to
10  disperse groups engaged in non-criminal activity
11  without satisfying the following conditions" --
12    A    Correct.
13    Q    -- one of them being a warning.
14    A    Correct.
15    Q    Is it the City's position that all of
16  those people were engaged in criminal activity
17  because they were unlawfully assembled, even those
18  there were no specific articulable facts to
19  establish that all of those people had knowledge
20  that somebody acted or was going to act in concert
21  to violate the laws?
22        MR. DIERKER:  Object to the form of
23  the question, argumentative, calling for a
24  conclusion of law.
25    Q    (BY MR. PRAISS)  You can answer my

Page 186

1  question.
2    A    Yes, I mean, the unlawful activity
3  has occurred, in the situation where given,
4  announcements are made, opportunities were given to
5  egress.  Failure to comply with that opportunity,
6  they were -- people were arrested.
7    Q    Okay.  A lot of those people were
8  arrested for unlawful assembly; correct?
9    A    I believe so.
10    Q    So that's why I'm focusing on that
11  provision.  And again, that evening, those people
12  that were arrested for unlawful assembly and in the
13  process were subjected to chemical agents, it is
14  the City's position that the officers were entitled
15  to use chemical agents against them because they
16  were engaged in unlawful assembly; therefore, they
17  were acting in a criminal conduct, no warnings had
18  to be given.  Correct?
19    A    No warnings would have to be given,
20  but warnings were given.
21    Q    Warnings that chemical agents would
22  be used.  I'm focusing on that.  Am I correct no
23  warnings were given to people that chemical agents
24  were going to be used against them, necessarily?
25    A    I can't answer that.

Page 187

1    Q    Are you aware in prior -- during the
2  Stockley protests of a single time when an officer
3  told someone that, I'm about to deploy chemical
4  agents with handheld pepper spray or a fogger and
5  gave them a warning before doing so?
6    A    I know warnings were given.
7    Q    Warnings about the use of chemical
8  agents.
9    A    But I cannot say that an individual
10  officer did or did not give a warning to an
11  individual they may have used chemical agents on.
12    Q    But under Special Order -- Section
13  XIII of Special Order 1-01 they are not required to
14  give warnings because of the City's interpretation
15  of what constitutes an unlawful assembly; correct?
16    A    Yes.
17    Q    Okay.  If you go to page 9 of the
18  presentation.  That deals with the offense of riot
19  and that deals with Section 574.050, which is --
20    A    Yes.
21    Q    You have a copy of the full statutory
22  provision in Exhibit 12, if you want to refer to
23  it.
24    A    Yes.
25    Q    Do you see on page 9 it lays out the

Page 188

1  key elements for the offense of rioting?
2    A    Yes.
3    Q    And you got -- in that situation a
4  person commits the offense of rioting if "he or she
5  knowingly assembles with six or more persons";
6  correct?
7    A    Yes.
8    Q    "Agrees with such persons to violate
9  any criminal laws"; correct?
10    A    Yes.
11    Q    "With force or violence"; correct?
12    A    Yes.
13    Q    And, "thereafter, while still so
14  assembled, does violate any criminal laws with
15  force or violence."
16        Those are all the elements?
17    A    Yes.
18    Q    Okay.  Again, that statutory
19  provision, 574.050, clearly requires force or
20  violence; correct?
21    A    Yes.
22    Q    And do you know if anybody was
23  actually charged with violation of this statutory
24  provision in connection with the Stockley protests?
25    A    I do not.

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 189

```
 1        Q    Okay.  Go to page 10.  This one deals
 2   with Section 574.060.
 3        Do you see that?
 4        A    Yes.
 5        Q    And again, feel free to look at
 6   Exhibit 12, if you want to look at the entire
 7   statutory provision, Mr. Larson.
 8        A    Okay.
 9        Q    On page 10 it lays out the key
10   elements for committing the crime of refusal to
11   disperse.
12        Do you see that?
13        A    Yes.
14        Q    The first element is that the person
15   has to be "present at the scene of an unlawful
16   assembly or riot"; correct?
17        A    Yes.
18        Q    And then there is three other
19   elements that follow, "person has to knowingly fail
20   or refuse to obey; a lawful command of a police
21   officer"; and "to depart the scene of such unlawful
22   assembly or riot"; correct?
23        A    Correct.
24        Q    Do you agree, sir -- strike that.
25        Am I correct that it's the City's
```

Page 190

```
 1   position that, in order to commit the crime of
 2   refusal to disperse, there must be an underlying
 3   unlawful assembly or riot to trigger the failure to
 4   disperse?
 5        MR. DIERKER:  Object to the form of
 6   the question, calls for a legal conclusion.
 7        A    Yes, that would be part of the --
 8   it's an element of the crime, so it's required to
 9   be there prior to charging an individual with
10   refusal to disperse.
11        Q    (BY MR. PRAISS)  And am I correct
12   that, we've established on several occasions, that
13   in order to have an unlawful assembly or riot --
14   strike that.
15        Focusing again on the kettle, I
16   apologize for belaboring this point but again,
17   you're not aware of any situation where somebody,
18   around 11:30 at night, 11:25 that evening, was
19   engaging in violent conduct that presented imminent
20   threat to police officers or property at that
21   point; correct?
22        A    At that particular moment in time, I
23   don't know what was occurring.  At that particular
24   moment in time in this grand scenario, I don't know
25   if someone was engaging in violence or not.
```

Page 191

```
 1        Q    Are you aware of any facts that
 2   suggest that there was somebody arrested for acts
 3   of violence at that time?
 4        A    There were not people arrested at
 5   that -- I'm confused because you're asking me
 6   almost to testify to a specific incident.
 7        Q    Let me help you out.  You're familiar
 8   with, and I don't know his title, Mr. Sachs?
 9        A    Yes.
10        Q    Who testified at the preliminary
11   injunction?
12        A    I know Lieutenant Sachs.  He was the
13   commander of SWAT at the time of the kettling.
14        Q    And I'll represent to you I've read
15   his testimony very carefully.  If he testified that
16   after about 8:30 that evening, where there was
17   property damage, there was no evidence any of
18   violent activity in the City in the later part of
19   that evening, do you have any facts to dispute
20   that?
21        MR. DIERKER:  Well, I'm going to
22   object to that question because it seems to me that
23   that's totally outside the scope of the corporate
24   designee deposition.  You're asking for knowledge
25   of the entire event, specifically specific conduct
```

Page 192

```
 1   of specific people.  I will allow him to answer.
 2        MR. PRAISS:  For what it's worth,
 3   you, of all people, should know speaking objections
 4   are not exactly appropriate.  And I think that was
 5   a novel of an objection.  You might want to
 6   consider shortening it a bit.
 7        MR. DIERKER:  I'll note your
 8   objection to my objection.
 9        MR. PRAISS:  Okay.  And the reason
10   for my question is not trying to go outside the
11   scope and to lay a foundation for the question that
12   he was having difficulty answering, so this is a
13   predicate to my question and that's why I need it.
14        Q    (BY MR. PRAISS)  So my question back
15   to you is, I'm representing to you what Lieutenant
16   Sachs testified, that after 8:30, there was no
17   evidence of violent activity in the City and
18   definitely none around 11:30 when the kettle took
19   place.
20        My question to you is, I just need to
21   understand, are you aware of any of facts to
22   challenge that testimony by Lieutenant Sachs?
23        A    I am not aware of any facts that
24   challenge Lieutenant Sachs's testimony.
25        Q    Okay.  And my question to you then
```

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 193

1  is, in order to declare -- in order for someone to
2  commit the crime of refusal to disperse, we
3  established that a predicate for that is either
4  being present at an unlawful assembly or a riot;
5  correct?
6      A    Correct.
7      Q    And in order to be, have to be at the
8  scene of an unlawful assembly or a riot, there has
9  to be acts of violence occurring; correct?
10     A    Correct, by the statutory definition.
11     Q    And yet --
12     A    With force or violence.
13     Q    And yet assuming Lieutenant Sachs'
14  testimony is accurate and there were no acts of
15  violence, force or violence occurring at 11:30 at
16  night, what is the basis for charging people with a
17  crime of refusal to disperse if there is no basis
18  for establishing an unlawful assembly or a riot, is
19  what I'm trying to understand.
20         MR. DIERKER:  Object to the form of
21  the question, argumentative.
22     A    I can't state -- I mean, based on the
23  hypothetical scenario, assuming that there is no
24  other individual who can say that force or violence
25  was occurring at that particular time, the

Page 194

1  declaration of the unlawful assembly was up to the
2  incident commander who should have followed the
3  statutory guidelines to declare.
4      Q    (BY MR. PRAISS)  Okay.  If you go to
5  page 11, please?  It says, "The decision to declare
6  a crowd unlawful must be based on reasonable and
7  articulable facts."
8          What is the City's understanding what
9  it means when it says -- uses the phrase
10  "reasonable and articulable facts"?
11     A    A common sense language definition of
12  what is the standard of reasonableness of an
13  ordinary person, articulable would be demonstrate
14  specificity, specific facts.
15     Q    And that's what I was looking for.
16  You agree with me that it requires some level of
17  specificity before you can go out and just declare
18  an unlawful assembly?
19     A    Yes.
20     Q    Okay.  Go to page 15.  This deals
21  with Interference With An Officer - Best Practice.
22         Do you see that?
23     A    I do.
24     Q    And in the second bullet says, "Warn
25  prior to arrest on this charge by giving an

Page 195

1  effective order.  Inform the protester how the
2  protester is interfering with official duty and
3  instruct the protester how to comply."
4          Do you see that?
5      A    Mm-hmm.
6      Q    Is that a yes?
7      A    Yes.  Sorry.
8      Q    No problem.  Am I correct that in
9  this situation, the City's policy is that a warning
10  is appropriate when an individual is interfering
11  with an officer undertaking some police function;
12  correct?
13     A    This point relates to the best
14  practices related to interfering with an officer
15  and the explanation on when, what is interference
16  to warn prior to arrest on the charge by giving an
17  effective order.  So, and I need to be involved in
18  some sort of official act.
19     Q    And it specifically says that in that
20  situation, the best practice is to warn prior to
21  arresting someone and by giving them an effective
22  order, and it delineates an example what an
23  effective order would be; correct?
24     A    Correct.
25     Q    And it would be, among other things,

Page 196

1  to inform the protester how he's interfering with
2  official duty and instructing him how to comply;
3  correct?
4      A    Yes.
5      Q    Okay.  Could you help me understand
6  why the City considers it a best practice to
7  provide a warning by giving an effective order in
8  the context of an individual interfering with an
9  officer but doesn't believe that any warning is
10  required before spraying someone with pepper mace
11  using a handheld device under Section IV of Special
12  Order 1-01?
13         MR. DIERKER:  Object to the form of
14  the question, argumentative.
15     A    I cannot.
16     Q    (BY MR. PRAISS)  Can you think of any
17  reason why it's a best practice in one case to give
18  a warning which is giving an effective order of
19  what a person needs to do in one -- in this context
20  and why it's different in the context of an
21  interaction with someone who is, again, interfering
22  with a police officer trying to effectuate an
23  arrest, but in that context there is no best
24  practice; in fact, you have free discretion to
25  spray someone to get them to comply?

49 (Pages 193 to 196)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 197

1       MR. DIERKER:  Same objection.
2       Q    (BY MR. PRAISS)  That's what I'm
3  trying to understand.
4       A   I don't have an answer for this.
5       Q   Okay.  Topic number 4, Mr. Larson,
6  specifically, I'll read it into the record, says,
7  "The City of St. Louis's policies and/or practices
8  concerning who has authority to declare an unlawful
9  assembly."
10       Do you see that?
11       A   I do.
12       Q   As of September 2017, did the City
13  have any written policies or practices concerning
14  who has authority to declare an unlawful assembly?
15       A   No.  Any officer can declare an
16  unlawful assembly based on probably cause.  We
17  don't train for -- officers are trained relative to
18  the application of specific ordinances and having
19  probable cause to enforce those ordinances.
20  However, in standard practice, especially related
21  to First Amendment issues, the policy is only a
22  command rank, a supervisor, sergeant, lieutenant on
23  up, incident commander, would be responsible for
24  declaring an unlawful assembly.
25       Q   You gave me a long answer and I'm

Page 198

1  getting tired and I had a tough time following you,
2  Mr. Larson, so I apologize but I'll break it into
3  pieces.
4       Am I correct that any individual
5  police officers at any point can declare, based on
6  his or her own opinion, that there's an unlawful
7  assembly?
8       A   If the elements of the law are met
9  and the officer has probable cause to believe that
10  the elements are met, yes, they could.
11       Q   Okay.  Am I correct there is nothing
12  written to provide guidance to an officer with
13  respect to when to declare unlawful assembly other
14  than the language of the statute?
15       A   Correct.
16       Q   Okay.  There's pretty significant
17  consequences when an officer declares an unlawful
18  assembly; right?
19       A   Agreed.
20       Q   Among other things, based on the
21  City's understanding, as you described earlier,
22  everybody that's congregating there, regardless of
23  what their mental state is and what their agreement
24  or lack of agreement is, could be charged with a
25  crime; correct?

Page 199

1       And with that in mind, my question
2  is, what training is provided to police officers so
3  that they know to use their discretion correctly?
4  That they know what it takes, the elements, that
5  they don't abuse their discretion and create havoc?
6  I apologize for the long question but that's what
7  I'm trying to understand.
8       MR. DIERKER:  I apologize for having
9  to object but I think the second half of the
10  question is fine but the preface --
11       MR. PRAISS:  And I'll --
12       MR. DIERKER:  -- injected other
13  matters.
14       Q    (BY MR. PRAISS)  I'll strike the
15  question and do a better job.
16       You agree with me declaring an
17  unlawful assembly is a pretty serious charge;
18  right?
19       A   In matters related to the First
20  Amendment, yes.
21       Q   And you just explained or testified
22  that any officer has the discretion to declare an
23  unlawful assembly; correct?
24       A   Yes, but common practice is only
25  senior officers would do so.

Page 200

1       Q   But there's nothing prohibiting a
2  regular officer, not a senior officer, from doing
3  it under the policies and practices of the City of
4  St. Louis; correct?
5       A   Correct.
6       Q   Okay.  My question to you is, what
7  specific training is provided to every police
8  officer about the standards pursuant to which they
9  can declare an unlawful assembly to make sure they
10  get it right?
11       A   The training is based on all of our
12  training, which is probable cause, to ensure that
13  the elements of the crime are present prior to
14  effecting either an arrest or a declaration of
15  unlawful assembly.  There's no specific training
16  focused at specifically unlawful assembly.
17       Q   To what extent does the City actually
18  test the police officers' knowledge about the
19  relevant elements of the provision to declare
20  unlawful assembly to ascertain to what extent they
21  actually have an accurate working knowledge of the
22  elements?
23       A   I don't believe there is a test.
24       Q   Okay.  And again, I'm trying to
25  understand, is there like a regular training with

50 (Pages 197 to 200)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 201

1    respect to this element that happens on a monthly,
2    biyearly, yearly basis, to make sure that officers
3    know the elements of the crimes they are about to
4    charge people, in those situations where the
5    discretion to do so?
6         A    To the best of my knowledge, and I'm
7    -- I may have gotten lost, no.  Not on that
8    specific point or element on unlawful assembly.
9    Obviously it's a topic that we're concerned about
10   and it's something that we want to make sure we're
11   doing correctly.
12        Q    Would one way to do that would simply
13   to give an open-ended test to police officers and
14   ask them on a piece of paper write down the four
15   elements for an unlawful assembly and realize that
16   probably less than 5 percent of them could do it
17   correctly would be my guess, no disrespect.
18        MR. DIERKER:  I'll object to the
19   statement.
20        A    I'm not sure that -- that was a
21   statement more than a question, but no, I mean,
22   there's no -- I've already answered I think there's
23   no specific training related to that.
24        Q    (BY MR. PRAISS)  Okay.  Topic 5, I'll
25   give you a second.  It is a long one.  I'll let you

Page 202

1    read it yourself, Mr. Larson.
2         A    Okay.
3         Q    In a nutshell, that one focuses on
4    the City's policies, practices when an unlawful
5    assembly maybe declared; correct?
6         A    Yes.
7         Q    And it's pursuant to any legal
8    authority.  I want to make it general; okay?
9         A    Yes.
10        Q    Am I correct that the exhibit that
11   you have in front of you, I believe this is Exhibit
12   6, the PowerPoint presentation --
13        A    Yes.
14        Q    -- dated August of 2017 and the
15   testimony that you've given me in the last 45
16   minutes captures the City's policies and practices
17   on this issue?
18        A    Yes.
19        Q    Is there anything other than what's
20   referenced in Exhibit 6 that the City believes
21   permits declaring an unlawful assembly under any
22   provision of law?
23        A    I don't believe so.
24        MR. PRAISS:  Okay.  Why don't we take
25   a short break.

Page 203

1         (Off the record.)
2         (Plaintiffs' 30(b)(6) Exhibit 13
3    marked for identification by the court reporter.)
4         Q    (BY MR. PRAISS)  Back on the record,
5    Mr. Larson.  We are going to deal with topics 7
6    through 1, and if you look at Exhibit 2, which is
7    the notice of this deposition, the common factor to
8    topic 7-11, if you look at it, is dispersal orders.
9         Do you see that?
10        A    Correct.
11        Q    And I'm going to cover those topics
12   but maybe to help start the process, I've handed
13   you what's been marked as Exhibit 13.
14        A    Okay.
15        Q    This was recently produced us to in
16   the litigation.  Have you ever seen Exhibit 13
17   before today?
18        A    I have not seen it in this format.  I
19   am familiar with the dispersal order and the
20   warning of deployment of munitions.
21        Q    Okay.
22        A    I see it's dated September 1, 2017.
23        Q    Do you know who created this
24   document?
25        A    I do not.

Page 204

1         Q    What specific steps did you take to
2    prepare to testify with respect to topics 7 through
3    11?
4         A    Specifically, I reviewed the order on
5    dispersal in -- which is the chemical munitions
6    order we have talked about, Special Order 1-01,
7    Section XIII, talks about dispersal orders.
8         Q    Okay.  But in terms of, you know,
9    topics 7 through 11 deal with other issues such as
10   who have authority to issue it --
11        A    Yes.
12        Q    -- when should it be declared and
13   training with respect to dispersal orders, very
14   different, Section XIII of Special Order 1-01
15   doesn't cover those things?
16        A    No, and it's basically -- it's built
17   off of those series of questions were related to
18   what I consider the probable cause requirement of
19   what meets probable cause to declare the unlawful
20   assembly, when the dispersal order should be given
21   relative to the deployment of chemical munitions or
22   the opportunity to comply, things of that nature.
23        Q    Okay.  This Exhibit 13 is dated
24   September 1, 2017; correct?
25        A    Yes.

ALARIS LITIGATION SERVICES
www.alaris.us                    Phone: 1.800.280.3376                    Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 205

1      Q    Do you know if there was any similar
2  documents dealing with the language for issuing a
3  dispersal order prior to that date that the City
4  used?
5      A    I don't -- let me -- I could look at
6  the Special Order and I believe that was dated --
7  what the date is on that.  There is some language
8  in there that is very similar to this so I know
9  that this was a topic of discussion as we were
10  preparing the operations order, I believe it's
11  encapsulated in here on dispersal somewhere.
12      Q    What are you looking at?
13      A    Right now I'm looking at the
14  operations plan.
15      Q    Gotcha.  The OPs plan that you
16  referenced before, yep.
17      A    Yes.
18      Q    And please take your time but let me
19  know if you find anything specifically in the OPs
20  plan that deal with dispersal orders that was in
21  effect prior to September 1, 2017.
22      MR. DIERKER:  Off the record.
23      (Off the record.)
24      Q    (BY MR. PRAISS)  Mr. Larson, I know
25  there's a question pending but I'm going to strike

Page 206

1  it and ask you a new one based on this exhibit.
2  Give me a second to have the court reporter mark it
3  as an exhibit.
4      (Plaintiffs' 30(b)(6) Exhibit 14
5  marked for identification by the court reporter.)
6      Q    (BY MR. PRAISS)  Are you familiar
7  with Exhibit 14?
8      A    I am.
9      Q    Could you identify it for the record?
10      A    It was the operational Civil
11  Disobedience Response Operations Plan relative to
12  the expected Stockley verdict.
13      Q    And it's dated --
14      A    September 27, 2017.
15      Q    So this was prepared after?  Or
16  before the Stockley protest, is what I'm confused.
17      A    It would have been issued -- the
18  preparation went prior but probably would have been
19  issued on the date that it was given.
20      Q    Okay.  During -- in the last few
21  minutes you had a chance to look through this
22  exhibit; correct?
23      A    Correct.
24      Q    I think at the time the question that
25  I asked you was dealing with any provisions about

Page 207

1  dispersal or prior to September 1, 2017, which is
2  the date of the dispersal order language in Exhibit
3  13.
4      A    Yes.
5      Q    And so with that in mind, did you
6  find anything in the operations plan relating to
7  the Stockley protest dealing with dispersal orders?
8      A    I did not.  I did not locate it.
9      Q    Thank you.  So sitting here today as
10  the corporate representative, are you aware whether
11  there was anything in writing prior to September 1,
12  2017, that dealt with instructions for the issuance
13  of an unlawful assembly and dispersal orders?
14      A    I am not.
15      Q    Okay.
16      A    And can you tell me where this came
17  from, Exhibit 13?
18      Q    I will let your attorney explain that
19  because he sent it to us.  If he wants to put that
20  on the record, that would be helpful.
21      MR. DIERKER:  We produced that to the
22  plaintiffs within the last week.
23      THE WITNESS:  I understand.  Okay.
24      Q    (BY MR. PRAISS)  And again, you have
25  never seen this particular Exhibit 13 before

Page 208

1  today's deposition; correct?
2      A    I wouldn't necessarily say that.  It
3  relates to dispersal language.  I am not -- I am a
4  little confused because it has just a blank heading
5  so it's not an email.  I can't say whether I would
6  have gotten it through email or not.
7      I am familiar with the dispersal
8  order language.  It is the standard language that
9  we use on -- or that is supposed to be used by the
10  incident commanders when issuing a dispersal.
11      Q    Gotcha.  Let's focus on the language
12  for a dispersal order.  It begins with, "This is an
13  unlawful assembly"; correct?
14      A    Yes.
15      Q    So the first thing that has to happen
16  is someone has to determine, based on articulable
17  facts, that all the elements necessary for an
18  unlawful assembly have taken place; correct?
19      A    Yes.
20      Q    And it continues whereby the person
21  giving the dispersal order orders the individuals
22  "to disperse from this area by moving," and it has
23  it in quotes, "to the sidewalk and walking (give a
24  clear course of egress)."
25      Do you see that?

52 (Pages 205 to 208)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

---

Page 209

1    A    Yes.
2    Q    So am I correct that the dipersal
3  order language -- first of all, is this language
4  mandatory?
5    A    This verbatim languatory?
6    Q    Yes.
7    A    No.  It is not, the verbatim language
8  is not mandatory per se.
9    Q    At any time since September of 2012
10  to the present, the operative time period for this
11  deposition, has the City had a requirement that
12  specific dispersal order language was mandatory to
13  be used?
14    A    Yes, we are required to give a
15  dispersal order prior to the deployment of chemical
16  munitions and it should follow this form.  It may
17  be paraphrased, it may not be exact word for word,
18  but the intent is to provide this language and this
19  language was most likely prepared to give hands to
20  people, who would have to make these statements, a
21  document to refer to.
22    Q    I think in your answer you used
23  language like it could be paraphrased, it can be --
24  and that it doesn't have to be the exact word for
25  word, so that's what I'm trying to focus on.  The

---

Page 210

1  person giving the dispersal order, is there a
2  specific requirement that he or she actually has
3  this language in front of her and the only thing
4  that they are modifying is potentially the -- what
5  is the clear course of egress that applies there
6  but the rest of it is going to be read verbatim?
7  That is my question.
8        Or as you can describe it, the person
9  is basically familiar with this general language
10  and kind of paraphrases, to use your words, and
11  gives a dispersal order?
12    A    We have to issue a dispersal order
13  and the language that we use would be substantially
14  similar to this.
15    Q    Substantially similar but does not
16  require it to be identical?
17    A    Does not require it to be identical.
18    Q    Okay.  Am I correct that the language
19  of the dispersal order shown in Exhibit 13 does not
20  include any language that instructs individuals to
21  cease congregating together?
22    A    No, there is nothing in here that --
23  in that language that says that.
24    Q    Am I  correct the dispersal order
25  does not include any language that instructs

---

Page 211

1  individuals how far they have to leave the area?
2    A    No.  The -- no.
3    Q    Is there a reason, from the City's
4  perspective, that is now a policy, why it would not
5  want to include some parenthetical applicable to
6  the relevant situation but that tells people, in
7  order for you to comply with this dispersal order,
8  you need to leave the current area where there's an
9  unlawful assembly and go three blocks, go past the
10  park, go to the intersection?
11    A    I think it's the City's position that
12  a dispersal order is common sense.  I mean, to
13  disperse, you have to break apart, you have to go
14  away, you have to move.  You can't merely take your
15  group and move 50 feet down the street or into
16  another area.  You need to cease congregating.  You
17  need to go different directions.
18    Q    Since you used the language "cease
19  congregating," it highlight my question before --
20    A    I believe you used the language,
21  "cease congregating."
22    Q    Yes, but you used it now.  My
23  question is, again, that language doesn't appear in
24  the dispersal order; correct?
25    A    No.

---

Page 212

1    Q    It doesn't tell people that you need
2  to disperse and not recongregate anywhere; correct?
3    A    No, it doesn't say that.
4    Q    Okay.  Am I correct the dispersal
5  order language in Exhibit 13 doesn't include any
6  language and instructs individuals for how long
7  they have to leave the area; correct?
8    A    No.  It's the -- once the unlawful
9  assembly is declared, there is no return to the
10  incident location.  So there is no reason to say
11  you have to come back in 15 minutes or put a time
12  limit on it.  It's over.  You have to disperse.
13  You have to leave.
14    Q    Right.  But, for example, there's
15  language at the end of it that says, "You have five
16  minutes to comply with this order."
17        Do you see that?
18    A    Yes.
19    Q    There's no language that says you
20  cannot recongregate downtown for the next three
21  hours or this evening because that's what that
22  person declaring the dispersal order is
23  contemplating would satisfy his or her
24  expectations.  That language isn't in there;
25  correct?

---

**ALARIS LITIGATION SERVICES**
www.alaris.us                     Phone: 1.800.280.3376                     Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 213

1    A    That language is not present.
2    Q    So how does a group of people that's
3   congregating, and now they're being told they're
4   engaged in unlawful assembly based on the City's
5   interpretation as you explained it to us earlier,
6   how are they supposed to know that -- let's say
7   that happens at 8:30 in the evening and then three
8   hours later that same group of people, by
9   coincidence, comes back together and starts
10  congregating again.  Because people communicate by
11  social media quite a bit these days.  It doesn't
12  take much.  Where somebody says, hey, I see a group
13  of people hanging, protesters, in this area.
14       The original dispersal at 8:30 didn't
15  tell them you can't ever come back to the City
16  tonight.  How are they supposed to know that, that
17  they're not going to be violating a dispersal
18  order?
19       MR. DIERKER:  I'll object to the form
20  of the question, it assumes facts not in evidence,
21  it's argumentative.
22    Q    (BY MR. PRAISS)  You may answer my
23  question.
24    A    I don't know what the -- a person is
25  supposed to know or not supposed to know.

Page 214

1    Q    Well, how is the person possibly
2   supposed to know that he or she is not supposed to
3   come back to the City three hours later if the
4   dispersal order didn't tell them that?
5       MR. DIERKER:  Same objection.
6    Q    (BY MR. PRAISS)  Do you see the
7   problem?
8       MR. DIERKER:  Same objection.
9    Q    (BY MR. PRAISS)  Is there a reason,
10  sir, why the City, when it was drafting this
11  dispersal order language, didn't include language
12  specifying what the expectations are in terms of
13  the time period during which people could not
14  recongregate in a certain area?
15       MR. DIERKER:  Same objection.
16    A    I don't know the reason.
17    Q    (BY MR. PRAISS)  And since the
18  Stockley protesters were not aware of any attempts
19  to modify this language such that if we have other
20  situations, potentially, the problems we've been
21  discussing could be eliminated; is that a fair
22  statement?
23    A    I'm not aware of any attempts to
24  modify this language presently.
25    Q    Okay.  We talked before about who had

Page 215

1   authority to declare an unlawful assembly and I
2   think your testimony was pretty much any officer,
3   based on his or her assessment and the presence of
4   articulable facts, could declare an unlawful
5   assembly and now I want to focus on who has
6   authority to issue a dispersal order.
7       And as of September 2017, did the
8   City have any policies or practices related to who
9   had authority to issue a dispersal order?
10    A    The standard policy and practice,
11  much like the declaration of an unlawful assembly,
12  would be that any officer would issue the dispersal
13  order.  In common practice, especially in large
14  scale events like this, it would be up to the
15  incident commander to make those declarations and
16  to ensure that those dispersal orders are given.
17    Q    To your knowledge, have there ever
18  been situations where the incident commander was
19  not the person who gave the dispersal order but
20  some other officers did so using their discretion
21  in connection with any protests in the City since
22  September of 2012?
23    A    Not -- I'm sorry, that's a big
24  question.  Could you break that down for me?
25    Q    I'm just trying to figure out, to

Page 216

1   your knowledge, as the City's representative,
2   dealing with the dispersal orders and prior
3   protests, the topic we've been dealing with, have
4   there been situations where an officer other than
5   the incident commander issued a dispersal order?
6    A    That was not directed by the incident
7   commander to issue?  So the incident commander did
8   not direct officer X to provide that.  I am not
9   aware of any time when an officer, on their own
10  volition, during any protest event, would have
11  issued a dispersal order on their own without
12  approval from a commander responsible for that
13  incident.
14    Q    Is there a reason, if I'm hearing you
15  correctly that the City has what you've
16  characterized as a standard practice, that even
17  though any officer has the right to declare an
18  unlawful assembly or issue a dispersal order, the
19  standard practice is it's only people at a higher
20  level do so.
21       Why isn't that delineated in writing
22  as a requirement to eliminate the risk that
23  officers who are not maybe as familiar with the
24  procedures do so incorrectly?
25       MR. DIERKER:  Objection,

54 (Pages 213 to 216)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 217

1    argumentative.
2        A    I don't have an answer.
3        Q    (BY MR. PRAISS)  Okay.  Have the
4    City's policies or practices related to who has
5    authority to issue a dispersal order changed in any
6    way since the Stockley protests?
7        A    No.
8        Q    Topic 8, if you look at it, deals
9    with the circumstances when a dispersal order may
10   be issued; correct?
11       A    Yes.
12       Q    And we looked at the statutory
13   provision, I believe that was Missouri Revised
14   Statute 574.060, which is in Exhibit 12, if you
15   have that?
16       A    Are we discussing 574.060?
17       A    Yes.
18       A    Okay.
19       Q    Am I correct, looking again at topic
20   8, that the circumstance under which a dispersal
21   order may be declared require that there has to be
22   people present at the scene of either unlawful
23   assembly or at the scene of a riot; correct?
24       A    An unlawful assembly, the statutory
25   language.

Page 218

1        Q    In fact, the language of dispersal
2    order, back to Exhibit 13, begins with "This is an
3    unlawful assembly"; correct?
4        A    Yes.
5        Q    So before some police officer
6    declares a dispersal order, there has to be all of
7    the facts necessary to establish an unlawful
8    assembly present; correct?
9        A    Yes, sir, the elements of the crime.
10   The unlawful assembly would need to be present
11   before a declaration or a dispersal order should be
12   given.
13       Q    So topics 9 and 11 specifically deal
14   with training provided to police officers relating
15   to the City's policies and practices under
16   circumstances dispersal order should be declared
17   and made and enforced.
18           Do you see that?
19       A    Yes.
20       Q    What specific steps did you take to
21   prepare to testify with respect to topics 9 and 11?
22       A    I reviewed the training document
23   prepared on protests on unlawful assembly which I
24   believe talks about dispersal orders.  Again, I
25   reviewed the Special Order on chemical munitions,

Page 219

1    1-01, Section XIII.
2        Q    Did you -- when you talk about the
3    training document, you were looking at Exhibit, I
4    believe that's 6 in front of you, Mr. Larson?
5        A    Yes.
6        Q    Did you look at any actual training
7    materials that are used to educate police officers
8    about dispersal orders?
9        A    I did not.  I did not review any
10   PowerPoints other than the material that we talked
11   about.
12       Q    Okay.  Again, in the operations plan
13   that was issued shortly after the Stockley
14   protests, you weren't able to find -- there's no
15   training materials there referenced about the
16   issuance of a dispersal order; correct?
17       A    No.
18           MR. PRAISS:  Okay.  Let me mark up
19   another exhibit here.
20           (Plaintiffs' 30(b)(6) Exhibit 15
21   marked for identification by the court reporter.)
22       Q    (BY MR. PRAISS)  Do you have Exhibit
23   15 in front of you?
24       A    Yes.
25       Q    I think earlier today you referenced

Page 220

1    a two-page document of -- that provided an outline
2    of training materials used by Sergeant Jemerson.
3    Do you recall?
4        A    Yes.
5        Q    Is Exhibit 15 that document?
6        A    It is.
7        Q    Okay.  And this is kind of the
8    outline for the course that Sergeant Jemerson
9    provides in connection with the Civil Disobedience
10   Team?
11       A    Yes.
12       Q    And this one's dated September 2014.
13           Do you see that?
14       A    Yes.
15       Q    And there's a long list of topics
16   included on this two-page document; correct?
17       A    Yes.
18       Q    Okay.  And the instructional goal it
19   talks about "preparing team members for the task of
20   staging a coordinated, safe, constitutionally sound
21   response to this -- civil disobedience events";
22   correct?
23       A    Yes.
24       Q    So one objective is to make sure that
25   the Civil Disobedience Teams knows how to act in a

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| | Page 221 |
|---|---|

1    constitutional, sound manner; correct?
2       A   Yes.
3       Q    With respect to the use -- I'm sorry.
4    With respect to dispersal warnings and the
5    requirements regarding the use of chemical
6    munitions, that's identified in the fourth topic;
7    correct?
8       A   Yes.
9       Q    Have you yourself, in your individual
10   -- strike that.
11          As a corporate representative or in
12   your individual capacity, have you actually ever
13   seen the material -- specific underlying materials
14   that Randy Jemerson uses to teach the elements laid
15   out in the fourth bullet point here?
16      A   I did not.
17      Q    In preparing for today's deposition
18   you didn't take the time to do that?
19      A   No.
20      Q    Do you know if he actually has any
21   handwritten materials, any typed materials that he
22   actually provides the members of the Civil
23   Disobedience Teams to make sure they act in a
24   constitutionally sound manner in issuing dispersal
25   warnings and releasing chemical munitions at

| | Page 222 |
|---|---|

1    protesters?
2       A   I do not.
3       Q    Would it be a concern for you to find
4    out that there are no such documents prepared and
5    provided to the members of the Civil Disobedience
6    Team?
7       A   It would be a concern; however, I
8    know that in order to have an outline such as this
9    prepared, that there would have to have materials
10   that would support this outline in some way, shape,
11   or form, and, therefore, I believe that there are
12   -- that that is being -- that is occurring, that
13   those training materials are available.
14          MR. PRAISS:  Go off the record a
15   second.
16          (Off the record.)
17      Q    (BY MR. PRAISS)  Moving on.  We had a
18   long discussion between counsel, and you were
19   present here to hear it.  My question to you is,
20   other than Exhibit 6, which is a presentation that
21   was given to senior staff on August 16, '17, and
22   the two-page outline used by Mr. Randy Jemerson
23   that just highlights by topics all the things that
24   he covers in the Civil Disobedience Team training,
25   you, as a corporate representative, are not aware

| | Page 223 |
|---|---|

1    of any other training materials used to train
2    police officers about the use of chemical agents,
3    about dispersal orders or unlawful assembly or any
4    of the other topics we've discussed so far today;
5    is that a fair summary?
6       A   That is a fair summary, I am not
7    aware of anything other than what we've discussed.
8       Q    Thank you.  We are going to the last
9    topic and that is topics 18 through 24.  So there
10   is a large group there.
11      A   Yes.
12      Q    I will try and cover them here in the
13   next maybe 45 minutes or so and we'll be done.
14          (Plaintiffs' 30(b)(6) Exhibit 16
15   marked for identification by the court reporter.)
16      Q    (BY MR. PRAISS)  Mr. Larson, you've
17   been handed what's been marked for identification
18   purposes as Exhibit 16.
19          Do you see that?
20      A   Yes.
21      Q    This is a Declaration by Charles Wall
22   regarding Exhibit A, which is attached to his
23   Declaration.
24          Do you see that?
25      A   Yes.

| | Page 224 |
|---|---|

1       Q    And you identified early on today
2    that Mr. Charles Wall was actually, if memory
3    serves me correctly, the only individual other than
4    attorneys that you met with to prepare for today's
5    deposition; is that correct?
6       A   Yes.
7       Q    Okay.  And in paragraph 2 Mr. Wall
8    identifies that he is employed by the St. Louis
9    City division of police and is current assigned to
10   the police legal unit, and assist in discovery and
11   related matters.
12          Do you see that?
13      A   Yes.
14      Q    That's what you referenced here
15   today; correct?
16      A   Yes.
17      Q    Gotcha.  I want to focus on really
18   the substance of Exhibit A in particular.  Is to
19   your knowledge, first of all, Mr. Wall the author
20   of Exhibit A?
21      A   I believe he created the spreadsheet
22   with possibly help from the IT department to
23   identify these potential -- these incidents.
24      Q    Okay.  Are you familiar with what
25   records -- what records the City maintains that

56 (Pages 221 to 224)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| Page 225 | Page 227 |
|---|---|

**Page 225**

1  were the source of all this information?
2     A    I believe there were the records
3  management system, I/LEADS we've discussed was one
4  source.  I believe there was a source from the
5  intelligence division/Real Time Crime Center that
6  contributed to this, and I also believe that there
7  were possibly information received from a CDT or
8  SWAT supervisor that had a list of incidents that
9  contributed to these.
10     Q    You identified I believe three
11  different sources?
12     A    Yes.
13     Q    For each one, if you could go slower
14  for me and identify what that source was and what
15  type of information, if any, you believe that
16  source would have provided for any of the columns
17  identified in Exhibit A?
18     A    Well, the -- the sources are -- I'm
19  going to do this rather generally at first.  The
20  information, as far as detail summary, the units
21  involved, the disposition of arrests, things like
22  that, that all came from the records management
23  system.
24          The actual protests themselves, or,
25  we got two lists from the two groups, we compared

**Page 227**

1  determined the name that's included in Exhibit A?
2     A    I would assume Charlie Wall, that
3  Sergeant Wall did, or the -- from the original
4  list, the Action Name is the group that was
5  associated with the incident.  So there's several
6  obviously different groups, that was the -- that's
7  how it would be determined the Action Name.
8     Q    Okay.  The next column is the number
9  of protesters.  What information did Mr. Wall rely
10  on to come up with the numbers identified?
11     A    The estimated numbers from the
12  reports and wherever we could glean that
13  information from.  So most likely a records
14  management system.
15     Q    The Details Summary column has more
16  language than other columns.
17          Do you see that?
18     A    Yes.
19     Q    And again, this was inputted by Mr.
20  Wall; correct?
21     A    Yes.
22     Q    Did anybody provide an input with
23  that, or what information did he use to describe
24  the details that he laid in?
25     A    He would have used the information

| Page 226 | Page 228 |
|---|---|

**Page 226**

1  them to the records management system or searched
2  parameters within the record management system, and
3  then created this list of potential -- of cases
4  that met the criteria of protest events based on
5  size.
6     Q    Okay.  I may follow up on that in a
7  few minutes, but let's keep going and I'll decide
8  how much more detail I need.
9          Am I correct the summary in Exhibit A
10  provides -- covers protests in the City from March
11  15, 2012, until the last one identified is July 24,
12  2018?
13     A    Yes.
14     Q    I want to go through the headings on
15  Exhibit A, and obviously the first one is Date.  Am
16  I correct that just reflects the date of when that
17  particular protest took place?
18     A    Yes.
19     Q    Start Time, pretty self-explanatory,
20  it's the start time of the protest?
21     A    Yes.
22     Q    Location is where the protest took
23  place?
24     A    Yes.
25     Q    Okay.  And Action Name.  Who

**Page 228**

1  that was provided from the two lists, checking that
2  against the records management system, reviewing
3  the reports, and then creating a detail summary.
4     Q    Okay.  Police Manpower, where would
5  he have gotten that information?
6     A    From the records management system,
7  who was involved.
8     Q    Okay.  When you say "records
9  management system," you used that phrase twice now.
10  What specifically are you -- what system are you
11  referring to?
12     A    The I/LEADS reports.
13     Q    I just wanted to make sure we were on
14  the same page.  Thank you.  Disposition includes
15  various information and level of detail.  Where
16  would that information have come from?
17     A    From the dispositions involving
18  arrests would have come from the I/LEADS report.
19     Q    Okay.  The Report number, what does
20  that refer to?
21     A    That refers to the incident case
22  number that we were discussing earlier, the I/LEADS
23  report number that relates that specific incident,
24  the number is tied to that.
25     Q    And so in some situations there is

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 229

1    only one, others there's a whole series of them.
2    And again, how is that determined whether there's
3    one or a series with respect to one protest?
4         A    The size of the event, the number of
5    the arrests, the individual charges, how it, just
6    it's determined on a case-by-case basis.
7         Q    Okay.  How are those reports
8    maintained by the City?
9         A    They're maintained within the I/LEADS
10   system.
11        Q    So if I wanted a report identified
12   here, how difficult would it be to locate it?
13        A    It would not be difficult at all.
14        Q    How difficult is it, if at all, to
15   determine all of the applicable reports that
16   correspond to a particular protest?
17        A    I'm a little confused by the
18   question.
19        Q    Yeah.  So when Mr. Wall was preparing
20   -- putting this document and, let's say, take the
21   first line item, Occupy Midwest, and the one dated
22   March 15, '12.
23        A    Mm-hmm.
24        Q    How hard is it for him to run a
25   search and locate all the applicable reports that

Page 230

1    relate to that one?  I guess different way of
2    asking it is, when he came across the report number
3    identified here, how does he know there aren't any
4    other reports out there?
5         A    The search parameter, primarily from
6    the IT department, information technology, would
7    have put in specific parameters, keyword phrases
8    keyword searches, protest, arrests, date and time.
9    So once we could narrow down the date and time of
10   particular incidents, we could run a search through
11   the records management system, I/LEADS, we could
12   search it by various parameters to determine that
13   we have everything that's available.
14        Q    Good.  The next column is P and a
15   number sign.  What does that stand for?
16        A    P and the number sign, I believe that
17   would be the, quote, P number.  So a P number is a
18   number that is in our computer-aided dispatch
19   network.
20             So an officer is sent to a location.
21   A P number is generated.  P number associates that
22   officer to the call for service.  If there is a
23   report written, obviously there is a complaint
24   number drawn, complaint number is associated to a P
25   number, and then the report is prepared.  If the

Page 231

1    report is not prepared, a code might be given,
2    responded to monitor protest, no police action
3    needed, put me back in service.  The P number is
4    closed.
5         But the P number is just there, I
6    don't know if he was, what purpose he had it on
7    that list for, if it was something he was going to
8    go back and do or if -- if there was, if we decided
9    not to follow up on that information.
10        Q    Very few of these entries have a P
11   number referenced in this column.
12        Do you see that?
13        A    Yes.
14        Q    Help me understand what is the
15   significance of a P number that's identified on
16   those few line items where it's present, and
17   equally, what is the significance of the fact that
18   there is no P number on the majority of them?
19        A    The majority of the P numbers, it
20   appears from this list, don't have arrests
21   associated with them.  So we knew there was a
22   protest, we monitored the protest, and no protest
23   number or call for service.
24        Now, I am also looking at, it looks
25   like chronologically, the inclusion of the P number

Page 232

1    becomes more prevalent in more recent time lines
2    and it may have been to associate potential
3    information with those, with these incidents
4    internally.
5         Q    Let's look at the entry for the
6    Stockley verdict protest on September 15, 2017.
7    There is a long list of P numbers associated there.
8    Do you see that?  On the bottom of the page and
9    it's page 4 of 9 of this filed with the court?
10        A    Yes.
11        Q    I'm just using that one as an example
12   where --
13        A    Page 4 of 9.  Yes.  9/15, yes, at the
14   bottom of the page.
15        Q    And you see under the column
16   associated with the P number, there is quite a few
17   entries there; right?
18        A    Yes.
19        Q    If I was to get a copy of the first
20   one, P1709150933, what would I be looking at?
21        A    You would be looking at a call log in
22   the computer-aided dispatch that relates to a
23   dispatch request.
24        Q    And what's the significance of having
25   a P number in connection with a protest, if any?

58 (Pages 229 to 232)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 233

1      A    There is no -- I mean, we use P
2  numbers for every police call for service.
3      Q    Okay.  Is there -- can you think of a
4  reason why Mr. Wall included this column and what
5  significance, if any, does it have?  Is what I'm
6  trying to understand.
7      A    I think the significance is that a P
8  number was located related to the incident.
9      Q    But the fact that the P number was
10  referenced here has no significance in terms of
11  what the police conduct was or what the protesters
12  did or what level of force was used or any other
13  issues?
14      A    No, I don't believe so.
15      Q    Simply a call to dispatch is all it
16  is?
17      A    Yes.
18      Q    Okay.  I think that more than enough
19  covers the P number issue.
20          (Off the record.)
21      Q    (BY MR. PRAISS)  The last two columns
22  there titled Resistance and Force.  Do you see
23  those, Mr. Larson?
24      A    Yes.
25      Q    What is your understanding of where

Page 234

1  Mr. Wall would have gotten the information that he
2  included in those two columns?
3      A    That would have come from the I/LEADS
4  reports that were created.
5      Q    Under the column involving Force, do
6  you see some places identify the use of mace?
7      A    Yes.
8      Q    And other places identify the use of
9  chemical munitions; correct?
10      A    Yes.
11      Q    Is there, for purposes of this chart,
12  are those two terms mutually exclusive?
13      A    I would say for the purposes of this
14  chart, they are not mutually exclusive.  The
15  chemical munitions relate -- would relate more to
16  the launching the gas guns, the pepper balls, those
17  type of things.  When he has mace, that would be
18  much more akin to the handheld canister.
19      Q    When he uses "mace," does it also
20  encompass a situation where a fogger is used?
21      A    It could.
22      Q    Do you know one way or the other?
23  Rather than could, does it, is my question?
24  Because the word "mace" appears a lot in many
25  instances and I'm trying to understand when he uses

Page 235

1  the word "mace," in his mind is he saying that's
2  the use of the fogger, the handheld, or both?
3      A    I would say that it is exactly that,
4  it is mace.  And it doesn't delineate which,
5  whether it was the small canister or the high
6  output canister, in the preparation of that.  But
7  it was separate from the chemical munitions being
8  launched by SWAT.
9      Q    So when SWAT launches chemical
10  munitions, using the different techniques that they
11  have, that's under chemical munitions, and for
12  purposes of this chart, when he uses the word
13  "mace," it applies to mace regardless the manner in
14  which it's deployed, whether it's a handheld device
15  or a fogger; correct?
16      A    Yes.
17      Q    Gotcha.  Thank you for that
18  clarification.  Every time there is a reference
19  here to "mace" or "chemical munitions," am I
20  correct that under the Special Order and I/LEADS
21  report, was supposed to have been prepared?
22      A    An I/LEADS report should have been
23  prepared.
24      Q    On this chart which record would
25  identify I/LEADS report that corresponded that

Page 236

1  would reflect the use of mace or chemical munitions
2  in connection with that protest?
3      A    The report number.
4      Q    So the report number is the key
5  document if I'm interested to learn about the use
6  of chemical munitions or mace for each protest?
7      A    Yes.
8      Q    Gotcha.  Do you remember we looked a
9  little before at that After Action Critique that
10  you submitted?
11      A    Yes.
12      Q    You recall you were the only one who
13  did so after the Stockley verdict?  My question to
14  you is, is there any reference on this chart that
15  identifies whether or not an After Action Critique
16  was issued and submitted by all of the detail
17  commanders and supervisors with respect to the
18  special/major events identified in these protests?
19      A    There is not a column for them.
20      Q    Okay.  Am I correct that when it
21  talks in the After Action Critique about the
22  handling special/major events, that each of these
23  protests would qualify as a special/major event?
24      A    Not necessarily.  Some of these are
25  pop up protests that we weren't prepared for that

**ALARIS LITIGATION SERVICES**
www.alaris.us                Phone: 1.800.280.3376                Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 237

1    we had to respond quickly to.  So an operations
2    plan would not have been created if there was an
3    operations plan for any of -- any of these, and I'm
4    not presently aware which ones may have had one and
5    which ones wouldn't.  The larger ones would have
6    had one if we were prepared for civil disturbance.
7        Q    So to have an operational planning
8    document prepared, if I'm understanding correctly,
9    the City has to have some kind of a notice that an
10   event's going to happen and in that situation,
11   subsequent to that event is when the detail
12   commanders and supervisors are supposed to submit
13   their After Action Critique; correct?
14       A    Yes.
15       Q    Okay.  From your understanding of the
16   systems used by the City, how difficult is it to
17   search for and determine to what extent an
18   operational plan was created for a particular
19   protest that's identified here?
20       A    It would not be difficult.  The
21   operational planning unit would keep a record of
22   the events that they have created details for and
23   they would be on file.
24       Q    And how difficult would it be to
25   determine whether or not all the detail commanders

Page 238

1    and supervisors submitted an After Action Critique
2    after that event, assuming that there was an
3    operational plan issued for --
4        A    It shouldn't be difficult because
5    they would have been sent to operational planning
6    for filing just as you received mine.
7        (Off the record.)
8        Q    (BY MR. PRAISS)  I'll give you my
9    highlighter.
10       A    Okay.  Thank you.
11       Q    I would appreciate -- I've gone and
12   done my best but I doubt that I did a very good job
13   so I need to you help me.  Highlight those rows and
14   as you go through it, identify on the record maybe
15   some information, the date, for example, where
16   officers issue a dispersal order and/or use
17   chemical munitions or mace in connection with a
18   protest that's outlined here.  See what I'm asking
19   to you do?
20       A    Yeah.  You're asking for -- okay.
21       Q    Let's slow down.  Let's make sure
22   we're doing the same thing.
23       A    Mm-hmm.
24       Q    So the first one you identified,
25   which I already unbelievably missed, is the second

Page 239

1    row, correct, where mace was used?
2        A    Yes.
3        Q    Okay.  Please take a few seconds,
4    we'll go off the record and identify and mark, for
5    your benefit and mine, those incidents where you
6    see dispersal orders issued over the PA, unlawful
7    assembly declared, in the columns under Disposition
8    and in the column under Force where it indicates
9    that mace and chemical munitions were used.  I'm
10   going to focus on those.
11       A    Okay.
12       (Off the record.)
13       A    Thank you, I believe I'm finished.
14       Q    (BY MR. PRAISS)  Thank you, Mr.
15   Larson, for doing that.  It will make the
16   questioning go much, much quicker, trust me.
17       A    I understand.
18       Q    You notice that on topics 18 through
19   24 it uses the phrase "prior protests," which is a
20   defined term; right?  In the definitions section of
21   the notice?
22       A    Correct.
23       Q    Okay.  And it makes a distinction
24   between those situations when individuals are
25   protesting police conduct or are not; do you

Page 240

1    understand that?
2        A    Yes.
3        Q    So I have one other favor to ask of
4    you.  I'll give you my pen because it's red ink and
5    take your time and go through all the rows and to
6    the extent the particular protest, as the City's
7    representative, you understand involve protesters
8    challenging police conduct, find a way to write
9    maybe the abbreviation I came up with just now of
10   PPC, standing for protesting police conduct.  So
11   what I want is to have the City's understanding of
12   which of these protests involved protesters
13   protesting police conduct.
14       (Off the record.)
15       A    Okay, I'm done.
16       Q    (BY MR. PRAISS)  Thank you, Mr.
17   Larson.  Now this should be just an exercise of
18   looking at your markings.  If you look at the
19   Exhibit A, that you've now highlighted and
20   identified with the abbreviation PPC for protesting
21   police conduct in applicable rows, from March 15,
22   2012, until September 17, 2017, when the Stockley
23   protest took place, during that time period, please
24   let me know how many protests took place in the
25   City of St. Louis where the police either declared

60 (Pages 237 to 240)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

---

Page 241

1 an unlawful assembly or issued a dispersal order in
2 responding to a protest.
3       A    I'm sorry, both conditions need to be
4 met?
5       Q    Either condition.  No, no, either
6 one.
7       A    Can you give that to me again?
8 Because I want to make sure I marked this
9 correctly.
10      Q    Okay.  I'm looking for any protest
11 from March 15, '12, the beginning, until the
12 Stockley protest, where the police declared an
13 unlawful assembly or issued a dispersal order.
14      A    Okay.
15      Q    So it will be in the column --
16 obviously, we're looking under -- the times when
17 you highlight the column under Disposition, and
18 just count those for me.
19      A    Okay.  If my math is correct, it
20 appears to be 16 times dispersal orders were given.
21      Q    Okay.  Again, my question was, either
22 dispersal or an unlawful assembly.  I'm combining
23 the two.  I'm not drawing a distinction.
24      A    That either a dispersal order or an
25 unlawful assembly was committed.

---

Page 243

1 where you have identified that the City declared an
2 unlawful assembly or issued dispersal order, of
3 those 15, how many have the abbreviation PPC for
4 protests of police conduct included?  Do you
5 understand my question?
6       A    I do.  I'm --
7       Q    Of the 15 you've just identified, how
8 many have involved the public protesting the police
9 conduct?
10      A    It looks like 12.
11      Q    Fair to say that the vast majority of
12 the instances where the City, the police declare an
13 unlawful assembly or issue a dispersal order, they
14 involve situations where the public was protesting
15 the police conduct?
16      A    I think that there's numerous
17 explanations for that, but yes, based on the list
18 that we've prepared and the questions that you've
19 asked me, those things are -- yes.
20      Q    If you could do me a favor and refer
21 back to your -- the Exhibit A, focusing again on
22 the time period from March 15, 2012, up to and
23 including the Stockley protests, identify the
24 number of instances where the police used either
25 chemical munitions or mace in responding to a

---

Page 242

1       Q    Okay.  So just so the record is
2 clear, and I apologize, but from your review of
3 your highlighting on Exhibit A, it's your testimony
4 there appear to be 16 different instances from
5 March 15, 2012, until September 17, 2017, when the
6 City declared an unlawful assembly or issued
7 dispersal order in responding to a protest; is that
8 correct?
9       A    Yes, the number appears to be 16.
10      Q    I'm puzzled because I only came up
11 with 13, but I believe you.  You probably found
12 instances I forgot to highlight, so I'm looking
13 again at my work real quick.  Looking for the words
14 "dispersal order" or "unlawful assembly" under the
15 column of Disposition and trying to get those added
16 up.
17      A    This time I came up with 15.
18      Q    Okay.  Let's go with your number.
19      MR. DIERKER:  You were talking about
20 prior to September 15?
21      MR. PRAISS:  Up through including the
22 Stockley protest.
23      A    And I counted through the entire
24 list.
25      Q    (BY MR. PRAISS)  And of those 15 rows

---

Page 244

1 protest, and let me know how many instances you
2 come up with.
3       A    I want to make sure I understand you
4 correctly, sir.
5       Q    All I'm asking now is if you look at
6 the use of Force column, use of Force and look for
7 any situations where either "chemical munitions" or
8 "mace" appears, and let me know how many rows you
9 come up there.
10      A    Thirteen.
11      Q    Just to make sure we're referring to
12 the same thing, it's your testimony that there is
13 13 rows in Exhibit A where under the use of Force
14 column the words "mace" or "chemical munitions"
15 appear?
16      A    Yes.
17      Q    Okay.  Of those 13, how many
18 specifically identify chemical munitions, which you
19 have explained is distinct in this case because of
20 use, it's referring to deployment through the SWAT
21 Team or -- but not of mace through a handheld
22 device.
23      A    I believe 5.
24      Q    Going back to the original number you
25 gave me of 13 instances where either mace or

---

61 (Pages 241 to 244)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

## Page 245

1   chemical munitions are referenced, of those, how
2   many rows also include the abbreviation PPC that
3   you've marked indicating that not only were
4   chemical munitions or mace used but involved a
5   protest where the public was protesting police
6   conduct?
7       A   Five.
8       Q   Was there ever a Code 1200 in effect
9   during the Stockley protests?
10      MR. DIERKER:  Object to form, lack of
11  foundation.
12      Q   (BY MR. PRAISS)  Do you understand my
13  question, sir?
14      A   I do.  I do believe you're asking if
15  a formal Code 1200 was declared, and I know that we
16  had mutual aide units involved, St. Louis City, the
17  Highway Patrol, those would come under the auspices
18  of a 1200.  Whether we actually, quote, declared a
19  1200, I can't say we did using that terminology but
20  we did coordinate with St. Louis County, the
21  Highway Patrol unit -- agencies, which would fall
22  under an umbrella of a potential 1200.
23      Q   In order to bring in those resources,
24  is it a prerequisite that you have to declare a
25  Code 1200?

## Page 246

1       A   Not as a prerequisite.  1200, because
2   this was more of a planned response to a proposed
3   issue or potential issue, we would do that.  The
4   1200 is really an emergency operations all hazard
5   plan for what we would do in the case of a
6   spontaneous type event.  So I can't tell you that
7   we declared a 1200 in principle or verbiage but the
8   spirit of having mutual aid was performed.
9       Q   Gotcha.  Did the City consider the
10  Stockley protest to constitute a 7250 at any point?
11      MR. DIERKER:  Objection, form, lack
12  of foundation.
13      A   A 17250, as far as I believe -- is
14  that the unlawful assembly?  Or --
15      Q   (BY MR. PRAISS)  The Jemerson
16  training document I think refers to that?
17      A   Oh, you're talking about a 7250?
18      Q   Yes.
19      A   A barricaded subject.  I'm sorry.
20  No, it would not have fallen under the barricaded
21  subject type of incident command.
22      Q   Gotcha.  Okay.
23      A   Sorry for misunderstanding.
24      Q   No, I'm happy we clarified it.  Give
25  me one second to ask my colleague here a question

## Page 247

1   but I think we may be close to an end, if not
2   already there.
3       (Off the record.)
4       MR. PRAISS:  Mr. Larson, I very much
5   appreciate your patience today and throughout this
6   whole process.  I have no further questions for you
7   and thank you very much.
8       MR. DIERKER:  Well, regrettably, I do
9   have a couple.
10      MR. PRAISS:  Which is always a risk
11  that I may ask a bunch of new questions.
12      (Off the record.)
13      EXAMINATION
14  QUESTIONS BY MR. DIERKER:
15      Q   So, Major, I would like to clarify
16  for the record, we've talked about foggers in
17  connection with mace, and is a fogger also known by
18  another term?
19      A   It could be known by a streamer or
20  high output mace.
21      Q   Okay.  And that device, what is the
22  difference between that device and the hand -- the,
23  what I'll describe as the individual handheld
24  device?
25      A   It's a larger container and it shoots

## Page 248

1   a stream farther, dissipates.
2       Q   And as far as its usage, is its usage
3   -- when would an officer use a streamer as opposed
4   to the smaller handheld device?
5       A   The -- they would use the -- a
6   sergeant or above would be issued the larger
7   device.  It would be used as -- the same as the
8   handheld device but when you need a greater range.
9       Q   So it would depend on the
10  circumstances in which the officer feels that it
11  needs to be deployed against an individual or more
12  than one individual?
13      A   Potentially, yeah, it's used
14  primarily with crowd dispersal and crowd control.
15      Q   Okay.  I'd like to call your
16  attention to Deposition Exhibit 14 and I'd like to
17  call your attention to what's Bates stamped CITY
18  00421.  Can you read the headings?
19      A   The heading is Civil Disobedience
20  Response Protocols.
21      Q   And what circumstances does that
22  address, in summary?
23      A   In summary, it's a outline or
24  guideline for the protocols that will be used
25  during a civil disobedience event.

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 249

1      Q      And any specific protocol or
2   circumstance that it's designed for?
3      A      I mean, I'm not sure I understand
4   your question, sir.
5      Q      I'll rephrase it.  To what extent, if
6   any, does it pertain to dispersal orders or
7   announcements?
8      A      Oh, it talks about the importance of
9   respecting the individuals' First Amendment rights
10  and that law violations and dispersement issues are
11  given appropriately, that warnings need to be
12  given, we need to allow for the appropriate time
13  for persons to vacate the area, and then afterward,
14  the appropriate time, an incident commander or
15  operation commander can indicate that arrests will
16  need to be made for violations of law.
17     Q      And with regard to the shorthand
18  terminology of "kettle," I would like to refer you
19  to page CITY 00427 in Exhibit 14, if you could read
20  the headings on that?
21     A      The Civil Disobedience Team -- Civil
22  Disobedience Team Arrest Procedure.
23     Q      Is there another heading below that?
24     A      Next is Civil Disobedience Hand-Off
25  Team.

Page 250

1      Q      And in your understanding, does that
2   address the situation where arrests from one to far
3   more than one would have to be dealt with?
4      A      Yes.
5      Q      I would like to put on the record
6   that when we had a recess, did we undertake to try
7   to get some answers to the camera maintenance
8   issues that were raised earlier?
9      A      Yes.
10     Q      And is it your understanding -- what,
11  if anything, is your understanding as to who
12  maintains the camera at 14th and Locust?
13     A      The maintenance of the camera would
14  be the street department, City of St. Louis.  That
15  was the agency I alluded to in my prior testimony
16  as working with us who maintains the camera.  I
17  wasn't sure -- I wasn't 100 percent sure it was the
18  street department and I didn't want to state that
19  without having that confirmed knowledge.
20     Q      And with regard to the video that's
21  actually recorded, is that a matter of software or
22  hardware?
23     A      My understanding is it is a matter of
24  software, not hardware.
25     Q      And the software is maintained by

Page 251

1   whom?
2      A      The software is licensed from the
3   Genetec company who is currently assisting us
4   trying to resolve the issue with the corrupted
5   data.
6          MR. DIERKER:  If I could huddle with
7   Andrew for just a second?
8          (Off the record.)
9          MR. DIERKER:  Nothing further.
10              RE-EXAMINATION
11  QUESTIONS BY MR. PRAISS:
12     Q      I have a series of new questions for
13  you, my friend.  I'm sorry.
14     A      I knew you did.
15     Q      And going in reverse order, the last
16  series of questions dealt with video, that is, I
17  believe, topic 25 of your deposition, the one that
18  you were unable to -- the City's unable to retrieve
19  at this point; you understand that?
20     A      Correct.  I believe we provided a
21  file in all of the files that we have provided and
22  it was determined that we have -- that that file
23  was not functioning properly.
24     Q      It's the only file from the only
25  camera that we cannot access; you understand that?

Page 252

1      A      My understanding was that there were
2   two files from that particular camera on two
3   different dates that couldn't be accessed.
4      Q      But it's that one camera I meant to
5   say?
6      A      Yes.
7      Q      It's only one camera among all the
8   cameras that were used to record the Stockley
9   protest for which -- which is critical in our eyes
10  but, coincidentally, we don't have the ability to
11  view what it recorded.  You do understand that's
12  what we're talking about?
13     A      I do.
14     Q      And it sounds like at some point
15  during the break you made some inquiries about that
16  subject; correct?
17     A      Yes.
18     Q      Who did you call?
19     A      We talked with Lieutenant Brent Feig
20  of the intelligence division, Real Time Crime
21  Center.
22     Q      Okay.  And did you ask him if there
23  was any written communications between anybody on
24  the City side and Genetec with respect to the
25  circumstances relating to the malfunction of this

63 (Pages 249 to 252)

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| Page 253 | Page 255 |
|---|---|

**Page 253**

1  particular camera and the fact that these video
2  recordings are not retrievable?
3      A    I did not ask him that.
4      Q    Okay.  Is there a reason why you
5  didn't?
6      A    No.  I mean, I know that we're
7  working on trying to get a resolution to this one
8  way or the other, but no, I did not.
9      Q    So sitting here today you still have
10 no knowledge, no different than it was many hours
11 before we were here today, in terms of at what
12 point in time somebody first realized that that
13 camera was malfunctioning back around September 15,
14 2017?
15     A    No.
16     Q    Okay.  Is it fair to say that,
17 sitting here today as the representative of the
18 City on topic 25, you are making an assumption that
19 the camera never recorded rather than that the
20 recording was somehow lost subsequent to?
21     A    No, based on my inquiry into the
22 topic, there is data present in the file.
23 Therefore, the belief is that something was
24 recorded and that somehow the software has not
25 either adequately recorded it or -- for play back,

**Page 255**

1  Team Arrest Procedure and Civil Disobedience
2  Hand-Off Team 1?
3      A    Yes.
4      Q    Am I correct neither of those
5  subjects have anything to do with the use of
6  chemical agents, dispersal orders, or unlawful
7  assemblies?
8      A    No.  That's correct.
9      Q    Okay.  And if you go, please, to the
10 other page that you were directed to, I believe
11 it's CITY Bates number 421 and 422, and am I
12 correct the heading for that section is Civil
13 Disobedience Response Protocols?
14     A    Yes, that is correct, sir.
15     Q    Okay.  Am I correct that the sum and
16 substance of that section under Civil Disobedience
17 Response Protocols is five paragraphs, about half a
18 page?
19     A    That is an appropriate description,
20 sir.
21     Q    Am I correct that the phrase -- the
22 terms "unlawful assembly" and "failure to disperse"
23 appear only one time in a parenthetical on the
24 bottom of CITY 421?
25     A    Yes.

| Page 254 | Page 256 |
|---|---|

**Page 254**

1  that's what the whole process is, the investigation
2  is ongoing trying to determine what is there and is
3  it recoverable, but there is data present is what I
4  am told.
5      Q    And at this point, do you know one
6  way or the other if at any time since September of
7  2017, that camera has consistently, up until the
8  last few weeks, malfunctioned consistently and
9  never been able to record for the same software
10 problem that you reference or, to the contrary,
11 somewhere along the line somebody realized there
12 was a problem and they fixed the camera?
13     A    I don't have that answer.
14     Q    Okay.  Counsel asked you a series of
15 questions about Exhibit 14, the OPs plan?
16     A    Yes.
17     Q    Do you have that?
18     A    Yes.
19     Q    Again, I'll work backwards.  I think
20 the last sequence of questions dealt with what's on
21 Bates number CITY 427 and 428.  I'll let you catch
22 up with me.
23     A    Okay.  427, 428.
24     Q    Am I correct the headings on page 427
25 in that situation deals with a Civil Disobedience

**Page 256**

1      Q    Am I correct there is nothing in this
2  section in terms of protocols explaining or
3  providing guidance under what circumstance, if any,
4  unlawful assembly or failure to disperse should be
5  made by police officers?
6      A    I'm sorry, you lost me, but I --
7      Q    I'll ask it again.
8      A    Please.  Thank you.
9      Q    Am I correct that, other than the
10 fact that the terms "unlawful assembly" and
11 "failing to disperse" appear in a parenthetical,
12 there is nothing in the section that we're looking
13 at, the Civil Disobedience Response Protocol, that
14 advises police officers under what circumstance
15 they can declare an unlawful assembly or issue a
16 failure to disperse declaration?
17     A    Yes.
18     Q    There is no such, nothing else;
19 correct?
20     A    There is nothing there that
21 references that.
22     Q    Am I correct there is nothing in this
23 section under Civil Disobedience Response Protocols
24 that in any way mentions the -- under what
25 circumstance, if any, it's appropriate to use

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 257

1    chemical agents, whether it's handheld pepper spray
2    or other chemical agents?
3        A    No, I don't believe so.
4        Q    Okay.  And then finally, there was a
5    reference at the very beginning of the questioning
6    from counsel about the term "foggers"; do you
7    recall?
8        A    Yes.
9        Q    And you said that there is a name for
10   it also as streamers?
11       A    Some officers refer to it as
12   streamers.  I think there is a lot of confusion on
13   the -- on the topic itself because people tend to
14   use different nomenclature for similar items.
15       Q    Okay.  And that's what I'm trying to
16   focus on.  There is only one actual object, whether
17   it's called a fogger or a streamer, there's not
18   different types, it's one device --
19       A    Right.
20       Q    -- that deploys pepper mace at a very
21   high rate and over a larger area; correct?
22       A    Yes.
23       Q    Okay.  Because the questioning made
24   me at least confusingly understand that you were
25   suggesting there is different types, and that's

Page 258

1    incorrect?
2        A    No, it's one particular.  There's the
3    handheld canister and the high output, which is
4    called by multiple different names.
5        Q    Regardless of what name it's called,
6    is it fair to say that the high output fogger, by
7    its nature, disperses a greater amount and over a
8    larger area of pepper spray than the handheld
9    device?
10       A    I think it launches pepper spray at a
11   greater distance.
12       Q    But also not only at a greater
13   distance but over a wider range?
14       A    It could spread, I would assume.
15       Q    It's not necessarily -- you're not
16   telling me it's designed to only fire a very narrow
17   stream that goes a longer distance; it also has the
18   capability and it does in fact spray over a wider
19   range than a handheld device?
20       A    I don't have an answer as far as like
21   I feel like you're asking a very technical question
22   about the stream.  It goes out.  It goes out at a
23   distance.  As it's going out, it could disperse and
24   -- but as far as that goes, that's the best answer
25   I can give you.

Page 259

1        Q    Okay.  And do you recall very early
2    on today we looked at, for example, what we marked
3    at Exhibits 8 and 9 of your deposition.  In
4    particular Exhibit 8, do you recall you testified
5    that there is a significant area that -- it's in
6    the light blue color -- that is indicative of a
7    very large spray range, based on the use of a
8    fogger is what it appears to be?
9        A    Potentially based on the fact that
10   that's assuming that this is in fact that that
11   cloud is an OC mace dimension.
12       Q    Can you think of anything else that
13   was used by the police in connection with the
14   kettle that would generate that kind of a spray
15   mist over a group of people?
16       A    No, I cannot, other than inert smoke
17   perhaps, but I don't believe that that would be
18   applicable.
19       Q    You would not use inert smoke -- gas
20   with a group of people surrounding you?
21       A    No, generally not.
22       MR. PRAISS:  I have no further
23   questions.
24       MR. DIERKER:  I think for the record,
25   we already made it clear that there were some loose

Page 260

1    ends that we need to tie up and produce some
2    additional documents, and because there was some
3    duplication in topics between this case and the
4    Molina case, we are anticipating a further 30(b)(6)
5    deposition involving the Molina case primarily, but
6    I just want to put on the record that we are
7    agreeing that the additional materials that are
8    provided in connection with this case can be the
9    topic of further deposition at the time of the
10   Molina 30(b)(6).
11       MR. PRAISS:  Since you're putting
12   this on the record, I'll ask one point question.  I
13   mean, I am here and clearly I would love to wrap up
14   this issue about the training.  And my
15   understanding, Andrew, from what you said, is that
16   you followed up and determined that there is in
17   fact additional training materials, a PowerPoint.
18       And my question is, I'm happy to wait
19   a few minutes.  If you have access to it right now,
20   I would ask let's print it out and let me ask the
21   witness some questions rather than waiting a month.
22   It makes no sense.  I'm here, Jessie's here, and I
23   think that document is -- it's a single document.
24   It's very different than everything else that was
25   encompassed in your statement.

65 (Pages 257 to 260)

Pls.' Ex. 26

**ERIC LARSON  4/8/2019**

---

**Page 261**

1          So if you have it right now, let's

2     print it out, no different than all the ones you've

3     printed out so far today.  I can wait a few

4     minutes.

5          MR. WHEATON:  That was my hope and I

6     requested that it be sent as soon as possible.

7     Unfortunately, I don't have these additional

8     materials yet.  I don't anticipate having them

9     within the next few minutes.  I do anticipate

10    having them within the next few days.

11         MR. PRAISS:  I'm sorry to hear that.

12    With that in mind, I have no further questions.

13         THE REPORTER:  Signature?

14         MR. DIERKER:  We'll read and sign.

15         (Wherein, the taking of the instant

16    deposition ceased at 5:24 p.m.)

17         (Deposition to be read and signed by

18    the witness.)

19

20

21

22

23

24

25

---

**Page 262**

1              CERTIFICATE OF REPORTER

2

3          I, TARA SCHWAKE, a Registered

4     Professional Reporter and Notary Public within and

5     for the State of Missouri, do hereby certify that

6     the witness whose testimony appears in the

7     foregoing deposition was duly sworn by me; that the

8     testimony of said witness was taken by me to the

9     best of my ability and thereafter reduced to

10    typewriting under my direction; that I am neither

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this deposition was

13    taken, and further that I am not a relative or

14    employee of any attorney or counsel employed by the

15    parties thereto, nor financially or otherwise

16    interested in the outcome of the action.

17

18

19    _____

20    Notary Public in and for

21    The State of Missouri

22

23

24

25

---

**Page 263**

1              ALARIS LITIGATION SERVICES

2

3     April 12, 2019

4

5     Mr. Robert Dierker

      OFFICE OF THE CITY COUNSELOR

      1200 Market Street, Room 314

6     St. Louis, Missouri  63103

7     IN RE: MALEEHA AHMAD, et al. v. CITY OF ST. LOUIS,

      MISSOURI

8

9     Dear Mr. Dierker:

      Please find enclosed your copies of the deposition of

10    ERIC LARSON taken on April 8, 2019 in the

      above-referenced case. Also enclosed is the original

11    signature page and errata sheets.

12    Please have the witness read your copy of the

      transcript, indicate any changes and/or corrections

13    desired on the errata sheets, and sign the signature

14    page before a notary public.

15

16    Please return the errata sheets and notarized

17    signature page within 30 days to our office at 711 N

18    11th Street, St. Louis, MO 63101 for filing.

19

20    Sincerely,

21

22

23    TARA SCHWAKE

24

25    Enclosures

---

**Page 264**

1                  ERRATA SHEET

      Witness Name: ERIC LARSON

2     Case Name: MALEEHA AHMAD, et al. v. CITY OF ST. LOUIS,

      MISSOURI

3     Date Taken: APRIL 8, 2019

4

5     Page #_____  Line #_____

6     Should read: _____

7     Reason for change: _____

8

9     Page #_____  Line #_____

10    Should read: _____

11    Reason for change: _____

12

13    Page #_____  Line #_____

14    Should read: _____

15    Reason for change: _____

16

17    Page #_____  Line #_____

18    Should read: _____

19    Reason for change: _____

20

21    Page #_____  Line #_____

22    Should read: _____

23    Reason for change: _____

24

25    Witness Signature: _____

---

**ALARIS LITIGATION SERVICES**
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

Page 265

```
 1    STATE OF _____)
 2
 3    COUNTY OF _____)
 4
 5    I, ERIC LARSON, do hereby certify:
 6         That I have read the foregoing deposition;
 7         That I have made such changes in form
 8    and/or substance to the within deposition as might
 9    be necessary to render the same true and correct;
10         That having made such changes thereon, I
11    hereby subscribe my name to the deposition.
12         I declare under penalty of perjury that the
13    foregoing is true and correct.
14         Executed this _____ day of _____,
15    20____, at _____.
16
17
18
19         _____
20              ERIC LARSON
21
22         _____
23              NOTARY PUBLIC
24    My Commission Expires:
25
```

**ALARIS LITIGATION SERVICES**

www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

Pls.' Ex. 26

ERIC LARSON  4/8/2019

| A | | | | |
|---|---|---|---|---|
| **a.m** 7:13 | 96:12 172:4 | 77:2 81:14,15 | **adequate** | 109:16,21 |
| **abbreviated** | 193:14 200:21 | 81:20,24 | 166:17,20,23 | 110:19 111:4,6,8 |
| 105:21 | **accurately** | 82:19 84:10,15 | 167:2 | 111:12 112:9 |
| **abbreviation** | 88:25 | 84:18 85:9 | **adequately** | 116:18 120:6,8 |
| 22:6 106:8 | **acknowledged** | **active/passive** | 26:21 253:25 | 121:16 123:4 |
| 124:23 151:19 | 183:10 | 74:8 | **adhere** 179:20 | 128:9 132:20 |
| 240:9,20 | **acknowledgm...** | **actively** 72:20 | **adjudicated** | 133:22 134:23 |
| 243:3 245:2 | 105:16,17,20 | 72:23 73:7 | 51:2 | 134:24 135:17 |
| **Abby** 5:19 | **ACLU** 5:4 7:19 | 74:24 75:24 | **adopted** 116:13 | 136:18 138:4 |
| **abilities** 30:11 | 90:24 | 77:8 81:6 | **adopting** 109:8 | 139:6 140:1 |
| **ability** 9:4 30:19 | **act** 60:14,24 | 82:15 | 152:13 | 141:9 142:6,15 |
| 40:17 41:17 | 81:24 176:25 | **activities** 28:9 | **advantageous** | 142:25 143:12 |
| 252:10 262:9 | 177:3,7,11,19,21 | 28:25 73:17 | 31:9 | 144:3,10 |
| **able** 47:13 52:5 | 177:22 178:10 | **activity** 16:7 17:3 | **advisable** 31:6 | 146:15 147:11 |
| 219:14 254:9 | 180:4,21 181:6 | 27:18 28:1 | **advise** 85:9 | 147:24 148:11 |
| **above-refere...** | 181:15 182:13 | 46:25 94:18 | 96:2 | 149:8,13,19,24 |
| 263:10 | 185:20 195:18 | 94:24 95:19 | **advises** 256:14 | 150:5,23,24 |
| **absent** 96:15 | 220:25 | 95:23 99:25 | **advising** 76:18 | 151:1 184:15 |
| 99:21 100:8 | 221:23 | 100:11 101:22 | **advisor** 155:25 | 185:9 186:13 |
| **absolutely** 71:17 | **acted** 60:22 | 103:14 104:24 | **afternoon** 4:15 | 186:15,21,23 |
| 100:17 | 182:15 185:20 | 105:8 184:21 | 131:7 139:15 | 187:4,8,11 |
| **absorb** 104:19 | **acting** 11:21 | 185:10,16 | 160:20 | 223:2 255:6 |
| **abundantly** | 76:17 93:19 | 186:2 191:18 | **afterward** | 257:1,2 |
| 120:1 | 122:10 124:2 | 192:17 | 249:13 | **ago** 8:11 18:4 |
| **abuse** 199:5 | 124:25 125:7 | **acts** 171:19 | **age** 7:9 | 21:15 49:2 |
| **academy** 81:13 | 125:18 126:21 | 172:14,16 | **agencies** | 53:19 57:4 |
| 139:5 144:16 | 127:5,9 183:14 | 173:24 174:6,9 | 245:21 | **agree** 22:4,12 |
| 144:17,25 | 186:17 | 175:1,25 191:2 | **agency** 54:16 | 22:16,23 57:8 |
| 145:14 146:24 | **action** 3:8 78:14 | 193:9,14 | 152:23 250:15 | 71:11 78:24 |
| 146:24 148:13 | 78:15 80:3,4,6 | **actual** 29:13 | **agent** 90:7 111:7 | 96:19,24 97:7 |
| 148:17 | 80:15 96:5 | 78:12 106:7 | 112:5 121:17 | 98:3 99:21 |
| **accept** 126:7 | 144:10 153:14 | 141:6 168:9 | 134:17 138:13 | 100:8 113:11,15 |
| 128:20 | 159:17 160:16 | 170:10 219:6 | 148:14 | 119:23 123:2 |
| **acceptable** 9:1 | 162:5,6,19,21 | 225:24 | **agents** 22:20 | 123:24 124:13 |
| 9:2 22:13 | 162:22 163:13 | 257:16 | 29:4,9,13 67:1 | 126:14 127:17 |
| 60:9 | 163:20,21 | **add** 79:16 117:18 | 67:10,23 76:8 | 130:13,19 171:1 |
| **access** 42:2 | 164:11,14,25 | **added** 242:15 | 84:24 85:2 | 172:13,19,25 |
| 45:13 157:7 | 165:1,10,11,18 | **additional** 10:24 | 89:7,12,21 | 178:4,5 |
| 251:25 260:19 | 165:24 | 260:2,7,17 | 91:8,12 94:11 | 189:24 194:16 |
| **accessed** | 226:25 227:4 | 261:7 | 94:16,23 96:3 | 199:16 |
| 252:3 | 227:7 231:2 | **address** 248:22 | 96:9,14 97:11 | **Agreed** 7:1 |
| **accreditation** | 236:9,15,21 | 250:2 | 97:16,19 98:8 | 198:19 |
| 146:5 149:21 | 237:13 238:1 | **addresses** | 98:17,23 99:9 | **agreeing** 172:15 |
| **accurate** 9:5 | 262:12,16 | 166:13 | 99:13 100:2 | 173:25 260:7 |
| 40:15 73:2 | **actions** 61:15 | **addressing** | 101:20 103:7 | **agreement** 2:21 |
| | 113:19,22 | 162:5 | 103:12,19,22 | 92:1,6,11,14,16 |
| | **active** 74:10,23 | **adduced** 10:10 | 105:1 108:24 | 92:22,24 |

ERIC LARSON  4/8/2019

93:9 94:3,7,16
97:12,20 98:9
98:14,20 99:7
99:14,21 100:8
102:24 103:5
103:18,23
104:3 109:1,6
109:11 111:2,13
111:22 112:9,14
116:7,10 128:8
136:19 171:6
173:5,6,7
174:15 175:12
175:15,20
177:25 181:23
182:13 183:22
185:9 198:23
198:24
**Agrees** 188:8
**ahead** 174:3
180:13
**Ahmad** 1:5 4:5
7:20 10:3,5
18:12 24:10
263:7 264:2
**aid** 246:8
**aide** 245:16
**air** 152:10
**akin** 234:18
**al** 1:5 4:5 92:5
263:7 264:2
**Alaris** 6:3 263:1
**allow** 42:2
122:6 192:1
249:12
**allowed** 17:1
71:21 74:18
**allowing** 76:15
**allows** 75:3
77:25
**alluded** 250:15
**Alpha** 33:13
**Altogether** 14:11
**amazing** 12:11
**amend** 157:1
158:12
**amended** 2:13

20:24 23:20
66:5,17 143:5
**Amendment**
30:4 32:15
34:21 197:21
199:20 249:9
**amount** 37:20
81:19 258:7
**and/or** 138:2
197:7 238:16
263:12 265:8
**Andrew** 5:20
251:7 260:15
**announcement**
65:13
**announceme...**
186:4 249:7
**answer** 17:22
18:5 48:13
65:6 72:15
75:13 76:22
78:5 79:18
97:17 99:4
107:25 108:1,5
120:15 121:7
126:7 145:19
175:7 185:25
186:25 192:1
197:4,25
209:22
213:22 217:2
254:13
258:20,24
**answered** 17:13
58:22 161:24
201:22
**answering**
27:16 192:12
**answers** 8:21
9:5 54:2,4
104:1 150:10
250:7
**anti-crime** 14:7
**anticipate** 8:18
183:12 261:8,9
**anticipating**
260:4

**anticipation**
88:12
**anybody** 24:23
71:18 87:8
91:2 93:19
125:18 126:21
132:3 162:8
174:16 176:8
182:15 188:22
227:22
252:23
**anyways** 57:7
**apart** 64:12
211:13
**apologize** 41:8
43:1 58:21
91:4 143:18
169:14 175:6
179:1 190:16
198:2 199:6,8
242:2
**apparently** 24:8
51:14,23
165:21
**appear** 175:21
211:23 242:4
244:15
255:23 256:11
**APPEARANC...**
5:1
**appears** 118:12
119:5 129:21
130:1,7 174:7
231:20
234:24
241:20 242:9
244:8 259:8
262:6
**applicable** 161:8
211:5 229:15
229:25
240:21 259:18
**application**
78:8,10 122:15
197:18
**applied** 77:19
95:4 116:12

168:22
**applies** 104:4,13
115:1 136:17,23
210:5 235:13
**apply** 22:8,17
22:24,25
124:9 184:18
184:19
**appreciate** 10:11
17:22 28:12
99:5 162:1
175:7 238:11
247:5
**approach** 103:4
152:9,16
180:16 183:11
**appropriate**
97:8 135:19
135:22 149:8
149:9,24
150:22 152:15
158:11 192:4
195:10 249:12
249:14 255:19
256:25
**appropriately**
77:7 90:23
249:11
**approval** 216:12
**approved** 50:3
**approximately**
11:12,18 12:3
68:22 159:22
**April** 1:19 4:14
12:7 13:15,18
263:3,10
264:3
**area** 15:18 46:21
96:25 100:5
105:3 119:15
119:21 120:24
121:22 123:15
129:23 130:17
131:24 132:12
132:13 135:23
208:22 211:1,8
211:16 212:7

213:13 214:14
249:13 257:21
258:8 259:5
**areas** 15:16
41:15 169:8
**argumentative**
72:15 75:12
79:8 185:23
193:21 196:14
213:21 217:1
**arm** 78:18
**arms** 74:22
82:17
**arrest** 32:24
50:12,15,24
69:21 70:4,5
70:13,16,18
71:5,13 72:9
79:2 80:19,20
82:1 83:3
85:11 113:21
119:5 125:3
127:3 133:11
135:3,4 136:1
137:7 152:1,21
184:1 194:25
195:16 196:23
200:14
249:22 255:1
**arrested** 32:17
32:17 50:23
186:6,8,12
191:2,4
**arresting** 32:16
195:21
**arrests** 113:8
120:17 125:7
126:4 127:1,18
135:8 225:21
228:18 229:5
230:8 231:20
249:15 250:2
**arson** 12:24
**articulable**
185:18 194:7
194:10,13
208:16 215:4

ERIC LARSON  4/8/2019

| | | | | B |
|---|---|---|---|---|
| ascertain | 198:7,13,18 | assume 8:25 | 28:17 | **B** 101:24 102:2 |
| 200:20 | 199:17,23 | 21:5 34:14 | **August** 12:3 | 108:17 |
| **asked** 55:9 | 200:9,15,16 | 41:11 44:19,25 | 86:10 140:5 | **back** 28:14 |
| 58:21 79:25 | 200:20 201:8 | 45:5 50:15 | 202:14 222:21 | 30:10 37:5 |
| 104:2 206:25 | 201:15 202:5 | 118:7 134:14 | **auspices** | 52:13 54:22 |
| 243:19 254:14 | 202:21 | 146:19,22 | 245:17 | 55:13 56:2 |
| **asking** 8:15 | 204:20 | 147:13 162:10 | **author** 224:19 | 57:13 70:19 |
| 54:6,7 76:2 | 207:13 208:13 | 227:2 258:14 | **authority** 93:22 | 76:10 82:23 |
| 79:2 88:22 | 208:18 211:9 | **assumed** 33:7 | 94:4 197:8,14 | 100:19 125:12 |
| 140:9 173:12 | 212:9 213:4 | 42:4 | 202:8 204:10 | 131:6 147:19 |
| 173:13 177:14 | 215:1,5,11 | **assumes** 120:13 | 215:1,6,9 | 156:7 158:16 |
| 179:2 184:24 | 216:18 217:23 | 213:20 | 217:5 | 167:18 169:11 |
| 191:5,24 | 217:24 218:3 | **assuming** | **auto** 14:8 | 170:15 185:7 |
| 230:2 238:18 | 218:8,10,23 | 119:24 193:13 | **auxiliary** 37:10 | 192:14 203:4 |
| 238:20 244:5 | 223:3 239:7 | 193:23 238:2 | **available** 42:19 | 212:11 213:9 |
| 245:14 258:21 | 241:1,13,22,25 | 259:10 | 95:15 111:9 | 213:15 214:3 |
| **asks** 71:14 | 242:6,14 | **assumption** | 122:18,20 | 218:2 231:3,8 |
| 143:10 163:23 | 243:2,13 | 54:23 148:5 | 131:24 222:13 | 243:21 |
| **aspect** 32:20 | 246:14 | 253:18 | 230:13 | 244:24 |
| **aspects** 28:8 | 255:22 256:4 | **assure** 10:17 | **aviation** 14:5 | 253:13,25 |
| 152:20 | 256:10,15 | 131:12 | **avoid** 78:23 | **background** |
| **assemble** | **assert** 79:14,15 | **attach** 106:7 | 152:25 | 9:22 11:4 |
| 170:22 176:22 | **assessment** | **attached** 3:5,21 | **aware** 8:9 9:16 | **backside** 62:18 |
| 180:3,17 | 215:3 | 3:25 101:24 | 19:23 20:13 | **backwards** |
| **assembled** | **assigned** 25:14 | 155:15 223:22 | 27:3 28:15 | 254:19 |
| 171:21 175:5 | 25:18 27:23 | **attachment** | 30:7 31:16 | **balls** 234:16 |
| 185:17 188:14 | 33:16,20 61:13 | 18:11 156:3 | 44:2 46:18 | **barricaded** |
| **assembles** | 61:25 166:23 | **attempt** 28:22 | 49:3 53:10 | 246:19,20 |
| 188:5 | 224:9 | 29:3 74:24 | 57:23 64:16 | **based** 64:25 |
| **assemblies** | **assignment** | 79:2 | 84:12 87:11 | 98:9 104:8 |
| 255:7 | 14:2 25:13 | **attempting** | 114:8,14,16,20 | 120:22 130:1 |
| **assembly** 3:14 | 62:4 65:5 | 120:19 | 116:20,22 | 135:3,25 |
| 169:6,9 170:21 | **assist** 25:18 | **attempts** 183:4 | 122:22 124:24 | 164:17 179:8 |
| 171:20 172:24 | 44:22 68:20 | 214:18,23 | 127:8 139:24 | 193:22 194:6 |
| 173:16,22 | 224:10 | **attention** 44:21 | 141:6 142:3 | 197:16 198:5 |
| 174:5,10,20 | **assistant** 16:18 | 61:3 86:1 | 143:17,25 | 198:20 200:11 |
| 175:2,10 176:1 | 16:23 19:2 | 248:16,17 | 144:8 156:9 | 206:1 208:16 |
| 178:8,15,16,18 | 87:19 | **attorney** 7:19 | 157:13,13 | 213:4 215:3 |
| 180:2 181:4,13 | **assisting** 251:3 | 75:15,17,23,24 | 164:22 167:17 | 226:4 243:17 |
| 182:2,18 184:2 | **associate** | 179:24 207:18 | 172:10 174:9 | 253:21 259:7 |
| 184:12 185:6 | 232:2 | 262:14 | 187:1 190:17 | 259:9 |
| 186:8,12,16 | **associated** 38:6 | **attorneys** 20:7 | 191:1 192:21 | **basically** 8:15 |
| 187:15 189:16 | 58:12 227:5 | 24:22 25:3,6 | 192:23 207:10 | 41:10 93:20 |
| 189:22 190:3 | 230:24 231:21 | 25:23 26:15 | 214:18,23 | 94:14 134:6 |
| 190:13 193:4,8 | 232:7,16 | 26:24 87:8 | 216:9 222:25 | 153:3 204:16 |
| 193:18 194:1,18 | **associates** | 110:11 224:4 | 223:7 237:4 | |
| 197:9,14,16,24 | 230:21 | **audio** 27:13 | | |

210:9
basis 74:4 77:17
  77:18 193:16
  193:17 201:2
  229:6
basket 37:24
Bates 62:18
  63:10 83:14
  83:20 84:2
  248:17 254:21
  255:11
Baumgartner
  2:23 101:9
  131:16
Baumgartner's
  101:18 102:3
  105:13 108:14
  108:17 109:24
Bear 30:16,17,19
  30:23,25 31:4
began 11:16
beginning
  147:25 241:11
  257:5
begins 83:13
  208:12 218:2
behalf 1:18 9:14
  93:19 157:20
  157:21
behavior 183:7
  183:8
belaboring
  190:16
belief 253:23
believe 12:3
  16:4,23,25
  18:13 19:9
  21:21 28:9,22
  28:24 29:3,8
  30:12 31:20
  32:7 33:22,23
  34:3 36:15,20
  37:10 40:1,5,11
  41:23 42:3,11
  42:20 43:4,19
  44:11 45:16
  47:19,23,23

48:1,14 52:2
  52:16,24 53:9
  56:25 57:17
  60:25 64:3
  67:9,13,16
  68:4 73:3
  81:12 85:17
  86:18 87:20
  87:24 88:5,5
  88:14 91:23
  92:12,12,18
  93:11,13,13
  99:10 102:21
  107:7 110:5
  111:17 112:22
  126:18 133:5
  136:7 138:19
  139:21 140:23
  141:21 146:4
  150:7,25 151:2
  152:11 155:1
  156:5,17 158:5
  159:20,24
  160:10 161:17
  168:6 170:8,11
  172:4,6 185:2
  186:9 196:9
  198:9 200:23
  202:11,23
  205:6,10
  211:20 217:13
  218:24 219:4
  222:11 224:21
  225:2,4,6,10
  225:15 230:16
  233:14 239:13
  242:11 244:23
  245:14 246:13
  251:17,20
  255:10 257:3
  259:17
believes
  202:20
benefit 81:3,4
  144:6 145:3
  239:5
best 17:20 21:13

23:14 29:11
  30:21 32:4
  46:11 47:1,2
  52:7 53:7
  60:6 81:4
  122:18 141:13
  152:6 153:12
  153:13 165:8,9
  194:21 195:13
  195:20 196:6
  196:17,23
  201:6 238:12
  258:24 262:9
better 79:21
  121:10 128:16
  151:8 153:11
  167:9,14,23
  199:15
beyond 43:15
  56:16,16
Bicycle 28:10
  29:20
big 37:24 65:17
  215:23
bit 9:22 11:8
  12:20 16:12
  37:17 68:10
  73:21 118:19
  124:18 137:11
  142:19 171:20
  192:6 213:11
biyearly 201:2
blank 208:4
blended 116:19
block 51:18,18
  164:4
blocks 211:9
blue 118:9
  259:6
blurry 137:11
bodily 99:22
  100:9 124:11
  125:2,19
bomb 12:24
bother 91:2
bottom 93:17
  99:11 118:9

232:8,14
  255:24
break 57:9
  73:20 100:16
  100:20,22
  117:14 128:23
  131:3,7,8
  145:22 160:22
  174:16 198:2
  202:25 211:13
  215:24 252:15
Brent 252:19
brief 106:2
briefing 61:11
briefly 11:3 151:5
bring 44:21
  70:24 245:23
broad 15:14,15
broadly 15:10
brought 85:25
buck 121:9
built 204:16
bulk 17:3
  150:25
bullet 194:24
  221:15
bunch 119:3
  128:4 247:11
burned 59:2
button 107:20
bystanders
  184:11

_____

**C**

C 109:23 131:19
C-A-L-E-A 164:9
call 45:1 64:7
  66:12 161:15
  162:7 166:16
  166:19 230:22
  231:23 232:21
  233:2,15
  248:15,17
  252:18
called 42:20
  257:17 258:4
  258:5

calling 20:4
  79:9 125:13
  173:10 178:21
  185:23
calls 44:5 75:12
  120:14 190:6
camera 30:22
  36:2 41:25
  42:6,17 43:5,9
  43:11,23 44:14
  44:16,20
  45:18,22
  47:12 48:1
  49:21 51:13,19
  51:23,25
  52:12,17,21
  53:6,10,15,18
  54:11,21,23
  55:12,17 56:15
  56:19 57:5,21
  57:24 58:6,17
  118:7 250:7,12
  250:13,16
  251:25 252:2
  252:4,7 253:1
  253:13,19
  254:7,12
cameras 27:25
  27:25 28:4,7
  28:11 29:21,25
  41:13,20 42:3
  42:4,8,9,14,22
  42:22 43:20
  45:14 51:18
  54:17 57:19
  61:14 252:8
canister 234:18
  235:5,6
  258:3
canisters 132:10
capabilities
  30:15 31:1
capability 30:8
  31:3,13 39:23
  41:11 43:14,15
  45:16 258:18
capacity 221:12

Pls.' Ex. 26

capital 132:22
capitalized
164:8
captain 12:1,23
14:4
captains 87:20
capture 28:5
37:21
captured 46:24
captures 119:1
202:16
capturing 41:10
car 48:1 49:21
57:19,21,23
58:6,10,17
cards 36:2
career 12:12
68:11
carefully 118:8
191:15
Carl 3:5 155:5
155:13,24
cars 57:21,22
case 1:7 2:22
4:7 7:20,22
10:8,10 18:14
20:18,25 24:11
24:12 38:14,21
38:25 39:8
45:24 55:15
64:11 133:15
153:6 165:20
196:17 228:21
244:19 246:5
260:3,4,5,8
263:10 264:2
case-by-case
229:6
cases 10:3 24:9
36:1 89:10,15
144:22 226:3
catch 158:17
254:21
caught 124:3
126:16
cause 197:16,19

198:9 200:12
204:18,19
causing 80:9
CCR 6:2
CD 33:13,13
CDT 32:7 33:2
33:3,10,23
34:13,16 40:11
40:14 59:24
61:9,21 139:5
139:6 141:4
144:15,16,19
145:11,13
146:23 148:22
148:24 150:7
150:16 225:7
cease 210:21
211:16,18,21
ceased 261:16
center 28:3
29:19 35:21
36:21,24 41:2
41:6,16,17,22
43:21,22 45:8
45:11,20 46:9
46:19 47:8
48:2 49:7
50:8 53:22
54:15 58:6
69:13 225:5
252:21
central 132:14
certain 28:7
30:11,19 34:25
93:22 106:12
132:23 152:20
159:12 173:24
214:14
certainly 31:14
85:22
certainty 162:3
CERTIFICATE
262:1
Certified 4:19
4:20,20 7:4
certify 262:5
265:5

chair 82:18
challenge
192:22,24
challenging
240:8
chance 104:19
155:18,20
169:2 206:21
change 153:4
161:18 181:20
264:7,11,15,19
264:23
changed 217:5
changes 15:22
15:23 16:4
17:8,11 44:1
64:6,14 65:16
66:8,16 153:17
156:9,15 158:8
263:12 265:7
265:10
Chapter 3:9
characterize
15:11
characterized
216:16
charge 13:13
14:3,16 37:4,11
37:18 135:5
194:25 195:16
199:17 201:4
charged 125:8
174:20 175:10
181:3 182:1,17
182:23 185:6
188:23 198:24
charges 229:5
charging 190:9
193:16
Charles 3:21
25:9,21 26:4
26:8,25
223:21 224:2
Charlie 227:2
chart 234:11,14
235:12,24
236:14

check 115:23
checking 228:1
chemical 22:20
29:4,9,13 31:5
67:1,10,23
76:8 84:24
85:2 89:7,11
89:21 90:7
91:8,12,16,18
91:21 94:11,16
94:22 96:2,6
96:9,14 97:11
97:15,16,19,24
98:4,8,17,22
99:9,13 100:2
101:20 103:7
103:12,19,22
105:1 108:24
109:16,21
110:19 111:4,6,7
111:8,12 112:5,8
116:18 120:6,8
121:16,17 123:4
128:9 132:19
133:21 134:16
134:22 135:17
136:18 138:4
138:13 139:6
140:1 141:9
142:6,15,25
143:12 144:3
144:10,20
146:15 147:10
147:24 148:11
148:13,19
149:7,13,19,24
150:5,23,23
151:1 184:14
185:9 186:13
186:15,21,23
187:3,7,11
204:5,21
209:15 218:25
221:5,25
223:2 234:9
234:15 235:7
235:9,11,19

236:1,6
238:17 239:9
243:25 244:7
244:14,18
245:1,4 255:6
257:1,2 259:11
chief 2:18 15:19
16:14,18,20,23
17:14 19:2
87:19,19
chief's 159:20
choice 127:16
choose 111:3
Christine 87:25
chronological
11:5
chronologically
231:25
circumstance
72:6 73:2
95:4 103:6
138:12 141:8
142:14 143:12
144:2 150:4
152:15 175:11
179:8 185:2
217:20 249:2
256:3,14,25
circumstances
51:5 55:16
57:1 71:20
73:19 85:10
94:11 99:21
100:8 113:9,12
113:13 115:2
122:16 126:3
138:3,18 140:1
142:5 173:23
182:25 217:9
218:16 248:10
248:21
252:25
citizen 32:14
179:7
city 1:8 2:16,16
2:17,19 4:8,16
4:17 5:14 7:21

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 9:14 15:3 21:1 | 202:20 205:3 | 248:19,25 | coincidentally | 15:20 16:17 |
| 22:5,6,7 | 209:11 213:15 | 249:21,21,24 | 252:10 | 73:24 86:19 |
| 23:24 27:7,11 | 214:3,10 215:8 | 254:25 255:1 | colleague | 87:13,16,18 |
| 28:4,15,22 | 215:21 216:15 | 255:12,16 | 246:25 | 88:3 159:16 |
| 29:3,8,15 | 224:9,25 | 256:13,23 | collect 40:17,19 | 161:19 189:20 |
| 30:14 31:7 | 226:10 229:8 | clarification | 59:25 | 197:22 246:21 |
| 39:23 41:3,11 | 237:9,16 | 32:5 33:5 | collected 40:21 | commander |
| 41:12,15,20 | 240:25 242:6 | 83:23 235:18 | 59:19 | 12:9 13:14,17 |
| 42:5,9,10,12 | 243:1,12 | clarified 246:24 | collecting | 13:20 14:3 |
| 43:10,10,19,24 | 245:16 246:9 | clarify 247:15 | 59:22 65:14 | 37:10 69:12 |
| 43:25 44:5,15 | 248:17 249:19 | clarifying 137:21 | collection 33:14 | 132:21 133:3,5 |
| 44:22 45:7,14 | 250:14 | classes 144:16 | 40:14 51:15 | 148:22,22 |
| 45:18 46:20 | 252:24 | classified 39:7 | collectively | 149:4 152:7 |
| 47:15 48:8,16 | 253:18 254:21 | classroom | 97:15 | 167:12 191:13 |
| 49:17 50:7,19 | 255:11,24 | 140:7 | colonel 14:4 | 194:2 197:23 |
| 50:19 51:6 | 263:5,7 264:2 | clause 180:1 | 16:17 | 215:15,18 |
| 52:5,21,22 | City's 31:2 41:23 | clear 8:20 20:5 | colonels 87:19 | 216:5,7,7,12 |
| 53:15 54:11,16 | 61:3 73:1 76:7 | 22:25 33:4 | color 259:6 | 249:14,15 |
| 55:7,18,19 | 76:14 88:25 | 56:5 58:23 | column 227:8 | commander/d... |
| 57:6,19 58:3 | 96:1 110:11,22 | 95:7,25 96:13 | 227:15 230:14 | 12:9 |
| 62:18 72:5 | 110:25 112:13 | 100:1 104:25 | 231:11 232:15 | commanders |
| 75:2 76:6 | 112:19 121:8 | 120:1 147:19 | 233:4 234:5 | 92:13 135:12 |
| 77:22,24 | 142:13 157:6 | 155:4 157:5 | 236:19 239:8 | 160:6,6 164:9 |
| 83:14,17 84:2 | 158:19 161:7 | 158:1 179:22 | 241:15,17 | 164:15,23 |
| 85:7 86:9 | 166:3 171:13 | 208:24 210:5 | 242:15 244:6 | 165:5,12,16,18 |
| 88:17 94:1,6 | 174:12 175:9 | 242:2 259:25 | 244:14 | 166:6 208:10 |
| 94:18 109:9,14 | 177:17 178:3,16 | clearest 88:21 | columns 225:16 | 236:17 237:12 |
| 109:19 111:3 | 179:8,25 | clearly 34:19 | 227:16 233:21 | 237:25 |
| 116:4,13,17 | 180:5 181:3 | 42:7 188:19 | 234:2 239:7 | commands |
| 122:6 133:25 | 182:6,17 | 260:13 | combining | 120:9 |
| 138:1,17 | 183:18 184:3,5 | close 57:14 | 241:22 | commenced |
| 142:23 145:10 | 184:8 185:4,15 | 68:24 113:13 | come 15:20 | 7:13 |
| 151:15,23 | 186:14 187:14 | 131:10 137:22 | 34:12,13 36:2 | commented |
| 152:4,13 153:3 | 189:25 194:8 | 247:1 | 52:18 56:2 | 167:1 |
| 153:15,23,24 | 195:9 198:21 | closed 231:4 | 61:3 66:3 | comments 10:12 |
| 155:6 156:10 | 202:4,16 211:3 | cloud 259:11 | 79:12 135:13 | commercial |
| 156:21,25 | 211:11 213:4 | clue 181:24 | 152:8,22 | 14:6 |
| 157:21 158:5,11 | 216:1 217:4 | clueless 183:24 | 212:11 213:15 | commission |
| 165:25 166:4 | 218:15 240:6 | code 231:1 | 214:3 227:10 | 107:19 178:9 |
| 171:25 172:2 | 240:11 251:18 | 245:8,15,25 | 228:16,18 | 181:5,14 |
| 176:4,14 179:5 | civil 2:15 3:15,18 | cognizant 171:19 | 234:3 244:2,9 | 265:24 |
| 179:11,15 | 33:5 73:6 | 172:8,10,14,18 | 245:17 | commissioned |
| 180:22 182:10 | 144:21 145:6,7 | 173:6,24 174:6 | comes 45:22 | 11:11 105:15 |
| 184:11 191:18 | 149:1 206:10 | 174:14,19 | 66:12 213:9 | 107:6 |
| 192:17 196:6 | 220:9,21,25 | 175:24 | coming 66:13,13 | commissioners |
| 197:7,12 | 221:22 222:5 | coincidence | 151:25 183:11 | 105:24 |
| 200:3,17 | 222:24 237:6 | 213:9 | command 12:4 | commit 10:25 |

ERIC LARSON  4/8/2019

180:21 182:13
190:1 193:2
commits 170:20
  188:4
committed
  171:20 175:3
  175:25 241:25
committing
  74:23 189:10
common 169:5
  172:9 177:21
  194:11 199:24
  203:7 211:12
  215:13
communicate
  213:10
communicated
  44:17 114:22
communicating
  44:24
communication
  17:17 19:3,7,11
  19:13 45:7
  107:18 178:2
communicatio...
  20:4,7,14
  114:21 252:23
company 43:3
  43:4 251:3
compare
  102:22 111:10
compared
  96:22 225:25
compatible
  42:23
compiled 35:10
compiling
  52:25
complaint 38:6
  38:9,22,24
  39:2,3,8,13,17
  49:14 50:10
  58:12 135:7,11
  135:14 136:2
  230:23,24
complete 14:25
  36:25 68:1

105:25 164:10
  165:17
completed 35:8
  45:4,6
completely
  27:16 56:16
  160:15
complex 79:9
compliance
  70:25 75:8
  79:21,23 80:2
  80:25 96:15
  153:11 164:9
compliant 70:11
  77:4,4 84:19
  121:5 123:5,20
  126:1 128:19
  130:23
complicated
  183:20
comply 50:17
  70:13 71:16,25
  73:11 74:5,15
  76:20 77:6
  78:17,19 79:3
  79:25 80:1,19
  80:20 81:23
  82:12,15,16,17
  82:18,25 96:5
  96:8,20
  120:20,21
  186:5 195:3
  196:2,25
  204:22 211:7
  212:16
complying
  71:24 95:14
  96:18 97:5
  120:8 122:10
  165:23
components
  33:23
composed
  159:19
composition
  91:16,19,21
  98:5

compound 79:8
comprehensive
  36:16
computer 134:3
  134:4
computer-aid...
  230:18
  232:22
concern 152:23
  166:2,10,11
  222:3,7
concerned
  56:8 201:9
concerning
  138:2 139:25
  141:8 142:5,14
  142:24 144:2
  151:23 158:20
  158:23 197:8
  197:13
concert 176:25
  177:11,19,22
  177:25 180:4
  180:20
  185:20
conclusion
  75:13 79:9
  173:10 177:14
  179:14 185:24
  190:6
conclusions
  178:22
concrete 16:9
condition 241:5
conditions
  185:11 241:3
conduct 60:5
  60:12 117:9
  186:17 190:19
  191:25 233:11
  239:25 240:8
  240:10,13,21
  243:4,9,15
  245:6
conducted
  141:3 145:7
confident 10:20

confirm 19:11
  30:13 63:17
  111:14
confirmed
  250:19
conflate 113:13
confuse 160:22
confused 43:2
  88:20 89:22
  98:24 126:2
  160:19 161:24
  191:5 206:16
  208:4 229:17
confusingly
  257:24
confusion
  257:12
Congratulation
  12:11
congregating
  127:15 130:16
  198:22 210:21
  211:16,19,21
  213:3,10
conjunction
  43:21
connected
  41:16
connection
  25:19,23
  31:25 33:10
  34:1,9,16 39:6
  39:22 40:24
  55:14 60:22
  69:21 73:4
  101:10 116:25
  117:6 122:2,24
  123:10 124:21
  125:9,11,16
  132:4 136:6,12
  136:24 137:4
  153:19 157:3
  160:9 165:6
  182:11 183:14
  188:24 215:21
  220:9 232:25
  236:2 238:17

247:17 259:13
  260:8
conscious 116:5
consequences
  198:17
consider 192:6
  204:18 246:9
considered
  30:14 102:14
  107:16 112:2,3
  152:13
considers
  184:12 196:6
consistent
  108:25 109:10
  111:1 120:11
consistently
  254:7,8
constantly
  153:10
constitute
  246:10
constitutes
  81:19 187:15
constitutional
  95:1 100:13
  105:10 221:1
constitutionally
  220:20
  221:24
construed 157:9
contact 43:10
  52:18
contained
  88:24
container 138:4
  138:14 140:2
  247:25
contemplates
  96:14 166:5
contemplating
  212:23
content 154:25
contentions
  126:19
context 10:5
  90:2,14 93:14

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 103:7 121:3 | 191:23 207:10 | 166:20,21,23 | 255:21 256:1 | 142:2 247:9 |
| 122:8 123:25 | 221:11 222:25 | 166:24 167:15 | 256:9,19,22 | **course** 3:18,18 |
| 196:8,19,20 | **correct** 12:19 | 167:16 168:3 | 257:21 265:9 | 24:6 32:15 |
| 196:23 | 13:10,22 18:15 | 169:24,25 | 265:13 | 39:10 51:14 |
| **continues** | 24:14 25:17 | 170:23 171:7 | **corrected** 55:1 | 78:13,15 |
| 208:20 | 26:5 29:21,22 | 171:15,16,17,22 | 115:21 | 86:24 100:24 |
| **continuum** | 35:1,5 40:6 | 171:23 172:8,11 | **correcting** | 124:20 150:7 |
| 70:21 | 41:4 45:15 | 172:19,20,21 | 115:20 | 153:13 208:24 |
| **contractor** | 49:10 52:3 | 173:22 176:2 | **corrections** | 210:5 220:8 |
| 42:13 | 55:10,23 | 176:11,14,20 | 263:12 | **court** 1:1 4:1,20 |
| **contrary** 64:18 | 61:22 62:21 | 176:23 177:3,5 | **correctly** 13:12 | 6:1 8:16 17:25 |
| 121:4 254:10 | 63:14,16 81:1 | 185:12,14 | 16:13 37:1 48:7 | 19:4 20:17,21 |
| **contravened** | 88:9 89:16,24 | 186:8,18,22 | 49:1 52:9 | 56:1 62:15 |
| 124:4 125:23 | 90:3,4 91:8,10 | 187:15 188:6,9 | 53:13 57:18 | 83:11 86:5 |
| **contravenes** | 91:11,18 92:23 | 188:11,20 | 72:25 82:11 | 93:6 101:2,13 |
| 122:11 | 94:8,9,12,19 | 189:16,22,23 | 92:21 108:5 | 101:23 109:2 |
| **contributed** | 94:20 95:2,4 | 189:25 190:11 | 136:15 153:3 | 117:20 128:25 |
| 225:6,9 | 95:9,12 97:25 | 190:21 193:5,6 | 164:12 199:3 | 153:16 154:8 |
| **control** 248:14 | 98:5,7,13,17,18 | 193:9,10 195:8 | 201:11,17 | 154:17 156:12 |
| **conveyed** 38:7 | 98:19,23 99:5 | 195:12,23,24 | 216:15 224:3 | 162:25 170:3 |
| 107:3 | 99:9,10 100:14 | 196:3 198:4,11 | 237:8 241:9 | 203:3 206:2 |
| **convoluted** | 102:8,11,12,14 | 198:15,25 | 244:4 | 206:5 219:21 |
| 22:11 | 103:3,10,14,15 | 199:23 200:4 | **correspond** | 223:15 232:9 |
| **cooperate** 72:11 | 103:16,21 | 200:5 202:5 | 229:16 | **courts** 15:1 |
| 75:5 | 104:6,12,20 | 202:10 | **corresponded** | **cover** 10:3 |
| **coordinate** | 105:5 109:2 | 203:10 | 235:25 | 21:23 28:12 |
| 245:20 | 109:24 110:17 | 204:24 | **corresponde...** | 47:22 66:23 |
| **coordinated** | 111:22 112:17 | 206:22,23 | 10:14 | 78:18 128:3 |
| 220:20 | 115:16 116:14 | 208:1,13,18 | **corresponds** | 138:12 150:17 |
| **copies** 35:23 | 119:12 121:19 | 209:2 210:18 | 119:11 | 151:4 203:11 |
| 91:4 170:6 | 121:23,25 | 210:24 211:24 | **corrupted** 55:4 | 204:15 223:12 |
| 263:9 | 122:3 123:11,12 | 212:2,4,7,25 | 55:5 251:4 | **covered** 21:23 |
| **copy** 18:21 | 123:16,17,21 | 217:10,19,23 | **cost** 31:14 | 75:19 91:8 |
| 20:24 90:22 | 125:6,10,21 | 218:3,8 219:16 | **counsel** 7:2,2 | 99:12 112:25 |
| 93:9 105:25 | 126:17,23 | 220:16,22 | 23:12 26:18 | 113:2 114:25 |
| 187:21 232:19 | 127:1,19,24,25 | 221:1,7 224:5 | 222:18 254:14 | 114:25 131:13 |
| 263:12 | 133:18,22 | 224:15 226:9 | 257:6 262:11 | 151:2 158:17 |
| **corner** 119:7 | 134:17 136:20 | 226:16 | 262:14 | 161:23 |
| 180:18 | 140:24 142:15 | 227:20 234:9 | **Counselor** 4:17 | **covering** 98:25 |
| **corners** 183:12 | 143:3 144:24 | 235:15,20 | 5:14 263:5 | **covers** 46:19 |
| **corporate** 53:14 | 145:1 146:1 | 236:20 | **count** 241:18 | 61:19 67:9,10 |
| 53:24 64:15 | 148:6 149:25 | 237:13 239:1 | **counted** | 81:11 121:22 |
| 67:20 84:22 | 151:16,17,21 | 239:22 241:19 | 242:23 | 123:15 222:24 |
| 116:24 146:12 | 156:22 157:23 | 242:8 251:20 | **County** 245:20 | 226:10 233:19 |
| 150:20 162:3 | 161:1,6 163:14 | 252:16 | 265:3 | **create** 65:24 |
| 172:3 173:14 | 163:15,17,18 | 254:24 255:4 | **couple** 18:7 | 199:5 |
| 178:23 182:10 | 166:14,15,17,18 | 255:8,12,14,15 | 35:13 115:13 | **created** 65:11,12 |

Pls.' Ex. 26

66:11 132:22
133:21 134:3,4
135:3 145:6
168:4,7,10,10
203:23
224:21 226:3
234:4 237:2
237:18,22
creates 150:15
creating 133:8
133:11 174:9
174:25 228:3
creation 116:8
145:8
crime 11:15 13:4
28:3 29:19
30:1 35:21
36:21,24 41:2
41:16,17,21
43:21,22 45:8
45:10,20 46:9
46:19 47:8
48:2 49:7
50:8 53:22
54:15 58:5
172:24 175:16
189:10 190:1,8
193:2,17
198:25 200:13
218:9 225:5
252:20
crimes 12:24
61:2 201:3
criminal 60:13
171:2,6 173:1,7
174:17 175:13
185:16 186:17
188:9,14
criteria 135:4
226:4
critical 3:6
155:9 157:12
252:9
Critique 3:8
162:6,19,21
163:13,20,21
164:11,15

165:10,11,18,24
236:9,15,21
237:13 238:1
crossed 79:1
crossing 74:19
74:22
crowd 67:10
77:18 90:9,10
108:24 109:16
109:21 113:6
113:23 117:1
121:16 132:20
133:22 174:6
174:8,9 183:4
194:6 248:14
248:14
crowds 73:18
CRR 6:2
CS 112:1,1
CSR 6:2
cuffed 82:23
current 15:4
211:8 224:9
currently 25:10
31:8 54:24
251:3
curve 41:9
custody 35:15
35:18,24 37:2
37:5,8,12 38:7
38:8,11,12
49:16,23
58:12 60:2
74:25 76:24
77:1,5,12 81:16
81:18 137:9
183:5

_____
D
_____
D 2:1 132:17
damage 124:11
125:2,20
191:17
damn 56:5
data 36:16
45:21 50:12
51:21 251:5

253:22 254:3
database 134:8
date 47:12 52:5
59:15,19
63:24 94:3
102:8,13
106:24 144:18
146:6 205:3,7
206:19 207:2
226:15,16
230:8,9
238:15 264:3
dated 3:16,19
86:10 88:8
145:25 155:4
202:14
203:22
204:23 205:6
206:13 220:12
229:21
dates 36:10
51:22 56:16
66:4 252:3
day 4:13,16 66:3
150:15,16
179:18 265:14
day-to-day
37:12
days 39:16
45:24 50:13
79:12 213:11
261:10 263:17
de-escalate
78:25
de-escalation
79:20
deal 36:23 67:1
91:5 114:17
130:15 138:17
151:7 203:5
204:9 205:20
218:13
dealing 49:3
57:15 76:8,10
84:4,23 90:14
91:13 92:8
115:16 135:22

139:18 145:24
152:16 161:9
170:15 173:15
205:2 206:25
207:7 216:2,3
deals 49:9
84:23 158:18
169:6 176:14
187:18,19 189:1
194:20 217:8
254:25
dealt 169:12
207:12 250:3
251:16 254:20
Dear 263:8
debate 10:13
December 13:15
13:19 21:16
decide 114:10
180:20 226:7
decided 231:8
decision 116:6
194:5
declaration
2:23 3:21
101:8,15,18
102:3 105:13
108:14,17
109:24 131:16
194:1 200:14
215:11 218:11
223:21,23
256:16
declarations
215:15
declaratory
153:7
declare 175:2
193:1 194:3,5
194:17 197:8
197:14,15
198:5,13
199:22 200:9
200:19 204:19
215:1,4 216:17
243:12
245:24

256:15 265:12
declared 173:16
173:23 174:5
202:5 204:12
212:9 217:21
218:16 239:7
240:25 241:12
242:6 243:1
245:15,18
246:7
declares 198:17
218:6
declaring
197:24 199:16
202:21 212:22
Defendant 1:9
4:9 5:13 7:3
Defendant's
101:9
defendants
93:19
defensive
74:23 81:12
define 111:8
defined 22:16
239:20
defines 81:9
definitely
160:21 163:9
192:18
definition 22:7
22:11,13,16,19
22:23 85:1
97:10,18,22
98:7,16,22
99:9,13 103:18
103:21 110:19
111:3,5,11,12
112:8 116:18
121:3,22
125:24 128:1
130:15 172:9
177:21,25
178:4 193:10
194:11
definitions 22:2
111:15 239:20

delegated
  132:8
deleted 60:23
  61:6
deleting 60:4
deliberate 31:11
delineate 84:14
  235:4
delineated
  216:21
delineates
  195:22
demonstrate
  194:13
denominator
  169:5
depart 189:21
department
  2:17,20 3:12
  11:7 12:25
  13:17 14:1 15:9
  15:25 16:3,15
  16:21 17:16
  19:19,22,25
  20:15 25:1,10
  25:14,18
  29:24 37:9
  39:1 42:1
  43:17,19 44:1,3
  44:7,9 45:7
  47:25 49:19
  65:18 86:9
  87:24 88:6
  102:16 107:7,8
  118:18 140:5
  145:11 148:17
  157:10,21,22
  164:7 166:9
  168:1,17
  224:22 230:6
  250:14,18
department's
  48:5
departments
  13:2
depend 248:9
dependent

174:21
depending
  35:12 45:22
depends 41:24
  122:16
deploy 70:16
  77:9,13 109:16
  109:21 128:9
  142:15,24
  143:12 144:2
  184:14 187:3
deployed 31:24
  40:23 68:15
  68:17,20 69:3
  69:10,11 73:18
  75:1 76:19
  96:9 98:11,15
  98:21 99:8,12
  104:9,14 112:16
  132:20 133:22
  134:17,23,24
  135:17 145:18
  235:14 248:11
deploying 69:9
  137:8
deployment
  29:13 70:6
  78:12 96:6
  104:11 108:24
  113:9 121:15
  132:9 139:5
  144:20 146:14
  147:10,24
  148:10 149:12
  150:7 203:20
  204:21 209:15
  244:20
deployments
  145:17
deploys 31:5
  137:13 257:20
depo 21:8
deposed 8:6
deposition 1:17
  2:14 4:12 7:3
  7:13,20 9:12
  9:13 10:19

18:24 20:24
  21:8,11 23:8,10
  23:20 24:4,16
  24:24 25:24
  26:4 27:2
  54:18 55:11
  56:20 65:4
  66:20 76:1
  85:6 86:14,22
  92:17 93:12
  110:8 117:22
  141:15 150:2
  159:3 178:24
  191:24 203:7
  208:1 209:11
  221:17 224:5
  248:16 251:17
  259:3 260:5
  260:9 261:16
  261:17 262:7
  262:12 263:9
  265:6,8,11
depositions
  30:25
deputy 13:16,20
  14:3
describe 81:4
  210:8 227:23
  247:23
described
  28:20 72:6
  139:13,18
  149:21 198:21
describing
  106:11
description 2:11
  3:2 171:12
  255:19
design 178:1
designated 9:14
  23:24 46:15
designation
  65:4
designed 249:2
  258:16
designee
  191:24

desired 263:13
destroy 60:14
  60:19
destroyed
  46:16 57:5
destruction
  51:5 56:23
  57:2 61:1
  125:9
detached 25:10
  25:12
detail 28:13
  32:6 62:1,2
  139:23 150:2
  164:9,15 165:5
  165:12,16,18
  166:5 167:9,14
  225:20 226:8
  228:3,15
  236:16 237:11
  237:25
details 132:23
  227:15,24
  237:22
determination
  46:6 152:19
determine
  54:20 55:5
  147:8,17,22
  152:20 154:4
  154:10 208:16
  229:15 230:12
  237:17,25
  254:2
determined
  16:10 153:13
  154:1 227:1,7
  229:2,6
  251:22 260:16
determining
  80:4 152:24
device 71:14
  90:2 91:20
  96:22 97:2,7
  98:16 104:14
  104:15 112:17
  114:13 121:23

123:2,5 124:4
  124:5 127:19
  128:12 129:20
  130:14,22
  134:6 196:11
  235:14
  244:22
  247:21,22,24
  248:4,7,8
  257:18 258:19
  258:19
dictionary
  177:24
Dierker 2:7 5:18
  9:25 10:20
  11:2 20:2
  23:14 48:11
  56:6,12 57:10
  62:10 65:3
  72:13 75:11
  76:21 78:3
  79:7,11,13
  85:22 90:25
  93:3 114:2
  115:7,10,22
  117:13 120:12
  122:12 147:12
  147:18 160:14
  162:10 169:16
  173:9 174:2
  177:13,20
  178:20 179:19
  181:7 182:4
  184:4 185:22
  190:5 191:21
  192:7 193:20
  196:13 197:1
  199:8,12
  201:18 205:22
  207:21 213:19
  214:5,8,15
  216:25 242:19
  245:10 246:11
  247:8,14
  251:6,9
  259:24 261:14
  263:4,8

dierkerr@stlo...
5:21
difference 81:5
84:9,14 85:8
247:22
different 23:21
26:9,17 27:17
29:15 31:7
33:20 35:14
39:11,12,12
40:23 42:18
56:3 58:7
91:24 94:10
114:24 116:19
118:23 119:2
123:9 133:18
135:17,18
138:18 144:11
151:25 160:16
164:16,17,21
169:8 170:17
172:19 179:7
180:16 196:20
204:14 211:17
225:11 227:6
230:1 235:10
242:4 252:3
253:10 257:14
257:18,25
258:4 260:24
261:2
differently
49:12 50:1
96:23
difficult 24:5
83:2 113:12
120:23 134:14
229:12,13,14
237:16,20,24
238:4
difficulty 192:12
digital 36:4
dipersal 209:2
direct 62:25
96:7 216:8
directed 18:20
60:7 216:6

255:10
directing 130:1
direction 15:1,19
15:23 16:9
159:19 262:10
directions 119:2
130:6 151:25
211:17
directive 101:20
102:4,12,15,19
102:23 103:4
103:11,17,23
104:7,13,21
105:6,14,24
106:1,4 108:16
111:14,22
112:10,15 116:5
116:9 136:20
directly 157:9
director 11:22
11:24
disagree 57:8
discourse 34:2
discovered
57:4
discovery 10:4
10:16,24 35:19
51:17 52:25
53:18 55:15
56:17 224:10
discretion 80:4
83:4 93:22
94:4 196:24
199:3,5,22
201:5 215:20
discuss 16:6
26:22 47:25
84:18
discussed
18:24 30:22
49:16 51:17
52:17 89:18
89:23 114:19
140:3 156:3
178:18 223:4,7
225:3
discussing

15:16 141:1
181:9 214:21
217:16 228:22
discussion
205:9 222:18
discussions
26:1
disgruntlement
56:13
disk 35:17
49:23 50:25
58:11 59:2
disobedience
2:15 3:15,19
33:5 73:6
145:6,7 206:11
220:9,21,25
221:23 222:5
222:24
248:19,25
249:21,22,24
254:25 255:1
255:13,16
256:13,23
dispatch 230:18
232:22,23
233:15
dispersal 3:14
67:22 77:18
90:10,11 91:24
108:24 109:16
109:21 113:24
117:1,8 121:15
121:16 132:20
133:22 136:25
203:8,19
204:5,7,13,20
205:3,11,20
207:1,2,7,13
208:3,7,10,12
208:21 209:12
209:15 210:1
210:11,12,19,24
211:7,12,24
212:4,22
213:14,17
214:4,11 215:6

215:9,12,16,19
216:2,5,11,18
217:5,9,20
218:1,6,11,16
218:24 219:8
219:16 221:4
221:24 223:3
238:16 239:6
241:1,13,20,22
241:24 242:7
242:14 243:2
243:13 248:14
249:6 255:6
disperse 73:18
103:13 113:23
117:7 183:4
185:10 189:11
190:2,4,10
193:2,17
208:22 211:13
212:2,12
255:22 256:4
256:11,16
258:23
dispersement
17:2 67:11
113:5 249:10
disperses
258:7
dispersing
94:17 95:21
99:24 101:21
103:8 104:22
disposal 28:1
disposed 50:3
disposition
225:21 228:14
239:7 241:17
242:15
dispositions
228:17
dispute 191:19
disrespect
201:17
disseminated
92:13 140:18
dissipates

248:1
distance 258:11
258:13,17,23
distill 175:8
distinct 244:19
distinction 81:7
239:23
241:23
distinguish
98:9 104:7
distinguishes
58:4
distributed
159:21
district 1:1,2 4:1
4:2 11:12 12:2
14:2 101:23
109:1 136:1
disturbance
144:22 237:6
disturbances
149:1
division 1:3 4:3
28:6 29:20
36:4 132:15
224:9 252:20
division/Real
225:5
divisions 132:14
document 3:6
27:18 28:7,25
29:12 32:14
38:2 47:22
48:9 62:25
65:17,25,25
68:7,9 83:21
85:15 86:8,13
86:21 87:3,4,5
87:6,9 88:3,16
89:2 90:13
106:7 132:22
133:9,11,14
139:9,18,22
140:4,6,7,13
140:22,25
141:14,17,18
142:1,2 146:2

Pls.' Ex. 26

149:20 157:11
166:5 168:4
169:18 203:24
209:21 218:22
219:3 220:1,5
220:16
229:20 236:5
237:8 246:16
260:23,23
documentation
27:24 29:16
30:1 31:22,24
32:6,8,25
33:3,15,20,25
34:6,8,12 35:4
35:9 36:8,10
36:25 37:21
39:6,22 40:3
40:23 47:5
49:5 50:2,8
58:5,24 59:6
59:8,10,16,21
59:25 60:21
61:6,10,23
62:3 63:15,18
64:3,9,19,22
65:1 146:25
documented
49:20 127:11
137:9
documenting
32:19
documents
23:7,9,12,15
26:20 67:21
84:13 85:7,12
87:2 110:7
114:16 139:19
143:19,22,25
143:25 144:6
144:8,14
145:23 146:5
146:13,18,19
149:20,22
167:21 205:2
222:4 260:2
doing 32:9

43:24 69:4
74:17 145:9,12
147:4 153:3
179:2 187:5
200:2 201:11
238:22
239:15
Dotson 2:22
92:5
double 115:23
doubt 238:12
download 60:18
downloaded
35:16 46:3
49:14,22
50:25 58:10
59:1
downtown
135:23 136:2
151:12 212:20
downward
130:8,10
Draft 155:10
drafting 214:10
drawing 241:23
drawn 230:24
drive 35:17
50:25
drug 14:8
due 54:1 56:12
82:8
duly 262:7
Duncan 5:19
duplicate 10:7,9
duplicating
10:18
duplication
35:19 260:3
duties 69:6
duty 40:19
53:25 195:2
196:2
dynamic 73:16

E

E 2:1
earlier 83:23

87:1 198:21
213:5 219:25
228:22 250:8
early 12:6,17
224:1 259:1
easier 96:20
180:16
EASTERN 1:2,3
4:2,3
easy 36:12
47:10 124:22
educate 219:7
education 75:19
effect 15:5 17:9
27:21 59:4,8
71:24 72:2
96:8 101:22
102:13,16
205:21 245:8
effecting 120:16
126:4 200:14
effective 195:1
195:17,21,23
196:7,18
effectiveness
164:5 166:8
167:24
effects 80:11
128:17,18
effectuate
70:13 71:5,12
72:8 83:2
85:11 113:21
120:2 127:1,18
196:22
effort 15:3 38:1
56:7 87:7
164:5
efforts 15:9
20:14 26:25
34:13 147:8
156:21,24,25
egress 95:15
186:5 208:24
210:5
eight 4:14
either 27:25

35:24 43:8
49:4,21 55:25
69:16 100:20
136:5,11 193:3
200:14 217:22
240:25 241:5
241:5,21,24
243:24 244:7
244:25
253:25
element 76:24
95:20 175:16
189:14 190:8
201:1,8
elements 107:11
120:19 128:10
170:12,17
176:16 188:1,16
189:10,19
198:8,10 199:4
200:13,19,22
201:3,15
208:17 218:9
221:14
eliminate
216:22
eliminated
214:21
email 2:12 3:5
17:16 18:8,20
19:20 20:12
44:24 45:1
56:8,9 57:3
66:8 85:19
154:25 155:1,1
155:4,13 156:4
157:7 208:5,6
emergency
246:4
emphasize
165:17
employ 149:19
employed 11:6
224:8 262:11
262:14
employee
107:13 262:14

employees
19:18
employment
11:4
empty 77:11
encapsulated
205:11
enclosed 263:9
263:10
Enclosures
263:25
encompass
134:22
234:20
encompassed
260:25
endeavor 178:9
181:4,14
ends 83:17
260:1
enforce 93:20
179:5 197:19
enforced 218:17
enforcement
12:10 13:13,15
13:21,24,25
14:8 69:7
93:21 94:4
120:9 126:1
177:18 179:15
enforces 179:12
182:6
engage 172:16
engaged 55:19
73:17 94:18,23
95:18,22
99:25 100:11
101:21 103:13
104:23 105:7
183:7 184:12
184:20 185:10
185:16 186:16
213:4
engaging 17:2
73:6 190:19
190:25
ensconce

Pls.' Ex. 26

152:25
ensure 95:15
    132:21 167:24
    200:12 215:16
ensuring
    106:23
entail 13:24
entails 12:21
entered 19:4
    35:18 38:18
    58:11 134:7
entire 39:5
    46:20 106:3,3
    148:8 189:6
    191:25 242:23
entirety 106:20
    107:14,17
entities 42:2
    45:15
entitled 20:9
    179:17 186:14
entity 42:7
entrap 151:25
entrapped
    182:16
entries 231:10
    232:17
entry 232:5
envelope 59:3
    59:12,18
envision 113:12
equally 113:21
    231:17
equip 31:13
equipment 111:7
    112:6 121:17
equipped 31:12
    57:21
Eric 1:17 2:5 4:12
    7:8 8:1 66:13
    263:10 264:1
    265:5,20
errata 263:11,13
    263:16 264:1
error 161:25
escalating
    77:24 78:23

escalation
    70:20 71:21
especially
    197:20 215:13
essential 103:11
essentially 11:10
    12:22 13:1,25
    33:15 45:21
    59:1 112:7
    174:24
establish 185:19
    218:7
established
    98:2 112:12
    123:8,13
    125:17 126:20
    126:24 128:2
    190:12 193:3
establishing
    193:18
estimate 21:14
    24:4,17 26:13
estimated
    227:11
et 1:5 4:5 92:5
    263:7 264:2
evaluate 15:4,11
    157:1
evaluating
    154:10 158:11
    162:5
evaluation
    156:15 158:6
evening 135:16
    152:8 184:1
    186:11 190:18
    191:16,19
    212:21 213:7
event 3:8 27:19
    28:2 50:20
    61:16 63:1
    122:19 163:13
    165:24 191:25
    216:10 229:4
    236:23 237:11
    238:2 246:6
    248:25

event's 237:10
events 32:2
    63:3 66:1
    157:10 164:8,11
    168:22 183:1
    215:14 220:21
    226:4 236:18
    236:22
    237:22
everybody
    14:10 182:16
    183:23 184:1
    198:22
evidence 11:20
    30:2 33:14
    36:19 38:9,10
    38:12,19,19
    40:13,13,17,20
    40:20 49:13
    49:14 50:24
    51:1 59:3,12,18
    59:25 60:14
    60:19 61:1
    120:13 125:17
    125:18 126:21
    127:8 182:15
    191:17 192:17
    213:20
exact 108:12
    209:17,24
exactly 78:1
    112:7 138:21
    192:4 235:3
Examination
    2:6,7 7:14
    247:13
examined 4:13
    7:10
examiner 11:17
example 34:18
    57:7 73:14
    106:14,15
    111:19 113:16
    135:15 160:24
    174:14 195:22
    212:14 232:11
    238:15 259:2

exception
    89:20
exceptional
    167:2
excluded 46:16
excluding
    24:22 162:11
exclusive
    234:12,14
exclusively
    113:2
excuse 9:25
    48:11 72:13
    75:6 79:7
    115:7 154:23
execute 61:12
Executed
    265:14
execution
    124:14
exercise 240:17
exercising
    34:21 94:25
    100:13 105:9
exhibit 2:12,13
    2:15,17,19,21
    2:23,24 3:3,5
    3:7,9,11,15,18
    3:21,22 17:24
    18:2,6 20:20
    20:23 21:1
    22:1 62:8,14
    83:9,10,13
    86:3,4,8,8
    87:9 88:23
    93:5,8 101:1,4
    101:10,14,24
    102:2 108:17
    109:23 117:19
    117:23 128:24
    129:2 131:15
    131:19 139:13
    139:14 140:14
    154:16,20,22
    155:21 156:8
    156:20
    160:25 162:24

163:3,10 165:11
    168:4 169:12
    170:2,5,10,11
    170:15 187:22
    189:6 202:10
    202:11,20
    203:2,6,13,16
    204:23 206:1
    206:3,4,7,22
    207:2,17,25
    210:19 212:5
    217:14 218:2
    219:3,19,20
    219:22 220:5
    222:20
    223:14,18,22
    224:18,20
    225:17 226:9
    226:15 227:1
    240:19 242:3
    243:21 244:13
    248:16 249:19
    254:15 259:4
exhibiting 71:16
exhibits 2:10 3:1
    3:25 143:15
    170:13 259:3
exist 58:1 141:12
    148:4 149:17
existence 44:9
exit 100:4 105:3
expectation
    10:8
expectations
    212:24 214:12
expected 3:16
    176:9 206:12
Expires 265:24
explain 12:20
    32:11 76:12,14
    85:7 207:18
explained 185:3
    199:21 213:5
    244:19
explaining
    256:2
explanation

| | | | | |
|---|---|---|---|---|
| 80:14 83:20 195:15 | 182:25 **factor** 94:21 203:7 | 203:19 206:6 208:7 210:9 216:23 | 51:16,22 55:3 55:5 251:21 252:2 | 224:19 225:19 226:15 229:21 232:19 |
| **explanations** 243:17 | **factors** 73:13 **facts** 64:25 | 224:24 **familiarize** | **filing** 238:6 263:18 | 238:24 249:9 253:12 |
| **explore** 68:10 **expressly** 7:6 60:4 | 120:13 127:9 185:18 191:1,19 192:21,23 | 19:22 **far** 17:2,7 26:6 41:25 48:4 | **fill** 166:6,10 **filled** 166:13 167:13 168:21 | **firsthand** 34:4 **five** 117:16 212:15 245:7 |
| **extended** 129:16,19 | 194:7,10,14 208:17 213:20 | 49:16,19 56:7 80:16 84:17,18 | **Filler** 3:5 155:5 155:14,24 | 255:17 **fix** 52:19 |
| **extended-ran...** 121:18,21 122:1 122:7,23 123:11,14,19,24 | 215:4 218:7 **fail** 80:20 165:19 189:19 **failed** 53:19 | 107:10 126:4 140:18,20 164:24 165:14 211:1 223:4 | **final** 11:1 153:25 **finally** 143:9 257:4 **financially** | **fixed** 254:12 **flail** 70:23 **flailing** 81:15 82:2 |
| 125:22 127:24 128:2 131:23 132:4,9 | 181:4 **failing** 80:18 96:5 181:17,18 | 225:20 246:13 248:2 250:2 258:20 | 262:15 **find** 36:12 54:13 85:13 87:2 | **flash** 35:17 50:25 **fleeing** 82:1,3 |
| **extent** 10:17 14:19 20:8 42:6,14 43:8 | 256:11 **fails** 70:19 **failure** 56:1 | 258:24 261:3 **farther** 248:1 **fashion** 83:1 | 114:9 134:10 205:19 207:6 219:14 222:3 | **flip** 171:9 **fluid** 184:25 **focus** 12:15 74:14 81:17 |
| 60:20 68:4 73:4 91:5 94:1 103:3 116:25 | 117:8 186:5 190:3 255:22 256:4,16 | **fault** 115:24 **favor** 240:3 243:20 | 240:8 263:9 **finds** 31:4 **fine** 8:5 10:23 | 131:12 168:25 208:11 209:25 215:5 224:17 |
| 117:5 123:1 137:3 170:9 173:4 180:7 | **fair** 8:21 16:5 26:23 34:21 34:22 42:9,11 | **FBI** 13:4 **February** 11:10 11:18 | 37:16 147:18 169:16 199:10 **finish** 8:17,20 | 239:10 257:16 **focused** 200:16 **focuses** 138:21 |
| 200:17,20 237:17 240:6 249:5 | 47:9 55:21 58:14 63:3 73:12 83:5 | **feedback** 167:2 **feel** 52:3 170:13 178:22 189:5 | 71:7 **finished** 239:13 **finite** 184:24 | 142:13 202:3 **focusing** 44:12 45:11 82:6 |
| **eyes** 252:9 | 88:15,23 97:20 104:1 | 258:21 **feels** 248:10 | **fire** 258:16 **firearm** 11:16 | 96:10 99:2 148:7 149:7 |
| **F** | 109:4,8 138:7 138:9 156:16 156:17 158:21 | **feet** 211:15 **Feig** 252:19 **felt** 10:21 | **first** 14:16 21:4,7 21:9,13 24:16 30:4 31:21 | 183:9 186:10 186:22 190:15 243:21 |
| **F-i-l-l-e-r** 155:5 **face** 78:18 **fact** 40:11 57:3 | 169:9 179:25 214:21 223:5 | **fight** 70:6,10 81:15 **fighting** 82:4 | 32:15 34:21 52:20 55:8 | **fogger** 91:20,22 96:22 98:22 |
| 57:18 64:18 122:1,17,23 | 223:6 243:11 253:16 258:6 | **figure** 55:6 153:10 215:25 | 67:12 76:18 81:22 93:16,18 | 99:8 104:15 112:17 119:20 |
| 124:16 125:7 154:24 174:8 | **fall** 245:21 **fallen** 246:20 **familiar** 7:22 | **figured** 18:6 **file** 36:22 59:2 101:13 237:23 | 94:14 95:4,6 95:24 96:10 100:1 104:24 | 120:10,23 121:2 128:18 187:4 234:20 |
| 174:21 175:25 183:14,20 184:9 196:24 | 21:1 30:18 91:25 154:22 154:24,25 | 251:21,22,24 253:22 | 133:2,7 145:23 168:17 176:19 178:18 180:8 | 235:2,15 247:17 257:17 |
| 218:1 231:17 233:9 253:1 256:10 258:18 | 156:2,21 162:18 163:9 | **filed** 50:6,22 232:9 **files** 46:4 51:14 | 181:9 189:14 197:21 199:19 208:15 209:3 | 258:6 259:8 **foggers** 96:24 247:16 257:6 |
| 259:9,10 260:17 **fact-dependent** | 172:7 191:7 | | | |

follow 16:12
59:22 92:4
189:19 209:16
226:6 231:9
follow-up
145:20
followed 194:2
260:16
following 50:4
71:10 94:5
177:24 185:11
198:1
follows 7:11
food 166:14,25
167:1
force 70:20,21
71:17,22 80:8
80:12,21
106:15,16,18
107:9,12
137:19 150:18
150:19 171:7
173:1,8 174:17
175:13 177:3,8
180:21 188:11
188:15,19
193:12,15,24
233:12,22
234:5 239:8
244:6,6,13
foregoing
262:7 265:6
265:13
forenoon 4:15
forgot 242:12
form 20:3 21:8
72:14 75:11
78:4 79:8
112:16 114:3
120:12 122:12
164:14,16,18
164:20,21,23
165:3 166:7,13
168:9,10,11,13
168:15,21
173:9 177:13
178:21 185:22

190:5 193:20
196:13 209:16
213:19 222:11
245:10 246:11
265:7
formal 245:15
format 65:20
163:23 203:18
formations
145:17
formed 178:1
forth 89:1 94:5
forward 10:5
81:24 144:18
forwarded
26:18 35:23
found 53:1
171:21 172:24
174:10,13
175:4 176:1
179:23 242:11
foundation 5:4
147:20 192:11
245:11 246:12
four 14:16 33:22
33:23 40:3,11
40:22 95:3,17
119:2 120:19
128:9 151:25
183:12 201:14
fourth 2:13
20:24 21:3
23:20 136:1
221:6,15
frame 37:14
39:19 43:23
68:19 69:8
framework
134:6
free 52:3 170:13
189:5 196:24
Friday 85:20
friend 251:13
frightening
94:25 100:12
105:9
front 20:12 62:6

66:20 69:13
129:2 130:7
137:23 144:6
160:24 202:11
210:3 219:4
219:23
full 94:19 170:12
187:21
fully 153:6
function 13:5
33:18 195:11
functioning
53:11 251:23
functions 15:22
32:10 61:12
63:1
funded 41:14
further 247:6
251:9 259:22
260:4,9
261:12 262:13
future 31:10
168:1

---

### G

gain 79:22
153:11
gap 147:16
gas 97:24,24
98:10,15,21
99:7 104:8
111:19 112:1,1,2
129:15 234:16
259:19
gee 56:10
general 27:17
32:23 47:21
48:9 60:8,10
66:8 77:9
90:8 113:8
130:5 140:11
202:8 210:9
generally 15:18
76:23 77:3
81:14 93:18
135:3 150:14
162:7 167:22

225:19 259:21
generate 39:2
107:22 259:14
generated
39:13 50:11
137:5 230:21
generating
66:16
generic 158:4
generically
161:4
Genetec 42:20
42:23 43:2,11
43:16 51:21
52:10,12 55:19
251:3 252:24
Gerald 133:6
getting 10:25
43:1 44:22
108:8 145:9
198:1
give 8:14 11:3
29:6 72:9
73:14 77:15
78:6 80:23
83:6 96:4
123:7 187:10
187:14 196:17
201:13,25
206:2 208:23
209:14,19
238:8 240:4
241:7 246:24
258:25
given 11:23
52:11 53:9
57:1 61:14
70:8 80:17
83:12 89:11,21
117:24 142:19
161:4 183:3
186:3,4,18,19
186:20,23
187:6 202:15
204:20
206:19 215:16
218:12 222:21

231:1 241:20
249:11,12
gives 73:24
78:14 210:11
giving 71:23
75:8 76:18
80:16 83:5
120:19 194:25
195:16,21
196:7,18
208:21 210:1
glance 155:18
glean 227:12
go 21:25 28:14
32:12 43:12
54:3 61:14
62:10 63:22
66:4 70:22
75:21 77:10
80:7 81:13,24
84:2 89:4
90:15 96:7
101:17 102:2
104:18 105:12
107:7 109:23
125:12 126:6
127:17 131:19
132:16 138:20
139:9 141:22
148:21 169:11
169:17 174:2
180:13 185:6
187:17 189:1
192:10 194:4
194:17,20
211:9,9,10,13
211:17 222:14
225:13 226:14
231:8 238:14
239:4,16
240:5 242:18
255:9
goal 78:23
79:19 130:22
220:18
goes 38:12
143:9 258:17

Pls.' Ex. 26

ERIC LARSON  4/8/2019

258:22,22,24
going 8:19,25
  9:17 10:5 12:15
  21:20 22:16
  27:19 36:8,17
  36:18,23 46:2
  49:16 54:6
  55:9 61:12
  62:17 66:3
  68:6 70:16
  71:9,25 72:1
  72:10,10 74:7
  74:11,12,12
  75:6 76:10
  77:10,11,16,17
  78:13,16 80:19
  80:24 81:24
  90:11,18 93:7
  99:18 114:11
  117:22 124:18
  125:25 126:6
  128:3 139:14
  147:19 151:3
  154:18 157:10
  167:18,22
  174:4 175:7
  180:15 185:20
  186:24 191:21
  203:5,11
  205:25 210:6
  213:17 223:8
  225:19 226:7
  231:7 237:10
  239:10
  244:24 251:15
  258:23
good 7:16,17
  91:6 100:16
  117:13 230:14
  238:12
Google 170:5
Gotcha 21:17
  38:21 83:7
  90:13 95:24
  96:17 99:16
  110:10 119:10
  152:12 205:15

208:11 224:17
  235:17 236:8
  246:9,22
gotten 37:17
  201:7 208:6
  228:5 234:1
governed
  113:20,22
governs 121:15
grab 80:7
graduate 144:17
graduated
  75:18
grand 66:2
  190:24
granted 94:3
grants 93:21
Gras 63:4
great 130:15
  150:2
greater 28:13
  97:1 125:25
  248:8 258:7
  258:11,12
ground 80:8
  152:8
group 16:21
  44:22 73:23
  122:8 126:11
  126:15 134:25
  135:10 152:1
  174:25 175:3,4
  183:19,21
  211:15 213:2,8
  213:12 223:10
  227:4 259:15
  259:20
groups 94:17
  95:21 99:24
  101:21 103:8,13
  104:22 135:18
  185:10 225:25
  227:6
guess 31:1 157:4
  201:17 230:1
guidance
  198:12 256:3

guideline 107:8
  248:24
guidelines
  152:13 194:3
guilty 171:21
  172:24 174:10
  175:4 176:1
  178:10 181:15
guns 234:16

                H

half 26:11,16,16
  199:9 255:17
Hall 4:17 34:9,19
  61:22,24
  63:18 64:18
Hall's 63:11 65:5
hand 20:22
  62:17 68:8
  77:11 82:21
  93:8 101:4
  117:22 129:16
  129:19 130:2
  134:3 154:18
  163:1 247:22
Hand-Off
  249:24 255:2
handcuffed
  72:21
handcuffs 70:12
  72:21 74:3
  82:3,22
handed 63:6
  203:12 223:17
handheld 71:13
  74:4 76:15
  90:2 91:20,22
  96:21 97:2,7
  98:16 99:23
  100:10 104:14
  104:21 105:7
  112:17,20,25
  113:3 114:13,24
  115:16 116:24
  121:23 123:2,5
  123:15 124:3,5
  125:22 127:18

128:12 130:21
  136:23 137:3
  137:13 138:3
  138:13,17 140:1
  141:9 142:6
  148:14 187:4
  196:11 234:18
  235:2,14
  244:21
  247:23 248:4
  248:8 257:1
  258:3,8,19
handing 86:6
handle 76:3
handled 145:16
  146:23 160:1
handling 164:7
  236:22
hands 70:18,22
  74:18,19 79:1
  80:7 82:22
  83:1 130:3,6,11
  209:19
handwritten
  47:16 221:21
hanging 213:13
happen 44:23
  64:14,14 183:2
  208:15 237:10
happened 17:19
  36:13 56:4,10
  61:5 64:17
  124:23 156:15
happening 57:5
  173:25 184:10
happens 45:21
  201:1 213:7
happy 56:17,19
  99:19 179:17
  246:24
  260:18
hard 17:7 91:2
  229:24
hardest 100:19
hardware 43:5
  43:9 250:22
  250:24

harm 71:4,18
  99:22 100:9
  121:5 125:2,20
  126:22 127:6
  127:10
havoc 199:5
hazard 246:4
head 139:8
heading 22:1
  92:4 116:20
  208:4 248:19
  249:23
  255:12
headings
  226:14 248:18
  249:20
  254:24
headquarters
  41:7
hear 92:21
  181:23 222:19
  261:11
heard 57:18
  72:24 82:11
hearing 48:7
  53:13 101:11
  153:2 216:14
heck 113:23
  181:1 183:24
heed 95:11
  100:4 105:3
  117:8
held 1:9 35:18
  35:22 36:4
  49:15 51:1
helicopter 30:8
  30:11
hell 75:6
help 15:8 110:21
  110:24 120:4
  191:7 196:5
  203:12
  224:22 231:14
  238:13
helpful 207:20
hey 213:12
high 235:5

Pls.' Ex. 26

247:20
257:21 258:3
258:6
high-capacity
121:18,21 122:1
122:7,23
123:10,14,19
123:24 125:21
127:24 128:2
129:20 131:23
132:9
higher 82:7
216:19
highlight 211:19
238:13 241:17
242:12
highlighted
240:19
highlighter
238:9
highlighting
242:3
highlights
222:23
Highway 245:17
245:21
hindering 61:1
history 56:14
168:13
hit 107:21
holding 35:25
74:17 82:18
129:19
homicide 12:24
honest 160:19
161:17
hope 71:11 76:4
261:5
hoped 54:5
hopefully 142:1
hosted 159:21
hot 121:12
hour 26:10
hours 4:14 24:3
24:18 26:12
142:2 150:8
212:21 213:8

214:3 253:10
huddle 251:6
Hudson 155:6
hundred 14:14
hurt 72:1,11 75:6
Hutson 87:25
hypothetical
64:17 174:23
175:6 181:21
182:19 183:21
183:23 193:23
hypothetically
44:13 182:12

—————I—————

i.e 49:19 52:10
I/LEADS 132:21
133:8,9,16,17
133:21 134:2,11
135:19 136:4
136:10 137:4
137:15,19
225:3 228:12
228:18,22
229:9 230:11
234:3 235:20
235:22,25
idea 182:20
184:10
identical 91:20
91:23 103:24
210:16,17
identification
17:25 20:21
62:15 83:11
86:5,7 93:6
101:2 117:20
128:25 154:17
154:19 162:25
163:2 170:3
203:3 206:5
219:21 223:15
223:17
identified 40:6
46:12 88:18
111:15 221:6
224:1 225:10

225:17 226:11
227:10 229:11
230:3 231:15
236:18 237:19
238:24
240:20 243:1
243:7
identifier 39:3
58:16
identifies 63:14
84:9 108:25
121:17 170:16
224:8 236:15
identify 47:10
59:9,14 158:9
206:9 224:23
225:14 234:6
234:8 235:25
238:14 239:4
243:23
244:18
ignorance 41:8
ignored 113:24
IL 4:20
illegal 60:13
imagine 71:10
immediate 70:7
101:22 120:24
124:10
immediately
45:13
imminent 71:3
71:18 99:22
100:9 125:1,19
126:22 127:5
127:10 190:19
impact 9:23
10:25 95:13
96:18 97:1,5
120:7 123:4
123:20 124:6
125:25 128:11
130:15
impairs 9:4
implausible
71:11
implemented

109:5
importance
249:8
important
28:22,25
29:3,8
impression
37:18 40:12
improper 60:5
improve 164:5
166:7
improved 168:1
inability 90:22
inappropriate
73:9
inappropriately
60:22
incident 3:6
28:10 34:10,19
34:23 35:4
38:5,10,25
39:1,4,21 50:5
53:4,11 58:13
60:21 63:24
63:25 64:10
64:13 127:11
132:21 133:3,5
134:24 135:23
137:6 152:7
155:10 157:12
163:22 165:2
166:4 167:15
174:22 191:6
194:2 197:23
208:10 212:10
215:15,18
216:5,6,7,13
227:5 228:21
228:23 233:8
246:21 249:14
incidents 28:5
29:1 30:1
32:23 34:17
39:10,18 50:11
68:16 69:21
69:25 133:11
134:22 135:13

160:17 161:18
224:23 225:8
230:10 232:3
239:5
include 31:3
85:21 111:3,5
112:15 116:17
172:23 173:5
177:6 210:20
210:25 211:5
212:5 214:11
245:2
included 61:10
91:13 97:11
98:16,22 99:8
104:4,4 107:18
111:6,15,21,24
112:20,22 117:1
132:24 135:10
135:13 220:16
227:1 233:4
234:2 243:4
includes 85:2
97:23 103:11
103:18 120:5
228:14
including 30:15
120:24 161:5
242:21
243:23
inclusion
231:25
incorporated
17:4 61:20
92:19,24
93:14 141:14,19
incorrect 173:8
258:1
incorrectly 99:4
216:24
independent
42:13
indicate 16:14
24:8 40:16
59:17,18
249:15 263:12
indicated 16:24

| | | | | |
|---|---|---|---|---|
| 49:24 151:15 | 95:14,18,21 | **informed** 54:1 | 116:9,12 | 245:16 |
| 157:4 181:10 | 96:7,18 97:1,5 | **initial** 115:25 | 182:21 209:18 | **involving** 7:20 |
| **indicates** 18:11 | 99:24 100:3,11 | **injected** 199:12 | **intention** 85:23 | 47:18 50:11 |
| 58:16 89:15 | 103:8,13 | **injunction** 18:12 | **interact** 113:18 | 134:13 228:17 |
| 98:14,21 99:7 | 104:23 105:2 | 19:4,5 20:1,17 | **interacting** | 234:5 260:5 |
| 105:14 108:15 | 105:7 113:8 | 101:11 153:17 | 34:20 | **issuance** 3:13 |
| 108:22 118:1 | 117:7 118:14,17 | 156:13 191:11 | **interaction** | 207:12 219:16 |
| 119:4 129:5 | 119:20 120:8 | **injuries** 80:6,11 | 32:14 34:24 | **issue** 10:15 |
| 132:19 171:17 | 122:8 123:4 | 124:11 | 153:5 196:21 | 42:25 43:16 |
| 181:12 239:8 | 123:20 124:25 | **injury** 80:9 | **interchangea...** | 110:22,25 |
| **indicating** | 125:25 127:3 | **ink** 240:4 | 162:23 | 112:24 114:17 |
| 245:3 | 127:4 128:11 | **inoperable** | **interdiction** 14:9 | 116:4 124:15 |
| **indicative** | 134:25 136:25 | 53:16 | **interest** 32:18 | 134:12 141:21 |
| 259:6 | 137:8 148:9 | **input** 66:15 | 46:21 158:5 | 157:2 158:13 |
| **individual** 38:18 | 149:2 152:8 | 227:22 | **interested** 20:9 | 202:17 204:10 |
| 50:16,16 53:1 | 164:24 172:15 | **inputted** 227:19 | 84:21 157:16 | 210:12 215:6,9 |
| 66:16 67:14 | 172:16,25 | **inquiries** 252:15 | 236:5 262:16 | 215:12 216:7 |
| 69:22 70:2,4 | 175:12 208:21 | **inquiring** 56:14 | **interference** | 216:18 217:5 |
| 70:17,19,23 | 210:20 211:1 | **inquiry** 169:8 | 194:21 195:15 | 233:19 238:16 |
| 71:19 72:6,21 | 212:6 239:24 | 253:21 | **interfering** | 243:13 246:3 |
| 73:24 76:16,19 | **individuals'** | **inside** 174:14 | 195:2,10,14 | 246:3 251:4 |
| 76:25 77:12,17 | 63:21 249:9 | 182:16 | 196:1,8,21 | 256:15 260:14 |
| 79:23 80:3,8 | **inert** 97:24 | **insofar** 29:24 | **interject** 147:12 | **issued** 16:25 |
| 80:25 82:11 | 259:16,19 | **inspection** 14:6 | 180:11 | 18:13,23 19:23 |
| 82:25 83:4 | **inform** 19:25 | **instances** 79:5 | **internal** 140:25 | 20:17,25 |
| 98:15 113:7 | 195:1 196:1 | 234:25 242:4 | **internally** 232:4 | 54:10,21 |
| 130:6,7,12 | **information** | 242:12 243:12 | **interpretation** | 108:18 109:1 |
| 134:25 135:4 | 9:23 16:24 | 243:24 244:1 | 172:1 187:14 | 116:4 121:18 |
| 135:18 145:8 | 17:4 28:13 | 244:25 | 213:5 | 131:24 132:6,7 |
| 163:24 170:25 | 36:5 41:21 | **instant** 261:15 | **interrupt** 10:1 | 153:16 154:8 |
| 174:18 187:9,11 | 46:3 52:11,25 | **instruct** 17:17 | **intersection** | 156:12 206:17 |
| 190:9 193:24 | 53:10 58:10 | 195:3 | 36:13 211:10 | 206:19 216:5 |
| 195:10 196:8 | 59:13 66:15 | **instructed** | **intimately** 30:18 | 216:11 217:10 |
| 198:4 221:9,12 | 88:24 107:3 | 157:24 | **investigate** | 219:13 236:16 |
| 224:3 229:5 | 134:7 135:5,6 | **instructing** | 16:16 17:18 | 238:3 239:6 |
| 247:23 248:11 | 148:25 150:22 | 196:2 | **investigation** | 241:1,13 242:6 |
| 248:12 | 153:9 156:3 | **instructional** | 28:8 55:4 | 243:2 248:6 |
| **individually** | 159:21 161:15 | 220:18 | 56:22 254:1 | **issues** 10:4,16 |
| 24:23 | 166:20 167:13 | **instructions** | **investigative** | 29:25 42:22 |
| **individuals** 17:3 | 176:6,10 225:1 | 3:12 207:12 | 12:5,23,25 | 46:2 65:17 |
| 24:25 25:6,8 | 225:7,15,20 | **instructs** 210:20 | **involve** 240:7 | 74:11 139:19 |
| 25:22 35:1 | 227:9,13,23 | 210:25 212:6 | 243:14 | 197:21 204:9 |
| 40:17 50:23 | 227:25 228:5 | **intelligence** | **involved** 68:16 | 233:13 249:10 |
| 61:13 63:1 64:1 | 228:15,16 | 28:6 29:20 | 160:5 181:18 | 250:8 |
| 65:23 73:5,11 | 230:6 231:9 | 61:25 225:5 | 195:17 225:21 | **issuing** 205:2 |
| 73:15 77:3,15 | 232:3 234:1 | 252:20 | 228:7 240:12 | 208:10 221:24 |
| 94:17,23 | 238:15 | **intent** 10:18 | 243:8 245:4 | **item** 229:21 |

Pls.' Ex. 26

ERIC LARSON  4/8/2019

items 111:14
  231:16 257:14
IV 83:25,25
  84:4 115:9,11
  115:14 137:11,14
  137:18 138:10
  196:11

___

J

January 11:21
  12:6,17 101:19
Jemerson 141:2
  141:3,7 148:23
  149:3 159:20
  160:1 161:14
  220:2,8
  221:14 222:22
  246:15
Jerome 2:23
  101:8
Jessie 5:9
Jessie's 260:22
job 63:1 100:18
  100:19,20
  147:4 199:15
  238:12
Joe 66:12
jsteffan@aclu-...
  5:11
judge 16:25
  18:14 19:23
  56:5 76:3
  79:11 119:24
  169:14 179:18
  179:18
judged 117:9
July 102:9
  108:19 226:11
jump 66:22
June 11:22
Jury 66:2

___

K

K-9 14:5
keep 22:10
  54:6,7 226:7
  237:21

keeping 174:24
kept 46:13,21
  50:12 115:21
kettle 34:2
  39:23 113:17
  117:6 118:15,18
  118:21 119:7,11
  123:10,25
  124:21 125:10
  125:11,16
  126:11 135:16
  137:4 151:8,10
  151:24 152:16
  152:21 158:20
  158:24 174:14
  182:11,17 183:9
  183:11 185:3
  190:15 192:18
  249:18 259:14
kettling 191:13
key 176:16 188:1
  189:9 236:4
keyword 230:7
  230:8
kind 131:6
  159:17 165:20
  210:10 220:7
  237:9 259:14
kinda 183:24
kinds 65:16
  98:25 183:1,3
knew 55:5,7
  66:2 231:21
  251:14
know 10:13,15
  10:24 21:10,24
  22:4 23:18
  27:19 30:2,19
  30:19,20
  33:19,25 34:6
  34:8,11,17 36:7
  36:12 37:7
  40:8 41:25
  44:11,20
  45:25 50:13
  50:16 51:25
  53:20 54:25

55:2 56:10
58:1,18 65:8
65:10 66:11
68:8 81:14
88:1,6,11 92:2
100:21 102:20
102:24 110:3
118:4,20
120:22 121:14
124:22 130:3
131:8 133:7
135:25 140:19
140:20 141:11
144:7 145:25
146:7,8,10,12
146:16,17,20
147:6 148:8
149:6 150:3,6
150:8 155:17
160:14,17,23
160:23 161:20
162:14 165:14
168:12 170:4
181:1 182:19
187:6 188:22
190:23,24
191:8,12 192:3
199:3,4 201:3
203:23 204:8
205:1,8,19,24
213:6,16,24
213:25,25
214:2,16
221:20 222:8
230:3 231:6
234:22
240:24 244:1
244:8 245:15
253:6 254:5
knowing 65:15
  75:5 121:3
  183:17
knowingly
  170:22 188:5
  189:19
knowledge
  16:19 17:13,21

20:11 23:15
29:11 30:21
31:19 32:4
34:4 39:20
40:22 42:12
46:8,11 47:1,2
52:7,15 53:7
54:9 55:16
60:7 61:7,18
66:7,15
106:24 115:4
136:4 141:13
148:3 149:17
149:22 151:22
152:4,6 153:16
165:4,8,9,23
166:1 168:18
182:2 185:19
191:24 200:18
200:21 201:6
215:17 216:1
224:19 250:19
253:10
knowledgeable
  53:25
known 118:15
  247:17,19
knows 65:7
  220:25

___

L

labeled 51:6
laboratory 11:16
  11:21,24 12:2
  36:4
lack 90:22 151:7
  198:24 245:10
  246:11
lady 130:10
laid 28:16
  174:22 221:14
  227:24
language 75:6
  84:8 98:13,19
  99:6 112:5
  116:6 130:21
  170:10,12

178:7,15 194:11
198:14 205:2
205:7 207:2
208:3,8,8,11
209:3,3,7,12
209:18,19,23
210:3,9,13,18
210:20,23,25
211:18,20,23
212:5,6,15,19
212:24 213:1
214:11,11,19,24
217:25 218:1
227:16
languatory
  209:5
large 27:18
  63:2 103:3
  121:22 135:22
  135:23 141:20
  174:22 183:19
  215:13 223:10
  259:7
larger 96:25
  123:15 128:3
  237:5 247:25
  248:6 257:21
  258:8
Larson 1:17 2:5
  4:12 7:8 8:2,3
  18:1 20:22
  48:16 54:2
  57:13 62:16
  86:8 101:3
  117:21 121:10
  124:18 129:1
  131:5 139:12
  158:3 163:1
  175:8 179:2
  189:7 197:5
  198:2 202:1
  203:5 205:24
  219:4 223:16
  233:23
  239:15 240:17
  247:4 263:10
  264:1 265:5

Pls.' Ex. 26

265:20
late 114:2
launched 235:8
launchers
148:20
launches 235:9
258:10
launching
234:16
law 2:19,20 25:1
25:10,14,18
60:15 75:18,21
75:22,25 76:3
79:11 86:9,10
87:24 88:25
91:14 93:21
94:3 120:9
126:1 140:5
161:10 169:24
177:14 182:23
184:9 185:24
198:8 202:22
249:10,16
lawful 7:9 120:9
121:6 123:20
189:20
lawfully 122:10
124:2
Lawrence 2:12
18:9
laws 171:2,6
173:1,7 174:17
175:13 185:21
188:9,14
lawsuit 50:21
lay 192:11
laying 103:6
114:6
lays 132:23
171:12 176:16
187:25 189:9
learn 147:1
179:6 236:5
learned 15:13
44:15 52:21
53:5,18 55:2
55:14 57:6

162:7 167:23
learning 41:9,9
55:12 90:23
leave 211:1,8
212:7,13
left 118:6
legal 75:13 76:2
79:9 161:9
173:10,13
178:21,22
179:3,14,24
190:6 202:7
224:10
lenders 161:16
lesson 3:18
61:19 141:20
lessons 15:13
161:15 162:7
167:23
let's 27:4 31:18
37:6,19 39:21
43:8 49:4,25
50:5,15 59:5
81:17,21 90:15
117:6 123:25
128:22 168:25
180:17,25
181:2 182:11
208:11 213:6
226:7 229:20
232:5 238:21
238:21 242:18
260:20 261:1
level 175:1
194:16 216:20
228:15 233:12
Leyshock 133:6
licensed 251:2
lieutenant 11:23
37:13,15 141:3
148:23 149:3
159:20 191:12
192:15,22,24
193:13 197:22
252:19
lieutenants
87:21

light 120:4
259:6
limit 212:12
limitation 50:21
line 99:11 106:8
137:11 156:7
229:21 231:16
254:11 264:5
264:9,13,17,21
lines 16:2 232:1
link 107:20
links 106:12
list 29:14 38:14
61:2 66:10
220:15 225:8
226:3 227:4
231:7,20
232:7 242:24
243:17
listed 46:4 62:2
62:2 63:22
64:21 111:8
113:6,9
listing 36:7 111:6
lists 66:10
225:25 228:1
literally 53:15
119:14
litigation 6:3
14:24,25 16:9
17:12 23:13
25:19 39:25
46:1 50:6
136:13 153:25
156:14 162:11
203:16 263:1
little 9:22 11:8
12:20 16:12
20:11 26:17
48:6 54:5
68:10 73:21
114:2 124:18
125:13 126:8
137:11 174:23
181:20 208:4
229:17 236:9
locate 39:24

134:14 139:15
207:8 229:12
229:25
located 28:4
41:5,6,15 52:1
52:2 56:18
233:8
location 3:4
34:16 36:11
47:12 52:4
59:15,19
63:24 129:6
166:17 212:10
226:22
230:20
locations 41:18
135:12
locking 82:17
locks 83:1
Locust 52:3
250:12
log 232:21
long 22:11 26:7
50:1,6 55:17
99:16 100:21
104:17 150:3
154:11 197:25
199:6 201:25
212:6 220:15
222:18 232:7
long-lasting
80:11
long-term
54:25 80:11
longer 80:15
184:21 258:17
look 17:18 46:2
48:15 49:25
51:3 54:14
63:10 82:7
93:16 105:13
108:13 111:11
118:8 129:4,13
131:15 139:23
142:9 149:16
149:20 150:1
155:13,20

169:1 176:13
189:5,6 203:6
203:8 205:5
206:21 217:8
219:6 232:5
240:18 244:5
244:6
looked 67:21
68:2 92:10
113:3 115:15
125:6 140:13
177:23 217:12
236:8 259:2
looking 15:12
31:15 39:21
45:17 47:10
83:15 108:16
136:17 140:8,9
152:21 169:12
170:11 175:17
179:13,22,23
182:5 194:15
205:12,13
217:19 219:3
231:24
232:20,21
240:18 241:10
241:16 242:12
242:13 256:12
looks 74:8 118:9
119:25 231:24
243:10
loop 57:14
137:22
loose 259:25
loss 51:5 56:22
57:2
lost 201:7
253:20 256:6
lot 8:15 24:9
26:17,19,20
64:13 66:11
145:17 157:15
185:5 186:7
234:24
257:12
lots 44:1

ERIC LARSON  4/8/2019

Louis 1:8 2:18,19
 4:8,16,18 5:6
 5:16 6:5 7:21
 11:7 19:21,24
 20:15 22:5,7
 23:25 27:7
 39:24 48:8,17
 63:3 75:22
 81:13 86:9
 88:18 94:2
 102:15 133:25
 145:10 148:16
 151:13 155:6
 156:10 157:9
 157:20,22
 164:6 166:4
 167:25 168:4
 176:5 182:10
 200:4 224:8
 240:25
 245:16,20
 250:14 263:6
 263:7,18
 264:2
Louis's 138:1
 197:7
love 260:13
lunch 117:14
 131:6
Luther 34:9,18
 61:22,24 63:11
 63:18 64:18
 65:5

___ M ___
mace 67:9,14
 68:15,17 69:3
 69:9,11,16,25
 70:14,16,24
 71:14 72:12,16
 72:18,19 73:1
 73:18 74:4,25
 76:10 77:3,9
 77:13 78:8,10
 78:17 80:10
 80:25 83:24
 84:5,19 85:3

85:11 89:19,24
 91:19,22 98:4
 112:3 113:4
 114:24 115:16
 115:18 137:3,8
 148:14 196:10
 234:6,17,19,24
 235:1,4,13,13
 235:19 236:1
 236:6 238:17
 239:1,9
 243:25 244:8
 244:14,21,25
 245:4 247:17
 247:20
 257:20 259:11
machine 90:24
mail 88:7
main 82:2
 164:18,20
maintain 42:14
 50:7 54:16
maintained
 35:10 46:5
 229:8,9
 250:25
maintaining
 41:19 42:8,10
 45:9 52:13,16
 164:8
maintains
 43:20 47:8
 50:19 224:25
 250:12,16
maintenance
 42:4 43:23
 250:7,13
major 3:8 12:8
 13:10 163:13
 164:11 165:24
 247:15
majority 231:18
 231:19 243:11
majors 87:20
making 148:4
 157:16 158:7
 253:18

MALEEHA 1:5
 4:5 263:7
 264:2
malfunction
 42:15 43:9
 44:16 51:24
 54:24,25 55:1
 252:25
malfunctioned
 44:14 52:23
 54:22 55:13
 55:17 254:8
malfunctioning
 44:21 53:16
 56:15 253:13
management
 36:5,16 133:10
 134:5 225:3
 225:22 226:1
 226:2 227:14
 228:2,6,9
 230:11
manages 43:5
mandatory
 89:10,20 90:6
 90:8,12 209:4
 209:8,12
manipulate
 80:8
manner 27:6
 48:16,22 72:9
 98:10 104:8,10
 125:19 127:9
 221:1,24
 235:13
manners 49:15
 66:9
Manpower
 228:4
manually 134:7
March 226:10
 229:22
 240:21 241:11
 242:5 243:22
Mardi 63:4
mark 11:17 17:23
 60:1 62:8

83:8 86:2
 206:2 219:18
 239:4
marked 17:25
 20:21,23
 62:15 83:11,13
 86:5,7 93:6,8
 101:2,4 115:15
 117:17,20,22
 128:25 154:17
 154:19 160:25
 162:25 163:2
 170:3 203:3
 203:13 206:5
 219:21 223:15
 223:17 241:8
 245:3 259:2
Market 4:17
 5:15 263:5
markings
 240:18
mask 129:15
mass 119:5
 127:2 137:7
 152:21
material 24:10
 26:21 38:7
 155:14 161:23
 219:10 221:13
materials 25:25
 26:1,2 139:4
 139:24 141:2,6
 141:12,20
 142:4 147:9
 147:22 148:4
 149:17 160:8
 219:7,15
 220:2 221:13
 221:21,21
 222:9,13
 223:1 260:7
 260:17 261:8
math 241:19
matter 28:21,24
 29:2,7 31:5
 51:1 80:20
 88:13 101:23

109:2 250:21
 250:23
matters 88:18
 89:1 199:13,19
 224:11
mayor 155:5,14
mayor's 155:25
 157:7
mean 16:1 25:11
 33:10 38:22
 46:15 50:4
 60:17 62:23
 78:10 87:17
 92:2 106:17
 122:11 140:6
 145:6 147:2
 149:2 153:8
 160:17,22
 164:22 174:7
 174:22 186:2
 193:22 201:21
 211:12 233:1
 249:3 253:6
 260:13
meaning 65:20
 112:8
means 21:4
 172:10 177:12
 184:13 194:9
meant 252:4
mechanical
 150:17
mechanics
 30:18 168:19
mechanism
 31:21
media 35:12
 213:11
medication 9:3
meet 24:22
 159:13 165:19
meeting 26:14
 26:15,24 87:6
 178:8,15,16,17
 180:2 181:13
meetings 18:25
 25:3,5,23

Pls.' Ex. 26

26:10,24
160:9 161:14
162:4
meets 204:19
members 14:1
19:14,21 27:24
27:24 28:10
29:17 32:11
59:21 65:18
107:6,7 145:13
145:15 150:15
171:20 220:19
221:22 222:5
memorandum
165:2,5
memorandums
164:24
memory 224:2
mental 198:23
mention 31:22
155:23
mentioned
14:17 19:1
29:16 41:1
44:4 57:17
76:8 87:3,12
150:9
mentions
256:24
mere 183:20
merely 211:14
merger 43:25
Merriam-Web...
177:24
met 24:21 25:9
25:22 26:3,7
94:19 198:8,10
224:4 226:4
241:4
method 36:22
47:7 91:24
106:11 150:14
methodology
113:9
methods 153:1
Metropolitan
2:17 3:11 11:7

19:18,21,24
20:15 148:16
157:20,22
164:6 167:25
middle 119:15
Midwest 229:21
mildly 34:25
mind 9:21
48:22 62:9
74:20 113:19
121:2 127:15
137:10 199:1
207:5 235:1
261:12
mine 238:6
239:5
minimization
124:12
minimize 96:8
96:17 97:4
120:23 123:3
128:10,16,18
minimized
95:13 120:9
124:6
minimizes 80:5
minimizing
121:4
minimum 78:25
81:19,21,22
82:6 130:20
minute 36:24
62:11 108:14
155:12 159:14
minutes 9:22
49:2 68:6
115:13 117:16
129:9 150:8
202:16
206:21 212:11
212:16 223:13
226:7 260:19
261:4,9
mirror 116:10
misdemeanor
178:11 181:16
182:23

misquoted
115:25
missed 238:25
missing 85:18
85:25 90:18
Missouri 1:2,8
3:10 4:2,8,18
4:22 5:4,6,16
6:5 169:24
170:7 217:13
262:5,21
263:6,7 264:2
misspoke 110:14
114:7
misstating
171:18
mist 129:23
259:15
misunderstan...
246:23
misunderstood
15:7
mixing 161:18
Mm-hmm 29:18
31:23 68:13
82:13 93:10
119:18 120:3
127:20 142:16
151:9 155:16
169:19 173:19
195:5 229:23
238:23
MO 4:21 263:18
mobility 145:17
modified 16:11,11
modify 153:4
157:1 158:12
214:19,24
modifying 15:11
210:4
Molina 10:3,4,8
10:9,17 24:13
30:25 134:12
134:13 136:13
260:4,5,10
moment 113:17
119:1 126:22

190:22,24
monetary 31:14
monitor 231:2
monitored 28:2
231:22
monitoring
28:8
month 21:15
108:12 260:21
monthly 107:5,9
201:1
months 14:17
24:7 53:19
57:4
morning 7:16,17
motion 56:1
motor 14:6
move 37:17
131:11 211:14,15
moved 12:6,22
64:7
moving 130:8,9
144:18 208:22
222:17
multiple 39:9,16
39:17 65:18
108:10 135:8
135:11,12,13
258:4
munitions 31:5
96:6 144:20
148:20
203:20 204:5
204:21 209:16
218:25 221:6
221:25 234:9
234:15 235:7
235:10,11,19
236:1,6
238:17 239:9
243:25 244:7
244:14,18
245:1,4
mutual 178:1
245:16 246:8
mutually 234:12
234:14

| | N |
|---|---|

N 2:1 263:17
name 7:24 8:1
38:20 44:4
59:2,9 63:11
146:2 163:6
226:25 227:1
227:4,7 257:9
258:5 264:1,2
265:11
name's 7:18
named 46:4
58:25
names 63:21
65:14 258:4
narrow 24:21
230:9 258:16
nature 30:3
73:16 124:12
128:3 148:20
184:23
204:22 258:7
necessarily
36:15 39:9
43:13 58:8
63:20 72:22
183:6 186:24
208:2 236:24
258:15
necessary 45:4
56:20 90:12
158:7 170:17
176:17 208:17
218:7 265:9
necessity 139:7
need 10:21
12:16 16:10
23:18 42:23
43:12 46:6,6
50:14 54:2,4
56:4 65:3
73:14 99:19
100:20 102:17
110:2 131:8
135:5 147:6
149:19 154:1,5

ERIC LARSON  4/8/2019

154:5 160:22
192:13,20
195:17 211:8,16
211:17 212:1
218:10 226:8
238:13 241:3
248:8 249:11
249:12,16
260:1
**needed** 40:20
41:18 115:22
179:20 231:3
**needs** 30:2
70:14 196:19
248:11
**neither** 255:4
262:10
**net** 124:17
125:13
**network** 41:13
230:19
**never** 48:10
143:5 182:20
207:25
253:19 254:9
**nevertheless**
151:18
**new** 8:21 15:12
109:10 131:11
145:14 206:1
247:11 251:12
**nice** 119:15 131:6
**Nicole** 155:6
**night** 124:24
126:23 151:12
185:5 190:18
193:16
**nomenclature**
257:14
**non-arrest**
133:12
**non-attorney**
26:3
**non-complian...**
72:17
**non-compliant**
71:19 77:8

**non-criminal**
94:18,24
95:19,22
99:25 100:11
101:21 103:14
104:23 105:8
185:10
**non-deadly**
80:12
**north** 6:4 51:18
132:14
**notarized**
263:16
**notary** 4:21 7:4
262:4,20
263:14
265:23
**note** 58:20
192:7
**noted** 51:15
53:2 64:4
**notice** 2:14 10:7
20:25 21:8,8
23:3,3,19,20
66:19 107:5
203:7 237:9
239:18,21
**noticed** 85:21
**notification**
106:10
**notified** 45:5
70:17
**notify** 181:18
**notifying** 45:1
**novel** 192:5
**November** 18:9
18:17 20:13
21:16 24:7
37:6
**number** 21:22
27:4,6 38:6,9
38:24 39:2,3
39:8 48:15
49:14 50:10
58:12 83:14
84:2 97:1
101:4 108:10

118:4 124:1
125:25 131:17
135:7,11 136:3
140:14 160:25
166:22 197:5
227:8 228:19
228:22,23,24
229:4 230:2
230:15,16,17
230:17,18,21
230:21,24,24
230:25 231:3
231:5,11,15,18
231:23,25
232:16,25
233:8,9,19
236:3,4 242:9
242:18
243:24
244:24
254:21 255:11
**numbered**
62:18 63:11
**numbers** 13:4
39:13,17 83:16
83:20 135:14
227:10,11
231:19 232:7
233:2
**numeral** 83:25
**numerals**
115:25
**numerous**
243:16
**nutshell** 153:2
202:3

---

## O

**o'clock** 4:14,15
36:13
**O'Toole** 2:12
18:9
**oath** 9:7 150:21
**obey** 189:20
**object** 20:3
48:12 65:3
72:14 75:11

78:3 79:7
120:12 122:12
173:9 177:13
178:20 185:22
190:5 191:22
193:20 196:13
199:9 201:18
213:19 245:10
257:16
**objection** 76:22
114:3 174:2
177:20 179:20
181:7 182:4
184:4 192:5,8
192:8 197:1
214:5,8,15
216:25 246:11
**objections** 79:11
192:3
**objective** 97:4
110:22,25
220:24
**obvious** 165:20
**obviously** 18:19
21:3 26:18
40:18 45:24
49:13 59:14
60:13 73:14
201:9 226:15
227:6 230:23
241:16
**OC** 98:3 112:2
120:1 121:18,21
122:1,7,23
123:11,14,19,25
124:5 125:22
127:24 128:3
128:13 129:20
130:1,14,22
131:23 132:4
259:11
**occasions**
190:12
**Occupy** 229:21
**occur** 27:19
39:10 64:6
74:12,13 183:6

**occurred** 14:21
38:4 39:16,18
50:24 53:4
56:22 61:8
66:1 92:2
120:21 127:12
163:22 166:4
186:3
**occurring**
120:17 135:8
190:23 193:9
193:15,25
222:12
**October** 37:6,19
44:10 53:5
155:4 168:18
**odd** 91:3,5
**offense** 170:21
187:18 188:1,4
**office** 2:18 4:16
5:14 15:21 91:2
155:25 159:20
263:5,17
**officer** 3:13 11:11
11:12 32:16
50:17 59:11
60:18 68:18
68:20,21,24
70:1,13 71:4,12
71:13,18,21
73:9,10 74:4
74:18,20 75:4
75:7 79:22
80:3,23 82:21
83:2,3 90:2
113:17 117:5
129:15,18,25
130:8 137:3,8
137:13 144:17
148:14 187:2
187:10 189:21
194:21 195:11
195:14 196:9
196:22 197:15
198:9,12,17
199:22 200:2
200:2,8 215:2

ERIC LARSON  4/8/2019

| | | | | |
|---|---|---|---|---|
| 215:12 216:4,8 | officers' 113:7 | 126:9,13,25 | 229:7 233:3 | operational 3:7 |
| 216:9,17 218:5 | 200:18 | 128:21 130:13 | 233:18 | 163:12 206:10 |
| 230:20,22 | official 39:1 | 130:19 131:5,14 | 236:20 | 237:7,18,21 |
| 248:3,10 | 195:2,18 196:2 | 132:16 133:24 | 237:15 238:10 | 238:3,5 |
| officer's 117:9 | officials 93:21 | 134:2,16,20 | 238:20 239:3 | operations 2:15 |
| officers 14:11 | 94:4 | 136:9 137:2,10 | 239:11,23 | 3:15 14:7 27:21 |
| 19:16,25 20:8 | oh 33:11 48:10 | 137:21 138:20 | 240:15 241:10 | 27:22 28:20 |
| 20:16 27:23 | 97:13 130:9 | 139:22 140:21 | 241:14,19,21 | 33:12 63:4,4 |
| 33:16 34:15 | 146:16 168:9 | 141:5 142:11 | 242:1,18 | 63:23 64:22 |
| 34:20,25 | 168:12 246:17 | 143:7,15,24 | 244:17 | 139:6 205:10 |
| 40:19 61:15 | 249:8 | 144:5,23 | 246:22 | 205:14 206:11 |
| 69:4 72:5 | okay 8:4 9:3 | 145:2 146:6,21 | 247:21 248:15 | 207:6 219:12 |
| 73:23 76:15 | 11:14 13:9 18:16 | 150:1 151:6,18 | 252:22 253:4 | 237:1,3 246:4 |
| 81:8,13 84:14 | 19:1,10 20:8 | 151:20 155:19 | 253:16 254:14 | operative |
| 85:10 88:4 | 22:3,10 23:2 | 155:19 156:2 | 254:23 255:9 | 209:10 |
| 94:15,22 | 23:11 24:20 | 156:18 157:25 | 255:15 257:4 | opinion 120:14 |
| 96:20 99:23 | 26:12 27:5 | 158:16 159:1 | 257:15,23 | 173:13 178:2 |
| 100:10 104:21 | 28:21 29:2,14 | 160:7 162:18 | 259:1 | 179:3,24 |
| 105:6,15,25 | 30:6,24 31:21 | 163:19 164:2 | Olive 5:5 41:7 | 198:6 |
| 106:23 107:3 | 40:2,5,7,8 41:1 | 165:4,15,22 | Omri 5:8 7:18 | opinions 76:2 |
| 107:19 108:8,11 | 41:5 47:15 | 166:2 167:4 | once 8:9 78:3 | 157:11 178:22 |
| 109:15,20 | 52:20 57:10 | 168:14,25 | 79:23 80:14 | opportunities |
| 112:24 114:9 | 59:9,20 62:5 | 170:1 172:10,13 | 115:20 178:20 | 186:4 |
| 114:22 118:17 | 62:22 63:17 | 172:21 176:13 | 212:8 230:9 | opportunity |
| 120:25 125:3 | 65:9 66:24 | 177:10 178:6 | one's 220:12 | 18:16 78:14,16 |
| 126:25 127:15 | 67:3,25 68:6 | 180:7,23 | one-on-one | 95:10 100:4 |
| 128:11 135:10 | 68:22 69:2 | 186:7 187:17 | 77:17 | 105:2 120:20 |
| 135:17,25 | 73:4,20 74:14 | 188:18 189:1,8 | ones 82:3 | 186:5 204:22 |
| 138:3 139:25 | 75:2,23 81:3 | 192:9,25 | 237:4,5,5 | opposed 248:3 |
| 140:10,19,24 | 83:19 84:2,7 | 194:4,20 | 261:2 | opraiss@aclu-... |
| 141:8 142:5,14 | 85:5,17 86:2 | 196:5 197:5 | ongoing 16:8 | 5:10 |
| 142:24 143:11 | 87:7,11 88:8 | 198:11,16 | 25:19 52:8 | OPs 40:6,25 |
| 144:1,9,13,24 | 91:12 92:15 | 200:6,24 | 56:24 61:20 | 62:5,20,23 |
| 145:2,5 146:14 | 93:2,16 95:3 | 201:24 202:2 | 65:24 145:9 | 63:3,7 64:4,5 |
| 147:23 148:10 | 97:17 99:17 | 202:8,24 | 145:14 148:12 | 64:6,14 65:10 |
| 149:19 151:24 | 100:15 102:2 | 203:14,21 | 148:15 156:14 | 66:3,5,17 |
| 158:19 167:22 | 102:12,17,21 | 204:8,23 | 156:19,24,25 | 205:15,19 |
| 179:5,13 181:19 | 103:2,10,16 | 206:20 | 157:14 158:6 | 254:15 |
| 183:25 186:14 | 104:17 105:5 | 207:15,23 | 254:2 | Option 127:17 |
| 190:20 197:17 | 105:20 106:5 | 210:18 212:4 | open 159:8 | order 3:14 11:5 |
| 198:5 199:2 | 106:14,22 | 214:25 217:3 | open-ended | 16:25 17:5,5 |
| 199:25 201:2 | 108:13 109:4 | 217:18 219:12 | 201:13 | 18:13,18,23 |
| 201:13 215:20 | 110:6,21 112:12 | 219:18 220:7 | operates 45:14 | 19:22 27:21 |
| 216:23 218:14 | 114:16 115:6 | 220:18 224:7 | 65:20 | 27:22 28:20 |
| 219:7 223:2 | 116:23 117:5,12 | 224:24 226:6 | operation 37:12 | 29:12 33:12 |
| 238:16 256:5 | 118:3 119:23 | 226:25 227:8 | 62:24 65:21 | 40:25 49:21 |
| 256:14 257:11 | 121:25 125:5 | 228:4,8,19 | 249:15 | 53:8 54:9,20 |

| | | | | |
|---|---|---|---|---|
| 60:16 62:24 | 213:18 214:4,11 | **outlined** 106:19 | 90:20,22 91:7 | 211:5 255:23 |
| 63:4,5,23 | 215:6,9,13,19 | 238:18 | 93:16,23 94:6 | 256:11 |
| 64:23 67:8,18 | 216:5,11,18 | **outlines** 108:23 | 94:12 132:17 | **park** 14:9 211:10 |
| 67:22,24 | 217:5,9,21 | **outlining** 152:3 | 136:12 163:7 | **part** 7:10 18:25 |
| 70:15 73:8,17 | 218:2,6,11,16 | **output** 235:6 | 169:17 170:15 | 27:22 48:4 |
| 74:5,16 76:9 | 218:25 219:16 | 247:20 258:3 | 171:9 172:22 | 51:16 59:24 |
| 76:17,23 | 222:8 235:20 | 258:6 | 173:3,4,16 | 60:17,17 61:9 |
| 80:25 84:3 | 238:16 241:1 | **outside** 15:17 | 175:18,20 | 61:11 64:19,21 |
| 92:19,25 | 241:13,24 | 24:25 46:20 | 176:13 187:17 | 65:2 67:23 |
| 93:15 96:19 | 242:7,14 | 48:12 65:4 | 187:25 189:1,9 | 80:13 81:17 |
| 97:6 101:16 | 243:2,13 | 114:18 129:22 | 194:5,20 | 94:15 97:11 |
| 106:19,20,24 | 245:23 251:15 | 191:23 192:10 | 228:14 232:8 | 101:13 107:9,18 |
| 107:13,14,16,17 | **orders** 2:18 13:3 | **outstanding** | 232:9,13,14 | 116:8 132:8 |
| 107:22,24 | 14:18 15:4 | 10:16 | 249:19 | 144:25 149:11 |
| 108:2,3,3,5,18 | 48:5 56:18 | **overall** 33:17 | 254:24 | 150:6 159:18 |
| 108:23 109:5 | 60:8 67:7 | 48:5 49:17 | 255:10,18 | 178:6 190:7 |
| 109:9,14,19,25 | 81:11 95:14 | 61:11 | 263:11,14,17 | 191:18 |
| 110:3,12,15,18 | 113:24 114:18 | **overhear** 181:21 | 264:5,9,13,17 | **participate** |
| 110:22 111:1,16 | 152:20 203:8 | **overheard** | 264:21 | 32:25 65:1 |
| 111:25 112:7,21 | 204:7,13 | 181:18 | **pages** 16:2 | **particular** 43:9 |
| 113:1 114:12 | 205:20 207:7 | **overhearing** | 62:17,19 63:6 | 43:17 45:11 |
| 115:18 116:13 | 207:13 208:21 | 181:2 | 63:10 65:10 | 47:11 55:11,12 |
| 117:2,10 121:14 | 215:16 216:2 | **overwrite** 45:23 | 85:25 90:19 | 57:16 61:25 |
| 122:11 124:4,8 | 218:24 219:8 | **owing** 10:4 | 91:3,5 92:4,8 | 63:24 64:8 |
| 125:24 130:24 | 223:3 239:6 | **owned** 42:6,9 | 169:15 | 64:22 68:7 |
| 131:20 136:17 | 241:20 249:6 | 43:10 | **painful** 80:10 | 73:24 104:6 |
| 136:23 137:12 | 255:6 | **owns** 41:25 | **paper** 201:14 | 123:9 163:23 |
| 137:14 138:11 | **ordinance** 172:2 | 45:22 | **paragraph** | 165:1 168:3 |
| 138:12 139:3 | 176:14,17 177:6 | | 93:17 101:17 | 190:22,23 |
| 142:21 154:8 | 177:11,18 178:6 | **P** | 105:13 108:13 | 193:25 |
| 166:7 172:23 | 179:6,10 180:9 | **P** 230:14,16,17 | 224:7 | 207:25 |
| 184:14 185:7,8 | 181:11,12 | 230:17,21,21 | **paragraphs** | 224:18 226:17 |
| 187:12,13 190:1 | **ordinances** | 230:24 231:3 | 255:17 | 229:16 230:10 |
| 190:13 193:1,1 | 197:18,19 | 231:5,10,15,18 | **parameter** | 237:18 240:6 |
| 193:7 195:1,17 | **ordinary** 194:13 | 231:19,25 | 230:5 | 252:2 253:1 |
| 195:22,23 | **original** 21:4 | 232:7,16,25 | **parameters** | 258:2 259:4 |
| 196:7,12,18 | 213:14 227:3 | 233:1,7,9,19 | 226:2 230:7 | **particularly** |
| 203:19 204:4 | 244:24 | **p.m** 118:10 | 230:12 | 133:15 |
| 204:6,6,14,20 | 263:10 | 119:12 261:16 | **paraphrase** | **parties** 262:12 |
| 205:3,6,10 | **originally** 10:2 | **P1709150933** | 93:17 | 262:15 |
| 207:2 208:8 | **outcome** | 232:20 | **paraphrased** | **partnerships** |
| 208:12,21 | 262:16 | **PA** 30:20 239:6 | 209:17,23 | 41:14 |
| 209:3,12,15 | **outline** 141:1,5 | **package** 60:1 | **paraphrases** | **PAS** 105:21,22 |
| 210:1,11,12,19 | 144:15 145:4 | **page** 2:3,11 3:2 | 210:10 | 105:25 106:5 |
| 210:24 211:7,7 | 220:1,8 222:8 | 21:25 23:4 | **parcel** 60:17 | 106:22 107:4 |
| 211:12,24 | 222:10,22 | 85:18,21 89:4 | **parent** 25:15,15 | 107:5 114:21 |
| 212:5,16,22 | 248:23 | 90:15,15,17,19 | **parenthetical** | 150:13 |

Pls.' Ex. 26

pass 107:16
108:6
passive 74:9,11
77:2 84:9,15
84:18 85:8
passively 72:17
72:19,25 73:7
74:2 77:10
81:5 82:19,23
84:19
patience 247:5
patrol 11:11
29:25 68:18
132:13,14,15,15
245:17,21
pattern 184:9
pausing 69:5
peaceful 72:9
101:21 103:14
104:23 105:8
184:21
peacefully 73:6
pedigree 135:5
pen 240:4
penalty 9:9
265:12
pending 46:5
100:23 156:14
205:25
people 24:21
34:20 37:16
45:8 64:7,7
66:12 73:23
84:20 95:16
120:2 121:5
124:1 126:12
126:15,15
127:16 128:4
130:15 145:10
152:1 157:15
159:13 173:23
174:6,8,19,25
176:9,10 180:3
180:7,17 181:10
181:11 182:12
182:19 183:4
183:13,19,21

184:8,11 185:5
185:16,19
186:6,7,11,23
191:4 192:1,3
193:16 201:4
209:20 211:6
212:1 213:2,8
213:10,13
214:13 216:19
217:22 257:13
259:15,20
pepper 68:15,17
68:24 69:3,16
69:24 70:14
71:13,22 72:1
73:10 76:16,19
77:25 79:4
80:24 83:4,24
84:4,5 85:2,2
85:11 89:19,19
89:23 91:19
96:21 97:24
98:3,10,15,21
99:7,11,23
100:10 104:8
104:13,22
105:7 112:16
112:20,25
113:3 114:24
116:25 121:23
123:15 125:23
127:18 130:21
136:24 137:13
138:17 187:4
196:10 234:16
257:1,20
258:8,10
percent 40:15
201:16 250:17
percentage
26:14
Perfect 58:20
101:17
perform 15:21
performance
164:6 166:8
167:25

performed 11:17
172:14 246:8
period 14:15
15:8 22:2
31:18 38:3
39:11 44:13
45:11,23 68:14
69:18,20
147:13,25
148:7,8
209:10 214:13
240:23
243:22
perjury 9:9
265:12
permits 202:21
perpetration
178:10 181:5,15
perplexed 48:6
75:10 126:8
Perry 16:25
person 59:10
70:12 71:1,14
71:15,22 74:1,5
76:24 79:1
96:2 130:2
150:13 170:17
170:20 171:5
171:18 172:13
172:25 175:4
175:10,11,24
176:17 178:8
178:15 180:2
181:13 188:4
189:14,19
194:13 196:19
208:20 210:1
210:8 212:22
213:24 214:1
215:19
personal
150:20
personnel
65:16 66:8,9
66:10 166:22
persons 72:18
124:10 125:2

125:20 170:23
171:1 175:2
176:20 188:5
188:8 249:13
perspective
31:2 116:3
166:3 211:4
pertain 249:6
pertinent 46:12
46:15
phone 44:25
66:12
photographing
32:16
photos 36:1
phrase 38:21
77:7 89:15
177:10 178:14
194:9 228:9
239:19 255:21
phrases 230:7
physically 71:2
picture 2:24 3:3
118:1,13,16
119:4,15
120:22 128:22
129:4,14
piece 201:14
piecemeal
36:18
pieces 145:23
198:3
place 10:12
65:19 119:8,11
126:4 143:2,3
144:24 145:13
168:19 182:22
184:2 192:19
208:18 226:17
226:23
240:23,24
places 234:6,8
plaintiffs 1:6,18
2:4 4:6 5:3
7:2,10 23:13
207:22
Plaintiffs' 17:24

20:20 62:14
83:10 86:4
93:5 101:1
117:19 128:24
154:16 162:24
170:2 203:2
206:4 219:20
223:14
plan 2:15 3:15
3:18 10:2
21:23 40:6
61:19 62:5,20
62:23 63:7,23
64:4,5,7,14
65:10 66:3,5
66:17 141:20
178:1 205:14
205:15,20
206:11 207:6
219:12 237:2
237:3,18
238:3 246:5
254:15
planned 246:2
planning 3:7
12:7,18 13:1,2
14:16 15:10,17
15:18,21 16:13
16:21 17:15
65:21 163:13
182:3 237:7,21
238:5
platform 42:17
42:20,21
platforms 42:18
42:19
plausible 113:25
114:7
play 73:13
253:25
played 163:24
please 8:17,24
48:16 68:7
72:11 79:3,15
89:4 102:3
110:2 111:10
171:17 194:5

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 205:18 239:3 | 75:3,7 80:23 | 259:13 | 184:3,6,8 | 197:20 199:24 |
| 240:23 255:9 | 81:13 83:2,3 | **policies** 15:4,12 | 185:4,15 | 215:10,13 |
| 256:8 263:9 | 85:9 86:9 | 15:12 17:18 | 186:14 190:1 | 216:16,19 |
| 263:12,16 | 88:4 90:2 | 28:16 47:16 | 211:11 | **practices** 76:7 |
| **plugged** 65:23 | 94:15,22 | 49:20 59:21 | **positions** 11:9 | 88:17 94:7 |
| **plural** 136:5,11 | 96:20 99:22 | 73:1 74:6 76:7 | 31:4 | 138:2 142:13 |
| **point** 11:1 20:6 | 100:9 102:15 | 88:17 109:15 | **possibilities** | 151:23 152:14 |
| 32:5 34:11 | 103:7 104:21 | 109:20 138:1 | 78:21,21 | 153:5,12,18 |
| 38:15,16,17 | 105:6 106:23 | 142:13 151:23 | **possibility** | 156:11 157:2 |
| 48:23 50:18 | 107:3 109:15 | 152:14 153:4 | 78:20 | 158:7,12,20 |
| 51:2 53:5 | 109:20 112:24 | 153:18 156:11 | **possible** 10:18 | 158:23 195:14 |
| 60:11 74:1 | 113:17 114:9,22 | 157:2 158:7,12 | 15:14,16 27:16 | 197:7,13 |
| 79:24 80:2 | 118:14,18 119:2 | 158:19,23 | 87:1 114:7 | 200:3 202:4 |
| 83:22 84:8,16 | 120:25 126:25 | 197:7,13 | 261:6 | 202:16 215:8 |
| 85:20 120:16 | 127:11,15 | 200:3 202:4 | **possibly** 159:25 | 217:4 218:15 |
| 120:18 174:7 | 129:15 133:14 | 202:16 215:8 | 160:5 214:1 | **Praiss** 2:6,8 5:8 |
| 183:5,25 | 137:3 138:3 | 217:4 218:15 | 224:22 225:7 | 7:15,18 10:11 |
| 190:16,21 | 139:25 140:10 | **policy** 13:3 14:18 | **post** 63:8 142:2 | 10:23 11:3 18:1 |
| 195:13 198:5 | 140:19 141:7 | 14:25 15:22 | 146:4 149:21 | 20:5,22 23:11 |
| 201:8 221:15 | 142:5,14,24 | 15:23,24,25 | 159:15 | 23:17,19 48:14 |
| 246:10 251:19 | 143:11 144:1,9 | 16:3,4 17:7 | **potential** 40:10 | 55:24 56:25 |
| 252:14 253:12 | 144:13,16,17 | 28:21,24 29:2 | 42:18 46:1 | 57:11,13 62:12 |
| 254:5 260:12 | 145:11 146:13 | 29:7 31:6 | 80:5 171:14 | 62:16 65:7,9 |
| **pointing** 130:4 | 147:23 148:10 | 47:20,22 48:3 | 224:23 226:3 | 72:24 75:14 |
| 130:5,10,12 | 148:13,17 | 48:3,9,23 | 232:2 245:22 | 77:20 78:5 |
| **points** 123:9 | 149:18 151:24 | 49:17 50:18 | 246:3 | 79:10,15,17 |
| **police** 2:17,18 | 153:5 157:9 | 72:4 75:3 | **potentially** 21:5 | 83:8,12 85:24 |
| 2:20 3:11,13 | 157:20,22 | 77:15,24 91:9 | 35:6 40:4 | 86:6 91:1,7 |
| 11:7,11 12:25 | 158:19 164:7 | 91:13 93:20 | 80:9 172:17 | 93:7 100:17 |
| 15:19 16:14,20 | 166:8 167:22 | 94:2 105:15 | 184:16 210:4 | 101:3 114:4,5 |
| 17:14 19:16,18 | 167:25 179:5 | 105:20 106:15 | 214:20 248:13 | 115:12 116:2 |
| 19:21,24,25 | 179:13 183:25 | 106:16,18,19 | 259:9 | 117:15,21 121:1 |
| 20:8,15,16 | 184:14 189:20 | 108:23 122:5 | **PowerPoint** | 122:22 129:1 |
| 27:13 28:1,17 | 190:20 195:11 | 133:24 142:23 | 61:19 89:5 | 131:2,5 139:12 |
| 28:23 29:4,9 | 196:22 198:5 | 152:2,24 | 160:8,11,13 | 141:22,25 |
| 32:14,24 | 199:2 200:7 | 155:24 168:17 | 171:10 173:17 | 147:15,21 |
| 34:20,25 37:9 | 200:18 201:13 | 171:25 176:4 | 202:12 260:17 | 154:18 160:21 |
| 38:25 40:18 | 218:5,14 219:7 | 184:13 195:9 | **PowerPoints** | 162:12,14 163:1 |
| 41:7,14 42:1 | 223:2 224:9 | 197:21 211:4 | 219:10 | 169:14,17 |
| 43:25 47:24 | 224:10 228:4 | 215:10 | **PPC** 240:10,20 | 170:4 173:12 |
| 49:19 57:20 | 231:2 233:2,11 | **pool** 63:22 | 243:3 245:2 | 174:11 177:15 |
| 57:22 59:17 | 239:25 240:8 | **pop** 236:25 | **practical** 116:3 | 177:23 178:25 |
| 60:5,18,22 | 240:10,13,21 | **portion** 84:3 | **practice** 75:25 | 179:21 181:20 |
| 65:18 68:24 | 240:25 241:12 | **position** 13:6 | 93:21 94:2 | 182:5 184:7 |
| 69:4 71:4,18 | 243:4,8,12,15 | 56:21 74:20 | 134:21 194:21 | 185:25 190:11 |
| 71:21 72:5 | 243:24 245:5 | 130:2 174:13 | 195:20 196:6 | 192:2,9,14 |
| 73:8,10 74:6 | 256:5,14 | 182:17 183:18 | 196:17,24 | 194:4 196:16 |

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 197:2 199:11,14 | 136:5,8,11 | 126:22 127:10 | 239:19 | 260:1 |
| 201:24 | 163:16 165:5 | 161:14 190:19 | 242:20 | produced 4:13 |
| 202:24 203:4 | 206:15 | presenting | 250:15 | 7:9 23:12,16 |
| 205:24 206:6 | 209:19 218:23 | 127:5 | prisoner 35:24 | 47:3 51:6,13 |
| 207:24 | 222:4,9 | presently | 35:24 | 52:22 203:15 |
| 213:22 214:6 | 230:25 231:1 | 109:19 214:24 | private 41:14 | 207:21 |
| 214:9,17 217:3 | 235:21,23 | 237:4 | 42:2,7 45:15 | Production |
| 219:18,22 | 236:25 237:6 | preserve 40:19 | privileged 20:4 | 23:3 |
| 222:14,17 | 237:8 243:18 | pretty 56:5 | probabilities | Professional |
| 223:16 233:21 | preparing 13:4 | 166:3 198:16 | 78:22 | 4:19 262:4 |
| 238:8 239:14 | 23:8 24:4 | 199:17 215:2 | probable 197:19 | professor 168:8 |
| 240:16 242:21 | 25:24 26:4,13 | 226:19 | 198:9 200:12 | program 141:1 |
| 242:25 | 55:10 68:2 | prevalent 232:1 | 204:18,19 | 144:19 |
| 245:12 246:15 | 85:5 86:21 | prevent 178:9 | probably 8:11,18 | programs |
| 247:4,10 | 93:12 110:8 | 181:5,14 | 21:16 26:10,16 | 148:21 |
| 251:11 259:22 | 147:6 205:10 | previous 62:3 | 31:12 36:3 | prohibit 60:4 |
| 260:11 261:11 | 220:19 221:17 | previously | 43:16 50:12 | prohibited 94:7 |
| pre-Stockley | 229:19 | 52:17 117:17 | 65:13 117:15 | 94:22 |
| 86:19 | prerequisite | 140:4 155:2 | 197:16 201:16 | prohibiting |
| precluded | 245:24 246:1 | primarily 14:1,7 | 206:18 242:11 | 200:1 |
| 94:15 | presence 215:3 | 32:13 35:16 | probe 124:18 | promoted 11:18 |
| predicate | present 25:3,6 | 58:9 67:22 | problem 43:11 | 11:22,25 12:8 |
| 192:13 193:3 | 34:1,4,5,9 | 68:18 132:6 | 55:25 180:12 | 13:10 |
| preface 199:10 | 55:20 69:14 | 133:14 230:5 | 195:8 214:7 | prompted 18:5 |
| prefer 118:24 | 99:22 100:9 | 248:14 260:5 | 254:10,12 | properly 251:23 |
| preferable | 124:10 149:18 | principle 124:14 | problems | property 35:14 |
| 130:20 | 171:19 175:24 | 246:7 | 214:20 | 35:18,24 37:2 |
| preliminary | 178:8 180:2 | print 260:20 | procedure | 37:5,8,12 38:7 |
| 18:12 19:4 | 181:13 189:15 | 261:2 | 152:25 | 38:8,11,12 |
| 20:17 101:10 | 193:4 200:13 | printed 18:21 | 249:22 255:1 | 49:16,23 58:11 |
| 153:17 156:12 | 209:10 213:1 | 170:6 261:3 | procedures | 60:1 124:11 |
| 191:10 | 217:22 218:8 | prior 18:23 | 216:24 | 125:2,9,20 |
| preparation | 218:10 222:19 | 22:15 24:17 | process 35:11 | 180:22 |
| 21:11 32:20,21 | 231:16 253:22 | 32:17 54:18 | 36:25 44:17 | 190:20 191:17 |
| 55:2 86:24 | 254:3 | 65:12,14,25 | 51:17 52:8 | proposed |
| 92:16 157:7 | presentation | 69:24 77:23 | 58:15 59:24 | 246:2 |
| 159:2 206:18 | 87:23 88:2,3 | 87:6,13 89:11 | 65:24 72:8 | prosecution |
| 235:6 | 161:2 169:18 | 89:21 90:6 | 80:22 148:15 | 61:1 |
| prepare 24:23 | 171:10 172:22 | 145:2,5 146:11 | 152:23 154:12 | prosperity 183:1 |
| 27:1 51:10 | 173:17 187:18 | 147:9 152:5 | 156:19 157:15 | protest 2:20 |
| 56:2 59:12 | 202:12 | 161:22 187:1 | 186:13 203:12 | 14:23 15:13 |
| 67:4,19 139:1 | 222:20 | 190:9 194:25 | 247:6 254:1 | 16:6 17:3 |
| 204:2 218:21 | presentations | 195:16,20 | processes | 22:12 27:18 |
| 224:4 | 162:4 167:21 | 200:13 205:3 | 154:13 | 27:20 28:18 |
| prepared 26:21 | presented | 205:21 206:18 | processing | 28:23 31:17 |
| 32:25 88:11 | 86:17,18 87:12 | 207:1,11 | 128:14 | 31:25 32:3,15 |
| 134:15,18,20 | 125:1,19 | 209:15 216:2 | produce 39:24 | 45:25 50:9 |

Pls.' Ex. 26

50:20 60:23
65:2 86:10
87:14 88:9,24
91:14 122:2,24
133:4 144:10
153:20 156:12
158:13 159:2,8
159:10 161:3,9
161:13 162:8
163:17 165:7
165:13 167:20
168:23 173:21
174:15 206:16
207:7 216:10
226:4,17,20
226:22 229:3
229:16 230:8
231:2,22,22
231:22 232:6
232:25 236:2
236:6 237:19
238:18 240:6
240:23 241:2
241:10,12
242:7,22
244:1 245:5
246:10 252:9
**protester** 28:1
113:18 195:1,2
195:3 196:1
**protesters** 61:15
98:11 104:9
119:3 126:16
142:15,25
143:13 144:3
152:17 153:6
183:14,15
213:13 214:18
222:1 227:9
233:11 240:7
240:12
**protesting**
73:23 239:25
240:10,13,20
243:8,14
245:5
**protests** 14:22

15:2 16:6,22
17:19 22:15
27:8,14 29:5
29:10,16 30:5
33:21 35:7
36:9 37:22
39:7,15 40:24
41:3 45:12
46:10,17,24
46:25 47:18
47:20 48:18
48:25 49:9
50:6 52:14
57:24 63:19
64:20 73:5,16
114:23 132:5
134:11,12,13,13
136:6,12 157:3
159:6 187:2
188:24 215:21
216:3 217:6
218:23 219:14
225:24
226:10 236:18
236:23,25
239:19 240:12
240:24 243:4
243:23 245:9
**protocol** 249:1
256:13
**protocols**
248:20,24
255:13,17
256:2,23
**provide** 9:4
56:18 78:7
139:7 196:7
198:12 209:18
216:8 227:22
**provided** 25:25
70:1 81:8
87:22 88:4
106:9 112:23
114:9 138:8,10
139:5,25
140:15,23
142:4 143:10

144:1,12,15
158:18,22
164:15 167:1,21
173:17 176:7,8
199:2 200:7
218:14 220:1
222:5 225:16
228:1 251:20
251:21 260:8
**provides** 177:24
220:9 221:22
226:10
**providing** 19:3
41:21 100:1,3
104:25 105:1
148:25 256:3
**provision**
109:10 115:15
124:17 169:24
170:18 171:13
178:19 179:16
182:7 186:11
187:22 188:19
188:24 189:7
200:19
202:22 217:13
**provisions**
114:24 124:8
138:16 161:9
206:25
**public** 4:21 7:4
14:9 27:13
28:18,23 29:5
29:10,16 34:2
45:15 243:8
243:14 245:5
262:4,20
263:14
265:23
**punishing**
94:25 100:12
105:9
**purged** 51:2
**purports** 88:16
**purpose** 32:12
32:13 35:3
94:17,24

95:21 99:24
100:12 104:22
133:8,10 231:6
**purposes** 39:25
86:7 105:8
106:6 154:19
163:2 223:18
234:11,13
235:12
**pursuant** 101:22
109:5 200:8
202:7
**put** 10:1,21 17:9
21:20 27:20
34:25 35:17
38:8 50:25
53:8 58:11
59:3 63:2,21
70:12,18,22
72:21 74:3
82:3,21,22
101:22 102:16
164:3 165:2
207:19 212:11
230:7 231:3
250:5 260:6
**puts** 82:21
**putting** 30:22
229:20
260:11
**puzzled** 242:10

───── **Q** ─────

**qualified** 145:11
**qualify** 236:23
**quality** 164:5
166:7,14
167:24
**question** 8:21
8:23 9:1 13:23
17:12 20:3,10
23:11 28:14
31:2 37:4,14
37:23 49:25
50:4 51:19
55:7 56:15,23
64:24 66:14

71:7 72:14
75:12 76:5,11
78:4 79:8,18
85:5 88:22
97:18 99:16
100:22 114:7
120:13 122:5
122:13 123:23
125:12 147:21
154:14 156:8
158:3 165:20
167:18 173:10
175:14 177:14
177:16 178:21
179:1 180:14,15
183:17 185:23
186:1 190:6
191:22 192:10
192:11,13,14,20
192:25 193:21
196:14 199:1,6
199:10,15
200:6 201:21
205:25
206:24 210:7
211:19,23
213:20,23
215:24 222:19
229:18
234:23
236:13 241:21
243:5 245:13
246:25 249:4
258:21 260:12
260:18
**questioning**
239:16 257:5
257:23
**questions** 7:15
8:15,18 12:14
18:7 54:6,8
57:15 102:20
103:1 104:2,17
107:11,25 108:1
108:5,9,11
117:16 118:19
131:11 139:16

ERIC LARSON  4/8/2019

143:17,20
145:20 147:15
156:7 163:23
184:24 204:17
243:18 247:6
247:11,14
251:11,12,16
254:15,20
259:23
260:21 261:12
quibble 74:7
quick 8:14
141:23 142:9
242:13
quicker 239:16
quickly 18:6
41:9 237:1
quite 37:17 76:3
92:8 114:4,6
142:19 154:7
213:11 232:16
quote 38:25
49:17 80:6
166:7 230:17
245:18
quotes 208:23

**R**

raised 250:8
raises 145:19
Randy 221:14
222:22
range 97:14
128:4 248:8
258:13,19
259:7
ranged 167:1
rangers 14:10
rank 11:19,23
12:1,8 34:14
197:22
rate 257:21
rationale 75:8
76:12,15
Re-Examination
2:8 251:10
reach 171:5

175:11,15
reached 79:24
80:14 174:15
181:22 182:13
183:22
read 51:4 86:23
99:18 101:18
108:15 118:9
137:25 138:22
164:3,12 191:14
197:6 202:1
210:6 248:18
249:19 261:14
261:17 263:12
264:6,10,14,18
264:22 265:6
readily 39:24
reading 26:20
ready 66:4
102:20,21
110:4,5
real 18:6 28:3
35:21 36:21
36:23 41:2,16
41:17,21 43:21
43:22 45:8,10
45:20 46:9,19
47:8 48:2
49:7 50:8
53:21 54:14
58:5 141:22
142:9 242:13
252:20
realize 201:15
realized 253:12
254:11
really 44:12
47:9 69:15
183:9 224:17
246:4
Realtime 4:19
7:4 29:19
reason 31:3,11
46:22 54:19
64:2,24 72:4
74:10 75:2
76:23 78:6

116:16,21,22
153:23 159:11
192:9 196:17
211:3 212:10
214:9,16
216:14 233:4
253:4 264:7
264:11,15,19
264:23
reasonable
183:12 194:6
194:10
reasonablene...
194:12
recall 21:7,9
26:6 68:21,22
68:25 69:1,9
69:11,14 85:16
86:16,25 87:3
87:22 88:7
116:7 140:15
159:17,22
160:3,10,18
161:19 162:16
168:2 183:15
220:3 236:12
257:7 259:1,4
received 18:20
37:20 225:7
238:6
recess 250:6
recognize 53:6
83:21 118:13,18
119:6,19
recognizes
77:22
recognizing
114:5 116:16
recollection
69:25 102:18
167:19
recongregate
212:2,20
214:14
record 7:25 8:1
8:19 10:1,22
21:21 28:1,23

29:4,8,15
30:9 31:6
32:2 35:4
38:5 41:3,12
41:18 45:2
51:4,19 57:12
57:14 59:25
61:14 62:11,13
62:22 81:4
85:17 93:3,4
100:25 101:19
131:4,6 133:2
133:13 138:1
139:10,11
141:22,24
155:3,4,23
157:18 164:4
179:22 197:6
203:1,4
205:22,23
206:9 207:20
222:14,16
226:2 233:20
235:24
237:21 238:7
238:14 239:4
239:12 240:14
242:1 247:3
247:12,16
250:5 251:8
252:8 254:9
259:24 260:6
260:12
recorded 27:7
35:13,20,22
36:19 38:2,5
39:5 49:15
52:21 58:11
59:8 60:21
250:21 252:11
253:19,24,25
recording 27:13
28:17 30:12,15
31:1 45:13
46:24 47:5,11
51:6 57:24
58:4,6,15,17

253:20
recordings 37:2
37:21 42:25
47:17 48:17,24
253:2
recordkeeping
58:3,15
records 35:8,9
36:18 45:19
46:9,16 47:9
50:7,19 54:15
133:10 134:5
148:15 224:25
224:25 225:2
225:22 226:1
227:13 228:2
228:6,8
230:11
recover 51:21
52:6
recoverable
254:3
recovered 30:3
red 240:4
reduced 262:9
refer 8:3 92:4
170:9,13
187:22 209:21
228:20
243:20
249:18 257:11
reference 22:5
96:12 111:18
131:22 132:11
137:5 235:18
236:14 254:10
257:5
referenced
136:13,18
139:6 142:3
143:16 145:24
180:8 202:20
205:16 219:15
219:25 224:14
231:11 233:10
245:1
references

Pls.' Ex. 26

92:3 256:21
referred 34:1
97:15
referring 18:13
19:2,8 24:12
32:22 60:11
68:9 87:4
102:9 115:8,14
115:17 132:12
141:18,19
144:15 151:11
151:24 155:9
156:24 168:14
180:3,5 228:11
244:11,20
refers 115:18
132:13 178:17
228:21 246:16
reflect 88:17
236:1
reflects 88:25
171:25 226:16
refrain 12:15
refresh 102:18
167:19
refreshed
26:20
refresher 8:14
145:15 150:10
150:12
refusal 74:15
189:10 190:2
190:10 193:2
193:17
refusals 80:1
refuse 189:20
refuses 71:15
82:12,25
refusing 72:20
74:2 76:17
81:23 82:15,16
82:17,18
regard 56:19
249:17
250:20
regarding 107:11
158:19 221:5

223:22
regardless
37:18 99:11
104:13 138:4
138:13 140:2
198:22 235:13
258:5
regards 77:14
Registered 4:18
262:3
regrettably
247:8
regular 30:1
200:2,25
relate 17:19
139:20 153:5
156:11 230:1
234:15,15
related 14:21
15:22 16:6,22
16:25 17:1
23:9 30:4
36:21 38:10,14
38:15 39:3,17
39:18 43:5
47:20,25
49:20 51:12
51:22 63:7
67:22 69:7
114:15 146:23
148:19,21 149:1
160:17,18
195:14 197:20
199:19 201:23
204:17 215:8
217:4 224:11
233:8 262:11
relates 14:7
38:24 48:24
49:13 113:5,7
151:1 195:13
208:3 228:23
232:22
relating 19:3
27:12 46:16
46:25 48:25
50:20 109:15

109:20 134:11
143:21 144:14
207:6 218:14
252:25
relationships
42:1
relative 3:16
28:2,9 32:6
43:25 70:3
139:5 141:15
197:17 204:21
206:11 262:13
release 66:6
released 51:16
53:2 65:15,25
releasing
221:25
relevant 22:1
57:6 147:13,24
153:19 200:19
211:6
relied 23:16
rely 23:7 227:9
remained 12:2
12:5
remember
236:8
reminder 107:9
render 265:9
renew 76:21
reorganizations
13:18
repair 43:12,14
45:3 55:18,19
56:14
repaired 44:18
55:1
repairs 45:3,4,6
repeat 88:20
99:19
rephrase 8:25
88:22 177:16
178:25 249:5
replacement
66:9,10
report 14:3,11
32:20,21,22

32:24 39:2
59:18 132:22
133:8,17,21
134:11,15,18,20
134:21 135:1,19
136:5,10 137:5
137:15,20
228:18,19,23
229:11 230:2
230:23,25
231:1 235:21
235:22,25
236:3,4
reporter 4:19,19
4:20,21 6:1
7:5 8:16 17:25
20:21 62:15
83:11 86:5
93:6 101:2
117:20 128:25
154:17 162:25
170:3 203:3
206:2,5
219:21 223:15
261:13 262:1,4
reporting 132:17
133:18
reports 14:4
37:9 133:14
134:2 135:3
135:25 136:7
160:17 227:12
228:3,12
229:7,15,25
230:4 234:4
represent 101:11
191:14
representative
9:14 23:24
53:14,24
64:16 67:20
76:6 84:22
116:12,24
121:9 139:1
146:12 150:21
157:6 162:3
172:4 173:14

178:3,23
182:10 207:10
216:1 221:11
222:25 240:7
253:17
representing
192:15
represents
118:16
reprimanded
165:22
request 15:20
16:15 17:15
21:12 23:3
50:17 53:18
55:15 70:11
71:16,24 73:8
73:12 82:25
141:16 164:25
232:23
requested
164:19 261:6
requests 16:20
35:19
require 55:25
137:19 184:22
210:16,17
217:21
required 80:15
80:23 90:6,9
108:2 128:12
132:17 137:15
164:10 165:17
180:21 187:13
190:8 196:10
209:14
requirement
95:25 96:21
97:6 107:23
108:4 120:6,7
124:13 134:23
165:19 170:25
175:18 177:7
184:18 204:18
209:11 210:2
216:22
requirements

95:3,17 103:12
117:2 128:6
165:25 168:21
172:23 173:5
221:5
requires 29:12
50:18 177:19
188:19 194:16
research 12:7,18
13:1,2 14:16
15:10,17,18,21
16:14,21 17:16
54:6
researching
13:3 14:18
reserved 7:7
resist 70:23
resistance 74:8
74:9,23 77:2
81:15,18,19,20
82:19 84:10,15
85:9 233:22
resisting 71:2
72:17,19,20
72:23,25 73:7
73:8 74:2,16
74:24 77:8,10
79:2 81:5,6,14
81:25 82:15,19
82:20
resistings
120:17
resolution
153:25 157:16
253:7
resolve 43:16
251:4
resolved 44:22
51:1 153:6
resorted 125:13
resources
245:23
respect 9:18
16:13 20:16
28:16 45:10
47:4,7,11 51:11
54:1,10,21

56:13 82:8
89:1 95:24
96:17 97:6
104:2 106:14
106:23 110:11
138:10,21 139:1
139:14 142:20
143:11,20
147:10 148:10
149:18 150:4
152:14 154:8
156:10,18
158:13 173:15
177:18 179:15
198:13 201:1
204:2,13
218:21 221:3,4
229:3 236:17
252:24
respecting
249:9
respond 150:16
237:1
responded
231:2
responding
55:15 145:24
241:2 242:7
243:25
response 2:15
3:15 27:13
28:11,17,23
29:5,9 53:17
143:16 206:11
220:21 246:2
248:20
255:13,17
256:13,23
responsibility
41:24
responsible
13:2 32:16
41:19 42:3,7
42:10 43:18
52:13,16 148:9
148:18,23,24
197:23 216:12

responsive
143:22
rest 181:12 210:6
restrict 122:21
restricting
122:17
restriction
120:11 121:4
restrictions
108:25 123:3
result 89:12
96:6 123:18
resume 56:20
retained 45:19
46:9,13 47:1,3
48:17 50:2
58:7,8,9
retention 47:17
47:20,22 48:9
48:24 49:4,17
retrievable
253:2
retrieve 251:18
return 212:9
263:16
returned 164:19
revamp 152:19
reverse 251:15
review 3:6 18:17
21:17 26:19
35:18 40:25
41:17 87:5
92:15 105:16
107:14,21,21
107:23 108:2
110:3 139:19
141:16 155:10
157:12 159:1,13
159:17 161:21
161:21 162:5
162:22 163:22
164:25 165:1
169:2 219:9
242:2
reviewed 18:22
18:23 21:12
23:9 24:9

26:1,19 58:25
67:7,15 83:24
86:21 87:2
93:11 110:8
139:3,4 140:6
140:9,23
204:4 218:22
218:25
reviewing 33:12
45:17 53:1
67:17 153:9
228:2
reviews 15:22
107:13
revise 152:19
Revised 3:10
170:7 217:13
revolves 135:6
right 10:12 29:17
49:6,8 82:9
83:16 86:25
89:4 90:17
113:25 114:4
119:14 129:14
129:15,19,22
140:12 143:14
145:5,25
147:5 148:6
154:3 157:17
161:11,17 167:10
180:24 198:18
199:18 200:10
205:13 212:14
216:17 232:17
239:20
257:19 260:19
261:1
rights 95:1
100:13 105:10
249:9
riot 187:18
189:16,22
190:3,13 193:4
193:8,18
217:23
rioting 188:1,4
riotous 183:7

risen 175:1
risk 216:22
247:10
risks 120:24
road 50:21
Robert 5:18
263:4
role 32:19 56:11
149:3 163:24
164:17
roles 65:22
roll 166:16,19
Roman 83:25
115:25
Room 5:15
263:5
rotating 108:10
Rothert 10:15
roughly 32:9
row 239:1
rows 238:13
240:5,21
242:25 244:8
244:13 245:2
RPR 6:2
rule 2:13 9:12
20:24 60:7,8
60:10 93:20
94:2
rules 27:12
28:16 47:16,16
59:20 60:3
run 229:24
230:10
running 54:3
82:4

S

S 163:8
Sachs 191:8,12
192:16,22
Sachs' 193:13
Sachs's 192:24
safe 95:15
220:20
safety 124:17
125:13

Saint 75:22
  168:4
sanctions 56:1
satisfy 212:23
satisfying 128:9
  185:11
saw 21:7,9,11,14
  86:17 118:22
  156:5
saying 17:17
  22:10 38:2
  49:11,12 71:23
  72:10 73:21
  74:17 79:1
  82:20 99:2
  114:23 115:21
  128:7 235:1
says 51:4 60:16
  64:15 89:10
  91:8,9 97:14
  101:8 102:4
  107:21 138:1
  149:23 164:4
  165:15 170:20
  175:23 180:1
  194:5,9,24
  195:19 197:6
  210:23 212:15
  212:19 213:12
scale 63:2
  215:14
scenario 71:10
  114:6 119:5
  137:7 152:22
  174:23 181:9
  190:24 193:23
scenarios
  133:18
scene 124:10
  125:1 189:15
  189:21 193:8
  217:22,23
school 75:18,21
  75:22 79:11
Schwake 4:18
  6:2 7:4 262:3
  263:23

scope 3:5 15:17
  48:22 56:17
  65:4 155:10
  157:12 178:23
  191:23 192:11
se 157:10 209:8
search 36:6,14
  47:11 170:5
  229:25 230:5
  230:10,12
  237:17
searchable
  134:8
searched 226:1
searches 230:8
seat 121:12
second 1:1
  21:5,25 38:16
  94:21 95:10
  146:2 163:6
  170:25 194:24
  199:9 201:25
  206:2 222:15
  238:25
  246:25 251:7
seconds 18:4
  239:3
section 2:15,20
  17:5 35:15
  37:2,5,8 67:8
  67:9,10,12,12
  67:13,15,24,24
  76:9 83:24,25
  84:4 86:10
  92:20,25
  93:15 108:18
  108:22 109:4
  109:9,13,18,25
  110:14,18 111:1
  111:7,16,24
  112:6,6,21 113:1
  113:2,10,20,22
  114:11,11,25
  115:1,8,9,11,12
  115:14,18
  116:13 117:2,9
  117:10 120:5,5

124:4 125:23
  128:6 130:23
  131:20,22
  132:17 136:16
  136:22 137:11
  137:12,14,18
  138:10,11,22
  142:20 167:8
  169:20 170:6
  170:16 177:5
  177:18 178:19
  180:8 184:13
  185:7 187:12
  187:19 189:2
  196:11 204:7
  204:14 219:1
  239:20
  255:12,16
  256:2,12,23
sections 3:9
  67:18 116:19
see 18:8 22:1,21
  23:5 27:9
  33:12 48:19
  48:20 51:8
  54:15 63:11
  66:25 86:11
  89:8,13 92:3
  93:18,24 95:8
  95:17 97:10
  101:6,25 102:4
  102:6 105:18
  108:15,20
  111:18 117:25
  118:4,11 119:14
  119:17 129:11
  129:14,22
  130:4 132:25
  138:5,23
  155:7,24
  163:4 167:6
  169:5,20
  170:16 171:3
  178:12 187:25
  189:3,12
  194:22 195:4
  197:10 203:9

203:22
  208:25 212:17
  213:12 214:6
  218:18 220:13
  223:19,24
  224:12 227:17
  231:12 232:8
  232:15
  233:22 234:6
  238:18 239:6
seeing 69:9,11
  86:16
seen 21:10
  24:16 48:4
  85:12,15 86:13
  101:14,15,16
  125:5 155:1
  160:12 203:16
  203:18
  207:25 221:13
seize 60:1
seizing 59:11
self-explanat...
  226:19
sends 179:5
senior 15:20
  16:17 86:19
  87:13,16,18
  88:2 140:15
  155:24 159:16
  160:4,5 161:5
  162:8 173:17
  199:25 200:2
  222:21
sense 179:16
  194:11 211:12
  260:22
sent 18:9 19:13
  19:14 20:12
  105:14,24
  106:1,4 107:5
  108:11 207:19
  230:20 238:5
  261:6
sentence 106:8
separate 20:10
  51:22 64:12

135:1 136:2
  144:7 235:7
separately 58:7
  58:8
September 3:12
  3:19 11:13,25
  16:19 27:11
  37:5,19 44:10
  44:14 53:4,16
  54:10,22
  55:13,20
  109:14 118:10
  124:24 129:10
  135:16 143:2
  147:14,25
  151:12 152:5
  152:12 158:14
  197:12 203:22
  204:24
  205:21 206:14
  207:1,11 209:9
  215:7,22
  220:12 232:6
  240:22 242:5
  242:20
  253:13 254:6
sequence
  254:20
sequential
  83:21
sergeant 11:19
  25:9 37:11
  141:2 197:22
  220:2,8
  227:3 248:6
sergeants
  121:19 131:24
  132:3,10
series 9:18
  39:15 141:20
  163:23 204:17
  229:1,3 251:12
  251:16 254:14
serious 55:25
  166:10 199:17
seriously 100:21
server 35:22

46:4,5
serves 224:3
service 230:22
 231:3,23
 233:2
services 6:3
 12:5,23 37:10
 42:13 263:1
session 161:21
sessions 159:15
 159:19,23
 161:22
set 73:19 89:1
 93:23 94:5
sets 94:10
settlement 2:21
 18:25 92:1,5,11
 92:16,22,24
 93:9 94:3,7,15
 97:11,20 98:9
 98:14,20 99:6
 99:14,20
 100:7 102:24
 103:5,18,22
 104:3 109:1,6
 109:11 111:2,13
 111:21 112:9,14
 116:7,10 128:8
 136:19 185:8
sex 12:24
shape 91:6
 222:10
share 176:9
SHEET 264:1
sheets 263:11,13
 263:16
shift 65:16
shifts 74:10
shoots 247:25
short 13:7,8
 20:11 57:8
 106:2 202:25
short-term
 124:23
shortening
 192:6
shorthand 4:20

249:17
shortly 219:13
show 60:5 68:7
showed 156:8
 156:19
showing 45:3
 156:21
shown 63:12
 159:7 210:19
sic 169:12
sick 64:7
side 47:25 76:3
 102:25,25
 107:20 129:14
 252:24
sidewalk
 208:23
sign 108:2,3
 230:15,16
 261:14 263:13
signature 7:6
 261:13 263:11
 263:13,17
 264:25
signed 107:16
 261:17
significance
 231:15,17
 232:24 233:5
 233:7,10
significant
 37:20 124:1
 166:3 183:19
 198:16 259:5
signifies 118:5
similar 24:9
 32:9 35:21
 58:20 88:3
 103:17 142:12
 161:20 205:1,8
 210:14,15
 257:14
simple 36:6
 76:18 163:21
 170:5
simply 70:10
 71:15 72:7

73:7 74:15
 76:17 82:11,14
 107:25 143:10
 152:7 173:24
 174:13 175:24
 182:21 201:12
 233:15
Sincerely
 263:20
single 135:19
 136:5,11 167:12
 187:2 260:23
sir 27:4 37:3
 48:15 62:6
 71:24 78:11
 79:1,18 93:7
 121:11 127:8
 175:20 189:24
 214:10 218:9
 244:4 245:13
 249:4 255:14
 255:20
sit 77:11
sitting 33:19
 64:2,15 146:11
 148:2 158:9
 162:2 172:3
 207:9 253:9
 253:17
situation 34:19
 70:6,16 71:1
 73:22 74:15
 75:3,9 77:21
 77:23,24
 78:24 79:20
 79:24 82:10
 82:24 90:5
 96:19 113:16
 114:10 119:24
 120:10 124:3
 126:10,17
 129:25 130:14
 135:15 144:11
 153:12 186:3
 188:3 190:17
 195:9,20 211:6
 234:20

237:10 250:2
 254:25
situations
 22:24 70:9
 73:10 124:9
 133:12 134:16
 137:2 184:25
 201:4 214:20
 215:18 216:4
 228:25
 239:24
 243:14 244:7
six 4:15 170:22
 188:5
size 138:4,14
 140:2 226:5
 229:4
slide 174:7
 175:17
SLMPD 18:21
 19:15
SLMPD.org
 19:17
slow 104:18
 238:21
slower 225:13
slowly 119:25
small 130:16
 235:5
smaller 248:4
smoke 97:24
 259:16,19
so-called 124:17
social 168:7
 213:11
software 38:13
 43:2,5,6,8
 134:5 250:21
 250:24,25
 251:2 253:24
 254:9
solely 76:5
somebody 17:14
 44:15 53:17
 55:14 57:3
 60:20 61:5
 70:10 127:9

141:7 174:13
 180:23 185:20
 190:17 191:2
 213:12 253:12
 254:11
soon 261:6
sorry 9:25 69:5
 71:8 89:22
 91:15,22 97:13
 98:24 110:16
 128:14 142:18
 180:11 195:7
 215:23 221:3
 241:3 246:19
 246:23 251:13
 256:6 261:11
sort 195:18
sound 220:20
 221:1,24
sounds 139:13
 252:14
source 159:8
 225:1,4,4,14
 225:16
sources 225:11
 225:18
south 51:18
 132:15
speak 49:18
 87:8 104:10
 110:10 141:21
speaking 40:10
 192:3
special 2:18
 13:3 14:6,18
 15:4 17:5,5
 48:5 60:8
 63:2 67:7,8,18
 67:23 76:9
 84:3 92:19,25
 93:14 101:16
 106:19,20,24
 107:17,24
 108:18,23
 109:5,9,13,18
 109:25 110:3
 110:12,15,18

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 110:22 111:1,16 | 210:2 218:20 | 75:4 76:16,19 | 156:10 157:9 | 250:18 262:5 |
| 111:25 112:6,7 | 221:13 228:23 | 77:25 78:17 | 157:20,22 | 262:21 265:1 |
| 112:21 113:1 | 230:7 249:1 | 79:4,4 80:9 | 164:6 166:4 | stated 110:22 |
| 114:12 116:13 | specifically | 80:24 83:4,4 | 167:25 176:5 | statement 73:2 |
| 117:2,10 121:14 | 28:19 30:4 | 84:4 85:2,11 | 182:10 197:7 | 73:12 83:23 |
| 122:11 124:4,7 | 38:15 47:20 | 89:19,23 91:19 | 200:4 224:8 | 97:21 116:1 |
| 125:24 130:24 | 49:18 53:21 | 96:22,25 | 240:25 | 124:8 154:9 |
| 131:20 136:17 | 59:23 64:25 | 98:3,4 99:12 | 245:16,20 | 156:18 158:4 |
| 136:23 137:12 | 67:4,8 84:13 | 99:23 100:10 | 250:14 263:6 | 169:9 171:25 |
| 137:14 138:11 | 85:8 88:12 | 104:13,22 | 263:7,18 | 172:5,22 |
| 138:12 139:3 | 96:13 110:7 | 105:7 112:16 | 264:2 | 176:3 201:19 |
| 142:20 152:20 | 111:11 112:24 | 112:20,25 | staff 140:16 | 201:21 214:22 |
| 184:14 185:7,7 | 121:2,17 128:7 | 113:3 116:25 | 160:4,5 161:5 | 260:25 |
| 187:12,13 | 141:21 153:15 | 119:19 120:1 | 162:8 173:18 | statements |
| 196:11 204:6 | 156:25 161:3 | 121:18,22,23 | 222:21 | 157:8 209:20 |
| 204:14 205:6 | 161:20 165:3 | 122:1,7,23 | stage 80:14 | states 1:1 4:1 |
| 218:25 | 175:23 191:25 | 123:11,14,15,19 | staging 220:20 | 27:6 |
| 235:20 | 195:19 197:6 | 123:25 124:6 | stamp 118:12 | stationed 34:14 |
| special/major | 200:16 204:4 | 125:22,23 | 129:8 | Stations 131:25 |
| 164:7 236:18 | 205:19 218:13 | 127:19,24 | stamped 248:17 | 132:12 |
| 236:22,23 | 228:10 244:18 | 128:3,4,13 | stance 82:4 | statute 50:21 |
| specialized | specificity 158:8 | 129:20 130:1 | stand 230:15 | 198:14 217:14 |
| 12:10 13:13,14 | 194:14,17 | 130:14,21,22 | standard 77:14 | Statutes 3:10 |
| 13:21,24,25 | specifies | 131:23 132:4 | 134:21 194:12 | 170:7 |
| 87:21 160:6 | 133:20 175:19 | 136:24 137:13 | 197:20 208:8 | statutory 161:9 |
| specific 17:15 | 185:8 | 138:18 187:4 | 215:10 216:16 | 170:18 187:21 |
| 24:10,11 28:16 | specifying | 196:25 257:1 | 216:19 | 188:18,23 |
| 33:17 34:17 | 214:12 | 258:8,10,18 | standards | 189:7 193:10 |
| 39:4,19,21 | spectrum 82:8 | 259:7,14 | 200:8 | 194:3 217:12 |
| 47:16,19,24 | speculating | spraying 74:12 | standing 113:17 | 217:24 |
| 49:3 51:10 | 69:1 | 75:5 196:10 | 130:3 174:18 | steep 41:9 |
| 55:7 60:7 | speculation | spread 258:14 | 180:25 181:22 | Steffan 5:9 |
| 61:12,19 65:5 | 120:14 | spreadsheet | 181:25 240:10 | step 152:24 |
| 65:22,22 | spend 151:3 | 224:21 | start 24:20 | steps 19:24 |
| 76:11 84:8,12 | 169:11 | St 1:8 2:17,19 | 25:2 27:4 | 51:10 54:19 |
| 84:16 97:18 | spent 24:4 | 4:8,16,17 5:6 | 31:18 36:8 | 55:17,19 |
| 107:11 114:8,14 | 26:13,17,19 | 5:16 6:5 7:21 | 71:9 81:23 | 138:25 147:1 |
| 114:20 135:7,9 | spirit 246:8 | 11:7 19:21,24 | 203:12 226:19 | 147:22 158:10 |
| 138:25 147:9 | spontaneous | 20:14 22:5,7 | 226:20 | 204:1 218:20 |
| 148:22 156:9 | 246:6 | 23:24 27:7 | started 68:12 | stickers 117:18 |
| 158:10 160:7 | sporadic 54:25 | 39:24 48:8,17 | starting 48:23 | STIPULATED |
| 185:18 191:6 | spray 68:15,17 | 63:3 81:12 | 147:14 | 7:1 |
| 191:25 192:1 | 68:25 69:3,16 | 86:9 88:18 | starts 178:7 | Stockley 3:16 |
| 194:14 197:18 | 69:24 70:14 | 94:1 102:15 | 213:9 | 14:22,23 15:2 |
| 200:7,15 | 71:13,22,22 | 133:25 138:1 | state 4:22 7:24 | 15:13 16:22 |
| 201:8,23 | 71:25 72:1,22 | 145:10 148:16 | 63:25 173:3 | 17:19 22:12 |
| 204:1 209:12 | 73:11 74:5,21 | 151:13 155:6 | 193:22 198:23 | 27:8,20 28:10 |

Pls.' Ex. 26

31:17,25 32:3
33:21 35:7
36:9 37:22
39:7,15 40:24
45:12,25
46:10,17,24
48:18,25
52:14 53:4
57:24 60:23
63:7,19 64:20
65:2 73:5
87:14 88:9,13
114:23 122:2
122:24 132:5
133:3 134:12
136:6 149:5
153:20 156:11
157:3 158:13
159:2,6,15
161:3,13,19,23
162:8 163:17
165:6,13
167:15,20
168:23 173:21
173:21 187:2
188:24 206:12
206:16 207:7
214:18 217:6
219:13 232:6
236:13
240:22 241:12
242:22
243:23 245:9
246:10 252:8
stop 181:17
stopped 43:24
stops 121:9
storage 36:22
stored 46:3
stream 248:1
258:17,22
streamer
247:19 248:3
257:17
streamers
257:10,12
street 4:17 5:5

5:15 6:4 69:7
79:22 180:17
211:15 250:14
250:18 263:5
263:18
strict 74:9
strike 19:11 34:7
55:8 76:13
87:11 90:14
91:16 92:22
110:23 133:16
138:8 143:8,17
149:15 164:2
175:19 189:24
190:14 199:14
205:25
221:10
stuff 66:12
style 42:24
subdue 70:24
subject 9:9
14:24 32:17,18
79:17 80:19
179:9 181:19
246:19,21
252:16
subjected
186:13
subjects 39:12
255:5
submit 38:19
60:1 237:12
submitted 36:3
36:19 38:18
38:20 49:23
101:9 164:19
165:10,12
166:12 236:10
236:16 238:1
submitting 59:11
subordinate
165:1
subscribe
265:11
subsequent
88:1 161:13
237:11 253:20

substance
20:16 149:14
155:13 224:18
255:16 265:8
substantially
135:9 210:13
210:15
subsumed
157:23
sufficient 100:4
105:2 107:24
suggest 182:15
191:2
suggesting
31:16 257:25
suggests
173:22
Suite 5:5
sum 149:14
255:15
summarize 11:8
summarizes
36:9
summary 11:4
55:21 83:5
106:2 156:16
156:17 223:5
223:6 225:20
226:9 227:15
228:3 248:22
248:23
supervisor
11:20 167:13
197:22 225:8
supervisors
29:25 132:7
164:10,16,17
165:6,12,16,19
166:6 236:17
237:12 238:1
supplied 106:13
140:4
support 222:10
supposed 32:7
208:9 213:6
213:16,25,25
214:2,2

235:21 237:12
sure 10:12 25:15
27:15 29:7
33:4,8 37:13
43:23 44:5
48:7 53:25
58:22 61:24
62:1,12 68:1
75:15 83:15
86:1 88:21
90:17 96:11
99:3 104:18
123:8 125:15
131:13 137:24
145:21 157:16
157:25 160:12
200:9 201:2
201:10,20
220:24
221:23 228:13
238:21 241:8
244:3,11
249:3 250:17
250:17
surprise 76:25
surrounded
119:3
surrounding
51:5 57:2
118:14 259:20
SWAT 14:5 111:9
145:16 148:18
148:22 149:4
150:15 191:13
225:8 235:8
235:9 244:20
sworn 4:13 7:9
262:7
sympathy
90:25
system 36:5,16
36:17 38:9
42:23 57:21
105:16,21,21
105:22,25
106:6,22
107:4,6 114:21

133:10 150:13
225:3,23
226:1,2
227:14 228:2
228:6,9,10
229:10 230:11
systems 237:16

T
tactic 152:3,5
tactical 78:7,9
tactics 81:12
144:19 150:17
tagged 58:25
take 9:21 29:1
30:10 54:19
57:8 60:5
74:24 76:24
76:25 77:5,12
78:13 80:3
82:10 100:19
102:17 108:14
110:2 124:12
128:15,23
131:2,8 137:8
138:25 147:1,8
147:22 150:1
154:13 155:12
179:17 202:24
204:1 205:18
211:14 213:12
218:20 221:18
229:20 239:3
240:5
taken 1:18 2:24
3:3 7:3 19:24
35:9 39:22
58:17 59:16
62:19 81:16,18
103:4 118:1,10
144:24 183:5
208:18 262:8
262:13 263:10
264:3
takes 107:15
150:4 199:4
talk 16:5 53:21

| | | | | |
|---|---|---|---|---|
| 59:5 73:22 | **Team/7250** | 116:6 136:19 | 140:21 143:20 | **theory** 38:11 |
| 219:2 | 3:19 | **temporarily** | 161:12 182:14 | 181:19 |
| **talked** 182:20 | **teams** 32:6 | 25:13,14 | 191:10,15 | **thereon** 265:10 |
| 204:6 214:25 | 33:20 37:21 | **temporary** | 192:16 199:21 | **thereto** 262:15 |
| 219:10 247:16 | 40:3,12,23 | 101:19 102:15 | 259:4 | **thin** 152:9 |
| 252:19 | 61:13,21 145:7 | 102:19,23 | **testify** 23:25 | **thing** 21:20 |
| **talking** 15:24,24 | 145:8 148:24 | 103:4,11,17,23 | 51:11 139:1 | 83:15 85:23 |
| 36:24 39:14 | 220:25 | 104:7,12,20 | 147:7 150:20 | 168:16 181:2 |
| 53:23 77:1 | 221:23 | 105:6,14,24 | 156:23 162:2 | 181:23 208:15 |
| 90:1 182:24 | **tear** 97:23 111:19 | 106:1 108:16 | 191:6 204:2 | 210:3 238:22 |
| 183:1 242:19 | 112:2 | 111:13,22 | 218:21 | 244:12 |
| 246:17 252:12 | **technical** | 112:10,15 116:5 | **testifying** 9:17 | **things** 16:6,10 |
| **talks** 49:22 | 258:21 | 116:9 136:20 | 67:19 157:19 | 30:3,20 |
| 166:16 167:4 | **technically** | **tend** 80:10 | **testimony** 9:24 | 35:20 46:2 |
| 204:7 218:24 | 72:16 75:17 | 96:24 257:13 | 10:9 15:3 19:2 | 49:12 55:21 |
| 220:19 236:21 | **technician** 11:20 | **term** 13:23 | 48:8 49:2 | 60:12,16 63:5 |
| 249:8 | **techniques** | 22:15 62:23 | 53:14 55:22 | 63:21 64:13,17 |
| **Tara** 4:18 6:2 | 77:12 235:10 | 97:19 110:19 | 57:1,18 82:14 | 65:16,22 81:10 |
| 7:3 100:19 | **technological** | 111:18 112:5 | 84:22 85:6 | 81:25 90:23 |
| 262:3 263:23 | 30:11 | 118:18,21,23 | 112:4 116:23 | 93:22 94:5 |
| **task** 220:19 | **technology** | 124:22 132:12 | 136:16 138:9 | 96:2 100:1 |
| **teach** 221:14 | 230:6 | 151:8,10,16 | 140:15 142:20 | 104:24 106:13 |
| **team** 27:24 | **tell** 17:8 20:6 | 161:4 162:6,18 | 162:1 182:9 | 124:11 140:8 |
| 28:11 29:16,20 | 56:8 64:25 | 167:23 | 191:15 192:22 | 148:20 152:19 |
| 31:22,24 32:8 | 73:23 78:12 | 239:20 | 192:24 193:14 | 153:11 159:16 |
| 32:25 33:3,6 | 129:18 168:16 | 247:18 257:6 | 202:15 215:2 | 163:25,25 |
| 33:13,13,14,15 | 207:16 212:1 | **terminology** | 242:3 244:12 | 166:14 167:5 |
| 33:16,17,24,25 | 213:15 214:4 | 245:19 249:18 | 250:15 262:6 | 167:23 177:7 |
| 34:6,8,12,16 | 246:6 | **terms** 20:1 | 262:8 | 183:2 184:23 |
| 35:4,9 36:8,10 | **telling** 19:20 | 66:16 92:23 | **text** 106:4,4 | 195:25 198:20 |
| 36:25 38:2 | 258:16 | 102:18,22,23 | **thank** 12:13 | 204:15,22 |
| 39:6,22 40:13 | **tells** 211:6 | 103:5 104:3 | 17:22 21:17 | 222:23 |
| 40:14,14 47:5 | **template** 65:20 | 109:10 111:2 | 23:17 57:11 | 225:21 234:17 |
| 49:5 50:8 | 65:21,23 | 114:12 117:1,10 | 66:19 88:22 | 243:19 |
| 58:5,24 59:6 | **Templeton** | 125:23 128:8 | 91:1 100:15 | **think** 10:15 12:6 |
| 59:8,10,16,21 | 2:22 89:12 | 130:23 137:14 | 105:12,23 | 14:10,13 17:13 |
| 60:21 61:6,10 | 91:25 92:5,11 | 161:8 162:6 | 115:19,19 | 18:5,19 20:2 |
| 61:23 62:3 | 92:15,19,22 | 204:8 214:12 | 127:14 131:1,9 | 21:20 25:22 |
| 63:15,18 64:4 | 92:24 93:9 | 233:10 234:12 | 137:21 142:8 | 26:7 31:10,14 |
| 64:6,9,19,22 | 97:20 98:8,14 | 253:11 255:22 | 145:19 170:14 | 33:2 40:2 |
| 65:1 145:13,16 | 98:20 99:6,13 | 256:2,10 | 207:9 223:8 | 41:24 48:4,12 |
| 148:18 150:15 | 99:20 100:7 | **test** 107:10,15 | 228:14 235:17 | 48:15 49:11 |
| 220:10,19 | 102:24 103:5 | 108:12 200:18 | 238:10 239:13 | 56:5,13 58:20 |
| 222:6,24 | 103:17,22 | 200:23 201:13 | 239:14 240:16 | 58:21 68:11 |
| 244:21 249:21 | 104:3 109:2,6 | **testified** 7:10 | 247:7 256:8 | 69:6 71:1 74:7 |
| 249:22,25 | 109:11 111:2,13 | 33:2 40:2 | **theft** 14:8 | 76:2 79:13,16 |
| 255:1,2 | 112:9,14 116:4 | 110:7,25 116:11 | **themself** 114:9 | 80:13 82:10 |

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 84:22 85:18 | throwing 37:24 | 160:23 162:4 | 146:11 148:2 | 158:17,18 |
| 85:24 91:23 | thwart 78:14 | 166:10 167:14 | 157:19 158:10 | 197:5 201:9 |
| 98:2 112:12 | tie 260:1 | 168:20 169:12 | 162:2 172:3 | 201:24 203:8 |
| 113:19,21 | tied 228:24 | 182:22 184:3 | 203:17 207:9 | 205:9 216:3 |
| 115:24 123:8 | time 8:23 12:10 | 187:2 190:22 | 219:25 223:4 | 217:8,19 221:6 |
| 123:13 124:13 | 13:7,8 14:20 | 190:24 191:3 | 224:1,15 | 223:9 251:17 |
| 126:2 128:17 | 15:8 16:4 18:17 | 191:13 193:25 | 247:5 253:9 | 253:18,22 |
| 131:17 142:10 | 18:22 21:7,9 | 198:1 205:18 | 253:11,17 | 257:13 260:9 |
| 150:10 153:8 | 21:13 22:2,11 | 206:24 209:9 | 259:2 261:3 | topics 9:18,24 |
| 153:13,22 | 24:16 26:17,19 | 209:10 212:11 | today's 23:8,10 | 10:6,7 23:21 |
| 154:3 157:8 | 28:3 30:14 | 214:13 216:9 | 24:23 25:24 | 23:25 26:22 |
| 179:16 183:10 | 31:18 32:9 | 221:18 225:5 | 26:4 54:18 | 48:12 57:15 |
| 192:4 196:16 | 35:21 36:21 | 226:19,20 | 55:11 76:1 | 66:23 67:4,20 |
| 199:9 201:22 | 36:23 37:13,14 | 230:8,9 232:1 | 85:6 86:14,21 | 68:3 76:7 |
| 206:24 | 38:2,15,16,17 | 235:18 240:5 | 92:16 110:8 | 84:23 118:20 |
| 209:22 211:11 | 38:25 39:10,11 | 240:23 | 159:2 208:1 | 131:12 137:23 |
| 215:2 219:25 | 39:15,19 41:2 | 242:17 | 221:17 224:4 | 145:24 147:7 |
| 233:3,7,18 | 41:16,17,21 | 243:22 | told 17:10 61:14 | 149:6 151:5 |
| 243:16 246:16 | 43:21,22,22 | 249:12,14 | 64:10 70:5 | 158:16 168:25 |
| 247:1 254:19 | 43:23 44:13 | 252:20 | 80:1 156:13 | 169:3 173:15 |
| 257:12 258:10 | 45:8,10,11,18 | 253:12 254:6 | 187:3 213:3 | 203:5,11 |
| 259:12,24 | 46:19 47:8 | 255:23 260:9 | 254:4 | 204:2,9 |
| 260:23 | 48:2 50:8 | times 8:8 36:10 | ton 12:14 | 218:13,21 |
| thinking 181:24 | 52:13,20 53:3 | 41:1,12 51:23 | tonight 213:16 | 220:15 |
| third 21:5 38:17 | 53:3,11,21 | 68:23 69:15 | Tony 10:14 56:9 | 222:23 223:4 |
| 80:2 95:13 | 54:15 55:8,20 | 106:5 115:13 | 85:19,25 | 223:9 239:18 |
| 120:7 128:7,10 | 56:3 58:5 | 241:16,20 | tool 11:16 90:11 | 260:3 |
| 171:5 | 59:15,19 61:4 | timing 119:10 | 122:14,15,18 | total 24:3,15 |
| Thirteen 244:10 | 62:1 63:24 | tired 198:1 | 122:20 126:5 | 26:10 |
| thorough 87:1 | 64:1,9,12 | title 3:18 11:23 | 126:5 134:5 | totality 126:3 |
| 136:10 | 65:19 66:5 | 191:8 | tools 122:17 | totally 191:23 |
| thought 156:20 | 68:14,19 69:8 | titled 7:20 9:12 | top 102:4 117:25 | tough 198:1 |
| threat 71:3,3,17 | 69:18,20 73:7 | 86:9 89:7 | 118:6 129:5 | toughest 100:18 |
| 99:22 100:9 | 79:3 80:2 88:1 | 163:12 169:20 | 139:8 164:4 | 100:19 |
| 125:1,19 | 92:13 100:16 | 233:22 | 176:9 | track 116:6,17 |
| 126:22 127:5 | 102:17 108:9 | today 7:19 8:16 | topic 21:22,22 | tracking 38:9,11 |
| 127:10 184:23 | 110:2 114:22 | 8:24 9:5,15 | 24:1 27:4,6 | 38:13 |
| 190:20 | 117:14 118:12 | 20:6 21:23 | 48:15 51:3,11 | tracks 103:4 |
| threats 124:10 | 120:18 122:19 | 22:17 33:19 | 51:13 55:11 | traffic 14:5 |
| three 26:9 | 123:9 126:7 | 39:20 53:15 | 56:5,16 66:22 | train 19:25 |
| 79:16 132:13 | 126:23 128:15 | 53:23 54:2 | 67:5,5,6 131:11 | 20:15 197:17 |
| 159:25 189:18 | 129:8 131:7 | 55:22 56:11 | 137:25 138:20 | 223:1 |
| 211:9 212:20 | 145:5 147:13 | 64:15 76:6 | 139:2,20 | trained 59:24 |
| 213:7 214:3 | 147:24 148:7,8 | 82:24 87:6 | 142:10,12 | 144:19 145:10 |
| 225:10 | 149:4,25 151:4 | 100:18 101:14 | 143:9,9,17,21 | 197:17 |
| threshold 81:21 | 151:22 154:13 | 116:24 121:10 | 143:22 149:6 | training 3:18,19 |
| 81:22 | 158:22 159:5 | 140:4 143:3 | 152:22 158:17 | 11:16 61:9,10,17 |

Pls.' Ex. 26

| | | | | |
|---|---|---|---|---|
| 67:21 68:8 | transpiring | 257:15 | typically 44:23 | 257:24 |
| 81:8,12 84:13 | 41:12 | **Tucker** 2:25 3:3 | 45:2 | **understanding** |
| 84:17,23 85:7 | **transportation** | 118:2,6 119:7 | | 10:6 25:17,20 |
| 86:19 87:3,5 | 14:9 | 127:12 129:6 | **U** | 30:24 43:7 |
| 106:6,12 | **transported** | **tugging** 74:17 | **umbrella** 62:25 | 51:12,20 58:2 |
| 112:23 114:8,15 | 32:18 | **turn** 70:11,18 | 245:22 | 58:23 68:1 |
| 138:21 139:4 | **trapped** 183:13 | 74:2 124:9 | **unable** 251:18 | 88:16,25 94:6 |
| 139:14,19,24 | 183:19 | **turned** 55:3 | 251:18 | 96:1,12 99:3 |
| 140:4,6,10,10 | **trial** 35:19 | 141:15 | **unacceptable** | 102:10 112:13 |
| 141:1,4,7,11 | **tried** 87:1 91:1 | **twice** 17:11 | 56:3,9 | 112:19 136:9 |
| 142:4 143:10 | 125:3 | 228:9 | **unambiguous** | 143:21 161:8 |
| 144:9,12,19,25 | **trigger** 81:20 | **two** 12:16 24:8 | 95:7,25 96:13 | 169:23 171:13 |
| 145:7,9,15,25 | 190:3 | 26:9 40:5 | 100:2 104:25 | 171:24 173:14 |
| 146:13,22,25 | **triggers** 81:6 | 51:13,22 55:3 | **unbecoming** | 175:9 177:12,17 |
| 147:9,23 148:3 | **trouble** 174:24 | 62:17 63:6 | 60:12 | 178:17 179:9 |
| 148:9,12,15,19 | **true** 47:4 265:9 | 80:1 82:2 | **unbelievably** | 179:12,14,25 |
| 148:21,24 | 265:13 | 85:25 94:10 | 238:25 | 180:5 181:3 |
| 149:12,16 | **trust** 239:16 | 104:17 106:8 | **uncooperative** | 182:6 194:8 |
| 150:3,15,16,25 | **truthful** 9:4 | 113:12 114:23 | 72:7 | 198:21 233:25 |
| 158:18,22 | **try** 51:21 78:25 | 118:20 138:19 | **underlying** | 237:8,15 |
| 159:15 161:22 | 96:8 139:15 | 143:15,19,24 | 190:2 221:13 | 240:11 250:1 |
| 199:2 200:7,11 | 175:7 223:12 | 144:6 145:23 | **understand** | 250:10,11,23 |
| 200:12,15,25 | 250:6 | 149:20 159:24 | 8:24 9:7,11,18 | 252:1 260:15 |
| 201:23 204:13 | **trying** 15:14,15 | 173:20 176:20 | 11:2 12:16 15:9 | **understood** 9:1 |
| 218:14,22 | 21:15 24:20 | 180:3,7,17 | 17:10 23:23 | 13:12 16:13 |
| 219:3,6,15 | 35:11 44:16 | 181:10 182:12 | 35:11 37:1,16 | 49:1 52:9 |
| 220:2 222:13 | 53:12 55:6 | 182:19 183:21 | 42:17 44:16,19 | 115:14,17 117:6 |
| 222:24 223:1 | 65:17 69:6 | 225:25,25 | 56:4 64:13 | 136:15 168:20 |
| 246:16 260:14 | 71:4,12 72:8 | 228:1 233:21 | 73:21 77:21 | **undertake** |
| 260:17 | 77:7,21 78:1 | 234:2,12 | 78:2 81:8 85:1 | 250:6 |
| **trainings** 61:20 | 85:12 113:18 | 241:23 252:2 | 106:16 110:21 | **undertaken** |
| 145:12,14 | 113:20,23 | 252:2 | 110:24 116:3 | 20:14 55:18 |
| **trains** 179:12 | 114:10 116:2 | **two-page** | 120:4 121:11 | 158:10 |
| **transcribed** 7:5 | 117:7 123:3 | 139:18 140:22 | 144:23 149:10 | **undertaking** |
| **transcribing** | 127:1,2 136:10 | 141:18 142:1 | 149:15 151:11 | 183:11 195:11 |
| 8:17 | 147:2,17 | 220:1,16 | 154:2 157:5,19 | **unequivocally** |
| **transcript** 3:25 | 153:10 154:2,4 | 222:22 | 174:12 179:4 | 112:13 |
| 263:12 | 154:10 174:12 | **type** 30:1,17 | 192:21 193:19 | **unfavorable** |
| **transcripts@al...** | 179:4,6 185:1 | 36:20 42:19 | 196:5 197:3 | 60:19 |
| 6:8 | 192:10 193:19 | 50:1 146:25 | 199:7 200:25 | **Unfortunately** |
| **transfer** 37:1 | 196:22 197:3 | 225:15 234:17 | 207:23 231:14 | 261:7 |
| **transferred** 11:15 | 199:7 200:24 | 246:6,21 | 233:6 234:25 | **uniformed** 14:1 |
| 12:1,4,18 13:9 | 209:25 | **typed** 221:21 | 239:17 240:1 | **union** 178:1 |
| **transpire** 32:24 | 215:25 233:6 | **types** 153:9 | 240:7 243:5 | **unique** 39:3 |
| **transpired** 151:11 | 234:25 | 257:18,25 | 244:3 245:12 | **unit** 11:20 15:21 |
| 153:19 168:23 | 242:15 251:4 | **typewriting** 7:5 | 249:3 251:19 | 25:15,16 32:7 |
| 185:2 | 253:7 254:2 | 262:10 | 251:25 252:11 | 33:3,4,9,10,16 |

37:9,12 38:8
42:19 61:25
65:21 87:21
111:9 160:6
224:10 237:21
245:21
**UNITED** 1:1 4:1
**units** 12:25 14:5
14:9 145:16
225:20
245:16
**universal** 89:16
**universe** 24:21
**University**
75:22 168:5
**unlawful** 3:13
60:16,24
73:17 169:6,9
170:21 171:19
172:14,16,24
173:15,22,24
174:5,9,10,16
174:20 175:1,2
175:5,10,25
176:1 177:3,7
178:10 180:21
181:4,6,15
182:1,13,18
183:7 184:1,12
184:21 185:6
186:2,8,12,16
187:15 189:15
189:21 190:3
190:13 193:4,8
193:18 194:1,6
194:18 197:8
197:14,16,24
198:6,13,17
199:17,23
200:9,15,16
200:20 201:8
201:15 202:4
202:21 204:19
207:13 208:13
208:18 211:9
212:8 213:4
215:1,4,11

216:18 217:22
217:24 218:3,7
218:10,23
223:3 239:6
241:1,13,22,25
242:6,14
243:2,13
246:14 255:6
255:22 256:4
256:10,15
**unlawfully**
171:21 175:5
185:17
**unnecessarily**
10:19
**update** 66:9
**upset** 90:18
**usage** 248:2,2
**use** 22:5 28:7
29:4,9 39:25
42:20 54:16
62:22 65:22
67:14 69:24
70:14,21,24
71:21 72:18,22
73:10 74:4
76:15,24 77:2
77:11,16,17,25
80:12,24 84:4
84:19 85:11
89:19,23
96:21 99:23
100:10 101:20
103:7 104:21
105:6 106:15
106:16,18
107:9,11 113:7
114:12 118:21
118:24 120:10
121:2 122:6,20
122:21 123:14
123:18,24
125:21 128:12
130:14,20,21
132:3,3,23
136:23 137:18
138:3,17 140:1

141:9 142:6
144:9 146:3,14
148:13,19,25
149:1,7,8,13,24
150:18,19,22
150:23 151:1
151:10,16,19,24
152:3,15
158:20,24
186:15 187:7
199:3 208:9
210:10,13
221:3,5 223:2
227:23 233:1
234:6,8 235:2
236:1,5
238:16 244:6
244:6,13,20
248:3,5
255:5 256:25
257:14 259:7
259:19
**uses** 31:8 141:7
148:14 177:10
178:14 194:9
221:14 234:19
234:25
235:12 239:19
**utilize** 42:13,21
62:25 153:1
**utilized** 100:3
105:1 122:2,19
122:24 123:11
**utilizing** 126:5,5

----

### V

**v** 2:22,23 263:7
264:2
**vacate** 249:13
**vacuum** 183:2
**value** 77:23
**various** 41:15
133:18 228:15
230:12
**vast** 243:11
**vehicle** 14:6
41:2 106:6

**vendor** 42:16
51:21 52:10
**verbatim** 209:5
209:7 210:6
**verbiage** 246:7
**verdict** 3:16
22:12 27:8
48:18 65:13,15
66:2 88:12
206:12 232:6
236:13
**version** 21:10
24:17 168:17
**versus** 7:21
26:15 58:5,6
77:2 84:9,15
84:18 85:8
92:5 112:2
137:12
**VI** 67:13 76:9
83:24 84:1
113:2,10,20
114:11,25 115:8
115:13
**vicinity** 135:9
**victims** 39:12
**video** 27:7,12
27:25 28:5,7
28:17,22 29:3
29:8,12,15
30:9,15,21 31:1
31:3 35:9 36:7
36:11 37:2,20
38:16,16,17
41:18 42:18,19
45:13 46:23
47:11,17 48:17
48:24 49:9,18
49:20 50:24
51:6 52:6,22
54:11 56:4,23
57:24 58:4,16
59:4,6,8,15
59:22 61:6
119:25 159:1,4
159:5,7,8,18
250:20

251:16 253:1
**videos** 39:5,22
48:1 49:4 53:1
58:24 60:4
106:13 125:6
**view** 252:11
**viewed** 76:9
**views** 178:2
**VIII-6** 67:9
**violate** 170:18
171:1,6 173:1,7
175:12 176:17
185:21 188:8
188:14
**violated** 123:3
**violates** 171:14
**violating** 181:11
182:23 213:17
**violation** 60:15
179:9 184:8
188:23
**violations**
249:10,16
**violence** 71:3,17
171:7 173:2,8
174:17 175:13
177:3,8
180:22 182:14
182:16 183:23
184:22,23
188:11,15,20
190:25 191:3
193:9,12,15,15
193:24
**violent** 72:7
124:9 125:8,18
127:9 183:8
190:19 191:18
192:17
**violently** 76:17
124:25 125:8
126:21 127:5
**visualize** 139:9
**visualizing** 185:1
**volition** 216:10
**voluntary** 79:20
79:22

vs 1:7 4:7

**W**

wait 159:14
260:18 261:3
waiting 152:18
153:24 260:21
walk 82:23
walking 208:23
Wall 3:21 25:9
25:21 26:5,8
26:25 223:21
224:2,7,19
227:2,3,9,20
229:19 233:4
234:1
Walton 136:12
want 10:13 12:15
20:6 22:10
27:15 28:12,13
39:21 46:2
48:6 54:2
58:22 67:25
71:9 72:5
73:20,22
74:14 75:15
79:12 83:14
84:19 86:1
96:11 99:3
131:10,12
133:12 137:22
145:22 147:19
149:15,16
152:1 157:25
158:8 169:1
170:9 179:21
179:24,24
187:22 189:6
192:5 201:10
202:8 211:5
215:5 224:17
226:14 240:11
241:8 244:3
250:18 260:6
wanted 19:10
33:7 36:7 58:1
109:9 132:2

134:10 228:13
229:11
wanting 82:7
wants 207:19
warn 70:15
194:24 195:16
195:20
warning 3:13
70:7 71:23
72:9 74:21
75:4,7,9 76:18
77:18 78:25
80:23 83:5,6
90:6,12 95:7
95:11,25 96:1
96:4,13,14
100:2,4
104:25 105:3
120:19 184:17
185:13 187:5
187:10 195:9
196:7,9,18
203:20
warnings 70:1
73:15 77:14,15
77:16,22 78:1
78:7 80:16,18
89:11,20 90:8
117:8 183:3
184:15,17
186:17,19,20
186:21,23
187:6,7,14
221:4,25
249:11
warrants 139:7
Washington
2:25 3:3 118:2
118:6 119:7
127:12 129:6
wasn't 53:8
70:10 132:7
140:18 149:4
250:17,17
watch 119:25
159:4,5
way 14:21 17:18

36:6,17 47:10
63:20 66:25
71:2 74:16
104:8 148:3
162:15,16
165:23 166:25
167:19 183:14
201:12 217:6
222:10 230:1
234:22 240:8
253:8 254:6
256:24
ways 27:17
29:15 30:6
31:7 35:14
58:7 135:2
we'll 56:2,19
57:8 68:10
85:21 91:4,5
128:23 131:11
139:23 142:1
179:19 223:13
239:4 261:14
we're 7:19 15:16
15:24,24
24:12 39:14
49:11,11 51:20
61:12 65:17
70:16 74:7
77:1,17 79:24
80:19 81:24
83:15 90:10
113:23 124:14
135:22 136:17
151:3 152:18,21
152:23 153:9
170:11 175:17
182:24,25
201:9,10
238:22 241:16
244:11 252:12
253:6 256:12
we've 28:20
79:5,25,25
80:1,16,17,17
80:18 114:18
115:7 123:8,13

125:17 145:9,11
153:13 160:16
190:12 214:20
216:3 223:4,7
225:3 243:18
247:16
week 65:13
207:22
weeks 24:6,15
88:8 173:20
173:21 254:8
welcome 54:7
went 19:17,17
102:13 124:16
206:18
weren't 126:16
135:24 147:19
219:14 236:25
Wheaton 5:20
261:5
wider 258:13,18
willingly 82:22
wise 152:24
wished 120:20
witness 4:12 7:6
23:16 56:2
100:24
207:23
260:21 261:18
262:6,8
263:12 264:1
264:25
witnessed 69:4
69:17
WITNESSES
2:2,3
Wonderful 9:11
word 165:17
172:7 175:20
177:25 209:17
209:17,24,25
234:24 235:1
235:12
words 71:23
163:19 210:10
242:13 244:14
work 3:6 14:20

42:16,24
43:16,20 53:8
54:9,20 56:18
150:17 157:12
164:1 168:7
242:13 254:19
worked 163:25
167:5
workhouse
160:18 161:22
working 14:17
51:20 52:8,10
53:6 54:24
200:21
250:16 253:7
works 15:19
79:21 155:10
worse 121:10
worth 31:15
192:2
wouldn't 72:5,8
72:22 77:2
78:15 153:7
208:2 237:5
Wow 159:1
wrap 260:13
write 14:24
164:24 201:14
240:8
writes 39:1
writing 13:3
14:18 15:12
28:15 81:9
141:12 149:23
207:11 216:21
written 48:3
84:13 141:6
197:13 198:12
230:23
252:23
wrong 51:15
52:4 160:16
182:22,22
184:2,3
wrote 48:21
56:8 57:3

Pls.' Ex. 26

ERIC LARSON  4/8/2019

**X**

X 2:1 43:11 59:4
  59:5,6 73:25
  96:5 216:8
Xerox 90:23
XIII 17:6 67:10
  67:16,24,24
  92:20,25
  93:15 108:18
  108:23 109:5
  109:9,13,18,25
  110:3,12,14,18
  111:1,16,25
  112:7,21 113:1,6
  113:22 114:11
  115:1 116:13
  117:2,10 120:5
  124:4 125:23
  128:7 130:23
  131:20 136:16
  136:22 137:12
  138:11 142:20
  184:13 185:7
  187:13 204:7
  204:14 219:1

**Y**

Y 73:25
yeah 34:23
  53:20 97:13
  137:7 168:11,14
  173:11 229:19
  238:20
  248:13
year 167:9
yearly 201:2
years 8:11
yep 205:16
yesterday 21:14

**Z**

Z 73:25

**0**

00421 248:18
00427 249:19
00430 2:16

00438 2:16
01152 51:7
  52:22 54:11

**1**

1 2:12 3:12 17:24
  18:2 27:4,6
  33:13,14,15
  57:15 97:14
  101:10 102:9
  116:19 127:17
  168:17 170:21
  203:6,22
  204:24
  205:21 207:1
  207:11 255:2
1-01 17:5 67:8
  67:24 92:20
  92:25 93:15
  106:19,20,25
  107:17 108:18
  108:23 109:5
  109:9,14,19,25
  110:15,18 111:1
  111:16,25 112:7
  112:21 113:1
  114:12 116:14
  117:3,10 120:5
  124:5 125:24
  130:24 131:20
  136:17,23
  137:12,14
  138:11,12
  142:21 184:14
  185:8 187:13
  196:12 204:6
  204:14 219:1
1-800-280-DE...
  6:7
10 3:5 10:6
  108:19 154:16
  154:20,22
  155:21 189:1,9
10/11/17 3:5
100 40:15
  250:17
101 2:23

11 3:7 10:6 36:13
  155:4 162:24
  163:3 165:11
  168:4 194:5
  204:3,9
  218:13,21
11/16/17 2:12
11:25 129:9
  190:18
11:30 118:10
  119:12 124:24
  126:11,23
  127:12 151:12
  190:18 192:18
  193:15
1130 5:5
117 2:25
11th 6:4 263:18
12 3:9 66:22,23
  67:5,6,20
  68:3 131:12
  137:25 138:22
  142:12 147:7
  170:2,5
  187:22 189:6
  217:14 229:22
  241:11 243:10
  263:3
1200 4:17 5:15
  245:8,15,18,19
  245:22,25
  246:1,4,7
  263:5
128 3:4
13 3:11 67:6
  138:20 139:2
  139:20 143:17
  143:21 149:6
  203:2,13,16
  204:23 207:3
  207:17,25
  210:19 212:5
  218:2 242:11
  244:13,17,25
14 3:15 67:6
  142:10 143:9
  206:4,7

248:16 249:19
  254:15
14th 52:2
  250:12
15 3:18 8:11
  66:23 67:5,6
  67:20 68:3
  131:13 143:9
  143:22 147:7
  147:14 149:6
  194:20 212:11
  219:20,23
  220:5 226:11
  229:22 232:6
  240:21 241:11
  242:5,17,20
  242:25 243:3
  243:7,22
  253:13
15.52.010
  176:14 177:6,11
  177:19 178:7
  179:6 180:9
154 3:6
16 3:21 18:9
  20:13 24:6,18
  26:12 86:10
  151:5 158:16,17
  222:21 223:14
  223:18 241:20
  242:4,9
16-hour 150:7
162 3:8
17 2:12 55:20
  89:4 118:10
  129:10 135:16
  151:5,12 152:5
  152:12 158:16
  158:17,18
  222:21
  240:22 242:5
170 3:10
17250 246:13
17th 124:24
18 90:15,19,20
  90:22 91:7
  223:9 239:18

1915 41:7
1994 11:6 68:12
1995 11:10 68:19
1995-2004
  68:25
1995/2004
  69:18

**2**

2 2:13 20:20,23
  48:15 57:15
  93:23 116:19
  118:4 131:23
  203:6 224:7
20 2:14 265:15
2004 11:13
  68:19 69:2,7
  75:18
2007 168:18
2010 11:18
2011 11:19
2012 147:14,16
  147:25 149:17
  209:9 215:22
  226:11 240:22
  242:5 243:22
2013 11:21,22
2014 3:20
  144:18,24
  145:3,25
  146:9,11 147:10
  147:16,25
  149:20 220:12
2015 11:25 69:8
  101:19 102:9
  108:19
2015-01-07
  102:5
2017 3:12 12:3
  13:18 16:20
  18:9,17 20:13
  27:11 37:6,20
  44:10,15 53:5
  53:17 54:10
  54:22 55:13
  86:10 109:14
  118:10 129:10

Pls.' Ex. 26

135:16 140:5
143:2 151:12
152:5,12 155:5
158:14 197:12
202:14
203:22
204:24
205:21 206:14
207:1,12 215:7
232:6 240:22
242:5 253:14
254:7
**2018** 12:6,6,8,17
13:15,16,19
14:17 226:12
**2019** 1:19 4:14
13:16 263:3,10
264:3
**203** 3:14
**206** 3:17
**219** 3:20
**223** 3:22
**24** 223:9 226:11
239:19
**247** 2:7
**25** 23:21 51:3
55:11 251:17
253:18
**251** 2:8
**27** 206:14

---

### 3

**3** 2:15 21:22
24:1 62:14
**3,000** 16:2
**30** 45:24 50:13
263:17
**30(b)(6)** 2:14
9:13 10:2,7
12:16 17:24
20:20,24
21:12 48:13
54:3 62:14
83:10 86:4
93:5 101:1
117:19 128:24
154:16 162:24

170:2 203:2
206:4 219:20
223:14 260:4
260:10
**314** 5:7,15,17
6:6 263:5

---

### 4

**4** 2:17 10:6
83:10,13
168:25 169:3
173:15 197:5
232:9,13
**4:17-CV-2455...**
1:7 4:7
**421** 255:11,24
**422** 255:11
**427** 254:21,23
254:24
**428** 254:21,23
**430** 62:18 63:11
**431** 62:18
**438** 62:19
**439** 62:19 63:11
**45** 202:15
223:13

---

### 5

**5** 2:19 10:6 12:2
86:4,8,8 87:9
88:23 169:3
169:17 170:15
173:15 201:16
201:24
244:23
**5:24** 261:16
**50** 211:15
**53** 83:17
**574** 3:9
**574.040** 169:21
170:6,16 171:14
177:6
**574.050** 170:7
187:19 188:19
**574.060** 170:8
189:2 217:14
217:16

---

### 6

**6** 2:21 93:5,8
101:17 140:14
160:25 169:1,3
169:12 170:11
171:9 172:22
173:3,4,15,16
175:18,20
202:12,20
219:4 222:20
**62** 2:16
**621-3361** 5:17
**63101** 5:6 6:5
263:18
**63103** 5:16
263:6
**644-2191** 6:6
**652-3114** 5:7

---

### 7

**7** 2:6,23 45:23
50:13 101:1,5
101:19 105:13
131:17 203:5
204:2,9
**7-11** 203:8
**711** 6:4 263:17
**7250** 246:10,17
**764** 83:14
**775** 84:3

---

### 8

**8** 1:19 2:24 10:6
24:6,17 26:12
108:13 117:19
117:23 176:13
217:8,20
259:3,4
263:10 264:3
**8/16** 86:18
**8/16/17** 2:20
**8:30** 191:16
192:16 213:7
213:14
**83** 2:18
**86** 2:20
**8th** 4:13

---

### 9

**9** 3:3 10:6
128:24 129:2
187:17,25
218:13,21
232:9,13
259:3
**9/15** 232:13
**9/27/17** 3:17
**9:58** 7:13
**906** 5:5
**93** 2:22
**95** 68:14
**96** 14:13