**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH MOLINA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.:   4:17-cv-2498 AGF |
| v. | ) | |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment is flawed because it flips the applicable standard on review on its head by improperly viewing the evidence in the light most favorable to Defendants, while omitting key facts that support Plaintiffs' claims in this case.

The Supreme Court and the Eighth Circuit have repeatedly held that in ruling on a motion for summary judgment—whether on the merits of Plaintiffs' claims or on Defendants' qualified immunity defense—this Court is required to view the evidence in the light most favorable to Plaintiffs.  *See, e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (vacating summary judgment on qualified immunity because court failed to view the evidence in the light most favorable to plaintiff); *Burnikel v. Fong*, 886 F.3d 706, 710 (8th Cir. 2018) (affirming denial of summary judgment based on qualified immunity and stating: "we are not permitted to accept [the police officers'] version of events in ruling on the legal issue they raise").

When the evidence is properly viewed in the light most favorable to Plaintiffs, it becomes clear that there is substantial evidence establishing that, in accordance with Lieutenant Dodge's orders, the officer defendants unlawfully deployed chemical munitions at Plaintiffs, in violation of their constitutional rights and/or—for those who did not directly do the shooting—failed to

1

intervene to prevent the deprivation of rights. Furthermore, Defendants' deployment of chemical munitions at Plaintiffs represents just one instance in a longstanding City custom of deploying chemical munitions against people engaged in expressive activity and perceived to be expressing an anti-law enforcement viewpoint, in violation of the First Amendment, and who are non-threatening and nonviolent, in violation of the Fourth Amendment.

<u>Argument</u>

I.     **The record does not blatantly contradict, but rather supports, Molina's and Vogel's allegations that chemical munitions were deployed at them.**

At the outset, Defendants argue that a video recording taken by a third-party witness, Heather De Mian, "blatantly contradicts" the allegations by Molina and Vogel that chemical munitions were deployed at them while they were on Euclid, close to a house then-owned by Molina. In support, Defendants rely on *Scott v. Harris*, 550 U.S. 372, 380 (2007), and *White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." Defendants' argument lacks merit for two reasons.

First, in *Scott* and *Harris*, the video blatantly contradicted the plaintiff's description of what had transpired by capturing precisely the disputed conduct at issue. *Scott* involved whether the police response to the plaintiff's conduct—ramming his vehicle from behind—had been lawful. The legality of that response turned on whether the plaintiff's driving had arguably merited the force the police had used. The plaintiff said he had kept control of his vehicle, "slowed for turns and intersections," "typically used his indicators for turns," and maybe most importantly, "did not run any motorists off the road." 550 U.S. at 379. But a video showed, instead, his "vehicle racing down narrow, two-lane roads in the dead of night at speeds that

[we]re shockingly fast," passing more than a dozen cars, swerving over the double-yellow center line, and "forc[ing] cars traveling in both directions to their respective shoulders to avoid being hit." *Id.* The danger he had posed to others, which the video showed had been considerable, made all the difference to his Fourth Amendment claim.

In *White*, the disputed conduct concerned the plaintiff's arrest. The plaintiff said that while he was lying on the ground being handcuffed, he had been kicked, struck with a stick, and dragged along the ground, all while being subjected to racial epithets. But his own video and audio, which directly depicted the arrest, showed nothing of the sort: no epithets, no cries or grunts of pain, no changing of position that dragging would entail, and a handcuffing that took just 25 seconds before officers pulled Coleman to his feet and he jokingly asked them for a selfie. In other words, as the *White* court held, the video taken by the plaintiff of his arrest did not "indicate anything like the assault" alleged by the plaintiff. 865 F.3d at 1077.

In contrast, Defendants do not have a video taken by either Molina, Vogel, or from the BEAR, that captures the moment when the BEAR passed by Molina's house as it was travelling south on Euclid. Instead, the De Mian video—which is blurry and dark—was shot mostly on Page and concluding at the corner of Page and Euclid which, as Defendants acknowledge, is at least **550 feet** (almost the length of two football fields) from Molina's house. (Defs.' Ex. L.) De Mian also does not turn onto Euclid until well after the BEAR has. In fact, it is hard to tell if either the BEAR or Molina's house are even visible at any part of the De Mian Video; it appears that the BEAR's lights can be seen, but just barely, and with no reference point about where the vehicle is at that time. As a result, *Scott* and *White* are inapplicable, because Defendants do not have a video that captures the disputed conduct at issue.[1]

---

[1] Defendants suggest that the audio of the De Mian Video also is somehow determinative. This is wrong. *See*

3

Without a depiction of the conduct at issue, a video cannot "blatantly contradict" a party's version of the facts. *Michael v. Trevena*, 889 F.3d 528 (8th Cir. 2019), is on point. In *Michael*, a plaintiff filed a lawsuit against police officers, alleging unlawful arrest and excessive force after officers were called to help resolve a family dispute. In reversing the district court's grant of summary judgment based on qualified immunity, the Eighth Circuit "conclude[d] that neither party's version of events 'is blatantly contradicted by the record' because the dash cam video of the incident reveals very little." *Id*. at 532. In support, the court noted that due to the location of the dash cam video and a tree that obstructed its view, the "officers' argument that the dash cam footage is dispositive of the case is wholly unsupported by the record." *Id*. As a result, the court noted "that this is one of those 'usual' qualified immunity cases in which viewing the facts in the light most favorable to the nonmovant 'means adopting … the plaintiff's version of the facts.'" *Id*. (citation omitted). *See also Johnson v. McCarver*, 942 F.3d 405. 411 (8th Cir. 2019) (concluding that video was "inconclusive"); *Thompson v. City of Monticello*, 894 F.3d 993, 998-99 (8th Cir. 2018) (rejecting argument that video blatantly contradicted plaintiff's version of the facts because the video "capture[d] only part of the incident").

Similarly, due to fact that De Mian Video was shot (at its closest point) approximately 550 feet from Molina's house at dusk, the video "reveals very little" of the critical facts that underlie Plaintiffs' claims. In particular, the video does not capture—or rule out—the deployment of chemical munitions from the BEAR in the direction of the alley south of Molina's house (where Molina and Vogel where trying to evade getting hit by the chemical munitions).

---

responses to Defendants' SUMF at paragraphs 48, 50, 57. Defendants make the bald assertion (without any evidentiary support) that De Mian was located the "same distance" from the BEAR in both situations. However, a review of De Mian's video of the deployment of chemical munitions at Page and Walton establishes that she was closer to the BEAR at that point; a distance far less than the well-over-550 feet that De Mian was located from the BEAR as it travelled south on Euclid past Molina's house.

4

Thus, as in *Michael*, the argument that the De Mian Video is dispositive of the case is wholly unsupported by the record.

Second, Defendants' argument is refuted by their *own* After-Action Report, which purports to memorialize what transpired near the intersection of Page and Euclid, including that multiple chemical munitions were deployed. (*See* Pls.' Ex. 3 at 00038–39.)[2] This conflict, however, has a simple explanation: De Mian is too far away, for the most part on a different street, and her video quality too low, to capture the BEAR's deployment of chemical munitions at Vogel and Molina. *See Liggins v. Cohen*, 2019 WL 2075902, at *5-6 (E.D. Mo. May 10, 2019). Plaintiffs' testimony, that officers on the BEAR *did* shoot chemical munitions while traveling south on Euclid and then at them into the south alley as they were running behind the house at 1221 N. Euclid, must be taken in the light most favorable to Plaintiffs at this stage. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 473–74 (8th Cir. 2010). And as such, summary judgment is not warranted. *See, e.g.*, *Williams v. Holley*, 764 F.3d 976, 980 (8th Cir. 2014) (affirming denial of motion for summary judgment on qualified immunity because the court must view "inconsistencies" in the record "in the light most favorable to [Plaintiffs], giving [Plaintiffs] the benefit of all reasonable inferences").

Thus, the Court should conclude that Molina's and Vogel's allegations are not blatantly contradicted by the record. To the contrary, in considering both the After-Action Report and the

---

[2] The After-Action Report was drafted by someone who was not present on the BEAR as it traveled off Page, did not take contemporaneous notes, and had no systematic way of collecting or recording information from the officers on the BEAR or ensuring the accuracy of their statements. (*See* Pls.' Ex. 5 at 30–32, 34:18-25; 35:21–36:13; 37:4-6; 38:5-18; 47:6–50:12; 63:1-16; *see also* Mayo Dep. 50:1-2 (although he was the supervisor on the BEAR, "not to [his] recollection did he contribute any information to the report, including the route, *id.* 67:6-13). It was approved some four months later. (*See* Ex. 3 at 00030; *see also* Dodge Dep. 79:13-17 (testifying that the report contains an inconsistency in that it "kind of blends" the two trips the BEAR took west on Page when it deployed munitions either on or toward Euclid "into one" trip); *id.* 83:22–84:1 (no sign-off process for After-Action Reports.) The Report also includes other descriptions that are not visible in the De Mian Video, like rocks allegedly being thrown.

De Mian Video, a jury could reasonably believe Molina and Vogel's testimony that Defendants deployed chemical munitions at them from the BEAR as it was passing by Molina's house.

## II.    There are genuine issues of fact that preclude summary judgment on Plaintiffs' claims against the individual defendants.

Defendants next argue that Plaintiffs cannot establish that any individual Defendant was personally responsible for the deployment of chemical munitions at Plaintiffs. In support, Defendants rely on the Eighth Circuit's decision in *White*. In so doing, Defendants fail to recognize that *White* actually supports Plaintiffs' position.

In *White*, the Eighth Circuit noted that "[t[o prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation. **That does not mean however that a § 1983 excessive force plaintiff must be able to personally identify his assailants to avoid summary judgment**." *Id*. at 1081 (emphasis added). Applying this principle, that court held, based on testimony from officers on the scene, that there was sufficient evidence that several officers were "personally involved" in the plaintiff's arrest. *Id*. at 1081. As a result, the court held that the district court erred in dismissing the claims against these officers. *Id*.

Again, Defendants' argument flips the applicable standard of review on its head. Plaintiffs need not pinpoint a particular officer to the exclusion of the others. Instead, they need merely point to sufficient evidence implicating each defendant to show that a jury could reasonably believe each officer is personally liable for violating Plaintiffs' constitutional rights if Plaintiffs' version of the facts is true. In other words, as long as there is a genuine dispute of material fact as to the individual liability of each defendant, Plaintiffs do not bear the burden of "ruling out" one officer over another.[3] *See Michaud v. Demarest*, No. 06CV4362, 2008 WL

---

[3] In addition, because each of the officers in the BEAR either actively injured Plaintiffs or failed to intervene as they colleague(s) did, they all jointly contributed to Plaintiffs' injuries. *See Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir.

4057744, at *5 (D. Minn. Aug. 26, 2008) (denying summary judgment to deputy defendants where plaintiff had not identified a "particular officer causing injury or a particular officer failing to stop preventable harm caused by other officers" and holding that evidence that all of the defendant deputies "either assisted in processing Michaud's arrest or were present in the [room] to witness the alleged use of excessive force" was "sufficient to establish a claim against those defendants for the purposes of summary judgment") (citing *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000)) and *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir. 1986)); *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 621 n.25 (D. Conn. 2016) (denying police officers' motion for judgment as a matter of law and stating: "Absent direct evidence, a jury may still find for the plaintiff on a theory of direct participation if there is sufficient circumstantial evidence from which the trier of fact could make reasonable conclusions concerning who, if anyone, struck [the plaintiff].") (alteration in original)); *Henderson v. City & Cty. of Denver*, 2014 WL 222761, at *4–5 (D. Col. Jan. 21, 2014) (denying motion for summary judgment of officer who had run after plaintiff but whom plaintiff could not specifically identify as having used force and stating: despite the "lack of direct evidence … the Court finds that a reasonable juror could conclude from the circumstantial evidence in this case, that the officer who used excessive force on Plaintiff was Defendant Ownbey") (citing *Segal v. Los Angeles Cty.*, 1988 WL 79481, at *1 (9th Cir. 1988) (unpublished) ("[I]t is not necessary that direct evidence

---

1985) (applying in excessive-force suit under § 1983 the "axiomatic" principle "that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury"); *see also Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir.2011) ("It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."); *Fogarty*, 523 F.3d at 1164 (affirming denial of qualified immunity where defendant failed to intervene during arrest that lasted between three and five minutes). Holding some officers liable for their active unlawful conduct and others liable for their unlawful failure to intervene in the unlawful conduct is distinct from some kind of "group liability" theory. *See Putman v. Gerloff*, 639 F.2d 415, 423–24 (8th Cir. 1981) (holding that district court erred in failing to submit subordinate's liability to jury when subordinate allegedly failed to intervene in superior's use of force).

exists to link particular officers with the assault. It is sufficient to withstand a [motion for summary judgment] if overall questions of credibility and inference exist that might permit a jury to infer participation.") (alteration in original)); *Antoine v. Cty. Of Sacramento*, 2007 WL 421022, at *8–9 (E.D. Cal. Nov. 27, 2007).

In addition, failing to intervene in an unlawful use of force is a constitutional violation just like actively participating in that unlawful use of force. *Putman*, 639 F.2d at 423–24; *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009) ("one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge"). The Eighth Circuit's description of failing to intervene in *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009), is instructive. In *Nance*, an officer confronted the victim of force with his gun drawn in a poorly lit parking lot, failing to identify himself, giving no warning, and not trying to stop his colleague, who shot the victim. *Id.* The court held that his "failure to take action to deescalate the situation if he had an opportunity and means to do so could establish liability." *Id.* The *Nance* court also relied on *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008), in which the Sixth Circuit rejected an officer's argument for qualified immunity in an excessive-force case because the officer had "participated in the tactical decision that he and [his partner] would confront [the plaintiff] in the latter's backyard with their guns drawn, without any verbal warning." *Id.* at 612 (quoting *Floyd*, 518 F.3d at 407). Although of course the force used in *Nance* and *Floyd* was greater than in the instant action, the role of the assisting officers is similar: they participated in the tactical decision to "patrol the area" and deploy munitions west of Walton and south of Page—where protestors had been instructed to disperse—and confronted Plaintiffs with immediate force, without warning, and without taking any action to deescalate the situation. (*See*

8

Molina Dep. 82:2-5, 105:22-24; 108:25–109:12, 112:4-5; Vogel Dep. 81:4–92:20, 93:13-23; Groce Dep. 122:16-20.)

Here, Plaintiffs have sufficient evidence—both direct and circumstantial—that the remaining individual defendants were personally involved, either by their deployment or failure to intervene in the deployment, of chemical munitions directed at Plaintiffs.[4] *See Velazquez v. City of Hialeah*, 484 F.3d 1340 (11th Cir. 2007) (per curiam) (reversing summary judgment for police officers where plaintiff "did not see who beat him, if anyone did"; stating that "[t]his is not the law. Were this the law, all that police officers would have to do to use excessive force on an arrestee without fear of consequence would be to put a bag over the arrestee's head and administer the beating in silence"; and holding that plaintiff's testimony that beating occurred and the officers admitted being present was enough to "permit[] the jury, if it believes that he was beaten, to find that both of the officers administered the excessive force or that one beat him while the other failed to intervene"); *see also Rohrbough v. Hall*, 4:07CV00996 ERW, at *9–13 (E.D. Mo. Oct. 23, 2008) (denying summary judgment to SLMPD officer who was present during alleged excessive force under excessive force and failure-to-intervene theories despite the fact that main aggressor had never been identified and was not sued).

a. *Lieutenant Dodge*

First, with respect to Lieutenant Dodge:

- A couple of weeks before the August 19, 2015 incident, Dodge wrote an email thanking another officer for giving him a script for use before deploying chemical

---

[4] Contrary to Defendants' argument, the fact that Plaintiffs rely, in part, on circumstantial evidence is immaterial. Indeed, the Eighth Circuit has emphasized that circumstantial evidence may be "more certain, satisfying and persuasive than direct evidence." *United States v. Hirani*, 824 F.3d 741, 747 (8th Cir. 2016) (citations omitted). As a result, "[i]n both civil and criminal cases, circumstantial evidence is considered just as probative as direct evidence, and for that reason, circumstantial evidence may constitute evidence that is clear, unequivocal, and convincing." *Id.*

munitions and stating, "Thanks [name]. We[']ll probably use it." The other officer replied, "I would expect nothing less. . . ." (Ex. 18 at Bates 39642.)

- Dodge was in command of the St. Louis BEAR and gave orders to the SWAT team members stationed on the BEAR that day. (Dodge Dep. 46:19-20; *see also* Busso Dep. 75:14-17, 80:1-4; Coats Dep. 82:15-19 ("Do you recall Lieutenant Dodge giving you any specific orders on that day? A. Yes. Q. What orders did he give? A. Launch gas.").)

- Dodge personally ordered the deployment of chemical munitions on August 19, 2015 from the BEAR, going "west on Page into the crowd" "in an effort to move the protestors off of Page and onto side streets." (Ex. 3 at 00039.)

- Then, Dodge ordered Sgt. Mayo, the ranking officer in the BEAR, "to patrol the area south of Page to ensure that rioters had dispersed." (Dodge Dep. 54-55.)

- Dodge made that order about "patrolling the area" "on [his] own initiative." (Dodge Dep. 62:9-19.)

- When he was on the St. Clair BearCat, Dodge made statements via radio like "We're going to go ahead and make another pass" and "We're addressing some people." (Busso Dep. 101:6-12, 104:7-12, 105:2-4.) A reasonable inference from these statements and the fact that Dodge had previously told "the people in the BEAR" to "go ahead and deploy gas to disperse the crowd," Dodge Dep. 61:17-21, is that the BEAR should continue to deploy munitions in the location he had now told the BEAR to go "patrol" to ensure "rioters had dispersed."

- Yet at that time Dodge knew that the goal of deploying munitions on Page had been to move protestors "onto side streets," and he testified that he personally gave a

dispersal order. Earlier dispersal orders had instructed civilians to go the direction that

they were going—west on Page and north and south on side streets.

For these reasons, there are, at least, disputed issues of fact that prevent summary judgment for

Dodge, since he was personally involved in the deployment of chemical munitions against

Plaintiffs. *See*, *e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008) (holding that

police officer who "personally ordered the use of tear gas" against protestor could be held liable

for excessive use of force).

  b. *Officers Mader, Wethington, Seper, Book, and Sgt. Mayo*

  Plaintiffs alleged that these officers either unlawfully deployed munitions at Plaintiffs or

failed to intervene when their colleagues did so. The following facts support the officers'

individual liability:

- Munitions were deployed from the BEAR at Plaintiffs. (Molina Dep. 105:22-24; 108:25–109:12, 112:4-5; Vogel Dep. 81:4–92:20, 93:13-23; Groce Dep. 122:16-20, 135:3-9.)

- Each of these defendants was stationed inside the BEAR as it passed Molina's house and as it traveled to Fountain Park. (Ex. 3 at 00038. *See also* Seper Dep. at 39:21-24.)

- From inside the BEAR, each officer had access to chemical munitions in "buckets" and at least one launcher. (Mader Dep. 75:24–26:7; Wethington Dep. 70:6-10.)

- It is possible to launch a munition from inside the BEAR, through a porthole, while looking out the small rectangular window above the porthole or while looking out the porthole from behind the launcher, just as it is also possible to push a munition out with one's hand. (Manasco Dep. 41:15–43:9.)

- A launcher is fairly accurate; assuming a person knows how to use it (something every SWAT team member is trained on), it will put a munition in a four-foot by four-

foot square from approximately 30 yards. (Coats Dep. 88:18-23.)

- From inside the BEAR, each officer had access to approximately 10 portholes that opened, including three on the right side of the vehicle, which faced Molina's house as the BEAR traveled south on Euclid. (Manasco Dep. 42:8-16.)

- The area inside the BEAR is open, officers can stand, sit, or kneel, and officers inside the BEAR can pass things to one another, including chemical munitions. (Manasco Dep. 33:13-17; Chambers Dep. 39:20–40:14; Seper Dep. 41:22–42:1.)

- Defendants' own evidence shows that the BEAR traveled south on Euclid from Page, passing Molina's house and entering Fountain Park, at approximately the time alleged by Molina and Vogel. (Ex. 3 at 00038–39; *see also* Ex. 2, Vogel Video of Munitions in Fountain Park; De Mian Video at time stamp 7:58; Wethington Dep. 49:24–50:2.)

- Defendants' own evidence shows the BEAR stopped somewhere south of Page on Euclid, giving an opportunity to deploy a munition at Groce from a stationary position, as he testified. (Ex. 00039; Groce Dep. 122:1-9; Mayo Dep. 44:5-12.)

- All of the officers stationed inside the BEAR, other than supervisor Sergeant Mayo, acknowledge that they deployed munitions from inside the BEAR. (Mader Dep. at 79-80, 107; Seper Dep. 43:3-13; Book Dep. 49:7-11; Wethington 70:6-10.)

- Canisters of various types were found on Euclid and in Fountain Park after the fact, along with a powdery residue and smoke. (Ex. 4; Molina Dep. 107:13-25, 108:17–109:12; Ex. 2, Vogel Video of Munitions in Fountain Park; Groce Dep. 127:19-22, 129:20–130:4.)

- The after-action report acknowledges that munitions were deployed on Euclid south of Page. (Ex. 3 and 00039.) It includes information that, upon deployment of

chemical munitions on Euclid south of Page, people ran "into the gangways of several residences out of sight." (Ex. 3 at 00039.) That is somewhat consistent with Molina and Vogel's testimony that they ran into the alley south of Molina's property to avoid being struck with munition canisters.[5]

- In their depositions, these officers largely disclaimed knowing exactly where they deployed munitions, but when they were reporting information to Officer Manasco, they told him the exact route the BEAR had taken, including its leg past the Molina house. (Manasco Dep. 31:2-23 ("Q. Who told you [the route]? A. I individually ask[ed] each officer on the BEAR if they could recall their route and they all dictated that back to me. [break] Q. The officers who you asked about their route, which officers are those? A. Officer Coats, Officer Busso, Officer Wethington, Officer Seper, Officer Mader, Officer Book and . . . [then-]Sergeant Mayo. Q. Did you talk to each of them individually? A. Yes, I did.").) From that, along with the fact that Dodge had told them to patrol the area south of Page, a reasonable inference must be drawn in Plaintiffs' favor that the BEAR occupants knew where they were, how far they were from the original "dispersal" site east of Page and Walton, and deployed munitions anyway.

---

[5] The after-action report says people ran east, whereas Molina and Vogel ran west, but there is at least one other directional error in the report. (*See* Manasco Dep. 62:14-23.) Furthermore, the report "kind of blends" the two trips the BEAR took west on Page when it deployed munitions either on or toward Euclid "into one" trip. (Dodge Dep. 79:13-17.) Again, the report was compiled after the fact by someone not present on the BEAR and not based on contemporaneous notes or any systematic process. (*See* Dodge Dep. 80:11-16 ("It's a very difficult process because we're not documenting the incident as it's happening, so a lot of times you've got to do it from memory. And these are pretty chaotic situations, so obviously mistakes can be made and not everything be included in it."); *see id.* 81:12-19; *id.* 82:10-23 (testifying that there is no one responsible for counting spent munitions and "[p]retty much each officer is responsible for, to the best of their ability, remembering what they did and where they did it").

c.  *Officers Coats[6] and Busso*

- Many of the facts above also support the individual liability of Officers Coats and Busso, including the many facts supporting the allegation that munitions were deployed from the BEAR at Plaintiffs.

- Coats and Busso were stationed on top of the BEAR as it traveled south on Euclid, past Molina's property, and entered Fountain Park. (Coats Dep. 37:1-4; 66:16-21; *see also* Ex. 3 at 00039.)

- From those positions, they could easily see what was happening outside the vehicle in all directions.

- Further, they had the ability to communicate by radio with their colleagues inside the BEAR. (Coats Dep. 41–42, 82–83; Busso Dep. 99:3-9.)

- Defendants' own evidence shows that Coats and Busso deployed chemical munitions, including Busso specifically on Euclid south of Page. (*See, e.g.*, Busso Dep. 77:18-22; Ex. 3 at 00038–39.)

- Coats, who was closer to Busso than two people are who are sitting across a conference table, carried a launcher. (Coats Dep. 84:22-23; 99:7-12.)

III.  **Taking the facts in the light most favorable to Plaintiffs, Defendants are not entitled to summary judgment on Plaintiffs' claims that the individual defendants retaliated against them for engaging in protected First Amendment activity.**

Defendants raise three additional arguments in an attempt to defeat Plaintiffs' First Amendment retaliation claim. First, Defendants argue that, "Plaintiff[s] cannot establish that any defendant was personally involved in the alleged deployment." However, as Defendants

---

[6] Plaintiffs move to voluntarily dismiss only the failure-to-intervene claim against Defendant Coats. Coats could see where munitions were deployed, and there is evidence that he himself deployed the munitions in question. But he could not reach his colleagues to intervene in their actions. Busso, on the other hand, "had the ability to go down into the BEAR" from his position. (Coats Dep. 99:7-17.)

acknowledge, this argument is identical to the one addressed in Section II of Defendants' memorandum and, therefore, Plaintiffs' response is the same: as established above, Plaintiffs have sufficient direct and circumstantial evidence supporting the personal liability of each individual defendant, creating genuine issues of fact, that precludes summary judgment.

Second, Defendants argue that Plaintiffs cannot "establish that any individual defendant recognized them." *Id*. However, there is no requirement that a plaintiff establish that a police officer recognize him or her in order to state a First Amendment retaliation claim. *See Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (stating elements). Indeed, if that were the case, protestors exercising their First Amendment rights would rarely, if ever, be able to state such a claim since it is unlikely that a given police officer recognizes a given protestor. *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (pointing out that "[t]he government may [unconstitutionally] attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience").

Third, Defendants argue that Plaintiffs cannot establish that any individual defendant retaliated against them for engaging in protected activity. In making this argument, Defendants appear to be challenging the third element necessary to establish a First Amendment retaliation claim: that "the adverse action was motivated at least in part by the exercise of the protected activity." *Peterson*, 754 F.3d at 602. Under this prong, "a plaintiff must show that the retaliatory motive was a 'substantial factor' or 'but-for cause' of the adverse action. *Id*. (citations omitted).

Defendants' causation argument fails because the Eighth Circuit has "long held that questions of motive and causation are peculiarly suited to resolution by a factfinder." *Wilson v. Miller*, 821 F.3d 963, 973 (8th Cir. 2016). *See also Peterson*, 754 F.3d at 603 ("[t]he causal connection is generally a jury question"). Applying this principle, in *Peterson*, the court rejected

the defendants' claim that causation was "free from doubt," because the parties presented conflicting evidence. On the one hand, the defendants argued that "Kopp pepper sprayed Peterson as a reasonable reaction to an escalating situation." *Id*. On the other hand, the plaintiff presented evidence that "Kopp pepper sprayed him in retaliation for criticizing him and asking for his badge number." *Id*. As a result, the court, the court concluded that the police officer was not entitled to summary judgment, since the evidence had to be viewed in the light most favorable to the plaintiff. *Id. See also Donnell v. City of Cedar Rapids*, 437 F. Supp. 2d 904, 925 (N.D. Iowa 2006) (denying summary judgment on whistle-blower claim and stating: "This case presents a classic question of fact for the jury. There are two sides to this story.").[7]

Similarly, causation in this case also presents a classic question for the jury, because there are two sides to the story. On the one hand, Defendants argue that plaintiff cannot establish that any individual defendant retaliated against them for engaging in protected activity. On the other hand, Plaintiffs point to the After-Action Report (as discussed above) among other evidence to establish that, in accordance with Lieutenant Dodge's orders, the defendants stationed in and on the BEAR deployed chemical munitions or failed to intervene when their colleagues did so, directed at Plaintiffs, who had been standing on the yard and the sidewalk as is their constitutional right, as the BEAR was traveling south of Page on Euclid past Molina's house.

Moreover, Plaintiffs' testimony supports the inference that chemical munitions were deployed at them in retaliation for exercising their First Amendment rights. Groce testified that as he approached the BEAR and told it to "leave the park," he was immediately struck on the hip

---

[7]     Defendants' reliance on *Green v. Nocciero*, 676 F.3d 748, 753 (8th Cir. 2012) is misplaced. In *Green*, the court held that the plaintiff could not establish causation because he "failed to identify what speech allegedly gave rise to the alleged retaliation." *Id*. In contrast, the speech at issue in this case is, as to Vogel and Molina, Plaintiffs' perceived participation in protests challenging the police shooting of Mansur Ball-Bey and their assembling on a public sidewalk. As to Groce, it is his instruction to the BEAR to leave Fountain Park. *See Peterson*, 754 F.3d at 603 (commenting that "[t]emporal proximity is relevant" in retaliatory force case).

and arm. Similarly Molina and Vogel testified that chemical munitions were deployed at them so specifically that the munitions traveled into the alley they had taken refuge in—despite the fact that they had been peacefully standing with a small group in front of Molina's house and had gone the direction of the dispersal order. Significantly, at the time, Molina was wearing a lime green hat that identified her as a legal observer. (Molina Dep. 134:12-19; *see also* Busso Dep. 133:3-9; Mayo Dep. 36:3-5; Dodge Dep. 64:8-21.) Consequently, it is reasonable to infer that Lieutenant Dodge ordered the BEAR to "patrol the area" and the officers on and in the BEAR retaliated at them on this basis alone: for exercising their First Amendment right to observe and record police conduct. *See*, *e.g.*, *Turner v. Lieutenant Driver*, 848 F.3d 678, 687–88 (5th Cir. 2017) (establishing a First Amendment right to record police activity); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) (holding that an individual's right to record officers' performance of their duties in public was clearly established); *Smith v. Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("[T]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) (holding there is a "First Amendment right to film matters of public interest").

Thus, when the evidence is properly viewed in the light most favorable to Plaintiffs, there are, at least, issues of fact that prevent summary judgment for the individual defendants as to Plaintiffs' First Amendment claim.

IV.     **Plaintiffs are entitled to seek to recover damages for the emotional injuries that they suffered by the deployment of chemical agents directed at them.**

Defendants argue that Molina and Vogel cannot establish that they were actually injured by the deployment of chemical munitions directed at them. As a result, Defendants ask the Court to limit any possible recovery by Molina and Vogel "to no more than one dollar in nominal

damages." *Id*. at 15.[8] Neither the facts nor the law support this argument.

First, Molina and Vogel are entitled to recover compensatory damages for the emotional/mental distress that they experienced from having chemical munitions deployed at them when the BEAR travelled south of Page on Euclid and passed Molina's house. In *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546 (8th Cir. 2013), the court commented that "[a] compensatory damage award for emotional distress may be based on a plaintiff's own testimony. Such an award must be supported by competent evidence of a genuine injury, but medical or other expert evidence is not required." *Id*. at 552 (internal citations and quotation marks omitted). Applying this principle, the court held that the plaintiffs, who were terminated for filing grievances against their supervisor, submitted sufficient evidence to support their claim of emotional distress when they testified that "the stress from [the termination was] immense," that is was "depressing," and that they were not "able to sleep at night." *Id*.

Molina and Vogel have provided similar testimony in this case. Molina testified that "I was injured in the sense that for almost a year, I didn't do anything at all. I laid in bed depressed, didn't get out of bed… I was completely depressed. I had no desire to do anything and I didn't participate in things that I like to participate in." (Molina Dep. 167:22-168:8.) Similarly, Vogel testified that the exposure to tear gas has caused her to experience mental distress and panic attacks and, as a result, she sought counseling for some two years. (Vogel Dep. 154:6–156:4.)[9]

---

[8]    In making this argument, Defendants exclude Groce, presumably because he testified that he was hit by something immediately after he told the BEAR to leave Fountain Park, and that caused a visible physical injury. (*See* Ex. 29.) Although neither Molina nor Vogel were actually hit by chemical munitions, they still suffered injuries for which they are entitled to seek to recover compensatory and punitive damages.

[9]    Defendants note that Vogel was exposed to tear gas on two occasions on August 19, 2015, and that Vogel does not claim that first exposure was unconstitutional. As a result, Defendants argue that Vogel cannot establish that she was injured, because she "cannot determine which side effects were the result of the first (unchallenged) exposure versus the second." *Id*. This argument, however, ignores Vogel's testimony that "despite the fact that it is difficult for [her] to tell which side effect was caused by which exposure, she was "feeling" the "effects" of "**both** of

Second, even if the jury were to award Molina and Vogel only one dollar in nominal damages, they would still be entitled to recover punitive damages. *See*, *e.g.*, *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 527–29 (8th Cir. 2019) (affirming award of $1 in compensatory damages and $250,000 in punitive damages); *Haynes v. Stephenson*, 588 F.3d 1152, 1158 (8th Cir. 2009) (affirming award of $1 in nominal damages and $2,500 in punitive damages).

Thus, Plaintiffs are entitled to seek to recover damages for the emotional injuries that they suffered by the deployment of chemical agents directed at them.

## V.    Defendants' deployment of chemical agents directed at Plaintiffs was not justified.

Defendants next argue that Plaintiffs unlawfully refused to disperse and any exposure to tear gas was therefore justified.

Defendants' argument ignores critical testimony by both Molina and Vogel, which must be taken as true at this stage of the case.[10] In particular, contrary to Defendants' characterization: Molina and Vogel were far away from where any dispersal order had been given (Defs.' Ex. L, Pls.' Ex. 1), and they had *gone the direction the dispersal order told them to go.* (*See* Responses to Defs.' SUMF paragraphs 8 and 11.) No one nearby was doing anything threatening, violent, or unlawful at the time the officers on the BEAR shot chemicals at Molina and Vogel. (Molina Dep. 165–166.) If true, that use of force was a gratuitous and completely unnecessary act of violence. *Burnikel*, 886 F.3d at 712. At the very least, there are genuine issues of fact preventing

---

these exposures." (Vogel Dep. 113:20-24.) Thus, the jury (and not this Court) has to determine whether the second exposure was a substantial factor in causing Vogel to suffer mental distress. *See Ricketts v. City of Columbia*, 36 F.3d 775, 779 (8th Cir. 1994) ("[U]nder Missouri law of proximate causation, to which we may look in applying § 1983, it is enough that the defendant's fault was a 'substantial factor' in producing the plaintiff's injuries, and the defendant's fault need not have been the *sole* proximate cause in order to allow recovery.") (italics in original); *Landers v. Monsanto Co.*, 2017 WL 3531378, at *3 (E.D. Mo. Aug. 17, 2017) ("Generally, whether proximate causation exists is a question for the jury.").

[10] Defendants do not mention Groce in making this argument.

Defendants from establishing that Plaintiffs unlawfully refused to disperse and shooting chemicals at them—some one-third of a mile away from Page and Walton—was justified.

## VI.    The individual defendants are not entitled to qualified immunity.

In ruling on qualified immunity, a court must engage in a two-pronged inquiry: (1) whether the facts, taken in the light most favorable to Plaintiffs, show that the officers' conduct violated a federal right; and (2) whether the right in question was clearly established. *Tolan*, 134 S. Ct. at 1865–66. Under either prong, the Supreme Court has emphasized that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id*. at 1866. Furthermore, qualified immunity is not appropriate where there are genuine issues of material fact relating to the plaintiffs' conduct:

> Where a genuine issue of fact surrounds the question of the plaintiff's conduct, the trial court must determine whether the evidence [is] sufficient to create a genuine issue as to whether the defendant in fact committed the acts. **Once a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied.**

*Gainor v. Rogers*, 973 F.2d 1379, 1385 (8th Cir. 1992) (internal citation and quotation marks omitted) (emphasis added)). *See also Wealot v. Brooks*, 865 F.3d 1119, 1128–29 (8th Cir. 2017) (reversing grant of summary judgment on qualified immunity and stating: "Because at least two genuine disputes of material fact must be resolved to determine whether the officer's conduct was reasonable, we reverse the grant of summary judgment on the excessive force claims against all defendants"); *Manning v. Cotton*, 862 F.3d 663, 669–71 (8th Cir. 2017) (affirming denial of summary judgment on qualified immunity because plaintiff's "allegations are based on disputed facts" and, therefore, the jury would have to resolve the "factual dispute and make the necessary credibility determinations").

Consistent with the foregoing standards, the individual defendants are not entitled to summary judgment on qualified immunity.

A.    *__The individual defendants violated Plaintiffs' constitutional rights__*.

In the section of their memorandum addressing qualified immunity, Defendants do not address the first prong of the qualified immunity inquiry. No doubt, this is because Defendants address the first prong in the preceding sections of their memorandum.

Similarly, Plaintiffs have fully addressed the first prong in the preceding sections of this memorandum, demonstrating that the individual officers violated Plaintiffs' constitutional rights by retaliating against them for their constitutionally protected activity and using excessive force and/or failing to intervene in the use of excessive force.

B.    *__Plaintiffs' constitutional rights were clearly established__*.

The second prong of qualified immunity focuses on whether, when the facts are viewed in the light most favorable to Plaintiffs, the conduct of the individual defendants violated Plaintiffs' clearly established constitutional rights. *See*, *e.g.*, *Henderson v. Munn*, 439 F.3d 497, 503-04 (8th Cir. 2006) (denying qualified immunity because reasonableness of officer's conduct in using pepper spray depended upon whose version of events was believed).

In addressing this factor, the Eighth Circuit has emphasized that "there is no requirement that [the plaintiff] must find a case where 'the very action in question has previously been held unlawful,' so long as 'existing precedent [has] placed the statutory or constitutional question beyond debate.'" *Karels v. Storz*, 906 F.3d 740, 747 (8th Cir. 2018) (citations omitted). *See also Thompson v. City of Monticello*, 894 F.3d 993, 999–1000 (8th Cir. 2018) ("While clearly established law should not be defined at a high level of generality … it is not necessary, of course, that the very action in question has previously been held unlawful.") (internal quotations omitted). Furthermore, "in an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law." *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015) (alterations in original) (citation omitted). *See also Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir.

2009) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

First, with respect to Groce, when properly framed (viewing the facts in the light most favorable to him), the critical question is whether it was clearly established on August 19, 2015 that it was unlawful for an officer to deploy chemical munitions at a nonviolent individual who was exercising his First Amendment rights but was not threatening or resisting arrest. The answer is yes. *See Thurairahah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) (affirming denial of officer's motion for summary judgment on qualified immunity, holding that it was clearly established in 2015 that "[c]riticism of law enforcement officers, even with profanity, is protected speech"); *Peterson*, 754 F.3d at 603 ("A reasonable jury could conclude, based on this account, that Kopp pepper sprayed Peterson in retaliation for asking for his badge number, and Peterson's First Amendment right was clearly established at the time of the incident [which occurred on April 25, 2011]."). Similarly, a reasonable jury could conclude, based on Groce's version of events, that the individual defendants deployed chemical munitions at Groce in retaliation for telling the BEAR to leave Fountain Park and that the force was excessive under the Fourth Amendment. *See also Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) ("The use of any force by officers simply because a suspect [which Groce was not even] is argumentative, contentious, or vituperative is not to be condoned.").

Second, with respect to Molina and Vogel, when properly framed (viewing the facts in the light most favorable to them), the critical question is whether it was clearly established on August 19, 2015 that it was unlawful for an officer to deploy chemical munitions at individuals who had gone some 0.3 miles from where they had heard a dispersal order (in the direction the order instructed them to go) and, along with a small group, gathered in front of a house owned by

one of the individuals, and were acting in a nonviolent and nonthreatening manner, and where there were very few other people in their vicinity, none of whom were acting violently at the time? Again, the answer is yes.

Several Eighth Circuit cases are instructive:

1) *Burnikel v. Fong*, 886 F.3d 706, 711–712 (8th Cir. 2018), held that "it was clearly established in 2013 that it was unlawful to strike a nonviolent person who had committed no crime, who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety," and who had called out to an officer. *Id*. at 712. Furthermore, a "'gratuitous and completely unnecessary act of violence' is unreasonable and violates the Fourth Amendment." *Id*. (citation omitted); *see also Henderson*, 439 F.3d at 502–03 (regarding pepper spray).

2) *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), held it was clearly established that it was "unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator." *Id*. at 499;

3) *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011), held that a plaintiff need not demonstrate more than *de minimis* injury to succeed on an excessive-force claim and that instead the "rule should focus instead on whether *the force applied* is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." *Id*. at 906;

4) *Treats v. Morgan*, 308 F.3d 868 (8th Cir. 2002), affirmed the denial of summary judgment on qualified-immunity grounds in Eighth Amendment pepper-spray case where, when viewed in plaintiff's favor, "[t]he evidence shows that there was no objective need for the degree of force used or the pain inflicted" because correctional officers "could not reasonably have

perceived [plaintiff] to be a threat to themselves or institutional security at the time" and they had "failed to temper their forceful response." *Id.* at 874; *see also id.* at 873 (holding that an Eighth Amendment claim exists when "an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat"); and

     5)    *Lawrence v. Bowersox*, 297 F.3d 727 (8th Cir. 2002), an Eighth Amendment case, affirmed a jury verdict against prison supervisor and affirmed the denial of qualified immunity because "[o]rchestrating an unnecessary pepper spray shower violated clearly established rights of which a reasonable person should have known." *Id.* at 733; *accord Baude v. City of St. Louis*, 4:18CV1564 RWS, 2020 WL 4470846, at *7 (E.D. Mo. Aug. 4, 2020) (denying 12(b)(6) motion on qualified-immunity grounds for use of pepper spray against perceived protestor where, taking plaintiff's facts as true, "the deployment of pepper spray against him was not objectively reasonable" because he was not fleeing, resisting arrest, posed no immediate threat to the officers' safety, was being detained for a nonviolent misdemeanor, and at most, was argumentative).

     Applying these cases leads to an obvious conclusion: on August 19, 2015, a reasonable officer would have understood that it is unlawful to deploy chemical munitions at a small group of individuals who were acting in a nonviolent and nonthreatening manner, and where there were very few other people in their vicinity (Vogel Dep. 83:1-20), none of whom were acting violently at the time. (Molina Dep. 166:14-23.) As Officer Mader admits, if Plaintiffs' allegations are true, then "there's a possibility" that "a crime" was committed against them. (Mader Dep. 141:9-15.)

     Thus, the Court should deny Defendants' motion for summary judgment with respect to their qualified immunity defense.

**VII.    Plaintiffs can establish a municipal liability claim against the City.**[11]

It is well established that "[a] municipality is liable under § 1983 for unconstitutional acts by its officials or employees that implement or execute a municipal custom or policy." *Harris v. City of Pagedale*, 821 F.2d 499, 504-06 (8th Cir. 1987) (holding that plaintiff proved the existence of a "municipal custom of failing to receive, investigate or act on citizen complaints of physical and sexual misconduct by police officers"). In order to prove a municipal custom exists, a plaintiff must demonstrate:

(1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3) The plaintiff['s] injury by acts pursuant to the governmental entity's custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation.

*Moore v. City of Ferguson*, 213 F. Supp. 3d 1138, 1146 (E.D. Mo. 2016) (citation omitted)) (alterations in original).

In *Moore*, relatives of suspect who died after police officer shot him with a stun gun brought claims against officer and municipality. *Id*. at 1143. With respect to their municipal liability claim, plaintiffs alleged, in part, that there was an unofficial custom by the Ferguson Police Department ("FPD") officers to use excessive force. *Id*. at 1146.

---

[11]    At the outset, the City argues that Plaintiffs' municipal liability claim fails because Plaintiffs cannot establish an underlying constitutional violation by any individual defendant. This argument fails because Plaintiffs can establish liability against the individual officers. Furthermore, even assuming, *arguendo*, that there were not an individually liable defendant, Plaintiffs could still proceed with their municipal liability claim. *See, e.g.*, *Evans v. City of Helena-West Helena*, 912 F.3d 1145, 1146 (8th Cir. 2019) ("While a municipality cannot be held liable without an unconstitutional act by a municipal employee, there is no requirement that the plaintiff establish that an employee who acted unconstitutionally is personally liable."); *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018) ("We have long held for that reason that a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom.").

In denying the city's motion for summary judgment with respect to plaintiffs' unofficial custom excessive force claim, the court noted that plaintiffs submitted sufficient evidence of a "continuing, widespread persistent pattern of unconstitutional conduct by FPD officers." *Id*. at 1147. Specifically, plaintiffs cited five incidents of excessive force that predated the stun gun shooting incident underlying the case. *Id*. Although the city "disputed the details of these incidents," the court concluded that "five instances of excessive force – involving Tasers – predating the events of this matter over the course of just one year constitutes more than isolated incidents." *Id*.

The court also concluded that plaintiffs satisfied the "deliberate indifference" factor. Although official FPD policy "prohibit[ed] use of force unless reasonable alternatives have been exhausted or would clearly be ineffective," the court noted that "FPD officers routinely engage[d] in the unreasonable use of [tasers], and supervisors routinely approved their conduct." *Id*. at 1147–48. Furthermore, the police chief testified that he had never disciplined an officer for using excessive force. *Id*. at 1148. Finally, the court concluded that the city's failure to "enforce its own policies regarding the appropriate use of [tasers] during interactions with the public," was the 'moving force' behind the violation of [plaintiff's] constitutional rights." *Id*. at 1148.

The analogous circumstances in this case support the same conclusion. First, contrary to Defendants' argument, Plaintiffs have adduced sufficient facts that establish a "widespread custom" by City police officers to unlawfully deploy chemical munitions against protestors they perceive to be expressing an anti-law enforcement view. In particular, Plaintiffs have submitted declarations and testimony from witnesses to (or victims of) retaliatory and excessive chemical munition deployment against protestors on 11 occasions, including some half-dozen that occurred before August 19, 2015. (*See* Pls.' SAUMF ¶¶ 31, 32; Exs. 9–23.) They also submit

evidence that supervisory staff knew of these incidents and yet failed to conduct reviews. (*See, e.g.*, Ex. 24 at Bates 2323, 2734–35; 26297, Ex. 27 and *infra* p. 31.)  That is sufficient to establish at least a genuine issue of material fact that City police officers have a continuing, widespread, and persistent pattern of using chemical agents at protestors in a retaliatory and excessive manner.

As further support for the existence of these overarching customs, there are other continuing, widespread, and persistent patterns that underlie them. First, the City has a custom of considering all street protests illegal from the outset, which officers believe gives them discretion to deploy munitions against protestors merely for blocking traffic, without giving due consideration to protestors' First Amendment rights.[12] (*See* Ex. 7, Testimony of Lt. Timothy Sachs, 73:9-23, Ex. 8, Testimony of Sgt. Brian Rossomanno, 212:6–213:20; *Langford v. City of St. Louis*, 443 F. Supp. 3d 962, 983–84 (E.D. Mo. 2020) (among other things, holding that City's framework for permits causes "severe burdens" on political speech by prohibiting spontaneous political speech and is in any event, at n.9, "uncertain and amorphous"); Ex. 24[13] at Bates 02323 ("the group had been told to remain on the sidewalk")[14]; Defs.' SUMF at ¶¶ 8, 11 (dispersal order gives rationale of "impeding the flow of traffic"; Defs.' Ex. U, Larson Aff. ¶ 11, defining

---

[12] *See also*, as an example of the subordination of First Amendment rights to other goals and the kind of us-against-them mentality of the City's commands to officers, *see* Ex. 24 at Bates 017804–05 (first paragraph). When viewed in light of the City's policies and custom of viewing all street protests as illegal from the outset, this is a moving force behind the violation of Plaintiffs' constitutional rights. *See also* Ex. 24 at Bates 17659–17691 (Sept. 3, 2014) and revised version at Ex. 24 at Bates 20256–20276 (Oct. 29, 2014), neither of which contains any reference whatsoever to protestor rights under the First Amendment.

[13] Ex. 24 consists of emails that have been designated as confidential and is filed under seal. Plaintiffs therefore will excerpt the emails only very sparingly.

[14] This email describes a street protest that ended in arrests (for being in the street and blocking traffic) and tasings. A jury later found an individual officer liable for battery for tasing one of the protestors. *See Hendrix v. City of St. Louis*, 1722-CC01430 (order of Jan. 15, 2020, denying summary judgment; jury verdict entered Feb. 20, 2020; order of June 4, 2020, denying defendant's motion for JNV).

"impeding the flow of traffic" as criminal activity that may properly permit the use of chemical munitions under Section XIII of Special Order 1-0); Ex. 24 at Bates 35170 (*see* statement at the end concerning "stay out of street"); Wethington Dep. 88:5–23 (testifying that there are scenarios in which "[y]ou can impede the flow of traffic without there being traffic there. You can unlawfully block a street, you know, without there being traffic and still have it be illegal."), *id.* 90:1-4 ("Do you know if in the city you ever have the right to block the street while protesting? A. You know, certainly there's probably a scenario. I don't know."); Book Dep. 98:9-101:22 (testifying that although he has ordered people to leave the street for impeding the flow of traffic, he "has no idea" of whether there has to be traffic for that to be unlawful and although he has ordered people to leave the sidewalk, he does not know whether one can impede traffic on a sidewalk and "has no idea" why he did so the most recent time); Dodge Dep. 110:15–112:6; *id.* 114:9-18 ("Q. Based on your long career with the St. Louis Metropolitan Police Department, if a person wants to express themselves by participating in a protest, but do so lawfully, how do they do that? . . . A. Um, I mean, they just don't break the law. Don't throw things, ***don't get in the street***, that kind of thing.") (emphasis added)).

Second, the City has a custom and policy of excepting certain munitions—and certain *goals* of deployment of munitions—from restriction in order to give more officers unfettered discretion on when and under what circumstances to deploy them. (*See* Ex. 24 at Bates 02731–39 (foggers); *see also* Ex. 7 at Vol. II, pp. 54–55 (pepper spray).)[15] For example, although the City asserts that it has a policy that handheld pepper mace should not be used on someone who is "*passively* resisting," the City places no restriction on using it against someone who is "*actively* resisting." Ex. 26, City Dep. 72:4–73:19. The policy fails to describe the difference between

---

[15] *But see* Ex. 26 at 112, 116–17 (City's 30(b)(6) designee taking opposite position in 2019).

passive versus active resistance, Ex. 26, City Dep. 84:7-20, and there are no training documents

that explain the difference between passive versus active resistance. *Id.* 85:5-16. And ultimately,

according to the City's designee, there is no real difference: "The minimum threshold, it first

would start with refusing to comply because that an active act." *Id.* 81:22-24. And, under those

circumstances, a police officer is authorized by police to effectuate an arrest by pepper spraying

an individual without warning. *Id.* 82:6–83:6; *see also id.* 196. We can see how this played out in

the incident that resulted in the individual defendants deploying munitions at Plaintiffs: by the

time they were gassed on Euclid, Plaintiffs had dispersed, but the officers claim to believe they

were *not* complying with the dispersal orders. That is, according to City policy as expressed by

the City's 30(b)(6) designee, the kind of "resistance" that allows the deployment of at least

certain munitions without warning. And lack of warning is in fact what took place. (*E.g.*, Vogel

Dep. 85:2-5, Molina Dep. 167:9-16.)

Third, the City also has a custom and policy of providing little to no training on when and

under what circumstances to deploy munitions against protestors.[16] Although some police

officers receive training relating to chemical munitions (notably, from the manufacturer), the

officers do *not* receive training regarding when it is appropriate and/or not appropriate to use

chemical munitions directed at protestors. (*See, e.g.,* Ex. 5, Manasco Dep. 59:5-10.) Indeed, the

City has done very little training on what circumstances allow its police officers to lawfully

deploy chemical agents against protestors. In fact, Lieutenant Colonel Lawrence O'Toole, the

acting commissioner of police in September 2017, was asked the following question:

> Q.      And my question is[:] are you aware of anything in writing that's provided
>         to the officers that really explains when it's appropriate to use chemical
>         agents consistent with the requirements of these two special orders [on
>         chemical agents]?

---

[16] Or on the First Amendment. (*See* Mader Dep. 61:3-9; Ex. 24 at Bates 31985.)

A.      My answer is -- is no. My -- what I've seen in writing is -- is regarding the
         pepper spray itself.

(Ex. 25, O'Toole Dep. 55:8-15.)[17]

One consequence of this custom and policy is that, even if a deployment of a chemical

munition is constitutional at a particular time and place during an incident, there is no follow-up

about how long—and how far—that use may persist. (*See* Ex. 17, *Ahmad v. City of St. Louis*, No.

4:17CV2455 CDP, 2017 WL 5478410 (E.D. Mo. Nov. 15, 2017), at *3 ("Sachs testified that he

could not say "exactly how far would be enough" to comply with this, or any, dispersal order. . . .

A tactical vehicle eventually deployed chemical munitions at the group.")); *id.* at *15 ("plaintiffs

presented testimony . . . of witnesses who reasonably thought they had complied with the

dispersal order by moving further down the street because the order did not indicate how far they

should disperse); Mader Dep. 99:20–102:3; Book Dep. 103:19–104:7;[18] Seper Dep. 70:20–74:3;

City Dep. 211–214. That too is a moving force behind the application of the overarching custom

that affected Plaintiffs on August 19, 2015. Even if it had been appropriate to use munitions east

of Page and Walton, once officers advanced and individuals threw things at them, no one

intervened to command the individual defendants to stop—indeed, *not* to "patrol the

neighborhood" from the BEAR and continue the usage of chemical munitions. In fact, Dodge

affirmatively ordered his subordinates to do just that. (Dodge Dep. 54-55; 62:9-19.) That is the

---

[17] At the same time, the City is actively seeking more powerful chemical munitions. *See* Ex. 24 at Bates 17064,
22506-08. *See also* City 034975 (August 4, 2015).

[18] "Q. Do you have an understanding of what disperse means?
A. Vaguely.
Q. What does it mean to you?
A. They're to leave the area.
Q. Okay. If you were telling a group of people to disperse, by which you meant to leave the area, how far would you
think that group of people would need to go in order to comply with your command?
A. I have no idea.
Q. How long would that group of people need to remain out of the area in order to comply with your command?
A. No idea."

kind of de-escalation duty that officers ignore at their peril. *See Nance*, 586 F.3d at 612.

Fourth, the City does not conduct thorough or appropriate reviews of the uses of chemical munitions against protestors. In his deposition in this action, Lieutenant Dodge was asked about an after-action meeting he attended following the August 19, 2015 incident. The only critique he recalled from that meeting—which his subordinates, the people actually deploying munitions did not attend—was the position of the staging area, which (due to wind direction) caused munitions to affect officers who did not have masks and that the officers should have had more tactical gear. (Dodge Dep. 85-88) Likewise, Dodge testified that, although he asked Officer Manasco to prepare an after-action report, there were some inconsistencies he knew of, just based on his own personal knowledge, but never fixed. (Dodge Dep. 78:5–80:23; *see also* Ex. 5, Manasco Dep. 35:21–36:4, 46:1, 12-13, 54:11-15).) This is consistent with the complete lack of review or assessment following uses of chemical munitions against protestors prior to 2015. The City's written policies suggest that there will be a "Critical Incident Review" prepared after any such event. (*See* Ex. U at Bates 901 ("At the conclusion of any civil disobedience event, the Unified Command will conduct a Critical Incident Review of the event and the multi-jurisdictional response"); *see also* O'Toole Dep. 15:19-24 (stating that "we would look at a critical incident review").) But the fact is that the City does not do Critical Incident Reviews. (*See* Ex. 27 at 1 ("the City does not possess any critical incident reviews regarding protests").)[19] The City's written polices also suggest it is "required" that an I/LEADS report be created after "chemical

---

[19] In fact, only one such after-action critique has been produced. That was following uses of chemical munitions against protestors in 2017, and it was completed by the staging area commander. That critique, which covered 10 days in 169 words, mentioned the quality of food served to officers but not the deployment of chemical munitions. (*See* Ex. 28; *see also* City Dep. 164:14–166:1 (agreeing that no other commanders fulfilled the requirement to complete an after-action critique and, to his knowledge, had never been reprimanded); O'Toole Dep. 18:11–21:4 (no after-action report done following 2017 protests at which munitions were repeatedly deployed against protestors); Sergeant Mayo Dep. 58:8-9 ("not to [his] recollection" was there an After Action Review of the August 19, 2015 incident); *id.* 81:7-9 (testifying that he has never participated in an After Action Review following a protest).

agents are deployed for crowd dispersal." (Ex. U at Bates 903.) But that is not done, except for what is in incident reports, which do not involve a critique. (Ex. 27 at 2–7.)

The First Amendment protects the right to engage in protest against the police—or anything else—in traditional public fora, including streets and sidewalks. *See, e.g., Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988); *United States v. Grace*, 461 U.S. 171, 179 (1983); *Carey v. Brown*, 447 U.S. 455, 460 (1980); *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515-16 (1939) (Roberts, J., concurring). "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982); *see also Citizens Against Rent Control Coal. for Fair Housing v. City of Berkeley,* 454 U.S. 290, 294 (1981). "[P]eaceable assembly for lawful discussion cannot be made a crime." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). The Fourth Amendment protects the right to be free of, among other things, "gratuitous and completely unnecessary act[s] of violence." *Henderson*, 439 F.3d at 503. Taking the facts in the light most favorable to Plaintiffs, the City's customs and policies of deploying chemical munitions against protestors in an excessive and retaliatory manner were the moving force behind the constitutional injuries the individual defendants caused to Plaintiffs, including their exposure to a gratuitous and unnecessary use of force and the suppression of their expressive activity: the criticism Groce engaged in and the interruption of Molina and Vogel's peaceable assembly on a public sidewalk. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality); *accord Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir. 1996).

The City's customs and policies provide the public insufficient notice of what is permissible. (Indeed, as described above, many officers themselves do not know.) Individuals like Plaintiffs are required to steer wide and thereby surrender their First Amendment rights or

face the possibility of assault with chemical agents. *See Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (holding that the government's interest in "curbing criminal activity . . . . cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity"); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (internal quotation marks and ellipses omitted)).

In sum, the customs and policies of considering all street protests to be illegal, issuing vague dispersal orders whose geographic scope and duration are unknown, sending officers to deploy munitions without training on under what circumstances munitions can be deployed, and failing to meaningfully review deployments of munitions, caused the unconstitutional custom of deploying chemical munitions against protestors in an excessive and retaliatory manner. And that custom was the moving force behind the deprivation of Plaintiffs' rights on August 19, 2015.

## <u>Conclusion</u>

For these reasons, Defendants' motion for summary judgment should be denied.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827MO
Jessie Steffan, #64861MO
Omri E. Praiss, 41850MO
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, MO 63101
Phone: 314-652-3114
Fax:    314-652-3112
arothert@aclu-mo.org
jsteffan@aclu-mo.org
opraiss@aclu-mo.org

Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Phone: (816) 470-9938
gwilcox@aclu-mo.org
**Attorneys for Plaintiffs**