## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

SARAH MOLINA, et al.,        )
                             )
            Plaintiffs,     )
                             )
       vs.                 )     Case No.  4:17-CV-2498-AGF
                             )
CITY OF ST. LOUIS, MISSOURI,   )
et al.,                       )
                             )
           Defendants.    )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' motion for summary judgment in this civil rights case brought under 42 U.S.C. § 1983.  ECF No. 169.  Plaintiffs are St. Louis area residents Sarah Molina, Christina Vogel, and Peter Groce.  Defendants are the City of St. Louis and several officers of the St. Louis Metropolitan Police Department (SLMPD).[1]  Plaintiffs assert that Defendants violated their First and Fourth Amendment rights by deploying chemical munitions at them after they dispersed from a protest.  For the reasons set forth below, the motion will be granted in part and denied in part.

### BACKGROUND

**Facts**

Viewed in the light most favorable to Plaintiffs for purposes of the present motion,

---

[1]     The Defendant police officers are Lieutenant Stephen Dodge, Sergeant Michael Mayo, and Officers Daniel Book, Joseph Busso, Lance Coats, Joseph Mader, Mark Seper, and William Wethington. Officer Jason Chambers was also named in the complaint but later voluntarily dismissed.  ECF No. 173.  Plaintiffs also move to dismiss Officer Coats on Count III.  ECF No. 185 at 14 n. 6.

the facts are as follows.  On August 19, 2015, Plaintiffs attended a protest near the intersection of Walton and Page Avenues in St. Louis following the police shooting of Mansur Ball-Bey during the execution of a search warrant.  Molina and Vogel, both lawyers, attended the protest as legal observers and wore neon green hats to designate themselves as such.  Defendant Dodge was a supervising lieutenant on the scene.  The other individual Defendants were onboard an armored vehicle deployed to release chemical munitions to disperse protestors.  Police Chief Sam Dotson and Lieutenant Colonel Gerald Leyshock, not parties to this action, were also on the scene.

The record contains several cell phone videos recorded from different vantage points on Page Avenue and an ariel photo of the area.  The image below (ECF No. 171-12) shows Page curving east-west at the top of the photo and Euclid running north-south in the center.  Molina's house is the red pin near the bottom center.  The street to the east of Euclid is Bayard.  To the east out of view are Walton and Marcus Avenues.



Video footage from the early evening shows a crowd of roughly 150 people in the street on Page and over 40 officers spanning across Page at Marcus in a skirmish line facing west toward the crowd.  At 6:55 p.m., the police gave two dispersal orders informing protestors that they were impeding the flow of traffic and would be subject to chemical munitions if they did not disperse west on Page or north or south on side streets. About ten minutes later, the police gave a third dispersal order and deployed inert smoke. By 7:10 p.m., most people were on the sidewalk, and traffic was flowing slowly at the intersection of Page and Walton.  A few stragglers threw rocks, and the officers responded with small munitions as the police line marched west toward Walton chanting "move back."  At 7:12 p.m., the police gave a fourth dispersal order.  By this point, Molina and Vogel were heading west on Page as instructed.

At 7:15 p.m., at the order of Defendant Dodge, an SLMPD armored vehicle known as a Ballistic Engineered Armored Response Counter Attack Truck (the "BEAR") traveled west on Page from the intersection of Walton and Page to Euclid and Page, deploying tear gas.  According to Molina, officers were shooting projectiles at people who were retreating.  ECF No. 171-1 at 23 ("We're not talking about just *into* an area, we're talking about *at* people to hit people.").  Molina and Vogel fled south on Bayard and through an alleyway to Molina's property on Euclid, approximately two and a half blocks (550 feet) south of the intersection of Euclid and Page and even farther (over a block west) from the police line then on Page between Bayard and Walton.

By 7:24 p.m., most of the protestors had dispersed from Page Avenue and scattered in different directions.  The police issued another dispersal order, and Defendant

Dodge instructed Defendant Mayo's team in the BEAR to patrol the area south of Page, while Dodge and other officers in a BearCat tactical vehicle patrolled the area north of Page.[2]   An observer named Heather DeMian, who was recording events and following the BEAR west on Page at that time (from the sidewalk), says on video, "the people have dispersed, and [the police] appear to be chasing them."  DeMian video at 7:00.  When DeMian arrives at the corner of Page and Euclid, the BEAR is out of view headed south on Euclid.  She asks a bystander, "What the f--- are they doing?" to which the bystander replies, "I think they're chasing some people."  *Id*.

By that time (roughly 7:28 p.m.), Molina and Vogel and a few others were standing on the sidewalk in front of Molina's house on Euclid.  Vogel testified that there were also "maybe five to ten" other people on Euclid south of Page at that time.  ECF No. 171-5 at 83.  Molina described her property as a safe meeting place away from the protest site.  ECF No. 171-1 at 25.  The record contains no evidence of prior protest activity at this location.  Molina observed a police helicopter hovering overhead and speculated that they could see Molina's and Vogel's neon green hats and were communicating with officers by radio.  ECF No. 171-1 at 25, 35.  Defendant Mader generally confirmed that police helicopters have the ability to give updates on where people are located.  ECF No. 171-15 at 26.  Defendant Book also knew that legal observers are "the ones with the yellow hats."  ECF No. 171-18 at 12.  Defendant Dodge knew that individuals wearing green hats were legal observers, and he recalled seeing some that day.  ECF No. 171-6 at

---

[2]     The BearCat and its team from St. Clair County, Illinois, were on site to assist. The St. Clair County officers are not named as defendants in this case.

16.  Defendant Dodge was the commander in charge of the helicopter at the time (ECF No. 171-18 at 11) and was the commanding officer who gave the order for the BEAR's patrol down Euclid (ECF No. 171-6 at 16).

Seeing the BEAR approaching and canisters flying toward other people on Euclid, the small group at Molina's property sought cover in the gangway between her house and a neighboring house.  Plaintiffs allege that chemical weapons were deployed directly at them in the space between the houses.  Though neither Vogel nor Molina actually saw canisters released from the BEAR as they were attempting to flee from it, Vogel noticed "the smell of tear gas" and said "the sound that it makes when it comes out started hitting and we had a fog, a cloud of smoke coming up at that point."  ECF No. 171-5 at 92. Vogel recovered one of the canisters from the street.

Around 7:30 p.m., Plaintiff Groce turned south onto Euclid following the BEAR on his bicycle.  He does not recall whether he saw the BEAR deploy tear gas at that time. Groce followed the BEAR to Fountain Park at the end of the street, where the BEAR had stopped.  Groce approached it and told the police to leave the park.  Though Groce claimed not to remember his precise wording, Molina testified that Groce told her that he told the police to "get the f--- out of my park."  ECF No. 171-1 at 32.  Groce was then hit in the hip by what he believed to be a tear gas canister.  Groce believed that the canister came from the BEAR because, he explained, "I was oriented to the BEAR and didn't see anyone else around me.   I felt an impact on my hip, I looked down, I found the object, then the BEAR drove away."  ECF No. 171-10 at 35.

The next day, Officer Nicholas Manasco (not a party) was tasked with writing a report of the day's events.  He met with the officers involved and wrote an After Action Report based on their verbal accounts.[3]  ECF No. 183-5 at 36.  There is no dispute that, as reflected in the report, Defendants Mayo (the sergeant in charge), Mader, Seper, Book, and Wethington were inside the BEAR; Defendants Busso and Coats were on the top; and Officer Chambers was driving.  ECF No. 183-3.  The report further states that Defendant Dodge ordered the officers to deploy chemical munitions and that, as the BEAR traveled south on Euclid, Defendants Busso, Book, and Mader deployed munitions on Euclid south of Page.  Several officers explained in deposition that munitions canisters can be released from one of many portholes of an armored vehicle either by hand or using a launcher.  A small window above each porthole allows an officer to see outside the vehicle, albeit with a limited view.

---

[3]     Defendants assert in a footnote in their reply brief that the After Action Report is inadmissible hearsay that cannot be presented in admissible form at trial. Fed. R. Civ. P. 56(c)(2). When such an objection is made, the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form in which the party anticipates presenting it. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing the advisory committee's notes to Rule 56). Plaintiffs have not had an opportunity to respond because the matter was raised in the reply brief. But Defendants have not identified any factual dispute that depends on the admission of the report itself. The identity of the officers in the BEAR is not in dispute, and Defendants themselves confirmed in deposition that they may have deployed tear gas at the location in question. Thus, the facts stated in the report could be presented in admissible form through the direct testimony of the individual Defendants who provided their accounts of the day's events to Officer Manasco shortly thereafter in preparation of the report. Of course, Plaintiffs can also testify to this fact. Additionally, the facts stated in the report itself may be admissible as a public record under Fed. R. Evid. 803(8). The Court will consider the facts stated in the report to the extent it assists in the Court's determination whether genuine material facts are in dispute.

**Procedural History**

In August 2017, Plaintiffs filed an original complaint against St. Clair County, St. Louis City, and eleven John Doe police officers asserting claims of retaliation in violation of the First Amendment (Count I) and excessive force in violation of the Fourth Amendment (Count II).  The municipal defendants moved to dismiss for failure to state a claim for municipal liability under *Monell*.[4]  ECF No. 11, 17.  This Court granted the motions, reasoning that Plaintiffs did not plead sufficient facts indicating a failure to train and supervise or an unconstitutional policy.  ECF No. 33.

In May 2018, Plaintiffs filed an amended complaint naming the St. Louis Defendants only and asserting claims against the individual officers for First Amendment retaliation (Count I), Fourth Amendment excessive force (Count II), and failure to intervene (Count III) and against the City for municipal liability under *Monell* (Count IV).  ECF No. 36.  At the close of lengthy and contested discovery, Defendants filed the present motion for summary judgment, which is fully briefed and ripe for review.

Defendants assert that they are entitled to summary judgment on the following grounds: (1) Plaintiffs' factual assertions are unsupported and contradicted by the record insofar as Plaintiffs did not actually witness officers fire munitions at them and video evidence does not substantiate their allegations; (2) Plaintiffs cannot identify any individual officer involved in the alleged deployment of chemical munitions and, even

---

[4]     *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

if they could, any deployment was justified because Molina and Vogel failed to

disperse; (3) even if the use of the munitions was not justified, the Defendant officers

are entitled to qualified immunity because Plaintiffs cannot show that Defendants'

conduct violated clearly established law at the time; (4) Neither Molina nor Vogel can

establish that they were actually injured, so any possible recovery should be limited to

one dollar in nominal damages; (5) Plaintiffs' First Amendment retaliation claim fails

because they cannot establish that any Defendant recognized them as participating in

the protest; (6) Plaintiffs' failure-to-protect claim fails because no officer inside the

BEAR could have seen where any other officer was deploying munitions, nor could

they discern whether that officer's actions were justified; and (7) Plaintiffs have not

established sufficient facts to support their *Monell* claim against the City.   Defendants

have also filed a motion to strike certain evidence from the record, as addressed in

Count IV below.  Additional facts are set forth below as relevant to specific claims.

## DISCUSSION

### I. **Applicable Law**

Summary Judgment

Summary judgment is proper when the moving party shows "that there is no

genuine dispute as to any material fact and the movant is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *Clary v. City of Cape Girardeau*, 165 F. Supp. 3d

808, 815 (E.D. Mo. 2016).  In ruling on a motion for summary judgment the court is

required to view the facts in the light most favorable to the non-moving party and must

give that party the benefit of all reasonable inferences to be drawn from the underlying

facts. *Id*. (citing *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987)).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, (1986).  To withstand summary judgment, the non-moving party must set forth affirmative evidence and specific facts, supported by affidavits and other evidence, showing that there is a genuine dispute on a material factual issue. *Holmes v. Slay*, 4:12CV2333 HEA, 2015 WL 1349598, at *3 (E.D. Mo. Mar. 25, 2015) (citing *Anderson*, 477 U.S. at 249).

When opposing parties tell two different stories and one is blatantly contradicted by the record such that no reasonable jury could believe it, a court should not adopt that version of the facts when ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. 248.  The court is required to resolve all conflicts of evidence in favor of the non-moving party. *Moore v. City of Ferguson, Mo.*, 213 F. Supp. 3d 1138, 1143 (E.D. Mo. 2016) (citation omitted).

Based on the foregoing standards, Defendants first argue that they are entitled to summary judgment because the videos and other evidence conclusively refute Plaintiffs' version of events.  Relying on the fact that the DeMian video lacks any clear visual or distinct sound of deployment, Defendants deny that *any* munitions were deployed when the BEAR traveled south on Euclid.  ECF No. 183 ¶51.  Defendants

note that the video captures the noise of a canister being launched from atop the BearCat around the same time (DeMian video at 7:12), yet no sound can be identified as a deployment from the BEAR.  They argue that this forecloses the fact of any deployment.

The Court finds Defendants' reliance on the DeMian video unpersuasive given the totality of circumstances.  The video is blurry even at close range.  It was recorded from Page with a cell phone, at dusk, 550 feet (183 yards) from Molina's house, with a helicopter audible overhead, cars passing, and other noises in the vicinity.  Tree branches hang over the street.  The video simply does not capture events at or near the specific location in question.  The fact that DeMian's cell phone captured the sound of a deployment (allegedly from atop the BearCat as it turned north on Euclid) does not foreclose the possibility that other canisters were deployed near Molina's house, possibly by hand.  *See, Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018) (rejecting defendants' position that dash cam footage was dispositive where the video revealed little of the incident); *Garcia v. City of New Hope*, 984 F.3d 655, 664 (8th Cir. 2021) (reasoning that a blurry video was insufficient to resolve a factual dispute as to whether the officer had probable cause for a traffic stop).  The video does not "blatantly contradict" the facts asserted by Plaintiffs.

Defendants also rely heavily on Groce's statement that he did not recall seeing the deployment of tear gas as he followed the BEAR down Euclid on his bicycle.  But he did not refute the allegation; he only said that he did not specifically recall a deployment at that moment, noting the extraordinary and "bewildering" scene that day.

ECF No. 171-10 at 72.  This is insufficient to remove the factual inquiry from the jury.

Other evidence in the record offers conflicting accounts about what transpired on Euclid.  Molina and Vogel testified that the BEAR shot tear gas directly at them as they fled to the back of Molina's house.  The City's own After Action Report states that Defendant Mader alone deployed a total of seven canisters as the BEAR traveled down Euclid, causing people to run for cover in the gangways "out of sight."  ECF No.  183-3.  The report states that Defendants Busso and Book also deployed tear gas on Euclid south of Page.  Six officers in the BEAR that day (excluding Officer Chambers, who was driving, and Defendant Mayo, who was supervising) testified that they deployed tear gas on the BEAR's patrol route, though most could not say exactly where.  Viewed in the light most favorable to Plaintiffs, this evidence is sufficient to create a triable jury question as to whether and how Defendants deployed tear gas at Molina and Vogel.  Defendants have not established an absence of triable facts on this record.

Qualified Immunity

Qualified immunity shields a government official from suit under § 1983 if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a defendant invokes a claim of qualified immunity, the burden falls on the plaintiff to show that (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right and (2) the right was clearly established at the time of the deprivation.  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1155 (8th Cir. 2014)

(quoting *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010)).  If the answer to either question is no, then the defendant is entitled to qualified immunity. *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 909 (E.D. Mo. 2020) (citing *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010)).

To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would have understood that what he is doing violates that right. *Quraishi v. St. Charles County, Mo.*, 986 F.3d 831, 835 (8th Cir. 2021) (citation omitted).  The state of the law at the time of the alleged violation – articulated by precedent, controlling authority, or a robust consensus of persuasive authority – must give officials fair warning that their conduct was unlawful.  *Id.*  There may also be the rare obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.  *Id.*

## II.  Whether Defendants Had Probable Cause

To prevail on their First or Fourth Amendment claims, Plaintiffs must show that Defendants had no probable cause for their actions.  *Quraishi*, 986 F.3d at 836.  To receive qualified immunity, Defendants need only establish arguable probable cause, which exists even where an officer has a mistaken but objectively reasonable belief that Plaintiffs committed a criminal offense.  *Id.*

Defendants argue that, even if they did launch munitions from the BEAR on Euclid south of Page, such deployment was justified because Molina and Vogel had been part of a "riotous crowd" that had thrown rocks at officers 12 minutes earlier at the corner of Page and Euclid, "just 550 feet away"; they were unlawfully assembled with

six to ten people in front of Molina's house and refused to disperse; and other protestors were still throwing rocks at the BearCat north of Page.  ECF No. 170 at 17-18; ECF No. 171 ¶¶ 30, 49, 53; ECF No. 189.

*Quraishi* is instructive.  There, an officer deployed tear gas at journalists covering the Ferguson protests after the police shooting of Michael Brown.  The officer claimed that there were projectiles coming from the area, but the totality of the evidence did not support his version of the facts.  The trial court concluded that the defendant was not entitled to qualified immunity as to probable cause because there were genuine issues of material fact insofar as the parties' accounts varied widely and the video evidence did not support the defendant's version.  *Quraishi v. St. Charles County, Mo.*, 4:16-CV-1320 NAB, 2019 WL 2423321, at *7 (E.D. Mo. June 10, 2019), *aff'd in part, rev'd in part and remanded*, 986 F.3d 831 (8th Cir. 2021).  The Eighth Circuit affirmed this conclusion.  It noted that there were no projectiles coming from the reporters' location, and it was disputed whether the reporters' location was an unlawful assembly.  Thus, accepting the plaintiffs' version of the facts, the officer "did not have arguable probable cause to use tear gas."  *Quraishi*, 986 F.3 at 836.

Here, it is difficult to say that even Defendants' own description of events establishes arguable probable cause.  Defendant Dodge testified that, in order to comply with a dispersal order, a person must get out of the street to allow the free flow of traffic and, if there is an unlawful assembly, "they need to leave the area altogether.  It's not enough for the group to move two blocks away if you still have the same group blocking the traffic, throwing objects at officers, or looting."  ECF No. 171-6 at 28.

Defendant Mayo's testimony was similar.  ECF No. 171-7 at 14.  By Defendants' own account, however, Molina and Vogel dispersed west on Page and south down side streets as protestors were ordered to do; a few individuals who dispersed from Page ended up at Molina's house two and a half blocks farther down Euclid; and there is no evidence whatsoever that anyone at that location was throwing objects, blocking traffic, or engaging in similar disruptive conduct.  ECF No. 170 at 18.  Thus, according to the standards articulated by Defendants Dodge and Mayo, Plaintiffs had complied with the dispersal order.  Nonetheless, Dodge ordered the BEAR to patrol down Euclid, and Mayo's team deployed chemical munitions there because of conditions existing 12 minutes earlier and/or at a distance of nearly two football fields.  Multiple Defendants inside the BEAR testified that they deployed munitions without knowing exactly where they were or what was happening outside.  These facts belie an objectively reasonable belief of unlawful assembly, mistaken or otherwise.

Moreover, in evaluating probable cause, the Court is not limited to only the Defendants' version of the facts.  *Quraishi*, 986 F.3d 836.  Again, the video evidence does not capture what happened at Molina's house.  *See, Garcia*, 984 F.3d at 664 (blurry video insufficient to establish probable cause).  But ample footage taken from different angles on Page provides a general sense of conditions.  The footage depicts confrontation earlier in the day but a marked dissipation, relative calm, and a significant police presence at the time in question.  When Chief Dotson saw the BearCat turning north on Euclid at that same time (the BEAR already out of view), he exclaimed, "What

the f--- are they doing *chasing them* there?"[5]  ECF No. 171-11 (Video 10 at 2:20).

Chief Dotson ordered them to "disengage" (*Id*. at 2:34) and ordered Defendant Dodge

to call back the BEAR.  ECF No. 171-6 at 19.  Traffic was flowing freely along Page

and side streets at that time.  A few pedestrians are visible on the sidewalks.  Video 10.

Overall, the video footage from Page at that time of the evening totally

contradicts Defendants' characterization of ongoing unlawful assembly or high conflict.

Like *Quraishi*, there are no undisputed facts supporting even a mistaken belief that

Plaintiffs had refused to disperse or were unlawfully assembled (e.g., blocking traffic,

throwing things) 183 yards from Page and even farther from the police line.  *Compare*

*White v. Jackson*, 865 F.3d 1064, 1075-1076 (8th Cir. 2017) (finding arguable probable

cause where a protester heard a dispersal order and chose not to disperse or disassociate

himself from others committing unlawful acts).

Viewing the facts in a light most favorable to Plaintiffs but even still allowing

for reasonable misperceptions by Defendants, the present record does not supply

arguable probable cause entitling Defendants to qualified immunity.  The Court thus

proceeds to the parties' arguments on specific claims in the complaint.

### III.  <u>First Amendment Retaliation (Count I)</u>

"The First Amendment protects a significant amount of verbal criticism and

challenge directed at police officers."  *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th

---

[5]  Plaintiffs infer that Chief Dotson was referring to the BearCat because the BEAR was out of view then and Colonel Leyshock responded by ordering the BearCat to return to the police line.  ECF No. 183; ECF No. 171-11 (Video 10 at 2:22); ECF No. 171-6 at 18-19.

Cir. 2017) (quotations omitted).  "Indeed, criticism of public officials lies at the very core of speech protected by the First Amendment."  *Id*.  To prevail on a claim of First Amendment retaliation, Plaintiffs must show that (1) they engaged in constitutionally protected activity; (2) Defendants took adverse action that would chill a person of ordinary firmness from continuing in the activity; and (3) Defendants' actions were motivated in part by Plaintiffs' exercise of their constitutional rights.  *Eggenberger v. W. Albany Twp.*, 820 F.3d 938, 943 (8th Cir. 2016) (citations omitted).  In their complaint, Plaintiffs essentially claim that Defendants shot tear gas at them because they had been part of the protest on Page criticizing the police for the death of Mansur Ball-Bey.  Plaintiffs further suggest that Molina and Vogel were singled-out as legal observers and that Groce was targeted for telling the police to get out of Fountain Park.

In support of their motion for summary judgment, Defendants assert that Plaintiffs have failed to establish that Defendants recognized them as protestors and acted with retaliatory motive.  By this argument, Defendants seem to imply that, on the contrary, they shot canisters at individuals whom they believed had nothing to do with the protests.  Defendants' position is illogical and also untenable on the present record. While Defendants are correct that bare allegations of retaliatory animus cannot withstand summary judgment, *Green v. Nocciero*, 676 F.3d 748, 753 (8th Cir. 2012), Defendants themselves admit that Molina and Vogel were among the protestors on Page and were standing with a few of them in front of Molina's house when the BEAR passed on patrol.  Molina and Vogel stood out in neon hats.  The evidence is unclear whether Defendants other than Dodge knew the hats to signify legal observers, some of

16

whom were recording events.  However, in one of the videos taken from the police line, legal observers are close enough to read the words National Lawyers' Guild on their distinct hats.  Defendants Mayo and Busso acknowledged that they had seen some protestors wearing the hats, and Defendant Book testified that he knew that legal observers were "the ones with the yellow hats."  Viewed in the light most favorable to Plaintiffs, the evidence permits an inference that Defendants recognized Molina and Vogel as legal observers.  In the very least, the jury could reasonably infer that Defendants believed the individuals at Molina's house to be protestors dispersed from Page, as this is precisely Defendants' cited justification for deploying tear gas at them. ECF No. 170 at 18.

With respect to retaliatory motive, Plaintiffs rely on *Peterson v. Kopp*, 754 F.3d 594 (8th Cir. 2014), where the Eighth Circuit instructed that the "causal connection" (i.e., retaliatory motive) is generally a jury question unless it is so free from doubt as to justify taking it from the jury.  *Id*. at 603.  On this inquiry, a jury could find notable that officers cheered and clapped when smoke was deployed at protestors (Video 8 at 13:32), or that some Defendants might have recognized Plaintiffs as legal observers. Again, at the least, Defendants assumed that Plaintiffs were among the protestors who dispersed from Page.  ECF No. 170 at 18.  Viewed in Plaintiffs' favor, the Court finds the totality of the record sufficient to create a jury question as to Defendants' retaliatory motives in deploying tear gas at Molina and Vogel from an armored vehicle, while Plaintiffs were peaceably standing on the sidewalk, 183 yards away from and 12 minutes after the protest scene at Page.  *Quraishi*, 986 F.3d at 838 (holding,

"Anderson's motive is not so free from doubt as to justify taking it from the jury.")
(quotations omitted).

From here, Defendants argue that they are nonetheless entitled to qualified
immunity because their conduct did not violate clearly established law.  But
Defendants' briefing fails to articulate any contours of First Amendment precedent at
the time.  While this case was pending, the Eighth Circuit issued its opinion in
*Quraishi*.  There, after finding that the officer lacked arguable probable cause to believe
that the plaintiffs were engaged in any unlawful conduct, the trial court went on to
conclude that the officer was not entitled to qualified immunity because, in 2014, a
reasonable police officer would know that shooting tear gas at journalists was a
violation of the First Amendment.  *Quraishi*, 2019 WL 2423321, at *7.  In affirming the
denial of qualified immunity on that claim, the Eighth Circuit noted that the reporters
appeared to have been singled-out, suggesting a retaliatory motive.  *Quraishi*, 986 F.3
at 838.  Though there existed no prior case directly on point, the Circuit noted generally
that a citizen's right to exercise First Amendment freedoms without facing retaliation
from government officials is clearly established, and an exact match is not necessary
when an issue is "beyond debate."  *Id*. at 838 (collecting cases).  *See, e.g., Hartman v.
Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First
Amendment prohibits government officials from subjecting an individual to retaliatory
actions … for speaking out."); *Peterson*, 754 F.3d at 603 (denying immunity to an
officer who pepper-sprayed a citizen who asked for the officer's badge number);
*Walker v. City of Pine Bluff*, 414 F.3d 989 (8th Cir. 2005) (denying immunity to an

officer who arrested a civil rights attorney observing a traffic stop).

To be sure, the facts before the Eighth Circuit in *Quraishi* were compelling insofar as the plaintiffs were journalists.  However, the supporting precedent cited in the Circuit's decision and other precedent pre-dating August 2015 confirms that First Amendment applies with equal force to citizens exercising their rights to criticize police conduct.  This, too, is beyond debate.  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action … is one of the principal characteristics by which we distinguish a free nation from a police state.").

Again retreating to their "justification" argument, Defendants suggest a scenario where protestors refused to disperse, lingered nearby, and unlawfully reassembled minutes later in another location.[6]  But viewing the evidence in a light favorable to Plaintiffs, there is nothing to suggest that this occurred here.  Video footage of Page and Euclid depicts a calm scene at that time and captures three witnesses, including Chief Dotson, describe what they saw on Euclid as the police "chasing" protestors.  Molina and Vogel had complied with police orders to disburse west and down the side streets, and were quite distant from the scene of the protest, simply standing on the sidewalk

---

[6]     Defendants cite *Abdullah v. County of St. Louis, Mo.*, 52 F. Supp. 3d 936, 943 (E.D. Mo. 2014), discussing Missouri's failure-to-disperse statute.  *See* Rev. Stat. Mo. § 574.060; *State v. Mast*, 713 S.W.2d 601 (Mo. App. E.D. 1986) (holding that people who are present and cognizant of the unlawful acts of other protestors can be guilty of unlawful assembly if they refuse to depart from the scene).  As previously discussed in the context of probable cause, Defendants' own characterization (ECF No. 170 at 18) belies their assertion that Plaintiffs refused to disperse or reassembled unlawfully at Molina's house.

outside Molina's house, when Defendants rolled down the street in an armored vehicle releasing tear gas.  A reasonable jury could infer from the record that Molina and Vogel stood out in their neon hats.  A reasonable officer would have understood that "chasing" after and deploying tear gas at legal observers and peaceful protestors who complied with a dispersal order and retreated to a sidewalk far away from an earlier assembly is impermissible.  Absent a showing of even arguable (mistaken) probable cause to believe that there was an unlawful assembly at Molina's house, Defendants have not established that they are entitled to qualified immunity on the First Amendment claims of Molina and Vogel.  *Quraishi*, 986 F.3d at 839.

Groce's First Amendment claim is even simpler.  Viewed in Groce's favor, the evidence reflects that Groce approached the BEAR in Fountain Park and told the officers to leave, in response to which Groce was shot in the hip with a canister.  There is no evidence suggesting that Groce was armed or otherwise presented any threat to Defendants inside their armored vehicle.  The law was settled, in August 2015, that the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for speaking out.  *Thurairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 985 (8th Cir. 2019) (citing *Hartman*, 547 U.S. at 256).  Criticism of law enforcement officers, even with profanity, is protected speech.  *Thurairajah*, 925 F.3d. at 985 (citing *City of Houston*, 482 U.S. at 461).  Defendants supply no facts or analysis suggesting they had probable cause to react to or limit Groce's speech, and the Court finds none in the record.  *Cf., Virginia v. Black*, 538 U.S. 343 (proscribing speech likely to incite violence).

Rather, Defendants' only argument in defense of Groce's First Amendment claim is that Groce cannot establish which officer shot at him.  As Defendants advance this theory with respect to all three Plaintiffs on all of their claims against the individual Defendants, the Court now proceeds to that theory.

<u>Identity of Officers</u>

Defendants assert that they are entitled to summary judgment on Counts I-III because Plaintiffs fail to identify which officers were directly involved in and responsible for the alleged deployment of munitions.  Plaintiffs counter that they need not establish which Defendant did what at this stage but only that sufficient evidence exists for a jury to find any of them responsible or at least collusive.

Defendants note that "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).  *Wilson* involved a First Amendment retaliation claim, albeit factually dissimilar.  In that case, the plaintiff claimed that municipal officials retaliated against her for complaining about a drainage ditch near her property by extending it onto the property and failing to maintain it.  The Eighth Circuit directly addressed the question of "which individual defendants were responsible" and concluded that the defendants for whom the evidence lacked any indication of involvement or knowledge were entitled to summary judgment, but the defendants who were either directly involved in allegedly retaliatory conduct or aware of such conduct and did nothing were not entitled to summary judgment. *Id.* at 591-592.

Defendants also rely on the Fourth Amendment case *White v. Jackson*, which states, "To prevail on a § 1983 claim, a plaintiff must establish each individual defendant's personal involvement in the alleged violation."  865 F.3d at 1081 (citing *Wilson*, 441 F.3d at 591, and *Dahl v. Weber*, 580 F.3d 730, 733 (8th Cir. 2009)).  But *White* does not support Defendants' position.  There, as here, the officers' own testimony confirmed their involvement in the incident in question, but the parties disputed whether the officers used excessive force, and the plaintiff could not identify which officer(s) allegedly beat him.  The officers asserted the same theory Defendants advance here, namely that the plaintiff could not establish any particular defendant's personal liability for his injury.  The Eighth Circuit rejected this argument, instructing that a plaintiff need not "be able to personally identify his assailants to avoid summary judgment."  *Id*.  Rather, it is sufficient that some evidence identifies the officers who participated.  *Id*.  The Circuit also noted that an officer who was not personally involved still may be liable for failing to intervene if (1) he was aware of the violation and (2) the duration was sufficient to permit an inference of tacit collaboration.  *Id*.  *See also Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (recognizing liability for failure to intervene when an officer knew of excessive force and had both the opportunity and the means to prevent harm).[7]

Defendants further rely on *Burbridge v. City of St. Louis, Mo.*, 430 F. Supp. 3d 595 (E.D. Mo. 2019), where a named defendant and unidentified officers used pepper

---

[7]      *White* and *Nance* involved the use of significant physical force not present here.

spray on a non-party, causing a residual effect on a plaintiff.  The trial court granted summary judgment for the defendants because the plaintiffs offered no evidence that the named officers used force against that plaintiff or that the spray delivered by any of them was what affected her.  These facts are clearly distinguishable.  *Burbridge* involved unknown officers and secondary exposure.  The present case involves identified officers who, according to their own testimony, either ordered the deployment, deployed canisters themselves, assisted with the deployment, or at least were aware of it and did nothing.  Consistent with *Wilson* and *White*, the Court finds the evidence sufficient to survive summary judgment.

Plaintiffs cite deposition testimony implicating each Defendant officer in some manner.  Defendant Dodge ordered the BEAR to launch gas to disperse protestors that day and specifically ordered the BEAR's patrol south of Page.  Dodge ordered the Euclid patrol on his own initiative (ECF No. 171-6 at 16), which Chief Dotson clearly and vehemently opposed.  Defendant Mayo was the commanding officer in the BEAR. He did not deploy munitions but heard other officers do so from atop the BEAR, although he could not recall where.  Defendants Coats and Busso were positioned atop the BEAR.  Busso was in the "hatch," and Coats was in the "overwatch" position to see into the crowd.  ECF No. 171-20 at 14-15, 17.  Both deployed munitions that day. Coats had a launcher, which he described as fairly accurate at short range (10-30 yards). ECF No. 171-20 at 21-22.  He remembered that the BEAR traveled down Euclid but, from the overwatch position where he could see into the street, he did not deploy munitions there himself.  ECF No. 171-20 at 14-15.  Defendants Mader, Seper, Book,

23

and Wethington stated that they deployed munitions from the BEAR that day and were part of the patrol when it passed Molina's house.  The inside of the vehicle is an open space, permitting coordination among officers.  They all had access to munitions and at least one launcher inside the vehicle.  There are multiple portholes from which munitions can be deployed by hand or using a launcher, with windows above each porthole.  Three portholes faced Molina's house on the right side of the vehicle as it traveled south on Euclid.  The After Action Report states that multiple canisters were deployed on Euclid, causing people to run for the gangways.  ECF No. 183-3.  The report suggests that Defendants Busso, Book, and Mader may have deployed canisters from that location.  Mader testified that canisters were in buckets in the floorboard of the BEAR that day and they deployed them by hand from the porthole.  ECF No. 171-15 at 20.  Only Defendant Coats could specifically recall that he did not deploy munitions on Euclid from the overwatch position, but he was uniquely positioned to see the area and assess whether any unlawful assembly was occurring.

Though Plaintiffs cannot specifically identify which officer(s) directed canisters at them, the Court finds the foregoing evidence sufficient to create a triable fact as to each officer's involvement in or awareness of the alleged constitutional violation. Stated inversely, applicable precedent does not support Defendants' position that Plaintiffs are required to establish each officer's tactical role inside an armored vehicle in order to survive summary judgment.  *White*, 865 F.3d at 1081.

For all of the foregoing reasons, the Court concludes that Defendants are not entitled to summary judgment or qualified immunity on Plaintiffs' First Amendment

claims.

## IV.  <u>Fourth Amendment Excessive Force (Count II)</u>

For Count II, Plaintiffs claim that Defendants seized them using excessive force and without probable cause, as Plaintiffs had dispersed in compliance with police orders, were not committing any crime, posed no threat, and were not resisting arrest when Defendants used chemical munitions against them on Euclid and in Fountain Park, well after and away from the protest scene.

In support of their motion for summary judgment on this count, Defendants assert that Molina and Vogel suffered no actual injury, and Defendants are entitled to qualified immunity because their conduct did not violate clearly established law at the time.  The Court need not address the nature of Plaintiffs' injuries because that argument is premature at this stage,[8] and because the Court concludes that Defendants are entitled to qualified immunity on this claim.

To defeat the defense of qualified immunity in a Fourth Amendment excessive force context, Plaintiffs must demonstrate that their right to be free from Defendants' particular use of force was clearly established at the time of the incident.  *Shelton v. Stevens*, 964 F.3d 747, 753 (8th Cir. 2020).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*. (quoting *Malley v.*

---

[8]     The cases cited by both parties demonstrate that the issue of damages is premature at the summary judgment stage.  *See e.g., Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 552-553 (8th Cir. 2013) (affirming the district court's denial of remittitur of the jury's award); *Corpus v. Bennett*, 430 F.3d 912, 915 (8th Cir. 2005) (affirming the district court's reduction of the jury's damage award to one dollar).

*Briggs*, 475 U.S. 335, 341 (1986)).  Even where an officer's action is deemed

unreasonable under the Fourth Amendment, he is entitled to qualified immunity if a

reasonable officer could have believed (even mistakenly) that the use of force was

permissible." *Id*. (quoting *Anderson*, 483 U.S. at 643).  Use of excessive force is an area

of the law in which the result depends very much on the facts of each case.  *Id*.  While

there does not have to be a case directly on point, existing precedent must place the

lawfulness of the particular action beyond debate.  *Id*.  "A plaintiff need not show that

the very action in question has previously been held unlawful, but [she] must establish

that the unlawfulness was apparent in light of preexisting law."  *Burnikel v. Fong*, 886

F.3d 706, 712 (8th Cir. 2018) (quoting *Anderson*, 483 U.S. at 640).

  *Quraishi* is controlling and dispositive.  There, although the officer's alleged use

of tear gas at reporters without probable cause would clearly violate the First

Amendment, the Eighth Circuit held that it was not clearly established that the officer's

acts constituted a seizure under the Fourth Amendment.  As such, the officer was

entitled to qualified immunity on that claim.  *Quraishi*, 986 F.3d at 839-840.  To

establish a Fourth Amendment violation, the claimant must demonstrate that a seizure

occurred.  *Id*. at 839.  To be seized, a reasonable person would have believed that he

was not free to leave.  *Id*.  Even viewed in the light most favorable to Plaintiffs, the

evidence does not suggest that Plaintiffs Molina and Vogel were seized.  Like the

plaintiffs in *Quraishi*, they merely felt the effects of the tear gas without suffering any

corporal impact.

  Although Groce was actually hit by a flying canister and sustained a bruise to the

hip, ultimately the conclusion is the same.  A seizure requires the use of force with intent to restrain, as opposed to force applied by accident or for some other purpose. *Torres v. Madrid*, 2021 WL 1132514 (U.S. Mar. 25, 2021), 592 U.S. ___ (2021) (holding that a seizure occurred where a subject evaded apprehension by officers who shot her).  The appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain.  *Id.*  Absent an intent to terminate a subject's freedom of movement, there is no seizure.  *Johnson v. City of Ferguson, Mo.*, 926 F.3d 504, 506 (8th Cir. 2019) (en banc) (finding no seizure without verbal or physical impediment to movement or submission to authority).  Groce does not allege that Defendants attempted to seize him, and the record reflects no such intent by Defendants.  Even if the record did contain allegations or evidence of a failed attempt constituting a seizure under *Torres*, it was not clearly established in 2015 that Defendants' actions would have constituted a seizure at that time.  *Torres*, 2021 WL 1132514, at *10.  Therefore, consistent with *Quraishi*, this Court must conclude that Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment claims.[9]

---

[9]     In a footnote, Plaintiffs attempt to distinguish *Quraishi* insofar as the plaintiffs there characterized the officer's conduct as a seizure rather than excessive force.  ECF No. 197 at 2.  But Plaintiffs' own complaint states that they were seized by an unreasonable use of chemicals.  In a Fourth Amendment context, force is examined as an aspect of the seizure.  *See e.g., Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("The determination whether the force used to effect a seizure was reasonable ultimately requires a case-specific balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.")

## V.  Failure to Intervene (Count III)

An officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment. *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015).  While the Eighth Circuit recognizes an officer's duty to intervene to prevent excessive force in violation of the Fourth Amendment, there is no clearly established law creating a duty to intervene to prevent other constitutional violations.  *Hess v. Ables*, 714 F.3d 1048, 1052 (8th Cir. 2013); *Zorich v. St. Louis County*, 4:17-CV-1522 PLC, 2018 WL 6621525, at *24 (E.D. Mo. Dec. 18, 2018).  As Plaintiffs' claim for failure to intervene is entirely dependent on their predicate Fourth Amendment claim, Defendants are entitled to qualified immunity on this count as well.

## VI.  Municipal Liability for First Amendment Retaliation (Count IV)[10]

Liability for an officer's constitutional violation may attach to the City if it resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.  *Garcia*, 984 F.3d at 670.

In order to prove a municipal custom, Plaintiffs must demonstrate: (1) a continuing, widespread, persistent pattern of unconstitutional misconduct; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's

---

[10]    To the extent Plaintiffs assert a claim for municipal liability under the Fourth Amendment, that claim fails with the grant of summary judgment for the individual Defendants on Counts II and III.  *Corwin v. City of Indep., Mo.*, 829 F.3d 695, 700 (8th Cir. 2016) ("In order for municipal liability to attach, individual liability first must be found on an underlying substantive claim.").  As such, the Court's analysis here focuses on Plaintiffs' claims under the First Amendment.

policymaking officials after notice of the misconduct; and (3) that the plaintiff was injured as a result of the custom. *Moore*, 213 F. Supp. 3d at 1146.

The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388-389 (1989). A plaintiff must show that the defendant had notice that its procedures were inadequate and likely to result in a violation of constitutional rights. *Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991).

In Count IV, Plaintiffs assert that the SLMPD had a custom of deploying chemical munitions against protestors and observers in retaliation and suppression of speech critical of law enforcement. Plaintiffs cite approximately 15 other incidents between 2012 and 2017 when SLMPD officers deployed tear gas at non-violent protestors. Plaintiffs thus contend that City officials knew about a widespread pattern of retaliatory use of chemical munitions to chill protected speech, and that such officials either were deliberately indifferent to such conduct or explicitly authorized it.[11]

As a preliminary matter, Defendants move to strike certain evidence obtained in other § 1983 cases filed in this district, which Plaintiffs offer in support of their claim that the City has a custom and practice of misusing chemical munitions against peaceful

---

[11]     Post-incident evidence is admissible to prove the existence of a municipality's customs at the time in question. *See Whitt v. City of St. Louis*, 4:18-CV-1294 RLW, 2020 WL 7122615, at *7 (E.D. Mo. Dec. 4, 2020) (collecting cases).

protestors.  ECF No. 191.  Four exhibits come from *Ahmad v. City of St. Louis, Mo.*,
4:17 CV 2455 CDP, 2017 WL 5478410 (E.D. Mo. Nov. 15, 2017).[12]  One is an excerpt
of the hearing testimony of Officer Timothy Sachs concerning the City's policy on the
use of chemical munitions and the deployment of them at the Stockley protests.  ECF
No. 183-7.  Another is an excerpt of the hearing testimony of Officer Brian
Rossomanno discussing how officers determine whether an assembly is unlawful.  ECF
No. 183-8.  The third is an excerpt of the hearing testimony of a citizen, Keith Rose,
describing his experience being pepper sprayed while serving as a legal observer at
numerous protests between October 2014 and September 2017.  ECF No. 183-15.  The
fourth is the full deposition of Colonel Lawrence O'Toole, exploring a wide range of
issues such as training, policies on the use chemical agents, unlawful assembly and
crowd management, and incident review.  ECF No. 183-25.  Additionally, Plaintiffs
offer the declaration of a citizen, Suzanne Brown, submitted in *Templeton, et al. v.
Dotson et al.*, 4:14-cv-2019-CEJ (E.D. Mo.), describing an event where, as a legal
observer, she witnessed police officers pepper-spray protestors on November 25, 2014.
ECF No. 183-11.

Defendants move to strike these exhibits because (1) Plaintiffs failed to disclose
their intent to rely on these witnesses under Rule 26(a); (2) Defendants' counsel was

---

[12]    On September 15, 2017, St. Louis police officer Jason Stockley was acquitted of
murder for the death of Anthony Smith, prompting several protests in the days that
followed.  *State of Missouri v. Stockley*, Missouri 22nd Circuit, Cause No. 1622-CR2213-
01.  *Ahmad* examines the City's actions taken against protestors in the wake of that
verdict.

not present for the testimony; and (3) Defendants did not consent to the use of these materials in this case.  Defendants urge the Court to exclude these exhibits as a discovery sanction under Rule 37(c)(1).  Plaintiffs counter in pertinent part that (1) these witnesses were indeed disclosed as part of Plaintiffs' Rule 26(a) disclosures (ECF No. 193 Ex. 1 and 2); (2) the City was a party in *Ahmad* and *Templeton* and the same City Counselor represented the City in *Ahmad*; and (3) the evidence submitted can be presented in an admissible form at trial.

The Court does not find a discovery sanction warranted here, as the names of these witnesses appear on Plaintiffs' disclosures, and will deny the request on this ground.  ECF No. 193, Ex. 1 and 2.  With regard to whether the Court may rely on the evidence at this stage, the Court notes that Defendants do not argue that the evidence could not be presented in admissible form, i.e., through the direct testimony of the witnesses in question, or under Rule 804,[13] or, with regard to some of the exhibits, as statements of a party opponent (Rule 801).  The Court will therefore consider this evidence as relevant to Count IV.

In support of their motion for summary judgment, Defendants emphasize that, at the time of the protest, the City had in effect a Use of Force policy stating that "Officers will use the least amount of force reasonably necessary to accomplish their lawful objectives while safeguarding their own lives and the lives of others."  ECF No. 171-21.

_____

[13]     If the declarant is unavailable, former testimony is admissible when given in a case where the party against whom it is offered had an opportunity and similar motive to develop it.  Fed. R. Evid. 804(b)(1).

It states that "chemical agents will not be used for the purpose of frightening or punishing individuals for exercising their constitutional rights." *Id*. at 50.  It further instructs that chemical agents should not be used to disperse groups engaging in non-criminal activity unless a warning is issued, individuals are given the chance to heed it, the impact on compliant individuals is minimized, and safe egress is announced and ensured.  *Id*. at 50-51.  The City adopted this policy in March 2015 – at least four months before the events at issue here – in connection with a settlement agreement in another civil rights case in this district:  *Templeton, et al. v. Dotson, et al.*, Case No. 4:14-CV-2019 CEJ.  *See Ahmad*, 2017 WL 5478410, at *7.

Major Eric Larson stated by affidavit in this case that all officers receive a copy of the Use of Force policy during their training and are also required to acknowledge it monthly through an electronic system.  ECF No. 171-21 at 1.  But numerous Defendants in this case stated in their depositions that they did not actually receive training as to when it was appropriate to use chemical munitions in a protest, and the electronic acknowledgment could be completed in a matter of seconds without actually reviewing the policy.  Plaintiffs thus assert that, notwithstanding the existence of a written policy, there is a widespread pattern and custom by City police officers to deploy chemical munitions unlawfully against protestors critical of law enforcement.

Plaintiffs submit more than a dozen sworn declarations and excerpts of deposition testimony by witnesses, including some legal observers, describing allegedly retaliatory and excessive chemical munition deployments on several occasions before and after August 19, 2015.  ECF 183, Ex. 9 through 23.  Plaintiffs also submit internal

SLMPD emails in an effort to depict a hostile culture and establish that supervisory

staff knew of the problem and failed to conduct reviews or take other appropriate

action.  ECF No. 199-2 at 82 (email from Sgt. Rossomano, dated August 27, 2015,

stating, "the DOJ is not your friend in this.  I'll try to send you a report from one of our

protests in a bit so you can see how we write the narrative."); ECF No. 199-2 at 40

(email from Sgt. Rossomanno, dated November 12, 2014, stating that superiors' jobs

are to "protect the troops from the protestors and to protect our troops from

themselves"); ECF No. 199-2 at 75 (after a protest in December 2014, an officer's

email stating, "[W]e were very lucky the crowd was a bunch of cowards or we would

not have been able to deter them.").

Plaintiffs allege that the City provides little to no training on the circumstances in

which munition deployment against protestors is appropriate.  Lieutenant Colonel

Lawrence O'Toole, in his deposition in *Ahmad*, could not identify any written materials

provided to officers explaining when it is appropriate to use chemical agents consistent

with the requirements of City policy on chemical agents.  ECF 183-25 at 55.  Notably,

there is no training about how long and how far a legitimate use of chemical munitions

may persist.  ECF No. 183-17.

Plaintiffs also rely on *Ahmad*, where the trial court reviewed police officers'

conduct and the City's practices in the fall of 2017 and found sufficient evidence of

unconstitutional conduct and underlying customs to warrant preliminary injunctive relief.

*Ahmad*, 2017 WL 5478410, at *3 ("Sachs testified that he could not say 'exactly how far

would be enough to comply with this, or any dispersal order… A tactical vehicle

eventually deployed chemical munitions at the group."); *Id.* at 15 ("plaintiffs presented testimony… of witnesses who reasonably thought they had complied with the dispersal order by moving further down the street because the order did not indicate how far they should disperse"). The facts discussed at length in *Ahmad* confirm Plaintiffs' evidence before and after August 2015 and are consistent with other evidence in the present record.[14]

The testimony of the Defendant officers in this case further supports Plaintiffs' position. Defendant Book testified that he had worked more protests than he could count, but he was not familiar with the City's policy regarding chemical munitions (adopted after *Templeton*) or the *Ahmad* preliminary injunction order, and he had "no idea" how far a group would need to go in order to comply with a dispersal order. ECF 171-18 at 26. Similarly, Defendant Seper testified that he had received no training about unlawful assembly and dispersal orders. He had worked a lot of protests but did not know about the City policy or the *Ahmad* order; he described a "crowd" as "just several people"; and he could not articulate how far a person would need to go to be dispersed and disassociated from such a crowd. ECF 171-16 at 18-19. Defendant Mayo, the sergeant in charge of the BEAR at the time of the Euclid patrol, testified that he had not had any specific training on unlawful assembly, the First Amendment, or the use of chemical

---

[14]     As previously addressed on Defendants' motion to strike, certain witness statements from the *Ahmad* case are spread upon the record here and the Court considers them on this motion. ECF No. 183, Exhibits 7, 8, 11, 15, and 25. Evidence from events after 2015 is relevant to the determination whether the City had a particular pattern, practice, or custom at the time of the alleged violation. *See, Whitt v. City of St. Louis*, 2020 WL 7122615, at *7 (E.D. Mo. Dec. 4, 2020) (collecting cases).

munitions.  ECF No. 171-7at 20-21.  Defendant Wethington likewise testified that he did not recall attending any specific trainings on protests, the First Amendment, or the use of chemical munitions.  ECF No. 171-2 at 8, 23.

Plaintiffs also assert that the City does not conduct meaningful incident reviews of the uses of chemical munitions against protestors from a constitutional standpoint.  ECF No. 183-27 (discovery response confirming that the City does not generate any critical incident reviews regarding protests).  In the after-action meeting following August 19, 2015, the only take-away that Defendant Dodge recalled for future improvement was that the police line was upwind of the protestors such that smoke and gas blew back on the officers.  ECF 171-6 at 22.  When asked in deposition if he would do anything differently, he said they should have arrested more people at the beginning.  *Id*. at 30.

The Court recognizes that Plaintiffs' witness declarations are not dispositive as to the lawfulness of police actions in each instance and that *Ahmad* was decided on its specific facts.  But the existence of a municipal custom is a fact question for the jury. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  Viewing the totality of evidence in the present record in a light most favorable to Plaintiffs, a jury could find that the City's customs and practices permit officers to deploy chemical munitions in an indiscriminate and retaliatory manner in violation of citizens' First Amendment rights. Because genuine issues of material fact must be resolved by a jury, the City is not entitled to summary judgment on Count IV as it relates to Plaintiffs' First Amendment claims.

## CONCLUSION

Genuine issues of material fact preclude summary judgment on Plaintiffs' claims of First Amendment retaliation by the Defendant officers and corresponding municipal liability for the City.  However, on Plaintiffs' Fourth Amendment claims of excessive force and failure to intervene, Defendants are entitled to qualified immunity because their conduct did not constitute a seizure according to clearly established law at the time of the protest, and accordingly the City bears no municipal liability on those claims.

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **DENIED** on Count I and **GRANTED** on Counts II and III.  As to Count IV, the motion is **DENIED** as it relates to Plaintiffs' First Amendment claims on Count I and **GRANTED** as it relates to Plaintiffs' Fourth Amendment claims on Counts II and III. ECF No. 169.

**IT IS FURTHER ORDERED** that Defendants' motion to strike Plaintiffs' exhibits (ECF No. 183, Exhibits 7, 8, 11, 15, and 25) is **DENIED**.  ECF No. 191.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March 2021.

36